IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Titan Consortium 1, LLC,

               *Petitioner*,

    v.

The Argentine Republic,

               *Respondent*.

**Civil Action No. _____**

### Petition to Enforce Arbitral Award

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Titan Consortium 1, LLC,

                    *Petitioner*,

        v.

The Argentine Republic,                              **Civil Action No. _____**

                    *Respondent*.

_____

**Declaration of Matthew S. Rozen in Support of Petition to Enforce Arbitral Award**

Pursuant to 28 U.S.C. § 1746, I, Matthew S. Rozen, declare as follows:

1.      I am an attorney and am admitted to practice law in the District of Columbia and Virginia.  I represent Petitioner Titan Consortium 1, LLC in this matter.

2.      I am over the age of eighteen and make this declaration from personal knowledge based on information reviewed and/or referenced herein.

3.      This declaration is submitted in support of the Petition to Enforce Arbitral Award filed today by Petitioners.

4.      Attached hereto as Exhibit A is a certified copy of the arbitral award rendered on July 21, 2017 in ICSID Case No. ARB/09/1 in the arbitration proceeding between Claimants Teinver S.A., Transportes de Cercanías S.A., and Autobuses Urbanos del Sur S.A., and Respondent, the Argentine Republic.

5.      Attached hereto as Exhibit B is a certified copy of the Decision on Respondent's Application for Annulment issued in the arbitration proceeding on May 29, 2019.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 23, 2021
Washington, DC

Matthew S. Rozen

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Titan Consortium 1, LLC,

              *Petitioner*,

    v.

The Argentine Republic,

              *Respondent*.

**Civil Action No. _____**

**Declaration of Matthew S. Rozen in Support of Petition to Enforce Arbitral Award**

# EXHIBIT A

**ICSID**

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### TEINVER S.A., TRANSPORTES DE CERCANÍAS S.A. AND AUTOBUSES URBANOS DEL SUR S.A.

### V.

### ARGENTINE REPUBLIC

### (ICSID CASE NO. ARB/09/1)

I hereby certify that the attached documents are true copies of the English version of Tribunal's (i) Award dated July 21, 2017, and Dissenting Opinion of Dr. Kamal Hossain attached to the Award; and (ii) Decision on Jurisdiction dated December 21, 2012 and Dissenting Opinion of Dr. Kamal Hossain attached to the Decision. The Decision on Jurisdiction and the separate opinions form integral part of the Award.

A certified copy of the Award was first dispatched to the parties on July 21, 2017. Therefore, pursuant to Article 49(1) of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, the Award is deemed to have been rendered on July 21, 2017.

Gonzalo Flores
Acting Secretary-General

Washington, D.C., August 20, 2021

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES
WASHINGTON, D.C.**

IN THE PROCEEDING BETWEEN

Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.
(CLAIMANTS)

and

The Argentine Republic
(RESPONDENT)

(ICSID Case No. ARB/09/1)

_____

AWARD

_____

*Members of the Tribunal*
Judge Thomas Buergenthal, President
Henri C. Alvarez, Q.C., Arbitrator
Dr. Kamal Hossain, Arbitrator

*Secretary of the Tribunal*
Mrs. Mercedes Cordido-Freytes de Kurowski

*Date of Dispatch to the Parties: July 21, 2017*

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

## REPRESENTATION OF THE PARTIES

*Representing Claimants*

Mr. Roberto Aguirre Luzi
Mr. R. Doak Bishop
Mr. Craig S. Miles
Ms. Silvia Marchili
Mr. Jorge Mattamouros
Mr. Esteban Leccese (until September 2016)
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002

*Representing Respondent*

Dr. Bernardo Saravia Frías
Procurador del Tesoro de la Nación
Argentina
Posadas 1641
C1112ADC, Buenos Aires
Argentina

# TABLE OF CONTENTS

I.  INTRODUCTION AND PARTIES ................................................................................1

II.  PROCEDURAL HISTORY .......................................................................................1

A.  Registration of the Request for Arbitration .................................................1

B.  Constitution of the Tribunal...........................................................................2

C.  Written and Oral Phases of the Proceeding .................................................3

D.  General overview of the Claim and Counterclaim ....................................31

   1.  Claimants' Claim and Prayer for Relief..............................................31

   2.  Respondent's Counterclaim and Prayer for Relief .............................33

III.  PRELIMINARY ISSUES RELATED TO THE IDENTITY OF CLAIMANTS ..................34

A.  Claimants' Ownership of the Airlines .........................................................34

B.  Claimants' Insolvency and Current Status..................................................37

C.  Evidentiary Issues Related to Claimants......................................................39

IV.  ISSUES OF ADMISSIBILITY AND STANDING NOT ADDRESSED IN THE DECISION
ON JURISDICTION...............................................................................................40

A.  King & Spalding's Power of Attorney to appear in this dispute .............40

   1.  The Parties' Arguments ......................................................................40

   2.  The Tribunal's Analysis ......................................................................44

   The Application of Spanish law......................................................................44

   The Relevance of the Burford Funding Agreement.........................................56

B.  Claimants' Alleged Lack of Standing.........................................................59

C.  Other Issues of Admissibility......................................................................62

D.  Claimants' Investment in the Airlines, 2001 - 2008 .................................66

   1.  Claimants' Investment in the Airlines ................................................67

   History of the Airlines, the 2001 Auction of Interinvest and the Share Purchase
Agreement......................................................................................................67

   Air Comet's Performance under the Share Purchase Agreement ....................69

     SEPI's Payment of USD  300 million for the Cancellation of Debts ..........71

     SEPI's Payment of USD 248 million for Air Comet's Industrial Plan........79

     Claimants' own USD 50 million Capital Contribution................................82

   2.  Subsequent Investments made by Claimants.......................................84

"Synergies" Contributed by the Marsans Group ............................................... 84

Acquisition of Aircraft ....................................................................................... 85

E.   Court Proceedings Involving the Marsans Group .........................................88

1.   Spanish Legal Proceedings ...................................................................... 89

Proceedings before Central Court for Investigative Proceedings No. 6 ........................... 89

Proceedings before Central Court in Charge of Preliminary Investigations No. 1 of Madrid ........................................................................................................ 90

Investigation before the Audiencia Nacional Española for "Possible Procedural Fraud". 90

Proceedings before the Court in Charge of Preliminary Investigations No. 8 ................. 91

Proceedings before the Court in Charge of Preliminary Investigations No. 35 of Madrid 91

Investigation before the Central Court in Charge of Preliminary Investigations No. 6 – "Operación Crucero" ............................................................................................. 92

Insolvency Proceedings of Viajes Marsans S.A. and related companies before Commercial Court No. 12 ....................................................................................... 92

Insolvency Proceedings of Transportes de Cercanías S.A. ............................................. 95

Insolvency proceedings of Seguros Mercurio, S.A. ....................................................... 96

2.   Argentine Legal Proceedings ................................................................... 96

Mata Ramayo y otros s/ Defraudación por Administración Fraudulenta - Criminal and Correctional Court No. 27 ..................................................................................... 96

Marsans Group, Aerolíneas Argentinas y otros s/ Defraudación por Administración Fraudulenta - Criminal and Correctional Court No. 3 ...................................................... 97

Criminal Case Concerning Document Forgery before Criminal Court No. 27 ................. 98

3.   Tribunal's Analysis: Relevance of these Domestic Court Proceedings to the Present Arbitration ............................................................................................ 98

Spanish Legal Proceedings ............................................................................................ 99

Proceeding before Central Court for Investigative Proceedings No. 6 ...................... 100

Proceedings before Central Court in Charge of Preliminary Investigations No. 1 of Madrid ................................................................................................................ 100

Investigations before the Audiencia Nacional Española and the Court in Charge of Preliminary Investigations No. 8 of Madrid ........................................................ 100

Proceeding before the Court in Charge of Preliminary Investigations No. 35 of Madrid ................................................................................................................ 101

Investigation before the Central Court in Charge of Preliminary Investigations No. 6 of Madrid - "Operación Crucero" .................................................................... 101

Insolvency Proceedings of Viajes Marsans, S.A. and Related Companies before Commercial Court No. 12 ........................................................................................ 102

Argentine Legal Proceedings ................................................................. 103

    Mata Ramayo y otros s/ Defraudación por Administración Fraudulenta .................. 103

    Marsans Group, Aerolíneas Argentinas y otros s/ Defraudación por Administración Fraudulenta ........................................................................... 104

    Criminal Case Concerning Document Forgery before Criminal Court No. 27 ......... 105

    Tribunal's Conclusion on the Various Court Proceedings ......................... 105

V.    FACTUAL BACKGROUND .................................................................... 106

VI.  APPLICABLE LAW ............................................................................ 155

VII. THE CLAIMS AND COUNTERCLAIMS - OVERVIEW ................................. 158

VIII. ........................................................ ALLEGED BREACHES OF FAIR AND EQUITABLE TREATMENT ............................................................................. 160

A.    Positions of the Parties on the Content and Scope of the FET Obligation ..................... 161

B.    The "Airfare Squeeze" ...................................................................... 165

    1.    The Regulatory Structure .................................................... 166

    Laws and regulations ........................................................... 166

        Scope of regulations ...................................................... 166

        The Air Business Law and Decree 6875/1971 ......................... 173

        (i)    The alleged "right" to a TER ................................ 173

        (ii)   The calculation of the TER .................................... 177

        Airfare bands .............................................................. 183

C.    Did the airfares set between 2001 and 2008 comply with the TER standard? ................ 185

    1.    Were airfares sufficient to permit the Airlines to cover their costs and earn a reasonable margin? ........................................................................... 185

    Claimants' requests for airfare increases and Argentina's responses .............................. 186

        2002: Declaration of State of Emergency for Commercial Air Transport.................. 187

        2004: Claimants' requests denied ............................................... 189

        2005-2006: Strikes, Government pressure, the June 2006 Agreement and a fare increase ................................................................................ 190

        2007-2008: Additional collective and individual requests for fare increases ............ 192

        Fare increases subsequent to re-nationalization ........................................ 195

    Other promised relief measures ............................................................ 196

    2.    Claimants' Management of the Airlines .................................................... 206

    General arguments regarding Claimants' performance .................................... 207

    Fleet management practices ................................................................. 209

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 11 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

Information and revenue-management systems ................................................................ 212

Operational and financial performance ........................................................................... 213

Failure to rejoin the IATA Clearing House ..................................................................... 213

Asset stripping ................................................................................................................. 214

Tribunal's Conclusion on Claimants' Alleged Mismanagement of the Airlines ............. 216

3.      Does the failure to set airfares in accordance with the TER standard amount to a breach of FET under the Treaty? ........................................................................................................... 224

Positions of the Parties .................................................................................................... 224

The Tribunal's Decision on Scope of the FET Obligation ............................................... 228

D.      Other Acts of Alleged "Re-Argentinization" and Undue Pressure Exerted by the Government of Argentina ......................................................................................................... 239

1.      The Role of Undersecretary of Air Transportation Ricardo Cirielli .......................... 240

2.      Unions .................................................................................................................... 246

3.      Financial statements ............................................................................................... 251

4.      The June 2006 Agreement ....................................................................................... 252

5.      Respondent's pressure on Claimants to sell the Airlines ........................................... 259

Early 2008 attempts to negotiate a sale of the Airlines ................................................... 261

The May 2008 Agreement ............................................................................................... 262

The July 2008 Agreement ................................................................................................ 267

Law No. 26,412 .............................................................................................................. 275

The valuations of the Airlines ......................................................................................... 280

Management of the Airlines and the Injunction .............................................................. 289

Law No. 26,466 .............................................................................................................. 291

Conclusions on the July 2008 Agreement and Subsequent Events ................................. 292

6.      Assumption of Obligations under the Airbus Purchase Orders .................................. 298

E.      Conclusion on the alleged breaches of the FET standard ............................................. 300

IX.     MFN: Full Protection and Security/Umbrella Clause ...................................................... 300

X.      Unjustified and Discriminatory Measures ....................................................................... 318

XI.     ALLEGED BREACHES - CREEPING EXPROPRIATION ............................................ 324

A.      Positions of the Parties on Indirect or Creeping Expropriation Claims ........................... 325

B.      Tribunal's Analysis ......................................................................................................... 325

XII.    ALLEGED BREACHES OF UNLAWFUL EXPROPRIATION ........................................ 334

A.      Did Respondent Expropriate Claimants' Investment? ..................................................... 335

vi

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)

Award

|   |   |   |
|---|---|---|
| 1. | Argentine Judicial Expropriation Proceedings | 335 |
| 2. | Investment Directly and Indirectly Expropriated | 337 |
| B. | The Standard for Lawful Expropriation | 339 |
| C. | "Only in the public interest" | 340 |
| 1. | Positions of the Parties | 340 |
| 2. | Tribunal's Analysis | 344 |
| D. | "In accordance with the law" | 346 |
| 1. | Positions of the Parties | 346 |
| 2. | Tribunal's Analysis | 350 |
| E. | "Shall in no case be discriminatory" | 353 |
| 1. | Positions of the Parties | 353 |
| 2. | Tribunal's Analysis | 356 |
| F. | "Adequate compensation" | 357 |
| 1. | Positions of the Parties | 357 |
| 2. | Tribunal's Analysis | 360 |
| G. | Tribunal's Conclusions on Unlawful Expropriation | 363 |

XIII. THE DEFENSE OF NECESSITY ........... 363

XIV RESPONDENT'S COUNTERCLAIM ........... 365

| A. | Applicable Law | 365 |
|---|---|---|
| B. | Is Respondent's Counterclaim a Claim? | 369 |
| C. | Tribunal's Conclusion with respect to Respondent's Counterclaim | 371 |

XV. DAMAGES ........... 371

| A. | Applicable Law | 374 |
|---|---|---|
| B. | Restitution in Kind | 380 |
| C. | Assessment of Damages | 382 |
| D. | Interest | 389 |

XVI. COSTS OF THE PROCEEDING ........... 392

XVII. DECISION OF THE TRIBUNAL ........... 397

# TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| ¶/¶¶ | Paragraph/paragraphs |
| 2006 Agreement | Letter of Intent between the National State and Argentine Airlines S.A. and Interinvest S.A. signed on 21 June 2006 |
| 2006 Addendum | Addendum to Letter of Intent between the National State and Argentine Airlines S.A. and Interinvest S.A. signed on 21 June 2006 |
| AASE | Aerolíneas Argentinas Sociedad del Estado |
| ACCP | Argentina's Code of Criminal Procedure |
| AFIP | The Argentine tax authority, *Administración Federal de Ingresos Públicos* |
| APTA | Association of Aeronautics Technical Personnel |
| Air Comet | |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings [2006] |
| ARSA | Aerolíneas Argentinas S.A. |
| Assignment Agreement | Credit Assignment Agreement among Teinver, Transportes de Cercanías and Autobuses Urbanos as the assignors and Air Comet as the assignee, dated 18 January 2010 |
| AUSA | Austral-Cielos del Sur S.A. |
| C-[#] | Claimants' Exhibits and Legal Authorities |
| Cl. Mem. | Claimants' Memorial on the Merits, 29 September 2010 |
| Cl. Reply | Claimants' Reply on the Merits, 10 August 2013 |

| Cl. CC. Rej. | Claimants' Rejoinder on the Counterclaim, 13 January 2014 |
| Cl. PHB | Claimants' Post-Hearing Brief, 30 June 2014 |
| Cl. Rej. on Juris. | Claimants' Rejoinder on Jurisdiction, 27 April 2011 |
| Cl. Skeleton | Claimants' Pre-Hearing Skeleton Submission, 17 February 2014 |
| Decision on Jurisdiction | Tribunal's Decision on Jurisdiction, 21 December, 2012 |
| FET | Fair and equitable treatment standard |
| Funding Agreement | Funding Agreement made between Claimants and Burford Capital Limited, effective as of 14 April 2010 |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of other States, Washington D.C., 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Interinvest | Interinvest S.A. |
| JMM | *Juzgado Mercantil de Madrid* |
| July 2008 Agreement | Agreement between the Government of Argentina and Intervest of 17 July 2008 |
| LA AR | Respondent's Legal Authorities |
| May 2008 Agreement | Framework Agreement between the Government of Argentina and the shareholders of the Air Comet/Interinvest Group and the Airlines of 15 May 2008 |
| MFN clause | Most-Favored Nation clause |
| PROCELAC | Office of the Prosecutor for Economic Crimes and Money Laundering, La Procuraduría de Criminalidad Económica y Lavado de Activo |

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

| | |
|---|---|
| RFA | Claimants' Request for Arbitration, filed on 11 December 2008 |
| RA-[#] | Respondent(s)'s Exhibit |
| Resp. CM | Respondent's Counter-Memorial and Counterclaim, 6 May 2013 |
| Resp. PHB | Respondent's Post-Hearing Brief, 30 June 2014 |
| Resp. Rej. | Respondent's Rejoinder on the Merits and Reply on the Counterclaim, 4 November 2013 |
| Resp. Mem. on Juris. | Respondent's Memorial on Jurisdiction, 6 December 2010 |
| Retainer Agreement | Retainer Agreement between King & Spalding and Claimants of June 2011 |
| Representation Agreement | Representation Agreement between Claimants and Burford of 24 April 2010 |
| SEPI | Sociedad Estatal de Participaciones Industriales |
| Side Agreement | List of non-contractual arrangements attached to the July 2008 Agreement, *Listado de Acuerdos Extracontractuales* |
| SPA | Share Purchase Agreement between SEPI and Air Comet S.A. |
| TER | Economically reasonable airfares (*tarifa económica retributiva*) |
| the Airlines | Aerolíneas Argentinas S.A. ("ARSA") and Austral-Cielos del Sur S.A. ("AUSA") and their subsidiaries |
| Treaty | Agreement between the Argentine Republic and the Kingdom of Spain on the Reciprocal Promotion and Protection of Investments of 3 October 1991 |
| TTN | *Tribunal de Tasaciones de la Nación* |
| US-Argentina BIT | Agreement between the United States of America and the Argentine Republic Concerning the Reciprocal |

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

| | |
|---|---|
| | Encouragement and Protection of Investment of 1991, which entered into force on October 20, 1994 |
| Vienna Convention | Vienna Convention on the Law of Treaties, 1969 |
| W.S. | Witness Statement |

# I.  INTRODUCTION AND PARTIES

1.     This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the Agreement between the Argentine Republic and the Kingdom of Spain on the Promotion and Protection of Investments dated October 3, 1991 (the "Treaty"), which entered into force on September 28, 1992, and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on October 14, 1966 (the "ICSID Convention").  The dispute relates to Claimants' allegations that Respondent has violated the Treaty, international law, and Argentine law, as well as commitments and representations made by Respondent to Claimants, by unlawfully re-nationalizing and taking other measures regarding Claimants' investments in two Argentine airlines: Aerolíneas Argentinas S.A. ("ARSA") and Austral-Cielos del Sur S.A. ("AUSA") (collectively, the "Airlines" or the "Argentine Airlines") and their subsidiaries. Respondent also makes a Counterclaim.

2.     Claimants are Teinver S.A. ("Teinver"), Transportes de Cercanías S.A. ("Transportes de Cercanías") and Autobuses Urbanos del Sur S.A. ("Autobuses Urbanos") (collectively, "Claimants").

3.     Claimants are companies incorporated under the laws of the Kingdom of Spain.

4.     Respondent is the Argentine Republic and is hereinafter also referred to as "Argentina" or the "Respondent."

5.     Claimants and Respondent are hereinafter collectively referred to as the "Parties."  The Parties' respective representatives and their addresses are listed above on page (i).

# II.  PROCEDURAL HISTORY

## A.     Registration of the Request for Arbitration

6.     On December 12, 2008, ICSID received a request for arbitration dated December 11, 2008 from Claimants against Respondent (the "Request" or "RFA").

7.     The RFA invoked Respondent's advance consent to ICSID arbitration contained in the Treaty, and by way of a most-favored-nation ("MFN") clause in the Treaty, the dispute settlement provisions in the 1991 Treaty between the United States of America and the Argentine Republic Concerning the Reciprocal Encouragement and Protection of Investment (the "US-Argentina BIT"), which entered into force on October 20, 1994.

8.     On January 30, 2009, the Acting Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Acting Secretary-General invited the Parties to proceed to constitute an Arbitral Tribunal as soon as possible in accordance with Rule 7(d) of the Centre's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

## B.     Constitution of the Tribunal

9.     By letter dated April 3, 2009, Claimants informed the Centre that they had selected the method envisaged in Article 37(2)(b) of the ICSID Convention for the constitution of the Tribunal (i.e. the Tribunal would consist of three arbitrators, one arbitrator appointed by each party and the third, who would be the president of the Tribunal, to be appointed by agreement of the Parties).

10.     On April 27, 2009, Claimants informed the Centre of their appointment of Mr. Henri C. Alvarez Q.C., a Canadian national, as an arbitrator. Mr. Alvarez accepted his appointment on May 4, 2009.

11.     On May 12, 2009, Claimants requested ICSID to appoint the arbitrators not yet appointed and to designate an arbitrator to be the President of the Tribunal in this case, pursuant to Article 38 of the ICSID Convention and Rule 4(1) of the ICSID Rules of Procedure for Arbitration Proceedings ("Arbitration Rules").

12.     On June 1, 2009, Respondent appointed Dr. Kamal Hossain, a Bangladeshi national, as an arbitrator. Dr. Hossain accepted his appointment on June 6, 2009.

13.     By letters of June 15, 2009, August 3, 2009, September 29, 2009, and November 2, 2009, the Centre consulted with the Parties in connection with the appointment of the arbitrator not yet appointed, as envisaged in Article 38 of the ICSID Convention and ICSID Arbitration Rule 4.

14.     By letter of December 14, 2009, the Centre informed the Parties that, pursuant to Article 38 of the ICSID Convention and ICSID Arbitration Rule 4, ICSID was to propose to the Chairman of the ICSID Administrative Council the appointment of Judge Thomas Buergenthal, a U.S. national, as the President of the Tribunal.

15.     On December 21, 2009, both Parties informed ICSID that they did not have any observations on the proposed appointment of Judge Thomas Buergenthal as President of the Tribunal.

16.     On December 28, 2009, the Chairman of the ICSID Administrative Council appointed Judge Thomas Buergenthal as President of the Tribunal. Judge Buergenthal accepted his appointment on December 30, 2009.

17.     The Tribunal is composed of Thomas Buergenthal (U.S.), President, appointed by the Chairman of the Administrative Council in accordance with Article 38 of the ICSID Convention; Henri C. Alvarez (Canadian), appointed by Claimants; and Kamal Hossain (Bangladeshi), appointed by Respondent.

18.     On January 4, 2010, the Secretary-General, in accordance with ICSID Arbitration Rule 6(1), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date.  Mr. Sergio Puig, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

**C.     Written and Oral Phases of the Proceeding**

19.     The Tribunal held a first session with the Parties on March 22, 2010 at the World Bank Conference Center in Paris.  The Parties confirmed that the Tribunal had been properly constituted and reached agreements on several procedural matters, *inter alia,* that the applicable Arbitration Rules would be those in effect from April 10, 2006, and that the procedural languages would be

English and Spanish. It was also agreed that the place of proceeding would be Washington, D.C. The agreement of the Parties was embodied in Minutes of the First Session of the Arbitral Tribunal signed by the President and the Secretary of the Tribunal and circulated to the Parties.

20.     On September 17, 2010, Claimants requested a one-week extension for the filing of their Memorial on the Merits. On September 20, 2010, Respondent informed that it had no objection to the extension requested by Claimants.  As a result, Claimants filed a Memorial on the Merits, with accompanying documentation, on September 29, 2010. The accompanying documentation included the witness statements of Messrs. Gerardo Díaz Ferrán, Gonzalo Pascual Arias, Carlos Bastos; and the Expert Report of Pablo Spiller and Manuel Abdala from LECG.

21.     By letter of November 10, 2010, the Parties were informed that Mrs. Mercedes Cordido-Freytes de Kurowski, ICSID Counsel, would replace Mr. Sergio Puig as Secretary of the Tribunal.

22.     Respondent filed a Memorial on Jurisdiction on December 6, 2010, following the Tribunal's agreement to Respondent's extension request of November 24, 2010. The accompanying documentation included the witness statements of Messrs. Juan de Dios Cincunegui and Rafael Llorens; and the Expert Reports of Dr. Ismael Mata, and Professor Agusto Nissen.

23.     Claimants' Counter-Memorial on Jurisdiction was subsequently filed on January 24, 2011, which included the Witness Statement of Vicente Muñoz Pérez.

24.     On February 4, 2011, the Tribunal issued Procedural Order No. 1, ruling that Respondent's jurisdictional objections would be dealt with as a preliminary question, and that the proceeding on the merits was accordingly suspended. The Tribunal also decided that a second round of pleadings on jurisdiction would be filed.

25.     On February 9, 2011, Respondent filed a request for production of documents. This was followed by Claimants' observations of February 14, 2011, Respondent's response of February 21, 2011, and Claimants' reply of February 28, 2011. On March 1, 2011, the Tribunal issued a decision on production of documents.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

26.     On March 10, 2011, Respondent filed its Reply on Jurisdiction with the second witness statements of Messrs. Juan de Dios Cincunegui and Rafael Llorens; and the second Expert Report of Dr. Ismael Mata and the Expert Report of Mr. Virgilio Iván Hernández Urraburu.

27.     On April 12, 2011, Claimants filed an application for Provisional Measures (the "Application for Provisional Measures" or "the Application"), including a request for an emergency temporary order, prohibiting the Argentine Republic from adopting certain tax measures until the Tribunal decided on the Request.

28.     On April 13, 2011, the Tribunal invited Respondent's comments on Claimants' request for an emergency temporary order by April 20, 2011.  The Tribunal also invited: (i) Respondent to file observations on Claimants' Request by April 27, 2011; (ii) Claimants to file observations in reply by May 4, 2011; and (iii) Respondent to file observations by way of rejoinder by May 11, 2011.  The deadlines for the filings concerning the Request were later extended on April 27, 2011.

29.     On April 20, 2011, Respondent submitted its Response to Claimants' Request for Urgent Provisional Measures, requesting that it should be dismissed for the reasons stated in that submission.

30.     On April 27, 2011, Claimants filed their Rejoinder on Jurisdiction, along with the second Witness Statement of Vicente Muñoz Pérez and the Expert Legal Opinion of Judge Stephen M. Schwebel.

31.     On April 29, 2011, the Tribunal issued Procedural Order No. 2, concerning Claimants' request for provisional measures. In its Procedural Order No. 2, *"[t]he Tribunal, after careful consideration, unanimously decided as follows:*

> a)  The Claimants' request for an emergency temporary order is denied.  Having heard from both parties, the Tribunal is not persuaded, given in particular the Respondent's assertions in paragraphs 6 through 8 of its submission of April 20, 2011, that there is an urgency that would warrant such an order.
>
> b)  The Tribunal notes that a hearing is scheduled to be held on May 27-31, 2011, during which, the parties will have the opportunity to fully present their arguments on this matter.  The Tribunal will decide on the Claimants Application shortly thereafter.

c) The parties are invited to refrain from aggravating or extending the dispute; and

d)  Either party may bring to the Tribunal's attention, any new, relevant, facts that may emerge fundamentally changing the current circumstances.

32.    Also on April 29, 2011, Claimants renewed their request for an emergency, temporary order. In their request, Claimants submitted that their Argentine subsidiary and holder of the title to the Airlines' shares, Interinvest S.A. ("Interinvest"), had been served on April 28, 2011 with a notice for immediate payment of approximately USD 663,944.25 (ARS 2,706,236.90) due to the Argentine tax authority ("AFIP"). Claimants further indicated that such notice constituted the very subject matter of Claimants' application for an emergency temporary order and for provisional measures in this arbitration.

33.    On April 29, 2011, Respondent filed its Response to Claimants' Request for Provisional Measures. This was followed by a response on May 4, 2011 to Claimants' letter of April 29, 2011. On May 6, 2011, Claimants filed Claimants' Reply in Support of their Request for Provisional Measures. Respondent subsequently filed on May 13, 2011, its Rejoinder on Claimants' Request for Provisional Measures.

34.    On May 13, 2011, the Tribunal decided on Claimants' request for an Emergency Temporary Order of April 29, 2011, as follows:

> After careful consideration, and in light of the proximity of the hearing to be held on May 27-31, 2011, the Tribunal has determined that at this time there is no imminent, or no sufficiently imminent, threat between now and the hearing.  Accordingly, the Tribunal has denied Claimants' request for an Emergency Temporary Order of April 29, 2011.
>
> The Tribunal would like to once again invite the parties to (i) refrain from aggravating or extending the dispute, and (ii) bring to the Tribunal's attention, any new, relevant, facts that may emerge fundamentally changing the current circumstances.

35.    A hearing on Jurisdiction and Provisional Measures was held at the seat of the Centre in Washington, D.C. from May 27-31, 2011. In attendance were the three members of the Tribunal, Judge Thomas Buergenthal, Mr. Henri C. Álvarez and Dr. Kamal Hossain. In the absence of Ms. Cordido-Freytes de Kurowski, Mr. Gonzalo Flores, and Ms. A. Catherine Kettlewell, Counsel, ICSID, were in attendance for the ICSID Secretariat.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

36.      Present at the hearing were:

For Claimants:

| | |
|---|---|
| Mr. R. Doak Bishop | King & Spalding |
| Mr. Roberto Aguirre Luzi | King & Spalding |
| Mr. Craig S. Miles | King & Spalding |
| Ms. Margrete Stevens | King & Spalding |
| Mr. Guillermo Aguilar-Alvarez | King & Spalding |
| Ms. Silvia Marchili | King & Spalding |
| Mr. Esteban Leccese | King & Spalding |
| Ms. Lorraine de Germiny | King & Spalding |
| Prof. Joost Pauwely | King & Spalding |
| Ms. Valeria Dentoni | King & Spalding |
| Mr. Esteban Sánchez | King & Spalding |
| Ms. Ashley Grubor | King & Spalding |
| Mr. Diego Fargosi | Estudio Fargosi & Asociados |
| Mr. Héctor Alonso | Estudio Fargosi & Asociados |
| Mr. Iván Losada | Claimants' Representative |

For Respondent:

| | |
|---|---|
| Dra. Angelina M.E. Abbona | Procuradora del Tesoro de la Nación |
| Mr. Horacio Pedro Diez | Subprocurador del Tesoro de la Nación |
| Mr. Eduardo Barcesat | Procuración del Tesoro de la Nación |
| Mr. Gabriel Bottini | Procuración del Tesoro de la Nación |
| Ms. Adriana Busto | Procuración del Tesoro de la Nación |
| Ms. Gisela Makowski | Procuración del Tesoro de la Nación |
| Mr. Tomás Braceras | Procuración del Tesoro de la Nación |
| Ms. Alejandra Mackluf | Procuración del Tesoro de la Nación |
| Mr. Javier Pargament | Procuración del Tesoro de la Nación |
| Ms. Mariana Lozza | Procuración del Tesoro de la Nación |
| Mr. Ignacio Torterola | Procuración del Tesoro de la Nación |
| Mr. Nicolás Duhalde | Procuración del Tesoro de la Nación |
| Mr. Julián Negro | Procuración del Tesoro de la Nación |
| Ms. Magdalena Gasparini | Procuración del Tesoro de la Nación |
| Mr. Pablo Ceriani | Aerolíneas Argentinas |

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

37.     The following persons were examined:

On behalf of Claimants:

| | |
|---|---|
| Mr. Gerardo Díaz Ferrán | Claimants' Witness |
| Mr. Gonzalo Pascual Arias | Claimants' Witness |
| Judge Stephen M. Schwebel | Claimants' Expert |

On behalf of Respondent:

| | |
|---|---|
| Mr. Juan de Dios Cincunegui | Respondent's Witness |
| Mr. Rafael Llorens | Respondent's Witness |
| Mr. Vicente Muñoz Pérez | Respondent's Expert |

38.     On June 8, 2011, the Tribunal issued Procedural Order No. 3, posing questions to the Parties after the Hearing. The Parties filed their answers subsequently, Claimants on June 16, 2011, and Respondent on June 23, 2011. On June 30, 2011 and July 5, 2011, Claimants filed further submissions to complement their answers.

39.     On August 26, 2011, Ms. Annalise Nelson was appointed Assistant to the President of the Tribunal with the agreement of the Parties.

40.     By letter of August 30, 2011, Claimants informed the Tribunal of the conclusion of Aerolíneas Argentinas' reorganization proceedings in Argentina. Claimants further brought to the Tribunal's attention two recent ICSID decisions, which they deemed relevant to the present arbitration: the Decision on Jurisdiction and Admissibility issued on August 4, 2011 in the *Abaclat and others v. Argentina* (case formerly known as *Giovanna a Beccara and others*) (ICSID Case No. ARB/07/5); and an Order Taking Note of the Discontinuance of the Proceeding issued on July 11, 2011 in the *ATA Construction, Industrial and Trading Company v. Jordan* (ICSID Case No. ARB/08/2).

41.     On October 26, 2011, Respondent filed a communication in response to Claimants' letter of August 30, 2011, including an expert report of Mr. Juan Antonio Cabezudo Álvarez.

42.     On November 8, 2011, Claimants provided their comments to Respondent's submission of October 26, 2011, requesting the Tribunal to disregard Argentina's new arguments and expert reports, and to affirm jurisdiction over Claimants' claims.

43.     By letter of December 15, 2011, the Tribunal informed the Parties:

> The Tribunal, having reviewed Respondent's letter of October 26, 2011 and Claimants' letter of November 8, 2011, has taken note of the arguments made therein as they relate to the pleadings on Jurisdiction, with the exception of the expert report of the Spanish attorney, Mr. Juan Antonio Cabezudo Alvarez, attached to Respondent's letter, and Respondent's arguments based thereon. The Tribunal has made this determination without prejudice to the excluded material being resubmitted to the Tribunal by Respondent at a later stage of these proceedings, if any.

44.     By letter December 15, 2011, Respondent requested leave from the Tribunal to file the dissenting opinions issued by Prof. Brigitte Stern, Mr. J. Christopher Thomas, Q.C. and Prof. Georges Abi-Saab in *Impregilo v. Argentina*, *Hochtief v. Argentina*, and *Abaclat v. Argentina*, respectively. Respondent argued that Claimants had not filed such opinions when they filed the *Impregilo* award, and the Decisions on Jurisdiction in *Hochtief* and in *Abaclat*. On December 20, 2011, considering that Claimants had informed the Tribunal that they had no comments on Respondent's request of December 15, 2011, the Tribunal granted Respondent's request. Respondent subsequently filed the dissenting opinions on December 22, 2011.

45.     On February 17, 2012, Respondent requested leave from the Tribunal to introduce into the record the recently adopted decision of the United States Court of Appeals for the District of Columbia Circuit in the case of *Republic of Argentina v. BG Group plc* of January 17, 2012, and in the *ICS v. Argentine Republic* case[1]. The request was granted on February 22, 2012, and the Tribunal provided Claimants with the opportunity to make a submission in response of the same length as Respondent's request. Claimants filed their response on February 28, 2012.

46.     On March 22, 2012, the Tribunal advised the Parties that the Tribunal did not require, nor would it accept, further submissions unless specifically requested by the Tribunal.

---

[1] *ICS, Inspection and Control Services Limited v. The Argentine Republic,* UNCITRAL, PCA Case No. 2010-9, February 10, 2012.

47.     On March 26, 2012, Respondent filed a request for the admissibility of new evidence relating to criminal proceedings pending in Spain. According to Respondent, such proceedings directly involved Messrs. Gonzalo Pascual Arias, Gerardo Díaz Ferrán – who had stated at the hearing on jurisdiction that they were the owners of 100% of Claimants, Iván Losada, who was present at the hearing and addressed the Tribunal in his capacity as Claimants' representative, and Vicente Muñoz Pérez, a witness produced by Claimants who testified at the hearing.

48.     Also on March 26, 2012, Claimants filed a Second Application for Provisional Measures. In their Second Application, Claimants requested that the Tribunal issue the following measures:

> Order Argentina to stop any procedures aimed at approving any formal or material changes to the financial statements of the Argentine Airlines for any year prior to 2008;
>
> Order Argentina to stop any procedures aimed at approving the 2008 Amended Financial Statements;
>
> Make available to Claimants' representatives in Interinvest, in their capacity as shareholders of the Argentine Airlines, all information available and subject to discussion and vote in the shareholders meeting to be scheduled in this respect; and
>
> Authorize Claimants' representatives in Interinvest to attend, participate and/or exercise their voting rights in the shareholders meeting that will presumably be scheduled in connection with the alleged "adjustments" to the Argentine Airlines financial statements, and in all cases free of any coercion, or physical or legal threat.

49.     In their Application of March 26, 2012, Claimants further requested that the Tribunal or its President immediately issue an emergency, temporary order to preserve the *status quo* (*i.e.*, the situation that exists at this date) with respect to all the financial statements, until such time as it rules on this Request for provisional measures.

50.     By letter of March 27, 2012, the Tribunal invited Respondent to comment on Claimants' Application of March 26, 2012, for an emergency temporary order, on or before April 4, 2012. Additionally, with reference to Claimants' Second Application for Provisional Measures, and in accordance with ICSID Arbitration Rule 39(4), the Tribunal fixed the time limits for the Parties to present their observations.

51.     On March 28, 2012, the Tribunal invited Claimants to comment on Respondent's submission of March 26, 2012, by April 4, 2012.

52.     On March 28, 2012, Respondent requested an extension of the deadlines fixed by the Tribunal on March 27, 2012. On March 29, 2012, the Tribunal invited Claimant to comment on Respondent's request; submitted to the Parties' consideration a schedule for the further submissions on Claimants' Second Application for Provisional Measures, and invited the Parties to consider the possibility of providing the translations of their respective subsequent submissions on the next day of their filing. Each Party filed its observations on the same date. Respondent submitted a further letter on the matter on March 30, 2012.

53.     In accordance with the revised procedural schedule fixed by the Tribunal on April 1, 2012, the Parties filed their respective observations and responses concerning Claimants' Second Application for Provisional Measures (Respondent's observations of April 11, 2012, Claimants' response of April 23, 2012, and Respondent's rejoinder of May 4, 2012).

54.     On April 4, 2012, Claimants filed observations on Respondent's request of March 26, 2012 for the admissibility of new evidence relating to criminal proceedings pending in Spain

55.     On May 24, 2012, Respondent filed a submission concerning Claimants' Second Application for Provisional Measures of March 26, 2012, and the Fourth Objection to Jurisdiction submitted by Respondent in this proceeding. Respondent also requested leave to introduce new evidence relating to the court proceedings in Spain.

56.     On June 1, 2012, Claimants filed a response to Respondent's request of May 24, 2012.

57.     By letter of June 5, 2012, Claimants informed the Tribunal that on June 1, 2012, Respondent, through Aerolíneas Argentinas S.A., Austral-Cielos del Sur S.A., and their subsidiaries, allegedly approved the Airlines' 2008 Amended Financial Statements. Claimants noted that the pending approval of those Statements had been the subject of Claimants' Second Request for Provisional Measures. On June 7, 2012, Respondent filed its observations on Claimants' letter of June 5, 2012.

58.     On September 28, 2012, Respondent submitted a letter, requesting leave from the Tribunal to introduce additional evidence into the record: (i) the award rendered on August 22, 2012 in

*Daimler Financial Services AG v. Argentine Republic* (ICSID Case No. ARB/05/1); (ii) a decision rendered by a Swedish court on November 9, 2011 concerning the award rendered on October 1, 2007 in the case captioned *RosInvest Co UK Ltd. v. The Russian Federation*, SCC Case No. V079/2005; and (iii) a submission in the *Thai-Lao Lignite (Thailand) Co., Ltd & Hongsa Lignite (Lao PDR) Co., Ltd v. Government of the Lao People's Democratic Republic* before the U.S. Court of Appeals for the Second Circuit.

59.     On October 3, 2012, the Tribunal issued Procedural Order No. 4, concerning Claimants' First Application for Provisional Measures of April 12, 2011. In its Procedural Order No. 4, the Tribunal decided as follows:

> a) The Tribunal rejects Claimants' Application for Provisional Measures in its entirety.
>
> b) The Tribunal reminds the Parties that they are obligated to refrain from aggravating the dispute.
>
> c) The Tribunal reserves its decision on the costs of the procedure relating to the Application for Provisional Measures to a later stage of this arbitration.

60.     Also on October 3, 2012, the Tribunal issued Procedural Order No. 5, concerning Claimants' Second Application for Provisional Measures of March 26, 2012. In its Procedural Order No. 5, the Tribunal decided as follows:

> a) Having been rendered moot by the approval of the 2008 Financial Statements on June 1, 2012, the Claimants' Second Application for Provisional Measures, including its request for an emergency temporary order, is denied.
>
> b) The Tribunal notes that it had explicitly instructed both Parties on April 1, 2012 to take no actions or steps to aggravate the dispute or render Claimants' Second Application moot during the Tribunal's consideration of it.  Therefore, the Tribunal reserves any further consideration of the approval of the 2008 Financial Statements for another appropriate stage of these proceedings.
>
> c) Notwithstanding that the 2008 Financial Statements may be available by request through the Inspección General de Justicia, the Tribunal orders Respondent to produce the 2008 Financial Statements of Aerolineas Argentinas S.A., Austral Líneas Aéreas - Cielos del Sur S.A., Jet Paq S.A., and Aerohandling S.A., production should be made promptly, and in any event, by October 17, 2012.  This Order should not be understood to prejudge any issue on the merits.
>
> d) The Tribunal reminds both Parties of the requirement that they preserve all relevant documents and information in their possession, custody or control, including all documents and information relating to the Financial Statements of the Argentine Airlines for the period of 2002 to date.
>
> e) The Tribunal reserves its decision on the costs of the procedure relating to the Claimants' Second Application for Provisional Measures to a later stage of this arbitration.

61.     On October 9, 2012, following the Tribunal's invitation of October 2, 2012, Claimants' responded to Respondent's letter of September 28, 2012.

62.     On December 6, 2012, Respondent filed a further request for the admissibility of new evidence, press reports from Spanish newspapers, referring to arrest warrants issued by a Spanish court against Claimants' representatives and/or witnesses, which in in Respondent's view could be material for the determination by the Tribunal of Respondent's Fourth Objection on Jurisdiction concerning the legality of Claimants' Investment.

63.     On December 7, 2012, Claimants filed a letter requesting that Respondent's submission be dismissed because in Claimants' view it was untimely, violated Tribunal orders and was irrelevant to the jurisdictional phase of this case as it was based on facts alleged to have occurred after Argentina's expropriation of Claimants' investment, and was unrelated to the Airlines, Argentina or Argentine law.

64.     By letter of December 17, 2012, the Tribunal reminded the Parties that by letter of March 22, 2012, they were advised that the Tribunal did not require, nor would accept, further submissions unless specifically requested by the Tribunal. As a result, the Tribunal did not admit Respondent's submission of December 6, 2012 at that stage, noting that if Respondent wished to raise those matters as part of its counter-memorial on the merits, it might do so in that filing as might be relevant.

65.     On December 21, 2012, the Arbitral Tribunal issued its Decision on Jurisdiction. Attached to the Decision was a separate opinion by arbitrator Dr. Kamal Hossain.  The Tribunal rejected the objections to jurisdiction and joined the determination of Respondent's responsibility for the acts of non-state entities to the merits of the case.  Copies of the Decision on Jurisdiction and of the separate opinion are attached to this Award, and form an integral part of it.

66.     On February 8, 2013, Respondent filed a request for the production of documents. This was followed by Claimants' observations of February 19, 2013 and Respondent's response of May 12, 2013.

67.     On March 8, 2013, Claimants filed a request for the production of documents. Subsequently, Respondent filed its observations on March 12, 2013, and supplemented them on March 26, 2013.

68.     On March 28, 2013, Claimants filed a response to Respondent's observations of March 26, 2013, and ratified their document production request of March 8, 2013.

69.     On April 4, 2013, Respondent revised its request for production of documents of February 8, 2013, and on April 8, 2013, Claimants filed observations on Respondent's revised request.

70.     On April 17, 2013, the Tribunal decided on the Parties' respective document production requests.

71.     On April 24, 2013, Respondent requested the Tribunal revisit its decision of April 17, 2013, with regard to the time frame given to Respondent to produce documents. Claimants filed observations on April 29, 2013.

72.     On May 3, 2013, the Tribunal decided on Respondent's request of April 24, 2013, and revised the procedural calendar in relation to the Parties' subsequent submissions.

73.     On May 6, 2013, Respondent filed its Counter-Memorial on the Merits, including a Counterclaim (the "Counterclaim"). Together with its pleading, Respondent submitted seven (7) expert reports of Cigarrán Abogados, Angela Marina Donato, Barry Eichengreen, Saul N. Keifman, Benedict Kingsbury, Ismael Mata, and KPMG; and eight (8) witness statements of Rafael Llorens, Carlos Albarracín, Norberto Adrián Caneto, Carlos Sergio Cipolla, Rafael Martínez, Mario Massolo, Leandro Serino, and Daniel Eduardo Martín.

74.     On May 24, 2013, after considering Respondent's observations of May 13, 2013, and Claimants' response of May 17, 2013, the Tribunal decided on Claimants' request for production of documents.

75.     On May 31, 2013, in connection with the disclosure of certain documents, Respondent requested that the Tribunal issue a confidentiality order, or, in the alternative, ensure that

Claimants, their experts and any other person who would have access to such information in the course of these proceedings, sign a confidentiality agreement. This was followed by Claimants' observations of June 3, 2013.

76.     On June 5, 2013, the Tribunal issued Procedural Order No. 6 concerning the confidentiality of evidence.

77.     On June 15, 2013, Claimants called the Tribunal's attention to Respondent's failure to produce certain documents and requested an order to produce certain documents.

78.     On June 24, 2013, the Tribunal decided on Claimants' further request for production of documents.

79.     On July 17, 2013, Claimants requested an extension of the deadline for the filing of their Reply on the Merits and Counter-Memorial on the Counterclaim. Respondent stated it had no objection, provided that it was afforded a similar extension. As a result, on July 19, 2013, the Tribunal granted the requested extension and adjusted the procedural calendar accordingly.

80.     On August 10, 2013, Claimants filed a Reply on the Merits, including observations on Respondent's Counterclaim.  The accompanying documentation included three witness statements of Nathalie Fernández, Vicente Muñoz Pérez and Ignacio Pascual de Riva and four expert reports of Alberto B. Bianchi, Manuel A. Abdala and Pablo T. Spiller of Compass Lexecon, Aurora Martínez Flórez and Andrés Ricover.

81.     On September 13, 2013, Respondent filed a request for the production of documents.  This was followed by Claimants' observations of September 23, 2013, and Respondent's response of October 1, 2013.

82.     On October 10, 2013, the Tribunal decided on Respondent's request for production of documents.

83.     Following exchanges between the parties with regard to the procedural calendar, on October 21, 2013, the Tribunal granted Respondent's request for an extension, allowing an extension similar to that granted to Claimants for the filing of their Reply on the Merits.

84.     On November 4, 2013, Respondent filed a Rejoinder on the Merits and a Reply on the Counterclaim, with supporting documents, including five (5) witness statements of Rafael Llorens, Norberto Adrián Caneto, Daniel Eduardo Martín, Rafael Martínez and Silva Tamayo, and six (6) expert reports of Oliver Wyman, KPMG, Saul N. Keifman, Ismael Mata, Cigarrán Abogados, and Angela Marina Donato.

85.     On December 17, 2013, Claimants filed a request for the production of documents. Subsequently, Respondent filed observations on January 3, 2014.

86.     On January 13, 2014, Claimants filed a Rejoinder on the Counterclaim with accompanying documentation, which included three (3) expert reports of Alberto B. Bianchi, Manuel A. Abdala and Pablo T. Spiller of Compass Lexecon, and Andrés Ricover.

87.     On January 15, 2014, Claimants filed a request for the production of documents concerning information missing from expert reports filed with Respondent's Rejoinder on the Merits and reply on the Counterclaim. This was followed by Respondent's observations of January 23, 2014.

88.     On January 30, 2014, at the request of Dr. Hossain, and following consultation with the other members of the Tribunal, the Secretary of the Tribunal asked the Parties whether they would have any objection to the attendance of one of Dr. Hossain's associates, Mr. Moin Ghani, at the forthcoming hearing as his assistant. On January 31, 2014, both Parties gave their consent to Mr. Ghani's attendance.

89.     On February 4, 2014, Claimants renewed their request of March 8, 2013 for production of certain documents. Claimants submitted that in light of newly-discovered information, it was then apparent that Respondent had withheld documents responsive to the requests at issue.

90.     On February 6, 17, and 22, 2014, the Tribunal decided on the Parties' pending requests concerning production of documents.

91.     On February 17, 2014, each Party filed a Pre-Hearing Skeleton Submission.

92.     A hearing on the Merits and Counterclaim took place at the World Bank Headquarters in Washington, D.C. from March 4-13, 2014.  In addition to the Members of the Tribunal; Judge Thomas Buergenthal, Mr. Henri C. Álvarez, Q.C. and Dr. Kamal Hossain; the Assistants to the President, Ms. Annalise Nelson and to Dr. Hossain, Mr. Moin Ghani; and the Secretary of the Tribunal, Ms. Mercedes Cordido-Freytes de Kurowski, present at the hearing were:

For Claimants:

| | |
|---|---|
| Mr. R. Doak Bishop | King & Spalding |
| Mr. Roberto Aguirre Luzi | King & Spalding |
| Mr. Craig S. Miles | King & Spalding |
| Ms. Margrete Stevens | King & Spalding |
| Ms. Silvia Marchili | King & Spalding |
| Mr. Esteban Leccese | King & Spalding |
| Mr. Jorge Mattamouros | King & Spalding |
| Mr. Louis-Alexis Bret | King & Spalding |
| Mr. Tomás Lanardonne | King & Spalding |
| Mr. Esteban Sánchez | King & Spalding |
| Ms. Carol Tamez | King & Spalding |
| Mr. Diego Fargosi | Estudio Fargosi & Asociados |
| Mr. Matías Martínez | Estudio Fargosi & Asociados |
| Mr. Luis Arqued | Claimants' Representative |
| Mr. Mariano Hernández | Claimants' Representative |
| Mr. Alvaro Martínez Domingo | Claimants' Representative |

For Respondent:

| | |
|---|---|
| Dra. Angelina M.E. Abbona | Procuradora del Tesoro de la Nación |
| Mr. Horacio Pedro Diez | Subprocurador del Tesoro de la Nación |
| Mr. Javier Pargament Mariasch | Subprocurador del Tesoro de la Nación |
| Mr. Horacio Seillant | |
| Mr. Gabriel Bottini | |
| Mr. Eduardo Barcesat | |
| Mr. Carlos Mihanovich | Procuración del Tesoro de la Nación |
| Ms. Mariana Lozza | Procuración del Tesoro de la Nación |
| Ms. Magdalena Gasparini | Procuración del Tesoro de la Nación |

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

| | |
|---|---|
| Mr. Darío Nicolás Federman | Procuración del Tesoro de la Nación |
| Mr. Luis Fernando Rivarola | Procuración del Tesoro de la Nación |
| Mr. Leandro Hernán Fernández | Procuración del Tesoro de la Nación |
| Mr. Nicolás Grosse | Procuración del Tesoro de la Nación |
| Ms. María Alejandra Etchegorry | Procuración del Tesoro de la Nación |
| Ms. Cintia Yaryura | Procuración del Tesoro de la Nación |
| Ms.Viviana Kluger | Procuración del Tesoro de la Nación |
| Ms. Alejandra Mackluf | Procuración del Tesoro de la Nación |
| Ms. María Soledad Romero Caporale | Procuración del Tesoro de la Nación |
| Ms. Adriana Marcela Cusmano | Procuración del Tesoro de la Nación |
| Mr. Sebastián Axel Green Martinez | Procuración del Tesoro de la Nación |
| Mr. Manuel Dominguez Deluchi | Procuración del Tesoro de la Nación |
| Mr. Nicolás Duhalde | Procuración del Tesoro de la Nación |
| Mr. Matías Ezequiel Muscillo | Procuración del Tesoro de la Nación |
| Mr. Luis Pablo Ceriani | Aerolíneas Argentinas |
| Mr. Nicolás Sykes | Aerolíneas Argentinas |

93.     The following persons were examined:

On behalf of Claimants:

| | |
|---|---|
| Mr. Ignacio Pascual de Rivas | Claimants' Witness |
| Mr. Vicente Muñoz Pérez | Claimants' Witness |
| Mr. Gerardo Díaz Ferrán (VC) | Claimants' Witness |
| Mr. Andrés Ricover | Claimants' Expert |
| Mr. Alberto Bianchi | Claimants' Expert |
| Ms. Aurora Martínez Flórez (VC) | Claimants' Expert |
| Mr. Manuel Abdala, LECG | Claimants' Expert |
| Mr. Pablo Spiller, LECG | Claimants' Expert |

On behalf of Respondent:

| | |
|---|---|
| Mr. Gustavo Silva Tamayo | Respondent's Witness |
| Mr. Rafael Martinez | Respondent's Witness |
| Mr. Daniel Eduardo Martin | Respondent's Witness |
| Mr. Norberto Adrián Caneto | Respondent's Witness |
| Mr. Rafael Llorens | Respondent's Witness |
| Mr. Benedict Kingsbury | Respondent's Expert |
| Mr. Ismael Mata | Respondent's Expert |
| Mr. Saúl Keifman | Respondent's Expert |
| Mr. Diego Bleger, KPMG | Respondent's Expert |

| | |
|---|---|
| Mr. Raúl Saccani, KPMG | Respondent's Expert |
| Mr. Gabriel Taira, KPMG | Respondent's Expert |
| Ms. Marina Donato | Respondent's Expert |
| Mr. Juan José Cigarrán | Respondent's Expert |
| Mr. Scott Hornick, Oliver Wyman | Respondent's Expert |
| Mr. Vikram Krishnan, Oliver Wyman | Respondent's Expert |

94.     On June 23, 2014, Respondent requested leave from the Tribunal to file new evidence, three orders issued by Spanish Courts in April-May, 2014, relating to criminal proceedings in Spain. On June 24, 2014, the Tribunal invited Claimants to comment by July 2, 2014.

95.     By letter of June 26, 2014, Claimants informed the Tribunal of the Parties' agreement to request an extension of the deadline to submit their submissions on costs from June 30, 2014, until July 7, 2014. By letter of June 30, 2014, Respondent confirmed this agreement. On the same date, the Tribunal granted the requested extension.

96.     The Parties filed simultaneous Post-Hearing Briefs on June 30, 2014.

97.     On July 2, 2014, Claimants filed observations on Respondent's request of June 23, 2014, concerning admissibility of new evidence.

98.     On July 7, 2014, the Tribunal decided on the admissibility of new evidence and admitted certain documents relating to criminal proceedings in Spain without taking any position on their ultimate relevance to the outcome of the arbitration.

99.     Also, on July 7, 2014, the Parties filed their statements of costs.

100.     On December 15, 2014, Respondent filed a further request for the Tribunal to admit new evidence concerning further developments related to the Spanish court proceedings. In its request, Respondent referred to (i) an exchange of communications between the Trustees in in Insolvency of Air Comet and the funder Burford Capital Ltd.; (ii) the classification of the insolvency proceedings of the Marsans Group's companies as culpable; and (iii) developments in the criminal proceedings pending in Spain for fraudulent concealment of assets.

101.    On January 7, 2015, Claimants submitted their response to Respondent's communication of December 15, 2014.

102.    On January 15, 2015, the Tribunal decided on the admissibility of new evidence and authorized Respondent to submit the documents mentioned in its December 15, 2014 letter.

103.    On March 3, 2015, Respondent requested leave from the Tribunal to submit into the record a copy of the criminal complaint filed by the Treasury Attorney-General of the Argentine Republic with the Argentine Public Prosecutor's office (*Procuración General de la Nación*) on February 23, 2015. This complaint named as respondents, among others, Burford Capital, Teinver, Air Comet, Autobuses Urbanos del Sur and Transporte de Cercanias. On March 17, 2015, Claimants submitted their observations on Respondent's request of March 15, 2015.

104.    On March 18, 2015, noting that Claimants did not oppose Respondent's submission of the additional document in question (subject to the comments set out in their letter of March 17, 2015, and for reasons of expediency), the Tribunal authorized Respondent to submit a copy of the criminal complaint.

105.    On May 4, 2015, Respondent filed the Criminal Complaint as Exhibit RA 686.

106.    On June 4, 2015, Respondent filed a letter relating to certain information set out in the Report from the Administrators of Air Comet's insolvency concerning the status of this arbitration proceeding.  On June 24, 2015, at the invitation of the Tribunal, Claimants submitted their response to Respondent's letter of June 4, 2015.  On June 29, 2015, the Tribunal informed the Parties that it had taken note of the Parties' respective positions, and would not require any further submissions from the Parties on that matter.

107.    On July 29, 2015, Claimants submitted a Third Application for Provisional Measures in respect of: criminal complaints made by entities of Respondent against Claimants and their subsidiary, Air Comet, S.A. ("Air Comet"), the legal representatives of these companies and their Spanish court-appointed receivers, Claimants' counsel in these proceedings, as well as Claimants'

third-party funder; and a criminal investigation commenced by the Office of the Public Prosecutor of Argentina on the basis of these complaints.

108.    On July 30, 2015, the Tribunal acknowledged receipt of Claimants' Application and invited Respondent to comment on it within eight business days from its receipt of the electronic version of the Spanish translation of this document.  The Spanish translation was received from Claimants on July 31, 2015.

109.    In accordance with the Tribunal's directions, the deadline for the filing of Respondent's response to Claimants' Application was scheduled for August 12, 2015.

110.    On August 12, 2015, Respondent filed its Response to Claimants' Application. In its prayer for relief, Respondent requested that the Tribunal dismiss Claimants' Application and requested leave to submit a decision of the Argentine Federal Court of Appeals and a report filed in the criminal proceedings in Spain against one of Claimants' ultimate shareholders.

111.    On September 8, 2015, the Tribunal invited Claimants to (i) file observations on Respondent's request of August 12, 2015, concerning the admissibility of new evidence; and (ii) if they so wished, to submit a reply to Respondent's Response, both by September 15, 2015.

112.    On September 15, 2015, Claimants submitted a letter informing the Tribunal of the filing by the Argentine Attorney General of the Treasury (the "Treasury Attorney General") and the head of the Office of the Prosecutor for Economic Crimes and Money Laundering (the "PROCELAC") of a criminal complaint against Claimants, Burford Capital, Ltd. ("Burford"), Air Comet, King & Spalding LLP ("King & Spalding"), and Fargosi & Asociados (the "PROCELAC Complaint"), together with a number of supporting documents.

113.    In light of the above, Claimants requested that the Tribunal: (i) grant a 10-day extension of the deadline for the filing of their reply to Respondent's Response and Respondent's request for admissibility of new evidence; (ii) order that Respondent immediately produce a copy of the PROCELAC Complaint (the "Production Request", incorporated into Claimants' Application); and (iii) schedule a hearing on Claimants' Application.

114.    On September 16, 2015, the Tribunal informed the Parties that the deadline for the filing of Claimants' response to Respondent's letter of August 12, 2015 was suspended until the Tribunal issued directions on Claimants' Production Request. The Tribunal also requested that Respondent advise the Tribunal by September 18, 2015 whether and how quickly it could provide a copy of the PROCELAC Complaint to Claimants.

115.    Also on September 16, 2015, Respondent informed the Tribunal that the Tribunal's request had been transmitted to the PROCELAC, given that the Argentine Treasury Attorney General's Office was not in possession of a copy of the PROCELAC Complaint.

116.    On September 23, 2015, the Tribunal invited (i) Respondent to inform the Tribunal by September 25, 2015, whether it had received any response from the PROCELAC on the Tribunal's request for a copy of the PROCELAC Complaint; and (ii) Claimants to provide a response by September 29, 2015.  The Tribunal also confirmed its availability to hold a hearing in Washington, D.C. on November 3 and/or 4, 2015.  It further invited the Parties to confirm their availability by September 28, 2015, should the Tribunal determine that a hearing on Claimants' Application was required.

117.    On September 24, 2015, Respondent submitted PROCELAC's response on the Tribunal's request for a copy of the PROCELAC Complaint dated September 18, 2015.  In its response, the head of PROCELAC indicated that because the PROCELAC Complaint had been filed with the court, pursuant to Article 204 of Argentina's Code of Criminal Procedure (the "ACCP"), no copy of such complaint could be provided.

118.    On that same date, both Parties confirmed their availability to hold a hearing on Claimants' Application during November 3 and/or 4, 2015, in Washington, D.C.

119.    On September 29, 2015, Claimants submitted their response to Respondent's communication of September 24, 2015.

120.    On October 2, 2015, the Tribunal acknowledged receipt of the Parties' respective submissions of September 24 and 29, 2015, and took note that the Parties had confirmed their

availability on the proposed hearing dates.  It further requested: (i) that Respondent produce a copy of the PROCELAC Complaint; (ii) Claimants to confirm whether their letter of September 29, 2015 constituted their Reply in Claimants' Application or whether they still wished to submit a full Reply; and (iii) Claimants to respond to Respondent's request for the admission of the two new documents set out in paragraph 81(c) of Respondent's Response.

121.    On October 6, 2015, Claimants submitted their reply to the Tribunal's letter of October 2, 2015, noting that they wished to submit a full Reply and, for reasons of expediency, did not oppose the incorporation into the arbitral record of the two new documents set out in paragraph 81(c) of Respondent's Response of August 12, 2015.

122.    On that same date, Respondent submitted its reply to the Tribunal's letter of October 2, 2015, reiterating its inability to produce the PROCELAC Complaint and providing details permitting identification of the relevant domestic court to which the PROCELAC Complaint had been submitted.

123.    By letter of October 8, 2015, the Tribunal acknowledged receipt of the Parties' respective letters of October 6, 2015.  It further acknowledged receipt on October 6, 2015, of the Spanish translation of Claimants' letter of September 29, 2015, and on October 7, 2015, of the English translation of Respondent's letter of October 6, 2015.

124.    In the same letter, the Tribunal, among other things: (i) set deadlines for a second round of written submissions, (ii) scheduled a hearing on Claimants' Application for November 3, 2015, at the seat of the International Centre for Settlement of Investment Disputes in Washington, D.C. (the "PM Hearing"), and (iii) provided the Hearing schedule and related logistics information.

125.    In accordance with the procedural schedule, on October 14, 2015, Claimants filed their Reply to Claimants' Application.  On October 15, 2015, Claimants filed a corrected version of their Reply to Claimants' Application ("Claimants' PM Reply"), together with a complete version of the PROCELAC Complaint and related file materials, which they had been able to obtain from the court.

126.    On October 16, 2015, both Parties submitted their respective lists of participants for the PM Hearing.

127.    On October 22, 2015, Claimants submitted a letter to the Tribunal attaching three public deeds executed by Claimants' court-appointed receivers in Spain, as a new exhibit, Exhibit C-1200.

128.    On October 23, 2015, the President of the Tribunal invited Respondent to submit any observations that it might have on Claimants' letter of October 22, 2015, and Exhibit C-1200 attached to it, within two business days from its receipt of the Spanish translation of said letter. Respondent would then have one business day to provide the English translation of its observations.

129.    On that same date, the President of the Tribunal supplemented the Tribunal's directions of October 8, 2015, by providing further logistical instructions to the Parties in preparation for the PM Hearing.

130.    Also on October 23, 2015, Respondent filed its Rejoinder to Claimants' Application ("Respondent's PM Rejoinder") and Claimants provided a Spanish translation of their letter of October 22, 2015.

131.    On October 26, 2015, Claimants provided an English translation of the relevant parts of their Exhibit C-1200, filed with their letter of October 22, 2015.

132.    On October 27, 2015, Respondent provided an English translation of its PM Rejoinder.  On that same date, Respondent submitted to the Tribunal a letter with its observations on Claimants' letter of October 22, 2015 and Exhibit C-1200.

133.    On October 28, 2015, Respondent provided an English translation of its letter of October 27, 2015.

134.   On November 3, 2015, the Tribunal held the PM Hearing on Claimants' Application in Washington, D.C.  In addition to the Members of the Tribunal and the Secretary of the Tribunal, present at the hearing were:

For Claimants:

In person
| | |
|---|---|
| Mr. Guillermo Aguilar Álvarez | King & Spalding |
| Mr. Roberto Aguirre Luzi | King & Spalding |
| Mr. R. Doak Bishop | King & Spalding |
| Ms. Ashley Grubor | King & Spalding |
| Ms. Silvia Marchili | King & Spalding |
| Mr. Craig S. Miles | King & Spalding |
| Ms. Margrete Stevens | King & Spalding |
| Mr. Diego Fargosi | Estudio Fargosi & Asociados |
| Mr. Luis Arqued Alsina | Teinver |
| Mr. Christopher Bogart | Burford Capital |
| Mr. Mariano Hernández | Air Comet |
| Mr. Alvaro Martínez | Air Comet |

Via video conference from Madrid, Spain
| | |
|---|---|
| Mr. Esteban Leccese | King & Spalding |
| Mr. Jesús Verdes Lezana | Transportes de Cercanías |
| Mr. Miguel Vilella Barrachina | Transportes de Cercanías |
| Mr. Edorta Etxarandio | Teinver |
| Mr. José Carlos González Vázquez | Autobuses Urbanos del Sur |
| Mr. Ramón Soler Amaro | Autobuses Urbanos del Sur |

For Respondent:

| | |
|---|---|
| Dr. Angelina Abbona | Procuradora del Tesoro |
| Mr. Horacio Diez | Procuración del Tesoro de la Nación |
| Mr. Carlos Mihanovich | Procuración del Tesoro de la Nación |
| Ms. Mariana Lozza | Procuración del Tesoro de la Nación |
| Mr. Sebastián Green | Procuración del Tesoro de la Nación |
| Ms. Soledad Romero | Procuración del Tesoro de la Nación |
| Ms. Magdalena Gasparini | Procuración del Tesoro de la Nación |
| Mr. Nicolás Duhalde | Procuración del Tesoro de la Nación |
| Mr. Manuel Domínguez Deluchi | Procuración del Tesoro de la Nación |
| Mr. Eduardo Barcesat | Asesor |
| Mr. Gabriel Bottini | Asesor |

Mr. Nicolás Sykes                          Aerolíneas Argentinas S.A.

135.    By letter of November 18, 2015, the President of the Tribunal informed the Parties that, due to personal commitments, his Assistant, Ms. Annalise Nelson, would be replaced by Ms. Jill Goldenziel. Ms. Goldenziel's *curriculum vitae* was attached, and the Parties were invited to inform the Tribunal by November 20, 2015, if they had any objection.

136.    On November 20, 2015, both Parties expressed having no objections to the appointment of Ms. Goldenziel as Assistant to the President. As a result, by letter of November 23, 2015, the Parties were informed of Ms. Goldenziel's appointment.

137.    By letter of December 1, 2015, Claimants informed the Tribunal that they had recently learned that ARSA's CEO had called for a shareholders' meeting on December 9, 2015, in order to consider, among other issues, the transfer of the shares to the National State. In their letter, Claimants noted that, as already explained, the expropriation proceeding in Argentina had not ended, because Interinvest had not been notified of the alleged rejection of its pending appeal before the Supreme Court. Accordingly, in Claimants' view, Interinvest continued to hold and should continue to hold title to the shares of both ARSA and AUSA.

138.    On December 2, 2015, the Tribunal invited Respondent to comment on Claimants' communication of December 1, 2015 by December 7, 2015.

139.    On December 4, 2015, Respondent responded to Claimants' communication of December 1, 2015.

140.    On December 9, 2015, the Parties were informed that the Tribunal was in receipt of both Claimants' communication of December 1, 2015, and Respondent's response of December 4, 2015, and had taken note of their contents.

141.    On January 4, 2016, the Secretary of the Tribunal transmitted to the Parties and to the Tribunal Members a copy of a letter from the Secretary-General of ICSID dated December 23, 2015, acknowledging receipt of a letter from the Argentine Republic of December 22, 2015, informing of the appointment of Dr. Carlos Francisco Balbín as Argentina's Treasury Attorney

General, following the resignation of Dra. Angelina María Esther Abbona. In its communication, Argentina additionally informed that Dr. Horacio Pedro Diez and Dr. Javier Pargament Mariasch had also submitted their resignations from their positions as Deputy Treasury Attorney General.

142.    On February 25, 2016, the Secretary of the Tribunal, on instructions of the President, informed the Parties that the Tribunal's Decision on Claimants' Third Request for Provisional Measures was ready in its English version, which had been sent for its translation into Spanish. It was further indicated that, unless the Parties requested otherwise, the Tribunal would issue its Decision in both languages simultaneously.

143.    On February 26, 2016, Claimants requested that the English version of the Tribunal's Decision on Claimants' Third Request for Provisional Measures be sent first, without waiting for the Spanish version. On the same date, Respondent requested that the Decision be issued simultaneously in both languages.

144.    By letter of March 8, 2016, Claimants brought to the Tribunal's attention a new development, the signing by the Argentina's President of Decree 294/2016 of February 2, 2016, derogating the cap on domestic airfares (that is, the maximum airfare), requesting the Tribunal to take this new development into account when rendering the award and in allocating the costs of this arbitration.

145.    On March 9, 2016, the Tribunal invited Respondent to comment on Claimants' letter of March 8, 2016 by March 16, 2016.

146.    Also, on March 9, 2016, Respondent requested an extension of the deadline to comment on Claimants' letter of March 8, 2016, until March 21, 2016, in light of a number of submissions that it needed to make in other cases. On the same date, the Tribunal granted the extension.

147.    On March 21, 2016, Respondent submitted its response to Claimants' correspondence of March 8, 2016.

148.    On March 29, 2016, the Tribunal informed the Parties that it was in receipt of the Parties' recent correspondence concerning the derogation of the cap on domestic airfares in Argentina, and had taken note of their contents.

149.    On April 8, 2016, the Tribunal issued its Decision of Claimants' Third Application for Provisional Measures ("Decision on Provisional Measures of April 8, 2016"). In its Decision, the Tribunal held the following:

> The Tribunal:
>
> a)  orders that Respondent refrain from publicizing the Complaints or the criminal investigation and any relation they may have to this arbitration, whether by communications to the press or otherwise;
>
> b)  defers its decision in respect of Claimants' Application for Provisional Measures as it relates to the suspension of the criminal proceedings in regard of counsel for Claimants and Claimants' court-appointed receivers, with liberty to Claimants to bring this Application back before the Tribunal in this respect should it become necessary;
>
> c)  reminds the Parties that they are obligated to refrain from aggravating the dispute;
>
> d)  denies the remaining aspects of Claimants' Application for Provisional Measures; and
>
> e)  reserves its decision on the costs of the procedure relating to Claimants' Application for Provisional Measures to the final award.

150.    Attached to the Tribunal's Decision of April 8, 2016, was a Dissenting Opinion by Dr. Kamal Hossain. In his Dissent, Dr. Hossain expressed his disagreement around setting out of contentious factual positions, which he considered were not necessary for the order made and conveyed the erroneous impression that those issues might be treated as settled. His objections also related to some issues, which he categorized as preliminary, fundamental and unresolved, which in his view had to be dealt with in the award on the merits upon consideration of the evidence on record.

151.    By letter of September 29, 2016, the Secretary of the Tribunal, on instructions of the President of the Tribunal, informed the Parties on the status of the Award:

> An advanced draft of the Tribunal's Award has been under discussion. The Tribunal Members have deliberated in person and by other means, and have exchanged several thorough notes expressing their particular, and sometimes opposed views on several key issues. The Tribunal is aware that the Parties have been waiting for a long period of time for the Tribunal's Award. The Tribunal is also fully aware how important this case is for the Parties. It therefore regrets the delay very much. As

the Parties know, however, this is a complicated case that requires the Tribunal to consider a vast factual background, extensive submissions, massive volume of documents and very complex legal issues in dispute.

The Tribunal wishes to assure the Parties that it is doing its very best to finalize the Award as soon as possible.

152.    By letter of October 4, 2016, Claimants requested that the proceeding be closed pursuant to ICSID Arbitration Rule 38(1).

153.    On October 17, 2016, Respondent filed a letter requesting leave from the Tribunal to file a document relating to the Public Prosecutor's classification of the insolvency proceedings of Transporte de Cercanías, S.A. as "culpable".

154.    On October 19, 2016, the Tribunal invited Claimants to comment on Respondent's request of October 17, 2016, for the Tribunal to decide on admissibility of new evidence.

155.    On October 24, 2016, Claimants filed observations of Respondent's request of October 17, 2016.

156.    On October 26, 2016, Respondent requested leave from the Tribunal to respond to Claimants' letter of October 24, 2016. The Tribunal granted this request on October 27, 2016, and Respondent submitted its response on November 1, 2016.

157.    On November 4, 2016, Claimants filed a response to Respondent's letter of November 1, 2016.

158.    By letter of November 11, 2016, the Tribunal provided directions to the Parties and fixed a procedural schedule for the submission by Respondent of the document in which the Public Prosecutor classifies the nature of the insolvency proceedings of Transportes de Cercanías, S.A., and for subsequent comments by Claimants. The Tribunal also acknowledged receipt of Claimants' letter of October 4, 2016, requesting that the proceeding be closed pursuant to ICSID Arbitration Rule 38(1), a request that Claimants had ratified in their letters of October 24, 2016 and November 4, 2016. The Tribunal indicated that it would communicate separately the closure

of the proceeding once it had determined Respondent's request of October 17, 2016 for the admissibility of new evidence.

159.     By letter of November 16, 2016, Claimants informed the Tribunal that they had no further comments on Respondent's request and repeated their request for the Tribunal to declare the proceeding closed. This was followed by Respondent's letter of November 17, 2016, informing the Tribunal that it would transmit an English translation of the document from the Public Prosecutor's Office in the next few days. The translation was filed on November 21, 2016.

160.     On November 29, 2016, the Tribunal acknowledged receipt of a document dated February 29, 2016, issued by the Provincial Prosecutor's Office of Madrid concerning the insolvency proceedings of Transportes de Cercanías, S.A. Having considered the document in question, and the Parties' positions on the matter, the Tribunal, informed the Parties that after due deliberation, it had decided to admit the document into the record on the basis that its relevance and weight would be assessed by the Tribunal together with all of the evidence submitted.

161.     In its letter of November 29, 2016, the Tribunal also invited the Parties to advise whether they wished to submit updated statements of cost, and if so, to submit them simultaneously by December 16, 2016.

162.     On December 6, 2016, both Parties expressed their wish to submit updated statements of costs. On December 16, 2016, as scheduled, each Party submitted an updated statement of costs.

163.     On January 25, 2017, the Tribunal declared the proceeding closed in accordance with ICSID Arbitration Rule 38(1). ICSID Arbitration Rule 46 provides that "[t]he award (including any individual or dissenting opinion) shall be drawn up and signed within 120 days after closure of the proceeding. The Tribunal may, however, extend this period by a further 60 days if it would otherwise be unable to draw up the award." On May 8, 2017, in accordance with Arbitration Rule 46, the Tribunal extended the period to draw up and sign the Award for a further 60 days (i.e., until July 24, 2017).

## D. General overview of the Claim and Counterclaim

### 1. Claimants' Claim and Prayer for Relief

164. This claim is brought by Teinver, Transportes de Cercanías and Autobuses Urbanos, all companies incorporated in the Kingdom of Spain, against the Respondent, under the Treaty. Claimants are members of a group of companies known collectively as the "Marsans Group".

165. As discussed in detail below,[2] in late 2001, Claimants Transportes de Cercanías and Autobuses Urbanos, together with two other Marsans Group entities, acquired control of ARSA and AUSA, which they purchased indirectly through their subsidiary Air Comet, a Spanish company that in turn owned Interinvest, the Argentine holding company for the Airlines. In 2006, Claimant Teinver acquired the 30% shareholding in Air Comet previously held by the other two Marsans Group entities. The Claimants collectively owned 100% of the shares of Air Comet at the time of filing of their claim.

166. Claimants' claim in this arbitration can be divided into two components. First, Claimants assert that Respondent unlawfully expropriated their investment in the Airlines at the end of 2008 through executive action and legislation that confiscated their shares in the Airlines. It is not contested by either Party that Respondent paid a symbolic ARS 1 in compensation for Claimants' shares in the Airlines. Claimants assert that Respondent's expropriation of the Airlines constitutes a violation of Article V of the Treaty.

167. Second, Claimants assert that before the formal expropriation of the Airlines took place in 2008, Respondent engaged in a series of acts that together constituted a creeping expropriation under Article V of the Treaty. Claimants allege, in particular, that Respondent maintained airfares at artificially low levels and prevented the Airlines from charging sufficient rates for airfares, resulting in a financial squeeze that damaged both Claimants' investment and the value of the Airlines. This was done, according to Claimants, in order to force a distressed sale of the Airlines. Claimants point to other alleged acts that they claim were part of a process of "re-Argentinization"

---

[2] *See* ¶¶ 176 to 183, below.

of the Airlines—acts designed to pressure Claimants into relinquishing their control of the Airlines. These acts include the following:

> The maintenance in office, despite a serious conflict of interest, of an Undersecretary of Air Transportation who had formerly served as the head of a powerful air transportation union in Argentina
>
> Acts taken by the "government-supported" air transportation unions
>
> Respondent's failure to comply with a number of agreements it entered with Claimants' subsidiaries between 2006 and 2008, including a memorandum of agreement for the sale of Claimants' shares in the Airlines to the Government of Argentina

168.    Claimants allege that these and other acts constituted both creeping expropriation in violation of Article V of the Treaty and constituted violations of the fair and equitable treatment standard under Article IV(1) of the Treaty. Claimants also allege that Respondent failed to protect their investment in Argentina, in violation of Article III(1) of the Treaty; that Respondent took unjustified and/or discriminatory measures against Claimants, in violation of Article III(1) of the Treaty; and that Respondent's conduct amounts to a breach of the umbrella clause, invoked through the MFN clause contained in Article IV(2) of the Treaty.[3]

169.    In the prayer for relief in their June 30, 2014 Post-Hearing Brief, Claimants request the following:

> A declaration that Argentina has violated the BIT;
>
> A declaration that Argentina's actions and omissions at issue and those of its instrumentalities for which it is internationally responsible are unlawful, arbitrary, discriminatory, unfair and inequitable, constitute an expropriation or measures tantamount to expropriation without appropriate and timely compensation, and that the GOA [Government of Argentina] failed to protect Claimants' investment and failed to fulfill obligations assumed with respect to the treatment of Claimants' investments;
>
> A declaration that the necessity defense does not apply;
>
> …
>
> An award to Claimants of restitution or the monetary equivalent of all damages caused to its investments, including historical and consequential damages;
>
> Pre-and-post award compound interest until the effective date of payment; and

---

[3] Claimants assert that, through this MFN clause, they are entitled to the more favorable treatment accorded to investors under Article II(2)(c) of the U.S.-Argentina BIT, which provides: "Each Party shall observe any obligation it may have entered into with regard to investments." Cl. Mem. ¶ 488, citing C-348.

An award to Claimants for all costs of these proceedings, including attorneys' fees.

170.    In this same prayer for relief, Claimants request compensation based on the unlawful formal expropriation of their investment, as well as on the Treaty breaches that occurred prior to formal expropriation. Claimants request a total amount of USD 1.59 billion for both Airlines combined, calculated with interest through July 31, 2013.[4]

171.    Respondent's final prayer for relief contains, with respect to Claimants' claim, a request for the Tribunal:

    (a)    to declare that King & Spalding lacks the necessary legal capacity to represent Claimants in this arbitration, which would result in the annulment of all actions taken, as well as to declare the forfeiture of Claimants' right to file an action;

    (b)    to reject all of the claims put forward by Claimants;

    …

    (d)    to order Claimants to pay for all costs and expenses arising from this arbitration proceeding.

## 2.    Respondent's Counterclaim and Prayer for Relief

172.    On May 6, 2013, Respondent submitted, along with its Counter-Memorial on Claimants' claim, a Counterclaim against Claimants. This Counterclaim is based on the damage Respondent alleges it has suffered due to Claimants' administration of the Airlines between 2001 and 2008, and the state of such companies as a consequence of such administration. Respondent asserts that the Airlines were in a "state of almost total destruction and paralysation, after the stripping of assets by the Marsans Group, which made the State comptrollership necessary to make the operations of the flag carrier viable."[5]

173.    In the final prayer for relief in its Post-Hearing Brief, Respondent requests this Tribunal:

    (c)    to sustain the Counterclaim filed by the Argentine Republic, to award damages—plus pre- and post-Award interest from the moment the Argentine Republic suffered the damage—as well as to grant the Argentine Republic such further relief as the Tribunal may deem appropriate;

---

[4] Cl. PHB ¶ 201.
[5] Resp. CM ¶ 890.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 50 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

174.    The Argentine Republic requests damages in the amount of USD 1,636,600,000, based on its claims regarding the Airlines' non-operating liabilities at the time of expropriation, necessary investments made by Argentina to ensure operation of the Airlines and extraordinary losses following expropriation due to inoperability.[6] These damages are calculated as of December 31, 2008.

175.    In their final prayer for relief, Claimants request from the Tribunal a declaration rejecting Argentina's Counterclaim in its entirety.[7]

## III.    PRELIMINARY ISSUES RELATED TO THE IDENTITY OF CLAIMANTS

### A.    Claimants' Ownership of the Airlines

176.    In 2001, the Airlines were owned by Sociedad Estatal de Participaciones Industriales ("SEPI"), a holding company for all companies fully or partially owned by the Spanish government. SEPI owned the Airlines through an Argentine intermediary company called Interinvest. SEPI owned 99.2% of Interinvest, and Interinvest in turn held 92.1% of ARSA's shares and 90% of AUSA's shares.[8] On October 2, 2001, SEPI entered into a Share Purchase Agreement ("SPA") with the Spanish company, Air Comet, through which Air Comet acquired SEPI's full 99.2% interest in Interinvest.[9] It appears that Air Comet's 99.2% interest in Interinvest, once acquired, did not change during the period between its acquisition of Interinvest in 2001 and the expropriation of Interinvest's shares in the two Airlines by Argentina at the end of 2008.[10]

177.    When the SPA was signed in October 2001, Air Comet was directly owned by two of the three Claimants, Autobuses Urbanos (35%) and Transportes de Cercanías (35%), as well as by two other Spanish companies, Proturin S.A. (29.8%) and Segetur S.A. (0.2%).[11] Three of these four companies signed the SPA as shareholders of Air Comet and expressly assumed the obligations of

---

[6] Resp. Rej. ¶ 826.
[7] Cl. CC Rej. ¶ 148(iii).
[8] C-11.
[9] C-18.
[10] *See* Claimants' letter of June 16, 2011 p. 5, in which Claimants state that "since July 20, 2006, the three Claimants together have owned 100% of Air Comet, which in turn kept its shareholdings in Interinvest, which in turn kept its shareholdings in ARSA and AUSA."
[11] Claimants' letter of June 16, 2011, 5. *See also* Air Comet's Shareholders Registry Book, at 4, Ex. 5 to the RFA.

Air Comet under the SPA.[12] Another Spanish company, Viajes Marsans S.A., was named in the SPA as guarantor of certain of Air Comet's obligations under the SPA and signed the SPA in that capacity.[13]

178.    Claimant Teinver became a shareholder of Air Comet on July 20, 2006, when it purchased Proturin's and Segetur's entire shareholdings in Air Comet.[14] At this point, Air Comet was owned entirely by the three Claimants, as follows: Autobuses Urbanos (35%), Transportes de Cercanías (35%), and Teinver (30%).

179.    From July 20, 2006 until the initiation of this arbitration, the three Claimants together owned 100% of Air Comet, although the distribution of shares during this period changed several times. On October 2, 2007, Teinver became Air Comet's majority shareholder, with the following distribution of shares: Teinver (56%), Autobuses Urbanos (22%) and Transportes de Cercanías (22%). Teinver purchased additional shares from Transportes de Cercanías on December 31, 2007, with the following distribution of shares: Teinver (66.67%), Autobuses Urbanos (22%) and Transportes de Cercanías (11.33%). On February 8, 2008, Claimants' respective participations shifted substantially: Teinver (96.77%), Autobuses Urbanos (2.13%) and Transportes de Cercanías (1.1%).[15] This was the ownership structure in place at the time Claimants instituted this arbitration (December 11, 2008) and the Acting Secretary-General of the Centre registered the Request and notified the Parties thereof (January 30, 2009).

180.    On December 10, 2009, about one year after the initiation of this arbitration, Transportes de Cercanías and Autobuses Urbanos sold their remaining shareholdings in Air Comet to Teinver, leaving Teinver as the sole shareholder of Air Comet.

181.    Between 2001 and 2008, when Air Comet owned and controlled the Airlines, each of the three Claimants Teinver, Transportes de Cercanías and Autobuses Urbanos was "part of the

---

[12] These three companies were Autobuses Urbanos, Transportes de Cercanías and Segetur.  *See* Share Purchase Agreement, C-18, Article 8.  Proturin S.A. does not appear to have signed the SPA.
[13] *Id.* at Article 8.  Note that Claimants assert that Transportes de Cercanías and Autobuses Urbanos were also bound as Air Comet's guarantors (*see* Cl. Mem. ¶ 40), although Article 8 of the SPA does not expressly indicate this.
[14] *See* Claimants' letter of June 16, 2011 at 5.
[15] *Id.* at 5-6. *See also* Air Comet's Shareholders Registry Book, at 4, Ex. 5 to the RFA.

Marsans Group"[16], a Spanish consortium that was formerly owned by two Spanish nationals, the late Mr. Gonzalo Pascual Arias and Mr. Gerardo Díaz Ferrán. Claimants do not spell out the ownership structure of the Marsans Group in great detail.[17]   Claimants depicted their share ownership in Air Comet and, indirectly, Interinvest in the following manner:



182.   From the various insolvency proceedings before the Spanish courts, the chain of ownership of what was loosely referred to as the Marsans Group appears to be as set out below:

---

[16] RFA ¶ 3.
[17] Claimants tend to refer to Claimants as "part of the Marsans Group," without much additional elaboration. *See, e.g.,* RFA ¶ 3; Cl. Mem. ¶ 7, fn.3. Respondent's witness, Mr. Juan José Cigarrán Magán, includes a generalized scheme of the group owned by Messrs. Díaz Ferrán and Pascual Arias in his First Report of May 3, 2013, p. 5.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award



183.   It appears that the assets of the Marsans Group, including the shares of Teinver, were sold by Messrs. Díaz Ferrán and Pascual Arias to a Spanish company called Posibilitum Business S.L. in or about June 2010.[19] Mr. Pascual Arias died on June 21, 2012. Mr. Díaz Ferrán was provisionally detained on December 5, 2012 in connection with the Operación Crucero criminal investigation conducted in Spain, where he currently remains in detention (described below).[20]

## B.   Claimants' Insolvency and Current Status

184.   All three Claimants and Air Comet initiated voluntary insolvency proceedings after this arbitration was commenced in late 2008.

185.   In the case of Air Comet, the Spanish Commercial Court No. 8 issued an order declaring the initiation of Air Comet's voluntary reorganization proceeding on April 20, 2010.[21] The order specified that Air Comet's powers of administration and disposition of its assets were henceforth subject to the authorization or agreement of the court-appointed reorganization administrators. On

---

[18] *See* Cigarrán Magán ER1 p. 5.
[19] *See* Transcript p. 54.  *See also*: Resp. Mem. on Juris. ¶ 282 ("The transaction entailed selling assets such as Viajes Marsans and Teinver S.A., which comprise the Hotetur hotel chain, the Air Comet S.A. airline, Seguros Mercurio, and Newco handling company, among more than 50 travel companies."); Judgment of Commercial Court No. 12 of June 13, 2013 (attached to Respondent's letter of June 13, 2013 in respect of the insolvency of Viajes Marsans S.A.: Ex. DUP004) pp. 37-38.
[20] Resp. CM ¶ 111; *see* RA-180, Annex P03.
[21] C-759.

December 22, 2010, this same court ordered the suspension of Air Comet's powers of administration and disposition.[22]

186.   As for Claimants, Teinver initiated voluntary reorganization on December 23, 2010,[23] Transportes de Cercanías on February 16, 2011,[24] and Autobuses Urbanos on January 28, 2011.[25] Transportes de Cercanías' reorganization proceedings entered the liquidation phase on April 23, 2013.[26] Teinver likewise entered the liquidation phase of proceedings on April 26, 2013.[27] At this point, the powers of both companies to administer and dispose of their assets were suspended.[28] It appears that Autobuses Urbanos has not entered the liquidation phase at present, but its powers of administration and disposition of assets were suspended by court order on April 10, 2013.[29]

187.   The bankruptcy of Air Comet and of all three Claimants is related to certain factual and legal disputes in this case. First, Respondent has asserted that Claimants' bankruptcy terminated King & Spalding's power of attorney to represent Claimants in this case. The Parties' arguments with respect to this issue are addressed below in Section IV of this Award. Second, the Parties disagree on the causes of Claimants' and Air Comet's bankruptcy. Claimants, through Mr. Díaz Ferrán, assert that the bankruptcies were the direct result of Respondent's unlawful acts and policies towards the Airlines.[30] Respondent argues that the bankruptcies were due to reasons wholly unconnected to Respondent's actions, including Claimants' poor business management, lack of liquidity and failure to make payments.[31] With respect to Air Comet's bankruptcy, Respondent argues that the company was in a state of bankruptcy as early as April 2008, predating

---

[22] C-757.
[23] RA-166; Decision on Jurisdiction ¶ 240.
[24] RA-167; Decision on Jurisdiction ¶ 240.
[25] C-753, Ex. M-101; Decision on Jurisdiction ¶ 240.
[26] C-840.
[27] C-839.
[28] Cl. Reply ¶ 24.
[29] C-841.
[30] *See, e.g.,* testimony of Díaz Ferrán, Transcript pp. 34-36.
[31] *See, e.g.,* Resp. Rej. ¶¶ 254-256, 261; Resp. PHB ¶ 8 (arguing "The allegation that an economic group that turned over six to seven billion US dollars per year between 2005 and 2008 fell apart because the Argentine Republic failed to reimburse a down payment allegedly made to AIRBUS lacks any credibility, especially considering that the Argentine Republic had not assumed any commitment with regard to such transaction.").

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 55 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

the expropriation of the Airlines later in 2008.[32] These arguments with respect to the causation of Claimants' insolvencies are relevant to both Claimants' claims and Respondent's Counterclaim.

## C.   Evidentiary Issues Related to Claimants

188.   Respondent asserts that "the main witnesses produced by Claimants have openly admitted to having a financial interest in the outcome of the arbitration proceedings, which causes their testimonies to lose value."[33] Respondent notes, in particular, that Claimants' witness, Mr. Vicente Muñoz Pérez, would benefit from the right to receive a percentage from the total amount that Claimants might collect from any award in this proceeding.[34] During the hearing, Mr. Muñoz Pérez conceded this interest, asserting that it constitutes remuneration for the work he has done.[35]

189.   Likewise, Respondent notes that Claimants' witness, Mr. Ignacio Pascual de Riva, recognized during the hearing that Air Comet owed him one million Euros that he had previously lent to Air Comet from his personal contributions.[36]

190.   Finally, Respondent makes the following argument in its Post-Hearing Brief:

> It should be noted that all of these individuals that have been found guilty in criminal and civil courts have testified throughout these proceedings, so that this Tribunal cannot hold the Argentine Republic liable based on the statements of those who are suspected and/or have been convicted of having caused their own bankruptcy, concealed information and who have been prosecuted for serious crimes. [emphasis added] [37]

191.   Respondent notes, in particular, that Messrs. Díaz Ferrán and Antonio Mata Ramayo[38] were convicted of crimes against the Treasury Department and sentenced to imprisonment, fines and disqualifications.[39] Respondent also asserts that Claimants have attempted to conceal

---

[32] *See* Transcript pp. 1725-1726, 1731; Mr. Cigarrán Magán, ER2 ¶¶ 5-6.

[33] Resp. PHB ¶ 56.

[34] Resp. PHB ¶ 57; Transcript pp. 466-469.

[35] Testimony of Muñoz Pérez, Transcript p. 487 ("Do you understand why I have that interest? Because all of this work, all of these appearances were done; and if the Government had reached an Agreement, I would have received my bonus as an executive and nothing would have happened. But this is the justification of why I have that financial interest, because I worked a lot and hard back then on this and I didn't receive any compensation.")

[36] Resp. PHB ¶ 58; Transcript p. 433; Mr. Pascual de Riva WS ¶ 103.

[37] Resp. PHB ¶ 210, emphasis added.

[38] Mr. Antonio Mata Ramayo is a former business partner of Messrs. Díaz Ferrán and Pascual Arias who served as Executive Vice Chairman of the Board of Directors of ARSA during the Marsans Group's administration.

[39] *See* Section IV.E, below for the discussion of these Spanish court proceedings.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 56 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

documents that would demonstrate the Marsans Group's engagement in asset-stripping, particularly with respect to the "Operación Crucero" criminal case.[40]

192.    It is the Tribunal's view that neither the domestic criminal and/or civil liability of any witness in this proceeding, nor the existence of pending criminal or civil suits against any witness in this proceeding, may constitute a bar on the witness's ability to testify in this arbitration proceeding. Likewise, the existence of legal liability or potential legal liability on the part of any witness in this case may not, on its own, serve as a basis on which to preclude the Argentine Republic's liability under the Treaty. The Tribunal must weigh the relevance and the relative weight of all the evidence produced in this case. The Tribunal has reviewed and addressed each of Respondent's assertions with respect to Spanish and Argentine domestic legal proceedings in Section IV.E, below.

## IV.    ISSUES OF ADMISSIBILITY AND STANDING NOT ADDRESSED IN THE DECISION ON JURISDICTION

### A.    King & Spalding's Power of Attorney to appear in this dispute

### 1.    The Parties' Arguments

193.    Respondent asserts, as an affirmative defense to this case, that the power of attorney granted by Claimants to King & Spalding became invalid "after the commencement of the proceedings as a result of the insolvency of the Claimants"[.][41] According to Respondent, King & Spalding's alleged lack of power of attorney "constitutes fraud on the court" and "cannot be made right by any subsequent measure,"[42] and these proceedings before ICSID must therefore be closed.[43]

194.    In support of its arguments, Respondent points to Article 48(3) of Spain's Bankruptcy Law, which provides that "any power of attorney existing at the time of the initiation of the insolvency proceedings shall be affected by the suspension or control of financial and property-related

---

[40] Resp. PHB ¶ 208, citing to a November 29, 2012 Report issued by the Unit for Financial and Tax-Related Crimes of the General Judicial Police Agency under the Ministry of the Interior. RA-180, document "P-14."
[41] Resp. Rej. ¶ 15; Resp. CM ¶ 53.
[42] Resp. CM ¶ 56.
[43] Resp. CM ¶ 58; Resp. Rej. ¶ 34.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 57 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

powers."[44] As such, it argues that Claimants' insolvency resulted in King & Spalding's "loss of procedural capacity."[45] Respondent also cites to Spanish Civil Code Article 1732(3) which, according to Respondent, "expressly sets forth that the declaration of bankruptcy of the principal is one of the grounds for termination of the power of attorney."[46]

195.    For its part, Respondent disagrees with the view by Claimants' expert witness, Professor Aurora Martínez Flórez, that the relationship between Claimants and King & Spalding is one of a service contract.[47]  Respondent argues that regardless of how the contract is classified, the fact remains that King & Spalding's power of attorney to act before this Tribunal ceased to exist under Spanish law.[48]

196.    Moreover, Respondent argues that King & Spalding's attempts to "ratify" its power of attorney fail.[49] While Claimants have produced letters[50] written by the trustees in insolvency for each of the Claimants that purport to ratify the power of attorney, Respondent asserts that these letters are flawed. It notes that the letters are not addressed directly to ICSID but rather to the King & Spalding attorneys representing Claimants. It also notes that the letters are undated,[51] and that

---

[44] Resp. CM ¶ 61, citing *Ley 22/2003, de 9 de julio, Concursal* (C-752). The full text of Article 48(3) provides: "The administrators or liquidators of the insolvent legal person shall continue to represent it within the context of the insolvency proceedings.  In the event of suspension, the management and disposition powers of the administrator or liquidators shall be transferred to the trustees in insolvency.  In the event of comptrollership, those powers shall continue to be exercised by the administrators or liquidators, under the supervision of the trustees in insolvency, who will be in charge of authorizing or validating all acts of management or disposition.  Any power of attorney existing at the time of the initiation of the insolvency proceedings shall be affected by the suspension or control of financial and property-related powers." (cited in English at Resp. CM ¶ 61).
[45] Resp. Rej. ¶ 15.
[46] Resp. Rej. ¶¶ 18, 29. The full text of Article 1732(3) reads as follows: "*El mandato se acaba: 1.º Por su revocación. 2.º Por renuncia o incapacitación del mandatario. 3.º Por muerte, declaración de prodigalidad o por concurso o insolvencia del mandante o del mandatario. / El mandato se extinguirá, también, por la incapacitación sobrevenida del mandante a no ser que en el mismo se hubiera dispuesto su continuación o el mandato se hubiera dado para el caso de incapacidad del mandante apreciada conforme a lo dispuesto por éste. En estos casos, el mandato podrá terminar por resolución judicial dictada al constituirse el organismo tutelar o posteriormente a instancia del tutor.*" *See* Martínez Flórez, Annex 11.
[47] Resp. Rej. ¶ 24.
[48] Resp. Rej. ¶ 24.
[49] Resp. Rej. ¶ 31.
[50] C-842; C-843; C-844.
[51] Resp. Rej. ¶ 31. Respondent's expert witness, Mr. Cigarrán Magán, asserted that "an undated document would, indeed, have a major formal defect." Transcript p. 984.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 58 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

they do not appear to have been notarized.[52] Finally, Respondent notes that the letters appear to have been executed unilaterally by the trustees, and do not appear to be the result of an order from a commercial court of Madrid.[53] According to Respondent, the trustees lack the right to ratify the acts taken by King & Spalding and to authorize the firm to carry on its activities.[54] Respondent asserts that "every lawyer is aware that, in order for a power of attorney to be renewed within the context of an insolvency proceeding, there must be a court order authorizing such renewal."[55]

197.    Finally, Respondent argues that the financing agreement signed between Claimants and third-party funder Burford on July 14, 2010 required Claimants to use the King & Spalding attorneys.[56] Respondent asserts that it is because of this requirement that Claimants have not produced a new Power of Attorney between the receivers and King & Spalding as they should have.[57]

198.    Claimants submit that neither their individual declarations of insolvency nor the commencement of their liquidation phases has any effect on the Power of Attorney signed between King & Spalding and Claimants.[58]

199.    First, Claimants assert that under Spanish Bankruptcy Law Article 52, neither the liquidation phase nor the suspension of powers to administer or dispose of assets has any effect on the continuation of this arbitral proceeding.[59] They note that upon the suspension of Claimants' powers of administration and disposition of assets, the Reorganization Administrators replace the

---

[52] Resp. Rej. ¶ 31; Transcript p. 986 (Mr. Cigarrán Magán: "I'm absolutely convinced that if the original Power of Attorney was done on a notarial instrument, then the ratification has to have the same form, public document."); Cigarrán Magán ER2, ¶ 62.
[53] Resp. Rej. ¶¶ 31, 32.
[54] Resp. Rej. ¶¶ 32, 34.
[55] Resp. Rej. ¶ 33; *see also* Transcript pp. 1709-1710 ("[A] Power of Attorney granted by the receiver would have to have been drawn up first requesting the judge of the insolvency proceeding—there would have to be a favorable ruling by that judge, and then it would be set forth in a public instrument.  And this is the way to appear in a proceeding, and there is no other way to do so.").
[56] Respondent's Closing, Transcript p. 1700 ("[F]or this to go forward, it is a fundamental condition that the attorneys be the ones who are here and that they are compelled by this Agreement of 14 July 2010.").
[57] *Id. See also* Resp. PHB ¶¶ 17-19, where Respondent argues that Clause 6(3) of the Burford Funding Agreement entitled Burford to terminate the funding agreement if King & Spalding's power of attorney were modified.
[58] Cl. Reply ¶ 26; testimony of Prof. Martínez Flórez, Transcript p. 935.
[59] Cl. Reply ¶ 27.

companies' regular organs in the pending arbitration proceedings.[60] In other words, upon suspension, the legal standing to sue in arbitration is held by the trustees, and Claimants are to be replaced in the arbitration by their respective boards of trustees.[61] However, Claimants argue that the reorganization administrators "are not required to seek authorization from the courts hearing Claimants' reorganization proceedings," noting that "[i]n accordance with Article 51(2) of the Spanish Bankruptcy Law, the court's authorization would only be required 'in order to withdraw, to accept a claim, in whole or in part, and to settle disputes.'"[62]

200.    With respect to the power of attorney granted to King & Spalding, Claimants' expert witness, Professor Martínez Flórez, asserts that after the suspension of powers, the board of trustees directly steps into the shoes of the debtor in the agreements and powers of attorney granted by the debtor before the declaration of bankruptcy.[63] She states that the trustees may terminate agreements with the attorneys and hire other representatives it chooses, but that to the extent the trustees do not do this, "the attorneys-in-fact existing at the time of the suspension will continue performing the duties entrusted to them to avoid business interruption."[64]

201.    With respect to Article 48(3) of the Bankruptcy Law, which provides that "any power of attorney existing at the time of the initiation of the insolvency proceedings shall be affected by the suspension or control of financial and property-related powers," Professor Martínez Flórez opines that the "affected" language does not mean that powers of attorney are terminated.[65] She explains that Article 51(2) of the Bankruptcy Law provides that while upon suspension the trustees replace the debtor in ongoing proceedings, this replacement "does not prevent the debtor from retaining separate representation and defense through its own attorney and trial attorney."[66] She takes the view, therefore, that if a debtor did in fact retain separate representation and defense, this indicates

---

[60] Cl. Reply ¶ 28, citing Spanish Bankruptcy Law Article 145(3); see also Martínez Flórez Report ¶ 27.
[61] Martínez Flórez Report ¶ 25, citing Articles 51(2) and 52 of the Spanish Bankruptcy Law.
[62] Cl. Reply ¶ 30.
[63] Martínez Flórez Report ¶¶ 44-45.
[64] *Id.* at ¶ 45.
[65] *Id.* at ¶ 30; *see also* Transcript p. 955, testimony of Prof. Martínez Flórez ("So what does it mean that they're "affected"?  It doesn't mean that they're terminated.  It means that they are affected.  They're impaired.  They are subject to the same regime that has to do with the powers to administer and dispose of property, so that is what is affected by the suspension or intervention.").
[66] Martínez Flórez Report ¶ 82.

that 1) the trustees had cancelled the power of attorney, since if they had not, the debtor's power of attorney would combine with that of the trustee, and 2) that such power of attorney held by the debtor did not terminate upon suspension.[67]

202.   With respect to the undated letters of ratification drafted by the reorganization administrators, Professor Martínez Flórez asserts that each letter is "an unnecessary document because the Power of Attorney that the lawyers had is still in full force."[68] According to her, there is therefore no need to ratify any power of attorney or grant a new power of attorney.[69]

## 2.   The Tribunal's Analysis

### The Application of Spanish law

203.   Respondent bases its arguments regarding the validity of the power of attorney granted to King & Spalding on Spanish law. The Tribunal agrees that, since Claimants are Spanish nationals, issues related to their capacity, including the validity of powers of attorney granted by those entities, should be determined based on the domestic law of Spain. Respondent challenges the validity of King & Spalding's power of attorney in these proceedings and submits that continuing to act without a valid power of attorney is, in essence, a formal irregularity that constitutes "fraud" on this Tribunal.   However, Respondent (correctly) does not take the position that this present arbitration cannot continue simply by virtue of the fact that Claimants entered voluntary insolvency proceedings after the initiation of the arbitration. Spanish Bankruptcy Law Article 52 is clear on this subject:

> Arbitration proceedings that are pending at the time of the reorganization proceeding declaration shall continue until the award becomes final, and the rules contained in paragraphs 2 and 3 of the preceding article shall apply. [emphasis added][70]

204.   In turn, Article 51(2), that "preceding article," applies with respect to companies in a state of suspension (as each of the Claimants currently is) as follows:

---

[67] *Id.* ¶ 83.
[68] Testimony of Prof. Martínez Flórez, Transcript, p. 959.
[69] *Id.* at pp. 941, 967, in which Prof. Martínez Flórez asserts that the letters are "just a writing to tell the Arbitral Tribunal that because litigation was commenced, they have standing to act in these arbitration proceedings."
[70] Spanish Bankruptcy Law (C-752); English translation provided in Claimants' letter of June 16, 2011, p. 14.

> In case of suspension of the debtor's powers of administration and disposition, the reorganization administrators shall, within the scope of their powers, replace the debtor in the pending legal proceedings. To that effect, the law clerk shall grant the reorganization administrators a period of five days to get acquainted with the proceedings. The reorganization administrators shall need the bankruptcy judge's authorization to withdraw, to accept the claim, in whole or in part, and to settle disputes. In every case, the law clerk shall give notice to the debtor and to those intervening parties that the judge considers should be heard on the subject.[71]

205.    As applied in this case, Article 51(2) requires that Claimants' reorganization administrators replace Claimants themselves in the present proceedings. Article 51(2) also provides that Claimants' administrators do not need to seek court authorization to take on or maintain this role; court authorization is only required if they withdraw or otherwise settle this dispute.

206.    The issue for this Tribunal to determine is whether King & Spalding has power of attorney at the present stage of this arbitration, now that each of Claimants' administrative powers have been suspended (in April 2013). Claimants submit that the power of attorney is still valid and that Claimants' reorganization administrators are simply "stepping into the shoes" of Claimants for purposes of the continuation of this arbitration. Respondent argues, to the contrary, that Claimants' power of attorney was extinguished by the bankruptcy, that a new power of attorney is needed, and that a valid new power of attorney has not yet been granted to King & Spalding or anyone else.

207.    Respondent argues that there is no possibility to cure this defect, and that this arbitration must be dismissed.[72] In its final prayer for relief in its Post-Hearing Brief, Respondent requests the Tribunal "to declare that King & Spalding lacks the necessary legal capacity to represent Claimants in this arbitration, which would result in the annulment of all actions taken, as well as to declare the forfeiture of Claimants' right to file an action."

208.    Ordered chronologically, the relevant facts related to this issue placed in the context of the procedure of the arbitration are as follow:

---

[71] English translation provided in Claimants' letter of June 16, 2011, p. 15.
[72] Resp. CM ¶ 58; Resp. Rej. ¶ 34.

- November 14, 2008: Original Representation Contract between Claimants and King & Spalding.[73]

- November 21, 2008:  Each of the three Claimants, Teinver, Autobuses Urbanos and Transportes de Cercanías granted broad Powers of Attorney to King & Spalding and other lawyers to represent them in negotiations with the government and to file and pursue arbitration proceedings against them before ICSID.

- December 9, 2008: Powers of Attorney were issued by the Boards of Directors and were subsequently notarized.

- December 11, 2008:  Claimants' Request for Arbitration is submitted by King & Spalding with a number of exhibits, including the Powers of Attorney, as required by Rule 2(2) of the ICSID Rules.

- January 30, 2009:  ICSID registered the Request for Arbitration.

- January 18, 2010:  Assignment Agreement between Claimants and Air Comet ("Assignment Agreement").[74]

- April 14, 2010:  Funding Agreement between Claimants and Burford ("Funding Agreement").[75]

- April 20, 2010:  Air Comet commences voluntary re-organization procedure.

- April 24, 2010:   Representation Agreement between Claimants and King & Spalding ("Representation Agreement").[76]

---

[73] Referred to in RA-162, which is the new Representation Agreement entered into on April 24, 2010 after the signature of the Funding Agreement between Claimants and Burford.
[74] RA-159.
[75] RA-160.  The Funding Agreement closed and became effective on July 4, 2010.
[76] RA-162.  The Representation Agreement came into effect upon the closing of the Funding Agreement, which subsequently occurred on July 4, 2010.

- June 21, 2010:   Agreement between Air Comet and its re-organization administrators, Messrs. Mariano Hernández, Luís Arqued and Luís Sierra.[77]  In this agreement, Air Comet's re-organization administrators state that they have been informed of the claim by Teinver, Autobuses Urbanos and Transportes de Cercanías at ICSID and that on January 18, 2010 these Claimants signed an agreement with Air Comet by which they assigned the net benefit which they might recover in the arbitration to Air Comet.   The agreement also records that Air Comet's re-organization administrators are familiar with the funding arrangement with Burford and that they expressly agree to the provisions of the Funding Agreement and undertake to abide by the provisions of that agreement regarding the amounts provided for therein.

- December 22, 2010:  The Spanish court (the *Juzgado Mercantil de Madrid*, "JMM" No. 8) in the Air Comet re-organization proceedings approves the terms of the Funding Agreement and authorizes Air Comet's re-organization administrators to consent to it.  In its reasons, the court reviews the terms of the Funding Agreement which, in the circumstances, it concludes are justified.

- December 22, 2010:  JMM No. 8 suspended Air Comet's powers of administration and disposition of assets and appointed Air Comet's re-organization administrators to exercise the powers of Air Comet.[78]

- December 23, 2010:   Teinver requests voluntary re-organization proceedings before the Spanish court (JMM No. 7 of Madrid).  In its record, the court records that the debtor (Teinver) conserves its faculties of administration and disposition of its assets, subject to the intervention of its re-organization administrators, Messrs. Edorta Etxarandio Herrera and Luis Arqued Alsina.[79]

---

[77] RA-163.
[78] C-757.
[79] RA-166.

- January 28, 2011: Autobuses Urbanos requests voluntary re-organization in terms similar to those of Teinver.

- February 16, 2011: Transportes de Cercanías requests voluntary re-organization which is recorded by the Spanish court (JMM No. 9 of Madrid) in terms similar to those in the case of Teinver.

- May 27-31, 2011: Hearing on Jurisdiction in Washington, D.C.

- June 16, 2011: Letter from Claimants responding to the Tribunal's requests set out in Procedural Order No. 3. As part of their response, Claimants supply letters from the re-organization administrators for each of the Claimants: Teinver,[80] Autobuses Urbanos,[81] and Transportes de Cercanías.[82] In their letters, the three sets of re-organization administrators state that they are responding to the inquiry by the Tribunal to confirm that the Request for Arbitration was submitted approximately two years before the commencement of the voluntary re-organization procedures and that the decision to commence the arbitration was validly taken by the companies in question. The letters state that Spanish law does not require the ratification of the commencement of the arbitration by the re-organization administrators. With respect to the continuation of the arbitration, the letters advise that the powers of administration of the officers of the companies have not been suspended and that no further authorization is required by the re-organization administrators or the judges responsible for the respective re-organization proceedings. They also point out that Spanish law provides that pursuant to the Spanish Bankruptcy Law, arbitration proceedings commenced prior to re-organization proceedings are to continue through to the issuance of an award. The administrators advise that they have reviewed the evolution of the arbitration and confirm that they are fully aware of these proceedings and have discussed them

---

[80] C-754.
[81] C-755.
[82] C-756.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 65 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

with counsel and are in full agreement that the arbitration proceedings continue. They also add that King & Spalding are fully authorized to continue the arbitral proceedings pursuant to the Powers of Attorney previously granted to them and which remain in full force and effect.  Each of these letters was dated and signed by the relevant re-organization administrators.

- August 30, 2011:  Claimants provide a copy of the decision of the Buenos Aires Commercial Court (of June 17, 2011) terminating the re-organization proceedings of ARSA commenced on June 22, 2001.

- December 21, 2012:  The Tribunal issues its Decision on Jurisdiction.

- April 10, 2013:  Order of JMM No. 7 suspending the powers of administration and disposition of assets of Autobuses Urbanos and granting these to the re-organization administrators.[83]

- April 23, 2013:  Commencement of the liquidation proceedings of Transportes de Cercanías by JMM No. 7.  The court's order states that the relevant terms of Title 3 of the Bankruptcy Law, including the suspension of the exercise by the company's officers of its powers of administration and disposal of assets, applies.[84]

- April 26, 2013:  Commencement of the liquidation proceedings of Teinver by JMM No. 7.  The court's order goes on to state that the relevant terms of Title 3 of the Bankruptcy Law, including the suspension of the exercise by the company's officers of its powers of administration and disposal of assets, applies.[85]

- August 10, 2013:  With their Reply, Claimants submit three letters, one from each of the sets of re-organization administrators for Teinver, Autobuses Urbanos and Transportes de Cercanías.[86]  The letters are not dated, but are signed by each of the

---

[83] C-841.
[84] C-840.
[85] C-839.
[86] C-842; C-843; and C-844.

re-organization administrators.  In the letters, the administrators give their names and say they are making an appearance before the Tribunal and make certain declarations, including express ratification of the powers of attorney and all acts performed on behalf of Claimants since the beginning of the arbitration.

- March 4, 2014:  the hearing on the merits was attended by Mr. Arqued, one of the court appointed administrators/receivers in the Teinver and the Air Comet re-organization/insolvency proceedings (for a number of days).  The daily transcript of the hearing also lists Mr. Hernández, one of the re-organization administrators of Air Comet, and Mr. Alvaro Martínez Domingo as attending the hearing as "Claimants' Representative".

- October 22, 2015: in the course of their Third Application for Provisional Measures, Claimants submitted three public deeds executed in Spain by the court-appointed receivers acting on behalf of Claimants in the various insolvency proceedings in Spain, all before notaries public in which, among other things, they confirmed their identity and powers to act on behalf of the respective Claimant in their capacity as court-appointed receivers, and attached evidence of their appointment.[87]

- November 3, 2015:  the hearing concerning Claimants' Third Application for Provisional Measures was attended by Messrs. Arqued, Hernández and Martínez, court appointed administrators/receivers in the various re-organization and insolvency proceedings, as well as a number of other representatives of Claimants.[88]

209.    Respondent's argument that the powers of attorney granted in favor of King & Spalding became invalid is based on Article 48(3) of Spain's Bankruptcy Law which provides as follows:

---

[87] C-1200.  *Also see* Decision on Provisional Measures of April 8, 2016 at ¶69.
[88] *See* ¶ 134, above, for a full list of attendees at the hearing.

The administrators or liquidators of the insolvent legal person shall continue to represent it within the context of the insolvency proceedings.  In the event of suspension, the management and disposition powers of the administrator or liquidators shall be transferred to the trustees in insolvency.  In the event of controllership, those powers shall continue to be exercised by the administrators or liquidators, under the supervision of the trustees in insolvency, who will be in charge of authorizing or validating all acts of management or disposition.  Any power of attorney existing at the time of the initiation of the insolvency proceedings shall be affected by the suspension or control of financial and property-related powers.

210.    Respondent says that "affected" means that the power of attorney was extinguished or was terminated by operation of law.  As a result, King & Spalding lost their procedural capacity to represent Claimants.

211.    Respondent also points to Article 1732(3) of the Spanish Civil Code which, according to it, provides that the declaration of bankruptcy of the principal is one of the grounds for termination of a power of attorney.  Article 1732(3) of the Spanish Civil Code provides as follows:

El mandato se acaba: 1.º Por su revocación. 2.º Por renuncia o incapacitación del mandatario. 3.º Por muerte, declaración de prodigalidad o por concurso o insolvencia del mandante o del mandatario. / El mandato se extinguirá, también, por la incapacitación sobrevenida del mandante a no ser que en el mismo se hubiera dispuesto su continuación o el mandato se hubiera dado para el caso de incapacidad del mandante apreciada conforme a lo dispuesto por éste. En estos casos, el mandato podrá terminar por resolución judicial dictada al constituirse el organismo tutelar o posteriormente a instancia del tutor.

212.    In addition, Respondent argues that the attempts to ratify or cure the defects in the Power of Attorney must fail.  In this regard, it says that the letters produced by Claimants with their Reply are defective because they are not in a notarial instrument, which it says is required when the original power of attorney was granted by way of a notarized public document.  Further, it says that the letters from the re-organization administrators are undated and are not addressed directly to ICSID or the Tribunal but, rather, to King & Spalding.  Finally, Respondent says that the letters were required to have been authorized or ordered by the court and cannot simply be issued unilaterally by the trustees under their own authority.

213.    The Tribunal finds that Respondent's objections as to the lack of standing due to the termination or extinguishment of King & Spalding's power of attorney are not persuasive for a number of reasons.

214.    First, it would seem appropriate to rely primarily on the provisions of the Spanish Bankruptcy Law as *lex specialis* rather than Article 1732 of the Spanish Civil Code.[89]  The Spanish Bankruptcy Law is more closely focused on what occurs with respect to the ongoing conduct of proceedings when insolvency occurs.

215.    In this regard, Article 52(2) of the Spanish Bankruptcy Law provides that arbitration proceedings underway at the time re-organization proceedings are declared shall continue until the issuance of the award.  It also provides that Articles 51(2) and (3) shall apply.  It is worth noting that the Spanish Bankruptcy Law distinguishes between court/judicial proceedings and arbitral proceedings, except to the extent that it incorporates certain provisions, such as Article 51(2) and (3), in the treatment of arbitral proceedings.  The latter provide that in the event of suspension of the debtor's powers of administration and disposal (which comes with the commencement of the liquidation phase), the insolvency administrators (within the scope of their competency) are substituted for the debtor.  They must appear in the proceedings and then they are accorded time to become informed of the proceedings to date.  In addition, Article 51(2) provides that the authorization of the judge presiding over the bankruptcy will be required for the insolvency administrators to withdraw, accept or settle claims.  It does not require court authorization for any other actions taken by the insolvency administrators.  In addition, Article 51(2) of the Spanish Bankruptcy Law provides that the debtor may retain/maintain separate legal representation of his own provided that the debtor provides sufficient guarantees to the court regarding payment of that representation and as to costs.

216.    As set out above, King & Spalding's representation of Claimants was implemented by way of a power of attorney issued by each of the boards of Claimants, as well as a separate Retainer Agreement (the "Retainer Agreement").  These were submitted with Claimants' Request for Arbitration in accordance with Rule 2(2) of the ICSID Rules.  There is no dispute that the original power of attorney and Retainer Agreement were valid and retained their full force and effect until the commencement of the liquidation phase/suspension of the powers of administration and disposition of assets of the debtor companies in April 2013.  At the Tribunal's request, each of the

---

[89] *See* testimony of Prof. Martínez Flórez Transcript pp. 970-971.

sets of re-organization administrators confirmed the validity and effect of the original power of attorney and Retainer Agreement in June 2011.  Further, after the commencement of the liquidation proceedings/suspension of Claimants' powers of administration and disposition of assets occurred in April 2013, each of the sets of re-organization administrators wrote to the Tribunal to confirm their appearance in the arbitral proceedings and to ratify and approve the actions taken by King & Spalding on behalf of Claimants.

217.    While Respondent raises formal objections relating to the letters from the re-organization administrators, for the reasons discussed below these are not convincing.  Each of these sets of administrators were appointed by the court in charge of the insolvency proceedings, were fully aware of the history of the arbitration, including the Funding Agreement (and the Assignment Agreement) and have twice confirmed their agreement with the continuation of the arbitration and representation by King & Spalding.  The Spanish Bankruptcy Law does not require any particular form in which the re-organization administrators must appear in arbitral proceedings or ratify the conduct of the proceedings.  The only specific instances in which court authorization is required are for the withdrawal, acceptance or settlement of claims against the debtor.

218.    Pursuant to the Spanish Bankruptcy Law, it appears that the re-organization administrators step into the shoes of the debtor upon the commencement of liquidation proceedings/suspension of powers of administration and disposition of assets.  In this regard, except where specifically provided for by the Spanish Bankruptcy Law (i.e., withdrawal, acceptance or settlement of claims against the debtor), it does not appear that any special court authorization is required for the re-organization administrators to perform their task.  Article 61(2) of the Spanish Bankruptcy Law provides that bilateral contracts to which the debtor is a party remain in effect despite the commencement of re-organization proceedings and their validity is not affected.  Further, Article 61(2) provides that the debtor (in the case of intervention) or the re-organization administrators (in the case of suspension) may request from the court the termination of a contract if this is deemed in the interests of the insolvency proceedings.  If such a request is made, the court must hear the parties before deciding whether the contract shall be terminated.  In this case, the re-organization administrators have not requested the termination of the Retainer Agreement between Claimants and King & Spalding.  In fact, the opposite has occurred and each set of re-organization

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

administrators have reaffirmed King & Spalding's powers of representation and ratified the actions taken by that firm on behalf of Claimants.

219.   Further, the Tribunal is persuaded by Professor Martinez Flórez's opinion that Article 1732(3) of the Spanish Civil Code does not apply to contracts like the Representation Agreement.[90]  It would seem that the "Contract of Representation" between Claimants and King & Spalding is a bilateral service agreement and is different from the power of attorney, which was granted separately.

220.   With respect to the powers of attorney granted by Claimants to King & Spalding, Article 48(3) of the Spanish Bankruptcy Law states that such powers in existence at the time of the declaration of re-organization/insolvency proceedings shall be "*afectados*" (affected) by the suspension or intervention of the powers of the debtor.  The article does not say that the powers of attorney shall be terminated or extinguished.  Elsewhere, in Article 61(2), the Spanish Bankruptcy Law refers to the termination (*resolución*) of contracts (and also states that the declaration of insolvency proceedings, in itself, shall not affect the validity of contracts).  Article 1732 of the Spanish Civil Code provides that agency agreements shall terminate as a result of death, insolvency or re-organization proceedings of the agent.  It also states that the agency agreement shall be "extinguished" in certain circumstances.  By contrast, Article 48(3) of the Spanish Bankruptcy Law states only that powers of attorney shall be "affected" by intervention or suspension.  With the commencement of insolvency proceedings, whether by way of the voluntary or obligatory proceedings, the powers of attorney are affected in that (in the case of intervention) the actions of the debtor through its counsel/authorized representative are subject to the approval of the re-organization administrators.  In the case of suspension, all actions within the scope of authority of the re-organization administrators are undertaken by them (and not the debtor itself) on behalf of the debtor.  In this respect, it seems reasonable that the power of attorney is affected or limited by the exercise of the relevant powers of the re-organization administrators.  However, the power of attorney is not terminated or extinguished by the commencement of insolvency proceedings.

---

[90] Martínez Flórez Report at ¶¶ 56-79.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

Further, the separate Contract of Representation remains in force, unless terminated by the debtor or the re-organization administrators.

221.    In the Tribunal's view, Respondent's objections to the ratification of the representation of Claimants by King & Spalding are highly formal and somewhat arbitrary.  The three different sets of re-organization administrators have been appointed by the court and are all active in the courts' various public proceedings.  In their letters, presented with Claimants' Reply in August 2013, the various sets of re-organization administrators state that they ratify all of the actions performed by Claimants in the course of the arbitration, both from its institution and after the commencement of the liquidation proceedings/suspension in April 2013 in the bankruptcy re-organization proceedings before the court.[91]  As they have been appointed by the court and regularly appeared before it, it is reasonable to assume that they are not likely to engage in unauthorized action, particularly with respect to the pursuance of this arbitration, which is known to the court.  Further, Mr. Arqued approved the Assignment Agreement by way of the agreement between Air Comet and its re-organization trustees[92] and requested and obtained the approval of the court (JMM No. 8) of the Funding Agreement.  Mr. Arqued is also a re-organization trustee in the Teinver proceedings.  Further, there does not appear to have been any objection by ARSA in the various re-organization proceedings - to which it is a party[93] - that the re-organization administrators are pursuing the arbitration without authorization due to invalid powers of attorney.

222.    Finally, in the circumstances of an international arbitration which has been ongoing for a number of years, one must question whether the strict application of the formalities of granting powers of attorney at Spanish law appropriately apply.  The arbitration was, by all accounts, commenced on behalf of Claimants by properly authorized legal representatives.  Almost five years after the commencement of the arbitration, due to the commencement of liquidation proceedings/suspension of powers of administration/disposition of assets, Respondent raises the validity of counsel's power of attorney and authorization to represent Claimants.  In response, the

---

[91] As noted at ¶ 208, above, and discussed in the Decision on Provisional Measures dated April 8, 2016, the court-appointed administrators also confirmed their powers in 2015.  *Also see* C-1200.
[92] RA-163.
[93] *See* the testimony of Mr. Cigarrán, Transcript pp. 1195-1202.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 72 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

re-organization administrators wrote to the Tribunal to confirm that they ratify the actions taken by counsel for Claimants and confirm their authorization to proceed with the arbitration. Although the letters are undated and not notarized or specifically ordered to be produced by the Spanish court, it would not seem appropriate to disregard these unless there is a valid reason to suspect that they are part of an effort to improperly create standing for the continuation of the claim. There is no evidence supporting this conclusion. Further, it should be noted that Mr. Arqued, a re-organization administrator in both the Air Comet and the Teinver insolvency proceedings, attended the hearing for some time, as did Mr. Hernández, another re-organization administrator in the Air Comet proceedings.

223.    For the foregoing reasons, the Tribunal finds that the powers of attorney granted to King & Spalding were initially, and have continued throughout these proceedings to be, valid. Claimants have proved that there was no obligation at Spanish law to produce a new power of attorney in the circumstances of this case. The Tribunal also notes that, as a factual matter, it is satisfied that the re-organization administrators of each Claimant and the relevant Spanish courts are aware of the powers of attorney and, further, have ratified the actions taken by the attorney in this arbitration. Consequently, the Tribunal declines Respondent's request to find that King & Spalding's (alleged) lack of power of attorney "constitutes fraud on the court" and dismisses Respondent's request that these proceedings before ICSID be closed on the basis that the powers of attorney were invalid.

**The Relevance of the Burford Funding Agreement**

224.    At the merits hearing, Respondent advanced an additional argument concerning King & Spalding's power of attorney. Specifically, Respondent argued that the Burford Funding Agreement requires Claimants to use King & Spalding as their counsel, and that a "conspiracy" between Claimants and Burford explains why they did not seek a proper new power of attorney. Specifically, Respondent argues that Clause 6(3) of the Funding Agreement entitles Burford to terminate the funding agreement if King & Spalding's power of attorney is modified or terminated, as well as to receive substantial compensation under Clause 10.1 of the Agreement.

225.    The "Funding Agreement" is an April 14, 2010 funding agreement made between Claimants and Burford,[94] an investment company headquartered in Guernsey, which concerned the financing of Claimants' litigation expenses in this arbitration. Respondent argued during the jurisdictional phase of this proceeding—and continues to argue—that Burford is a "vulture fund" that will be the primary beneficiary of any ICSID award in this case.[95]

226.    Clause 6.3 of the Funding Agreement provides:

> The Claimant undertakes to grant to the Nominated Lawyers a full power of attorney (or local law equivalent) in the Funder's usual form to cause and allow any and all Award proceeds to be paid forthwith as set out above. The Parties acknowledge and agree that such power of attorney (or local law equivalent) is of the essence of this Agreement and is a condition thereof and that any variation or termination of such power of attorney shall entitle the Funder to terminate this Agreement pursuant to Clause 10.1.[96]

227.    As such, Clause 6.3 concerns a specific "power of attorney" to disburse payments from the Award. Schedule 3, Definitions of the Funding Agreement, in turn defines "Nominated Lawyers" as "the lawyers conducting the Claim on behalf of the Claimant being specified as such in Schedule 1 or a substitute firm selected by the Claimant with the Funder's approval (which shall not be unreasonably withheld)."[97]

228.    In this regard, Respondent submitted as follows:

> If the full powers of attorney granted to K&S in the year 2008 were affected by a declaration of bankruptcy against their clients, then the effectiveness of the Funding Agreement would come to an end and, therefore, the whole scheme would fall apart, because if K&S were granted a new power of attorney, this time by the trustees in insolvency, such power of attorney would force K&S to report to the trustees of insolvency and the respective groups of creditors in the insolvency proceedings resulting in a declaration of bankruptcy and, as a result, the private and confidential Funding Agreement would cease to have legal effect.

---

[94] RA-160.
[95] Respondent asserts that Burford "is not an investor under the BIT, but rather a third party that is abusing the ICSID system by bringing forward a claim that is contrary to the purposes and goals of the Convention in order to make astronomical profits." (Resp. CM ¶ 89) Respondent also argues that the order of priority for beneficiaries of any award in this proceeding will be Castle 2003-1C (an American company with a court-ordered lien to collect on any award in this proceeding) (Resp. CM ¶¶ 92-94), Burford, a number of private individuals (*see* Resp. CM ¶ 95), Air Comet, and finally Air Comet's creditors. Respondent argues that in light of the distribution of any potential award, "[h]ardly could the case be more removed from the aim and goals of the ICSID Convention." (Resp. CM ¶ 96)
[96] RA-160.
[97] *Id.*

229.   Respondent says that a "conspiracy" between Claimants and Burford explains why Claimants did not seek to obtain a new, proper power of attorney.[98]

230.   The Tribunal has found that the powers of attorney are valid and that there was no obligation to seek a new power of attorney.  In light of this finding, it is not necessary to make findings in respect of Respondent's "conspiracy" argument relating to the powers of attorney.  The Tribunal considers it important to note that Respondent provided no evidence to support this argument, which makes serious allegations not only about Claimants, but also their counsel and third-party funders.  Respondent entirely failed to substantiate its "conspiracy" argument and it is inconsistent with the evidence.

231.   First, regarding the notion of conspiracy, although the Funding Agreement was originally a private agreement between Claimants and Burford, it was disclosed to the re-organization administrators for Air Comet who agreed with the Funding Agreement and requested its approval by the court,[99] which approved the Funding Agreement.[100]  By way of its court approval, the Funding Agreement became public and must have been known by the re-organization administrators for Claimants (Mr. Arqued was a re-organization administrator for both Air Comet and for Teinver).  In view of the close inter-relationship between the Air Comet insolvency proceedings and those of Claimants and the Assignment Agreement, it is reasonable to assume that the re-organization administrators for each of Claimants were fully aware of the Funding Agreement.

232.   Second, with respect to the argument that the Funding Agreement requires Claimants to retain King & Spalding as attorneys, and the fact that insolvency proceedings are a ground for termination of the Funding Agreement pursuant to Article 10.3, this argument makes little sense.  Respondent's argument appears to be that if Claimants had requested a new power of attorney this would have alerted Burford to the insolvency proceedings and given the latter the right to terminate the Funding Agreement.  However, it is highly unlikely that Burford was not already fully aware

---

[98] Respondent's arguments are set out at ¶¶ 16-19 and 26-28 of Resp. PHB.
[99] RA-164.
[100] RA-165.

of Claimants' financial status and continued to monitor it closely, given its financial interest in doing so.  In any event, there is no indication that Burford ever treated the insolvency of Claimants as a basis for terminating the Funding Agreement (it appears that their financial interests are well protected in that agreement).  Further, the relevance of the relationship between Claimants and Burford as far as a potential termination of the Funding Agreement is concerned is unclear.  The re-organization administrators were, and are, clearly aware of the Funding Agreement and have confirmed King & Spalding's authorization to represent Claimants in this arbitration because, it is logical to assume, this is in the interests of Claimants' creditors.

233.    Accordingly, the Tribunal would not vary its finding on the validity of the powers of attorney based on Respondent's additional "conspiracy" argument.

## B.      Claimants' Alleged Lack of Standing

234.    Respondent additionally argues that Claimants do not have standing in this arbitration because they assigned their litigation rights to Air Comet.[101]

235.    The Assignment Agreement among Teinver, Transportes de Cercanías and Autobuses Urbanos as the assignors and Air Comet as the assignee, was executed on January 18, 2010.[102] The Agreement concerned the assignment to Air Comet of the proceeds of a potential award in this arbitration, and was addressed in some detail by this Tribunal's Decision on Jurisdiction in 2012. In that Decision, the Tribunal determined that the Assignment Agreement post-dated the filing of the arbitration, and did not affect Claimants' standing to bring this arbitration.[103] The Tribunal noted that its conclusions were "without prejudice to further submissions by the Parties in respect of Respondent's allegations in so far as they affect the merits of Claimants' claims, as appropriate, during the merits stage."[104]

236.    Respondent now asserts that the Assignment Agreement constitutes a "fraud against the creditors in the insolvency proceedings of Teinver S.A., Autobuses Urbanos del Sur S.A. and

---

[101] Resp. PHB ¶ 29.
[102] RA-159.
[103] Decision on Jurisdiction ¶ 259.
[104] Decision on Jurisdiction ¶ 259.

Transportes de Cercanías S.A., since it was made at a date that is curiously close to the date Air Comet S.A.U. initiated its insolvency proceedings[.]"[105] Respondent also asserts that the assignment is "a confession of the fact that the filing of this claim before the ICSID Tribunal by the three shareholder companies—in the full knowledge that the claim, if any, belonged to Air Comet—was a guise and that the only reason why they devised all of this scheme was to facilitate the distribution of the slices that the various parties and participants will receive if the tribunal rules in favor of Claimants."[106]

237.   Respondent also argues that the agreement is an assignment of contentious claims from Claimants to Air Comet, and not simply of the rights to the proceeds from any potential award.[107] Respondent argues that "once the assignment is made, the assignor is replaced in the proceedings by the assignee, which has not been the case in this arbitration proceeding."[108] In other words, Respondent argues, Air Comet should have appeared in this proceeding. Moreover, Respondent argues that Argentina as the potential debtor should have been given prior notice of the assignment of its debt.[109]

238.   For their part, Claimants argue that the Assignment Agreement did not transfer Claimants' rights under the Treaty, but rather transferred to Air Comet only the right to net proceeds from Argentina's payment of a potential award of damages.[110] Claimants assert that there is no applicable legal standard that would prevent this Tribunal from issuing an award of damages in Claimants' favor due to the assignment agreement.[111] Claimants argue moreover that the assignment to Air Comet is a perfectly valid transaction, and that at the time of the assignment neither Claimants nor Air Comet were undergoing any type of reorganization proceedings under Spanish law.[112] Finally, Claimants note that Air Comet is not entitled to seek payment directly from Argentina of any damage award or recovery in connection with this arbitration; Air Comet

---

[105] Resp. CM ¶ 80.
[106] Resp. CM ¶ 44; Resp. Rej. ¶ 41.
[107] Resp. Rej. ¶¶ 41, 47.
[108] Resp. PHB ¶ 30.
[109] Resp. Rej. ¶ 47.
[110] Cl. Reply ¶ 34.
[111] Cl. Reply ¶ 36.
[112] Cl. Reply ¶ 37.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 77 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

is only entitled to receive from Claimants, not Argentina, the net proceeds of any eventual payment from Argentina to Claimants.[113]

239.    The terms of the assignment agreement provide as follows:

> 1) Assignors hereby expressly agree to assign to AIR COMET S.A.U. any and all collection rights that may arise out of the claim filed with the ICSID …

> 2) Parties hereto agree that the final amount to be assigned to AIR COMET S.A.U. shall be equal to the amount the ICSID may possibly award to the Assignors after deducting all necessary and relevant costs, as well as any and all payments due to the ICSID Tribunal. All fees and expenses related to legal advisers, consultants, expert witnesses, witnesses, experts, reports, assessments, as well the interests or commissions due to any and all institutions, companies or offices contributing to the funding of the claim shall also be deducted from the amount to be assigned. Finally, in order to fix the final amount of the collection rights to be assigned to AIR COMET S.A.U., *success fees* agreed upon in contract in favor of those intervening during the proceedings before the ICSID Tribunal shall be deducted as well, whether they are due for tasks performed prior to the filing of the formal claim, during the relevant proceedings, or during any appeal or during the enforcement thereof. [114]

240.    The text of the agreement does not appear to assign Claimants' *contentious claims* in this dispute; rather, the text appears to be limited to assigning to Air Comet the proceeds from any award issued. Furthermore, the agreement contemplates that Air Comet would receive the award proceeds only after Claimants have paid the costs and fees described in item 2. As such, it does not appear that Air Comet has the right to receive payment directly from Argentina in the event of the award.

241.    It should also be noted that the Assignment Agreement, which was signed on January 18, 2010, predated by three months the initiation of Air Comet's voluntary reorganization proceeding on April 20, 2010.[115]    It also predated the initiation of the three Claimants' voluntary reorganization proceedings by about a year. Air Comet and its insolvency administrators executed an agreement on June 21, 2010 wherein the administrators acknowledged the existence of this

---

[113] Cl. Reply ¶ 41.

[114] RA-159.

[115] The Tribunal notes that Respondent has repeatedly argued that Air Comet became insolvent prior to the expropriation of the Airlines in 2008.  *See, e.g.*, Resp. PHB ¶¶ 204-205.  However, it is the date of assignment rather than the date of insolvency that is relevant for present purposes.

dispute and the Assignment Agreement.[116] The Assignment Agreement was filed with the Spanish court overseeing Air Comet's reorganization.

242.    The Tribunal finds that Claimants did not assign their claims through the Assignment Agreement and, accordingly, that agreement can have no impact on the standing of Claimants in this proceeding.

## C.    Other Issues of Admissibility

243.    In the Decision on Jurisdiction, the Tribunal left open certain additional issues of admissibility that were not necessary to address at that stage of the proceedings, as it had determined that the claims were admissible and that Claimants had standing, and that required further factual inquiries in order to be properly determined.  At this stage, the Tribunal will return to the issues of Respondent's objections, on policy grounds, to Claimants' standing because it would allegedly upset the hierarchy of claims against the Airlines.  The Tribunal will also address the question of whether, in addition to their respective indirect shareholdings in Interinvest, Claimants made other investments in Argentina that are protected by the Treaty.

244.    Respondent notes in its Post-Hearing Brief that this Tribunal "postponed the analysis of certain irregularities regarding the admissibility of the submission and claims filed by Claimants for final consideration at the time of rendering the award on the merits of the case."[117] Respondent cites to paragraph 234 of the Decision on Jurisdiction, in which the Tribunal addressed certain arguments made by Respondent with respect to the indirect nature of Claimants' shareholding in the Airlines, which were held by Claimants through two layers of subsidiaries, the Spanish Air Comet and the Argentine holding company, Interinvest.

245.    As the Tribunal noted,

> … Respondent has advanced a number of policy arguments against Claimants' standing in this dispute. According to Respondent, the Claimants are upsetting the hierarchy of creditor claims against the Argentine Airlines and Interinvest, and it is inappropriate to award damages to a shareholder rather than to the company that has actually suffered injury. Respondent also expresses its concern that this suit could increase the risk that Respondent could be subjected to double-

---

[116] *See* Claimants' letter of June 16, 2011 at 17-18.
[117] Resp. PHB ¶ 10.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

payment, because Interinvest could recover through the Argentine Courts in addition to any recovery by the Claimants under the Treaty.[118]

246.    The Tribunal then determined that

> Respondent's assertions could have relevance in the merits proceeding of this case, but Respondent fails to demonstrate why these assertions are relevant at the jurisdictional stage. Moreover, Respondent has failed to articulate why these policy issues, as specifically applied to the facts at hand, should affect the outcome of this jurisdictional objection. Respondent has not attempted to demonstrate the extenuating nature of the facts here, or to differentiate the facts in this case from the large number of other ICSID cases in which claimant shareholders were found to have standing.[119]

247.    With respect to Respondent's allegation, during the jurisdictional phase of this proceeding, that Claimants' recovery would upset the hierarchy of creditor claims against the Airlines and/or Interinvest, Respondent has not placed any evidence on the record in either the jurisdictional or the merits phase to support this contention.  Indeed, it is not clear that there is, in fact, any "list" of creditor claims against the Airlines, which are not currently in insolvency, or against Interinvest (the current status of which has not been addressed over the course of these proceedings). [120] To be sure, Respondent has addressed the "hierarchy" of beneficiaries with respect to any proceeds from this Tribunal's award. However, that is a different issue than the one raised during the jurisdictional phase of this arbitration in connection with Claimants' "indirect" interest in the Airlines.

248.    For this reason, the Tribunal finds that there is no evidence to support Respondent's position that Claimants' standing is affected by policy reasons related to the hierarchy of creditors.

249.    With respect to the question of whether Claimants had other investments in Argentina, at paragraphs 207 through 238 of the Decision on Jurisdiction, the Tribunal found that Claimants' indirect shareholdings constitute an investment and that Claimants have standing to bring their

---

[118] Decision on Jurisdiction ¶ 233.
[119] Decision on Jurisdiction ¶ 234.
[120] The Tribunal notes that the Argentine Federal Administrative Court ruled in favour of the Argentine Republic with respect to the expropriation of Interinvest's shares in the Airlines on February 27, 2014 and the Interinvest's appeal appears to have been dismissed by the Federal Court of Appeal in Contentious - Administrative Matters. *See* ¶¶ 468-470.

claims.  The Tribunal's finding of jurisdiction on the basis of the ownership of shares is sufficient to found jurisdiction and is a final decision.

250.    At paragraph 238 of the Decision on Jurisdiction, the Tribunal deferred consideration of Claimants' other investments to the merits stage of the proceedings.  Now that the evidentiary part of that stage of the proceedings is complete, the Tribunal concludes that, in addition to shares in Interinvest, certain other investments identified by Claimants were also made.

251.    Through their wholly-owned subsidiary, Air Comet, Claimants entered into the SPA by which they acquired the shareholdings in Interinvest, ARSA and AUSA and also undertook a number of other commitments which required the investment of funds for the benefit of Interinvest and the Airlines.  Two of the three Claimants were shareholders of Air Comet and signatories to the SPA (Transportes de Cercanías and Autobuses Urbanos) and the third (Teinver) purchased all the remaining shares of Air Comet in 2006.  As shareholders and signatories, Transportes de Cercanías and Autobuses Urbanos approved the SPA and unconditionally assumed all of Air Comet's obligations under the SPA and, in particular, the several terms of the Industrial Plan set out in Article 7 of the SPA.

252.    While the nominal purchase price under the SPA was USD 1.00, this was a much more complex agreement pursuant to which Air Comet (and Claimants) undertook several obligations, including the following:

- Assumption of the assets and liabilities of ARSA and AUSA (including responsibility for all liabilities going forward from the relevant financial statements for ARSA May 31, 2001 and for AUSA fiscal year 2000);

- Leading the negotiation of the Creditors Agreement/re-organization proceedings of ARSA and negotiations with the creditors of AUSA;

- Commitment to maintaining the headcount of the various airlines and companies;

- Maintenance and expansion of flight routes and of the fleet of the airlines; and

- Contribution of capital.

253.   The SPA and the other agreements related to it represent a complex transaction.[121]  The nominal purchase price does not reflect the complexity of the transaction.  A nominal purchase price is not unusual where there are other interests and risks associated with the transaction.  In this regard, see, for example, *Société Générale v The Dominican Republic*[122]  and *Bayindir v. Pakistan* where the funds invested in the construction project were the funds paid by the State under the relevant contract.  Here, it is clear that Air Comet and its shareholders, Claimants, were undertaking significant responsibilities and risks in assuming the debts and liabilities of the Airlines going forward and the undertaking to maintain and expand the operations of the Airlines.

254.   Further, pursuant to the obligations under the SPA, SEPI transferred funds to Interinvest and Air Comet in Argentina and Spain.  In turn, these funds were invested in the Airlines.  While the origin of the funds in question was SEPI and not Claimants, this is irrelevant, as the funds were contributed as a result of the obligations undertaken by Air Comet and Claimants under the SPA.  This is consistent with other cases where tribunals have found that the actual source of the funds is irrelevant provided that these were contributed by the investor.[123]  While there may be some dispute as to the precise amounts contributed, there seems no doubt that a number of sums were contributed to Interinvest and the Airlines by Air Comet:

- USD 300 million to acquire ARSA's liabilities as of October 2001;[124]

- USD 248 million in accordance with the SPA - to operate and modernize the Airlines;[125]

---

[121]  SPA: C-18; Agreement for Capital Contributions between Interinvest and SEPI, October 15, 2001: C-584; Agreement among Air Comet, Transportes de Cercanías, Viajes Marsans and others, December 3, 2001: C-525.

[122]  *Société Générale in respect of DR Energy Holdings Limited and Empresa Distribuidora de Electricidad de Este, S.A. v The Dominican Republic*, UNCITRAL Award on Preliminary Objections to Jurisdiction, September 19, 2008: C-622, ¶36.

[123]  *See*, for example, *Saipem S.p.A. v People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Decision on Jurisdiction, March 21, 2007, ¶¶ 106 and 107, AL RA-143; *Yaung Chi OO Trading PTE LTD v Government of the Union of Myanmar*, ASEAN I.D. Case No. ARB/01/1, Award, March 31, 2003, ¶ 45: C-620; *Wena Hotels Limited v Arab Republic of Egypt*, ICSID Case ARB/98/4, Award, December 8, 2000, ¶ 126: C-279.

[124]  *See* Cl. Rej. on Juris. ¶¶ 202-207; Cl. PHB ¶¶ 9-10 and the sources cited there.

[125]  *See* Cl. Rej. on Juris. ¶¶ 208-215 and the sources cited there.

- USD 13.5 million in Interinvest;[126]

- USD 8 million (ARS 6.05 million) in ARSA;[127] and

- USD 0.8 million in AUSA.[128]

255.    In addition, through Air Comet and Interinvest, Claimants invested in the concessions to operate the Airlines.  The evidence indicates that Claimants clearly contributed to the improvement of the Airlines' fleets through leasing contracts and the Airbus orders and a USD 5 million Boeing 737 flight simulator.

256.    Finally, Claimants also provided technical, logistical and marketing support.  The evidence indicates that after the execution of the SPA and takeover by Air Comet and Claimants, the performance of the Airlines improved dramatically (until 2004/2005, when cost increases accelerated sharply and other events affected the Airlines' performance).

257.    The Tribunal notes that Respondent does not seriously challenge that these additional investments were made or that Claimants operated the Airlines.  Instead, Respondent's arguments focus on their dissatisfaction with how these investments were managed by Claimants.  These arguments will be discussed in the context of the analysis of the merits, beginning in the following section.

**D.    Claimants' Investment in the Airlines, 2001 - 2008**

258.    As a defense to the claims and in support of its Counterclaim, Respondent submits that "Claimants' acquisition of the Airlines was opportunistic in order to appropriate the funds provided by the SEPI to Claimants and to the clear detriment of the Airlines."[129]  Respondent submits that the state of the Airlines at the time of expropriation was the result of the Marsans Group's behavior. As Respondent has made these submissions in support of both its jurisdictional objections[130] and

---

[126] *See* Cl. Rej. on Juris. ¶ 215 and the sources cited there; C-597; C-598; AR-77.
[127] *See* Cl. Rej. on Juris. ¶ 215 and the sources cited there.
[128] *See* Cl. Rej. on Juris. ¶ 215 and the sources cited there; Cl. PHB, ¶ 7 and the sources cited there.
[129] Resp. PHB ¶ 181.
[130] Resp. Mem. on Juris. pp. 85-124.

its position on the merits,[131] the Tribunal considers it convenient to address these arguments at this point in the award, as it relates to any remaining issues of admissibility and standing and to return to these arguments, as necessary, in the determination of the merits.

## 1.    Claimants' Investment in the Airlines

### History of the Airlines, the 2001 Auction of Interinvest and the Share Purchase Agreement

259.    The precursor companies to ARSA had been owned by the Argentine state since the 1950s. They were privatized and purchased by a group of investors led by Spanish state-owned airline Iberia Líneas Aéreas de España S.A. ("Iberia") in 1990. The precursor companies to AUSA were acquired by Iberia in 1991. Iberia incorporated a fully-owned Argentine subsidiary, Interinvest S.A., in 1994 to serve as the holding company for the Spanish investments in the Argentine airline industry. In 1995, the Spanish government constituted SEPI to operate as the holding company for all companies owned partially or fully by the Spanish Government, and SEPI acquired Iberia's holdings in Interinvest.[132]

260.    By mid-2001, the Airlines were facing severe financial and operational difficulties. At the time, only 10% of international flights and 30% of domestic flight routes were being operated; there were delays in paying employee salaries; and there were significant labor conflicts.[133] ARSA filed for bankruptcy reorganization in June 2001. That same month, SEPI announced its intention to sell its share of Interinvest in order to end contributions of Spanish public capital into the Airlines, which had been necessary over the previous decade.[134] The Argentine Government followed the sale process closely, although it was not interested in aiding ARSA through any allocation of government funds.[135]

---

[131] Resp. CM pp. 1-89.
[132] *See* Cl. Mem. ¶¶ 20-26.
[133] C-9: SEPI Summary Report.
[134] See SEPI Summary Report: C-9, which states that one of the advantages of selling SEPI's shares was that SEPI could successfully put an end to contributions of Spanish public capital which had been necessary over ten years to sustain the Airlines, and which totalled more than USD 1,817 million of which USD 1,120 million corresponded to the period 1990-1996 and USD 697.5 million to the period 1996-2001.  The SEPI Summary Report also noted that the Airlines had a loss of USD 363 million in the previous year and USD 43 million per month in 2001.
[135] Cl. Mem. ¶ 33; *see* Carlos Bastos WS, ¶¶ 23-24.

261.    SEPI received nine offers from potential buyers, and ultimately selected Air Comet's offer. At the time, after assessing all of the offers, SEPI determined that Air Comet's offer had several advantages over other offers.[136]  In particular, SEPI noted that a sale to Air Comet would permit SEPI to address the principal problems currently before the companies, including the re-establishment of routes, punctual payment of salaries and maintenance of the workforce and updating the outdated and limited fleet. Air Comet's offer included financial guarantees from members of the Marsans Group, a superior business plan, and "valuable synergies" from the Marsans Group network of air transport and tourism.[137] It is not disputed that at the time SEPI sold its share of Interinvest to Air Comet, the Airlines were in dire financial condition and required significant investment in terms of both capital and operational commitment.

262.    The SPA was signed on October 2, 2001 between Air Comet and SEPI.[138] Air Comet acquired SEPI's 99.2% share in Interinvest, and Interinvest in turn held 92.1% of ARSA and 90% of AUSA. Air Comet paid a symbolic price of USD 1 and undertook the following commitments: 1) to assume Interinvest's, ARSA's and AUSA's liabilities, and to lead the negotiation of the reorganization for ARSA, 2) retain the Airlines' personnel for two years, 3) maintain a majority interest in the Airlines for two years, 4) restart flights on existing routes and develop new routes, 5) make USD 50 million capital contribution, and 6) modernize and expand the Airlines' fleet.[139] It is not disputed that Air Comet assumed the Airlines' liabilities and led the reorganization for ARSA; retained personnel for two years; maintained a majority interest in the Airlines beyond two years; and restarted flights on existing routes and developed new routes.  Air Comet's fulfillment of the obligations to make capital contributions and modernize and expand the Airlines' fleet will be described in the following subsection.

---

[136] SEPI Summary Report: C-9.
[137] *See* C-9; Cl. Mem. ¶¶ 35-36.
[138] As noted previously, the SPA was also signed by three of Air Comet's shareholders and by Marsans Group as guarantor.
[139] SPA: C-18, Art. 7(A)-(F).

**Air Comet's Performance under the Share Purchase Agreement**

263.    Respondent repeatedly asserts that under the Share Purchase Agreement, Claimants purchased the Airlines for only one US dollar.[140] Respondent also asserts that Claimants failed to contribute "even one peso" into the Airlines.[141]

264.    Moreover, Respondent argues that Claimants did not comply with the terms of the SPA, to the detriment of the Airlines as well as of the Government of Argentina's own shareholding in the Airlines.[142] In particular, Respondent argues that Air Comet diverted the funds it received from SEPI from their intended purposes under the SPA, and asserts that Claimants' goal "was not the efficient management of the Airlines, but to appropriate [t]he sum of USD 753 million that SEPI had given them."[143]

265.    The SPA contemplates that SEPI would make three sets of payments to Air Comet to be used for the following purposes:

> To pay off liabilities of the Airlines up to USD 300 million, in accordance with a list of liabilities to be determined by SEPI. (SPA Article 9)
>
> To pay for economic commitments resulting from the execution or implementation of the Industrial Plan, in an amount of up to USD 248 million. (SPA Article 9)
>
> To pay for "any deviations in the [Airlines'] assets and liabilities between July 31, 2001 and the closing." (SPA Article 11) The amount to be paid by SEPI was not specified at the time of the SPA, although Respondent puts the final amount at USD 205 million.[144]

266.    The SPA also contemplates that Air Comet would make a financial contribution of its own, in the amount of USD 50 million, to be paid within nine months of the closing of the SPA.[145]

---

[140] *See, e.g.,* Resp. CM ¶¶ 199, 860; Resp. Rej. ¶ 613; KPMG ER2 ¶ 2.2; Resp. PHB ¶ 2.

[141] Transcript pp. 1720, 1782.

[142] Resp. CM ¶¶ 227-228.

[143] Resp. PHB ¶ 175.

[144] *See, e.g.,* Respondent's Opening, Transcript pp. 224, 228.

[145] *See* SPA Article 7(c) ("By means of a timely increase of capital, BUYER shall admit new institutional partners within a term of NINE MONTHS since the CLOSING, and undertakes to make such a capital increase during that term of at least USD $50,000,000 (or its equivalent in Pesos argentinos). BUYER undertakes that at least 15% of the new partners shall be Argentine eligible investors. Such capital increase could be made as a one-time contribution or by installments during the above mentioned period. Compliance with this capital increase is guaranteed by a penalty clause of THREE MILLION (3,000,000) United States Dollars (USD) to be paid by BUYER to SELLER, upon SELLER's mere demand, without BUYER's right to claim any exception, as soon as it is proved that BUYER has defaulted in its obligation and such default is not cured within a term of 4 months.").

267.    It is worth first considering the general relevance of these commitments and their alleged breach to this arbitration. The Tribunal determined in its Decision on Jurisdiction that to the extent any of the alleged breaches of the SPA did occur, they could not affect jurisdiction because they would have only occurred subsequent to Claimants' acquisition of the investment.[146]   For the avoidance of doubt, the Tribunal considers that any acts or contributions made by Air Comet to the Airlines are acts or contributions made by Claimants.  This follows from the fact that Claimants have demonstrated that they have collectively maintained majority ownership of Air Comet from the time that the Airlines were purchased from SEPI through to the commencement of the arbitration, albeit in varying proportions.[147]   The Tribunal notes that this is consistent with the approach taken by Respondent in its submissions and throughout the proceedings of referring to Claimants as part of the Marsans Group.

268.    With respect to the relevance of these alleged breaches on the merits, Respondent now argues that the diversion of the funds from SEPI "translates into clear and obvious breaches of both domestic and international law."[148] Specifically, Respondent asserts that the Marsans Group's conduct was contrary to the principle of good faith that is part of Argentine, Spanish and international law.[149] Respondent also argues that the alleged diversion of funds "marks the beginning of a pattern that the Group would follow regarding the Airlines through its management" and that consists of "absorb[ing] as much liquidity as possible, both from SEPI's funds and from the Airlines' administration[.]"[150]

269.    In response, Claimants assert that Air Comet complied with the terms of the SPA. Claimants request that the Tribunal dismiss Argentina's arguments that Claimants did not invest in the Airlines and that Claimants' investment was inadequate or unlawful. Claimants further request the Tribunal to find that Argentina's false allegations are irrelevant to either a finding of

---

[146] Decision on Jurisdiction ¶¶ 324-328.
[147] *See* paragraphs 176 to 181, above.
[148] Resp. Rej. ¶ 189.
[149] Resp. Rej. ¶ 191.
[150] Resp. Rej. ¶ 186.

liability or the determination of quantum in this arbitration.[151]  Each of these individual allegations, as they relate to admissibility and standing, will be discussed in the following sections.

### SEPI's Payment of USD  300 million for the Cancellation of Debts

270.    Respondent's allegations regarding Claimants' misuse of the SEPI funds focuses most intensely on the use of the USD 300 million SEPI provided to cancel ARSA's debts. The Parties largely agree that Air Comet used the majority of these designated funds to buy or subrogate ARSA's existing debts from its current debt holders.[152] ARSA's liabilities were then transferred from Air Comet to Interinvest, which turned them into capital contributions that accordingly increased Interinvest's stockholdings in ARSA.[153]

271.    Respondent argues that these actions violated the terms of the SPA, Article 8, which earmarked those funds for paying off the Airlines' liabilities.[154] According to Respondent, the subrogation benefited Air Comet to the detriment of both ARSA and the Government of Argentina, which held shares in ARSA.

272.    With respect to ARSA, Respondent argues that "it is reasonable to suppose that the financial evolution (and other aspects) of the Airlines would have been different if the funds in question contributed by SEPI had been applied to the cancellation of debts, as stated in the Share Purchase Agreement. However, through the Marsans Group's manoeuvre [sic], after the funds have been contributed by SEPI, the Airlines still owed said debts, but to a new creditor: by chance, the Marsans Group (which in turn acquired the claims without paying anything, due to the diversion of SEPI's funds)."[155]

---

[151] Cl. PHB ¶ 12.
[152] Resp. CM ¶ 230; Cl. Reply ¶¶ 108-111; *see also* the December 2001 Agreement: C-525, p. 13, itemizing each of the debts subject to subrogation.
[153] Cl. Reply ¶ 110. It appears that the Parties agree that after Air Comet subrogated the above-mentioned debts, it converted them into an increased shareholding. *See* Resp. CM ¶ 232 ("Due to the diversion of funds, Air Comet became the main creditor in the insolvency proceedings and, thereafter, it not only became the majority shareholding, but it could dilute the State interest in ARSA.").
[154] Resp. Rej. ¶¶ 195, 200. Respondent also argues that Air Comet's acquisition of ARSA's liabilities breached Argentine insolvency law, although these arguments are far from clear. *See* Resp. Rej. ¶¶ 214-218.
[155] Resp. Rej. ¶ 210; Resp. CM ¶ 248.

273.    With respect to the Government of Argentina's own shares in ARSA, Respondent argues that since said claims were ultimately contributed to ARSA's capital, Air Comet obtained the additional benefit of holding a higher proportional interest in ARSA's capital, with the other shareholders' interests being reduced accordingly.[156] Respondent asserts the Argentine Republic's interest was reduced from 5.34% to 1.34% by this measure.[157] Respondent notes that since the government retained less than 2% of the share capital required by the Argentine Corporations Law No. 19,550 to request information and to have reports filed with the Audit Committee investigated, it was reduced to the role of "a passive shareholder at the mercy of the Marsans Group's shareholders."[158]

274.    Claimants concede that Air Comet subrogated ARSA's creditors' claims rather than paying off the debt directly. In their Rejoinder on Jurisdiction, they described precisely how these transactions were structured, based on the SPA and two subsequent agreements dated October 15, 2001[159] and December 3, 2001:[160]

> These agreements provided as follows: (i) Air Comet would acquire credits against ARSA directly from ARSA's creditors; (ii) Air Comet would lead the renegotiation with ARSA's creditors and reorganization proceeding; (iii) Air Comet would subrogate in ARSA's creditors' rights to facilitate ARSA's negotiation with its creditors in the reorganization proceedings, and (iv) Air Comet would then transfer those credits to Interinvest, which would make a capital increase in ARSA, and consequently, increase Interinvest's stockholdings in that airline.[161]

275.    Claimants submit that Air Comet's subrogation to ARSA's creditors' rights was done with SEPI's consent. ARSA's liabilities were ultimately transferred to Interinvest and contributed to ARSA's capital, thereby increasing Interinvest's stockholdings and reducing ARSA's debt.[162] Claimants assert that "[t]his subrogation was done in accordance with the SPA, Spanish and Argentine law, and with the approval of SEPI, and it is specifically provided for in the December 2001 Agreement" concluded subsequent to the SPA.[163] While Claimants concede that the

---

[156] Resp. Rej. ¶ 211.
[157] Resp. Rej. ¶ 212.
[158] Resp. Rej. ¶ 213.
[159] C-584.
[160] C-525.
[161] Cl. Rej. on Juris. ¶ 204.
[162] Cl. Reply ¶ 110.
[163] Cl. Reply ¶ 110.

Argentine Republic's shareholdings in ARSA decreased, Claimants argue that the alleged "dilution" was not detrimental to ARSA itself, and that Respondent was presented with the opportunity to match Interinvest's capital contribution, but opted not to do so.[164]

276.   Moreover, Claimants point to their success in settling ARSA's liabilities, noting that they were able to reach a Settlement Agreement with ARSA's creditors that was later approved by the Argentine bankruptcy court. They note that only three years after their acquisition of the Airlines, 97 percent of ARSA's Settlement Agreement had already been paid.[165]

277.   The Tribunal has carefully reviewed the evidence and concludes that, despite Respondent's allegations, Air Comet's use of the USD 300 million did not violate any of its agreements, nor did Respondent prove that it violated any laws.

278.   Pursuant to Article 9 of the SPA, SEPI assumed responsibility for debts and liabilities pre-July 2001.  To meet that obligation, in part, SEPI undertook to transfer USD 300 million, which were to be allocated to the payment of the liabilities/debts of Interinvest or the Airlines.  The money was to be transferred at closing (*formalización*) pursuant to certain instructions and priorities set out in Article 9.  The article also says that the parties will agree to the procedure for delivery of the funds prior to closing.[166]

279.   Interinvest and SEPI entered into a subsequent agreement,[167] in which Interinvest stated that it had the intention of purchasing outstanding credits owed by it, ARSA and AUSA to a list of creditors listed in its Annex A.  It goes on to state that in order to do so, Interinvest has requested from SEPI the contribution of funds.  In turn, SEPI states that it intends to contribute the funds subject to their return if the acquisition of the debts does not proceed.  The agreement then goes on to record that SEPI gives to Interinvest USD 300 million for the purpose of purchasing debts owed by Interinvest and the Airlines in the amount of USD 319.51 million.  The creditors listed from whom the debts were to be purchased included ABN Bank, SEPI itself, and Repsol.  The

---

[164] Cl. Reply ¶ 109.
[165] Transcript pp. 1627-1628.
[166] C-18: SPA between SEPI and Air Comet dated October 2, 2001.
[167] C-584: Agreement for Capital Contributions between Interinvest and SEPI dated October 15, 2001.

agreement is signed by both parties and the copy in evidence bears a stamp showing it has been produced from a central archive.

280.    The evidentiary record also contains a further agreement relating to the acquisition of certain debts of ARSA, specifically debts owed to ABN Bank, SEPI, Indra and Repsol.  This agreement dated December 3, 2001 is between Air Comet and Transportes de Cercanías, Busursa (Autobuses), Segetur and Viajes Marsans (the "December 3, 2001 Agreement").[168]    This agreement records that Air Comet is obliged to use the credits/debts purchased as its own funds in order to contribute irrevocably as capital or contributions to ARSA in the manner which is most fiscally convenient to it.  This obligation was to be realized within six months of the approval of the agreement of the creditors to ARSA's re-organization proceedings (Point II).  In the event the credits purchased were not used as agreed, the signatories to the contract conferred to SEPI the irrevocable right to demand from any of them payment of the amounts at issue (approximately USD 300 million) (Point III).

281.    Point IV of that agreement records that Air Comet, as the shareholder of Interinvest, which was the controlling shareholder of ARSA, was obliged to send to SEPI a copy of the certificates issued by the auditors of ARSA recording the destination of the credits purchased by Air Comet (pursuant to Point II).  The parties also declared that a copy of the contract would be notified formally by a notary to SEPI for its knowledge, approval and acceptance of the rights accorded to it under the contract.  It appears that on the same date, December 3, 2001, this contract was "elevated" to public status before a notary who also confirmed that he had been requested to officially notify a copy to SEPI.  The notary goes on to state that a copy was notified to SEPI.  The record indicates that on December 5, 2001, another notary attended at the offices of SEPI and met with the Secretary General of that company who declared before the notary that he was familiar with the contract being "elevated" to public status and that he accepted expressly the rights conferred upon SEPI in the contract and that he reviewed the documents and approved and signed them.  Thus, the Tribunal notes that although SEPI is not a signatory to this agreement, it does

---

[168] C-525: Agreement between Air Comet and Transportes de Cercanías, Busursa, Segetur and Viajes Marsans December 3, 2001.

appear that SEPI was familiar with it and formally agreed to it; the contract bears a number of stamps and seals, notably an apostille dated July 1, 2003.

282.   The record also indicates that the Spanish *Tribunal de Cuentas*, which reviews on an annual basis various activities of public sector enterprises, audited these particular agreements and transactions.   There are a number of audit reports in evidence that disclose an ongoing review of this, and other, investments.   Report No. 705 sets out in considerable detail the lengthy history of the Spanish government's/public sector's involvement in the Argentine airlines and how SEPI came to purchase the actions it held in Interinvest.[169]   The court reviewed in some detail the various provisions of the SPA and the contracts described above.   It reviewed the transfer of the USD 300 million from SEPI to Air Comet[170] and noted that USD 27 million were transferred from Interinvest's blocked account (into which USD 300 million had been transferred) to pay a short-term loan owed to ABN Bank.[171]   It also reviews the irrevocable contribution agreement of October 15, 2001 and the agreement between Air Comet and its shareholders of December 3, 2001 (described above).   The court then examined the purchase of the debts from the various creditors rather than their payment.   In reviewing what occurred, the *Tribunal de Cuentas* set out in detail SEPI's explanations: SEPI believed that the purchase (and subrogation right) as opposed to payment of the debts was permitted by the SPA.   The report also makes it plain that SEPI was fully aware of the contract and approved it.

283.   In its conclusions to Report No. 705, the *Tribunal de Cuentas* stated the following:

> SEPI contributed USD 300 million to Interinvest which pursuant to the contract had to be used to pay debts.  From this amount, USD 273 million were used by Air Comet to purchase those debts, leaving it subrogated in the position of the creditors against ARSA in order for it to intervene in the re-organization proceedings of ARSA.  All of this was with the consent of SEPI which even sold to Air Comet one of its own credits owed to it by ARSA.  Air Comet undertook to capitalize ARSA's credits within six months from the date on which the Argentine judicial authority approved the re-arrangement plan.  That deadline elapsed on 26 June 2003 and to date it is unknown whether the contributions to ARSA's capital were made.[172]

---

[169] RA-77: Spanish State Audit Court's Report, No. 705, dated March 16, 2006 at p. 72 *et seq.* (Spanish version).
[170] RA-77 commencing at p. 107 (Spanish version).
[171] RA-77 commencing at p. 111 (Spanish version).
[172] RA-77, Clause Twenty Second at p. 167 (Spanish version).  Tribunal's translation.

284.     In its recommendations, the *Tribunal de Cuentas* states that SEPI's conduct should comply with the concrete terms of the privatization authorization and comply with the formal procedures for any modifications.  It also recommended that SEPI should require strict compliance with the obligations assumed by Air Comet which remained outstanding at the time, taking into account, in any event, the protection of the economic interests of the public sector.  Finally, it also recommended that as a general matter in privatization processes where obligations are to be performed after the closing of the transfer contract, the privatization consultative committee be involved until all obligations have been performed in their entirety.  However, the *Tribunal de Cuentas* did not recommend challenging the contract or invalidating it or any of the steps taken by SEPI.

285.     Claimants' investment was also the subject of further review by the *Tribunal de Cuentas*.  In Report No. 765 dated July 19, 2007, the court again addressed the transfer of the USD 300 million and the various other post-closing obligations contained in the SPA.[173]   In its conclusion, the court noted that SEPI had submitted a number of other documents, which did not fully demonstrate that the debts had been finally contributed to ARSA.  This appears to have lead the court to again address this subject in its next report (No. 811), discussed below.  The court did note that SEPI had submitted documentation demonstrating that other requirements under the SPA, such as Air Comet's capital contribution of USD 50 million to ARSA, had been performed.[174]

286.     A further report dated October 30, 2008 (Report No. 811) also addressed these issues.  Report No. 811 again referred to the agreements related to Claimants' investment recording that Interinvest and SEPI entered into the agreement of October 15, 2001 in which it was agreed that Interinvest would purchase the liabilities (of Interinvest and the Airlines), rather than pay the liabilities as provided for in the SPA.[175]   It also records that, subsequently, on December 3, 2001, Air Comet and its shareholders signed an agreement pursuant to which Air Comet undertook to acquire ARSA's credits and that Air Comet would become the creditor of Interinvest/the Airlines.

---

[173] C-585: The Spanish State Audit Court's Report, No. 765, dated July 19, 2007.
[174] C-585, p. 13, which says that although seven months late, the contribution had been made and that, in fact, 25% (USD 13.45 million) had been paid out pursuant to the requirements at Argentine law.
[175] C-527: The Spanish State Audit Court's Report, No. 811, dated October 30, 2008.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

Report No. 811 also recorded, as described above, that the agreement of October 15, 2001 was recorded with a notary public and notified to SEPI for its knowledge and consent. It went on to find that Air Comet then proceeded to purchase the credit/liabilities in December 2001 and June 2002.

287.    Report No. 811 also discussed the delays in SEPI providing the court with documentation reflecting the use of the funds provided by SEPI.[176]   The report states that in view of the documentation eventually received, one could understand that the commitment undertaken by Air Comet in the December 3, 2001 Agreement to contribute all acquired credits to ARSA's own funds had been accomplished, albeit more than four years late on November 21, 2007. The court mentions that Air Comet obtained the additional benefit of receiving a larger pro rata share in ARSA's capital, which resulted in a reduction in the other shareholders' interests.[177]   As a result, the report states that the money contributed, in principle, by SEPI to assist the Argentine company could be seen as giving rise to a benefit for the purchasers (Air Comet/Claimants). The court stated that, although this could be justified by the modifications introduced in the December 3, 2001 Agreement (the irrevocable contributions agreement, which had been notarized), this had not been provided for in the SPA, as the latter had been authorized by the Council of Ministers.[178]

288.    In its conclusion, Report No. 811 states as follows:

> 2.       SEPI contributed USD 300 million to Interinvest that, under the Agreement, should have been allocated to the payment of liabilities of the Argentine group. From that amount Air Comet used 273 million with SEPI's consent, to purchase those liabilities and undertook to capitalize the credits in ARSA by June 26, 2003. The documents finally furnished by SEPI with its allegations evidence that the liabilities were ultimately contributed to ARSA's capital, although with more than four years' delay.[179]

289.    Although Respondent argues that the purchase of ARSA's debt and subrogation to ARSA's creditor's claims was not in compliance with the terms of the SPA,[180] the references above indicate

---

[176] C-527 at pp. 14-15 (Spanish version).
[177] C-527 at p. 15 (Spanish version).
[178] The Tribunal notes that although the report referenced other disputes between SEPI and Air Comet relating to certain contingencies that had arisen after the execution of the SPA, there is no indication of a dispute between SEPI and Air Comet relating to the contribution or use of funds paid by SEPI under the SPA (*i.e.* the USD 300 million or the USD 248 million for the implementation of the Business Plan).
[179] C-527 at p. 18 (Spanish version) and at p. 14 (English version).
[180] *See* Resp. Rej. ¶¶ 200-210.

that SEPI was, indeed, aware of the purchase of the debt and subrogation by Air Comet and consented, as found by the Spanish audit court. In these circumstances, it appears that while the acquisition and subrogation may not have been in accordance with the SPA as originally contemplated, the parties subsequently agreed to a different handling of the USD 300 million contributed by SEPI. There is no indication that SEPI ever complained of this or that it sought to annul the SPA on this basis. In fact, SEPI's position before the *Tribunal de Cuentas* was that this was permitted by the SPA. In these circumstances, the Tribunal finds that there is no basis to conclude that the alleged non-compliance with the terms of the SPA has been made out nor that any deviation from the original terms of the SPA would provide a basis for finding that the transaction was illegal or would justify declining jurisdiction on the basis that the investment was not made "in accordance with [Argentina's] legislation".[181]

290.    Respondent also alleges that the acquisition of ARSA's debt and subrogation by Air Comet was in breach of Argentine law.[182] The Tribunal notes that these arguments were not very well developed. Despite this, the Tribunal has considered these arguments and notes that the Argentine courts reviewed the handling of ARSA's re-organization proceedings and approved of the various steps throughout.

291.    The re-organization proceedings of ARSA were finally concluded by the Argentine courts in June 2011.[183] The Tribunal agrees with Claimants' submission that the ARSA re-organization proceedings were the proper place to raise any alleged illegality or impropriety related to the investment and the record appears to indicate that Respondent did not do so at the time. The Tribunal has taken into account Respondent's assertion that the termination of ARSA's reorganization proceedings in the Argentine courts in no way prejudges the legality of Claimants' actions during the reorganization proceedings.[184] However, Respondent has failed to establish in

---

[181] *See* BIT, Article III.
[182] *See* Resp. Rej. ¶¶ 214-218.
[183] *See* C-768: the decision of the Buenos Aires Commercial Court of June 17, 2011 terminating the re-organization proceedings of ARSA, commenced on June 22, 2001, submitted with Claimants' letter of August 30, 2011; *see also* C-771 - the decision of the Buenos Aires Commercial Court of August 15, 2011, submitted with Claimants' letter of November 8, 2011, where the court formally resolved to consider the re-organization plan to have been complied with and the re-organization proceedings of ARSA to have been completed, subject to the final assessment and payment of costs and payment to the last remaining creditors.
[184] Respondent's letter of October 26, 2011, p. 3.

this arbitration any basis on which the Tribunal could find that the acquisition of ARSA's debt and subrogation by Air Comet in and of itself was in breach of Argentine law.

292.    Respondent's arguments regarding the effect of the Spanish criminal court proceedings relating to the tax treatment of Air Comet's acquisition of ARSA's liabilities will be addressed below.[185]

293.    Respondent further argues that Air Comet's acquisition of ARSA's debt and subrogation and Interinvest's subsequent capitalization of the credits contributed by Air Comet unduly diluted its holdings in ARSA and AUSA.[186]   As noted above at paragraph 273, Respondent asserts the Argentine Republic's interest was reduced from 5.34% to 1.34%, which it says resulted in it being reduced to a "passive shareholder".  Respondent has not explained how this effect of the treatment of ARSA's debt was improper.  Claimants admit that the capitalization of credits resulted in the reduction in Respondent's shareholding and note that Respondent was offered the opportunity to make capital contributions at the time, which would have avoided the dilution in its shareholding, and declined to do so.  The dilution of Respondent's shareholding was the consequence of the capitalization and Respondent could have avoided that consequence by making its own capital contribution.  Having determined that the capitalization was not improper, it follows that the resulting capital contribution and dilution of Respondent's shareholding was also not improper. Respondent has failed to demonstrate how simply reducing its proportionate shareholding was contrary to any law or harmful to ARSA itself.

### *SEPI's Payment of USD 248 million for Air Comet's Industrial Plan*

294.    Respondent argues that Air Comet did not properly use the USD 248 million in funds from SEPI to enact its Industrial Plan. Respondent argues that these funds were to be used for "a) optimizing the network and routes by improving the fleet, b) improving business management efficiency, and c) rationalizing the costs and processes through initiatives not involving payroll

---

[185] *See* Section IV.E, below.
[186] *See* Resp. Rej. ¶¶ 211-213.

reduction."[187] Respondent argues that the certifications Air Comet obtained to prove the use of the funds only support the bank fund movements, not the destination of the funds for specific purposes.[188] Instead, relying on its expert, KPMG, Respondent argues that these funds were used to pay for daily operations of the Airlines.[189] Respondent's primary issue appears to be whether these funds were properly contributed to "executing, or for the purpose of implementing the Industrial Plan" of the Airlines, as well as salaries.[190] In this regard, it relies on KPMG's analysis that approximately 80% (USD 203 million) was earmarked for operating expenses.

295.    Claimants argue that they applied the USD 248 million SEPI funds in accordance with the SPA. According to Claimants, SEPI, Air Comet and Interinvest agreed that these moneys would be transferred to Interinvest as follows: (i) USD 128 million in October 2001 after the SPA notarization, and (ii) once Interinvest had spent and certified the use of the first USD 100 million, SEPI would transfer to Interinvest four contributions of USD 30 million each, thus totaling the USD 248 million committed in the SPA. SEPI would release each transfer only after receiving from PricewaterhouseCoopers (PwC) a certification confirming that the previous transfer was spent in accordance with the SPA.[191] Claimants state that Interinvest then transferred most of these amounts directly to the Airlines to be used to pay for, inter alia, their leasing installments, fuel, salaries, repairs, airport fees, advances on purchases and taxes.[192] For each of these payments, PwC issued a certificate justifying the use of the funds.[193]

296.    For the reasons that follow, the Tribunal concludes that Respondent has not proved that Claimants' use of the USD 248 million was improper or illegal and, in any event, what effect any improper or illegal use of funds would have on the Tribunal's jurisdiction.

---

[187] Resp. CM ¶ 250. The Tribunal notes that while the SPA refers to an Industrial Plan as the basis of Air Comet's obligations under the SPA (designated "Exhibit I" in the SPA), the Industrial Plan is not attached to C-18, and it is not clear whether this document has been produced elsewhere on the record. As the Parties' arguments focused on the obligations under the SPA, the Tribunal has, like the Parties, approached these arguments through the language of the SPA itself.
[188] Resp. Rej. ¶¶ 221-223.
[189] *See* KPMG ER2, ¶¶ 3.4.1 *et seq*. (in particular ¶ 3.4.6).
[190] Resp. Rej. ¶¶ 218-226.
[191] Cl. Rej. on Juris. ¶ 208.
[192] Cl. Rej. on Juris. ¶¶ 209-211, citing C-586-C-596.
[193] *Id.*; *see* also Cl. Reply ¶ 107.

297.    The Tribunal notes that Article 9 of the SPA provides:

> BUYER may allocate the amount of USD D 248,000,000 to the payments or investments to be made by the CORPORATIONS or the COMPANY in favor of the CORPORATIONS executing, or for the purpose of implementing, the INDUSTRIAL PLAN.
>
> …
>
> If the auditor's certificate shows that amounts were used other than for making payments or investments to be made by the CORPORATIONS or the COMPANY in favor of the CORPORATIONS executing, or for the purpose of implementing, the INDUSTRIAL PLAN, BUYER shall reimburse such amounts, although SELLER may offset them against pending payment obligations. No reimbursed amounts may be requested again by BUYER; therefore, it will be deemed that SELLER's primary obligation has been reduced accordingly.[194]

298.    Like the use of funds to acquire ARSA's debts, the issues related to the use of the USD 248 million was also the subject of investigation by the *Tribunal de Cuentas.* The *Tribunal de Cuentas* found that the USD 248 million were contributed to Interinvest and the Airlines, although the SPA contemplated their contribution to the Industrial Plan, including the expansion of the Airlines' fleet and development of new routes.  In its Report No. 705, the *Tribunal de Cuentas* reviewed the use of these funds and found that the majority of the funds were contributed to meet operating expenses.[195] It noted that in response to inquiries from SEPI, Air Comet responded that if it had not acted to invest the funds in operating expenses it would have been impossible to avoid the bankruptcy since a number of the planes would have been unable to fly and salaries had to be paid. All of this would have had a very negative effect on the implementation of the Industrial Plan.[196] The *Tribunal de Cuentas* also reviewed the various responses provided by SEPI, which while continuing to follow up and obtain further information from Air Comet, defended the use of the funds by Air Comet and continued to advance funds until the full USD 248 million had been transferred to Air Comet.[197]

---

[194] C-18, Article 9.
[195] RA-77 at pp. 120-135 and 167-168.
[196] RA-77 at pp. 123-124.
[197] The record also indicates that in the context of a legal proceeding before the Court of Preliminary Investigations in Madrid SEPI provided a report documenting the certifications made by PwC for the use of the USD 248 million.  *See* document KPMG Supp. 3-4, p. 3, referencing "*B) Documentación relativa a la justificación del destino de los 248,000,000 USD entregados a AIR COMET, S.A. para ejecución del Plan Industrial.*"

299.    In its Report No. 765, the *Tribunal de Cuentas* concluded that Air Comet had demonstrated the contribution of 22 of the 23 additional planes which it had undertaken to supply in the SPA.[198] Further, the *Tribunal de Cuentas* noted that SEPI penalized Air Comet in the amount of USD 86,957 for not supplying the last plane, as contemplated in Article 9 of the SPA set out above. Article 7 of the SPA refers to certain specific undertakings contained within the "Plan Industrial", which include the maintenance of the employee headcount, contribution of USD 50 million to capital, maintenance of a majority interest in airlines, the expansion of the routes of the Airlines and the expansion of the fleet by a total of 23 airplanes.

300.    As in the case of USD 300 million, the evidence indicates that SEPI was aware of how Air Comet was using the USD 248 million intended for the execution or implementation of the Industrial Plan.  Apart from applying a penalty of USD 86,957 for failure to supply one airplane, SEPI does not appear to have invoked any contractual remedies against Air Comet for the possible failures to comply with the terms of the SPA.  Nor did SEPI or the Spanish government seek to revoke the agreement on the basis of possible non-compliance by Air Comet. As a result, there is no basis for the Tribunal to find that Claimants' use of the USD 248 million was illegal or improper.

### *Claimants' own USD 50 million Capital Contribution*

301.    Under Article 7(c) of the SPA, Air Comet was obligated to contribute USD 50 million as follows:

> By means of a timely increase of capital, BUYER shall admit new institutional partners within a term of NINE MONTHS since the CLOSING, and undertakes to make such a capital increase during that term of at least USD 50,000,000 (or its equivalent in Pesos argentinos). BUYER undertakes that at least 15% of the new partners shall be Argentine eligible investors. Such capital increase could be made as a one-time contribution or by installments during the above mentioned period. Compliance with this capital increase is guaranteed by a penalty clause of THREE MILLION (3,000,000) United States Dollars (USD) to be paid by BUYER to SELLER, upon SELLER's mere demand, without BUYER's right to claim any exception, as soon as it is proved that BUYER has defaulted in its obligation and such default is not cured within a term of 4 months.

---

[198] C-585 at Article 7(f), although 8 of the planes in question were delivered after the deadline.

302.    Respondent asserts that Air Comet did not comply with its contribution requirement, arguing that Air Comet only paid USD 13.5 million of the total required amount and that it did so seven months later than the time period set forth in Article 7(c) of the SPA.[199]

303.    For their part, Claimants submit that, through Air Comet, they made a total cash contribution of USD 24.2 million over the course of their management of the Airlines.[200] This amount includes cash contributions of USD 13.5 million to Interinvest,[201] USD 9.9 million to ARSA[202] and USD 0.8 million to AUSA.[203] Claimants do not assert that they paid in full the USD 50 million amount required by Article 7(c).

304.    The Tribunal notes that neither Party indicates that Air Comet was ever found to be in default of its obligation to make the USD 50 million investment, nor that SEPI took any steps under the SPA or otherwise in this regard.  The obligation to contribute USD 50 million to capital was also the subject of review by the *Tribunal de Cuentas*. In its Report No. 765, the Spanish Audit Court concluded that Air Comet had complied with its obligation to increase the capital of ARSA by USD 50 million (albeit somewhat late).[204]  The *Tribunal de Cuentas* determined that Air Comet paid in cash approximately 25% of the amount on February 19, 2003 and the balance by February 11, 2005.[205]

---

[199] Resp. Rej. ¶ 230; *see also* Transcript p. 1454 (KPMG).

[200] Cl. Rej. on Juris. ¶ 215; Cl. Reply ¶ 107 (in particular, fn. 239); Cl. PHB ¶ 7.

[201] Claimants reference Interinvest's Citibank account statement, January 2, 2004: C-597 and Interinvest's 2004 Financial Statemnets: C-598.

[202] Claimants reference the following documents: SWIFT Message, 4.4 million Wire Transfer from Air Comet to ARSA, Feb. 7, 2008: C-599; SWIFT Message, 3.285 million Wire Transfer from Air Comet to ARSA, Feb. 7, 2008: C-600; SWIFT Message, 0.315 million Wire Transfer from Air Comet to ARSA, Feb. 15, 2008: C-653; Letter from Air Comet to Banco Santander ordering a 1.9 million (ARS 6.05 million) wire transfer to ARSA, July 4, 2008: C-601; and Air Comet's Bank Statement, July 29,2007, confirming a 1.9 million (ARS 6.05 million) wire transfer to ARSA: C-654.

[203] Claimants reference a USD 800,000 Wire Transfer from Viajes Marsans S.A. to AUSA, November 11, 2008: C-602.

[204] C-585.

[205] C-585 at p. 21. In support of its finding that the balance had been paid by February 11, 2005, the Audit Court refers to a document issued by an Argentine public auditor certifying that Air Comet had paid USD 45.7 million on that date by way of delivery of a banker's cheque (*see* page 13).

305.   Accordingly, the Tribunal finds that Respondent has failed to demonstrate the alleged breach of the SPA and that Claimants made additional capital contributions to the Airlines after their initial investment.

## 2.   Subsequent Investments made by Claimants

306.   In response to Respondent's claims that Claimants did not invest even one peso in the Airlines, Claimants assert that in addition to the cash contributions they made (described above), they also reinvested into the Airlines the USD  106 million in profits that the Airlines made during 2002, 2003 and 2004.[206] As discussed further below, Claimants point to two key aspects of their investment in the Airlines. First, they assert that Air Comet and the other companies of the Marsans Group brought significant "synergies" to the Airlines. Second, they point to their improvement of the Airlines' fleet and their "massive" order of additional aircraft.

### "Synergies" Contributed by the Marsans Group

307.   Claimants assert that under their control, the Airlines became "part of a larger network of companies specializing in air transportation and tourism, and comprising over 11,000 employees."[207] Claimants describe these synergies:

> As any well-managed entities within an integrated group of companies, ARSA and AUSA were able to benefit from the other companies' activities (including sales of Viajes Marsans—the largest Spanish travel group—or Astra's negotiating) and resources (Air Comet's Madrid hub to Europe, Viajes Marsans' access to Amadeus and IATA, to cite a few). Claimants' management allowed the Argentine Airlines to double-down on their strengths (in the maintenance area, for instance) and to mitigate their liabilities (in part by sending aircraft to Air Comet).[208]

308.   Claimants point in particular to the following benefits received by the Airlines: the channeling of Marsans Group sales towards ARSA and AUSA; negotiating discounted rates for Marsans Group companies; unified booking, airfare clearing and revenue management systems; unified flight operations; unified aircraft maintenance; intercompany aircraft leasing and reassignment and chartering; and unified aircraft purchasing.[209] Claimants assert that the Marsans

---

[206] Cl. PHB ¶ 7; Cl. Mem. ¶ 48.
[207] Cl. Mem. ¶ 36; *see also* Díaz Ferrán WS ¶ 6.
[208] Cl. Reply ¶ 67.
[209] Cl. Reply ¶ 61.

Group gave the Airlines preferential treatment among the Marsans companies, including the re-booking of passengers from other Marsans Group airlines onto ARSA's Madrid-Buenos Aires flights, the conclusion of an agreement to use Air Comet's fleet, the provision of free managerial advice and assistance, and the use by other Marsans Group airlines of ARSA's maintenance facilities in order to generate additional revenue for ARSA.[210]

309.    Respondent discounts Claimants' so-called synergies. First, Respondent asserts that Claimants have submitted no evidence of the alleged discounts received by the Airline through its connection to the Marsans Group.[211] And to the contrary, the Report of Respondent's expert, Oliver Wyman, emphasizes the negative impact of the "synergies." The Wyman Report notes in particular the relatively high marketing and sales costs due to reliance on indirect sales channels, which meant higher agency commissions, increased booking fees and a costly web booking engine.[212]

310.    Second, Respondent argues that Claimants' alleged "synergies" amounted to no less than asset-stripping by the Marsans Group. Arguing that "Claimants had nothing to offer the Airlines,"[213] Respondent asserts that "[i]n general, what Claimants describe as 'benefits' for the Airlines were basically benefits for the Marsans Group (for example, the use of the hotels of the latter by the crew of the Airlines, etc.). … [I]n reality, the Marsans Group acted as a parasite of the Airlines, taking advantage of them, extracting all it could from them, and leaving them in appalling conditions and at the doors of bankruptcy."[214]

## Acquisition of Aircraft

311.    Claimants point to Interinvest's expansion of the Airlines' fleet of airplanes during their control of the Airlines. They assert that the Airlines "added" 50 airplanes between the end of 2001 and the end of 2008, although it is not entirely clear from this whether all of these planes were

---

[210] Cl. Reply ¶ 62.
[211] Resp. Rej. ¶ 77. Respondent discounts the testimony of Mr. Pascual de Riva.
[212] Wyman ER, § 6.3.4-6.3.4.4.
[213] Resp. Rej. ¶ 71.
[214] Resp. Rej. ¶ 73.

purchased or leased.[215] Claimants note in particular that ARSA signed a USD 557.8 million leasing contract for Boeing aircraft in 2004, "which enabled the airline to operate more long-distance flights and to increase its passenger capacity on domestic and international routes."[216] In 2006, Marsans Group concluded a Memorandum of Understanding with Pratt & Whitney to equip part of the Airlines' fleet with new engines and provide maintenance services.[217] Claimants also purchased a Boeing 737 flight simulator that they assert provided significant advantages to the Airlines.[218]

312.    Claimants point to a number of important aircraft purchases made during their management of the Airlines, for a total of 73 new aircraft.[219] First, they point to a framework agreement the Marsans Group (through an Irish subsidiary, Astra) entered with Airbus in July 2006 for twelve Airbus A330-200s, six of which would go to ARSA.[220] Claimants also point to subsequent agreements concluded between Astra and Airbus to purchase the following:[221] 1) five additional Airbus A330-200s,[222] 2) 42 Airbus A320-200s to be delivered from July 2010 to 2014 (Claimants assert that "[t]his order was specifically intended for ARSA and AUSA's fleets"),[223] 3) ten Airbus A350-900s to be delivered in 2014 (Claimants assert that "[t]his order was intended to supplement the previously ordered A330-200s"),[224] and 4) four Airbus A380-800s to be delivered in 2011 and 2012 (jumbo planes that were "ideally suited to the Buenos Aires-Madrid route").[225]

---

[215] Cl. Mem. ¶ 44. In their Reply, Claimants appear to amend this number to 45 aircraft: "Between November 2001 and June 2008, Claimants also incorporated a total of 45 additional aircraft into the Airlines' fleet, including seventeen Boeing 737-500s, thirteen MD-80s, five Boeing 747-400s, two Airbus A-310s, two Airbus A-320s, two Airbus A-340s and one Boeing 737-300F." *See* Cl. Reply ¶ 90.

[216] Cl. Mem. ¶ 45; Cl. PHB ¶ 8; C-19.

[217] Cl. Mem. ¶ 58; C-45 (September 19, 2006 Memorandum of Understanding); and C-50 (May 18, 2007 Purchase and Support Agreement).

[218] Cl. PHB ¶ 8; testimony of Mr. Pascual de Riva, Transcript p. 408.

[219] Note, however, that this total appears to include all twelve of the A330-200s from the initial purchase in July 2006, even though only six of the aircraft were intended for ARSA.

[220] Cl. Reply ¶ 96; C-41 (July 18, 2006 Letter of Intent) and C-49 (December 2006 Purchase Agreement).

[221] *See, e.g.*, Cl. Reply ¶ 100; *see also* C-576, C-666; and C-575. While Claimants do not explicitly state that each of these planes was destined for either ARSA's or AUSA's primary or exclusive use, this is implied by Claimants' descriptions including in the parentheses above.

[222] C-56 (October 11, 2007 Purchase Agreement for Option Aircraft).

[223] C-54 (October 11, 2007 Memorandum of Understanding); C-576 (December 7, 2007 Purchase Agreement).

[224] C-55 (October 11, 2007 Memorandum of Understanding); C-666 (December 7, 2007 Purchase Agreement).

[225] C-26 (October 11, 2007 Memorandum of Understanding); C-575 (December 7, 2007 Purchase Agreement).

313.    Respondent argues that the fleet added by Claimants "was old, with low indexes of dispatch reliability and high fuselage deformation indexes and performance penalty."[226] Respondent also argues that the planes were not "acquired" but were received under leasing contracts, and as such should not be considered as "acquisitions" that became the property of the Airlines.[227] Finally, Respondent argues that Claimants failed to add the types and number of aircraft designated by the 2001 Share Purchase Agreement, within the timeline contemplated by the SPA.[228] Respondent's expert, KPMG, argues that

> [O]ut of the 248 million dollars destined to the Industrial Plan, AIR COMET only allocated a reduced portion to investments, although the Plan established the need for investments to expand the fleet. The Marsans Group incorporated old aircrafts and models different than those typified in the purchase agreement. If it had incorporated the models established in that contract in 2001, by 2004 the airlines would have had 12 Airbus 320/321, seven Airbus 340-200/300 and another four aircrafts of other types, a fleet that would have meant a completely different operating situation for the airlines.[229]

314.    In the Tribunal's view, it is unnecessary to decide whether these additional investments actually qualify as investments for the purposes of founding jurisdiction.  As determined in the Decision on Jurisdiction, Claimants have met the threshold of proving an investment.  The Tribunal does not find that any of the additional evidence led by Respondent on the merits affects this conclusion.  If anything, the Tribunal has been provided with more detailed proof that, as outlined above, qualifying investments were made.

315.    The Tribunal notes that, in any event, when Air Comet took over the operation of the Airlines, they had all but completely stopped operations and were on the verge of bankruptcies. But for Claimants' investment, that would have been the end of the Airlines.  Rather than completely ceasing operations (or being taken over by Respondent and operated by it), the evidence indicates that the Airlines went back into operation and performed quite well for a number of years.  The evidence indicates that Air Comet did, in fact, invest in the Airlines by reinvesting profits, expanding the fleet and giving the Airlines access to various benefits through

---

[226] Resp. CM ¶ 270; *see also* KPMG ER1 § 21.1.6 ("[I]t is worth mentioning that the age of the aircraft incorporated during the 2001-2008 period through lease agreements, ranged between 10 to 25 years, an average 16 years old at the time of entering into the lease agreement.").
[227] Resp. CM ¶ 272.
[228] Resp. CM ¶¶ 277-279.
[229] KPMG ER1, § 7.1.1-7.1.2.

the Marsans Group's sales and booking systems, management systems and aircraft leasing and purchasing. The Tribunal finds that Claimants also made additional investments in the Airlines. In the Tribunal's view, Respondent's arguments in response to these items really go to the value of the Airlines and what compensation, if any, is due for their expropriation. Accordingly, the question of whether or not Claimants reinvested profits and contributed synergies are relevant to the value of Claimants' investment and not its existence and will be discussed, as necessary, in the discussion of the merits, below. For the sake of good order, the Tribunal notes that Respondent has failed to prove its contention that Claimants' investment was entirely opportunistic in the sense that the investment was made in order to misappropriate the funds provided by SEPI; the evidence clearly demonstrates that Claimants operated the Airlines for a number of years and contributed funds provided by SEPI, as well as its own funds, to retire the debt owed to the Airlines' creditors at the time of investment and to the Airlines' ongoing operations thereafter.

### E.     Court Proceedings Involving the Marsans Group

316.     Respondent has briefed in its pleadings a number of legal proceedings involving Claimants and the Marsans Group in Spain and Argentina. Respondent addressed most of these cases at the jurisdictional stage of these proceedings, arguing that Claimants' investment was therefore illegal. In its Decision on Jurisdiction, this Tribunal rejected Respondent's objection on the grounds that these alleged illegalities occurred after the investment was made,[230] although the Tribunal noted that "certain of the allegations raised under this objection may affect the merits of the claim" and that "it will be open to the Parties to make further submissions in respect of these allegations as appropriate during the merits stage of the Arbitration."[231]

317.     Respondent has referred to at least seven different proceedings and investigations taking place within the Spanish courts and at least three different proceedings pending before Argentine courts. A brief description of each proceeding, as characterized by the Parties, is set out below.

---

[230] Decision on Jurisdiction ¶ 318.
[231] Decision on Jurisdiction, ¶ 331.

## 1.    Spanish Legal Proceedings

## **Proceedings before Central Court for Investigative Proceedings No. 6**

318.    In its objections to jurisdiction, Respondent asserted that under the terms of the 2001 Share Purchase Agreement, SEPI was to provide funds to Air Comet, a portion of which was to be used to cancel ARSA's debts. According to Respondent, instead of complying with the terms of the SPA, Air Comet used these SEPI funds to purchase the outstanding debt from the existing creditors, thereby subrogating the claims.[232] For Claimants' part, they have asserted that Air Comet's acquisition of liabilities, the subsequent transfer of the credits to Interinvest, and the capital increase in ARSA were all lawfully conducted.[233]

319.    These allegations concerning the allocation of SEPI funds have been the subject of a preliminary criminal investigation before the Central Court for Investigative Proceedings No. 6, against Messrs. Díaz Ferrán, Pascual Arias and Mata Ramayo. The Parties agree that these allegations were dismissed on September 7, 2011, with the exception of one remaining allegation.[234] As described by Claimants, the allegations that were dismissed include the following: crimes of falsification of Air Comet's financial statements or books, unlawful exaction of money, procedural fraud, and misappropriation of public funds.[235]   The remaining claim concerned a crime against the Spanish Public Treasury on the basis of Air Comet's non-payment of corporate tax, committed with the participation or involvement of Messrs. Díaz Ferrán, Pascual Arias and Mata Ramayo.[236]

320.    On December 9, 2013, Criminal Central Court No. 1 of Madrid found Messrs. Díaz Ferrán and Mata Ramayo guilty of corporate tax evasion with respect to Air Comet's failure to report the

---

[232] *See, e.g.,* Resp. Mem. on Juris., ¶¶ 254-268; Resp. Reply on Juris., ¶¶ 286-308; RA-79.

[233] Cl. Reply ¶ 365. *See* "Claimants' Investments," at ¶ 263 *et seq.* above, for additional discussion of Claimants' actions with respect to the obligations contained in the SPA.

[234] RA-172ter; Claimants' letter of November 8, 2011, p. 4; Cl. Reply ¶ 366; *see also* Respondent's letter of October 26, 2011, p. 2, fn. 6.

[235] Claimants' letter of November 8, 2011, p. 5, citing RA-172ter (Order of the Spanish Central Investigation Court No. 6 of Madrid, Sept. 7, 2011), second legal conclusion.

[236] Respondent's letter of October 26, 2011, p. 2; Claimants' letter of November 8, 2011, p. 4; RA-172ter.

benefit it received from the subrogation of ARSA's debt.[237] Messrs. Díaz Ferrán and Mata Ramayo were each sentenced to two years and two months of prison and a euro 99 million fine (which reflected the amount of tax payable by Air Comet). On May 23, 2014, the Central Court of Criminal Matters of the National Court of Spain dismissed the appeal of this judgment and issued an order enforcing the sentences of Messrs. Díaz Ferrán and Mata Ramayo.[238]

## Proceedings before Central Court in Charge of Preliminary Investigations No. 1 of Madrid

321.    This criminal proceeding concerns allegations of embezzlement by Messrs. Díaz Ferrán and Pascual Arias as administrators of Viajes Marsans S.A., and Mr. Iván Losada as administrator of Teinver.[239] For their part, Claimants argue that this event is totally unrelated to both the jurisdiction of this Tribunal and the subject matter of this arbitration.[240] Claimants also note that the court's order of February 2, 2012 was to conduct a preliminary investigation against the named individuals.[241] Neither Party gave any additional information about the nature of the investigation, the timing of the alleged embezzlement, or the nature of Claimants' involvement in the allegations.[242]

## Investigation before the *Audiencia Nacional Española* for "Possible Procedural Fraud"

322.    Respondent makes a brief reference to an investigation in which Messrs. Díaz Ferrán and Pascual Arias are suspected of "possible procedural fraud," namely, providing the court with false

---

[237] RA-669. This judgment only addressed claims that Messrs. Mata Ramayo and Diaz Ferrán, as shareholders and directors of Air Comet, committed crimes against the Spanish Treasury by failing to pay taxes on Air Comet's increase in value related to the subrogation of ARSA's debt.  The Court considered the proper tax treatment for this transaction and determined that Air Comet had failed to report a taxable benefit.  The Court found Messrs. Mata Ramayo and Diaz Ferrán criminally liable for tax fraud (an offence against the Spanish Treasury). The judgment makes no finding of fraud or harm, as it relates to the actual use of the funds Air Comet received from SEPI, to the Airlines, its creditors or otherwise. As discussed at paras. 274-289, above, SEPI was aware of and consented to Air Comet's use of the funds to subrogate ARSA's debt rather than to pay it off directly.

[238] RA-682. It appears that Mr. Díaz Ferrán may have filed an appeal before the Spanish Constitutional Tribunal: *see* Claimants' letter of July 2, 2014, p. 3.

[239] *See* Respondent's letter to the Tribunal dated March 26, 2012, pp. 3-4 and Annex II; Resp. CM ¶ 98.

[240] *See* Claimants' letter dated April 4, 2012, p. 3; Cl. Reply ¶¶ 369-370.

[241] Cl. Reply ¶ 369.

[242] In its letter of June 23, 2014, Respondent sought to submit a new decision of the Central Court of Preliminary Investigations in respect of this matter.  The Tribunal admitted this new document.  In its letter of March 21, 2016, Respondent referred to press reports of a new decision of the Central Court which was said to have convicted Mr. Díaz Ferrán of embezzlement and offered to submit a copy.  The Tribunal did not request the submission of a copy of the decision in question.

documents.[243] Claimants deny the relevance of the alleged preliminary investigation as well as the validity of the alleged claims and the related press reports. [244] Neither Party describes the nature or the timing of this dispute, nor does either Party illustrate clearly the connection of this investigation to the three Claimants.

## Proceedings before the Court in Charge of Preliminary Investigations No. 8

323.   This case appears to have been brought by a creditor of the Marsans Group against Messrs. Díaz Ferrán and Pascual Arias, Losada and Ángel de Cabo Sanz and concerns alleged illegal acts of Mr. de Cabo's company, Posibilitum Business S.L., with respect to former Marsans Group companies in the course of Air Comet's insolvency proceedings.[245] Claimants characterize this proceeding as a preliminary investigation.[246] Neither Party articulates a clear connection between these proceedings and any of the three Claimants.

## Proceedings before the Court in Charge of Preliminary Investigations No. 35 of Madrid

324.   As characterized by Respondent, these proceedings concern charges of procedural fraud against Dr. Mata Ramayo, a former partner of Messrs. Díaz Ferrán and Pascual Arias, and Executive Vice Chairman of the Board of Directors of ARSA during the Marsans Group's administration.[247] According to Respondent, on May 17, 2013, in an order deciding to continue preliminary proceedings, the Spanish criminal judge found that a false document had been irregularly and belatedly included in the record of ARSA's insolvency proceedings in Argentina. Respondent argues that the false document relates to Dr. Mata Ramayo's attempt to mislead the Spanish criminal judge into concluding that Royal Romana Playa had only acted on behalf of Air Comet, and not as the assignee of Air Comet's creditors against ARSA.[248]

---

[243] Respondent's letter dated March 26, 2012, at p. 5; Resp. CM ¶ 100.
[244] *See* Claimants' letter dated April 4, 2012; Cl. Reply ¶ 371.
[245] Respondent's letter dated March 26, 2012, at p. 6; Resp. CM ¶ 101; Cl. Reply ¶ 375.
[246] Cl. Reply ¶ 375.
[247] Respondent's letter dated July 4, 2013, pp. 4-5.
[248] *Id.*, referencing Decision of the Criminal Court for Investigation Proceedings No. 35 of the City of Madrid, Spain, May 17, 2013, at 4 (Annex II).

325.     Claimants assert that this preliminary investigation is irrelevant because it is a Spanish proceeding under Spanish law, and the validity of the document at issue has already been decided in Argentine courts during ARSA's reorganization proceedings, which are now final.[249]

### Investigation before the Central Court in Charge of Preliminary Investigations No. 6 – "Operación Crucero"

326.     As characterized by Respondent, this criminal proceeding involved Messrs. Díaz Ferrán, Pascual Arias, de Cabo and a number of others who are being investigated on suspicion of illegally concealing or disposing of their assets in order to avoid the claims of their creditors.[250] The timeline of the allegedly illegal activities is not entirely clear, although Respondent refers to personal guarantees made by Messrs. Díaz Ferrán and Pascual Arias starting in 2008, and it appears that the allegedly illegal activities may have extended after the purchase of the Marsans Group companies by Posibilitum Business S.L. in 2010.[251] Mr. Díaz Ferrán was provisionally detained in connection with this investigation on December 5, 2012, with a bail set at 30 million euros.[252] On April 29, 2014, the Court set the various charges for oral trial proceedings against Mr. Díaz Ferrán and others before the Criminal Division of the National Court of Spain.[253]

327.     As characterized by Claimants, these proceedings are irrelevant to the subject matter of this arbitration, and concern a number of specific events that allegedly occurred well after Argentina's expropriation of the Airlines.[254] Further, Claimants say that the proceedings do not directly involve them nor the beneficiaries of any recovery the Tribunal may award.[255]

### Insolvency Proceedings of Viajes Marsans S.A. and related companies before Commercial Court No. 12

328.     As characterized by Respondent, a Spanish prosecutor alleged that companies of the Marsans Group committed serious irregularities in connection with their insolvency

---

[249] Cl. Reply ¶¶ 378-379; C-768.
[250] *See* Resp. CM ¶¶ 103, 107. At the hearing on the merits, Claimants emphasized that Mr. Díaz Ferrán had not, at that time, been accused, but rather remains under investigation. Transcript p. 44.
[251] *See, e.g.,* Resp. CM ¶ 104; RA-180 at pp. 3-4.
[252] Resp. CM ¶ 111.
[253] Respondent's letter dated June 23, 2014; RA-683.
[254] Cl. Reply ¶ 376.
[255] Claimants' letter dated July 2, 2014.

proceedings.[256]  Specifically, the prosecutor requests that Messrs. Díaz Ferrán and Pascual Arias, and Posibilitum Business S.L. be found liable in connection with their acts as the reorganization administrators of Viajes Marsans S.A., Viajes Crisol S.A.U., Rural Tours S.A.U., and Tiempo Libre S.A.U.[257]  According to Respondent, on June 13, 2013, the Spanish judge characterized the insolvency proceedings of Viajes Marsans, S.A. as culpable.[258]  In its judgment, the court concluded that Viajes Marsans, S.A. had committed accounting irregularities, in particular by failing to make provision for debit balances of Teinver and Air Comet, and that "… substantial sums of money were withdrawn from the insolvent debtor VIAJES MARSANS, S.A., *mainly to be transferred to TEINVER, S.L.'s account*, which led to the lack of liquidity that caused the insolvency situation."[259]  The court decided that Mr. Díaz Ferrán, the estate of Mr. Pascual Arias and Posibilitum Business, S.L. were covered by the declaration of culpable insolvency.  In that regard, Mr. Díaz Ferrán was prohibited from administering third party assets or third party entities for 15 years, his rights as a creditor were forfeited and he was found to be jointly and severally liable for the debts and liabilities of Viajes Marsans, S.A. not covered by the liquidation proceedings.

329.    As characterized by Claimants, this dispute is not a criminal proceeding, but rather was a matter before a commercial court.[260]  Claimants also note that the parties to this proceeding are not parties to the present arbitration.[261]  Further, Claimants maintained that were the Tribunal to consider the merits of the court's decision and Respondent's submissions, these show that Claimants' bookkeeping was properly maintained during the life-span of Claimants' investment. Claimants say that the role of Air Comet in the acquisition of the liabilities of the Airlines, the

---

[256] Resp. CM ¶ 102.

[257] Respondent's letter dated March 26, 2012, at p. 6-7.  Claimants submitted that the prosecutor's submission was irrelevant for the purposes of this arbitration and had been contested by the interested parties.  *See* Claimants' letter dated April 4, 2012, p. 4.

[258] Respondent's letter dated July 4, 2013, pp. 1-4.

[259] Respondent's letter dated July 4, 2013, pp. 1-4.  In its letter, Respondent notes that the court found that a substantial part of the conduct of Viajes Marsans S.A. should be attributed to Posibilitum Business S.L., which had purchased the shares of Viajes Marsan S.A. and other companies of the Marsans Group, including Teinver (which, in turn, held 100% of the shares of Viajes Marsan S.A.).  See the court's judgment: Exhibit DUP004 at pp. 37-39 (English version): attached to Respondent's letter dated July 4, 2013.

[260] Cl. Reply ¶¶ 363-364.

[261] *Id.*  The parties to the proceedings are: Viajes Marsan S.A.; Gerardo Díaz Ferrán; Gonzalo Pascual Arias; and Posibilitum Business S.L.

subsequent transfer of the credits to Interinvest and the capital increase in ARSA were all lawfully conducted as confirmed by the decision of the Spanish Central Court for Investigative Proceedings No. 6.[262]

330.    On September 24, 2014, Commercial Court No. 12 issued a judgment classifying the insolvency proceedings of Tiempo Libre S.A.U. as culpable.[263]   In its judgment, the court concluded that Tiempo Libre S.A.U.'s insolvency should be classified as culpable on the basis, *inter alia*, of: serious accounting irregularities, including the failure to provide for debit balances owed to Tiempo Libre S.A.U. by Air Comet, Viajes Marsans S.A. and Teinver; improper use of the Marsans Group's cash pooling system to provide funds to Viajes Marsans S.A., Teinver and other affiliates; a culpable delay in filing insolvency proceedings; and failure to cooperate with the trustees in bankruptcy.  The court held that Mr. Díaz Ferrán, the estate of Mr. Pascual Arias and Posibilitum Business S.L. were affected by the classification of the insolvency proceedings as culpable.  The court went on to disqualify Mr. Díaz Ferrán and Posibilitum Business S.L. from administering third party assets or any third parties for a period of 15 years and forfeited any rights and interests held by them as creditors of Tiempo Libre S.A.U.   Further, the court held that Mr. Díaz Ferrán, the estate of Mr. Pascual Arias and Posibilitum Business S.L. were jointly and severally liable to pay for the liabilities of, and all claims against, the insolvency estate of Tiempo Libre S.A.U.[264]

331.    Respondent says that this decision, together with the several other decisions of Spanish courts in the record, are consistent with the irregular and illegal conduct which it alleges against Claimants in this case.[265]   Claimants say that Tiempo Libre S.A.U. is not a claimant in these

---

[262] Cl. Reply ¶¶ 365-368. Claimants add that the only remaining claim relates to Air Comet's non-payment of corporate tax.  In this regard, *see* ¶¶ 318-320, above.

[263] *See* Respondent's letter dated December 15, 2014, pp. 4-8; RA-684: Judgment of Commercial Court No. 12 for Madrid, dated September 24, 2014. The insolvency proceedings of Tiempo Libre S.A.U. had been conducted together with those of Viajes Marsans S.A. The court's judgment records that Tiempo Libre S.A.U. operated a retail travel agency. Its shares were held 100% by Viajes Marsans S.A. whose shares, in turn, were held by Teinver. *See* RA-685 (English version), p. 15 (Item Ten), p. 21 (Item Sixteen).

[264] RA-685 (English version) pp. 23-24. The court found that Posibilitum Business S.L. became liable as of the time it purchased the shares of Teinver in June 2010 and thereby became the *de facto* manager and responsible for the administration of Viajes Marsans S.A. and Tiempo Libre S.A.U.

[265] Respondent's letter dated December 15, 2014, p. 8.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 111 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

proceedings and its insolvency proceedings are unrelated to the facts underlying Claimants' claims in this arbitration.  They argue that Respondent cannot prove its allegations in these proceedings by reference to the court's judgment in the Tiempo Libre S.A.U. insolvency proceedings and that Respondent has not explained why or how the findings of the Spanish court in that matter have any bearing on the claims in this arbitration.[266]

**Insolvency Proceedings of Transportes de Cercanías S.A.**

332.    In February 2016, the Provincial Prosecutor's office of Madrid submitted a request to Commercial Court No. 7 for Madrid to have the insolvency proceedings of Transportes de Cercanías S.A. declared culpable.[267]  The basis for the Provincial Prosecutor's application appears to be the transfer of funds received for the sale of the concession owned by Transportes de Cercanías S.A. on or about January 29, 2010 to other companies alleged to be managed by Messrs. Díaz Ferrán and Pascual Arias (including Teinver and Viajes Marsans S.A.), leaving debts of Transportes de Cercanías S.A. unpaid.  In addition, there is an allegation that Transportes de Cercanías S.A. had not produced accounting books and audits since the last fiscal report for 2008. Respondent says that the Provincial Prosecutor's classification of the insolvency proceedings as culpable updates reports of one of its witnesses, Dr. Cigarrán, and is relevant.

333.    Claimants argue that the Provincial Prosecutor's allegation refers to facts and allegations unrelated and immaterial to the merits of this arbitration.  They say that the events referred to in the Provincial Prosecutor's application all occurred after the expropriation of the Airlines and are irrelevant to the issues before the Tribunal.  Further, Claimants argue that they have been in court-supervised insolvency proceedings for several years and have been managed only by the receivers appointed by the competent Spanish courts.  Neither the founders of the Marsans Group, nor those who later acquired the companies of the Marsans Group, have had any involvement in the

---

[266] Claimants' letter dated January 7, 2015, p. 7. Claimants refer to the Decision on Jurisdiction at ¶¶ 324-328 and argue that Respondent has not established the irregularities that it alleges in these proceedings and that no Argentine court has found any irregularities, fraud or other form of criminal conduct regarding their investment in or management of the Airlines in the time since their investment in 2001.
[267] *See* Respondent's letter dated October 17, 2016 and the application of the Provincial Prosecutor's office of Madrid, dated February 29, 2016.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 112 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

management of Claimants' business or the arbitration for a number of years.[268]  Claimants say that what the Spanish prosecutors may be considering in regard of the former executives of the Marsans Group is irrelevant to the matters in dispute in this arbitration.[269]  No order or decision of Commercial Court No. 7 in charge of the insolvency proceedings of Transportes de Cercanías S.A. was submitted in evidence.

**Insolvency proceedings of Seguros Mercurio, S.A.**

334.  Respondent reports that the Court of Commercial Matters No. 9 of Madrid found Messrs. Díaz Ferrán and Pascual Arias "guilty" of the bankruptcy of Seguros Mercurio, S.A., a Marsans Group company, in May of 2012.[270]  It also noted that other companies of the Marsans Group, including Teinver, were liable as accomplices to the bankruptcy.[271]

335.  Claimants argue that Respondent has failed to demonstrate how these proceedings are remotely related to or how they affect Claimants' claim in this arbitration.  They note that Seguros Mercurio, S.A. was a Spanish insurance company owned by the Marsans Group, and that it had no connection with Claimants' investment in Argentina.[272]  They also note that the substance of the court's May 11, 2012 decision covers a time period *after* the expropriation of Claimants' investment.[273]

**2.      Argentine Legal Proceedings**

**Mata Ramayo y otros s/ Defraudación por Administración Fraudulenta - Criminal and Correctional Court No. 27**

336.  Respondent refers to this ongoing criminal investigation, which concerns the alleged fraudulent diversion of funds provided by SEPI to Air Comet, pursuant to the SPA in October 2001, the approval of the Airlines' 2001 balance sheet containing allegedly "bogus" entries, and

---

[268] Claimants' letter dated October 24, 2016, pp. 1-2.
[269] *Id*. Claimants say that the arbitration is being conducted by the court appointed receivers for the benefit of the creditors of the bankruptcy estates.
[270] Respondent's letter dated May 24, 2012; CM ¶¶ 67-68; RA-173.
[271] Respondent's letter dated May 24, 2012, p. 4.
[272] Cl. Reply ¶¶ 392, 394.
[273] Cl. Reply ¶ 393; C-891.

the alleged misuse of monies contributed by a third party.[274]  This investigation was commenced in February 2002 and the court's decision is still pending.

337.    In response, Claimants refer to their submissions on the acquisition of the investment in the Airlines and say that 1) the transfer of funds from SEPI to Air Comet to settle the Airlines' liabilities was done in accordance with the law and relevant agreements; 2) the 2001 balance sheet was discussed and approved at the October 18, 2002 shareholders meeting and was independently audited by PricewaterhouseCoopers; and 3) that there is no evidence of any such alleged transaction concerning transfers of funds to third parties and any issue concerning the settlement agreement in ARSA's reorganization proceedings in 2002 has been finally settled and the reorganization proceedings were finally closed on June 17, 2011.[275]

## Marsans Group, Aerolíneas Argentinas y otros s/ Defraudación por Administración Fraudulenta - Criminal and Correctional Court No. 3

338.    According to Respondent, this investigation concerns the alleged overbooking of tickets by the Airlines in July 2008.[276]  Respondent asserts that ARSA and AUSA purposefully permitted overbooking with the full knowledge that they would not be able to meet their commitments. Respondent says that according to the complainant the alleged overbooking would have led to substantial operating loss.[277]  According to Respondent, the investigation proceedings are pending before the Federal Criminal and Correctional Court No. 3.

339.    Claimants say that this is an Argentine court proceeding applying Argentine law and is therefore irrelevant.  In any event, Claimants assert that Respondent's allegations, as well as the proceedings themselves, are groundless.  Further, they state that the proceedings are still in a preliminary stage.[278]

---

[274] Resp. CM ¶ 123 *et seq*; Resp. Rej. ¶ 267 *et seq*; RA-70.  *See also*, Resp. PHB ¶ 199 and fn. 238.
[275] Cl. Reply ¶¶ 382-384.
[276] Resp. CM ¶ 130 *et seq*; Resp. Rej. ¶ 279 *et seq*; RA-522.
[277] Resp. Rej. ¶¶ 281-282.
[278] Cl. Reply ¶¶ 386-387.

340.   The investigation in this matter appears to have been requested in November 2008 and appears to be still pending.[279]

## Criminal Case Concerning Document Forgery before Criminal Court No. 27

341.   According to Respondent, this criminal investigation pending before Criminal Court No. 27 concerns allegations that a forged document was inserted into the record of the 2001 ARSA reorganization proceeding.[280]   Respondent asserts that the Court has established that this document, which concerned the nature of the relationship between Air Comet and Royal Romana Playa, was introduced fraudulently.[281]  Respondent notes that the matter is also pending before the Spanish Court of Preliminary Investigations No. 35.[282]

342.   Claimants assert that ARSA's reorganization proceedings have concluded with finality, and that to the extent this allegation remains at issue in the investigation in the Court of Preliminary Investigations No. 35 proceeding in Spain referenced above, it is *res judicata* and Spanish courts cannot in good faith revive a claim that has been finally settled in another jurisdiction.[283]

## 3.   Tribunal's Analysis: Relevance of these Domestic Court Proceedings to the Present Arbitration

343.   In the Decision on Jurisdiction, the Tribunal dismissed Respondent's objection to jurisdiction that Claimants' investment was not protected by the Treaty because of alleged illegalities connected to that investment.[284]  In the Decision on Jurisdiction, the Tribunal found that the relevant time at which to consider the alleged illegality of an investment under the Treaty is the time of the entry into the investment: in this case, primarily the acquisition of the shares of

---

[279] *See* RA-522.  This exhibit contains an initial decision, dated March 18, 2011, by the court before which the complaint was initially submitted, declining jurisdiction to pursue the inquiry and referring the matter to the Criminal and Correctional Court of the city of Buenos Aires.

[280] Resp. Rej. ¶ 274 *et seq.*

[281] Resp. Rej. ¶ 277.

[282] Resp. Rej. ¶ 278; RA-512.

[283] Cl. Reply ¶¶ 377-379.

[284] Decision on Jurisdiction, ¶¶ 277-331. At ¶ 331, the Tribunal noted that certain of the allegations raised by Respondent may affect the merits of Claimants' claims and that it would be open to the Parties to make further submissions in respect of these allegations, as appropriate, during the merits stage of the arbitration.  The Tribunal considers any relevant submissions in this regard as part of its analysis of the relevant claims.

Interinvest through Air Comet in October 2001.[285]  The Tribunal also found that the relevant law is the law of the state receiving the investment: in this case, the law of Argentina.[286]  The Tribunal went on to find that Respondent had failed to discharge the onus of demonstrating, as a factual matter, that Claimants had committed illegalities in acquiring their investment in the Airlines.  In this regard, the Tribunal found that a number of Respondent's allegations were based on Spanish law, while others related to performance of the terms of the SPA or other events which occurred after the execution of the SPA by which Claimants acquired their investment.[287]  The Tribunal reached a similar conclusion with respect to Respondent's allegation that Claimants had breached principles of good faith when Air Comet subrogated ARSA's creditors' claims and when it failed to declare this subrogation to the responsible Spanish tax authorities.[288]

344.     The Tribunal's review of Respondent's additional submissions and the various court decisions and documents submitted in this merits phase of the arbitration, together with Claimants' responses, confirms the conclusions it reached in the Decision on Jurisdiction.  In this regard, Respondent's allegations, for the most part, continue to refer to either proceedings under Spanish law or events which occurred after Claimants' acquisition of their investment in the Airlines and do not affect the Tribunal's jurisdiction on the basis that the relevant investments were not made in accordance with Argentine law.  The Tribunal comments on the various proceedings referred to by Respondent in the following paragraphs.

**Spanish Legal Proceedings**

345.     As described above, for the purpose of Respondent's objection to jurisdiction in this arbitration, the relevant law is the law of Argentina.  Accordingly, Spanish law and Spanish law proceedings are of limited, if any, relevance.  Further, many of the proceedings raised by Respondent do not address the legality of the acquisition of Claimants' investment at the time it was made, but, rather, subsequent [unrelated] events.

---

[285] *Id.*, ¶¶ 318-322.
[286] *Id.*, ¶ 323.
[287] *Id.*, ¶¶ 324-328.
[288] *Id.*, ¶¶ 329-330.

### Proceeding before Central Court for Investigative Proceedings No. 6

346.    As noted above, Messrs. Díaz Ferrán and Mata Ramayo have been found guilty of corporate tax evasion with respect to Air Comet's failure to report the benefit it received from the subrogation of ARSA's debt.  This conviction relates to the treatment under Spanish corporate tax law of the benefit Air Comet received from the subrogation of ARSA's debt after the execution of the SPA and the transfer of funds from SEPI to Air Comet.  In the Tribunal's view, this does not affect the legality of Claimants' investment under Argentine law.

347.    Further, as discussed above, the legality of the SPA and the various related agreements has not been challenged in the Spanish courts, or elsewhere.  As also described previously, SEPI was aware of and consented to the subrogation of ARSA's debt and the agreements concluded in that regard.  In addition, the Spanish Tribunal de Cuentas audited these particular agreements and transactions and did not recommend challenging the SPA or invalidating it or any of the steps taken to implement it.[289]

348.    Finally, the Tribunal notes that all of the other allegations submitted to preliminary criminal investigation in this matter against Mr. Díaz Ferrán and others were dismissed.

### Proceedings before Central Court in Charge of Preliminary Investigations No. 1 of Madrid

349.    As discussed previously, very limited evidence relating to these proceedings were submitted in evidence.  It appears that the alleged illegal conduct occurred well after Claimants' investment and, indeed, after the expropriation of Claimants' investment in 2008.

### Investigations before the Audiencia Nacional Española and the Court in Charge of Preliminary Investigations No. 8 of Madrid

350.    Each of these matters appears to consist of preliminary investigations relating to alleged events occurring during the course of insolvency proceedings after Claimants made their investment.  Neither Party described the nature or the timing of these investigations nor the connection of the investigations to Claimants.

---

[289] *See* above at ¶¶ 282-289.

### Proceeding before the Court in Charge of Preliminary Investigations No. 35 of Madrid

351.    This proceeding relates to an allegation that Dr. Mata Ramayo, a former Officer and Executive Vice Chairman of the Board of Directors of ARSA, sought to improperly introduce a false document into the record of ARSA's insolvency proceedings in Argentina.  Respondent alleges that the document in question relates to an aspect of an investigation before the Argentine courts, discussed below.[290]  In both cases, the investigations appear to be ongoing and there was no evidence of a final decision in either case.

352.    In addition, the Tribunal notes that the proceedings in ARSA's bankruptcy were concluded and declared terminated in June and August 2011.[291]

353.    In these circumstances, the Tribunal is unable to reach any firm conclusion on the status of the allegations being investigated in the Spanish and Argentine courts.  Further, on the basis of the Parties' submissions, the Tribunal is unable to determine what effect, if any, the allegations in question would have on the insolvency proceedings of ARSA or the legality of Claimants' investment in this dispute.

### Investigation before the Central Court in Charge of Preliminary Investigations No. 6 of Madrid - "Operación Crucero"

354.    This matter concerns an investigation which has been set for trial in respect of charges relating to illegal concealment or disposal of assets in order to avoid the claims of creditors.  The claims are brought against Messrs. Díaz Ferrán, Pascual Arias, de Cabo, Losada and a number of others.  The investigation appears to have been commenced in 2012 and was set for trial by way of an order dated April 29, 2014.[292]  The timeframe during which the alleged crimes were committed is not clear from the evidence presented, although it appears that the relevant events occurred in 2010 when Messrs. Díaz Ferrán and Pascual Arias are alleged to have created a plan to remove and hide their personal assets as well as those of various companies under their control

---

[290] Mata Ramayo y otros s/ Defraudación por Administración Fraudulenta, described at ¶¶ 336-337, above.
[291] At the request of the debtor, ARSA, the Argentine Commercial Court No. 15 ordered the conclusion of the reorganization proceedings: C-768.  On August 15, 2011, the court declared that the reorganization plan had been complied with and that the reorganization proceedings of ARSA had been completed: C-771.
[292] RA-683.

with the assistance of Mr. de Cabo.[293]   From this, it appears that the events giving rise to the charges occurred well after Claimants' investments were made and were expropriated in 2008.

355.    Although Mr. Díaz Ferrán was provisionally detained in connection with these proceedings, there does not appear to have been any conviction or final decision rendered in this matter.

### Insolvency Proceedings of Viajes Marsans, S.A. and Related Companies before Commercial Court No. 12

356.    As described above, these proceedings involve the insolvencies of Viajes Marsans, S.A. and Tiempo Libre, S.A.U., both of which have been declared culpable and affect Mr. Díaz Ferrán, the estate of Mr. Pascual Arias and Posibilitum Business, S.L.  The Tribunal was not made aware of any appeals from these decisions or relevant developments other than those described above.[294]

357.    It appears that the relevant events giving rise to the declaration of a culpable insolvency commenced with what the court classified as "serious accounting irregularities" which reflected a false view of the solvency of Viajes Marsans, S.A. in the company's annual accounts for 2008/2009, approved on December 30, 2009.  This indicates that the conduct at issue commenced approximately one year after the formal expropriation of the shares in the Airlines.  Further, the proceedings do not involve as parties any of the Claimants.  As a result, the classification of the insolvency of Viajes Marsans, S.A. cannot have affected the legality of Claimants' investment in the shares of the Airlines.  The same is true with respect to the insolvency of Tiempo Libre, S.A.U.[295]

358.    The Tribunal reaches the same conclusion with respect to the Provincial Prosecutor's request to have the insolvency proceedings of Transportes de Cercanías declared culpable.[296]  As described above, the basis for this request appears to be the sale of Transportes de Cercanías' concession to a third party on or about January 29, 2010.  By that time, Transportes de Cercanías

---

[293] RA-180, Document P-01, pp. 1-2.
[294] *See* ¶¶ 328-331.
[295] *See* ¶¶ 328-331.
[296] *See* above at ¶¶ 332-333.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 119 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

had sold all its remaining shares in Air Comet to Teinver (which occurred on December 10, 2009). Again, it also appears that the events in question occurred after the making of Claimants' investment and after its expropriation. Finally, there does not appear to have been any decision made by Commercial Court No. 7 of Madrid in respect of the request to have the insolvency proceedings of Transportes de Cercanías declared culpable.

359.    Accordingly, these proceedings are also irrelevant to the question of the legality of Claimants' investment in the Airlines.[297]

**Argentine Legal Proceedings**

***Mata Ramayo y otros s/ Defraudación por Administración Fraudulenta***

360.    As described above, this matter involves an ongoing criminal investigation which concerns the alleged fraudulent diversion of funds provided by SEPI to Air Comet, in breach of the SPA, the approval of the Airlines' 2001 balance sheet containing allegedly false entries and the alleged misuse of monies contributed by a third party in the case of claims held by two creditors against ARSA and which are said to be assigned to Royal Romana Playa.[298]  The relevant underlying facts are disputed by the Parties.

361.    The Tribunal notes that the investigation in this matter was commenced in February 2002 and is still pending.  It appears that investigative interviews or depositions were taken from several witnesses in 2010.[299]  However, no decision of the court appears to have been rendered and no further materials in respect of this proceeding were submitted in evidence.

362.    In the Tribunal's view, the fact that an investigation has been ongoing before an Argentine court since 2002, and the materials submitted in evidence, are of little assistance in determining whether Claimants' investment was made in accordance with Argentine law and, consequently,

---

[297] The Tribunal reaches the same conclusion with respect to the insolvency proceedings of Seguros Mercurio, S.A. While the court in that case, Commercial Court No. 9 of Madrid, declared the insolvency of Seguros Mercurio, S.A. to be culpable, there does not appear to be any connection with Claimants' investment in Argentina and the Airlines. Further, it appears that the relevant events giving rise to the classification of the insolvency as culpable occurred well after Claimants' investment in the Airlines and after its expropriation.  *See* C-891.

[298] *See* ¶¶ 336-337, above, and the sources cited there.

[299] *See* RA-70.

entitled to protection under the Treaty.  As indicated previously, where a *prima facie* showing of the legality of an investment is made, the onus is on the respondent to demonstrate that the investment was not made in accordance with the legislation of the state receiving the investment. As the Tribunal found in the Decision on Jurisdiction, Respondent has not discharged this burden.

363.    As the Tribunal also found in the Decision on Jurisdiction, the SPA and other agreements between Air Comet and SEPI were governed by Spanish law and there has been no finding of breach or invalidity of those agreements by the Spanish courts, or otherwise.  In these proceedings, as described above in Section D, the Tribunal has found that Claimants did, in fact, make various investments and has found these sufficient to ground its jurisdiction.  In addition, also as pointed out in the Decision on Jurisdiction, non-compliance with performance requirements under the SPA, which arise after the Agreement was executed, may affect certain aspects of the merits of the dispute, provided they are adequately demonstrated.  However, they do not retroactively invalidate or render illegal the binding nature of the SPA, nor the investment it conveyed.

### *Marsans Group, Aerolíneas Argentinas y otros s/ Defraudación por Administración Fraudulenta*

364.    This investigation concerns alleged overbooking of tickets by the Airlines in July 2008. For the reasons described previously, any finding that the alleged offences had occured would not affect Claimants' acquisition of their investment.  Rather, if proved, the alleged overbooking of tickets could be relevant to the financial position of ARSA and AUSA and affect the merits of Claimants' claim in so far as it was shown to affect compensation or some other relevant aspect of the claim on its merits.

365.    Further, and in any event, each Party must prove the facts upon which it relies in these proceedings.  While evidence of domestic court proceedings, including criminal proceedings, may be of some relevance or assistance in proving a fact, it is common ground that the decision of domestic courts are not binding on this Tribunal.  In any event, the Tribunal notes that these proceedings have been pending since November 2008 and no decision has been rendered or submitted in these proceedings.  Accordingly, the Tribunal will consider Respondent's allegation that the Airlines engaged in overbooking of tickets, to the extent it is relevant, later in this Award.

### Criminal Case Concerning Document Forgery before Criminal Court No. 27

366.     The Tribunal has addressed this issue above at paragraphs 341 and 342.  As the Tribunal has noted, this is an ongoing investigation which appears to not have been concluded.  Further, in light of the termination of ARSA's reorganization proceedings in 2011, the Tribunal is not pursuaded that this investigation is relevant to the question of the legality of Claimants' investment.

### Tribunal's Conclusion on the Various Court Proceedings

367.     Having carefully reviewed all of the voluminous materials relating to the various court proceedings in Spain and Argentina, the Tribunal concludes that none of these proceedings proves any illegality of Claimants' investments at the time they were made or that they were not made in accordance with the legislation of Argentina such that they should be denied protection under the Treaty pursuant to Article II(2), or otherwise.

368.     Finally, the Tribunal addresses another aspect of the court proceedings set out above upon which Respondent relies.  In this regard, Respondent says that "the events in Spain constitute the same manoeuvres performed at the Airlines" and that "criminal and insolvency proceedings in Spain prove that fraudulent concealment or disposal of assets have been usual practice, a *modus operandi*, of the business group to which the Claimants belong."[300]  Respondent suggests that this conduct demonstrates that the same conduct occurred in the facts of this case.  In the Tribunal's view, this is not correct.  It would be inappropriate to attribute to Claimants evidence of "similar fact" based on findings of courts in other proceedings, involving different parties, facts and circumstances.  This is particularly the case where the various criminal allegations relate to events alleged to have occured well after the relevant period of Claimants' investment in Argentina.  Each Party must prove the facts it alleges before this Tribunal and the findings of other courts or tribunals will only be of limited, if any, assistance in that regard.

369.     The Tribunal now turns to address the merits of the Parties' claims.

---

[300] Resp. Rej. ¶ 238.  *See also* Resp. Rej. ¶ 285 where Respondent suggests that in view of the conduct described in the various court proceedings, it is not difficult to understand that such facts also occurred at the Airlines under Claimants' management, including alleged stripping of assets and the Airlines' critical financial situation.

## V.    FACTUAL BACKGROUND

370.    In 1990, the Government of Argentina conducted an international privatization of Argentina's official, state-owned carrier, Aerolíneas Argentinas Sociedad del Estado ("AASE"), whose assets were transferred for that purpose to a newly formed company named Aerolíneas Argentinas S.A. ("ARSA").  The winning bidder was a group of investors led by the Spanish state-owned airlines, Iberia Líneas Aéreas de España S.A..[301]  By way of Decree 2,201 of October 19, 1990 and the General Transfer Contract authorized by that Decree, all of AASE's assets, concessions and permits were sold and transferred to ARSA.[302]  At approximately the same time, the investor group led by Iberia acquired 85% of the shares in ARSA with Iberia itself controlling 20% of the shares.[303]  By 1996, Iberia had increased its holdings in ARSA to 84%.[304]  By 2001, that shareholding had further increased to approximately 92.1%.

371.    In 1994, Iberia incorporated a fully-owned Argentine subsidiary, Interinvest, to serve as the holding company for Iberia's investments in the Airlines.  As of that time, Interinvest became the controlling shareholder in the Airlines.  Subsequently, in 1995, the Spanish government constituted SEPI to hold corporate shares owned by the Spanish government and, as a result, SEPI acquired Iberia's shareholding in Interinvest.  In June 2001, SEPI owned 99.2% of Interinvest which, in turn, held 92.1% of ARSA's shares and 90% of AUSA's shares.

372.    Austral-Cielos del Sur S.A. ("AUSA") was formed by two private companies which merged in 1971 to form Austral Lineas Aereas, S.A. ("AUSTRAL").  It was subsequently nationalized in 1980 and then privatized in 1985 when it was purchased by Cielos del Sur, S.A.[305]  In 1991, Iberia acquired AUSA.[306]  As a result, by 1991, the Spanish government, through Iberia was a significant shareholder in the Airlines.

---

[301] Cl. Mem., ¶¶ 20-23.
[302] C-6: Decree 2201/90, approving the creation of ARSA; C-7: Decree 2438/90, approving the General Transfer Contract; C-63: General Transfer Contract signed on November 20, 1990.
[303] C-8: Share Purchase Agreement of November 16, 1990.
[304] C-9: ARSA's summary report, p. 13.
[305] C-10: AUSTRAL Corporate History.
[306] Cl. Mem., ¶ 24; C-14, p. 209.

373.    By June 2001, both Airlines were in serious financial difficulties.  ARSA was under reorganization proceedings, had liabilities exceeding USD 1 billion and forecasted operating losses for the current year in excess of USD 350 million.  It had also suspended flights to all but one international destination.  AUSA was also in difficult financial circumstances.[307]

374.    In June 2001, SEPI announced its intention to sell its shares in Interinvest.  After conducting preliminary discussions with various potential purchasers and a preliminary evaluation of initial offers, SEPI preselected four bidders and ultimately selected the offer made by Air Comet.[308]

375.    The Government of Argentina appears to have monitored the sale process of SEPI's participation in Interinvest.  The then Argentine Minister of Infrastructure, Mr. Carlos Bastos, was responsible for various areas of activity, including the Subsecretariat of Commercial Air Transportation.  In that capacity, he was charged with overseeing the problems arising from ARSA's insolvency.  He held several meetings with representatives of SEPI as well as with representatives of the Spanish government from May to September 2001.  At those meetings, Minister Bastos explained the Argentine government's position that it was interested in keeping the Airlines in operation but that the Argentine government was not, in any event, willing to assist the Airlines with an allocation of public funds.  Minister Bastos also met with representatives of the Marsans Group, including Messrs. Díaz Ferrán and Pascual Arias.[309]

376.    On October 2, 2001, SEPI and Air Comet entered into the SPA, pursuant to which Air Comet acquired 99.2% of the shares of Interinvest which, in turn, held 92.1% of ARSA's shares and 90% of AUSA's shares.[310]  At that time, the Government of Argentina held approximately 5.34% of ARSA's shares.

---

[307] Cl. Mem., ¶ 28; Cl. Reply, ¶ 45; Cl. PHB, ¶ 2.
[308] Cl. Mem., ¶¶ 34-35; SEPI Summary Report: C-9, pp. 4-5.
[309] Bastos WS, ¶¶ 20-28. Mr. Bastos testified that he met with his Spanish counterpart in Madrid in September 2001 and agreed that the process to sell the stock in the Airlines would move forward and that the sale would be politically supported.  Mr. Bastos also testified that in his capacity as a minister, he publicly endorsed the transaction: Bastos WS, ¶¶ 21, 24 and 28.
[310] C-18: Share Purchase Agreement, signed October 2, 2001 and notarized on October 15, 2001.

377.     Pursuant to the terms of the SPA, Air Comet paid a purchase price of USD 1 for the shares of Interinvest.[311]   Under the SPA, Air Comet agreed, in accordance with the industrial plan it created for the Airlines, to assume the assets and liabilities of the Airlines, to retain airline employees for two years, to make a USD 50 million capital increase, to maintain its majority interest in the corporations, to service specified flight routes, and to expand aircraft fleets.[312]   For its part, SEPI agreed to assume the Airlines' liabilities up to USD 300 million, and to assume commitments resulting from the implementation of the industrial plan up to USD 248 million.[313]   SEPI later agreed to contribute an additional USD 205 million to cover the operational losses suffered by the Airlines between July and October 2001.[314]

378.     Pursuant to a number of subsequent contracts, Air Comet purchased and subrogated ARSA's creditors' claims rather than paying off the debts directly.   ARSA's liabilities were then transferred to Interinvest and contributed to ARSA's capital.   As described previously, this was done with SEPI's knowledge and agreement.[315]

379.     After the conclusion of the SPA (under Claimants' management), the financial condition of the Airlines improved significantly; however, ARSA's reorganization proceedings that had commenced in 2001 continued in Argentina for a number of years.   In December 2002, ARSA and the majority of its creditors agreed on a plan of debt restructuring, which was approved by the court in charge of ARSA's bankruptcy proceedings.[316]   By the end of 2004, ARSA had repaid the

---

[311] C-18, section 2.
[312] C-18, section 7.
[313] C-18, section 9.
[314] Cl. Mem., ¶ 41.
[315] C-584: Agreement for Capital Contributions between Interinvest and SEPI, dated October 15, 2001; C-525: Agreement between Air Comet and Transportes de Cercanías, Bursura Segetur and Viajes Marsans, dated December 3, 2001. This Agreement was provided to an authorized representative of SEPI by a notary public on December 5, 2001. The notary records that SEPI's representative was familiar with the Agreement and expressly accepted the rights accruing to SEPI pursuant to its terms. C-532: SEPI's Assignment of Credits to Air Comet, dated June 17, 2002.  *See* ¶¶ 270-293, above, and the sources cited there, including the reports of the Spanish *Tribunal de Cuentas*.
[316] C-526: Judgment of Commercial Court No. 15 dated December 26, 2002. According to the debt restructuring plan, ARSA was obliged to repay only approximately 40% of the amounts owed prior to the conclusion of the SPA and it was allowed to make payment in Argentine Pesos. *See* Díaz Ferrán WS, ¶ 12.  *See also* C-530: court judgment of March 25, 2003; C-531: court judgment of November 30, 2005. *See also* C-24: Dow Jones International News, October 29, 2002.

majority of its debt and was relieved from its obligations under its reorganization proceedings.[317] On June 17, 2011, Commercial Court No. 15 ordered the conclusion of ARSA's reorganization proceedings in Argentina and, on August 15, 2011, declared the termination of ARSA's reorganization proceedings.[318]

380.    Despite challenging conditions, including the events of September 2001 and the economic crisis and subsequent devaluation in Argentina, the revenues and market share of the Airlines increased substantially between 2002 and 2004.  In this regard, the Airlines' share of the Argentine air transportation market increased from 32% in 2001 to 81% in 2004.  In addition, the Airlines' combined revenues reached ARS 2.6 billion in 2004.  Further indications of the improvement in the Airlines' economic and financial indicators included: constant increase in revenue for both airlines between 2002 and 2004, improving from substantial negative net income in 2001 to positive net income of USD 12 million for AUSA and USD 32 million for ARSA;[319] the continuous increase in the number of passengers transported as well as the domestic and international revenues per passenger and per kilometre for both airlines;[320] and the fact that the Airlines recommenced operation of all previously abandoned routes both domestically and internationally.[321]

381.    The Airlines also expanded and improved their fleet by renegotiating leases acquiring various aircraft and signing a substantial leasing contract for 49 Boeing Aircraft in 2004.[322]  This was followed by plans in 2006 to modernise the Airlines' fleet by way of substantial purchases of aircraft from Airbus, discussed in more detail below.

---

[317] C-25: La Nación, December 27, 2004; Díaz Ferrán WS, ¶ 12.
[318] *See* C-768: decision of June 17, 2011; C-771: decision of August 15, 2011.
[319] Cl. Mem. ¶ 48 and the sources cited there, including AUSA's and ARSA's financial statements: LECG ER1, Table III.
[320] Cl. Mem. ¶ 48 and the sources cited there; Cl. Reply ¶¶ 50-57. AUSA, which operated almost entirely domestically, saw its numbers of transported passengers increase as follows: 0.7 million passengers in 2001; 1.4 million passengers in 2003; 1.5 million passengers in 2004; 2.2 million passengers in 2005 and 3.1 million passengers in 2007. ARSA's domestic passengers increased from approximately 1 million passengers in 2001 to 1.5 million in 2002 and 2.3 million in 2005. ARSA's international passengers increased from 0.9 million passengers in 2001, to 1.2 million in 2002, 1.8 million in 2004 and 1.9 million in 2005.
[321] Cl. Reply ¶ 50 and the sources cited there; LECG ER1, pp. 2, 23; Ricover ER1, ¶ 16.
[322] Cl. Mem. ¶¶ 44-45.

382.    As mentioned, the economic situation of the Airlines improved from 2002 to 2004 despite the challenging economic conditions in Argentina at the time.  These included the devaluation of the Argentine peso in 2002, which produced a steep decline in the value of peso-denominated airfares while the vast majority of the Airlines' costs were denominated in US dollars.  In addition, there was a substantial increase in the price of jet fuel, which accelerated substantially as of mid-2004.  The combination of these conditions gave rise to a series of requests by the Airlines, some of which were made in conjunction with other airlines, for increases of the airfare caps set under the Air Transportation Regulatory Regime.[323]  In response to the many requests made, during the period between May 2002 and July 2008, a total of four airfare tariff increases were granted.[324] Since July 2008, i.e. after Respondent expropriated the Airlines, Respondent increased airfare tariffs nine times from November 2009 to May 2013.[325]

## The Regulatory Framework

383.    The applicable legislation governing commercial air transportation, including the granting of airline concessions, conditions to operate and airfares, are the *Aeronautics Code* and the *Air Business Law*.[326] The *Aeronautics Code* provides that the Government of Argentina, through the Transportation Secretariat, is responsible for setting airfares.[327] The *Air Business Law* addresses airfares.  In respect of domestic airfares, it provides in relevant part as follows:

> **Section 42** - Airfares shall be established taking into consideration the interests of the Nation, of the users and of the operators, in accordance with the concept of an economically reasonable airfare for each route and each segment.[328]

---

[323] Cl. Mem. ¶ 111 and the sources cited there.

[324] Cl. Mem. ¶¶ 373-416; Cl. Reply ¶¶ 152-155. These increases are discussed in more detail below.  Claimants say that the tariff increases were insufficient to address the significant cost increases faced by the Airlines and that two of the increases came very late, in April and May 2008 and were too late to be of assistance to Claimants.

[325] Cl. Reply ¶ 148 and the sources cited there.

[326] C-60; C-61.

[327] C-61/C-859, Article 109. Pursuant to *Aeronautics Code*, Article 133 and Decree 326/1982, Article 24: C-860, application of the airfare tariffs or bands was mandatory and subject to substantial fines for non-compliance.  *See also* C-80: Decree 1654/2002, Article 9 and C-83: Decree 1012/2006, Article 8. This appears to have changed with respect to maximum airfares with the adoption of Decree 294/2016 in February 2016, referred to above.

[328] Air Business Law, Section 42.  Section 22 of the law addresses international airfares and provides as follows: "airfares for international air transport services operating in the Argentine Republic shall be set by the competent national authorities taking into consideration the interests of the Country, of the users and of the Argentine operators".  The Parties are in agreement that airfares for international flights were not regulated by the Government of Argentina:

384.   The *Air Business Law*, in Section 6, provides for the subsidization of national carriers rendering regular air services where losses are caused by non-economically-reasonable-airfares (*tarifas-no-retributivas*) ("TER") for scheduled air services on routes declared of general interest by Government of Argentina.

385.   Article 3 of Decree 6875/1971, implemented in the same year as the *Air Business Law*, addressed the content of economically reasonable airfares or the *tarifa económica retributiva* ("TER") in more detail as follows:

> **Section 3 –** The administrative authority [i.e. the Secretary of Transportation] shall perform the necessary technical and economic studies to determine the economically reasonable airfare for passengers [flights] in all the routes and segments of routes, based on the load factor approved by the administrative authority. The airfare shall cover the direct and indirect exploitation costs for each route or segment of route, to which an additional amount approved for each company shall be added to account for financial costs and a margin of return.

> **Section 4 –** The direct costs shall be calculated based on the inputs required to perform a correct and efficient operation (fuel and lubricant, air personnel, maintenance, insurances and devaluation). The indirect costs shall globally consist of a percentage of the direct costs, set by the application authority [i.e., the Secretary of Transportation], compatible with the national market, the characteristics and evolution of the specific company and pro-rata according to each route or segment of route.

> **Section 5 –** The additional amount to cover financial costs and profitability shall result from the following:

> a)   As financial cost: interest accruing on the fixed assets allocated to the service after deducting amortization and the company's own capital stock, using updated values in all cases, plus interest on the current assets based on a percentage of the updated fixed assets allocated to the service, as fixed by the enforcement authority;

> b)   As profitability: interest on the Company's own capital stock used for the operation.

> The interest rates fixed by the administrative authority shall in all cases be consistent with the characteristics of the market providing the capital.

> The additional amount shall be pro rata each service rendered on routes or parts of routes.[329]

Resp. CM ¶ 389; KPMG ER1 ¶ 11.2.7; Cl. Reply, ¶ 114 and fn. 256.  Rather, it appears that airfares on international routes were governed by bilateral agreements in force between Argentina and the respective country.

[329] C-62: Decree 6875/1971.  While Decree 6875/1971 regulates uneconomical and unprofitable routes, Claimants say that this decree sets forth the methodology that the regulator must follow when setting TER-compliant airfares for every domestic route. They say that the methodology is not specific to uneconomical or unprofitable routes and provides the criteria for the calculation of economically reasonable airfares for all domestic routes. In this regard, Claimants refer to what Respondent's Expert, KPMG, says about the Decree at KPMG ER1, ¶ 11.2.9. *See* Cl. PHB, ¶¶ 30-31. *See also* the reports of the Parties' respective experts, Messrs. Bianchi and Mata, who agreed that the principle of "fair and reasonable" public service tariffs is embodied in the concept of economically reasonable airfares in Article

386.     Also of relevance is that in 1990, when AASE was privatized and ARSA was created, the General Transfer Contract provided as follows with respect to airfares:

> the Argentine State warrants [to ARSA] that the domestic flights' airfares will be set according to the provisions of Law No. 19,030 [*Air Business Law*] (Articles 42 [*i.e.*, the concept of an economically reasonable airfare], 43, 44, 45 and 46) and the resolution SETOP No. 357/78, and that international flight [airfares will be set] according to Articles 22 to 27 of the referred Law; or in accordance with [the laws and resolutions] that eventually replace the ones mentioned, although guaranteeing as appropriate the same objectives as the provisions mentioned.[330]

387.     In 1987, the Government of Argentina had introduced some flexibility into the airfare structure by substituting an airfare band regime for the previous fixed airfare system.  The new airfare band system was introduced by Resolution No. 275/85 and later developed by Decree 2186/92.  Initially, the airfare bands permitted a 20% variation in domestic passenger fares below and above a base or reference airfare.  This was later increased to 60% and then reduced to 35%.[331] The use of airfare bands required the approving authority (the Transportation Secretariat) to approve a base airfare or *tarifa de referencia* and airfares which were required to fit within the bands set by the base airfare.

388.     In October 2001, when the SPA was concluded, the airlines providing domestic services in Argentina were engaged in an airfare war, offering very low prices in order to capture business in a depressed market.  In light of this, the Association of Argentine Airlines, (Cámara de Líneas Aéreas de la República Argentina) ("CLARA"), wrote to the then Sub-Secretary of Transportation to request the modification of the airfare bands regime to protect the industry from predatory

---

42 of the Air Business Law. They agreed that the applicable tariffs must allow the concessionaire, when operating efficiently, to obtain proceeds in an amount adequate to cover costs of the operation, maintenance and expansion of services, as well as a business profit: *see* Cl. PHB ¶ 29 and the sources cited there.

Respondent disagrees with Claimants' interpretation of Decree 6875/1971 and its relevance. Respondent, and its expert, Ms. Donato, say that Decree 6875/1971 applies only in the case of economic subsidies provided for in Article 6 of the Air Business Law and has no application or relevance in this case since Claimants did not request the subsidization of any particular routes of special interest. *See* Resp. Rej. ¶¶ 371-374; Donato ER2, ¶¶ 18-21, 23.

[330] C-63: General Transfer Contract, Art II(3)(m) p. 1075, signed on November 20, 1990, between the Government of Argentina, ARSE, ARSA and Iberia. Reference to economically reasonable airfares (TER) has been made in several decrees and resolutions since that time.

[331] *See* C-65: Resolution No. 275/87; Ex. C-66: Decree 2186/92, Article 2(c), Annex II; Ex. C-67: Resolution SST No. 264 dated November 16, 1990.  The 60% air bands remained in place at the time Claimants made their investment. However, by way of Resolution 42/2001 of December 15, 2001, the bands were reduced to a variation of 35% below and above the base airfare.  *See* C-81.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 129 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.
v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

airfares and fostering an increase in demand.[332]   In its letter, CLARA noted that there was an oversupply of airplanes to serve the domestic market and that costs had increased significantly due to taxes, the privatization of airports and the increase in the costs of supplies and materials.  This situation had been aggravated by the state of the air transportation market after September 11, 2001.  CLARA went on to request a modification of the airfare bands regime to limit maximum tariffs to a band of 40% above the referenced tariff (to increase demand) and minimum tariffs of 30% below the reference tariff (to protect against predatory pricing).

389.    By way Resolution MTCyD No. 47/2001, bands of 35% above and below the reference airfares were established.  In addition, the Resolution provided that in the case of tourist packages and excursion tickets subject to certain conditions, the minimum band below the reference airfare could be decreased up to 45%.[333]

390.    In 2002, after the devaluation of the Argentine Peso, Dinar S.A., another airline operating in the domestic market, wrote to the Secretariat of Transportation requesting an average increase of 73% with a narrowing of the airfare bands to 25% above or below the reference tariff.[334]   On May 17, 2002, in response to Dinar S.A.'s proposal, which appears to have been circulated by the Secretariat of Transportation, the Airlines wrote to the Secretary to provide their views.  The Airlines stated that Dinar S.A.'s proposal was not commercially viable and proposed, instead, gradual increases in the airfares until a balanced fare structure was achieved.  The Airlines went on to propose a table of airfares which appear to have provided for an average increase of approximately 34% with respect to maximum airfares.[335]   In addition, the Airlines expressed the view that airfares were better regulated by the market and that there should be a gradual removal of tariffs as was the case in international transportation and in the majority of developed national markets.

391.    Subsequently, the Government of Argentina approved four increases to the base airfare between 2002 and 2008.  The first of these occurred in September 2002 with the enactment of

---

[332] RA-538: letter of October 12, 2001 from CLARA.
[333] RA-333.
[334] RA-334: letter from Dinar S.A. to the Secretariat of Transportation dated May 13, 2002.
[335] Resp. Rej. ¶ 337; RA-335.

Decree 1654/02.[336]   In that decree, the government declared a State of Emergency in the air transport sector, noting the costs of the commercial air transport sector, including a high percentage of imported inputs and the increase in domestic inputs such as fuel and the need to adopt policies designed to offset existing imbalances so that airlines could continue to operate.  The decree went on to provide for a nominal increase in the airfare caps for domestic flights by approximately 41% and to re-establish the airfare bands at approximately 60%.[337]   In addition, Decree 1654/2002 instructed the Ministry of Economy to submit to the Executive Branch, for submission to Congress, a bill covering a variety of measures intended to assist air transport operators, including a cut in the value-added tax (VAT) for fuel, an exemption from VAT on insurance contracts, and a number of other exemptions and flexibility to permit the use of VAT to cover other costs.  It does not appear that the said bill was ever adopted by Congress or that the measures it contained were ever implemented.

392.   By way of Decree 71/2003, dated May 29, 2003, Mr. Ricardo Cirielli was appointed Undersecretary of Air Transportation.  Among his duties, the Undersecretary of Air Transportation was responsible for overseeing and regulating all matters pertaining to the air transport industry and reported directly to the Secretary of Transportation at the time, Mr. Ricardo Jaime.  At that time, and since 1992, Mr. Cirielli had been the Secretary General of one of the larger labor unions in the Argentine air transportation sector, the Association of Aeronautics Technical Personnel ("APTA").[338]   As the head of APTA, Mr. Cirielli had opposed the investment by Spanish companies in the Airlines and Air Comet's then President, Mr. Antonio Mata Ramayo.[339]   Upon

---

[336] C-80.

[337] C-80: Decree 1654/2002, Article 4 and Annex I.  Claimants say that the percentage of 41% does not reflect the actual situation since in December 2001 the scope of the airfare bands had been reduced from 60% to 35% by way of Resolution No. 47/2001: Ex. C-81.  Claimants also say that the effect of Decree 1654/2002 was to restore the airfare band in force prior to their reduction by way of Resolution No. 47/2001 and to provide, on top of that a modest increase of 20%.  According to Claimants, this was insufficient to account for the consequences of the devaluation and the increased costs of the airlines.  *See* Cl. Mem., ¶ 117; Cl. Reply, ¶ 153.

[338] See C-88: Decree 71/2003, May 29, 2003; C-89: Decree 65/2003, May 28, 2003; C-90: Mr. Cirielli Resume.

[339] *See* C-91-C-95: APTA press communication, October 15, 2001.  *See also* C-96: Anti-Corruption Office Resolution No. 111/06, March 29, 2006.

his appointment as Undersecretary of Air Transportation, Mr. Cirielli went on an unpaid leave of absence from his position as Secretary General of APTA.[340]

393.    By way of Resolution ST No. 369 dated June 7, 2004 and Resolution ST No. 102 dated March 3, 2005, the Secretariat of Transportation renewed for a period of 15 years the concessions for many of ARSA's national and international routes which were about to expire.[341]  The renewal of the remaining routes was deferred since the concessions for these routes remained in force for a number of years.

394.    The continuous increase in the costs faced by air carriers operating in Argentina led to a written request on October 4, 2004 by the Airlines to the Argentine Secretary of Transportation for an airfare increase.  In their request, the Airlines cited the steady increase in the price of crude oil and jet fuel which, at that point, accounted for 36% of ARSA's costs.  Due to these costs, according to the Airlines, the fares and rates charged by them were out of step with the cost increases and did not comply with the economically reasonable airfare (TER) principle established in the *Air Business Law*.  As a result, the Airlines requested an increase of 8% to the reference rates and/or cap rate upon which they were required to base their fares.[342]

395.    On December 28, 2004, the Secretary of Transportation, Mr. Jaime, rejected the Airlines' request for a fare increase.  This decision was based on two technical reports issued by the Office of the Undersecretariat of Aerocommercial Transportation, and the recommendation of Mr. Cirielli, who, in turn, based his recommendation to deny the requests on the same reports.[343] While the technical reports on which the recommendation and decision to deny the price increase were based acknowledged the increase in the price of fuel, they concluded that an airfare increase was not warranted because the Airlines had increased certain airfares since the enactment of

---

[340] C-110: APTA press communication, May 28, 2003.  In his press release, Mr. Cirielli noted that while he temporarily left his functions as Secretary General of APTA and president of another union, OSPTA, this did not mean in any way that he would stop following closely all decisions and actions taken by APTA or that he gave up in any way his personal concern for the future of APTA.
[341] RA-360; RA-361.
[342] C-71. In their letters, the Airlines stated that the request for increase was made without prejudice to other rate related matters that needed to be addressed in due course.
[343] C-82.

Decree 1654/02 and achieved positive operating results for 2003 and 2004.[344]  The Airlines appealed the decisions to reject their request for an airfare increase.  These appeals were denied in March 2005 on the basis of reports prepared by the Office of the Undersecretary of Aerocommercial Transportation.[345]

396.    In 2005, the Airlines' fuel and other costs continued to increase.  In addition, the Airlines suffered a series of strikes by APTA and the Air Pilots Union.[346]

397.    On November 15, 2005, the Federal Court of Appeal in contentious-administrative matters for the city of Buenos Aires found that Mr. Cirielli had a conflict of interest with respect to a number of matters concerning ARSA.[347]  This decision was the result of an administrative motion which ARSA had filed with the Secretary of Air Transportation requesting that Mr. Cirielli recuse

---

[344] C-82: technical reports, p. 10 of 7 [sic]. The technical reports concluded, in part, as follows:

> [The] increases in the price of oil cannot be deemed to be permanent, at least for the time being, and, accordingly, it appears to be inadvisable to authorize permanent rate increases that are inflexible to a decrease just to account for temporary cost increases.

> Moreover, the cost increases we have analyzed do not seem to disrupt the company's economic equation, which yields considerable positive margins in the domestic market.

[345] RA-338, Cl Reply ¶177 . The report concluded, in relevant part as follows:

> Finally, it must be noted that the need for an airfare review arises from the fall in the company's profitability, and not out of an increase in the cost of one production supply only […].

> The results indicate that, since the macroeconomic collapse in early 2002, the c[Argentine Airlines'] operating profits from domestic flights have experienced - according to [their] own data - a substantial recovery of around 38%.

> Such recovery is mostly due to three main factors:

> (a) increases in maximum allowed airfares (Decree 1654-/2002);

> (b) a higher concentration of airfares in the upper end of the authorized airfare band, and;

> (c) the substantial increase in demand associated with the economy's recovery.

Claimants maintain that the denial of the airfare increase requested was in contravention of the regulatory framework on the basis that airfares were required to be set by the Secretariat of Transportation taking into account: direct costs (including the price of fuel and salaries); indirect costs (calculated as a percentage of direct costs); financial costs; and a margin of return for operators.  According to Claimants, if an air carrier's revenues increased or if it had achieved a profit, this did not disentitle it to an airfare increase on the basis of increases in costs.  *See* Cl. Reply ¶¶ 177-179.

[346] Claimants contend that although Mr. Cirielli was on a formal unpaid leave of absence from his position as Secretary General of APTA as of his appointment as Undersecretary of Air Transportation, he maintained close ties with APTA and was involved in those strikes: *see* Cl. Mem. ¶¶ 169-171; Cl. Reply ¶¶ 192-197.

[347] C-123.

himself with respect to the matters in question involving ARSA. The Secretary of Air Transportation denied the request and the matter proceeded through the courts by way of a judicial complaint.  This decision was followed by a decision on March 29, 2006 by the Anti-Corruption Office of the Argentine Ministry of Justice and Human Rights, issued in response to a complaint filed by ARSA in 2003.  The Anti-Corruption Office found that Mr. Cirielli had a conflict of interest vis-à-vis ARSA and held that he was required to "refrain from any direct or indirect involvement in any cases in which…ARSA has any interest."[348]  Mr. Cirielli remained in his position as Undersecretary of Air Transportation until December 2007.

398.    In November 2005, APTA and the Air Pilots Association, APLA, organized a strike which lasted nine days.  Although the strike affected all airlines operating in Argentina, it appears to have affected the Airlines particularly severely.  At the request of the Government of Argentina, Mr. Díaz Ferrán travelled to Buenos Aires to negotiate a resolution to the strike.  A series of meetings occurred between Mr. Díaz Ferrán and Mr. Alberto Fernández, the President's then Chief of Staff, and President Kirchner.  According to Mr. Díaz Ferrán, he told Mr. Fernández that it would not be possible to increase salaries unless the government immediately increased airfares which had not had any increase in three years.  Again, according to Mr. Díaz Ferrán, at the President's request, the leaders of the two unions, APTA and APLA, joined the meetings, and a provisional agreement was reached that the government would provide increases in airfares and fuel subsidies and the unions would moderate their wage demands.  Final wage increases would then be negotiated and become effective when the fare increases promised by the government became effective.[349]  Subsequently, Mr. Díaz Ferrán and Mr. Pascual Arias met with the President's Chief of Staff, Mr. Fernández, and the Argentine Minister of Economy, Ms. Felisa Miceli, who were in Madrid for an official visit.  During the course of the meeting, according to Mr. Díaz Ferrán, Mr. Fernández confirmed the Government of Argentina's commitment to increase the airfares and to provide subsidies for jet fuel in early 2006.[350]

---

[348] C-96: Anti-Corruption Office Resolution No. 111-06, March 29, 2006.  *See also* Cl. Mem. ¶¶ 172-177 and the sources cited there.
[349] *See* Díaz Ferrán WS ¶¶ 30-35; C-144: *Acta Acuerdo* dated December 2, 2005 and ratified by Resolution SS. R.L No. 131-05; C-145: *Acta Acuerdo* dated December 2, 2005 and ratified by means of Resolution ST No. 562/03.
[350] Díaz Ferrán WS ¶¶ 36-38.

399.    In February 2006, the office of the Undersecretariat of Aerocommercial Transportation prepared a report on changes in macro-economic conditions and company profitability in the air transport sector since the implementation of Decree 1654/2002.[351]  The report noted that for well-known reasons, air transport companies had suffered the impact of a more than substantial increase in certain relevant supplies, particularly fuel.  It also noted that the impact was even more dramatic in Argentina given the effect of the exchange rate following devaluation.  It went on to note that the price of jet fuel had increased by 97% since 2002, shortly after the implementation of Decree 1654/2002, and by 42.11% between September 2004 and the end of 2005.  It also noted that, as a result, based on data supplied by a company that provided almost exclusively domestic flight services, the share of "fuels" in that company's "costs of services provided" had increased from 26.47% in 2002 to 37.85% in 2003 and 41.47% in 2004.[352]

400.    By the end of March 2006, no airfare increases or fuel subsidies had been implemented.  At that time, a number of reports appeared in the media describing the President's alleged plan to take over the Airlines.[353]

401.    In May 2006, faced with the unions' demands for wage increases and no increase in the airfares, Mr. Díaz Ferrán and Mr. Pascual Arias requested a meeting with the Argentine government to address the situation.  Meetings were then held with the President of Argentina, his Chief of Staff, Mr. Fernández, and others.  According to Mr. Díaz Ferrán, the President and Mr. Fernández again confirmed their undertaking to increase airfares but that they required a solution to the dispute with the unions first.  The Airlines then negotiated and concluded an agreement with APTA and APLA including significant wage increases of approximately 25%.[354]

---

[351] C-862.  The report was authored by the same economist who had prepared the reports in response to the Airlines' request for an airfare increase in 2004, described above at ¶ 395.  The report goes on to state that it has taken into account the evolution of certain variables, including the price of jet fuel.  It also notes that since Decree 1654/2002, the air transport companies had requested increases in the air tariffs on various occasions in October 2004. In that regard, the report indicates that it has attempted to evaluate changes since that time as well.

[352] C-862, pp 1-2. The report also noted that price levels in economy, such as salaries, had increased between 18% and 57% since the implementation of Decree 1654/2002 and between 10% and 26.8% since October 2004 to date. The report concluded that in light of the cost increases reviewed, the costs structure of the air transport companies could be expected to have been affected.

[353] *See* C-146: *El plan secreto para quedarse con AEROLÍNEAS EDICIÓN i,* March 29, 2006.

[354] Díaz Ferrán WS ¶ 42; C-147: Resolution S.R.L. No. 60-06; C-220: APTA press release, May 19, 2006; C-148: *Aerolíneas acuerda con aeronáutico y los vuelos ya no corren peligro,* INFOBAE.COM, May 15, 2006.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

402.    In the meantime, the Government of Argentina had judicially challenged ARSA's financial statements for 2002, 2003 and 2004.[355]

403.    Negotiations with representatives of the Argentine government continued.[356]  Eventually, Mr. Díaz Ferrán and Secretary Jaime reached an agreement in mid-June 2006 and agreed that the contract would be executed in Madrid during an official visit by President Kirchner.  After what appear to have been hectic and controversial last-minute negotiations, an agreement entitled "Letter of Intent between the National State and Argentine Airlines S.A. and Interinvest S.A." (the "2006 Agreement") and an Addendum (the "2006 Addendum") were signed on June 21, 2006.[357]

404.    The 2006 Agreement was signed on behalf of the Government of Argentina by the Minister of Federal Planning and the Minister of Economy and on behalf of the Airlines by ARSA and Interinvest.  The 2006 Agreement reads in relevant part as follows:

> 1.    It is the parties' intention to discuss the following agenda at the next Annual/Special Meeting of the Stockholders of Aerolíneas Argentinas S.A.:
>
> (a)    Approval of the Financial Statements for fiscal year 2005.
>
> (b)    Increase or modification of the capital stock, in an amount such that the Class "A" share of the total capital stock will, including the existing stockholdings, reach at least five percent (5%) and up to twenty percent (20%) thereof.  This increase or, as the case may be, modification will be paid

---

[355] *See Estado Nacional Ćontra Aerolíneas Argentinas S.A. S/ordinario, file no. 91.184/04*: C-132; *Estado Nacional Ćontra Aerolíneas Argentinas S.A. S/ordinario, file no. 92.412/2005*: C-133; Cl. Reply ¶¶ 178-180; Resp. Rej. ¶¶ 211-213.  As mentioned previously, Respondent says that the contribution of the claims purchased by Air Comet to ARSA's capital gave Air Comet a higher proportional interest in ARSA's capital and diluted Respondent's interest.  Claimants submit that there was no basis for the challenge to the financial statements, which caused the Airlines harm by affecting their ability to obtain credit.  They also allege that the challenge to the financial statements was part of Respondent's hostile treatment in support of its plan to "re-Argentinize" the Airlines.  Respondent, on the other hand, argues that Air Comet's purchase of ARSA's debt and subrogation to ARSA's creditors' claims and capitalization of the credits, with the resulting dilution of its interest in ARSA from 5.34% down to 1.34%, was a maneuver to deprive it of rights as a shareholder: Resp. Rej. ¶¶ 211-213: Resp. CM ¶¶ 438-444.

[356] According to Mr. Díaz Ferrán , during these negotiations Secretary Jaime informed him that the Government of Argentina would increase the airfares and withdraw judicial challenges against ARSA's financial statements only if the government was allowed to increase its control and shareholding participation in ARSA.  *See* Díaz Ferrán WS, ¶ 44.  Respondent maintains that there was no link between the 2006 Agreement and the increase in airfares provided for in Decree1012/2006 of August 7, 2006.  *See* Resp. Rej. ¶¶ 439-440.

[357] C-134.  Although both the 2006 Agreement and the 2006 Addendum bear the date June 21, 2006, it appears that the 2006 Addendum was only signed two days after the signature of the 2006 Agreement.  This was due to a dispute between the Parties in respect of the language of one of the 2006 Agreements' provisions (Section 1(c)(ii)) which addressed certain voting privileges attached to the Government of Argentina's increased shareholding of 5% provided for in the 2006 Agreement.  *See also* Díaz Ferrán WS, ¶¶ 50-66; Cl. Mem., ¶¶ 200-209.  *See also* Resp. CM ¶¶ 432-465; Resp. Rej. ¶¶ 413-443.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

in or implemented at par value, through the capitalization of claims held by the State against AASA, cash contributions, and such other methods as the parties may agree upon, in accordance with the applicable legal provisions.

(c)      Amendment of AASA's Corporate Bylaws in order that said instrument shall make provision for and reflect the following:

(i)      the holders of class "A" stock will have the right to appoint one (1) regular and one (1) alternate member of the Statutory Audit Committee and, in addition, two (2) regular directors and two (2) alternate directors.  The number of Class "C" directors would be set at nine (9); and

(ii)      the favorable vote of Class "A" shares-and, when required, the favorable vote of the two Directors appointed at the Class "A" shares proposal-shall be necessary for the adoption of any strategic decision such as: (1) significant capital increases, (2) strategic alliances or operations that affect the national flag carrier or that ought to be in line with the Argentine commercial air transportation policy, (3) deciding the elimination or reduction of commercial air transportation domestic services.

(iii)      the modification of the capital stock as provided for in Section 1(b).

2.      Once the agreements between the parties are completed and once the points referenced to in Article 1 of the present agreement are approved in the Meeting of Shareholders, the National State will relinquish the legal proceedings brought against AASA challenging the validity of the approbation by AASA Board of Financial Statements corresponding to the fiscal years ending 31.12.2002, 31.02.2003, and 31.12.2004; all of this would be done upon AASA's consent, and the brief or briefs to be filed by the attorneys for the State of Argentina and the AASA would state that each party would pay for its own costs in all the aforementioned proceedings.

3.      The increase in the Class "A" share of the total capital up to twenty percent (20%) of the Capital Stock may be made at Stockholders' Meetings taking place after the Meeting referred to in Section 1 hereof.

4.      The parties hereby state their intention to file all the required paperwork and take all steps required for the public offering of AASA's stock. The State of Argentina and Interinvest will independently determine the timing and the portion of their stake each of them will set for the public offering, as the case may be.

405.      The 2006 Agreement addressed and resolved a number of disputes between Respondent and ARSA and Interinvest, including the Government of Argentina's complaints regarding the dilution of its shareholding in ARSA and its challenge of ARSA's financial statements for the years 2002, 2003 and 2004.  It also provided an option to the Government of Argentina to increase its shareholding in ARSA to 20%.  Although not referred to in the 2006 Agreement, it was followed shortly by an increase in airfares of approximately 20%, as described below.

406.      The Addendum reads in relevant part as follows:

1.      Section 1 is hereby amended to read as follows: "The parties have agreed to discuss the following agenda at the next Annual Stockholders Meeting.

2.      Section 1(c)(ii) shall read as follows: "the favorable vote for Class "A" shares or the favorable vote of the two Directors appointed at the proposal of Class "A" shares – as the case may be-shall be necessary for the adoption of the following decisions: 1) Significant capital increases of the Corporation, except in the case in which such capital increase was needed in order to ensure the normal operation and development of the Corporation; 2) Entering into alliances with other international airlines of the type of "One World" "Star Alliance"; 3) Elimination or substantial reduction of the commercial air transportation domestic services.  Notwithstanding the foregoing, if the Director representing the class "A" shares were against the aforementioned elimination or substantial reduction, shall ensure the compliance with the application of the economically reasonable airfare (art. 42, Law No. 19,030).

3.      As regards Section 3, the State of Argentina hereby reserves a period of one year to make such a decision.

407.    The signature of the 2006 Addendum resolved a dispute relating to the text of Section 1(c)(ii) of the 2006 Agreement.  Claimants allege that Secretary Jaime had modified the text of the 2006 Agreement in a manner inconsistent with what they say had been the agreement negotiated between Mr. Díaz Ferrán and Secretary Jaime relating to certain rights which would attach to Respondent's increased shareholdings of 5% in ARSA.[358]  According to Claimants, the 2006 Addendum reflects the original agreement reached between Mr. Díaz Ferrán and Secretary Jaime.[359]  Amongst other things, the 2006 Addendum modified the text of the 2006 Agreement to require the favorable vote of Respondent's Class A shares by its two appointees to the Board of ARSA only in the case of elimination or substantial reduction of commercial air transportation domestic services.  Further, it provided that if Respondent's representatives voted against the elimination or substantial reduction of services, the Government of Argentina would be required to ensure compliance with the application of the economically reasonable airfares pursuant to Law 19,030, Article 42 in respect of unprofitable routes.  The 2006 Addendum also deleted the requirement for the favorable vote of the government's shares in order to approve the adoption of any strategic decision of the company and limited the decision on which a favorable vote of the government's shares would be required to the specific decisions listed.

---

[358] Cl. Mem. ¶¶ 200-209.
[359] Díaz Ferrán WS ¶ 66.  It appears that Mr. Díaz Ferrán complained to Secretary Jaime regarding the change in the text and that, with the assistance of the Spanish government, the 2006 Addendum was negotiated and signed: *see* Díaz Ferrán WS ¶¶ 61-66.

408.    On August 7, 2006, the Government of Argentina adopted Decree 1012/2006.   In that Decree, the government recognized the very difficult circumstances ("State of Emergency") in the air transport sector and provided for a number of measures to address this, including an increase in airfares of approximately 20%, the preparation of a bill proposing cuts in VAT for fuel, a VAT exemption for aircraft purchased or leased with a purchase option, and a VAT exemption applied to insurance policies purchased outside Argentina. It also provided for a subsidy for fuel costs for domestic air transportation.   Decree 1012/2006 reads in relevant part as follows:

WHEREAS:

…Specifically, the causes of the deep-rooted crisis of this sector are, among others, the tight credit that prevents airlines from securing financing, the increase in the price of aviation fuel, the higher insurance costs, and the direct incidence of leasing costs when it is impossible to buy new aircraft, the increase in the price of spare parts, and the tax compliance burden to companies.

…Therefore, it has become necessary to reformulate the state of emergency of the air transport sector within the framework of Law No. 25,561, as amended, and to adopt policies designed to offset existing imbalances that airlines need to continue operating and growing…

…In that scenario, it is considered advisable to adopt tax measures that might help the companies in the commercial air transport sector to mitigate the effects of cost increases due to structural changes within Argentina, the changes that the September 11, 2001, events brought about, and the consequences of hurricanes Katrina and Wilma, all of which had an impact on the price of aviation fuel.

…The changes in the way airlines get new aircraft have resulted in the increased importance of leasing to the detriment of purchasing. Hence, both methods should be treated equally for tax purposes, since those changes are more based on swings in the market than on decisions made by airlines.

…The impact of aviation fuel on the companies' cost structure and the increases in costs make it advisable to apply a differential tax treatment, exempting sales of imported aviation fuel from the payment of Value Added Tax.

…Finally, to the high cost of aviation fuel, it is advisable to adjust the base airfare set by Decree No. 1654/02, which is used to determine the prices charged to the public by operators of scheduled domestic air transport services for passengers, and maintain unchanged the price range established by Decree No. 1654/02. The increase will be considered for the purposes of the economically reasonable airfare as set forth by Section 42 of Law No. 19,030, to be authorized in future by the OFFICE OF THE SECRETARY OF STATE FOR TRANSPORT under the MINISTRY OF FEDERAL PLANNING, PUBLIC INVESTMENT AND SERVICES, as Enforcement Authority."

…Both the legal system and current economic reality are obviously different from those existing at the time the Aeronautical Code was enacted.  Law No. 17,285 (Aeronautical

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

Code) and the Argentine Commercial Air Transport Policy Law No. 19,030 are currently being revised.

Now therefore,

THE PRESIDENT OF ARGENTINA

ORDERS THE FOLLOWING:

**Section 1** —A continued State of Emergency is hereby declared with respect to Commercial Air Transport throughout Argentina by Argentine operators subject to the National Authority established in Section 1 of Decree No. 1654, dated September 4, 2002.

**Section 2** — Under the state of emergency declared in the previous Section, the exemption allowing Argentine airlines to take out commercial air insurance in Argentina, as provided in Sections 2 and 3 of Law No. 12,988 (as restated in Decree No. 10,307, dated June 11, 1953), is hereby ratified.

**Section 3** — An Aviation Fuel Subsidy Scheme (RCCA) is hereby established for scheduled domestic air transport services for passengers, to supplement the benchmark airfare set in Exhibits I and II, as approved by Section 6 of this Decree.

**Section 4** — The OFFICE OF THE SECRETARY OF STATE FOR TRANSPORT of the MINISTRY OF FEDERAL PLANNING, PUBLIC INVESTMENT AND SERVICES shall regulate the implementation of the subsidizing scheme, the conditions to be met by the beneficiary airlines, and the need for its continuity. If applicable, it shall also favour the inclusion of the scheme set in Section 3 hereof into the budget estimates for allocation to its activities for Fiscal Year 2007.

**Section 5** — The MINISTRY OF ECONOMY AND PRODUCTION and the MINISTRY OF FEDERAL PLANNING, PUBLIC INVESTMENT AND SERVICES are hereby instructed to submit to the OFFICE OF THE HEAD OF THE CABINET OF ARGENTINA, within THIRTY (30) days from publication of this Decree, a bill proposing the approval of the following action:

a)    Use of any technical and/or freely available balances of Value Added Tax to which operators of scheduled domestic air transport services for passengers are entitled for paying any other federal tax, as well as their contributions to the Social Security System (Sistema Unico de la Seguridad Social).

b)    Exemption from Value Added Tax of the insurance contemplated in Section 2 hereof.

c)    Exemption from Value Added Tax of the purchase of aviation fuel by operators of scheduled domestic air transport services for passengers.

**Section 6** — The operators of scheduled domestic air transport services for passengers are hereby authorized to apply, as from 00.00 a.m. of the day following that of publication of this Decree, the airfares included in the price range between the benchmark airfare and the highest airfare for each of the points of origin/points of destination described in Exhibit I, and to apply, as from the THIRTIETH (30th) calendar day from the publication hereof, the airfares listed in Exhibit II. Both Exhibits are an integral part of this Decree.

123

> The increase set forth in the preceding paragraph shall be considered on account of the economically viable [reasonable] fare determined by Section 42 of Law No. 19,030 to be authorized in future by the OFFICE OF THE SECRETARY OF STATE FOR TRANSPORT under the MINISTRY OF FEDERAL PLANNING, PUBLIC INVESTMENT AND SERVICES, as Enforcement Authority…[360]

409.   Following the adoption of Decree 1012/2006, the Airlines wrote to the Secretary of Transportation in August and October 2006 to explain, *inter alia*, that the increase in airfares provided by Decree 1012/2006 was insufficient to allow the Airlines to obtain economically reasonable airfares.[361]   In its letter of August 18, 2006, ARSA requested that domestic tariffs be fixed pursuant to the applicable provisions of the *Air Business Law* and Resolution SETOP No. 357/78 and the General Transfer Contract.   It also requested that the tax measures provided for in Decree 1012/2006 be implemented, noting that similar measures contained in Decree 1654/2002 had never been implemented.[362]   In their letter of October 20, 2006, the Airlines advised the Secretary of Transportation that the fuel subsidy ("RCCA") to be implemented by way of Resolution No. 812/2006 was insufficient to cover the economic effects of an economically reasonable airfare and the increase of costs, particularly with respect to fuel, and the effects of the devaluation of 2001/2002.   As a result, the Airlines requested, amongst other things, the reconsideration and increase of the jet fuel subsidy (RCCA) implemented by Decree 1012/2006 and Resolution No. 812/2006.[363]

410.   In November 2006, the Government of Argentina increased its participation in ARSA from 1.2% to 5%.   As had been agreed in the 2006 Agreement, Interinvest transferred to the government

---

[360] C-83. According to Claimants, only the increase in airfares and the subsidy on aviation fuels (RRCA) were implemented.   No tax bills were approved by Congress.   Claimants say that the increase in airfares of approximately 20% was inadequate to account for rising costs and did not meet the requirements for providing an "economically reasonable airfare" under the terms of the Air Business Law.   *See* Cl. Mem. ¶¶ 213-214.   Claimants also say that the 20% increase was not what had been promised in the negotiations leading up to the 2006 Agreement.   With respect to the subsidy on air fuel, Claimants say that it accounted only for 4.5% of the Airlines' fuel costs for domestic routes: Cl. Mem. ¶ 147, fn. 163.
[361] *See*. C-72 (August 2006) and C-73 (October 2006).   The Airlines also requested the implementation of the subsidy of air fuels (RCCA) provided for in Decree 1012/2006.
[362] C-72, pp 1-2.   The letter also indicated ARSA's agreement with the reference in Decree 1012/2006 to a bill for the updating of the Aeronautical Code (adopted in 1967) to reflect changes in the industry since that time and international developments.
[363] C-73.

3.8% of ARSA's shares.[364]  In addition, amendments to the by-laws of ARSA to permit the appointment of one regular and one alternate member of the statutory audit committee and two regular directors and two alternate directors were approved and the members of the audit committee were appointed.  It appears that Respondent's representatives on ARSA's Board of Directors attended and actively participated in meetings and that Respondent was also represented at shareholders' meetings.[365]

411.    In December 2006, the Government of Argentina withdrew its complaints challenging ARSA's financial statements for 2002, 2003 and 2004.[366]   In addition, Respondent's representatives on the Board of Directors voted to approve ARSA's financial statements for the fiscal year end of December 31, 2005.[367]  After certain rectifications made to the draft financial statements, the 2005 financial statements were formally approved.[368]

412.    In 2007, the Airlines' financial difficulties continued.  The Airlines again suffered a series of strikes related primarily to demands for wage increases.[369]

413.    In April 2007, representatives of the Airlines again met with Secretary Jaime to discuss the need to revise airfares for domestic flights.  In their letter of April 4, 2007, the Airlines again submitted that the airfares provided for in Decree 1012/2006 were far from allowing the Airlines to achieve the economically reasonable airfare referred to in the Decree.  The Airlines went on to point out that in addition to other steadily increasing costs, the salary demands (in the neighborhood of approximately 24% increases) from the various unions which represented the Airlines' employees substantially affected their overall cost structure.  The letter requested a

---

[364] *See* ARSA's minutes of the Shareholders' meeting of November 23, 2006: C-224; ARSA's minutes of the Board meeting of October 27, 2006: C-225.  *See also* press reports at C-154; C-155; C-156; and C-157.
[365] *See*, for example, ARSA's Board of Directors' Minutes of May 29, 2008, approving unanimously the Airlines' letter of April 29, 2008 to Secretary Jaime complaining of the losses suffered by the Airlines due to the lack of economically reasonable airfares and other measures: C-86.  *See also* ARSA's Board of Directors' minutes of October 27, 2006: C-225; and ARSA's board of Directors' minutes of November 29, 2007: C-226.  *See also* the minutes of ARSA's shareholders' meetings of November 23, 2006 and July 25, 2007: C-224; C-534.
[366] Resp. Rej. ¶¶ 428-430; RA-550; RA-478; Llorens WS3 ¶¶ 6, 12; Llorens WS4 ¶ 10; Cl. Reply ¶ 246.
[367] Resp. Rej. ¶ 431; Minutes of ARSA's Ordinary and Special Shareholders' meetings held on November 23, 2006: C-224.
[368] Resp. Rej. ¶¶ 432-433; RA-552; RA-551.
[369] Pascual Arias WS ¶ 55.

minimum airfare increase of 15%, which would allow them to address increases in certain costs and salary increases, but would still leave the Airlines far from achieving economically reasonable airfares.[370]  This letter was followed by a series of letters from the Association of Major Airlines Operating in Argentina, CLARA.[371]

414.    In September 2007, it was reported that the Airlines had suffered approximately 20 strikes during the course of the year, or approximately a strike every 15 days.[372]  In addition, jet fuel prices continued to rise.  By the end of 2007, ARSA's financial condition had further deteriorated: EBITDA for 2007 was USD 4 million, net losses were USD 116 million and there had been an increase in the company's accounts payable of USD 34 million over 2006.[373]

415.    During the course of the Iberia-American Summit in Chile in November 2007, Mr. Díaz Ferrán and Mr. Pascual Arias met with Mr. and Mrs. Kirchner and President José Luis Zapatero to discuss the state of the Airlines.[374]  According to Claimants, during that discussion, Mr and Mrs. Kirchner indicated that the Government of Argentina had no interest in buying out the Airlines

---

[370] C-74.

[371] *See* C-75: CLARA's letter to the Secretary of Transportation dated May 2, 2007 submitting a cost analysis study reflecting the current situation of airline business costs.  *See also* C-76: CLARA's letter of September 12, 2007 following up on its letter of May 2, 2007 to which it had received no reply and stating that the increasing costs faced by airlines and regulated tariffs were preventing its member airlines from covering their costs.  This letter requested measures permitting the Airlines to increase their revenues from domestic air transportation, including, in the short term, an increase in the minimum and maximum airfare bands approved under Decree 1012/2006 and, in the medium term, a progressive deregulation of the domestic air transportation market.  CLARA recognized that the mismatch between costs and airfares could not be cured by simply increasing airfares since this would affect demand.  In this regard, it requested the implementation of the tax measures covered by the bill to be prepared pursuant to Decree 1012/2006.  *See also* C-77: CLARA's letter of November 8, 2007 requesting an immediate increase of air fares of 40% and the implementation of the tax measures set out in Decree 1012/2006.  The letter also stated that if this were not done, the Airlines would not be able to cover their costs, much less consider investing in more aircrafts or their modernization.

[372] C-230: Clarín, September 15, 2007; Pascual Arias WS ¶ 55. Claimants allege that Mr. Cirielli was against Spanish ownership of the Airlines and had confirmed that position publicly on a number of occasions: *see* Cl. Mem. ¶ 221 and the sources cited there.  In addition, Claimants say that the head of APLA, Mr. Jorge Perez Tamayo, who was also the preferred pilot for Presidential flights, was opposed to Spanish ownership of the Airlines: *see* Cl. Mem. ¶ 220 and the sources cited there.

[373] C-40: ARSA's 2007 financial statements.  AUSA's EBITDA reduced to USD 4 million, net losses for the year were USD 21 million and accounts payable were increasing (by USD 20 million between December 2007 and June 2008).  C-33: AUSA's 2007 financial statements.

[374] Pascual Arias WS ¶ 66; C-169: El País, November 10, 2007; C-169: Clarín, November 11, 2007.

and that they were content with the companies' business plan which they would support to resolve the Airlines' problems.[375]

416.    In November 2007, the Government of Argentina gave notice of its intention to exercise its option to purchase an additional 15% of ARSA's shares.[376]  However, it does not appear that the option was ever exercised or implemented.

417.    In January 2008, Mr. Pascual Arias and Mr. Díaz Ferrán were contacted by Mr. Manuel Vázquez, who told them that he represented a group of investors interested in purchasing ARSA and AUSA.[377]  Eventually, after various exchanges and negotiations, an offer was made to Air Comet to purchase its shares in Interinvest for the amount of USD 150 million.  This offer was rejected as too low.[378]

418.    It appears that, in parallel, discussions regarding airfares had been continuing between the Airlines and the Secretary of Transportation.  On March 26, 2008, ARSA wrote to the Secretary of Transportation to provide information requested by the Secretariat in the course of recent meetings in respect of the possible impact of measures being considered by the Secretariat.[379]  In this regard, ARSA stated its understanding that the measures in question were an airfare increase of approximately 30% and the fixing of the maximum price of jet fuel at ARS 1.80 per liter in all airports in the country and went on to list the monthly increase in flights to various destinations that the implementation of such measures would permit.  It also provided information on increased

---

[375] Cl. Mem. ¶ 227; Pascual Arias WS ¶ 66.

[376] C-226: ARSA's Board meeting minutes of November 29, 2007; Llorens WS4 ¶ 12.  The Board minutes go on to note that the State's exercise of their option to increase its shareholding would significantly increase ARSA's capital and resolve certain issues relating to the possible reduction of ARSA's capital pursuant to Article 206 of Law No. 19,550, the Commercial Companies Law (*Ley de Sociedades Comerciales*).

[377] Pascual Arias WS, ¶ 68; Díaz Ferrán WS, ¶ 73.  According to Claimants, Mr. Vázquez was an advisor to the Secretary of Transportation, Mr. Jaime.  According to Mr. Pascual Arias, Mr. Vázquez told him that his approach had been approved by the Argentine government.  *See* also Muñoz Pérez WS1, ¶ 6,710.  *See* also C-170: extract from Case No. 2, 160/09, Criminal Court No. 11, April 21, 2010 in which Mr. Vázquez is recorded as having testified that he had acted as an advisor to Minister Jaime.

[378] C-171; C-172 dated April 2 and 3, 2008, respectively.  In his response of April 3, 2008 to the offer from the group of investors, Mr. Muñoz Pérez, on behalf of Grupo Marsans, stated that the value of Interinvest at the time was of a minimum of USD 265 million.  He went on to state that in normal circumstances, in which the activities of the Interinvest Group were not impeded by the current operational and legal circumstances, the estimate of Interinvest's value was approximately USD 700 million: C-172, pp. 1-2.

[379] C-78.

flights in the event that the Secretariat also updated the index in the RCCA regime (dealing with subsidization of jet fuel).  The letter also went on to state that despite the measures proposed by the Secretariat, for a number of other destinations, increasing, or even maintaining, flight schedules was not economically viable in light of the costs and low occupancy rates for those destinations. In regard of these, ARSA stated that in order for it and AUSA to be able to assure the proposed increases in flight frequencies throughout the country and to ensure a minimum of one flight daily to the majority of destinations, Government of Argentina would have to pay for empty seats to economically unviable destinations.  ARSA noted that without payment for empty seats on flights to the destinations in question, the other measures proposed by the government would not be sufficient to cover the cost of increased flight frequency requested by the Secretariat nor to maintain the current flight frequencies.  ARSA also stated that it was important that the measures provided for in Decree 1012/2006 be implemented since these had not, to date, been adopted by the Argentine Congress.

419.    On April 11, 2008, the Secretary of Transportation issued Resolution No. 257/2008 which increased airfares by approximately 18% for economy-class fares.[380]  Resolution No. 257/2008 reads, in relevant part, as follows:

> WHEREAS, pursuant to Decree No. 1012/06, Section 6, the air fare increase thereby authorized is to be deemed an increase authorized towards such remunerative fare as, in accordance with Law No. 19,030, Section 42, the MINISTRY OF FEDERAL PLANNING PUBLIC INVESTMENT AND SERVICES' OFFICE OF TRANSPORTATION may authorize in the future, in its capacity as the Enforcing Authority for commercial air transportation.
>
> WHEREAS, subsequently to the issue of said Decree, the airlines' costs have materially and repeatedly increased, in particular jet fuel costs – as a result of international and local contingencies –  as well as payroll costs, which rose as a result of salary adjustments.
>
> WHEREAS, in combination with the steady increase in the cost of aircraft leases, spare parts, insurance and IT services, this situation warrants a revision of the fares currently charged for domestic flights.
>
> WHEREAS, various government authorities and institutions from several provinces have expressed to us their concerns over the need to increase the offering of flights to the

---

[380] C-181/RA-341: Resolution No. 257/2008.  It appears common ground that the airfare increase granted was in the approximate amount of 18%.  The same is true with respect to Resolution No. 315/2008 dated May 16, 2008: C-182/RA-342.

provinces, as the number of flights has declined as a result of the state of emergency that was declared by means of Decree No. 1654/02.

WHEREAS, accordingly, the economic-financial situation needs to be adjusted with a view to achieving equilibrium at acceptable occupancy rates for said services.

WHEREAS, given the complexity inherent in the determination of air transportation costs, the fact that such costs are dependent upon international and local variables, and the fact that they have considerable weight in the definition of a satisfactory adjustment procedure that can continue to be applied over time, external technical assistance has been sought to determine the remunerative fares for Argentina's commercial air transportation market.

WHEREAS, accordingly, until such time as that has been achieved, the applicable increase is to be supplemented with the scheme established by Decree No. 1012/06, Section 3, which scheme shall be deemed to be supplementary and applied towards future fares, entirely in accordance with the provisions of Section 6 of the aforementioned Decree.

WHEREAS, in accordance with Annex I, Section 6(a) – AIR FARES FOR DOMESTIC TRANSPORTATION of Resolution No. 1532, issued on November 27, 1998 by the MINISTRY OF ECONOMY AND PUBLIC WORKS AND SERVICES, the fares applicable to any type of commercial air transportation of passengers are the ones notified by the carrier to the relevant authorities and/or approved by the latter, as published and in force as of the issue of the air carriage contract.

WHEREAS, considering the above, the commercial airlines shall submit for approval the air fares to be applied to such differential intermediate or business class services as they may offer for regular domestic flights, and the Enforcing Authority shall reserve the right to define the regulatory aspects that are to apply at the time of assessing said fares for approval.

WHEREAS, for such purpose, in its capacity as the Enforcing Authority for Decree No. 1012/06, this OFFICE OF TRANSPORTATION shall use international custom and usage and the rules set by the INTERNATIONAL AIR TRANSPORT ASSOCIATION (IATA) as reference.

…

**Section 1.**  The operators of regular domestic air passenger transportation services are hereby authorized to apply, effective at 00:00 on the day following the day of publication of this Resolution, the economy-class fares in the fare brackets between the reference rate and the maximum fare for each of the points of origination-destination described in Annex I, which is an integral part hereof.

The increase provided for in the preceding paragraph shall be supplemented with the scheme established by Decree No. 1012/06, Section 3 and shall apply on account of such fare as may be established, as a result of bringing it in line with the provisions of Law No. 19,030, Section 42.

…

Section 2.  Commercial airlines shall submit for approval by this OFFICE OF TRANSPORTATION the air fares to be applied to such differential intermediate or

> business class services as they may offer for regular domestic flights, and this authority shall reserve the right to define the conditions that will apply to services of this sort.[381]

420.    It appears that the first time a distinction was made between economy and business class in legislation relating to airfares was in Resolution No. 257/2008.  After Resolution No. 257/2008 subsequent resolutions all made the same distinction and adopted the same language as used in the Resolution.[382]   There is a dispute between the Parties as to whether Resolution No. 257/2008 deregulated airfares for business class such that these fares were no longer subject to the airfare caps as of the date of the Resolution or whether, according to Respondent, the regulation of tariffs only ever applied to economy-class fares.[383]

421.    In mid-April 2008, Mr. Pascual Arias was contacted by Mr. Ernesto Gutiérrez, an Argentine businessman who led a number of businesses, including Aeropuertos Argentina 2000, the concessionaire for the operation of airports in Argentina.[384]   Mr. Gutiérrez indicated to Mr. Pascual Arias that he had been asked to act as an intermediary for the purpose of allowing Argentine investors to acquire a share in ARSA and to increase Government of Argentina's holding in the company.  Later, in May 2008, Mr. Gutiérrez introduced Mr. López Mena, a successful Argentine-Uruguayan entrepreneur, as an interested purchaser.[385]

422.    In the meantime, the financial condition of the Airlines had continued to worsen.  On April 29, 2008, the Airlines wrote to the Secretary of Transport, Mr. Jaime to request urgent measures to ensure the continuity of flight services by the Airlines.  That letter reads in relevant part as follows:

> The purpose of this letter is to make the Secretary of Transportation aware of the circumstances that have prejudiced the Company and could lead to a standstill of operations, resulting from noncompliance with the provisions of Executive Orders No.

---

[381] C-181 (English translation)/RA-341.

[382] *See* Cl. PHB ¶ 80 and the sources cited there.

[383] Cl. PHB ¶¶ 78-87; Resp. Rej. ¶ 355; Respondent's Skeleton, ¶ 22; Transcript pp. 1056, 1740-1741.

[384] Pascual Arias WS ¶ 69.  According to Mr. Pascual Arias, Mr. Gutiérrez informed him that he had been asked by the Government of Argentina (Mr. and Mrs. Kirchner) to mediate between the Airlines and the government in order to achieve the entry of Argentinian shareholders into ARSA and the increase in the share capital held by Argentina.

[385] Pascual Arias WS ¶ 74; Cl. Mem. ¶ 238.  Mr. López Mena is an Argentine-Uruguayan national with substantial investments in Argentina, including the main ferry company operating between Argentina and Uruguay, Buquebus. *See also* C-177; C-373.

1654/2002 and 1012/2006 that declared a state of emergency for commercial air transport in Argentina.

In 2007, though with partial reductions in flight frequencies, Argentine Airlines' operations covered the whole of the country. However, as shown by studies conducted by your Office and recent Resolution 257/2008, we are operating many of our routes at a loss. Of course, there are no other airlines providing flight services on loss-making routes.

So far in 2008, the price of fuel has increased in excess of 40%, deteriorating even more ARSA's income vs. cost ratio. In spite of that, the Argentine Airlines continued providing regular services throughout the country.

Please find below a more detailed description of the events that have been affecting us in the last few months, which we request to be urgently attended to in order to prevent further deterioration.

Also, we need an urgent solution to the problems we are having with YPF to supply the fuel needed for our aircraft, since we are not receiving the funds committed to us.

Failure to approve the Set of Measures requested before, that were to be implemented last January 1 but became gradually delayed as time went on, resulted in Aerolíneas Argentina showing a loss in excess of USD 100,000,000 in net income and expenses during the first quarter of 2008.

After the issue of Resolution 257/08 last April 14, no progress was made in establishing an average reference price for domestic fuel. If a price similar to that of August 2006 had been fixed in the first quarter of this year, our cost of fuel would have been reduced by an amount slightly over USD 30,000,000.

Furthermore, there has been no rise in air fares truly reflecting the rise in costs since August 2006, the date of the last increase. Although the Office of the Secretary of Transportation recognized a 70% gap between them, no more than an initial 18% increase was granted, far from the minimum 33% planned under the Set of Measures. It should be taken into account that the company's traffic demand rose to a peak between January 1 and April 14 this year, for which reason income lost on a monthly basis is fairly higher than the annual average.

Should the 33% increase had been approved last January 1, the company would have made, approximately, USD 45,000,000 more than it billed for the period.

Aerolíneas Argentinas and Austral would have had USD 17,000,000 more at their disposal if laws on VAT exemption for fuel, insurance and aircraft leasing had become effective last January 1, as provided for in Executive Order 1012/06 of August 2006.

Failure to update the Aviation Fuel Subsidy Scheme for destinations where the airfare is below the cost per kilometer resulted in the company not receiving USD 10,000,000 in additional subsidies during the first quarter of 2008.

From the USD 50,000,000 loan agreed upon with Banco de la Nación Argentina there are still USD 18,000,000 pending disbursement. We request the Secretary to take action so that the balance is disbursed as soon as possible.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 148 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

So far we have described the USD 102,000,000 shortfall in the first quarter of this year. If the provisions of Executive Order 1012/2006 had been applied since it was issued, that is to say, since September 2006 through April 2008, the relevant figures would range between USD 390,000,000 and USD 450,000,000, depending on the minimum prices (ARS 2.28 or 1.85 set per liter of aviation fuel. The Secretary [of State] surely understands that, without that money, the project of both the workers and the shareholders of Aerolíneas Argentinas and Austral is not feasible.

In view of the above, I emphasize the urgency of dealing with the matters affecting the Aerolíneas Argentinas Group, which require your support and urgent attention. Lack of action shall, against our will, have an immediate impact on air connections within Argentina, that is to say, flights to certain destinations will be suspended, and on the chain of payments of the domestic air industry. That, because of the lack of measures to provide an economic basis for the normal operation of the company, as acknowledged in Executive Orders 1654/2002 and 1012/2006, and, more recently, Resolution 257/2008.[386] [Emphasis in original]

423.    In May 2008, Mr. López Mena agreed with Mr. Pascual Arias as representative of the Air Comet – Interinvest Group to enter into due diligence regarding both ARSA and AUSA.[387]

424.    On May 15, 2008, the Government of Argentina and the shareholders of the Air Comet/Interinvest Group and the Airlines signed a framework agreement (*acuerdo marco*) relating to the viability of the Airlines and the allocation of their capital stock (the "May 2008 Agreement").  The May 2008 Agreement reads in relevant part as follows:

The first party acts for and on behalf of the Office of the Secretary of State for Transport of the Ministry of Federal Planning, Public Investment and Services of Argentina, and of the Ministry of Economy, respectively (hereinafter, the "Argentine State").

The second party acts for and on behalf of Air Comet S.A. and Interinvest, both companies being representatives of the majority shareholders of Aerolíneas Argentinas S.A. and Austral Líneas Aéreas – Cielos del Sur S.A. (hereinafter, the "Shareholders").

Both parties acknowledge each other's full legal capacity to assume the undertakings set forth in this Master Agreement".

**W H E R E A S**

**ONE**: The Shareholders and the Argentine State are aware of the serious situation confronting Aerolíneas Argentinas S.A. (hereinafter, "AEROLÍNEAS") and Austral Líneas Aéreas – Cielos del Sur S.A. (hereinafter, "AUSTRAL"), and wish both of them a

---

[386] C-79.  The translation quoted was submitted with the Spanish original of C-79.  The previous month, the Airlines had informed the Secretary of Transport that if no airfare increase was granted, they would have to stop serving certain unprofitable routes: C-371: ARSA's letter to Secretary of Transportation, Mr. Jaime, dated March 26, 2008.  *See also* C-69: ARSA's 2008 financial statements; C-70: AUSA 2008 financial statements.
[387] *See* C-312: letter from Mr. López Mena to Mr. Pascual Arias, dated May 7, 2008; C-175: letter from Mr. Pascual Arias to Mr. López Mena, dated May 8, 2008.

future committed to providing better quality and more efficient services to the Argentine market, for the benefit of the employees of both AEROLÍNEAS and AUSTRAL.

**TWO**: The Shareholders and the Argentine State are aware that, in order to make AEROLÍNEAS and AUSTRAL viable, it is essential that both companies reach the stability necessary to provide a safe, reasonable operation of the services for the benefit of the passengers and the Argentine air traffic. It is necessary to establish social and labor conditions for the different categories and, particularly, for the group of pilots, similar to those applied by world leading airlines, so that the Aerolíneas Argentinas Group is able to compete in the global aviation market.

**THREE**: The Shareholders and the Argentine State are aware of the difficulties faced by AEROLÍNEAS and AUSTRAL, and believe that a new allocation of the capital stock and the enforcement of measures intended to streamline transportation costs and taxes, as contemplated in this Master Agreement, could bring about a solution to those difficulties.

NOW, THEREFORE, in order to fulfill the above purposes, the Shareholders and the Argentine State, acting willingly and in good faith hereunder, agree to perform the Following

**T E R M S   A N D   C O N D I T I O N S:**

**ONE: Reallocation of the Capital Stock of AEROLÍNEAS and AUSTRAL.**

1.1.    AEROLÍNEAS

The Shareholders and the Argentine State undertake to take all such steps as may be necessary to reallocate the shares, for the primary purpose of reaching the necessary stability to make AEROLÍNEAS viable. For that purpose, the reallocation of shares mutually agreed by the parties shall be as follows:

- The Argentine State will increase its direct interest from the current 5% to a minimum 20% of the capital stock of AEROLÍNEAS; the employees may hold a maximum 10% of the capital stock. The Argentine State may modify these percentage interests in order to admit interested Provinces as new shareholders.

- The private sector shall hold 70% of the capital stock of AEROLÍNEAS through an intermediary Argentine company in which the Shareholders will directly or indirectly hold 48% of the capital stock, and a local group made up of various Argentine private companies will hold the remaining 52%.

- To fix the price to be paid for the increase in the public sector's interest and in the Argentine private company's interest in the capital stock of AEROLÍNEAS, the average of the appraisals conducted by three consulting firms with expertise in international quality appraisals selected by the Shareholders with the approval of the Argentine State shall be used, and the consulting firms will be provided updated information and a projection for the next FIVE (5) years.

Once the capital is structured as indicated herein and simultaneously with the implementation of that structure, the Shareholders shall have the option to sell, which the Argentine State and the remaining direct or indirect holders of the AEROLÍNEAS' capital stock shall accept, the 48% of the capital stock directly or indirectly held by them in the intermediary company that directly holds 70% of the AEROLÍNEAS' capital stock, to be

exercised within a term of THREE (3) years as from the date of execution of the transaction that will determine the new capital structure of AEROLÍNEAS as agreed herein, at the minimum price to be determined at the time of execution of the transaction agreed herein.

1.2    AUSTRAL

Prior to the execution of the transaction agreed upon in paragraph 1.1 hereof, the Shareholders and the Argentine State undertake that AEROLÍNEAS shall purchase 100% of AUSTRAL's capital stock from its current owners, at a price to be determined by the average of the appraisals conducted by three first rate, internationally recognized entities specializing in the purchase and/or appraisal of international companies in this industry, selected by the Shareholders with the approval of the Argentine State, which are PriceWaterhouseCoopers, Deloitte and Morgan Stanley.

AEROLÍNEAS shall provide the private and public funding required for undertaking all of the transactions contemplated in this Master Agreement for the purchase of AUSTRAL, pro rata the percentage interest proposed for each of the Parties. If applicable, the Central Bank of Argentina will be requested to consider the possibility that 30% of the funding coming from abroad be exempted from the deposit obligation.

It is of the essence of this Master Agreement that the proceeds from the agreed upon transactions be allowed to be remitted abroad, in accordance with the legislation applicable as of the date hereof, without any exception or additional limitation or restriction.

Payment in full of the undertaking between the Argentine State and the Shareholders in this paragraph 1.2 shall be a condition for carrying out the agreement described in paragraph 1.1 hereof.

**TWO: Viability Measures for AEROLÍNEAS and AUSTRAL.**

In addition to the agreements described in Clause One above, the Shareholders and the Argentine State undertake to promote such action and formalities as are required to improve the economic viability of AEROLÍNEAS and AUSTRAL, as specified below:

2.1    To grant an 18% increase in the prevailing price range of the domestic flights market.

2.2    To establish that commercial air transportation companies shall pay a maximum fuel price of 1.85 Argentine Pesos per liter.

2.3    To implement a policy of routes and frequencies to regulate new entrants to this market. To optimize and improve the quantity and quality of the domestic network, the Aerolíneas Argentinas Group shall meet the needs established for the next TEN (10) years on an exclusive basis.

2.4    To promote distribution and feeding traffic through the major hubs (Center, South and North) of the country.

2.5    To exempt operators from value added tax levied on fuel, aircraft leasing, insurance and purchase of spare parts.

2.6    To make the technical balance of value added tax freely available for use.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

2.7    To exempt operators from income tax on Foreign Beneficiaries for the leasing of aircraft and payment of ticket reservation services. Exemption from minimum presumed income tax.

2.8    To request Provincial Governments to exempt the international transportation industry from the tax on gross income.

2.9    To establish an international commercial air transportation policy that allocates routes to the Aerolíneas Argentinas Group as the flag carrier airline, and try to balance services abroad so that Argentina can play the role to which it aspires.

2.10    To renew the fleet and grant fiscal facilities for that purpose on a case-by-case basis.

2.11    To resolve the problem of AEROLÍNEAS' cumulative indebtedness.

Given that the above listed measures require, as the case may be, to be enacted by law, the Argentine State and the Shareholders undertake to make their best efforts to expedite them and allow for the full performance of the covenants contained in this Master Agreement.

**THREE: Simultaneous and Interdependent Undertakings between the Shareholders and the Argentine State.**

3.1    The Shareholders and the Argentine State hereby execute this mandatory Master Agreement as an expression of their commitment to behave with the utmost good faith to make the future of AEROLÍNEAS and AUSTRAL viable, in support of the market and tourism development in Argentina, and for the benefit of the staff of AEROLÍNEAS and AUSTRAL.

3.2    Compliance with the commitments of the Shareholders and the Argentine State shall be simultaneous and interdependent, in the understanding that a chronological order will be followed, so that the transaction contemplated in paragraph 1.2 of Clause ONE shall be carried out prior to the transaction contemplated in paragraph 1.1 thereof, although it is of the essence that the action contemplated in Section TWO be taken simultaneously for the full performance of this Master Agreement.

**FOUR: Negotiation of this Master Agreement.**

The Shareholders and the Argentine State represent that the covenants contained herein may not be conditioned or substantially changed, nor deferred in time due to circumstances which were not, nor cannot be, negotiated or agreed upon by both Parties.

**FIVE: Applicable Law and Jurisdiction.**

The Shareholders and the Argentine State, in its capacity as shareholder, agree that any dispute or conflicting interpretation shall be governed by the private civil law of Argentina and be subject to the rules of international arbitration of the International Chamber of Commerce ("ICC") based in Paris, and both undertake to comply with and perform the arbitration award.

The arbitration procedure shall be conducted by three (3) arbitrators, in Spanish, to facilitate understanding by the Parties.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 152 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

In witness whereof, this Master Agreement is signed ad referendum by Julio Miguel DE VIDO, Minister of Federal Planning, Public Investment and Services, in two counterparts, in the City of Buenos Aires on the date first above written.[388]

425.    Pursuant to Article 1.2 of the May 2008 Agreement, PriceWaterhouseCoopers, Deloitte and Morgan Stanley provided the appraisals of 100% of AUSA's capital stock.  The valuations conducted averaged USD 392 million for 100% AUSA's stock.[389]

426.    The new corporate structure envisaged by the May 2008 Agreement was as follows:[390]



427.    As described above, in April 2008, the Secretary of Transportation had issued Resolution ST No. 257/08 by which it granted an 18% increase in airfares.[391]  In addition, after the May 2008

---

[388] C-180. Mr. López Mena attended the signing ceremony for the May 2008 Agreement: C-176.
[389] *See* C-375: Deloitte's May 2008 Valuation; C-376: Morgan Stanley's May 2008 Valuation; C-377: PriceWaterhouseCoopers' May 2008 Valuation.  The results of the valuations were as follows:

1. Deloitte's DCF valuation of AUSA resulted in an equity value of USD 476 million.

2. Morgan Stanley's May 2008 valuation of AUSA resulted in an equity value between USD 450 and USD 550 million based on a DCF valuation (which ranged between USD 611 and USD 737 million) and a multiples valuation which ranged between USD 237 and USD 692 million.

3. PriceWaterhouseCoopers' valuations of AUSA resulted in an equity value of between USD 303 and USD 381 million using a DCF methodology and USD 130 and USD 369 million using a multiples valuation.

There is a dispute between the Parties regarding the nature of the valuations performed.
[390] Cl. Mem. ¶ 242.
[391] C-181.

Agreement was signed and as contemplated by Article 2.1 of that agreement, the government granted a second airfare increase of 18% by way of Resolution ST No. 315/08.[392]

428.    Mr. López Mena did not proceed with the investment to purchase a controlling share in ARSA's new holding company under the structure established in the May 2008 Agreement. Accordingly, the transaction envisaged in the May 2008 Agreement failed.[393]

429.    Following the failure of the May 2008 Agreement, a number of meetings and negotiations between representatives of Interinvest and the Government of Argentina took place regarding the sale of the Airlines to the government. Negotiations were tense and difficult.  The Spanish Ambassador to Argentina and embassy assisted Claimants and it appears that the Spanish Minister of Foreign Affairs interceded on behalf of Claimants.[394]

430.    At the same time, the financial condition of the Airlines continued to deteriorate.  It appears that there was some concern that the Airlines would be unable to meet their payroll and social security contributions.  As a result, a number of the unions who represented the employees of the Airlines made a submission in the insolvency proceedings of ARSA (which had been commenced in 2001 and had not yet been concluded) advising of the difficult economic and operational circumstances of ARSA and requesting measures to ensure that sums owing to the employees would be paid.[395]  This led to an agreement between the Ministry of Labor and the Secretary of Transportation and various unions pursuant to which the latter agreed to ensure continuing service for a period of 60 days.[396]  On July 11, 2008, the Ministry of Federal Planning, the Ministry of

---

[392] *See* C-182.

[393] Cl. Mem. ¶¶ 250-251; Cl. Reply ¶ 283.  Claimants suggest that the reason Mr. López Mena did not proceed to invest as foreseen was his concern that the Government of Argentina would not proceed with its various commitments under the May 2008 Agreement.  *See* Cl. Reply ¶¶ 281-283; C-183: La Nación, May 9, 2008, *López Mena Pide Que Se Le Garanticen Subsidios y Tarifas*.  Respondent maintains that Mr. López Mena did not make any commitment to proceed with the investment under discussion and decided not to proceed because he had not received enough information from the Marsans Group.  *See* Resp. Rej. ¶¶ 458-464; C-312; RA-555.

[394] *See* C-184-C-189.  *See also* Muñoz Pérez WS1 ¶¶ 13-15; Muñoz Pérez WS2 ¶ 55; Transcript pp. 452-457; Llorens WS2 ¶¶ 24-25.

[395] RA-459: Decision of July 18, 2008 by the court overseeing the insolvency proceedings, p. 1.

[396] Llorens WS3 ¶ 17; RL-06; Resp. Rej. ¶ 467.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 154 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

Labor and the Secretary of Transportation also made a submission in ARSA's insolvency proceedings requesting various interim measures.[397]

431.    In June 2008, the manner in which the Secretariat of Transportation provided fuel subsidies was modified.  On June 19, 2008, the Secretary of Transportation entered into an agreement with YPF, Shell and Esso pursuant to which they would supply jet fuel at the subsidized price of ARS 1.85 per liter for all airlines providing domestic passenger air transport.[398]  The agreement set out the volume of jet fuel to be supplied and provided that Government of Argentina would pay the supply companies the difference between the subsidized price and the current price of jet fuel.

432.    On July 10, 14 and 31, 2008, the Secretary of Transportation adopted resolutions providing for the payment of various sums to the Airlines in order to pay wages and operating expenses to maintain the operations of the Airlines.[399]

433.    The ongoing negotiations between representatives of Interinvest and representatives of the Government eventually led to the signature of an agreement between the Government of Argentina and Interinvest on July 17, 2008 (the "July 2008 Agreement").[400]  In addition, a list of non-contractual arrangements (*Listado de Acuerdos Extracontractuales*, the "Side Agreement") was attached to the July 2008 Agreement.[401]

---

[397] Llorens WS3 ¶¶ 19-20; RL-07; Resp. Rej. ¶ 469.
[398] RA-375.
[399] RA-556: Resolution No. ST471; RA-557: Resolution No. ST500; RA-558: Resolution No. ST521; Resp. Rej. ¶ 471; Llorens WS3 ¶ 28.  In the resolutions, the Secretary of Transportation identified the alleged deficient management by Grupo Marsans as the cause of the financial situation of the Airlines.  In the resolutions, the Secretary of Transportation stated that the financial and operational circumstances of the Airlines had been communicated and confirmed to the Secretariat by the members of the Board of Directors of ARSA appointed by Argentina.  In total, the three resolutions provided for the transfer of ARS 201,000,000.  On July 4, 2008, Air Comet transferred USD 1.5 million to ARSA: C-601.
[400] C-190.  The July 2008 Agreement was signed by Secretary Jaime on behalf of Respondent and by a representative of the "Interinvest S.A. Group".
[401] C-190, p. 5.  It appears that the Side Agreement was signed on July 16, 2008.  There is a dispute between the Parties regarding the status of the Side Agreement.  Respondent says that the Side Agreement, submitted by Claimants as C-190, did not form an integral part of the July 2008 Agreement signed by it.  It says that although Claimants maintain that the alleged Side Agreement was signed by Mr. Gutiérrez as the State's representative, Mr. Gutiérrez was not and had never been an officer of the Government of Argentina and could not act on its behalf: *see* Resp. Rej. ¶¶ 474-475; Llorens WS4 ¶ 22.  Respondent says that the July 2008 Agreement consists only of what it submitted as RA-559.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

434.   The July 2008 Agreement was formally ratified on July 21, 2008.[402]

435.   The July 2008 Agreement reads in material part as follows:

>    WHEREAS, the Parties are aware of the serious situation that, as is publicly and widely known, AEROLÍNEAS and AUSTRAL find themselves in, and their wish is for both airlines to have a future providing the most-efficient, best quality service to the Argentine market, also for the sake of the employees of both AEROLÍNEAS and AUSTRAL.

>    WHEREAS, [INTERINVEST] intends to sell its entire stock interests in AEROLÍNEAS and AUSTRAL, as it hereby expressly represents.

>    WHEREAS, given its obligation to guarantee the provision of the air transportation services, the STATE OF ARGENTINA intends to purchase the entire stock interests held by [INTERINVEST] in both airlines, as it hereby expressly represents.

>    WHEREAS, the Parties have agreed on a period of SIXTY (60) days as from the execution hereof to take all corporate and statutory steps required to formalize the purchase and sale transaction; during said period, approval shall be obtained at the relevant stockholders' meetings and the STATE OF ARGENTINA shall put in motion all legal steps required for such purpose. The 60-day period until the date of actual transfer of the stock shall be hereinafter referred to as the "Transition Period."

>    **NOW, THEREFORE, THE PARTIES HAVE AGREED AS FOLLOWS:**

>    **ARTICLE 1:** [INTERINVEST] shall provide the STATE OF ARGENTINA with all documents required to formalize the transfers provided for in this agreement.

>    **ARTICLE 2:** The STATE OF ARGENTINA shall take all steps legally required for the purchase of [INTERINVEST]'s entire stockholding in AEROLÍNEAS and AUSTRAL.

>    **ARTICLE 3:** The Parties hereby agree to set up a TRANSITION BOARD to be in charge of managing the operations of AEROLÍNEAS and AUSTRAL throughout the Transition Period. The Board shall be made up of two (2) representatives of the STATE OF ARGENTINA and two (2) representatives of [INTERINVEST]. The STATE OF ARGENTINA shall appoint the General Manager of AEROLÍNEAS and AUSTRAL for the 60-day Transition Period, and [INTERINVEST] hereby agrees to accept such appointment; said General Manager shall be in charge of monitoring the airlines'

---

Claimants, on the other hand, say that the Government's representatives agreed with their representatives to the Side Agreement during the course of negotiating the July 2008 Agreement. They say that the Side Agreement was signed by Respondent and Claimants' representatives on July 16, 2008. They maintain that the rest of the July 2008 Agreement was signed the following day, July 17, 2008: Cl. Mem. ¶¶ 255-258; Pascual Arias WS ¶ 81; Cl. Reply ¶¶ 297-298 where Claimants say that the Side Agreement was signed by Respondent's agent, Mr. Enrique Gutiérrez. Claimants maintain that Mr. Gutiérrez acted as Respondent's *de facto* representative in both the May 2008 and July 2008 Agreements.

The Tribunal notes that RA-559 submitted by Respondent attaches a copy of the Side Agreement. The copy of the Side Agreement bears only two signatures or initials, whereas the July 2008 Agreement bears five signatures and appears to have been initialled on all of its pages.

[402] C-190. It appears that the ratification was by Argentina's Minister of Federal Planning, Mr. De Vido; Spain's Ambassador to Argentina, Mr. Estrella and Messrs. Díaz Ferrán and Pascual Arias.

operations and of their daily management on the express instructions of the TRANSITION BOARD.

The TRANSITION BOARD shall manage AEROLÍNEAS and AUSTRAL during the 60-day Transition Period up to the stock transfer; it shall take such actions as may be necessary for the timely and adequate performance of Article 4 hereof.

**ARTICLE 4:** In order to perfect the purchase and sale of the stock that is the subject-matter of this Agreement, the Parties shall have a period of sixty (60) days to secure:

(a)     The legal and corporate instruments required to formalize the sale of the stock to the STATE OF ARGENTINA;

(b)     An itemized report on the condition of all material assets of AEROLINEAS and AUSTRAL, stating the operating condition of the assets and the services required for the operation of property and equipment, in general, assets located in Argentina and abroad, aircraft, engines, motor vehicles, inventory, and other assets.

(c)     An itemized report on the status of contracts and purchase orders in place at AEROLINEAS and AUSTRAL.

(d)     Reports on and status of bankruptcy claims and post-bankruptcy claims due and payable, enforceable against AEROLINEAS, and of AUSTRAL's liabilities.

(e)     Reports on and status of labor contracts and administrative structure.

(f)     Reports on and status of concessions, authorizations and guarantees in place.

(g)     Such other necessary information, sufficient to assess the value of AEROLÍNEAS and AUSTRAL, as the STATE OF ARGENTINA may require.

**ARTICLE 5:** In the 60-day Transition Period, the Parties shall prepare an income statement and balance sheet of AEROLÍNEAS and AUSTRAL as of July 17, 2008, which is the date on which the TRANSITION BOARD will come into operation. The purpose of this shall be to preserve the rights and interests of the STATE OF ARGENTINA, stockholders, directors, managers and employees, creditors and customers of ARGENTINA and AUSTRAL.

Once the income statements have been prepared and audited, within the aforementioned 60-day period and pursuant to the applicable standards and regulations, the Parties shall review and approve: (i) the financial and management statements of AEROLÍNEAS as of December 31, 2007; and (ii) the special-purpose financial statements and management statements of AEROLÍNEAS as of July 17, 2008.

As regards AUSTRAL, the Parties shall review the financial statements as of the dates stated in (i) and (ii) above.

Said financial statements shall be approved by the stockholders of AEROLÍNEAS and AUSTRAL via the relevant statutory procedures.

**ARTICLE 6:** The prices for the purchase of the stock interests in AEROLÍNEAS and AUSTRAL shall be determined as follows:

(i)      The purchase price for AUSTRAL's stock interest shall be determined based on the valuation provided by a valuation entity to be appointed therefor by [INTERINVEST] and the valuation to be performed at the request of the STATE OF ARGENTINA.

(ii)      The purchase price for AEROLÍNEAS' stock interest shall be determined based on the valuation provided by a valuation entity to be appointed therefor by [INTERINVEST] and the valuation to be performed at the request of the STATE OF ARGENTINA.

The STATE OF ARGENTINA shall seek the abovementioned valuations from the Appraisal Board, which agency shall assess the value of the airlines as a whole.

Should the valuations thus performed yield different results and/or if an agreement cannot be otherwise reached as to the <u>price of the two stock interests,</u> a third valuation shall be sought from an impartial local or foreign entity of international renown specialized in the purchase and sale and/or valuation of international airlines; the valuation thus obtained shall be final and definitive as between the Parties.

The valuation shall be performed using the discounted cash flow method. Such future cash flows shall be calculated using the following assumptions: (i) the cost of fuel at its current subsidized value of D 1.85 (one Argentine peso and eighty-five cents) per liter plus VAT; said price is to be changed using reference prices and proportionately to price variations in the market; and (ii) the current fare for domestic flights, modified proportionately to any changes projected for all other costs.

Payment of the purchase prices for the stock of AEROLÍNEAS and AUSTRAL referred to in this Agreement shall be effected upon transfer of the stock, via a bank transfer of freely and readily available funds into such foreign accounts as [INTERINVEST] shall indicate in writing prior to the date of payment.

Arbitration shall be conducted in Spanish for easier understanding by both Parties.

In witness whereof, subject to subsequent approval by Mr. Julio Miguel DE VIDO, Minister of Federal Planning, Public Investment and Services, and Messrs. Gerardo Díaz Ferrán and Gonzalo Pascual, in their capacity as majority stockholders of Aerolíneas Argentinas, S.A. and Austral Líneas Aéreas – Cielos del Sur, S.A., this Memorandum of Agreement has been executed in two original counterparts constituting one and the same agreement, in the city of Buenos Aires, on Monday, July 21, 2008.[403]

436.    The Side Agreement provided as follows:

LIST OF NON-CONTRACTUAL ARRANGEMENTS

(i)      Stay of all court actions. Immediate

(ii)      Upon the signing of the agreement, all court actions will be dropped.

(iii)      Signing of the Agreement: On Monday 21, before the ambassador to Spain (who will also be signing), the Argentine Minister, and the executing parties.

---

[403] C-190 (emphasis added).

(iv)   Oral agreement that there will no political, media or court persecution and that upon the execution of all final documents, the broadest statutory guarantees will be given.

437.   On July 18, 2008, the court hearing the applications of the unions and the Government reviewed the difficult circumstances faced by the Airlines, including the number of operational aircraft, the significant liabilities of the Airlines and the fact that the Secretary of Transportation had adopted measures to pay wages owing for the month of June as well as critical operational expenses.  The judge noted that the original agreement with ARSA's creditors had been performed and practically concluded and had been approved (homologated).  Accordingly, ARSA's remaining obligation was to fully complete the approved agreement with creditors.  In these circumstances, the judge appears to have concluded that his remaining jurisdiction did not include the various protective measures recently requested by the unions and Government of Argentina, particularly where Government of Argentina had exercised its authority to ensure the ongoing operation of the Airlines by way of its relevant entities.[404]

438.   On July 24, 2008, the Government of Argentina submitted the July 2008 Agreement for approval by the Argentine Congress.  This was done by way of a bill for the "repossession" ("*rescate*") of the Airlines by the purchase of their shares.  The bill was also accompanied by a Presidential message.[405]

439.   On July 29, 2008, Interinvest wrote to Argentina's Minister of Federal Planning, Mr. De Vido to complain about a number of statements made in the Presidential message which, according to Interinvest, were unnecessary, inaccurate and in breach of the Agreement reached on July 21, 2008 to avoid unjustified accusations.[406]

---

[404] RA-459: Decision of July 18, 2008, pp. 5-6.  The judge went on to note the seriousness of ARSA's situation and that he had found that ARSA had not been as diligent as he would have expected with respect to its obligation to collaborate and provide information to the court until the conclusion of its bankruptcy proceedings: *see* RA-459, pp. 6-8.  As a result, the court required ARSA to provide information, including its plan to re-establish normal operations within 10 days.
[405] Ex. 12 to Muñoz Pérez WS2: President's letter of submittal, dated July 24, 2008.
[406] C-197.  The letter was copied to the Secretary of Transportation, Mr. Jaime, the Spanish Ambassador to Argentina and the Spanish Minister of Industry, Tourism and Commerce.

440.    On August 6, 2008, Secretary Jaime appeared before the Argentine National Congress during the debate of the Repossession Bill.[407]

441.    On September 1, 2008, Mr. Muñoz Pérez appeared before the Argentine Senate to address the purchase and sale of the Airlines and questions regarding the management of the Airlines.[408]

442.    On September 18, 2008, the Argentine Congress enacted Law 26,412 which approved the "repossession" (*rescate*) of the Airlines (and their subsidiaries, Optar S.A., Jet Paq S.A. and Aerohandling S.A.) by way of a purchase of their shares.  The Law provided that compensation would be calculated by the *Tribunal de Tasaciones de la Nación* ("TTN").  Law 26,412 provided in relevant part as follows:

> **SECTION 1** - In order to guarantee the public service of commercial air transport for passengers, mail and cargo, the Argentine State shall redeem the shares in Aerolíneas Argentinas S.A. and Austral Líneas Aéreas - Cielos del Sur S.A, and any other company owned by them (Optar S.A., Jet Paq S.A., Aerohandling S.A.), by purchasing their capital stock.
>
> **SECTION 2** - The National Valuation Office shall assess the companies Aerolíneas Argentinas  S.A. and Austral Líneas Aéreas - Cielos del Sur S.A, pursuant to Section 1 hereof. Valuations will be carried out taking into consideration the values prevailing as of July 1, 2008. The Joint Committee of the House and the Senate for State Reform and Privatization Follow Up created under Section 14 of Law 23,696, shall supervise valuations, ensuring that they take into account the companies' actual

---

[407] *See* C-196: transcript of Secretary Jaime's Statement before the National Congress, August 6, 2008.  In his appearance before Congress, Secretary Jaime stated, *inter alia*, the following:

> My opinion, or at least what we expressed, is that the National State through the relevant agencies must fix the price of the shares which is related to the assets and liabilities of both companies.  The business group presents its valuation on both companies.  Obviously if there is no agreement, we will elevate the matter to Congress for its consideration.  The Executive Power and the company have recourse to a third valuation, which will be presented to Congress for its approval.
>
> That is to say, the final valuation which is done by the third company. (p. 42 of 49)
>
> …
>
> I repeat that the methodology is that the National State determines the value through the relevant agencies.  I clarify that as the National State there is no other way of determining value.  Of course we can permit the company which wishes to sell to determine the value.  And finally, if there is no coincidence nor agreement, there would be recourse to a third valuation by international entities.  Surely we would look at entities such as, for example, the Organization for International Civil Aviation - OACI.  But that would be determined in the case that there was no coincidence. (p. 43 of 49) [Tribunal's translation]

[408] C-1104.  In his comments, Mr. Muñoz Pérez stated, *inter alia*, that Interinvest had agreed to sell the Airlines since it was impossible to continue managing the companies in the face of the permanent situation harassment by the trade union leadership, whose agenda was for Marsans to leave the country, and the absence of an adequate State Aero-commercial Policy.  *See* C-1104, p. 2.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

Shareholders' Equity and that they are in keeping with the technical criteria governing the activities that those companies are engaged in.

**SECTION 3** - The price determined shall be submitted to the Honourable Argentine Congress for approval.

**SECTION 4** - The assignment is hereby authorized of up to TEN PER CENT (10%) of the capital stock of the companies Aerolíneas Argentinas Sociedad Anónima and Austral Líneas Aéreas - Cielos del Sur Sociedad Anónima, to be respectively transferred to the staff of those companies pursuant to the Employee Stock Ownership Plan.

**SECTION 5** - The Executive Branch of the Federal Government may implement any and all mechanisms as may be necessary to provide for financial needs resulting from any operational shortfalls in the companies Aerolíneas Argentinas S.A. and Austral Líneas Aéreas - Cielos del Sur S.A. until December 31 (thirty first), 2008, shall make pertinent budget adjustments, and shall report such transfers to the Joint Committee of the House and the Senate for State Reform and Privatization Follow Up.

**SECTION 6** - The financial aid amounts, whether granted or to be granted by the Executive Branch of the Federal Government in compliance with the above Section, shall be taken a capital contributions and/or credits owed to the Argentine State, and the relevant budget adjustments shall be made.

**SECTION 7** - The Joint Committee of the House and the Senate for State Reform and Privatization Follow Up created under Section 14 of Law 23,696 shall exercise the duties set forth in the above law, to which effect it will be briefed about any actions taken.

**SECTION 8** - For the purpose of ensuring transparency in procedures, thus facilitating the review, evaluation and supervision of the proper enforcement of this law, the Auditor General shall take such action as is necessary; reports may be requested by any other agency of the Argentine State.

**SECTION 9** - The Argentine State shall in no case assign or waive its majority shareholding in the company, the power to take strategic action or the right to veto decisions.

**SECTION 10** - This Law is in the public interest and shall become effective on the date of its publication in the Official Bulletin.

**SECTION 11** - This Law is to be forwarded to the Executive Branch of the Federal Government.[409]

The law made no mention of the July 2008 Agreement nor of the valuation methodology provided for in that Agreement.

443.    On September 19, 2008, Interinvest submitted detailed response to the letter of submittal of the bill to Congress.[410]

444.    In October 2008, valuations of the Airlines were prepared by Credit Suisse on behalf of Interinvest, and the TTN.  Credit Suisse's aggregate valuations for the Airlines ranged between

---

[409] C-388.
[410] *See* C-198 and Ex. 13 to Mr. Muñoz Pérez WS2 ¶ 30.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

USD 330 and USD 540 million.[411]  The TTN's valuation concluded that the Airlines had a negative value of ARS 2,540,338,289 (approximately USD 832 million at the time).[412]

445.    It appears that the TTN and Credit Suisse met on a number of occasions with respect to the valuation of the Airlines.[413]

446.    On behalf of the Federal Ministry of Planning, Mr. Rafael Llorens raised a number of issues regarding the authorship and formal presentation of the Credit Suisse report and requested additional information which he said was required to adequately assess Credit Suisse's valuation.[414]

447.    On October 29, 2008, Mr. Llorens, the Legal Sub-Secretary of the Ministry of Planning, and Mr. Martín, a member of the TTN, met with a representative of Interinvest and representatives of Credit Suisse from New York.  During the course of their discussion, Credit Suisse's representative, Mr. Buenaventura, confirmed that he was a representative of Credit Suisse who authored the report and that, normally, Credit Suisse does not sign the reports it prepares.  He also confirmed that the Credit Suisse report valued the two Airlines, adding that the report should not be considered an independent valuation, as it was based on financial information provided by management.[415]

---

[411] *See* Credit Suisse valuation, dated October 12, 2008: C-201, p. 7.  *See also*, letter from Interinvest to the Argentine Secretary of Transportation of October 14, 2008, copied to Minister De Vido and the Spanish Minister of Industry and the Spanish Ambassador to Argentina: C-205.

[412] *See* C-204: the TTN's Valuation dated October 10, 2008. This valuation was on a "substantive patrimonial value" or asset value basis. In addition, the valuation report records that the TTN had also performed a valuation on a DCF basis which also yielded a negative value (ARS -1,897,854/USD -622,235,362). The TTN's alternative valuation was conducted making different assumptions, including five years of cash flows and no terminal value for the Airlines. It also applied discount rates in pesos to cash flows in U.S. dollars and did not adjust airfares in proportion to cost increases. *See* Transcript pp. 683-687; Martín WS Ex. 19, pp. 1939-1940, 1945-1946, 1953. In his testimony before the Argentine Congress, Mr. Martín explained that the valuation conducted by the TTN was different from the one agreed in the July 2008 Agreement: *see* C-1092 pp. 58-65.
The TTN also confirmed its initial valuation of October 2008 in a supplementary report dated November 12, 2008. In that report, the TTN also responded to comments made by Interinvest in a letter dated October 23, 2008 (C-380). In January 2009, the TTN prepared a second valuation report for the expropriation process commenced pursuant to Law No. 26,466 (C-379). This valuation valued the Airlines at ARS 3,087,748,413 (USD 894,999,525).

[413] *See* C-1092: the statement of Mr. Martín before the Argentine Congress on October 28, 2008, at p. 64.

[414] *See*, *inter alia*, C-206: letters from Mr. Llorens dated October 23, 24, 28, 30 and November 7, 2008.

[415] *See* C-208: minutes of the October 29, 2008 meeting.

448.    On the same date, Interinvest wrote to Ministers De Vido and Jaime to complain about what it referred to as the government's formalistic requirements that Credit Suisse's valuation report had to be signed, accredited and notarized.  Interinvest noted that it was customary practice for international valuation firms to identify their valuations by way of their letterhead without a formal signature or other formalities.  Interinvest also responded to the government's suggestions that the additional information submitted with Credit Suisse's valuation was insufficient.  Interinvest expressed the view that the supplementary documentation supplied was more voluminous than the details supplied with the TTN's valuation.  In addition, the Interinvest representatives noted that despite the exchange of supplementary information, there had been no agreement on the transfer price for the shares in the Airlines.  The letter went on to request the selection of a third-party valuator, pursuant to the terms of the July 2008 Agreement.[416]

449.    In early November 2008, there were a number of exchanges between Interinvest and Mr. Llorens regarding the government's request that all documents and reports mentioned in Credit Suisse's valuation report and supplementary documents be produced to it.   In his correspondence, Mr. Llorens stated that Interinvest had failed to produce information and documentation requested by him and listed a number of other questions and information he maintained were needed.[417]

450.    In its response of November 10, 2008, Interinvest stated that the formalities that had been requested by the Government had not been agreed and were not required pursuant to the terms of the July 2008 Agreement.  Interinvest went on to state that it had produced the information and documentation requested of it although it had not been agreed or required to be produced.  Interinvest also confirmed that it had provided to the government a signed and apostilled copy of the Credit Suisse valuation report.[418]   In response to the additional request for information, Interinvest stated that the period for discussions between the Parties of the price for the shares of the Airlines on the basis of the valuations exchanged had expired.  It went on to request, on an

---

[416] C-209.
[417] C-206: Mr. Llorens letter of November 7, 2008.
[418] C-886; Llorens WS2 Ex. 24.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 163 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

urgent basis, an answer in which the government identified a third-party valuator for the purpose of valuing the Airlines pursuant to the terms of the July 2008 Agreement.[419]

451.    On November 12, 2008, Interinvest wrote to Secretary Jaime to request that the Transition Committee established in the July 2008 Agreement meet since, as of October 8, 2008, Argentina's representatives on the Transition Committee had not attended any of the committee's weekly meetings.  As a result, the general manager appointed under the terms of the July 2008 Agreement (Mr. Julio Alak) was managing the Airlines without the guidance of the Transition Committee.[420]

452.    On November 21, 2008, Interinvest was served with a Notice of Preliminary Injunction obtained by the Government of Argentina.  The Preliminary Injunction ordered that there should be no change in the membership of the Board of Directors of the Airlines nor in the role of Mr. Alak in his roles as a Director and the General Manager of the Airlines.  In addition, a court officer was appointed to report to the court about the operation of the Airlines.[421]

453.    On the same date, a draft bill of a law expropriating the shares of the Airlines was submitted to the Argentine Congress.[422]

454.    On December 17, 2008, the Argentine Chamber of Deputies adopted Law 26,466 which authorized the expropriation of Interinvest's shares in the Airlines.[423]   Law 26,466 provided in relevant part (in Spanish) as follows:

> **ARTICLE 1** — In compliance with Article 1 of Law No. 26,412, the shares of Aerolíneas Argentinas Sociedad Anónima and Austral Líneas Aéreas Cielos del Sur Sociedad Anónima, as well as those of Optar Sociedad Anónima, Jet Paq Sociedad Anónima and Aerohandling Sociedad Anónima as subsidiaries thereof, are hereby declared to be in public interest and subject to expropriation, pursuant to [Argentine] Law No. 21,499.

---

[419] C-886.  In its letter, Interinvest also addressed a number of other issues raised by Mr. Llorens regarding access to information relating to the Airlines and the approval of the financial statements of the Airlines at July 17, 2008.

[420] C-210.  In addition, Interinvest again requested that Argentina provide a response to its request to appoint a third-party valuator.  *See also* C-212, pp. 29-33: minutes of the meeting of the Board of Directors of ARSA on November 19, 2008.

[421] C-213.

[422] C-214.  On the same date, an alternative bill proposing the expropriation of the assets of the Airlines was also submitted: C-1041.

[423] *See*: RA-314; LEGC-08.  The law was approved by the Senate on December 22, 2008.  As in the case of the bill submitted on November 21, 2008, Law 26,466 makes no mention of the July 2008 Agreement, which had been referred to in the original bill submitted to the Argentine Congress on July 24, 2008.

The shares held by the State and workers of such companies are exempted from the foregoing provision.

The expropriator in the terms of Law No. 21,499 shall be such body as the Argentine Executive Branch may appoint to such effect.

The [TTN] shall act as valuator, as provided by Article 13 of Law No. 21,499 for real property, and as the relevant technical office as provided by Law No. 21,626 (2001 consolidated text) for personal property.

**ARTICLE 2** — In furtherance of the continuity and safety and the public service of commercial air transportation of passengers, mail and cargo; the maintenance of sources of employment; and the safeguard of the property owned by the companies mentioned in Article 1 hereof, in the terms of Articles 57 and 59 of Law No. 21,499, the Argentine Executive Branch, by means of such body as may be appointed thereby, shall exercise all such rights as the shares to be expropriated may confer thereupon as soon as this Law becomes effective.

**ARTICLE 3** — In order to ensure the provision, extension and improvement of the services, the Argentine Executive Branch shall implement such mechanisms as may be necessary so as to meet the financial needs arising from the companies mentioned in Article 1 hereof, in accordance with Article 26 of Law No. 26,422 on the National Public Administration Budget.

The transactions and budgetary adjustments to be made to such effect shall be reported to the Congressional Bicameral Commission for State Reform and Privatization Follow-Up.

For the purpose of revamping and improvement of the services, within the term of one hundred and eighty (180) days, such body as may be appointed and composed on a federal basis shall formulate a medium and long-term General Business Plan that is both strategic and operational. Such Plan shall be reported to the Congressional Bicameral Commission mentioned supra.

The Plan shall have special regard for the needs of such regions of Argentina as may depend mainly on air transportation.

**ARTICLE 4 —** There being no agreement, the Office of the Public Prosecutor for the Argentine Treasury shall initiate such expropriation proceeding as may be applicable.

**ARTICLE 5** — The assignment of the shares of stock to workers of Aerolíneas Argentinas Sociedad Anónima and Austral Líneas Aéreas Cielos del Sur Sociedad Anónima, as well as those of the subsidiaries thereof, up to ten percent (10%) of their blocks of shares, is hereby authorized, as per the Employee Stock Ownership Plan.

**ARTICLE 6** — The Argentine Executive Branch shall implement all such mechanisms as the Law may provide in order to discriminate liabilities arising from the ordinary course of business of the companies mentioned in Article 1 hereof from those arising from fraudulent transactions or as a consequence of administrators' mismanagement.

In addition, it shall appear in all criminal cases in which such crimes as may have been committed by current majority shareholders, the administrators of such companies or even third parties to the detriment of the company's assets are being investigated; and shall report the wrongful acts of which it may learn on account of such management.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

> For the purpose of recovering such assets as may have been affected by the administrators' mismanagement, fault or negligence, it shall bring such civil and commercial actions as may be applicable.
>
> **ARTICLE 7** — This Law is a public policy act and shall become effective on the date of publication thereof in the Official Gazette.

455.   On December 30, 2008, the President adopted Decree 2347/2008 creating an administrative entity under the auspices of the Secretariat of Transportation and the Ministry of Planning to exercise all the rights of the shares in the Airlines until the expropriation process under Law 26,466 was completed.[424]

456.   On January 15, 2009, the Government of Argentina sent to Interinvest the TTN's valuation of the Airlines' shares in the negative amount of ARS 3,087,748,413 and requested that Interinvest inform it whether it accepted that valuation.[425]

457.   On January 21, 2009, Interinvest rejected the TTN's valuation, referring to what it stated had been Argentina's confiscatory process.  Interinvest also repeated its previous objections to the TTN's valuations.[426]

458.   As Claimants rejected the TTN's Valuation, the Government of Argentina commenced an expropriation lawsuit against Interinvest (the "Expropriation Lawsuit").  In the meantime, the administrative entity created by Decree 2347 had been appointed to exercise all rights granted by the shares of the Airlines.[427]

---

[424] C-217.
[425] *See* C-215: Resolution 36/09 and C-379: the TTN`s Valuation of January 12, 2009.  Resolution 36/09 stated that the valuation had been prepared in accordance with Laws 21,499 and 26,466 and Decree 2347-08.  The valuation was performed exclusively on the substantive or patrimonial value method, provided for in Article 10 of Law No. 21,499.
[426] C-216: Interinvest's letter of January 21, 2009.  In its letter, Interinvest states that the valuation of the Airlines set out in Resolution 36/09 did not reflect the fair market value of the shares of the Airlines and did not compensate for the harm it maintained that Argentina`s previous conduct had caused to the airlines.  The letter then went on to state that in order to obtain full compensation, Teinver, Autobuses Urbanos and Transportes de Cercanías would continue with the international arbitration commenced before ICSID.  In this regard, Interinvest had submitted to the Argentine government a letter from the three Claimants advising of their decision to submit their dispute to the ICSID pursuant to the Treaty.  *See* C-265.  On November 27, 2008, the Government of Argentina had responded to Claimants` letter requesting that Interinvest`s representative submit documentation sufficient to prove his capacity as a representative of Claimants, noting that this response did not imply Argentina`s consent to the applicability of the Treaty, the alleged capacity as foreign investors of Claimants, the admissibility of the claim or any of the statements made in Claimants` letter.  *See* C-266.
[427] C-570: Expropriation Claim of February 2009.

459.    Commencing in November 2008, representatives of Interinvest and of Respondent had discussed the possible settlement of the disputes between them.  Pursuant to the discussions between the parties and the drafts exchanged, Interinvest would agree to the sale of the shares of the Airlines for a nominal price of 1 Peso in exchange for the Government of Argentina taking steps to acquire 35 of the aircraft that ASTRA had previously committed to purchase from Airbus, plus various additional concessions.[428]   These discussions took place from November 2008 through February 2009.  The first draft of the agreement under discussion was dated December 1, 2008.

460.    On January 21, 2009, Secretary of Transport Jaime wrote to Airbus to indicate the Government of Argentina's interest in purchasing 35 aircraft that ASTRA had ordered from Airbus.  Mr. Jaime's letter added that the Government of Argentina's interest in the aircraft was related to the delivery dates or slots for aircraft to be delivered to ASTRA and asked that Airbus do what it could to expedite discussions and negotiations with all parties involved so that the acquisition could take place as soon as possible.[429]

461.    Following this, on January 24, 2009, Airbus' Contracts Division prepared a draft Memorandum of Agreement between it and the Argentine Federal Ministry of Planning which provided that the Government of Argentina committed to purchase and take delivery of 35 specified aircraft and make an initial payment in an amount which would cover pre-delivery payments plus an additional USD 150 million.[430]

---

[428] *See*, *inter alia*, C-221; C-223; C-229; C-232; C-233 and C-235.
[429] C-229.
[430] C-231, Article 7.  The draft Memorandum of Agreement provided that the pre-delivery payments ("PDP") portion of the initial payment would be used to satisfy Argentina's PDPs due upon the signature of a purchase agreement. The remainder of the initial payment (USD 150 million) was to be used by Airbus to obtain the release by ASTRA of all its rights in respect of the aircraft subject of the Memorandum of Agreement, including payment of a termination fee, settlement of capital and financing costs and other costs incurred by ASTRA.  The draft was exchanged between lawyers for the parties and a copy of the draft Memorandum of Agreement was sent to Mr. Manuel Vásquez, the advisor to Secretary of Transportation Jaime, on January 26, 2009.

462.    On February 8, 2009, a new draft of the agreement Interinvest and Respondent had been negotiating was produced.  It was retitled "Draft Agreement for the Implementation of Law No. 26,466" (the "Draft Agreement") and appears to have been initialed.[431]

463.    In the recitals at the beginning of the Draft Agreement, the parties make reference to the adoption of Law No. 26,466 for the expropriation of the shares of the Airlines, the fact that pursuant to Decree 2347, the Federal Ministry of Planning had been designated as the expropriating entity and instructed to proceed with the expropriation and that the controlling shareholders of Interinvest had commenced an arbitration against Argentina pursuant to the terms of the Treaty.  It also stated that in view of these circumstances, the parties had reached an agreement for the implementation of Law No. 26,466.  Pursuant to the terms of the Draft Agreement, Interinvest agreed to the transfer of all of its shares in the Airlines in exchange for the payment of 1 Peso.  For its part, Government of Argentina agreed to certain additional obligations (*compromisos adicionales*), including the acquisition and acceptance of ASTRA's rights and obligations in respect of 35 aircraft ordered from Airbus for delivery within certain slots.  In that regard, the Draft Agreement included an obligation on the part of the Airlines (then owned by Government of Argentina) to conclude a purchase agreement with Airbus within 30 days of the conclusion of the Draft Agreement.  Further, the purchase agreement between the Airlines and Airbus was required to provide full and final release of all of ASTRA's obligations under its contracts with Airbus in respect of the aircraft in question.[432]

464.    The Draft Agreement was never signed nor implemented.  It appears that the Government of Argentina was having difficulty securing financing for the purchase of the aircraft from Airbus.  Although discussions and negotiations continued for some time, the projected transfer of ASTRA's rights to purchase the aircraft from Airbus was delayed and, eventually, abandoned.[433]  ASTRA

---

[431] *See* C-235: *Acuerdo para el cumplimiento de la Ley 26,466*.  The agreement, which remained in draft form, was initialled by Mr. Muñoz Pérez on behalf of Interinvest and, it is alleged, Mr. Manuel Vásquez.  *See* Pascual Arias WS ¶ 88.  As discussed below, there is a dispute between the Parties as to the initials alleged to have been added to the draft on behalf of Respondent.

[432] C-235, Articles 2.1 and 2.2.  It appears to be common ground between the Parties that had the Draft Agreement been signed and implemented, this would have resolved the dispute between them in respect of the expropriation of the Airlines.  *See* the testimony of Undersecretary Llorens: Transcript pp 619-620, 654-655; Cl. PHB ¶ 156-157.

[433] It appears that the Government of Spain sought to assist by making financing available to the Government of Argentina.  *See*, *inter alia*, C-236: letter from the Spanish Ambassador to the Argentine Minister of Foreign Affairs

and Airbus reached a contractual arrangement to assist ASTRA to finance the purchase of certain aircraft (Airbus A330s) which the Government of Argentina was to undertake to purchase in the Draft Agreement.  Pursuant to this arrangement, ASTRA and Airbus agreed to the termination of various purchase agreements in order to reallocate the Pre-delivery Payments (PDPs) that ASTRA had paid pursuant to purchase agreements for A380s, A320s and A350s to the payment of outstanding obligations in respect of the A330s which had been purchased.  As a result, all sums invested by ASTRA in the A320s, A350s and A380s were applied to finance the purchase of the A330s.[434]

465.    On July 10, 2009, ASTRA and Airbus also concluded a Supplemental Agreement which provided for the payment of a fee from Airbus to ASTRA upon the completion of an agreement between Airbus and the Government of Argentina for the purchase of the aircraft identified in the proposed draft Memorandum of Agreement between Airbus and the Argentine Ministry of Planning.[435]

466.    Although discussion continued between representatives of the Argentine Secretary of Transportation and the Ministry of Planning, Interinvest and Airbus for some months, no firm agreements were concluded.  In November 2009, Airbus informed ASTRA that it was ready to deliver the first A330 aircraft it had purchased.  ASTRA was not in a position to purchase the aircraft and, in December 2009, one of its creditors exercised its rights to take delivery and ownership of the aircraft.  In due course, ASTRA lost its right to purchase the A330 aircraft from Airbus as well as any right to recovery of any sums paid in advance as deposits.  The last contact between Interinvest and Respondent regarding the possible purchase of the A330 aircraft took place in January and February 2010.

---

dated April 30, 2009; C-237; C-238; C-240: email from Mr. Manuel Vásquez to Mr. Vicente Muñoz Perez dated June 16, 2009, attaching terms of a possible restructuring of debt payments from Argentina to Spain; C-383; C-384: email on behalf of the Argentine Ambassador to Spain to Mr. Vicente Muñoz Pérez dated June 24, 2009.
[434] Cl. Mem. ¶¶ 296-299 and the sources cited there.
[435] *See* C-244: Supplemental Agreement between ASTRA and Airbus dated July 10, 2009; C-245: email from Mr. Benoit de San Exupery to Mr. Vicente Muñoz Pérez dated June 17, 2009 regarding ongoing discussions between Airbus and Argentina regarding the draft Memorandum of Agreement between them.

467.    As described above, Air Comet initiated voluntary reorganization proceedings on April 20, 2010.  This was followed by the commencement of voluntary reorganization proceedings by Teinver on December 23, 2010, by Autobuses Urbanos on January 28, 2011 and by Transportes de Cercanías on February 16, 2011.[436]

468.    On February 27, 2014, the Argentine Federal Administrative Court rendered its decision on the expropriation of Interinvest's shares in the Airlines (the "Expropriation Judgment").[437]  In its judgment, the court accepted the valuation of the TTN, noting that it was of decisive importance. It noted that the TTN had applied the "substantive value or patrimonial value (*valor sustantivo o patrimonial)*" and considered the market value of the assets of the Airlines, using comparative or depreciated replacement cost methodologies.  It held that the discounted cash flow methodology did not apply since it was inconsistent with the Application of Article 10 of the National Law on Expropriation (Law No. 21,499) which provides that indemnification shall only consist of the objective value of the asset and the damages which are the direct and immediate consequence of the expropriation.  According to the court, under the Expropriation Law hypothetical earnings, increased value from use of the asset and *lucro cesante*, *inter alia,* are not to be taken into account. The court held that the discounted cash flow method is based principally on projections of a company's performance in the future and discounting present values from future revenues for losses and operating costs.  As a result, the discounted cash flow methodology proposed by Interinvest was based on forecast hypothetical earnings and costs and its application implied ignoring the Expropriation Law.[438]

---

[436] *See* Part III.B, above.
[437] C-1197.
[438] *Id.*, pp. 9-10.  The court also noted that the TTN's valuation had been adopted unanimously, in the absence of a technical representative of Respondent, which Interinvest chose not to appoint.  The court also noted that Interinvest had not proved that the method of discounted cash flow was the valuation method for an ongoing aviation services company – without prejudice to the issues which had been raised with respect to the allegation that the Companies were not going concerns but, rather, in the process of dissolution for loss of share capital – which, according to the court, was more consistent with the provisions of Article 10 of the *Expropriation Law*.  The court also mentions that Interinvest did not question the constitutionality of the Expropriation Law.  However, Claimants say that Interinvest did challenge the constitutionality of Law No. 26,466 (which is the law which directed the expropriation of Interinvest and not the general Expropriation Law): *see* Cl. Reply ¶ 324 and C-887, p. 5: Interinvest Pleading of June 2, 2010 in the Expropriation Lawsuit.  Claimants also submit that the judge in the first instance proceedings acted arbitrarily by preventing Interinvest from submitting key valuation issues and by not permitting Interinvest more than five days to challenge a new report by the TTN.  *See* Cl. Reply ¶ 327; C-888; C-889; and RA-408.

469.     Interinvest appealed the first instance decision in the Expropriation Lawsuit on May 23, 2015.  In April 2015, the Federal Court of Appeal in Contentious–Administrative Matters rendered its judgment, dismissing the appeal and confirming the first instance decision (the "Expropriation Appeal Judgment").[439]  In its reasons, the Court of Appeal held that the TTN had opted for valuing all the current and non-current assets and liabilities of the Airlines and that this was correct since the companies were facing a loss-making economic and financial condition and, therefore, were not in a condition to continue operating in the immediate future.  The court also held that Interinvest had not provided any evidence that the application of the discounted cash flow methodology would or could have resulted in a positive valuation.[440]

470.     There is a dispute as to whether Interinvest appealed the Court of Appeal's decision to the Argentine Supreme Court.  In a letter dated December 1, 2015, Claimants submitted that the expropriation proceeding in Argentina had not ended since it had not been notified of the rejection of its pending appeal, as alleged by Respondent.[441]  In submissions made during the course of Claimants' Third Application for Interim Measures, Respondent submitted that Claimants had not submitted an appeal to the Supreme Court and, therefore, the Court of Appeal's decision had become binding.[442]  In the end, the evidence on this issue was not entirely clear.  The Tribunal notes that no copy of an appeal to the Supreme Court or further evidence of the filing of an appeal was tendered by Claimants.  In these circumstances, it appears that no further appeal from the Court of Appeal's decision was taken.

---

[439] RA-690.

[440] *See* RA-690 (English version), pp. 7-11.  The court states that the appellant only referred in a vague manner to the failure to assess the value of intangible assets and did not offer any evidence that had any such assets been taken into account, the result of the valuation would have been different. The court refers to the "…huge indebtedness of the companies [and] the inability to face such debts on the basis of the earnings derived from the exploitation thereof…".  The court also noted that the TTN had requested a discounted cash flow analysis from the School of Economics of the University of Buenos Aires and that according to the latter's analysis the application of the DCF method also resulted in a negative result.

[441] *See* Claimants' letter dated December 1, 2015.

[442] Response of the Argentine Republic to Claimants' Third Application for Provisional Measures, August 12, 2015, ¶¶ 63-71; Republic of Argentina's Rejoinder on Claimants' Third Request for Provisional Measures, October 23, 2015, ¶¶ 56-57.  *See also* Ex. RA-689 which appears to indicate that the Federal Court of Appeals in Contentious – Administrative Matters dismissed Interinvest's appeal by way of its judgment of May 26, 2015 and that the Resolution dismissing Interinvest's appeal was communicated to Interinvest on June 1, 2015.  *See also* Respondent's letter dated December 4, 2015.

471.    After July 2008, the Argentine Secretary of Transport issued a series of resolutions increasing airfares in November 2009, June and July 2010, March and May 2011, February, June and November 2012, and May and December 2013.[443]  On February 2, 2016, Decree 294/2016 was issued; this decree removed maximum airfare caps for domestic air transportation.[444]

472.    The Airlines continued to operate throughout 2008 and remain in operation to date.

## VI.    APPLICABLE LAW

473.    In their Request for Arbitration, Claimants allege that Respondent violated the Treaty, international law and Argentine law.  Specifically, Claimants allege that Respondent breached the following obligations and standards with respect to their investment in Argentina:[445]

(a)    Article V of the Treaty by having nationalized, expropriated or otherwise appropriated through measures tantamount to expropriation the Claimants' investment without satisfying the conditions for a lawful expropriation;

(b)    Article IV(1) of the Treaty by failing to accord fair and equitable treatment to Claimants' investment;

(c)    Article II(2)(c) of the US-Argentina BIT, to which protection Claimants say they are entitled pursuant to the MFN clause in the Treaty (Article IV(2)), by failing to observe obligations Respondent entered into with regard to Claimants' investment;

---

[443] *See* C-863: Resolution 227/2009; C-864: Resolution 118/2010; C-865: Resolution 210/2010; C-866: Resolution 64/2011; C-867: Resolution 112/2011; C-868: Resolution 23/2012; C-869: Resolution 49/2012; C-870: Resolution 778/2008; C-871: Resolution 265/2013; C-966: Resolution 1595/2013. *See also* Cl. PHB ¶¶ 38-40.  According to Claimants, these airfare increases amount to an increase of 127% of the average airfare in five years. Claimants say that if the airfare increases granted in April and May 2008, shortly before the July 2008 Agreement was concluded, were included in the total, then the increase of the average airfare as of April 2008 amounted to 163%.  Claimants contrast this increase with the airfare increases granted during Claimants' ownership period of almost seven years, which Claimants say was for a total of approximately 40%.  *See* Cl. Reply ¶¶ 148-149.
[444] *See* Decree 294/2016, dated February 2, 2016.  Available at:
http://servicios.infoleg.gob.ar/ infolegInternet/anexos/255000-259999/258356/norma.htm.  The Decree states in part that maximum tariffs had hindered the development of commercial air transportation and that it was appropriate to update the airfare regime and to maintain only reference fares on base airfares for domestic economy class.  *See also* Claimants' letter of March 8, 2016 in respect of this Decree and Respondent's response of March 21, 2016.
[445] RFA ¶ 11.

(d)     Article III(1) of the Treaty by impairing by unjustified or discriminatory measures the management, maintenance, use, enjoyment, disposal or liquidation of investments made in Argentina by Claimants; and

(e)     Article II(2)(a) of the US-Argentina BIT, through operation of the MFN clause in the Treaty (Article IV(2)), by failing to accord full protection and security and the treatment required by international law.

474.     The Parties consented to ICSID arbitration to resolve the investment dispute.  Article 42(1) of the ICSID Convention provides:

> The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.

475.     The *Agreement between the Argentine Republic and the Kingdom of Spain on the Promotion and Protection of Investments* was signed on October 3, 1991 by both parties and entered into force on September 28, 1992 (the "Treaty").[446]  The Treaty is *lex specialis* between Respondent and Spain, as it governs investments made by nationals of one State in the territory of the other.  The Treaty forms the legal basis for Claimants' claims against Respondent in this arbitration.[447]  Thus, the provisions of the Treaty supersede principles of customary international law unless those principles are general principles of international law in the nature of *jus cogens*.[448]

476.     Regarding applicable law, Article X (5) of the Treaty provides:

> The arbitral tribunal shall make its decision on the basis of this Agreement and, where appropriate, on the basis of other treaties in force between the Parties, the domestic law of the Party in whose territory the investment was made, including its rules of private international law, and the general principles of international law.[449]

---

[446] Agreement between the Argentine Republic and the Kingdom of Spain on the Reciprocal Promotion and Protection of Investments (C-1).
[447] Cl. Mem. ¶ 335 *et seq.*
[448] *Amoco Int'l. Fin.* v. *Islamic Rep. of Iran*, 27 I.L.M. 1314, 1338 (1988) ("*Amoco*") (C-277).
[449] C-1.

477.    As an international agreement concluded between States in written form and governed by international law, the Vienna Convention on the Law of Treaties ("Vienna Convention") applies to the interpretation of the Treaty.[450]   The Vienna Convention confirms that every treaty in force is binding upon the parties and obliges parties to perform them in good faith.[451]   Further, parties to treaties "may not invoke the provisions of [their] internal law as justification for [their] failure to perform a treaty."[452]   Accordingly, Respondent may not avoid its treaty obligations owed to Claimants by relying on its compliance with its internal laws, regulations or administrative acts.

478.    Article 31 of the Vienna Convention provides the Tribunal with the general rules of interpretation:

> 1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.
>
> 2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:
>
> (a) any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;
>
> (b) any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.
>
> 3. There shall be taken into account, together with the context:
>
> (a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;
>
> (b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;
>
> (c) any relevant rules of international law applicable in the relations between the parties.
>
> 4. A special meaning shall be given to a term if it is established that the parties so intended.

479.    With respect to certain claims, Respondent has stated that it is not liable for certain acts, as they cannot be attributed to Respondent.  In the context of these particular defenses, the Articles on State Responsibility will also be relevant to the Tribunal's analysis.

---

[450] 1969 Vienna Convention on the Law of Treaties, Art. 1 and 2(1)(a) ("Vienna Convention") (C-285).
[451] Vienna Convention, Art. 26.
[452] Vienna Convention, Art. 27.

480.    Accordingly, the claims and Counterclaims in this arbitration are governed by the ICSID Convention, by the Treaty and, where the Tribunal considers appropriate, the law of Argentina and general principles of international law.  The Tribunal's analysis in the subsequent sections of this Award will be guided by these sources and discussed in more detail in the context of each of the claims and Counterclaims.

## VII.    THE CLAIMS AND COUNTERCLAIMS - OVERVIEW

481.    As has been set out in considerable detail in the previous sections of this Award, Claimants invested in Argentina in 2001 through their indirect through Air Comet purchase of Interinvest, which, in turn, owned the majority of the shares of the Airlines and operated the Airlines until 2008 when the Government of Argentina formally expropriated the shares of the Airlines.  At the time of Air Comet's initial investment, the Airlines were in dire financial condition.  During Air Comet's ownership, the financial condition of the Airlines initially improved and positive returns were realized before the Airlines began to again experience financial difficulties.  It is undisputed that at the time of expropriation in 2008, the Airlines were again insolvent and the Government of Argentina intervened to assist in providing funds for expenses in order to keep the Airlines in operation.

482.    Claimants allege that the declining financial condition of the Airlines and their ultimate return to insolvency was a result of Argentina's measures, which they assert amount to breaches of the Treaty.  Claimants complain specifically about Argentina's refusal to increase domestic airfares or provide other relief to ensure economically reasonable airfares; Argentina's interference with the management of the Airlines in pressuring the Airlines to increase wages in response to union demands; the acts of the Undersecretary of Air Transportation; Argentina's unjustified challenge of the Airlines' financial statements; Argentina's pressure on Claimants to sell their interest in the Airlines to an Argentine purchaser; Argentina's breach of agreements reached with respect to the sale of the shares and their value; and, ultimately, Argentina's valuation of those shares when it decided to expropriate them in 2008.

483.    Argentina, instead, maintains the position that Claimants made no real investment in Argentina at all and that their mismanagement of the Airlines was the cause of their demise.

Argentina submits that it had no choice but to expropriate the Airlines in order to maintain the vital public service of connectivity within the country and that it was justified in paying nothing for the shares, as the Airlines had a negative collective valuation at the time of expropriation. Further, Argentina makes a Counterclaim in this arbitration for what it says are its losses related to Claimants' investment.

484.     Respondent states that Claimants' entry into the Airlines and their management of the Airlines was ill-conceived, "parasitical"[453] and self-serving. Respondent asserts that Claimants chose voluntarily to enter the Argentine air industry at a particularly inauspicious period that coincided with the events of September 11, 2001 and the Argentine economic crisis.[454] One of the airlines, ARSA, was in the midst of bankruptcy proceedings at this time.[455] Further, Respondent argues that Claimants failed to undertake a proper due diligence of the Airlines before entering the 2001 Share Purchase Agreement with SEPI, and then failed to invest in the Airlines as it was required to do pursuant to the terms of that agreement.[456]

485.     Thus, Respondent argues that it was Claimants' management of the Airlines that led to their grave financial and operational condition by 2008, and not State policy. In that respect, Respondent asserts, as a defense to Claimants' claims, that:

> It has been demonstrated that the state of the Airlines by mid-2008 was not a consequence of the actions of the Argentine State. On the contrary, the situation is attributable to the management of the Marsans Group. It was the lack of diligence and commitment in the acquisition and management of the Airlines, coupled with disrespect for applicable rules, that impacted on the viability of the Airlines.[457]
>
> Claimants attempt to have the Tribunal assume that a company in such situation, which was later put in the hands of a group that collapsed all over the world, amidst scandals, management disasters and fraud, would have been successful if it had not been because of the measures adopted by the Argentine Government. But nobody could reasonably assume that that could have happened.[458]
>
> … the manoeuvres of the Marsans Group led the Argentine Airlines to a situation in which the public service of air transport of passengers, mail and cargo was jeopardized.[459]

---

[453] *See, e.g.,* Resp. Rej. ¶ 73.
[454] *See, e.g.*, Resp. CM ¶ 155.
[455] *Id.*
[456] *See, e.g.*, Resp. CM ¶ 155.
[457] Respondent's Skeleton Submission ¶ 86.
[458] Resp. CM ¶ 152.
[459] Resp. Rej. ¶ 68.

> Indeed, in 2008, the Airlines where [*sic*] in the same—or even worse—economic situation they were in 2001, as a consequence of the inefficient management of the Marsans Group. Claimants' allegation that this was the result of the airfares applied is false since, as has been explained by KPMG, during the relevant period, the airfares affected by the regulation increased more than costs.[460]

486.    In the event that the Tribunal determines that Respondent has breached the Treaty, Respondent argues that its measures were necessary and raises the defense of necessity.

487.    In the following sections of the Award, the Tribunal will review each of Claimants' claims and Respondent's defenses to those claims, as well as Respondent's Counterclaim.

## VIII.    ALLEGED BREACHES OF FAIR AND EQUITABLE TREATMENT

488.    At the core of Claimants' case are the allegations that Argentina treated Claimants' investment unfairly and inequitably and, ultimately, expropriated it without paying any compensation.  Claimants allege that Respondent failed to provide fair and equitable treatment to their investment, in violation of Article IV(1) of the Treaty. Claimants asserted that the following acts allegedly taken by Respondent constituted FET violations:

(a)    The "airfare squeeze"[461]

(b)    The maintenance of Undersecretary Cirielli in office[462]

(c)    Respondent's unjustified challenge of ARSA's financial statements[463]

(d)    Respondent's acts with respect to the June 2006 agreement, including Respondent's coercion of Claimants to obtain additional shares at no cost, its unilateral modification of the text of the June 2006 Agreement, and its breach of the June 2006 Agreement by failing to set TER-compliant airfares and failing to comply with its promised 15% stock option of ARSA by invoking the corresponding cash contributions[464]

---

[460] Resp. Rej. ¶ 74.
[461] Cl. Mem. ¶ 440; Cl. Reply ¶¶ 480, 482; Cl. PHB ¶¶ 36, 54, 97.
[462] Cl. Mem. ¶ 444; Cl. Reply ¶ 489; Cl. PHB ¶ 24.
[463] Cl. Mem. ¶ 446; Cl. Reply ¶ 412.
[464] Cl. Mem. ¶¶ 363-364; Cl. PHB ¶ 103.

(e)     The breach of the May 2008 Agreement[465]

(f)     The breach of the July 2008 Agreement and the subsequent *de facto* expropriation of the Airlines[466]

(g)     Respondent's failed promise to subrogate Claimants' Airbus orders[467]

489.     In general response to Claimants' claims with respect to FET, Respondent states that Claimants did not have a protected investment and that it acted at all times fairly and equitably toward any investment that Claimants did make (i.e. that it met its obligations of minimum standard of treatment at international law).  The Tribunal has already determined that Claimants had protected investments in Argentina.[468]  Respondent's specific defenses to the FET claims will be discussed in the following sections.

## A.      Positions of the Parties on the Content and Scope of the FET Obligation

490.     Claimants assert that the FET standard contained in Article IV(1) of the Treaty

> …is not a single monolithic standard, but encompasses several categories of conduct. Specifically, fair and equitable treatment comprises, *inter alia*, the following obligations: (i) to provide investors with a stable and predictable legal and business environment; (ii) not to frustrate an investor's legitimate expectations; (iii) to act transparently and consistently towards investors and their investments; (iv) to act in good faith; (v) to refrain from coercion or harassment; and (vi) to promote and protect investment.[469]

491.     Claimants stress, in particular, that case law overwhelmingly demonstrates that the FET standard prohibits host States from engaging in conduct that frustrates the legitimate expectations of investors.[470] They also stress that legitimate expectations can arise from contracts and specific representations, such as in the case of Respondent's promised subsidies and tax relief, as well as

---

[465] Cl. Mem. ¶ 450; Cl. Reply ¶ 495; Cl. PHB ¶ 117.
[466] Cl. Mem. ¶ 453; Cl. Reply ¶ 496; Cl. PHB ¶ 143.
[467] Cl. Mem. ¶ 458; Cl. Reply ¶ 497; Cl. PHB ¶ 161.
[468] *See* Section IV.D and in particular, ¶ 315, above.
[469] Cl. Reply ¶ 466.
[470] Cl. Reply ¶ 469 *et seq*.

in the case of the June 2006, May 2008 and July 2008 Agreements.[471]  Claimants have summarized the fair and equitable treatment standard as follows:[472]

- The fair and equitable treatment standard requires the State to be "just, even-handed, unbiased, legitimate."

- The fair and equitable treatment standard should be ascertained in light of the object and purpose of the treaty, which, in this case are in part to "intensify economic cooperation for the economic benefit of both countries" and "to create favorable conditions for investments."

- The fair and equitable treatment standard obligates the State to respect the investor's legitimate expectations.  Furthermore, through its laws, regulations, policies and statements, a state creates certain expectations about the treatment that an investor may anticipate.

- The fair and equitable treatment standard requires the State to protect the stability of the legal and business environment of the investment. When a state abrogates its commitments and thereby violates an investor's legitimate expectations, it creates an unstable and unpredictable legal and business environment.

- The fair and equitable treatment standard requires the State to refrain from conduct that is inconsistent or lacks transparency. Thus, a state's conduct should be free from ambiguity or uncertainty. Accordingly, "all relevant legal requirements for the purpose of initiating, completing and successfully operating investments made, or intended to be made, under the Agreement should be capable of being readily known" by the investor.

- A finding of bad faith is not required to conclude that a state violated its obligation to treat the investments fairly and equitably.

- The fair and equitable treatment standard requires the State to conform its measures and conduct to a standard of good faith.

492.    As formulated in its latest pleadings, Claimants argue that Argentina breached the FET standard vis-à-vis Claimants' investment in numerous respects, including the following:

(a)    Argentina failed to abide by its specific commitments, promises and guarantees regarding Claimants' ability to charge Economically Reasonable Airfares (the "Airfare Squeeze");

---

[471] Cl. PHB ¶¶ 174-175.
[472] Cl. Mem. ¶ 436. Citations omitted.

(b)    Argentina appointed and maintained Mr. Cirielli as Undersecretary of Air Transportation during Claimants' investment despite his public animosity against Claimants;

(c)    Argentina resorted to deceptive and unlawful tactics in order to increase its stockholdings participation in ARSA in the context of the June 2006 Agreement, including baseless challenges to ARSA's financial statements, supporting APTA's and APLA's strikes against the Airlines, failing to grant reasonable airfares, among others;

(d)    Argentina breached both the May and July 2008 Agreements and arbitrarily treated Claimants and their investment;

(e)    Argentina further reneged on its post-expropriation promise to assume Claimants' contractual position in the acquisition of Airbus aircraft.[473]

493.    Claimants also assert that Respondent failed to act transparently and consistently toward Claimants and their investment through the following alleged conduct:

(a)    its groundless excuses not to appoint a third independent valuator under the July 2008 Agreement;

(b)    its pressure on Claimants to conclude the June 2006 and May 2008 Agreements, in exchange for airfare increases it had to grant anyway;

(c)    its persistent refusal to calculate the Economically Reasonable Airfare between 2002 and 2008, but granting insufficient increases "on account of" it;

(d)    the Government of Argentina's May 29, 2008 acknowledgment of damages (in the range of USD 390-450 million) due to its failure to implement tax benefits and subsidies that it had promised to Claimants since 2002;

---

[473] Cl. Reply ¶ 479; Cl. PHB ¶ 176.

(e)     its appointment of Mr. Cirielli as Undersecretary of Air Transportation notwithstanding his evident bias against Claimants, and his maintenance in office notwithstanding the existence of court and administrative rulings acknowledging his conflict of interest with Claimants;

(f)     the filing of groundless challenges to ARSA's financial statements to then withdraw them with prejudice when receiving a percentage of ARSA's stockholding per the June 2006 Agreement,

(g)     its *ad hoc* use of *de facto* representatives (such as Mr. Vázquez and Mr. Gutiérrez) for making low-ball offers to purchase the Airlines;

(h)     its threats to Claimants' representatives (such as Mr. Muñoz Pérez); and

(i)     its *de facto* control of the Airlines in violation of the July 2008 Agreement.[474]

494.    Respondent asserts, in response, that the expression "fair and equitable treatment" as used by Article IV(1) of the Treaty refers to the minimum standard under customary international law. Under this standard, acts that give rise to a FET breach are those that "fall below the internationally acceptable levels and which, when weighed against the given factual context, amount to manifest arbitrariness, discrimination, a gross denial of justice, or a lack of due process leading to an outcome which offends judicial propriety."[475] Respondent asserts that none of the acts described by Claimants rise to this level.

495.    Respondent argues further that the concept of "legitimate expectations" referenced by Claimants appears nowhere in the Treaty or other BITs concluded by Argentina. Nonetheless, even if this standard did apply to the circumstances, Claimants failed to take into consideration the dismal condition of the Airlines in 2001, and failed to conduct any due diligence analysis.[476] The Treaty cannot be read to grant foreign investors immunity from business risks or to offer them any

---

[474] Cl. PHB ¶ 177.
[475] Resp. PHB ¶ 232.
[476] Resp. PHB ¶¶ 234-236.

guarantee of profitability.[477] Respondent asserts that, far from this being a situation where a State changed the domestic legal framework to the detriment of the investor, it is Claimants here who complain that they were not able to modify the existing legal framework to their own advantage.[478]

496.    The Respondent also denies each of the Claimants' allegations set out above.

497.    The Tribunal's findings on the scope and content of the FET obligation is set out at paragraphs 663 to 668, below.

## B.    The "Airfare Squeeze"

498.    Claimants contend that the Airlines, as airlines operating in Argentina, had the right under Argentine law to charge an "economically reasonable airfare" ("TER") the acronym for the Spanish *tarifa económica retributiva*) for domestic flights. Claimants allege that Argentina failed to set airfares in accordance with the TER principle, and that the airfares set were too low for Claimants to make the reasonable return to which they were entitled. Claimants argue that over the period of their control of the Airlines (2001-2008), and in the wake of the Argentine financial crisis and devaluation of the peso, their costs rose sharply relative to the airfares they could charge. They argue that despite their numerous requests, Respondent failed to raise the airfares sufficiently to reflect cost increases, which "severely harmed, and ultimately financially choked the Argentine Airlines."[479]

499.    Claimants say that the airfare squeeze breached numerous obligations owed by Respondent under the Treaty. Claimants assert that Respondent's failure to provide economically reasonable airfare levels constitutes a breach of the Fair and Equitable Treatment (FET) obligation set forth in Treaty Article IV(1).[480] Claimants also allege that the airfare squeeze constitutes a part of Respondent's indirect or "creeping" expropriation of the Airlines in violation of Treaty Article V.[481] Finally, Claimants assert that Respondent's failure to provide a TER constitutes a breach of

---

[477] Resp. PHB ¶ 236.
[478] Resp. PHB ¶¶ 238-239.
[479] Cl. Reply ¶ 142.
[480] Cl. Mem. ¶ 440; Cl. Reply ¶¶ 412, 480, 482.
[481] Cl. Mem ¶ 356 *et seq.*; Cl. Reply ¶ 411 *et seq.*

Argentina's failure to protect Claimants under Treaty Article III(1).[482]   The Tribunal will review all of Claimants' arguments as they relate to the airfare squeeze in this section of the Award and return to its findings, as necessary, in subsequent sections.

500.    This section will first address the Parties' arguments with respect to the Argentine regulatory regime that sets airfares and the concept of the "economically reasonable airfare." Second, it will address the Parties' arguments regarding the acts taken by both Claimants and Respondent with respect to the setting of airfares; these acts consist primarily of Claimants' requests for fare increases and the allegedly inadequate responses by Respondent. Third, it will address the Parties' quantitative arguments with respect to the airfares.  The Tribunal will then examine whether the alleged airfare squeeze gave rise to a breach of the FET standard under the Treaty.

## 1.    The Regulatory Structure

501.    Claimants request the Tribunal to find that Respondent was required under Argentine law to set economically reasonable airfares for domestic routes, i.e., at levels that would have permitted the Airlines to recover their direct, indirect and financial costs and to obtain a reasonable profit.[483] Claimants further request that the Tribunal find that Argentina, by contemporaneous conduct and representations, acknowledged Claimants' right to economically reasonable airfares as well as its own failure to set airfares for the domestic passenger market in compliance with the TER-standard from 2002 up until expropriation of the Airlines.[484]

## Laws and regulations

### *Scope of regulations*

502.    Airfares are regulated by the Argentine government via the Air Business Law, Law No. 19,030.  Argentine regulations require Respondent to approve a base airfare or *tarifa de referencia.* Argentine regulations also set both a ceiling and a floor ("airfare bands") with reference

---

[482] Cl. Mem. ¶ 478; Cl. Reply ¶ 513.
[483] Cl. PHB ¶ 36.
[484] Cl. PHB ¶ 54.

to the base airfare, usually by a set percentage below and above the base fare, so that the air carriers can freely price each available seat within the upper or lower band.

503.    It is undisputed by the Parties that these regulations concern only airfares for domestic flights.[485] As such, Claimants' allegations of the "airfare squeeze" are limited to Respondent's actions with respect to these domestic airfares. The regulations are further limited in scope because they only apply to domestic tickets that are purchased *within* Argentina. Respondent argues, therefore that airfare regulation in Argentina affected only "a small portion of the revenues of the Airlines."[486]

504.    The scope of operations of the two Airlines was different.  AUSA flew almost exclusively domestic routes and its revenues generated from those routes represented 98% of its total revenues. On the other hand, ARSA operated a substantial number of international routes as well as domestic routes and revenues generated from its domestic routes represented approximately 25% of its total revenues.[487]

505.    The Parties disagree on whether domestic business class fares were subject to these same airfare regulations during the 2001-2008 period of Claimants' management of the Airlines.

506.    Claimants assert that any premium or business class airfares were regulated until 2008, and that business fares were only deregulated as part of the April 2008 fare increases granted by the Secretariat of Transportation.[488]

507.    ST Resolution No. 257 of April 2008 is entitled "A resolution authorizing the operators of regular domestic air passenger transportation services to apply economy-class fares in certain fare brackets. Effectiveness." It provides, in relevant part:

> **Section 1.** The operators of regular domestic air passenger transportation services are hereby authorized to apply, effective at 00:00 on the day following the day of publication of this Resolution, the economy-class fares in the fare brackets between the reference rate and the maximum fare for each of the points of origination-destination described in Annex I[.] …

---

[485] Fares for international flights are regulated via bilateral agreements; *see* Resp. Rej. ¶ 355.
[486] Resp. PHB ¶ 77.
[487] CLEX ER3 ¶ 64.  The figures are averages for the period of 2002-2008.
[488] Cl. PHB ¶ 79; Transcript pp. 1374-1375 (testimony of Dr. Spiller/CLEX).

> **Section 2.** Commercial airlines shall submit for approval by this OFFICE OF TRANSPORTATION the air fares to be applied to <u>such differential intermediate or business class services</u> as they may offer for regular domestic flights, and this authority shall reserve the right to define the conditions that will apply to services of this sort.[489]  (emphasis added)

508.    Claimants note that all resolutions relating to fare increases enacted after this resolution likewise specify that the fare caps apply only to economy class. ST Resolution No. 315 of May 2008, for example, is entitled "*Servicios regulares de transporte aéreo interno de pasajeros. Tarifas clase económica,*" and does not make any reference to "executive" or "business class" fares.[490] Claimants also note that the resolutions on airfares that were enacted during their control of the Airlines prior to April 2008 did not distinguish between "economic" and "business" class fares or otherwise exclude business class fares.[491]

509.    Claimants' economic expert, Dr. Pablo Spiller, testified that he understood "that in practice there was some oral agreement between the companies and the Secretariat which will allow a certain small number of seats to be sold as Business at a particular premium, and that premium should be equivalent to what they would do if they had, instead of Business Class seats, regular seats."[492] He confirmed that this informal policy was, as such, revenue-neutral.[493]

---

[489] C-181.

[490] C-182; Cl. PHB ¶ 79; *see also* Resolution 227/2009: C-863; Resolution 118/2010: C-864; Resolution 210/2010: C-865; Resolution 64/2011: C-866; Resolution 112/2011: C-867; Resolution 23/2012: C-868; Resolution 49/2012: C-869; Resolution 778/2012: C-870; Resolution 265/2013: C-871; and Resolution 1595/2013: C-966.

[491] Cl. PHB ¶ 80.  *See* Decree 1654/2002 (September 2002), Declaring a State of Emergency for Commercial Air Transport provided throughout Argentina by domestic operators subject to the National Authority during the effectiveness of Law No. 25,561: C-80.  The provision of this Decree that governs airfares does not identify or otherwise distinguish between economy class and business/executive class ("Section 4 — The operators of scheduled domestic air transport services for passengers are hereby authorized to apply, as from 00.00 a.m. of September 1, 2002, the airfares approved in Exhibit I hereof. In the case of air routes or air route segments not listed in Exhibit I hereof, the airfare benchmark shall be calculated pro rata the corresponding mileage, comparing it to the airfare benchmark for a route of a similar distance."). *See also* Decree 1012/2006 (August 2006), Declaring a continued State of Emergency for Commercial Air Transport provided throughout Argentina by domestic operators subject to the National Authority created in Section 1 of Decree 1654/2002.  Airfares. Effectiveness: C-83.  This Decree also does not identify or otherwise distinguish between economy class and business/executive class ("Section 6 — The operators of scheduled domestic air transport services for passengers are hereby authorized to apply, as from 00.00 a.m. of the day following that of publication of this Decree, the airfares included in the price range between the benchmark airfare and the highest airfare for each of the points of origin/points of destination described in Exhibit I, and to apply, as from the THIRTIETH (30th) calendar day from the publication hereof, the airfares listed in Exhibit II. Both Exhibits are an integral part of this Decree. …").

[492] Transcript pp. 1374-1375 (testimony of Mr. Spiller/CLEX).

[493] *Id.*

510.    Respondent has asserted, in contrast, that the airfare regulations do not apply, and never applied, to Business Class tickets.[494] Respondent has supported this assertion on the basis of the evidence of two of its expert witnesses.[495] However, Respondent's accounting and damages expert, KPMG, took an inconsistent position on this issue over the course of this proceeding. In its first expert report, it noted that "Later on, in April and May 2008, ST Resolutions No. 257 and 315, respectively, further increased reference and maximum airfare twice by 18% for economy class, deregulating prices to be charged for business class."[496] During the hearing, however, KPMG asserted that "in late January 2008, the standard or the rule allow[ed] for the deregulation of the Business Class, but this is something that had already been done in the past,"[497] and that "only the domestic airfare was regulated for the economy seating in Argentinean pesos and sold to Argentinean residents."[498]

511.    The Tribunal's review of the regulatory framework indicates that no distinction was made between economy and business class airfares until ST Resolution No. 257/2008.  Prior to that time, all the relevant legislation and decrees relating to airfares simply referred to the airfares and bands in question without differentiating between economy and business class or exempting business class from the application of the relevant airfare caps.  The Tribunal notes that it was not until Respondent submitted its Rejoinder on the Merits that it raised the argument that domestic business class airfares were unregulated during the period of 2002 to 2008.  In addition, Respondent's expert, KPMG, identified ST Resolution Nos. 257 and 315 as new regulations which deregulated airfares for business class.[499]  The Tribunal is not persuaded by KMPG's explanation in cross-

---

[494] Resp. Rej. ¶ 355; Respondent's Skeleton ¶ 22; Resp. PHB ¶¶ 80-81.
[495] *See* Donato ER2, ¶ 25 ("This airfare-band system only governs economy class airfares for regular domestic passenger air transport; and executive class airfares, non-regular air services, postage and cargo air transport and international air transport are not subject to these limitations."); testimony of Professor Keifman, Transcript p. 1093 (it is "absolutely false" that business fares were only deregulated beginning in April 2008); testimony of KPMG, Transcript p. 1476 ("only the domestic airfare for the economic fare type is regulated point of sale in Argentina.").
[496] KPMG ER1, ¶ 2.6.5.
[497] KPMG Testimony, Transcript p. 1478.
[498] KPMG Testimony, Transcript p. 1393.
[499] KPMG ER1 §§ 11.4.11, 2.6.5.

examination that although the first decree to de-regulate business class airfares was adopted in April 2008, in practice these airfares had already been deregulated.[500]

512.    Claimants' experts, Messrs. Abdala and Spiller, testified that business class airfares were not deregulated and that the airlines were not free to charge business class airfares or to re-designate economy class seats as business class seats without the Secretariat of Transportation's authorization.[501]  There was some indication that airlines reached informal, oral agreements with the Secretariat of Transportation to sell a limited number of seats as "business" or "gold" seats at a premium.  However, that premium was limited to the maximum airfare chargeable for the equivalent regular, economy seats.  As a result, the ability to convert regular seats into "business" or "gold" seats was still limited by the maximum airfare set by decree and, therefore, was revenue neutral.[502]  As a result, to the extent there may have been some limited, informal practice of rebranding seats, as permitted by the Secretariat, this practice was revenue neutral and did not affect Claimants' experts' yield calculations.

513.    The Tribunal concludes for all intents and purposes, until the adoption of ST Resolution No. 257/2008 in April 2008, all domestic airfares, including for "business" or "gold" seats, were regulated and subject to the reference airfares and the approved maximum airfare caps and bands contained in the regulations.[503]

514.    Finally, the Parties disagree as to whether the Airlines were required to serve specific, less profitable routes.  Claimants assert, for example, that while their domestic competitor, LAN

---

[500] Transcript pp. 1477-1479.  Read in context, KPMG's expert report indicates that business class airfares were first deregulated in April and May 2008 and KPMG criticized the CLEX report for not reflecting this change in its damage calculations.  Further, KPMG did not offer any support for its statement at the hearing that business class airfares had previously been deregulated.

[501] Transcript pp. 1374-1378.

[502] *Ib.*

[503] In addition, the Tribunal finds Respondent's position that business class seats were unregulated prior to April 2008 and that the airlines could have freely charged business class airfares to maximize revenue unconvincing.  If this were case, one would have expected ample evidence of the charging of substantially higher premium prices for business class.  There was no such evidence.  Rather, the evidence indicates that all of the airlines operating in Argentina repeatedly requested airfare increases throughout the period from 2004 to 2008.  This included LAN Argentina, which requested airfare increases, both in its own name and as a member of CLARA: C-75; C-76; C-77; C-967 (report of LAN's Board of Directors dated May 21, 2008) C-1045 (LAN's letter of March 11, 2008 to the Secretariat of Transportation).

Argentina "was able to select the densest and most profitable routes to serve," the incumbent airlines, ARSA and AUSA "were effectively required also to serve the less desirable routes that LAN was able to avoid."[504] Claimants' expert, Mr. Ricover, testified that while "there is no legal source" for this obligation placed on the Airlines, "[n]ot everything in Argentina is written on paper. Some commitments and some responsibilities are political. And I can tell you for sure that, even if there were no specific requirements on paper, it doesn't mean that there were not requirements."[505]  Mr. Ricover's position is supported by the contemporaneous correspondence between the Airlines and Respondent.[506]

515.    Respondent, on the other hand, asserts that there was no such obligation on the Airlines to fly specific routes.[507] Respondent refers to the testimony of its aviation law expert, Professor Angela Marina Donato, who asserted that the provision of service along any particular route is not imposed by Government of Argentina, but rather it is the operators who may request to provide this service.[508] Professor Donato also testified that operators have the right to request the suspension or interruption of the service provision if they consider that the airfare of a given route is not profitable.[509] Respondent asserts that the Airlines, under Claimants' management, never made such a request.

516.    The Tribunal's review of the regulatory framework for domestic air transport in Argentina indicates that there was no formal requirement on the Airlines to fly specific routes.  Accordingly, when applying for concessions, it appears that airline companies could request the specific routes they wished to serve.  Further, the regulations permitted competition between airlines on the same routes such that the granting of a particular concession does not appear to have granted any form of monopoly.  There was no evidence regarding the conditions under which concessions would be granted and whether servicing other routes was a condition of approval for the granting of a concession.  However, the evidence did indicate that ARSA was considered the national flag

---

[504] Cl. PHB ¶ 92.
[505] Testimony of Mr. Ricover, Transcript pp. 962-963.
[506] *See*, for example, C-79: Airlines' letter to the Secretary of Transportation, Mr. Jaime, dated April 29, 2008; and C-371: ARSA's letter to Mr. Jaime dated March 26, 2008, as well as the 2006 Agreement.
[507] Resp. PHB ¶¶ 92-95.
[508] Resp. PHB ¶ 92, citing Testimony of Professor Donato, Transcript p. 676.
[509] Resp. PHB ¶ 93, citing Testimony of Professor Donato, Transcript pp. 676-678.

carrier at the time of privatization and that as part of the privatization process, the Argentine State, as a shareholder, was granted a right of veto over the elimination or substantial reduction of transportation services operated by the company at the time of the public tender.[510]  It appears that under Iberia's and SEPI's control of the Airlines, the latter operated a broad range of routes throughout Argentina.  These were covered by concessions which remained with the Airlines in 2001 when Claimants acquired the shares of Interinvest from SEPI.  As indicated previously, in 2005 the Secretariat of Transportation renewed ARSA's concessions to operate a number of routes and deferred the renewal of other concessions which still had a number of years to run.

517.    The Tribunal also notes that in 2007 and 2008, the Secretariat of Transportation raised with the Airlines the need to provide and increase the frequency of air transportation to a number of destinations within Argentina.[511]  It appears to be common ground that the Executive Branch of the Government never made a declaration that any scheduled air services on certain routes or route segments were of special interest to the Nation pursuant to the Air Business Law, Article 6 and Decree 6875/1974, Article 2.  Nor did the Airlines request payment of subsidies or compensation pursuant to Article 6 of Law 19,030 and Decree 6875/1971.

518.    However, in their letters of March 26 and April 29, 2008, the Airlines did advise the Secretariat of Transportation that a number of their routes were unprofitable and that they would be unable to maintain certain routes or the frequency of service of certain routes requested by the Secretariat absent an increase in airfares and other relief, including in certain cases payment for empty seats by the Secretariat.[512]  The Tribunal also notes that pursuant to ARSA's by-laws, adopted by Decree 220/1990, and the terms of the 2006 Agreement and Addendum, Respondent, as a shareholder of ARSA, had the right to veto the elimination or substantial reduction of domestic air transportation services.[513]  Further, and in any event, Claimants' complaint regarding the

---

[510] *See* the By-laws (*Estatuto Social*) of ARSA adopted by Decree 220/90, Anexo 1, § VII, ¶ 34(b): C-6.  *See also* the General Transfer Contract (*Concesiones y Autorizaciones*): C-63 pp. 1071-1072.

[511] *See* C-78/371: letter from the Airlines to the Secretariat of Transportation dated March 26, 2008; C-79: letter from the Airlines to the Secretariat of Transportation dated April 29, 2008.  In their letter of March 26, 2008, the Airlines refer to recent meetings with the Secretariat of Transportation over the past few weeks and the Secretariat's request that the Airlines provide details of the positive impact of the Secretariat's proposed measures on the maintenance and frequency of various routes.

[512] C-78/371; C-79.

[513] C-6, Annex 1, § VII, ¶ 34(b); C-134.

uneconomically low airfares relates to fares for all domestic routes during the relevant period, not just to certain specified routes. Respondent's argument amounts to saying that the Airlines were free to decide to stop operating all of their routes or relinquishing their concessions. In the circumstances, this was not possible. The relevant issue is whether under the domestic legal framework, the Airlines were entitled to charge airfares which would allow them to recover their costs and obtain a reasonable margin of return.[514]

### The Air Business Law and Decree 6875/1971

519. Article 42 of the Air Business Law, Law No. 19,030, governs the setting of airfares. The Parties disagree on whether Article 42 establishes a "right" to a TER, on the mechanism Article 42 and other regulations use to determine whether a fare is economically reasonable, and on whether Argentina failed to use the correct methodology to determine whether the fare is reasonable.

####   (i)    The alleged "right" to a TER

520. Article 42 provides that

> *Las tarifas se establecerán consultando los intereses de la Nación, de los usuarios y de los explotadores, con el concepto de tarifa económica retributiva correspondiente a cada ruta y tramo de ruta.* / Airfares shall be established taking into consideration the interests of the nation, of the users and of the operators, in accordance with the concept of an economically reasonable airfare for each route and route segment. (Claimants' translation) [515]

521. Claimants interpret Article 42 as establishing a right to charge airfares consistent with the TER.[516] As they interpret the language of Article 42, "after the balancing of all relevant interests ('taking into consideration'), airfares must in all cases be set 'in accordance with the concept of an economically reasonable airfare…'"[517] To Claimants, the TER is "not simply another 'interest' to

---

[514] Cl. PHB ¶ 51 and footnote 100.
[515] C-60.
[516] *See, e.g.*, Cl. Reply ¶ 119, arguing that not only does Argentine law "guarantee that airfares are to be set in accordance with the right to an Economically Reasonable Airfare, but it also provides for a methodology by which the regulator is required to calculate airfares in accordance with that overarching right."
[517] Cl. CC Rej. ¶ 52.

balance against the interests of the nation, the users and the operators; instead, Article 42 ensures air carriers that the airfares set by the regulator shall not fall below that standard."[518]

522.    Claimants moreover tie the language of Article 42 to what they describe as a long-standing tradition of just and reasonable tariffs in Argentine administrative law for public services.[519] Claimants' Argentine legal expert, Professor Alberto Bianchi, asserts that under this principle, "the fare received by the service provider should be sufficient in efficient conditions in order to assure repayment of all operating costs and a reasonable Rate of Return or reasonable profit[.]"[520] Claimants also argue that this principle has been consistently affirmed by the Argentine Supreme Court and is recognized by Argentine scholars, including Respondent's legal experts.[521]

523.    Respondent disagrees with Claimants' interpretation of Article 42. First, it argues that the TER is not a "right" that guarantees a particular level of return.[522] It asserts that Article 42 provides no guarantee of profitability, let alone a guarantee of a constant total or unitary gross margin in dollars.[523] Second, Respondent interprets the specific language of Article 42 as *balancing* the interests of three different elements: "a) the interests of the country (more access by users, connectivity, the promotion of tourism, etc.), (b) the interests of users (who want a better service price/quality ratio), and (c) the interest of the companies providing the services (who seek to improve their profitability)."[524] It submits as well that Article 42, as properly translated, does not contain the phrase "in accordance with," as Claimants have posited.[525]

524.    In interpreting the legal framework governing the setting of airfares in Argentina, the Tribunal notes that the relevant laws and decrees which applied during the course of Claimants' investment were longstanding.  The Aeronautics Code had been adopted in 1967 and the Air Business Law and Decree 6875/1971 were both adopted in 1971.[526]  The basic, general provision

---

[518] Cl. CC Rej. ¶ 52.
[519] Cl. CC Rej. ¶ 46; Bianchi ER2 ¶ 38.
[520] Testimony of Mr. Bianchi, Transcript p. 767.
[521] Cl. PHB ¶ 28, referencing Mata ER3 ¶¶ 32-33; Testimony of Professor Donato, Transcript p. 884.
[522] Resp. Rej. ¶ 328.
[523] Resp. Rej. ¶ 365.
[524] Resp. Rej. ¶ 366, *see also* Donato ER2 ¶¶ 9, 4; Testimony of Professor Donato, Transcript p. 858-859.
[525] *See* Respondent's Opening, Transcript p. 304.
[526] RA-2/C-61; RA-304/C-60; C-62.

governing domestic airfares is Article 42 of the Air Business Law which, unlike other laws and regulations governing other regulated services such as gas distribution, water and sewer services, did not provide for a detailed mechanism for the calculation of tariffs and their periodic revision. Further, as Respondent notes, the air transport sector permitted competition and free entry by competitors, unlike other regulated sectors in which a monopoly or oligopoly of regulated services existed.[527]   While, as discussed below, Decree 6875/1971 provides some guidance on the calculation of economically reasonable airfares (the TER), this is not immediately apparent and its provisions are not entirely clear.  The Tribunal also notes that by 2007, the prevailing conditions in the domestic air transportation market had changed such that the regulatory and tax regime was acknowledged to have become antiquated and airfare tariffs had become outdated.[528]  In addition, it appears that by 2008, due to the complexity inherent in the determination of air transportation costs, the Secretary of Transportation sought external technical assistance to determine the economically reasonable fares for Argentina's domestic air transportation market.[529]

525.    Turning to Article 42 of Law 19,030, the Tribunal finds that the plain language of the text provides that airfares shall be set in accordance with, or by way of the concept of, an economically reasonable tariff (the TER) for each route or route segment.  The Tribunal is unable to accept Respondent's interpretation that the TER is only one of various interests to be considered pursuant to Article 42 of Law 19,030.  Rather, the plain meaning of Article 42 of Law 19,030 is that airfares shall be established by way of, or in accordance with, the concept of an economically reasonable tariff which is required to be set in consideration of the interests of the nation, the users, and the operators in respect of each route and route segment.  Further, Article 42 of Law 19,030 does not establish any hierarchy between the various interests to be consulted.  While Respondent submitted that, properly translated, Article 42 of Law 19,030 does not contain the phrase "in accordance with" the concept of an economically reasonable tariff, it does not offer, nor justify, a different translation.

---

[527] Resp. Rej. ¶¶ 375-376.
[528] *See* Bill No. 4982-D-2007, October 23, 2007: RA-325 pp. 2/3-3/3.  *See also* Decree 1012/2006 which states, in the recitals, that the legal system and the current economic reality were obviously different from those existing at the time the Aeronautical Code was enacted and that both the Code and the Air Business Law were being revised.  *See* C-83.
[529] *See* ST Resolution No. 257/2008 of April 11, 2008: C-181/RA-341.

526.     This interpretation is consistent with the evidence of Claimants' legal expert, Dr. Bianchi, and Respondent's legal expert, Dr. Mata, in respect of Argentine administrative law relating to public services, pursuant to which public service tariffs must be "fair and reasonable".[530] According to Dr. Mata, the "…tariffs charged must allow the concessionaire, when operating efficiently, to obtain proceeds in an amount adequate to cover the costs of operations, maintenance and expansion of services, as well as for a business profit."[531]

527.     In addition, the conduct of the Parties also reflects this interpretation.  In this regard, the General Transfer Contract, Article II(3)(m) contains a guarantee by Government of Argentina that tariffs for domestic flights would be set according to Articles 42-46 of the Air Business Law.[532] Further, in the 2006 Agreement, the Parties agreed that the Government of Argentina, through the exercise of the votes attached to its Class A Shares in ARSA, would have the right to object and block the elimination or substantial reduction of domestic air transportation services provided that compliance with the application of the economically reasonable tariff (Article 42, Law 19,030) was ensured.[533]

528.     Furthermore, a review of the various decrees and resolutions adopted by the Government of Argentina, as well as the bills it submitted to Congress, reflect the obligation to set domestic airfares pursuant to the TER.  For example, Decree 1012/2006 expressly provided that the tariff increases granted to update the tariffs set in Decree 1654/2002 were to be considered "on account of the economically viable [reasonable] fare determined by Section 42 of Law No. 19,030."[534] Similar references were made in ST Resolution No. 257/2008 and ST Resolution No. 315/2008.[535]

---

[530] Cl. PHB ¶¶ 28-29 and the sources cited there.
[531] Mata ER3 ¶ 33.  *See also* the decision of the Argentine Supreme Court in *Re Maruba*, Bianchi ER2, Ex. 110.
[532] C-63 p. 1075.  In addition, the same provision of the General Transfer Contract also provided that in the event the Air Business Law were replaced, the same objectives as those in Articles 42-46 of Air Business Law would be assured.
[533] C-734, quoted above at ¶¶ 404-406.
[534] C-83, quoted above at ¶ 408.
[535] C-181; C-182.  Note also C-856, a report prepared for the Secretariat of Transportation, amongst others, regarding the calculation of tariff increases, dated March 25, 2008 (the "March Report").  The March Report qualifies its findings by stating that the study undertaken does not imply that the economically reasonable airfare corresponding to each route or route segment, as identified in Article 42 of Law No. 19,030, has been identified since, in order to achieve this, the assistance of a team of experts would be required.  *See* C-856 p. 2.

Finally, the repeated request from the Airlines and from the Airlines Chamber ("CLARA") referred to the need for tariff increases in order to achieve an economically reasonable airfare.[536]

529.    On the basis of the foregoing, the Tribunal concludes that the legal regime governing domestic airfares in Argentina, and specifically Article 42 of Law No. 19,030, provided that airfares were required to be set in accordance with the concept of economically reasonable airfares. This concept is consistent with and reflects the Argentine administrative law principle which requires that public service tariffs shall be "fair and reasonable".

### (ii)    The calculation of the TER

530.    The Parties also disagree on the means by which the TER is to be determined. Claimants assert that TER is "explained" in Decree 6875/1971, which, according to them, implements the Air Business Law.[537] Claimants refer to Article 3 of Decree 6875/1971, which provides that:

> The administrative authority [i.e. the Secretary of Transportation] shall perform the necessary technical and economic studies to determine the economically reasonable airfare for passengers [flights] in all the routes and segments of routes, based on the load factor approved by the administrative authority. The airfare shall cover the direct and indirect exploitation costs for each route or segment of route, to which an additional amount approved for each company shall be added to account for financial costs and a margin of return.[538]

531.    According to Claimants, Articles 4 and 5 of the Decree further specify the mechanism by which the "four items" on which the TER is based are to be calculated. Article 4 describes the calculation of 1) direct and 2) indirect costs, while Article 5 describes the calculation of 3) financial costs and 4) the margin of return for the airline.[539] Claimants also assert that this decree requires

---

[536] *See*, in this regard: the Airlines' letter of October 20, 2006: C-73; the Airlines' letter of April 4, 2007: C-74; CLARA's letter of November 8, 2007: C-77.

[537] Cl. Mem. ¶¶ 75-77.

[538] C-62.

[539] Cl. Reply ¶¶ 117-118. Article 4 provides that "The direct costs shall be calculated based on the inputs required to perform a correct and efficient operation (fuel and lubricant, air personnel, maintenance, insurances and devaluation). The indirect costs shall globally consist of a percentage of the direct costs, set by the administrative authority [i.e., the Transportation Secretariat], compatible with the national market, the characteristics and evolution of the specific company and pro-rata according to each route or segment of route." Article 5 provides that "The additional [airfare] amount [i.e., in excess of direct and indirect costs] to cover financial costs and profitability shall result from the following: a) As financial cost: interest accruing on the fixed assets allocated to the service, after deducting amortization and the company's own capital stock, using updated values in all cases, plus interest on the current assets based on a percentage of the updated fixed assets allocated to the service, as fixed by the administrative authority; b) As profitability: interest on the company's own capital stock [i.e., equity] used for the operation."

Respondent to conduct annual airfare reviews to ensure that the airfares in force implement the airlines' right to a TER (Art. 10). Respondent is also permitted to modify airfares between annual reviews if certain changes in costs occur (Art. 6).[540]

532.    Respondent disagrees with Claimants' assertion that Decree 6875/1971 applies generally to airfares on all routes. Instead, Respondent asserts that the Claimants confuse the TER concept under Article 42 of the Air Business Law with the concept of economic supplementation or subsidization for unprofitable routes under Article 6 of that same law.[541] According to Respondent, Decree 6875/1971 *only* regulates the special circumstances of Article 6 and *not* the general circumstances of Article 42.[542] As Respondent explains Article 6 and Decree 6875/1971:

> [I]n the event that unreasonable airfares are charged for regular air transport services which are of special interest to the Nation in routes or portions of routes declared to be of general interest, the so-called economic compensation provided for in Article 6 of Law No. 19,030 applies. For the purpose of determining whether the economic compensation should be granted, Article 6 provides that the benefits obtained by domestic carriers in rendering the rest of the regular air transport services awarded, as a result of charging fares that are higher than the reasonable airfare, will offset the economic compensation to be granted. Presidential Decree No. 6875/1971 regulates the method for determining such economic compensation, which is not granted at will, but is subject to the fulfillment of certain conditions[.][543]

533.    In other words, according to Respondent and its experts, Article 6 is a specialized provision of the Air Business Law by which the Argentine government will subsidize airlines that fly unprofitable routes declared to be of special interest to the state, unless the airline is able to offset

---

[540] Cl. Mem. ¶¶ 86-87; Cl. Reply ¶ 128. Claimants note that additional criteria for calculating fair and equitable airfares are set forth in Resolution 357/78 (1978). (Cl. Mem. ¶ 89; C-64) It is unclear, however, how this Resolution fits with the mechanism described in Decree 6875/1971, or whether the Resolution is still applicable today, 35 years later (the legal distinction between decrees and resolutions is also not entirely clear). The Resolution notes the importance of determining fair and equitable fares, as well as having a methodology to reliably calculate airline costs, and then requires airlines to report their costs using a reporting system. The Resolution requires the Airlines to temporarily use a different cost reporting system in light of their higher costs, and states that these higher costs will be factored into their average fares.

[541] Resp. Rej. ¶¶ 371, 373. The full text of Article 6 is as follows: "The Executive Branch of the Federal Government shall subsidize national carriers rendering regular air services, thus covering any losses caused by non- Economically Reasonable Airfares for scheduled air services of special interest to the Argentine State, carried out in routes declared of general interest. Profits made by operating the remaining scheduled air services, with higher airfares, will offset any subsidized amounts."

[542] Resp. Rej. ¶ 372; Donato ER2 ¶ 17.

[543] Resp. CM ¶ 641.

any such losses through its other, profitable routes.[544] It says that, Decree 6875/1971 supplies the mechanism for determining only that subsidy. Respondent argues, moreover, that carriers are not under a duty to provide services to these unprofitable routes, and they are only entitled to compensation if they meet the necessary conditions under the terms of Article 6.[545] Respondent argues that if Claimants considered that the airfares for internal regular air transport services for passengers on certain routes or route segments were unprofitable, they should have requested a subsidy according to the established procedures and conditions.[546] Respondent points out that Claimants did not seek "supplementation" or "subsidization" for specific unprofitable routes, nor did they ever refer to Article 6 or Decree 6875/1971 in their requests for airfare increases.[547]

534.   In response to Respondent's arguments on the relevance of Decree 6875/1971, Claimants acknowledge that "Decree No. 6875/1971 implements the economical compensation mechanism set forth in Article 6 of the Air Business Law" and that Article 6 of the ABL provides for compensation "in cases where [the Airlines] sustain losses caused by uneconomical or unprofitable routes, i.e., routes subject to *tarifas no retributivas* or below the TER-standard that are declared by the Government to be of 'special interest to the nation[.]'"[548] Claimants then argue that

---

[544] *See* Testimony of Professor Marina Donato, Transcript pp. 859-860 ("One mustn't confuse this guidance or this mandate that Article 42 gives with what is provided for in Article 6, which refers exclusively within the law that I've mentioned, Law 19,030, to economic complementation.  This Article 6, which is elliptically referred to as on economic complementation, was regulated by Decree 6875 of 1971, which answers purely and exclusively to the scope of this Article 6, which establishes a regime of economic complementation.").

[545] Resp. Rej. ¶¶ 367-369.  *See also* Testimony of Prof. Donato on both points ("[Article 6 of the Air Business Law] is applied only when there are—there's an occurrence of a series of measures on a cumulative basis.  First, the declaration of the services as being of special interest to the Nation; Second, when the routes in question are declared to be of general interest; and finally, when the benefits obtained—or the profits obtained from the rest of the network of the given operator or carrier are not sufficient to cover those deficits that might be caused by a break—by an economic bankruptcy in the operator or operators.  This regime of economic complementation…is applied only when those elements or conditions occur at the same time.  And…at the request of a Party, when a carrier finds itself in the conditions I just mentioned, it asks the State to apply and to be a beneficiary, if appropriate, and if they meet the characteristics for this benefit called economic complementation or economic supplementation." (Transcript at pp. 860-861)) ("[I]f a business person is dissatisfied because he cannot make money because it doesn't make money out of one single route, well, this businessperson has two options.  First, to go with the economic supplementation regime.  And, of course, he has to meet the requirements that I have already stated.  This is a special benefit that applies to special circumstances. … The second is to ask for the suspension of the service in connection with a certain route or a certain portion of that route." (Transcript p. 890-891)).

[546] Resp. Rej. ¶ 370.

[547] Resp. PHB ¶ 91.

[548] Cl. CC Rej. ¶ 53.

> [T]he effect of Article 6 and Decree No. 6875/1971 as part of the regulatory framework applicable to airfares is twofold: i) these instruments confirm that the right to Economically Reasonable Airfares [ERA] is an overarching right applicable to all routes flown by air carriers, i.e., the economic compensation mechanism derives from the application of the right set forth in article 42 of the Air Business Law [ABL]; further, ii) Decree No. 6875/1971 explains in detail the methodology according to which the regulator must set airfares for them to comply with the [ERA] standard, i.e., it spells out the scope of the right to [ERA] by providing that airfares must cover costs and allow for a fair margin of return in order to meet the legal standard.[549]

535. The heading and preambular language of Decree 6875/1971 indicate that the decree specifically regulates Article 6's routes of "special interest" and the provision of subsidies when these routes incur losses:

> Section 6 of the Commercial Air Transportation Policy Law No. 19,030 determines the basic conditions for the Executive Branch's economic subsidies to domestic air carriers.
>
> …
>
> The system to be implemented by this regulation should refer to scheduled air services meeting the public interest requirement set forth in Section 6 of Law No. 19,030.
>
> Considering that its aim is to offset operating losses resulting from air fares approved by the Executive Branch for social or political interests at stake, or from insufficient traffic potential, the economic subsidy system should be timely applied and cover all aspects to ensure the day-to-day operations of the public service concession holders.[550]

536. Title II of the Decree, to which Claimants primarily refer, is entitled, in translation: "Method to Determine the Subsidy for Companies Providing Scheduled Passenger Services." The word "subsidy" (Respondent translates this as "supplementation," and the term in the original Spanish is *complementación económica*) invokes the idea of compensation. However, the language of Article 3, within Title II, does appear to refer to *all* routes, and not only those that are unprofitable or of "special interest" and that therefore require subsidization or supplementation:

> Article 3 — The administrative authority [i.e. the Secretary of Transportation] shall perform the necessary technical and economic studies to determine the economically reasonable airfare for passengers [flights] *in all the routes and segments of routes*, based on the load factor approved by the administrative authority. [emphasis added]

537. Articles 4 and 5 describe the costs and profitability measurements that are to be considered in determining the TER. Article 6 indicates when the Secretary of Transportation may review the

---

[549] Cl. CC Rej. ¶ 56.
[550] C-62.

TER during the fiscal year. Only in Article 7 is specific reference made to unprofitable routes: "The State shall grant subsidies (*complementación económica*) to offset the economic losses of public service concession holders arising from fixed fares lower than the economically [reasonable airfare] (*tarifa económica retributiva*) for the services set out in Title I hereof." Article 7 therefore indicates that in the event that the fixed fare for a given route is set lower than the TER that has been normally calculated for that route, subsidies or compensation may be granted to the airline.

538.     The Tribunal notes that while Respondent and its expert, Professor Donato, have asserted that a company seeking a subsidy under Decree 6875 must request it after meeting the specified conditions, Decree 6875 seems to call for a slightly different procedure. In Title III of Decree 6875, Rules for Granting an Economic Subsidy, Article 10 provides that:

> Before December 1 of each year the State shall review the fare structure to become effective the following year, taking into account any proposals made by the companies providing the services, which should aim towards becoming self-sufficient. Thirty (30) days prior to the commencement of each period of operation, the administrative authority shall determine the services per routes or route segments for which, in view of the public interest, it is advisable to set a fare lower than the economically reasonable airfare. The companies shall be notified, on the same date, of the aggregate preventive subsidy that will be granted to each of them upon application of the method described under Title II. They may file their comments within the following fifteen (15) days, and the administrative authority shall issue a final decision.

539.     The Tribunal's review of the relevant provisions of the Air Business Law and Decree 6875/1971 together with the evidence of the Parties' legal experts indicates that the TER is the fundamental principle applicable to all domestic air routes and is the standard against which Decree 6875/1971 determines whether subsidies or supplementation of airfares declared to be of special interest to the Government of Argentina is warranted.   In order to achieve this, Decree 6875/1971 sets out the components of the economically reasonable tariff and provides direction on how those components should be calculated.

540.     Pursuant to Article 6 of the Air Business Law, the Government of Argentina is required to subsidize or compensate carriers rendering regular domestic transportation services for losses caused by the application of airfares which are not economically reasonable (*tarifas no retributivas*) or below the TER standard and which have been declared to be of special interest to the Government of Argentina.  Decree 6875/1971 implements Article 6 of the Air Business Law

and sets out the mechanism for doing so, including the determination of the economically reasonable tariff against which the non-economically reasonable airfare (*tarifas no retributivas/tarifas fijadas, que sean inferiores a la tarifa económica retributiva*) are measured in order to determine the subsidy or supplementary compensation due (Art. 6 of the Air Business Law and Art. 7 of Decree 6875/1971). As noted above, Article 3 of the Decree provides that the regulatory authority (the Secretariat of Transportation) is directed to undertake the necessary technical and economic studies to determine the TER for passengers [flights] for all routes and route segments. This direction is not specifically directed to non-economical routes of special interest to the Government of Argentina, but appears to apply generally to all routes and route segments. This appears logical since without determining the TER for a given route, it would appear difficult to determine whether the fare for that route was lower than (*inferior*) to the TER.[551] Article 3 then goes on to provide that the said airfare (the TER) (*Dicha tarifa*) shall cover the indirect and direct costs of operating the routes or route segments and add an amount for financial costs and an approved margin of return for each operator.

541. Articles 4 and 5 of the Decree describe how the direct and indirect costs of operation are to be determined, notably providing that direct costs shall be calculated based on the necessary inputs (fuel, lubricant, air personnel, maintenance, insurance and devaluation) for the correct and efficient operation of the services. The Tribunal notes that this is consistent with Dr. Mata's evidence on the nature of the TER when he states that the airfare "must allow the concessionaire, when operating efficiently, to obtain proceeds in an amount adequate to cover the costs of operation, maintenance and expansion of services, as well as allow for a business profit."[552]

542. Accordingly, the Tribunal concludes that while Decree 6875/1971 addressed and implemented the specific regime created by Article 6 of the Air Business Law relating to subsidies for losses incurred by the application of non-economically reasonable airfares on routes declared of special interest to the Government of Argentina, it also sets out the components of the TER and

---

[551] KPMG's review of the regulatory framework and Decree 6875/1971 is consistent with this. *See* KPMG ER1 ¶ 11.2.9.
[552] Mata ER3 ¶ 33. This is consistent with the Argentine jurisprudence on the principle of "just and reasonable tariffs" in the case of public service concessions. In this regard, *see* Cl. CC. Rej. ¶¶ 46-47, 58 and the sources cited there.

how it should be calculated. It also required the Secretariat of Transportation to conduct the necessary technical and economic studies to determine the TER for all routes and route segments. This is consistent with the Tribunal's conclusion set out above that under the regulatory framework governing domestic airfares, the TER applies to all domestic routes.

543. The Tribunal's review of the evidence indicates that the Secretariat of Transportation did conduct a number of studies of airfares during the period from 2001 to 2008, often in response to requests from the Airlines for fare increases and other relief. These will be addressed separately, below. However, there was no evidence that the Secretariat of Transportation, or other governmental agencies, determined the TER for each domestic route or route segment on an annual or regular basis. Further, there was no evidence regarding whether such reviews were carried on at any time prior to 2001.

544. In addition, as previously noted, no specific declaration that particular routes were of "special interest to the Nation" was made by the Secretariat of Transportation. Further, although the Airlines made repeated requests for increases in the airfares and other forms of relief, there was no evidence that the Airlines, Interinvest or Claimants ever made an application for the granting of subsidies or supplementary compensation pursuant to Article 6 of the Air Business Law and Decree 6875/1971.

### *Airfare bands*

545. An additional component of Claimants' arguments on the alleged airfare squeeze is that the airfare band permitted by Argentine regulations during 2001 - 2008 was too narrow, preventing Claimants from implementing an effective yield management strategy. According to Claimants, the airfare band system was implemented in Resolution 275/87, providing a "base" or reference airfare and permitting a ceiling above and a floor below this base by a fixed percentage.[553] Claimants maintain that while the airfare bands did not permit fully open competition, these measures were designed to permit some degree of competition and to increase management's ability to make short-term and long-term strategic decisions for the companies.[554]

---

[553] C-65; C-66.
[554] Cl. Mem. ¶¶ 92-95; Cl. Reply ¶¶ 184-190..

546.    Claimants claim that as a consequence of the continuous increases in costs between 2001 and 2008 and the economically unreasonable or insufficient airfares, the airfare bands were effectively narrowed and the Airlines were unable to use the airfare bands to implement standard price differentiation and yield management techniques.[555]   Claimants also say that in 2012 the airfare bands were expanded back to pre-2002 levels.[556]

547.    Respondent does not appear to oppose Claimants' description of the regulatory framework for airfare bands.  However, Respondent says that the airfare band system existed well before 2001 and continued to apply beyond the period of 2001 to 2008.[557]  Further, Respondent says that the existence of the airfare band system did not grant operators the right to demand a certain band width; instead this was within the discretion of the Secretary of Transportation.[558]  In addition, Respondent says that the airfare band width ratio remained practically the same from the end of 2001 and denies that the band width was expanded after the expropriation of the Airlines.[559] According to Respondent, the airfare bands established under the regulatory framework allowed the implementation of yield management strategies in order to obtain the greatest value for each seat.   However, according to Respondent, the Airlines failed to implement a proper yield management strategy and to take advantage of improvement opportunities due to bad revenue management.[560]

548.    As noted previously, the airfare band system was introduced in 1987.  Further, the initial airfare bands of a 20% variation were subsequently increased to 60%, briefly reduced to 35% and then re-established at approximately 60% by way of Decree 1654/2002.[561]   There was no indication that the widths of the airfare bands were subsequently modified by way of resolution or

---

[555] Cl. Reply ¶¶ 184-189; CLEX ERSupp. ¶¶ 32-41.
[556] C-868: Resolution 23/2012 which appears to have added an additional, expanded airfare for flights booked less than 10 days before departure.
[557] Resp. Rej. ¶ 379.  As noted above, Decree 294/2016 discontinued maximum airfare bands in 2016.
[558] Resp. Rej. ¶ 387.
[559] Resp. Rej. ¶ 391 and the sources cited there.
[560] Resp. Rej. ¶¶ 384-386, 388-389; Keifman ER2 ¶ 19.  Respondent maintains that the bad revenue management it alleges was confirmed by the fact that revenue management results were poor in both domestic flights and international flights which were not subject to airfare bands.  Respondent also disputes Claimants' comparison between the airfare bands in the Argentine regulatory framework to the rates derived from the deregulated Chilean and Peruvian markets.
[561] *See* ¶ 387 above and the sources cited there.

decree until 2012 with the adoption of Resolution No. 23/2012 which introduced an expanded maximum airfare for flights booked less than 10 days before departure.  As a result, the Tribunal understands Claimants' complaint to be based primarily on the lack of an appropriate benchmark or reference tariff (*tarifa de referencia*) rather than a narrowing of the airfare bands as such.

### C.  Did the airfares set between 2001 and 2008 comply with the TER standard?

549.  Claimants assert that Respondent failed to set airfares in compliance with the TER standard, in violation of the FET provision of the Treaty.[562]  Claimants further request a finding that in the May 29, 2008 Board of Directors Meeting, the Government of Argentina expressly acknowledged that domestic airfares were uneconomically low, giving rise to losses to the Airlines within a range of USD 390-450 million.[563]

550.  Respondent says that its regulation of domestic air transportation fares for passengers was in compliance with the regulatory framework and fair and reasonable.  It says the airfare squeeze alleged was legally and practically impossible and, in any event, there was no airfare squeeze.[564]  Respondent also submits that the losses suffered by the Airlines and their dire condition in 2008 was the result of the manner in which Claimants took over the Airlines and their poor management of the Airlines.[565]

### 1.  Were airfares sufficient to permit the Airlines to cover their costs and earn a reasonable margin?

551.  The Tribunal addresses first whether the airfare increases granted were sufficient to cover the Airlines' cost increases and permit a margin for profit.  It then addresses Respondent's defense that the true cause of the Airlines' losses was their poor management by the Claimants.

---

[562] Cl. PHB ¶ 36.
[563] Cl. PHB ¶ 54.
[564] Resp. PHB ¶¶ 77-95, 121.
[565] Resp. Rej. ¶¶ 80-124, 362, 389; Resp. PHB § IV ¶¶ 281-285.  Respondent's Counterclaim is based in significant part on the alleged inefficiency and mismanagement of the Airlines by the Marsans Group: Resp. CM ¶ 907; Resp. Rej. ¶ 822.

**Claimants' requests for airfare increases and Argentina's responses**

552.    Claimants argue that in the face of substantial cost increases between October 2001 and July 2008, the Government of Argentina approved four "economically insufficient airfare increases," the last two only weeks before the State took control of the Airlines.[566] According to Claimants, none of these four increases complied with the TER standard. Claimants assert that these numerous requests to increase fares, which they made both on their own and as part of the Argentine airline industry, demonstrate that the fares were set below the TER standard and impeded the Airlines' ability to cover costs and obtain a fair margin of return.[567] Claimants' expert, Compass Lexecon, says that the fare increases were "arbitrary in light of the regulatory framework, as none of these increases were based on an estimate of the TER."[568]

553.    Claimants also assert that Respondent recognized the insufficiency of the fare increases by "commit[ing] in the same decree or resolution to grant tax benefits, insurance cost relief and fuel subsidies to alleviate the burden on the Argentine Airlines caused by the insufficient approved airfare."[569] Moreover, Argentina failed to implement the promised tax relief.[570]

554.    For its part, Respondent argues that it never changed the regulatory system applicable to airfares during Claimants' tenure; the same regulations applied as before Claimants took control of the Airlines.[571] Respondent asserts that the Government of Argentina was highly responsive to the problems within the airline industry between 2001-2008, granting four airfare increases between 2001 and 2008 that raised reference fares by 67% and cap fares by 135%.[572] It notes that it provided other forms of relief to airlines, including exemptions from taking out insurance within the country and establishing a fuel subsidy.[573]

---

[566] Cl. Reply ¶ 139.
[567] Cl. CC Rej. ¶ 81.
[568] CLEX ER Supp. ¶¶ 15-18.
[569] Cl. Reply ¶¶ 139-140.
[570] Cl. Reply ¶ 141.
[571] Transcript p. 1739; Resp. PHB ¶ 84.
[572] Resp. CM ¶ 405.
[573] Resp. CM ¶¶ 376-377.

555.    Respondent furthermore notes that there was no requirement that the Airlines provide services on certain routes if they were deemed too unprofitable, and that carriers had the right to request suspension or interruption of the service if they considered that the rate was not profitable.[574] Respondent asserts that Claimants never invoked Article 6 of the Air Business Law or Decree 6875 during their control of the Airlines, nor did they apply for a subsidy under these regulations.[575]

556.    Finally, with respect to the tax exemption measures allegedly promised but not delivered by the Government of Argentina, Respondent asserts that it was under no legal obligation to provide these measures, that the recommendations contained in the decrees did not constitute binding promises, and that the Executive did not have any authority to enact the tax relief measures envisioned in the decrees, which had to be granted by Congress.[576]

### *2002: Declaration of State of Emergency for Commercial Air Transport*

557.    Claimants note that soon after they began managing the Airlines in late 2001, the Government of Argentina declared a state of public emergency in the social, economic, administrative, financial and exchange areas.[577] On January 9, 2002, the Government devalued the peso to a fixed rate of ARS 1.40 per USD 1.00. A month later it established a floating exchange rate, and the value of the peso immediately fell on the open market.[578]

558.    On September 4, 2002, Decree 1654/02 Declaring a State of Emergency for Commercial Air Transport provided for the first airfare increase.[579] In that decree, the Government of Argentina described the following:

> The costs of the commercial air transport sector include a high percentage of imported inputs; also, the cost of domestic inputs, such as fuel, has also increased.
>
> Specifically, the causes of the deep-rooted crisis of this sector are, among others, the tight credit that prevents airlines from securing financing, the increase in the price of the type of fuel used, the higher

---

[574] Transcript pp. 1783, 1784.
[575] Transcript p. 1742.
[576] Resp. CM ¶¶ 379-381.
[577] Law No. 25,561: C-68.
[578] Cl. Mem. ¶ 103.
[579] C-80.

insurance costs, and the direct incidence that exchange rate fluctuations have on the air transport sector. Therefore, it is necessary to expressly declare the emergency of the air transport sector within the framework of Law No. 25,561, to adopt the policies designed to offset existing imbalances that airlines need to continue operating, and, as a result, providing services to users and preserving jobs.

Excessive supply in a market depressed by recession, on the one hand, and prices misaligned with the operational costs of companies, on the other, may give rise to market predatory practices likely to lead to an absurd price-based competition, which in turn may prevent a business from operating safely and profitably, during a reasonable period of time. As a consequence of the above, it is advisable to adjust the current airfare benchmark and price ranges used to determine the prices charged to the public by operators of scheduled domestic air transport for their services, in order to make them consistent with the current costs of the industry.

559.   According to Respondent, the measures contained in this Decree had been requested by another domestic airline, Dinar, which had requested an average increase of 73% on the maximum fares.[580] Respondent notes that ARSA had proposed only smaller increases averaging 34.5%, and that ARSA had critiqued Dinar's request, "alleging that such request was not financially viable, and that for increases on current levels to be accepted by users, gradual amendments had to be considered."[581] According to Respondent, the Government of Argentina ultimately granted an increase of 41% in maximum airfares, and of 45% in minimum airfares.[582]

560.   Claimants dispute the quantification of the increase on maximum airfares, and peg it instead at a "very modest" 20% increase.[583] Claimants assert that this increase was "not nearly sufficient, however, to account for the continuous drop in the US$ value of the domestic airfares, coupled with the steep increase in the Argentine Airlines' cost structure, which was mostly set in US dollars."[584] Moreover, they argue that according to Argentina's own "cost index," the Decree should have raised airfares by 88%.[585] They do not directly respond to Respondent's contention that ARSA requested only a 34.5% increase at the time.

---

[580] RA-334.

[581] Resp. CM ¶ 393; RA-335.  *See also* testimony of Professor Keifman, Transcript p. 883.

[582] Resp. Rej. ¶¶ 337-339.

[583] Cl. Reply ¶ 153, *see also* fn. 302, in which they argue that this increase only served to "restore" a prior reduction in width of the airfare bands and add an additional 20%.

[584] Cl. Mem. ¶ 117.

[585] Cl. Reply ¶ 153. Here, Claimants refer to Argentina's "cost index" as the calculation that was used in a February 16, 2006 Report: C-862.  However, it does not appear that this cost index was actually used to assess the fare increase that was ultimately issued in the 2002 Decree (nor, for that matter, is it even clear that Argentina applied this cost index in determining the next fare increase in August 2006 that followed the February 2006 Report).

561.    In addition to its provisions on airfares, the 2002 Decree also included provisions for the preparation of a bill proposing measures to cut the value-added tax for fuel by 50%, create a VAT exemption for aircraft leased with a purchase option, to permit airlines to use VAT surpluses to pay any other taxes and Social Security obligations, and create a VAT exemption for insurance policies purchased outside Argentina.  The Parties appear to agree that these tax provisions were never implemented; their arguments regarding these provisions are addressed below.

### 2004: Claimants' requests denied

562.    Respondent points out, and Claimants do not refute, that Claimants did not request an additional airfare increase until 2004, two years later.[586] In October 2004, Claimants wrote to the Office of Transportation requesting a rise in the reference or cap rate of 8% to account for the increase in the price of fuel.[587] This request was rejected in December 2004 on the basis of two Technical Reports (one for each airline) dated October 28, 2004, that were issued by the office of Undersecretary Cirielli.[588]

563.    Claimants concede that neither the reports nor the rejection letters disputed the Airlines' right to a TER. They argue, however, that Argentina wrongly focused on the Airlines' increased revenues in 2003 rather than their increased costs. Claimants argue that this focus was wrong because "costs to be taken into account for the purpose of setting the airfares are beyond the airlines' control, whereas the revenues are at least partially a function of the efficient management of the company," and that considering revenues would "indirectly punish efficient management of airlines and reward or subsidize inefficient management practices."[589] Claimants argue that such an analysis is "in clear contravention of the regulatory framework in place."[590] According to Claimants, Respondent is required to set airfares taking into account the four factors listed in Decree 6875/1971: i) direct costs, ii) indirect costs, iii) financial costs and iv) a margin of return.[591] They argue that "[t]he ability of air carriers to make a reasonable margin of return is one of the

---

[586] Resp. CM ¶ 397.
[587] C-80.
[588] C-82.
[589] Cl. Mem. ¶ 129.
[590] Cl. Reply ¶ 178.
[591] Cl. Reply ¶ 179.

objectives of the regulatory framework[.]"[592] Claimants also argue that it was a mistake for Respondent to focus only on the period preceding the request, rather than trending current and future increases in fuel prices.[593]

564.    According to Respondent, the Reports concluded that both Airlines had been obtaining positive gross margins with an increasing trend and that they had even begun to monopolize certain routes.  The Reports also found that the cost increases did not affect the financial equation of the companies, which had larger positive margins on the domestic market.[594]

565.    Respondent notes that the Secretary of Transportation prepared two new technical reports, one for each airline, in March 2005 in response to a motion for reconsideration that had been filed by Claimants. These reports concluded that the Airlines had achieved a major recovery in operating profitability.[595]

### 2005-2006: Strikes, Government pressure, the June 2006 Agreement and a fare increase

566.    According to Claimants, two labor unions of the Airlines held a major strike at the end of November 2005. According to Mr. Díaz Ferrán, this strike that lasted nine days, "almost completely shut down the Argentine Airlines," and further destabilized the already precarious financial position of the Airlines.[596] In this context, say Claimants, the Airlines met in December 2005 with President Nestor Kirchner, Secretary of Transportation Ricardo Jaime and the President's Chief of Staff to again request an increase in fares.[597] According to Mr. Díaz Ferrán, the Chief of Staff promised an increase in fares in the first quarter of 2006.[598] By March 2006, the fares had not increased. Around this same time, according to Claimants, one Argentine publication

---

[592] *Id.*
[593] Cl. Mem. ¶ 129.
[594] Resp. CM ¶ 398.
[595] Resp. CM ¶ 400; RA-338.  In its conclusions, this report stated that the basis for the requested adjustment of the airfares was not only an increase in costs but also a decrease in profitability (p. 3/4).
[596] Díaz Ferrán WS ¶ 28.
[597] Cl. Mem. ¶ 134.
[598] Cl. Mem. ¶ 135, Díaz Ferrán WS ¶ 36.

reported on the government's "secret plan" to get a hold of the Airlines, and asserted that the government was delaying fare increases in order to further pressure Claimants.[599]

567.   Claimants assert that they held additional meetings with President Kirchner in May 2006 and were again promised that the fares would be increased.[600] They allege that this time President Kirchner's promise was conditioned upon the Airlines' conclusion of an agreement with the unions for a 25% salary increase.[601] Around this same time, Secretary of Transportation Jaime separately indicated that Argentina would only increase fares (and also withdraw its challenges to the Airlines' financial statements) if the government could increase its shareholding and control in ARSA.[602]

568.   The June 2006 Agreement between the Airlines, Interinvest and the Government of Argentina will be discussed further in Section VIII D.4., below.  For present purposes, it suffices to note that Claimants consider the "core" of their negotiations on this agreement to concern an increase in airfares in exchange for increased Government of Argentina participation and withdrawal of judicial proceedings against ARSA's financial statements.[603]   In response, Respondent argues that neither the June 2006 Agreement nor its addendum contained any stipulation regarding a commitment of airfare increases.[604]   A review of the text of the Agreement and Addendum reveals that neither document addresses airfares or the TER.[605]

569.   In August 2006, Respondent issued Decree 1012/2006,[606] which permitted an increase in airfares of 20%.[607] The decree also included a fuel cost subsidy and directed the preparation of

---

[599] Cl. Mem. ¶¶ 190-192, citing an article in periodical *Edicion i* entitled "The Secret Plan to Get Hold of Aerolineas" (C-146).
[600] Cl. Mem. ¶ 136; Pascual Arias WS ¶ 36; Díaz Ferrán WS ¶ 42.
[601] Cl. Mem. ¶ 193.
[602] Cl. Mem. ¶ 195.  The Parties strenuously disagree on the issue of Respondent's "restoration" of its 5% share in ARSA.  *See* Section 4 for additional information on these arguments.
[603] Cl. Mem. ¶ 200.
[604] Resp. CM ¶ 465.
[605] C-134.  Rather, the Agreement addresses (1) Respondent's 5% option and the features of its Class A shares, (2) Respondent's agreement to desist in contesting the 2002-04 financial statements, (3) Respondent's option to raise its stake to 20%, and (4) steps to make a potential public offering of shares, while the Addendum addresses the features of Respondent's Class A shares, modifying the terms of provision (1) of the Agreement.
[606] C-83.
[607] Cl. Mem. ¶ 137; Resp. CM ¶ 401.

legislative bills granting VAT exemptions similar to those that had been included in the 2002 Decree.[608] Claimants argue that this 20% increase was insufficient in light of the spike in costs since the 2002 Decree, and say that Argentina once again failed to implement the VAT exemptions.[609]

570.    Claimants refer to a technical report dated February 16, 2006, which they say was the basis for the August 2006 increase, and which they say "strongly recommended an airfare increase on the exact same basis that had been alleged by the Argentine Airlines in 2004 and 2005."[610] However, Claimants argue that the 20% increase granted in the August 2006 decree was "facially insufficient, even according to the GOA's analysis conducted in the February 2006 Report."[611] Specifically, Claimants argue that in the February 2006 Report, the Government of Argentina determined that since the 2002 fare increase, fuel costs alone had increased 97%, and that salaries had increased 57%, other costs aside. Nonetheless, Decree 1012/2006 granted only a much more modest 20% increase in airfare caps.[612]

571.    Respondent, for its part, does not reference the February 16, 2006 report but instead references a March 16, 2006 "Technical report on preliminary assessments of amounts to be reimbursed for commercial domestic air routes," that served as the basis for Decree 1012/2006. The contents of this report are different from the February 16, 2006 report cited by Claimants, although the report is authored by the same individual who authored the February report.[613]

### *2007-2008: Additional collective and individual requests for fare increases*

572.    On three separate occasions in 2007, CLARA, the association of major airlines operating in Argentina,[614] requested that the Secretary of Transportation take measures to mitigate the damage caused by low airfare caps.[615] In their November 8, 2007 letter, for example, CLARA

---

[608] Cl. Mem. ¶ 143.
[609] Cl. Mem. ¶¶ 139, 143.
[610] Cl. Reply ¶ 180; C-862.
[611] Cl. CC Rej. ¶ 72.
[612] *Id.*
[613] Resp. CM ¶ 401; RA-446.
[614] CLARA's members included ARSA, AUSA, LAN Argentina, Andes Líneas Aéreas and Sol Líneas Aéreas.
[615] C-75 (May 2007), C-76 (September 2007) and C-77 (November 2007).

requested a rise of 40% in air fares as well as the implementation of the tax measures provided for in the 2006 Decree. According to Claimants, Argentina ignored each of CLARA's requests.[616] Respondent argues that CLARA's requests were granted by two resolutions that were issued in April and May 2008.[617]

573.    In March and April 2008, the Airlines sent two urgent requests for swift action to raise airfares, emphasizing their shortfall and asserting that the lack of action would have "an immediate impact" including suspended flights and payment problems.[618] Claimants point in particular to the April 29, 2008 letter, in which they identified losses of USD 100 million suffered in the first quarter of 2008 due to the below-TER airfares. Claimants also noted in this letter that "[i]f the provisions of Executive Order 1012/2006 had been applied since it was issued, that is to say, since September 2006 through April 2008, the relevant figures would range between USD 390,000,000 and USD 450,000,000." They say that at the May 29, 2008 meeting of ARSA's Board of Directors, the Government of Argentina's representatives confirmed the accuracy of the facts described and damages detailed in the April 29, 2008 letter, and stated that "the National State is aware of this situation."[619]

574.    Around this same time, in March 2008, a report assessing airfares was prepared for the Secretary of Transportation.[620] This report was prepared at the request of the Secretary of Transportation in order to provide information in relation to a possible increase in domestic airfares. It reviews the cost increases of the Airlines between August 2006 and December 2007

---

[616] Cl. Mem. ¶ 154.
[617] Resp. CM ¶ 402.
[618] Cl. Mem. ¶ 156; C-78; and C-79.
[619] Cl. Reply ¶ 156; C-86.  The ARSA Board minutes of the meeting read, in relevant part, as follows:
    Following discussion of the matters and even though the Directors found the terms of the letter to be correct as of the date the letter was sent, they unanimously agreed not to reduce operations or suspend flight destinations for the time being.  Directors Julio Alak and Vilma Castillo took the floor and stated that, because the letter was sent to the Secretary of Transportation on April 29, it can be said that the measures that were therein requested were being gradually implemented, given the synergy between their issue and implementation. They further stated that the Federal Government was aware of the situation and that the ratification took place after the letter had been sent, as a result of which, in their capacity as Directors appointed by the Federal Government, not only were they not unaware of the factual situation but they knew that efforts were being made in that regard.
[620] C-856.

and notes that it does not estimate the economic retributive tariff [TER] "corresponding to each route and route segment, as provided in Article 42 of the Law No. 19,030 [Air Business Law], since that requires the assistance of a team of experts that defines the model air carrier for the domestic market."[621]

575.     In April and May 2008, the Argentine government granted two increases, each providing for an  increase in fares of approximately 18%, by means of two Resolutions.[622]

576.     Claimants note that the Government of Argentina stated that it granted both of these airfare increases "on account…[and] as a result of bring[ing airfares] in line with the provisions of Law 19,030 [Air Business Law], Section 42."[623] According to Claimants, "[t]his constitutes a recognition that, up to that date, airfares did not comply with the TER."[624] In any case, Claimants argue that these two increases had "no impact whatsoever on the Argentine Airlines' operations simply because the GOA took full control of the Argentine Airlines in July 2008."[625] Claimants also argue that the Government of Argentina acknowledged that the April 2008 increase was below the Economically Reasonable Airfare.[626]

577.     Respondent, on the other hand, argues that the parties agreed to the second 18% increase as part of the May 15, 2008 Master Agreement signed between Argentina and Air Comet/Interinvest, which was then effectively granted by Resolution ST No. 315/2008. Argentina says that "under that agreement, both parties agreed—without reserves—that such additional 18%

---

[621] Cl. CC Rej. ¶ 84; C-856.  The report appears to calculate the airfare increases required to the existing maximum to reach the "*tarifa de equilibrio*" or balanced airfare on the basis of various assumptions.
[622] C-181; C-182.
[623] C-181; C-182.
[624] Cl. Reply ¶ 169.
[625] Cl. CC Rej. ¶ 82.
[626] Cl. Reply ¶ 208.  *See also* Decree 257/2008:C-181 (noting that "given the complexity inherent in the determination of air transportation costs, the fact that such costs are dependent upon international and local variables, and the fact that they have considerable weight in the definition of a satisfactory adjustment procedure that can continue to be applied over time, external technical assistance has been sought to determine the remunerative fares for Argentina's commercial air transportation market.  …[A]ccordingly, until such time as that has been achieved, the applicable increase is to be supplemented with the scheme established by Decree 1012/06, Section 3, which scheme shall be deemed to be supplementary and applied towards future fares, entirely in accordance with the provisions of Section 6 of the aforementioned Decree.").

increase was adequate—rather than insufficient—and that was precisely the increase percentage granted by the Argentine Republic."[627]

### *Fare increases subsequent to re-nationalization*

578.    Claimants note that following Respondent's expropriation of the Airlines, Respondent increased airfares at least eight times: in November 2009, June 2010, March 2011, May 2011, February 2012, June 2012, November 2012 and May 2013.[628] According to Claimants' expert, Compass Lexecon, "[a]lthough the cost of jet fuel in 2013 is approximately the same as it was in 2008, statutory airfare levels doubled since expropriation. In fact, the only cost component that increased since expropriation seems to have been local salaries, which according to the Secretariat of Transportation represented only 18% of the airlines' cost structure in 2008."[629]

579.    To illustrate the evolution of airfares during the period of 2001 to 2013, the Claimants submitted the following figure:[630]

---

[627] Resp. Rej. ¶ 350.  *See also* C-180: the May 2008 Agreement, which provides in provision 2.1 a commitment "To grant an 18% increase in the prevailing price range of the domestic flights market."
[628] Cl. Reply ¶ 148.
[629] CLEX ER Supp,¶ 29.   *See also* Compass Lexecon Direct Examination Slide 17 and Claimants' Opening Counterclaim Presentation Slide 32.
[630] *See* CLEX ER Supp, ¶ 29 and Examination Slide 17; Claimants' Opening Counterclaim Presentation Slide 32; Cl. PHB ¶ 38, Figure A.  Respondent objected to the use of this figure at the hearing on the basis that it had not been previously submitted.  However, the Tribunal has found that it is based on evidence in the record and admissible.



*Source: Decrees 1654/2002 and Decree 1012/2006, Resolutions 47/2001, 257/08, 315/08, 227/2009, 118/2010, 210/2010, 64/2011, 112/2011, 23/2012, 49/2012, 778/2012, 265/2013, 1595/2013 (Exs. C-80, C-81, C-83, C-181, C-182, C-863-871, C-966)*

580.    In response to this point, Respondent notes that "increases after July 2008 continued with the [Government of Argentina's] policy of accompanying cost evolution."[631]

**Other promised relief measures**

581.    Claimants argue that in the 2002 and 2006 Decrees, Respondent undertook to provide tax benefits, insurance cost relief and fuel subsidies, but that Respondent never implemented these commitments.[632] Respondent does not deny that certain measures, which depended on the adoption of laws by Congress, were never implemented.  However, it says that other measures, including fuel subsidies, were implemented.

582.    Claimants assert that regardless of which governmental entity was authorized to enact the "promised" benefits, "Argentina cannot escape its international obligations by invoking domestic

---

[631] Resp. Rej. ¶ 393; KPMG ER2 ¶ 5.3.2.
[632] Cl. Reply ¶ 141.

rules governing the allocation of powers between its several sovereign branches."[633] Claimants also argue that these measures, which were promised in addition to the fare increases, constitute "recognition by the GOA that tax benefits were needed [and] demonstrate[] that the approved airfares were not Economically Reasonable Airfares even at that time. In other words, had the approved airfare increase been sufficient for the Argentine Airlines to cover their direct and indirect costs and obtain a reasonable margin of return, why would the GOA commit to grant tax exemptions?"[634]

583.    Respondent argues that it never 'promised' or undertook to grant tax benefits, and that the decrees "only included internal instructions issued by the Argentine Executive for the draft of bills contemplating certain tax benefits. Under no circumstances did these instructions constitute binding promises."[635] Argentina notes that several other bills were also proposed concerning the tax benefits mentioned in those decrees.[636] Respondent argues that as the decrees themselves indicate, changes on tax matters must be made by Congress, and the executive branch lacks the powers to enact them.[637] Finally, Respondent notes that it provided other benefits, including an exemption from the obligation to take out insurance in the country[638] and an Aviation Fuel Subsidy Scheme (RCCA) established in 1012/2006 Decree, which led to disbursements in the form of subsidies between August 2006 and February 2008, 95% of which went to the Airlines.[639]

584.    The language of the Decrees as it relates to the tax measures is indeed precatory. In this regard, the 2006 Decree states "[i]t is, therefore, recommended," "[i]t is also considered advisable to authorize," "[t]he impact of aviation fuel on the companies' cost structure and the increases in costs make it advisable to apply a differential tax treatment[.]"[640] The 2006 Decree also notes that "[s]ince the recommended tax measures require the enactment of a law, the Ministry of Economy and Production and the Ministry of Federal Planning, Public Investment and Services should be

---

[633] Cl. Reply ¶ 161.
[634] Cl. Reply ¶ 159.
[635] Resp. Rej. ¶ 330.
[636] *See* RA-322-RA-327.
[637] Resp. CM ¶ 379.
[638] Resp. CM ¶¶ 418-420.
[639] Resp. CM ¶ 423.
[640] C-83.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 214 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

instructed to submit to the Office of the Head of the Cabinet of Argentina within thirty (30) days a bill proposing the approval of such measures, for the Head of the Cabinet to coordinate the action to be implemented as from the issue of this Decree."[641]  As a result, the provisions relating to the preparation of bills regarding tax measures do not amount to a commitment by the Government to implement such measures.  However, the repeated measures proposed in addition to airfare increases do reflect that the airfare increases granted were not sufficient, on their own, to permit the Airlines to cover their costs and earn a reasonable margin.

585.    In the Tribunal's view, the evidence indicates quite clearly that airfare increases did not match increases in the Airlines' costs.  This is usefully demonstrated by Claimants' experts, Compass Lexecon, in the figure set out below:[642]

---

[641] *Id.*
[642] CLEX ER Supp. ¶ 26.  A comparison of this figure with the evolution of the Airlines' main costs drivers for the period 2008-2013 in CLEX ER3 ¶ 29 indicates how tariff increases between 2002 and 2008 were insufficient to cover the increase in the Airlines' costs during that period whereas tariff increases granted from 2009 to 2013 covered and eventually exceeded the increase in the Airlines' costs for that period.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award



Figure I    Evolution of Airlines' Main Cost Drivers and Domestic Tariffs (2001-2008), in US$ (2001=100)

Source: Compass Lexecon based on INDEC (LECG-36) and (LECG-37), EIA (CLEX-007), US Bureau of Labor Statistics (LECG-39), Resolution MTCT 47/2001 (C-81), Decree 1,654/2002 (C-80), Decree 1,012/2006 (C-83), Resolution ST 257/2008 (C-181), Resolution ST 315/2008 (C-182).

586. According to Claimants' experts, over the period between 2001 through to April 2008, costs increased by 182%, but maximum airfares increased by only 43%, when measured in ARS. When measured in USD, the Airlines' costs fell by only 10.9% while airfares decreased by 36.9%.[643] The Tribunal finds this evidence persuasive and is unable to accept Respondent's position that airfare increases exceeded, let alone covered, the costs of the Airlines during the period in question.[644]

---

[643] Transcript p. 1272; CLEX Presentation Slides Nos. 5-6, 25; CLEX ER3 ¶¶ 36-38.  The Tribunal notes that if the April and May 2008 increases are included in the comparison, airfares increased by 100% by the time of expropriation. Claimants say that the increases which took place in April and May 2008 came too late to be of assistance to the Airlines before the July 2008 Agreement.

[644] In this regard, the Tribunal accepts the position of Claimants' experts that Respondent's analysis is flawed for a number of reasons, notably by estimating the increase in maximum airfares in ARS while representing the evolution of the Airlines' domestic costs in USD.  Claimants' experts note that over the relevant period, the ARS depreciated by approximately 216%.  *See also* Compass Lexecon's critique at CLEX ER3 ¶¶ 36-47.

587.    Further, several of the decrees and resolutions adopted by the Government of Argentina and the Secretary of Transportation reflected an awareness that airfares needed to be increased in order to cover the Airlines' increasing costs and to meet the TER standard, particularly from 2005 forward.  A number of these are referred to above in Section V.[645]  Further, the provisions in the relevant decrees requesting the preparation of bills on tax matters for submission to Congress reflects the need to adopt measures in addition to airfare increases in order to cover the increasing costs of the industry.[646]

588.    Finally, the Tribunal notes the repeated requests by both the Airlines and CLARA, including its member LAN Argentina, for airfare increases, commencing soon after the airfare increase provided for in Decree 1012/2006 through mid-July 2008.  These demonstrate that all of the operators in the air transport industry requested airfare increases and other measures in order to cover their costs and obtain a fair margin of return.[647]  In this regard, the Tribunal notes in particular the Airlines' letter of April 29, 2008 to the Secretary of Transportation urging the adoption of airfare increases and other measures and detailing the lost revenue alleged to have flowed from the failure to grant adequate increases and to adopt other proposed measures (C-79). The minutes of the ARSA Board meeting of May 29, 2008 indicate that the government representatives on the Board were aware of the dire economic circumstances of ARSA and approved the text of the letter of April 29, 2008.[648]

589.    For these reasons, the Tribunal concludes that the domestic airfares regulated by the Secretary of Transportation did not permit airlines operating in the domestic passenger

---

[645] The Tribunal notes here the following: Decree 1654/2002; Decree 1012/2006; Decree 257/2008; Decree 315/2008; the Secretariat of Transportation's Technical Report dated February 16, 2006: C-862; and the March 2008 Report: C-856.

[646] In this regard, *see* the draft bills of March 19, 2003, August 21, 2003, March 11, 2004, March 14, 2004, and October 23, 2007 (RA-322 - RA-327).  The latter (RA-325) refers, amongst other things, to the important increase in costs, in particular of jet fuel, an antiquated tax and regulatory regime that discouraged investment and outdated airfares, as well as "…the losses incurred by all domestic flight carriers in Argentina, as a result of regulated airfares, continuous cost increases, poor airfare regulation, etc.".

[647] The various requests for airfare increases and other measures are set out in ¶ 382 and footnotes 323, and 371 ¶ 572 and footnote 615, above.

[648] C-86.  The minutes record that the Government of Argentina's representatives stated that the State was aware of the situation.  The Tribunal returns to the significance of the April 29, 2008 letter and the Board minutes of May 29, 2008 below.

transportation sector to cover their costs and earn a reasonable margin of return. The Tribunal now turns to the question of what effect this had on the Airlines.

590.    Respondent raised a number of arguments to the effect that the airfares in place during Claimants' ownership of the Airlines between 2001 and 2008 were reasonable and did not detrimentally affect the Airlines. For the reasons set out below, the Tribunal is not persuaded by these arguments.

591.    First, Respondent argues that the Airlines' domestic operations, which were the only ones covered by the airfare regime, were healthy and yielded positive results in the period between 2001 and 2008. According to Respondent, the true cause for the Airlines' losses was their international operations.[649] Claimants say that the analysis conducted by Respondent and its experts is flawed for a number of reasons including analyzing the costs and revenues of the two Airlines on a combined basis and over estimating the relevance of international operations thereby over-allocating estimated costs and losses to the international operations.[650] As a result, Claimants say that Respondent and its experts are wrong in maintaining that the Airlines' domestic operations cross-subsidized international operations and that their experts significantly inflated losses incurred by the international operations.

592.    The Tribunal's review of the detailed expert reports and the relevant evidence leads it to prefer Claimants' position and the evidence of its experts. In the Tribunal's view, in examining these questions it is important to distinguish between the data for ARSA and AUSA and analyze their data separately, particularly in light of the fact that AUSA operated almost exclusively domestic routes and that domestic revenues represented approximately 98% of its total revenues. Further, the Tribunal is persuaded by Claimants' argument that Respondent's experts, KPMG, did not adequately allocate certain categories of costs and/or revenues to domestic operations but, rather, allocated them entirely to international operations.[651] The Tribunal agrees that this affects

---

[649] Resp. PHB ¶¶ 112-115; Respondent's Skeleton Argument ¶ 134; KPMG ER1 ¶ 5.2.10; Keifman ER2 ¶ 5.
[650] Cl. Reply ¶¶ 623-627; Cl. PHB ¶¶ 58-72; CLEX ER Supp. ¶¶ 42-43 and Appendix A; CLEX ER3 ¶¶ 42-47. Claimants and their experts also maintain that Respondent's experts relied on the unaudited financial statements provided by Respondent, whereas Claimants relied on the audited financial statements to the end of 2007.
[651] Cl. PHB ¶¶ 60-69; CLEX ER Supp.¶ 159; CLEX ER3 ¶¶ 42-47.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

a fundamental element of Respondent's experts' analysis and renders it unreliable.[652]  As a result, the Tribunal finds Claimants' expert's analysis more persuasive and accepts it.  In this regard, the Tribunal accepts that AUSA's costs consistently exceeded revenues for all years in question except 2003 and 2004.[653]  As a result, the Tribunal concludes that, insofar as AUSA is concerned, domestic revenues did not exceed domestic costs and it does not appear that domestic operations cross-subsidized international operations (which were minimal for AUSA).

593.    In respect of ARSA's costs and revenues, it appears that neither ARSA's financial statements nor the financial data used by Respondent and its experts permit the reliable allocation of certain categories of revenues and costs between domestic and international operations.  In these circumstances, it appears that Respondent's expert, KPMG, allocated all of these "unassigned" categories of revenues and costs to the international segment of ARSA's business.[654]  On the other hand, Claimants' expert, CLEX, maintained that a number of costs and revenues were tagged or identified with the destination of flights and, therefore, could be allocated to either domestic or international segments of ARSA's business.  It goes on to note that other categories of revenues and costs are more difficult to allocate and concludes that it would be reasonable to infer that ARSA's profitability in the domestic market "cannot be too dissimilar from what we observe in the case of [AUSA], given the similarities between [ARSA/AUSA]'s domestic operations."  From this, Claimants' experts conclude that KPMG's opinion that the domestic segment of ARSA's business cross-subsidized international operations was unsupported and inaccurate.[655]

---

[652] Cl. PHB ¶ 62.  Claimants give three examples of why the improper allocation of the entirety of three categories of costs/revenues to international operations ("contracts"; "non-commercial" and "unassigned") leads to unreliable results.  The Tribunal finds each of these persuasive.  It also notes that these examples highlight the importance of analyzing ARSA and AUSA's costs and revenues separately.  In this regard, the Tribunal finds that Respondent's reasoning that domestic airfares accounted for only 30% of the Airlines' revenues both irrelevant and misleading.  Since AUSA's domestic revenues represented 98% of its total revenues, the statement that only 30% of revenues for both Airlines combined does not apply to AUSA and is irrelevant.  In so far as ARSA is concerned, the statement is inaccurate and irrelevant.

[653] Cl. PHB ¶ 67; CLEX ER3 ¶¶ 44-45.  The Tribunal notes that according to CLEX, the positive difference between AUSA's revenues and costs in USD for 2003 and 2004 is not a direct consequence of adequate level of airfares.  Rather, they say that the reason for the positive difference is that AUSA's load factors from the very low levels of 2001 (58%) increased to the more reasonable levels in 2003 and 2004 (76% and 79%, respectively).

[654] CLEX ER3 ¶ 47.

[655] CLEX ER3 ¶ 47; Cl. PHB ¶¶ 70-71.  In the circumstances, Claimants argue that AUSA's financial information is the best proxy available to analyze ARSA's domestic operations in this respect.

594. In the Tribunal's view, Claimants' expert's evidence is persuasive and their suggestion that AUSA's financial information relating to the profitability (unprofitability) of its domestic operations serves as a reasonable proxy for ARSA's domestic operations is reasonable. As a result, the Tribunal is unable to accept Respondent's argument that the Airlines' domestic operations yielded positive results for the period between 2001 and 2008 or that the cause of losses on domestic operations was ARSA's international operations which were subsidized by the Airlines' domestic operations.

595. Respondent also argued that domestic airfares were not uneconomically low because the Airlines did not charge the maximum airfares but, rather, charged airfares which were, on average, 14% below the maximum airfare.[656] Claimants say that the fact that not all passengers paid the maximum airfare does not prove that airfares were set at adequate levels in compliance with the TER. Claimants maintain that the fact that airfares charged were, on average, only 14% below the maximum cap, demonstrates the opposite of what Respondent argues.[657]

596. In the Tribunal's view, Claimants' position is correct. Claimants' experts demonstrated by way of a mathematical exercise that if the average airfare was 14% below the maximum cap, then the proportion of travelers purchasing flights at the maximum fare was 70%.[658] According to Claimants' experts, the ratio of 70% (or 75%) is significantly above what could be considered a typical proportion of passengers with a high willingness to purchase a ticket at the highest unrestricted fare. They contrasted the high ratio of passengers in Argentina paying the maximum fare to the ratio of 15% in Peru and Chile.[659] While the Tribunal accepts that the airfare regimes in Peru and Chile were different during the relevant period, the comparison is instructive. Further, the Tribunal accepts Claimants' experts' evidence that a low maximum airfare will prevent an airline from collecting a much higher airfare from those passengers who are prepared to pay a

---

[656] Resp. CM. ¶406; Resp. Rej. ¶ 326; KPMG ER1 ¶ 11.5.11.
[657] Cl. PHB ¶¶ 74-77.
[658] CLEX ER Supp. ¶ 37 and footnote 44. Assuming that all travelers paid either the maximum or the minimum fare, Claimants' experts calculated that 70% of all passengers would have had to pay the maximum fare in order to achieve an average fare of 14% below that cap. Claimants' experts compared this figure with the figure of 75% provided by the Argentine Chamber of Commerce in a 2010 study: *see* CLEX ER Supp. ¶ 37 and the source cited at footnote 46 (LECG Ex. 67, CLEX-06).
[659] CLEX ER Supp. ¶ 37 and Figure IV.

much higher airfare for the convenience of traveling at short notice.[660]  As a result, the Tribunal cannot accept Respondent's argument that since average domestic airfares were approximately 14% below the maximum cap, airfares were not uneconomically low.

597.    Respondent also argued that since business class airfares were not covered by the domestic airfare regime, the Airlines could have converted their economy class seats into business seats to maximize revenue, thereby avoiding any constricting effect of maximum economy class fares.  For the reasons set out above at paragraphs 505-513 the Tribunal has found that this was not a realistic possibility since business class or premium class seats were included within the airfare regime and maximum airfare caps until the adoption of ST Resolution No. 257/2008.[661]  As a result, there is no basis to argue that the Airlines could have created a business class with disproportionately higher airfares prior to April 2008 and thereby maximized revenues to offset the effects of the maximum airfare caps.

598.    Finally, the Tribunal has considered Respondent's arguments relating to the efficiency and profitability of the Airlines' competitor, LAN, as compared to those of the Airlines in order to demonstrate that in the case of an efficient operator the airfares were adequate and permitted a reasonable margin of return.[662]  In response to this argument, Claimants say that LAN Argentina was not more efficient than the Airlines and that its net income and operating margins were negative for the years 2005 to 2007.  They also say that it was only in 2008 that LAN's net income became positive.  Claimants note that 2008 was an exceptional year for the Airlines and that they were only under the Claimants' control for part of that year.  Claimants say that AUSA's financial performance was, on average, substantially better than that of LAN for the years 2005 through 2008 (even including all of 2008).  Relying on their experts, Compass Lexecon and Mr. Ricover, Claimants also maintain that LAN's business model was different from that of the Airlines in that LAN was able to select the densest and most profitable routes to serve.

---

[660] Transcript pp. 1280-1281; CLEX Presentation Slide 11.

[661] Further, to the extent that an informal practice permitting the conversion of economy class seats into business class seats existed, the evidence indicates that it was revenue neutral.  Further, there was no indication that this was a wide spread or that it represented a material portion of the Airlines' domestic seats or revenues.  Further, in the context in which all air carriers in Argentina had repeatedly requested airfare increases, it seems highly unlikely that they would have had available the option of creating full business class seats in order to avoid the maximum airfares.

[662] Transcript p. 1259; Resp. PHB ¶¶ 116-119.

599.    In the Tribunal's view, Respondent has not demonstrated that LAN Argentina was more efficient than the Airlines nor that it was able to operate more efficiently than the Airlines.  In this regard, the Tribunal believes that the proper comparison is between LAN Argentina and AUSA, both of which operated almost exclusively domestically.[663]  The evidence indicates that from 2005 to 2007, LAN Argentina had negative income and negative operating margins and that it was only in 2008 that these turned positive (net income of USD 13,503,000 and operating margin of 8%).[664]  Further, from 2005 to 2007, AUSA's ratio of operating costs to revenues was substantially better than that of LAN Argentina.  The Tribunal accepts that 2008 was an exceptionally difficult year for the Airlines and that they were only (fully) managed by the Claimants until the July 2008 Agreement.  As a result, some allowance must be made in considering 2008.  In addition, the Airlines, as flagship carriers, served a broad range of domestic routes.  Further, elimination or substantial reduction of those routes was restricted by Decree 6875/1971, at the time of privatization, and the 2006 Agreement.  On the other hand, when LAN entered the Argentine market in 2005, it decided to focus almost exclusively on the ten densest routes.[665]

600.    Finally, the Tribunal notes that LAN also requested increases of the airfares, both on its own and as part of CLARA.[666]

---

[663] As described above, AUSA operated almost exclusively domestically and 98% of its revenues were generated from domestic flights.

[664] CLEX ER Supp. ¶¶ 49-50 and Table IV.

[665] CLEX ER Supp. ¶ 51 and Table IV.  Compass Lexecon states that the Airlines served more than 30 domestic routes (CLEX ER1 ¶ 45).  As also described above, the Government of Argentina exerted some pressure on the Airlines to maintain all their routes, particularly those to more remote regions, and to increase frequency of flights.

[666] C-75; C-76; C-77; C-1045 pp. 40-41.  In its letter of March 11, 2008, LAN appears to respond to requests from the Secretary of Transportation to provide information on its operations for 2008 in light of airfare increases being considered by the Secretariat.  In commenting on the contemplated increases, LAN stated that the airfare increases should be substantially higher than the proposed 20% to 24% increase of the maximum airfare plus fuel subsidies in order to truly permit the airline industry to achieve growth and coverage adequate to the size of the country and in line with the increase with Argentine GDP over the past few years.  LAN also stated that while permitting greater revenues for the airline companies was vital for their survival, it was also necessary to address the fundamental issues faced by the industry, including the adoption of the bills specified in Decree 1012/2006, amongst other things.

*See also* C-967: Report of LAN Argentina's Board of Directors dated May 21, 2008.  In that report, LAN's Board of Directors stated that the airfare increases granted in April and May 2008 were not sufficient to achieve sustainable profitability in the long term and that the Board had worked with the Argentine authorities to design an additional package of measures, both of regulatory and tax nature, which would permit the improvement of the economic situation of the airline industry which, to date, had not been implemented.  *See* p. 2 of the Board's report to shareholders.

601.    As a result, the Tribunal is not persuaded that LAN's activity in Argentina between the years 2005 to 2008 demonstrates that it operated more efficiently than AUSA or that the airfares in place at the time permitted an efficient operator to cover its costs and generate a reasonable profit.

602.    The Tribunal now turns to examine Respondent's other argument that Claimants' alleged mismanagement of the Airlines was the cause of their poor performance and the dire situation in which they found themselves in July 2008.

## 2.      Claimants' Management of the Airlines

603.    Respondent makes a number of arguments with respect to Claimants' management (or alleged mismanagement) of the Airlines during the 2001 to 2008 period of their ownership. Respondent's arguments appear to be directed towards three key contentions: first, that far from investing in the Airlines, Claimants damaged the Airlines almost to the point of irreparability; second, that Respondent was forced to intervene and take control of the Airlines because a vital public interest was imperiled; and third, the airfares were fair and reasonable and that it was due to Claimants' inefficiency and poor management that the Airlines lost money and were in a dire condition in July 2008.

604.    The first contention is closely linked to Respondent's Counterclaim, in which Respondent claims damages for the alleged harm done to the Airlines as the result of Claimants' deficient management. Respondent argues that Claimants' business management of the Airlines was "predatory"[667] and that the Marsans Group "acted as a parasite of the Airlines, taking advantage of them, extracting all it could from them, and leaving them in appalling conditions and at the doors of bankruptcy."[668]

605.    The second contention is closely linked to Respondent's defense to Claimants' Claim, particularly with respect to Respondent's arguments regarding the legality of its expropriation of the Airlines. Respondent asserts that Claimants "did not comply with the Argentine regulatory and

---

[667] Resp. CM ¶ 263.
[668] Resp. Rej. ¶ 73.

company laws by engaging in a conduct that was terribly detrimental to the Argentine Airlines."[669] As a result, the Argentine State was forced "to take control of an airline that was totally abandoned, which, in turn, implied a risk for the country's connectivity."[670]

606.    The third contention relates to Respondent's defense to Claimants' claim that the airfares set during the relevant period were not in compliance with the TER standard and hindered the Airlines' ability to operate efficiently and earn a reasonable margin.[671]

**General arguments regarding Claimants' performance**

607.    Respondent contends that Claimants neglected the Airlines during their tenure "to such an extent that they are almost irreparable."[672] Respondent points to a variety of practices it alleges led to the Airlines' poor condition by July 2008, including inefficient fleet maintenance, an aging and heterogeneous fleet, asset-stripping, cannibalism of aircraft, obsolete computer systems, a lack of revenue management policies, and isolation from global strategic alliances systems, among other practices.[673]

608.    Respondent asserts that far from providing valuable "synergies" through the network of Marsans Group companies, "Claimants had nothing to offer to the Airlines."[674] Respondent argues that the improved results of the Airlines between 2002 and 2005 were absolutely unrelated to Marsans' management. Rather, according to Respondent, the positive results during that period were caused by the cost dilution resulting from the devaluation, the disappearance of two competitors, and the recovery of the local domestic market.[675]

609.    Claimants argue in response that at the time they acquired the Airlines in late 2001, both had operations at a virtual standstill. The Airlines had a market share of only 20% of the Argentine market.[676] ARSA had already been placed in bankruptcy, had substantially reduced its domestic

---

[669] Resp. CM ¶ 264.
[670] Resp. CM ¶ 266.
[671] Resp. CM ¶ 269; Resp. Rej. ¶¶ 80 and 834.
[672] Resp. CM ¶ 268.
[673] Resp. CM ¶ 269; Resp. Rej. ¶ 80.
[674] Resp. Rej. ¶ 71.
[675] Resp. CM ¶ 265; Resp. Rej. ¶ 75.
[676] Cl. Reply ¶¶ 45-78; Cl. CC. Rej. ¶¶ 14-23.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 224 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

routes and was only serving one international destination.[677] Claimants note that Argentina had publicly declared its willingness to let the Airlines fail and go through liquidation at this time, and that "Claimants were the only ones preventing Argentina's flag-carriers from disappearing."[678]

610.   Claimants assert that they restarted operations on all of the previously abandoned routes and that the number of passengers consistently increased from 2002 to 2005.[679] They say that ARSA ticket sales in Europe increased 764% between 2001 and 2007.[680] The Airlines' share of the Argentine domestic market share increased from 20% in 2001 to 57% in 2002 and to 82% in 2003.[681] All together, they assert that the Airlines' operations and profitability significantly improved during the first years of Claimants' ownership.[682] Moreover, Claimants argue that it seems hardly reasonable that the Government of Argentina would have renewed the Airlines' concession in 2004 and 2005, as it did, if they had been doing such a poor job managing the Airlines.[683]  Claimants also say that it was the uneconomical airfares that affected the Airlines' financial performance and not any alleged lack of efficiency or poor management of the Airlines, which were properly managed.[684]

611.   The Tribunal will set out and address here Respondent's specific arguments regarding the alleged mismanagement of the Airlines to the extent necessary to address the issues related to adequacy of the airfares and its effect on the Airlines' ability to operate efficiently and earn a reasonable margin of return on their domestic operations. The Tribunal will return to these arguments, to the extent necessary, below, when it addresses Claimants' expropriation claim and Respondent's Counterclaim.

---

[677] Cl. Reply ¶¶ 46, 79; Cl. CC. Rej. ¶ 14.
[678] Cl. Reply ¶ 48; Cl. CC. Rej. ¶ 14.
[679] Cl. Reply ¶ 50.
[680] Cl. Reply ¶ 51.
[681] *Id.*
[682] Cl. Reply ¶ 55.
[683] Cl. Reply ¶ 65.
[684] Cl. Reply ¶¶ 45-91; Cl. CC. Rej. ¶¶ 24-41.

**Fleet management practices**

612.   According to Respondent, the management of the Marsans Group was characterized by a complete lack of investment in the fleet and poor maintenance of it.[685]

613.   First, Respondent argues that Claimants acquired obsolete aircraft for the Airlines' fleet. Consequently, asserts Respondent, the Airlines had the oldest fleet in the market, with an average age of 20 years, thus doubling the age of the aircraft of other companies in the market, the average age of which was between five and ten years.[686] Respondent asserts that Claimants' expert, Mr. Ricover, who asserted that the Airlines' fleet age was comparable with other large legacy airlines, wrongly cherry-picks the data. It asserts that in reality, the average age of the fleet of British Airways and United Airlines is lower.[687] Respondent argues that the acquisition of old aircraft resulted in higher fuel consumption, higher maintenance costs and inventory problems, among other inefficiencies.[688]

614.   Second, Respondent asserts that the Airlines' fleet included different types and subtypes of aircraft, which resulted in an inefficient management of the company, as well as in higher maintenance, crew and other costs.[689] It notes that by 2008, the Airlines had eight different types of aircraft.[690] Respondent argues that fleet heterogeneity entails higher costs because a larger aeronautical material stock variety is required to maintain it, given the diversity of parts of the different aircraft. It also asserts that crew expenses are greater given that it is impossible to use the same crew on different fleets.[691] Finally, Respondent asserts that although the Airlines had the same number of "cockpit commonalities" as United Airlines and American Airlines, these latter airlines have much larger fleets than the Airlines.[692]

---

[685] Resp. Rej. ¶ 81.
[686] Resp. CM ¶ 280.
[687] *See* Resp. PHB ¶¶ 184-186, citing testimony of Ricover, Transcript pp. 765-771.
[688] Resp. Rej. ¶¶ 101-102, citing KPMG ER2, ¶ 12.1.12; Wyman ER, ¶ 2.7.
[689] Resp. Rej. ¶ 98.
[690] Resp. CM ¶ 282.
[691] Resp. CM ¶ 284.
[692] Resp. PHB ¶ 187.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 226 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

615.     Third, Respondent asserts that Claimants engaged in "cannibalizing" the Airlines' fleet. "Cannibalization" is the practice of dismantling aircraft and using the parts on other aircraft in the fleet.  Respondent argues that rather than streamlining inventory pools and planning carefully, the Airlines' maintenance practices involved finding and using parts off of existing aircraft and engines. As such, engines were in storage for months waiting for overhaul.[693] Respondent asserts that in 2008 half the fleet was out of service due to cannibalization.[694]

616.     Fourth, Respondent asserts that the Airlines took poor care of the planes they leased. According to Respondent, this made it impossible for them to return to the lessor.[695] Respondent argues that the leased airplanes not only failed to meet the required technical conditions, but also had unpaid rent and penalties, which made their redelivery impossible. Respondent asserts that even airplanes in good technical condition had incurred such a degree of contractual infringement due to unpaid rent that lessors could not accept their redelivery.[696]

617.     For all these reasons, Respondent asserts that the fleet was in a dire situation by July 2008. It states that at this time, only three out of 24 of the Airlines' owned planes were operative, and only 31 out of 62 of the Airlines' leased planes were operative.[697]

618.     Claimants disagree with Respondent's characterization of the Airlines' fleet acquisition and maintenance. First, they rely on the evidence of their expert, Mr. Ricover, that the average age of the Airlines' fleet was comparable with that of other major airlines, including American, British and United.[698] They note that the Government of Argentina acquired or leased even older aircraft for Airlines after the 2008 nationalization.[699] Moreover, Claimants argue that fleet age should not be confused with fleet efficiency.[700] Mr. Ricover asserts that

---

[693] Wyman ER ¶ 6.5.4.
[694] Resp. Rej. ¶¶ 84, 91.
[695] Resp. CM ¶¶ 302, 308-312.
[696] Resp. Rej. ¶ 91, citing RA-434 (Letter from the Economic and Financial Area Manager, the Fleet and Financial Restructuring Planning Manager, and the Head of the Financial Restructuring Unit to the General Manager of Aerolíneas Argentinas on the Restructuring of unpaid debt and aircraft compensation with WELLS FARGO BANK NORTHWEST NATIONAL ASSOCIATION (TRITON), dated April 12, 2011, p. 7).
[697] Resp. CM ¶ 286; Martín WS1 ¶ 34-35.
[698] Cl. Reply ¶ 86, citing Ricover ER1, ¶¶ 44-48.
[699] Cl. Reply ¶ 87.
[700] Cl. Reply ¶ 86.

 [E]ven though the average fleet age increased significantly between 2006 and 2008, utilization remained virtually unchanged. In addition, even though fleet age decreased in 2009 as compared to 2008, utilization fell as well. The data presented shows no conclusive evidence on the relationship between fleet age and utilization. Automatically concluding that an older fleet would be less efficient is therefore misguided.[701]

619.   Finally, Claimants note that between November 2001 and June 2008, they incorporated a total of 45 additional aircraft into the Airlines' fleet, and also entered into a massive Airbus purchase for ARSA and AUSA to overhaul the fleet with new aircraft of the same manufacturer and type.[702]

620.   Second, with respect to Respondent's contentions concerning the heterogeneity of the Airlines' fleet and the inefficiencies this created, Claimants argue that in fact the Airlines were comparable to competitors. Claimants' expert, Mr. Ricover, explained that the proper way to assess fleet homogeneity from an airline management perspective is to measure the level of "cockpit commonality"—namely, the ability to operate different types of aircraft within the same fleet by using the same type-rated crews. Mr. Ricover asserts that all of AUSA's aircraft presented the same type-rating and could thus be operated by the same crews, and that ARSA's fleet was similarly homogeneous with only five cockpit types, a similar level to most international carriers.[703]

621.   Third, with respect to what Respondent characterizes as "cannibalization," Claimants assert that this is, in fact, the widely-encountered practice of airlines managing their spare parts inventory between different aircraft.[704] Claimants state that aircraft are composed of numerous components that are designed to be interchangeable and easily removed and replaced. Instead of immobilizing an entire aircraft when one of its engines requires or undergoes maintenance, an airline can install another engine on that aircraft (which, for instance, can come from another aircraft whose mainframe or landing gear is undergoing maintenance at the same time) to

---

[701] Ricover ER1 ¶ 48.
[702] Cl. Reply ¶¶ 90-91.
[703] Cl. CC Rej. ¶ 34; Ricover ER2 ¶¶ 46-48 and Fig. 7.
[704] Cl. CC Rej. ¶ 36.

maximize the operational efficiency of the fleet. Claimants assert that this is a widespread practice.[705]

622.     Fourth, with respect to Claimants' maintenance of aircraft leased by the Airlines, Claimants assert that some of the planes had been leased to ARSA before Claimants took over, and on leases to be returned after 2011. Claimants argue therefore that that they cannot be held accountable for the condition of these planes in late 2011.[706]

**Information and revenue-management systems**

623.     Respondent and its experts claim that the information systems used by Claimants at the Airlines, which included core systems and equipment, networking electronics, base software, service infrastructure, administration systems, and human resources were outdated.[707]

624.     Respondent also asserts that the revenue management systems used by Claimants were outdated. These systems are intended to set the guidelines for the adequate commercialization of tickets and, based on complex mathematical calculations, provide for the correct value of a ticket, taking into account how far in advance they are booked. In other words, revenue management permits airlines to sell to the right customer at the right moment at the right price.[708] Respondent submits that without up-to-date revenue management, the Airlines were hindered in their ability to support activity growth, ensure continued services, and allow for the development and deployment of new updates and new-technology-application projects.[709] Respondent also asserts that the Airlines paid their web-booking engine service provider more than twice the rates proposed by a competitor entity.[710]

625.     Claimants assert that Respondent has failed to substantiate its allegations with respect to the alleged out-datedness and costs of the Airlines' information and revenue management systems. They argue, moreover, that the Airlines "benefitted from state-of-the-art IT and revenue

---

[705] Cl. CC Rej. ¶¶ 37-38.
[706] Cl. Reply ¶ 85.
[707] Resp. CM ¶ 289; *see also* Wyman ER, ¶ 6.4.
[708] Resp. CM ¶ 294.
[709] Resp. CM ¶¶ 290-291.
[710] Resp. Rej. ¶ 112, citing Wyman ER, ¶ 6.3.4.3.

management systems" through the Marsans Group. They assert that the only reason Respondent had to incur expenses with respect to revenue management after nationalization was because the Airlines could no longer access the systems that the Marsans Group had used.[711]

## Operational and financial performance

626.    According to Respondent, the Airlines had poor operational performance, with delays and cancellations greater than those of their competition.[712] Respondent asserts that when the Argentine State took control of the companies in July 2008, they were undergoing a virtual operative collapse.[713]   Respondent also notes that starting in July 2008, the Argentine State was forced to disburse funds to meet the Airlines' current liabilities – wages, fuel and other operating costs – which amounted to ARS 737 million in less than six months.[714]

627.    Claimants assert, in response, that an overwhelming majority of delays and cancelations resulted from the Government of Argentina's pressure on Claimants through the unions, which was abetted by Undersecretary of Aerocommercial Transportation, Ricardo Cirielli, and the Kirchner administration.[715] Claimants also argue that it was Respondent's policy of "Re-Argentinization" that led to the Airlines' "financial agony" during the final years of Claimants' management.[716]

## Failure to rejoin the IATA Clearing House

628.    Respondent asserts that the Airlines were disadvantaged by not belonging to the International Air Transportation Association (IATA) Clearing House. According to Respondent's expert witness:

> [T]he Airlines' lack of participation in global airline alliances and in joint ventures and/or code share agreements was a significant inhibitor of international expansion opportunities. All carriers included in the benchmark were members of the IATA Clearing House, which provides a "competitive, seamless secure service providing an efficient on-time settling of interline accounts between the world's airlines, airline-associated companies and travel partners." The service allows for over 450

---

[711] Cl. Reply ¶¶ 69-70.
[712] Resp. CM ¶ 298.
[713] Resp. CM ¶ 300.
[714] Resp. Rej. ¶ 126.
[715] Cl. Reply ¶ 72.
[716] *See, e.g.,* Cl. Reply ¶ 265.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 230 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

airlines and participants to settle their accounts through this service. Without participation as a member in the IATA Clearing House, the Airlines were unable to effectively leverage partnerships that nearly all airlines utilize. In our experience, most major airlines participate in the Clearing House, and absence from it is a significant anomaly and can be representative of management challenges.[717]

629.    For their part, Claimants assert that ARSA's temporary suspension from the IATA Clearing House did not mean that it could not negotiate or enter into passenger distribution agreements with other airlines. Rather, these settlements were paid directly between the companies and not through a central clearing house.[718] Claimants' expert, Mr. Ricover, states that not having direct access to the IATA Clearing House did not particularly affect ARSA because most of its activity involved selling point to point tickets between Argentina and the international destinations, with very little traffic traveling beyond those points.[719] Moreover, Claimants note that the Airlines were still a part of the IATA, which enabled their flights to be booked on any booking page.[720] Finally, Claimants argue that ARSA only regained membership in the IATA Clearing House in 2011, three full years after the Government took control of the Airlines.[721]

**Asset stripping**

630.    Respondent asserts that Claimants engaged in a practice of "asset-stripping" throughout their tenure with the Airlines. Respondent points to what it alleges was a practice of leasing aircraft from ARSA's and AUSA's fleet for the benefit of other Marsans Group companies, including Air Comet España and Air Comet Chile.[722] Respondent alleges that when these aircraft were returned, they were "in a disastrous condition."[723] Respondent also asserts that Air Comet would use ARSA aircraft for charter flights, on routes that were inefficient for ARSA, with the costs of fuel, flight crews and attendants borne by ARSA.[724]

---

[717] Wyman ER, ¶ 6.2.4.
[718] Cl. Reply ¶ 75.
[719] Cl. Reply ¶ 76, citing Ricover ER1, ¶ 51.
[720] *Id.*
[721] Cl. Reply ¶ 77.
[722] Resp. CM ¶ 308.
[723] Resp. CM ¶ 309.
[724] Resp. CM ¶¶ 311-312, citing Massolo WS ¶ 8.

631.    Respondent also asserts that the Marsans Group abused its position as an indirect parent company of OPTAR, an Argentine travel company owned by the Airlines. Respondent alleges that Claimants unified sales and operations of OPTAR with the rest of the Marsans Group in order to take the following alleged measures: the lease of OPTAR's real estate to Marsans Internacional Argentina S.A. at a "ridiculous" price, the Operation and Sale Structure Unification Agreement, the assignment of OPTAR's administration to Marsans, the transfer of a large amount of OPTAR's personnel to Marsans, as well as other actions evidencing the existence of an asset stripping.[725]

632.    What Respondent asserts amounted to "asset-stripping," Claimants argue was the strategic use of beneficial "synergies" between Marsans Group entities.[726] Claimants deny that the Marsans Group leased planes between its entities in a way that damaged the Airlines. They assert that the planes that ARSA leased to Air Comet were ones that ARSA could not use efficiently, given their age and high fuel consumption. Air Comet, on the other hand, could use them on shorter routes, and paid a monthly lease for them. In short, according to Claimants, Air Comet was able to use ARSA's planes that would have otherwise been grounded.[727] Claimants point to other leases on idle aircraft between ARSA and Air Comet, which they assert were "very profitable for ARSA."[728] Finally, Claimants note that Air Comet occasionally chartered inactive ARSA aircraft, for which Air Comet paid an hourly cost at arm's-length prices and generated significant income for ARSA.[729]

633.    With respect to Argentina's accusations regarding the management of OPTAR, Claimants assert that Argentina itself authorized this unification in 2004 by Resolution No. 1122 of the Undersecretary of Tourism Policy. Claimants argue that given the complementary nature of the two companies, it made complete sense to rationalize their management in order to achieve increased efficiency and economies of scale as part of one travel group.[730]

---

[725] Resp. CM ¶ 322.
[726] Cl. Reply ¶ 67.
[727] Cl. Reply ¶¶ 81-82.
[728] Cl. Reply ¶ 83.
[729] Cl. Reply ¶ 84.
[730] Cl. Reply ¶ 71.

## Tribunal's Conclusion on Claimants' Alleged Mismanagement of the Airlines

634.    The Tribunal has carefully reviewed all of the Parties' voluminous submissions, factual and expert evidence on the issue of the management of the Airlines and concluded that the lack of efficiency and poor management alleged by Respondent has not been made out and, in any event, was not the primary cause of the Airlines' inability to cover their costs and earn a reasonable return from 2005 to 2008.   As noted previously, after the conclusion of the SPA, under Claimants' management the Airlines' operations and financial situation improved substantially until, it appears, the Airlines' costs (notably for jet fuel and salaries) commenced their sharpest increase in 2004.

635.    In October 2001, when the SPA was concluded, the Airlines' operations had almost stopped completely.   The Airlines' liabilities exceeded USD 1 billion and forecasted operating losses for 2001 exceeded USD 350 million.   Further, ARSA had been in insolvency proceedings since before SEPI's privatization process had commenced.   In addition, ARSA had only one international destination which it serviced and approximately only 17 operational airplanes.   The Airlines' market share had also fallen to less than 20% of the Argentine market.[731]   Finally, it was apparent that Respondent was not prepared to contribute funds to assist ARSA and was not prepared to place the Airlines under state ownership.[732]

636.    Commencing in 2002, the situation of the Airlines improved rapidly.   As noted previously, in December 2002, ARSA and the majority of its creditors agreed on a plan of debt restructuring and by the end of 2004 ARSA had repaid the majority of its debt and was relieved from its obligations under its re-organization proceedings.[733]   Further, despite the challenging economic conditions, the Airlines' revenues and market share increased substantially.   Its market share improved from approximately 32% at the end of 2001 to 81% in 2004.   In addition, the Airlines' net income improved substantially from 2002 through 2004 such that both Airlines had positive net revenues in each of those years.[734]   The Airlines also expanded and improved their fleet.[735]

---

[731] *See* Cl. Reply ¶¶ 45-46 and the sources cited there.
[732] Bastos WS ¶ 21.
[733] *See* ¶ 379 and the sources cited there.
[734] *See* Cl. Mem. ¶ 47 and the sources cited there; ¶ 380, above.
[735] Cl. Mem. ¶¶ 44-45; ¶ 381, above.

Finally, ARSA's concessions, whose expiry dates were approaching, were renewed by the Secretariat of Transportation in 2005.[736]

637.   All of this evidence supports Claimants' position that the Airlines were operated efficiently and that they were sufficiently well managed to achieve significant improvement at both an operational and financial level.  The Tribunal is unable to accept Respondent's position that this improvement was due solely to other factors such as the devaluation of the Argentine peso and the recovery of the market.  While these, and other factors, may have been of some influence, the Tribunal is not persuaded that these were the primary factors in the improvement of the situation of the Airlines.  Further, during the course of 2004, the Airlines' costs, notably for jet fuel, commenced a very sharp increase which continued through 2008.  In the Tribunal's view, the mismatch between these increasing costs and domestic airfares described above had a substantial impact on the Airlines' operational and financial management and their ability to manage more generally.

638.   Commencing with the Airlines' fleet management practices, the Tribunal has found the evidence of Claimants' experts, Compass Lexecon, and their industry expert, Mr. Ricover, persuasive.  Amongst other things, the Airlines' revenue-passenger kilometer ("RPK") appears to have increased substantially from 2001 through 2005.[737]  Similarly, the Airlines' available seat-kilometer per employee ratio also increased substantially from 2001 through 2005.[738]  Further, it appears that the Airlines were, in fact, more productive than their regional competitors, TAM, LAN and Gol.[739]

639.   The Tribunal has also considered Respondent's arguments regarding the age and heterogeneity of the Airlines' fleet.  In the Tribunal's view, Respondent's complaints in this regard do not demonstrate that the Airlines' fleet was unduly old or heterogonous such that their efficiency would be affected more than other comparable airlines or that the age of the Airlines' fleet or the number of different aircraft which composed it constitutes evidence of poor

---

[736] *See* ¶ 393, above, and the sources cited there.
[737] Ricover ER1 ¶ 28 and Figure 3.
[738] Ricover ER1 ¶ 32 and Figure 4; Ricover ER2 ¶¶ 27-30 and Figure 6.
[739] Cl. CC. Rej. ¶ 32; Ricover ER2 ¶¶ 21-26.

management.  In this regard, the Tribunal finds the evidence of Mr. Ricover persuasive, despite Respondent's criticism of his evidence.[740]  Although Mr. Ricover's evidence on these issues was not initially clear in light of amendments made to his report, this did not appear to affect its effect.  For example, while Mr. Ricover did not calculate the average age of the entire fleet of British Airways and United Airlines, which was lower than the age of the Airlines' fleet, he selected comparable categories of aircraft and compared these.[741]  In the Tribunal's view, the use of comparable aircraft appears reasonable in the circumstances.  Mr. Ricover's evidence tended to indicate that the age of the Airlines' fleet was not out of line with that of the other airlines to which they were compared insofar as comparable aircraft were concerned.

640.    The Tribunal has also noted the point made by Respondent that Mr. Ricover attached draft financial statements for 2007 to his reports although by the time he testified, the audited financial statements were available.  However, it does not appear that any relevant information upon which he relied differed between the draft and the audited financial statements.[742]  With respect to the alleged heterogonous nature of the Airlines' fleets, it appears that the Airlines had a similar number of cockpit types as other airlines with much larger fleets.  This tends to indicate that those airlines had the potential to be more efficient given the larger number of aircraft which could be operated by the same cockpit crews.  However, Mr. Ricover also noted that other airlines had significantly more cockpit types and yet operated very efficiently.[743]  As a result, Respondent's criticism is not conclusive.  Further, the Tribunal notes that many of the aircraft that the Airlines operated between 2001 through 2008 had been in service for some time and it could be expected that it would take some time to renew the fleet and, in doing so, achieve higher cockpit commonality.  While the Airlines had started a process of renewal of the fleet by sourcing aircraft from Airbus, they were unable to complete the large purchase of further aircraft from Airbus and their integration into the fleet.

---

[740] Resp. PHB ¶¶ 184-189.
[741] Transcript pp. 765-771, 786-787.
[742] *See*: Transcript pp. 754-760, 786-787.
[743] Ricover ER2 ¶ 48 and Figure 7; Transcript pp. 773-777.  Mr. Ricover noted that all of AUSA's aircraft presented the same type rating and could therefore be operated by the same crews.  *See* Ricover ER2 ¶¶ 47-48.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 235 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

641.    The Tribunal has also considered Respondent's other criticisms of the Airlines' fleet management practices, including the alleged "cannibalization" of parts and maintenance of leased aircraft.  With respect to the former, the practice of "cannibalization" appears to be a common practice in the airline industry.[744]  However, from the evidence, the Tribunal is unable to determine whether the practice by the Airlines was greater than for comparable airlines in the industry.

642.    With respect to the maintenance of leased aircraft, the Tribunal accepts that as at December 2008, a number of leased aircraft were in poor condition such that they failed to meet the required technical conditions for return to the lessor.  In addition, it appears that unpaid rent and penalties were due.[745]

643.    With respect to the Airlines' suspension from the IATA Clearing House, the Tribunal finds that this had a more limited effect on the Airlines during the period of Claimants' management than suggested by Respondent.  First, the Tribunal notes that throughout the entire relevant period, both Airlines remained members of IATA and it was only their access to the IATA Clearing House which was suspended due to an outstanding debt incurred prior to October 2001.  Further, it appears that the Airlines had access to IATA's billing and settlement plans through the Marsans Group.[746]  As a result, the Airlines had access to IATA and were able to clear payments through the Marsans Group.  It also appears that ARSA was able to enter into various distribution agreements with other airlines.  Finally, the Tribunal notes that under Respondent's management, ARSA only re-acquired its membership in the IATA Clearing House in 2011.  As a result, the

---

[744] Cl. CC. Rej. ¶¶ 36-39 and the sources cited there.
[745] Resp. Rej. ¶ 91; RA-434; RA-279.  It appears that in all but one case, the aircraft in question were leased prior to Claimants' investment in the Airlines and that the earliest expiry date of the leases was in October 2008, with the balance of the leases expiring in 2009 and 2010: *see* RA-434 p. 2/16.  The ARSA internal report goes on to state that as at the end of December 2008, only three of the nine B737-200s were in operation.  It appears that: two of the aircraft in question had been out of operation since April and July 2006; two aircraft in question had been out of operation since January and July 2007; and one aircraft in question had been taken out of operation for scheduled maintenance in April 2008.  Further, it appears that one of the aircraft was sub-leased to Aerolineas Austral Chile S.A. (a subsidiary of Air Comet).  The report also records that as of its date (April 12, 2011), five of the aircraft were in storage at various airports in "high degree of deterioration and cannibalism".
It appears that, in the end, the dispute between the Airlines and the lessor was resolved by way of an agreement in which the Airlines acknowledged the debt for outstanding rents, penalties and interest on arrears (in the amount of USD 11,468,242.80): *see* Resp. CM ¶ 305.
[746] Muñoz Pérez WS3 ¶ 17.

Tribunal is not persuaded that the failure to re-instate the Airlines' membership in the IATA Clearing House demonstrates the poor management of the Airlines alleged by Respondent.

644.    The Tribunal has also considered Respondent's allegations of "asset stripping" relating to what it alleges was a practice of leasing aircraft from ARSA's and AUSA's fleets for the benefit of other Marsans Group companies.  Respondent alleges that these leases were not in the Airlines' economic interest and that the leased aircraft were returned in poor condition.  The Tribunal's review of the relevant evidence does not establish Respondent's allegations.  The explanations supplied by Claimants in respect of the leasing which Respondent impugns appear to make business sense and to have generated revenue for the Airlines.[747]  The Tribunal is unable to conclude on the basis of the limited evidence presented that Claimants engaged in "asset stripping" in favor of other Marsans Group companies as alleged.

645.    The Tribunal has also considered Respondent's allegations with respect to merging the management of Optar S.A. with Marsans' International Argentina.  Claimants explained that this was done instead of leaving the two businesses separate and competing against each other.  In this regard, the Tribunal notes that the Argentine Secretariat of Tourism authorized the unification of the management of the two companies' operations in the same premises.[748]  In support of its allegations, Respondent relied on an internal report to the General Management of the Airlines dated February 3, 2012.[749]  While this report makes a number of detailed allegations, there is no direct evidence of the alleged favorable treatment of Marsans International by way of the alleged favorable lease of Optar S.A.'s premises, assignment of Optar S.A.'s administration and the transfer of Optar S.A.'s personnel to Marsans International as well as other actions alleged to evidence "asset stripping".  As a result, the Tribunal is unable to reach any firm conclusion in respect of these allegations.

646.    Respondent also criticized the information and management systems used by the Airlines under Claimants' management, supported, in part, by its industry expert, Oliver Wyman.  In the

---

[747] Cl. Reply ¶¶ 80-84.
[748] Resolution No. 1122, November 17, 2004: RA-283.  *See also*: Operation and Sale Structure Unification Agreement dated July 28, 2004: RA-282.
[749] RA-281.

Tribunal's view, while updating and improvements to the systems used by the Airlines could well have been made, this does not necessarily demonstrate mismanagement by the Airlines or Claimants.   In reviewing the evidence of Respondent's expert with respect to information and revenue management systems, the Tribunal notes that during the period of Claimants' management of the Airlines, the latter had access to and used the information technology and revenue management systems of the Marsans Group.   This included, for example, access to the flight booking system used by the Marsans Group, Amadeus.   While there were other systems available at the time, some of which appear to have been less expensive, the Tribunal is unable to conclude that the Airlines' reliance on the Amadeus system constitutes mismanagement.[750]

647.   Respondent's expert also made a number of other criticisms of the Airlines' sales and marketing systems and costs.[751]   These appear to indicate that the Airlines were paying higher average commissions to distributors with a point of sale in Argentina (an average of 6%, as compared to the market average of 4% to 5%).   They also indicated that other carriers had moved to a lower base commission rate (1%) versus the Airlines' 3% base commission rate during the time of their engagement.[752]   The Tribunal accepts that improvements could have been made to the Airlines' systems and that these may have improved the Airlines' revenue.   However, the Tribunal is unable to determine with any certainty what impact this had.

648.   Respondent relied on the evidence of its expert, Oliver Wyman, in respect of the many criticisms it makes of Claimants' management of the Airlines.   From its review of that evidence and that of Claimants' expert, Mr. Ricover, as well as, to a certain extent, Compass Lexecon, the Tribunal accepts that a number of improvements could have been made to various aspects of the Airlines' operations and management.   In other cases, the Tribunal does not accept that the evidence supports Respondent's criticisms.   In this regard, the Tribunal notes that Oliver Wyman

---

[750] *See* Wyman ER ¶ 6.3.4.1 which points out the major available systems at the time, including Amadeus.   The experts go on to say that the Airlines were paying Amadeus more than twice the web booking engine rates proposed by one of its competitors, Sabre.   No details for this were provided in support.

[751] *See*, for example, Wyman ER ¶ 6.3.4.

[752] Wyman ER ¶ 6.3.4.   With respect to the latter, the Tribunal notes that Oliver Wyman's engagement commenced in October 2009.   As a result, it is hard to determine precisely what the base commission rates for the comparative airlines were prior to that time or what steps, if any, the Airlines took in regard to base commissions in 2009, or subsequently.

was retained in October 2009 and that its evidence is based on its observations from that point forward.[753]  Further, Oliver Wyman relied primarily on the data for the Airlines for the year 2008 as the basis for its report.[754]  As a result, Oliver Wyman did not examine the state of the air transport industry in Argentina, including the regulation of domestic tariffs, prior to 2008.[755]  Further, Oliver Wyman was apparently not aware that the commercial air transport sector was in a declared state of emergency from 2002 through 2008, nor of the fact that other airlines (LAPA, Dinar and Southern Winds) had gone out of business during that time.[756]

649.    For these reasons, the Tribunal is of the view that the evidence of Oliver Wyman must be tempered.  While it was highly critical of the Airlines' management and performance, it does not appear that the entire relevant context was examined in arriving at these conclusions.  Further, Oliver Wyman did not consider the effect of the regulated domestic airfares on the profitability of the Airlines during Claimants' management.  Oliver Wyman concluded that the performance gaps which they identified in the management and operation of the Airlines was USD 357 million less than it should have been based on benchmarked Latin American carriers and USD 248 million less than it should have been compared to global benchmarks.  As a result, they concluded that the Airlines were facing severe commercial and operational challenges at the time of their study, which commenced in 2009, and that this outcome had likely materialized over several years of performance deterioration.[757]

650.    While the Tribunal accepts that a number of the criticisms and gaps identified by Oliver Wyman appear to be valid, for the reasons outlined above, it cannot accept all of them.  Further, the Tribunal cannot accept that the regulation of domestic airfares did not affect the profitability

---

[753] Transcript pp. 824-826.

[754] Transcript pp. 832-833.  Mr. Krishnan stated as follows:

> We were not explicitly instructed as such.  But our focus was to, as I mentioned in my PowerPoint presentation, to first just describe the state of the Airlines as we found them, and then look at a path forward.  So we did not spend any time exploring time periods prior to '08.

[755] Transcript pp. 835-836.  It does not appear that Oliver Wyman was aware of the levels at which airfares had been set, nor the effect that these might have had on the performance of the Airlines.  According to them, "there were ways in which the Airlines could manage its way to break even without the tariff structure ever changing."  In Oliver Wyman's view, the airfares were not "…one of the drivers of the Airlines' unprofitability."  *See* Transcript pp. 836, 846-847.

[756] Transcript pp. 838 - 839.

[757] Wyman ER ¶ 8.1; Transcript p. 801.

of the Airlines.  As indicated previously, AUSA's revenues were generated almost exclusively by domestic transportation and domestic airfares represented approximately 25% of ARSA's revenue. In their letter of April 29, 2008 to the Secretary of Transportation, the Airlines identified the loss in net income flowing from the regulation of airfares at levels below the TER standard at a range of USD 390 million to USD 450 million.[758]  Claimants' experts, Compass Lexecon, estimated the historical losses due to the setting of domestic airfares between September 2002 and 2008 at USD 268 million for AUSA.[759]

651.    Having carefully reviewed all of the relevant evidence, the Tribunal is unable to conclude that the alleged inefficiencies and mismanagement of the Airlines was the sole or primary cause of their losses during the period of 2002 through 2008.  While the Tribunal accepts that some of the criticisms made by Respondent and its experts may be valid and may have contributed to some extent to a loss of revenue, it is unable to accept that the regulated domestic fares had no role to play.  Rather, the Tribunal has found the regulated domestic airfares were insufficient to permit the Airlines to cover their costs relating to their domestic operations.  This is particularly the case in respect of AUSA whose revenue was generated almost exclusively from domestic airfares.  In the Tribunal's view, the low, regulated domestic airfares had a substantial impact on the Airlines' financial and operative performance and Claimants' ability to manage the Airlines efficiently.

652.    In addition, the Tribunal believes that the difficult circumstances of the airline industry during the time the Airlines were owned by Claimants should be borne in mind.  As noted previously, a state of emergency in the air transportation sector in Argentina was declared in 2002 and maintained throughout the relevant period.  The various decrees and resolutions adopted by the Government during that time reflected the very difficult conditions faced by the industry both in Argentina and internationally.

---

[758] C-79, approved by ARSA's Board of Directors at its meeting of May 29, 2008: C-86.

[759] The estimate calculated to August 2010 for AUSA was USD 390 million.  Discounted to January 2008, the amount is USD 268 million.  Compass Lexecon had also quantified the airfare squeeze damages for ARSA, differed to 2010, in the amount of USD 269.7 million.  However, according to Claimants, this claim would only come into play in the event of a finding of unlawful expropriation. In any event, Claimants did not rely on Compass Lexecon in support of its damages claim in so far as ARSA is concerned.  *See* Cl. PHB ¶ 200.

653.    In conclusion, in spite of the provisions in the regulatory framework providing for the establishment of domestic airfares in accordance with the TER, it does not appear that the economically reasonable tariff was ever calculated or set by the Secretary of Transportation or any other of Respondent's government agencies. Nevertheless, the evidence indicates that the Ministry of Transportation, and the Government of Argentina more broadly, was aware of the need to adjust airfares to address the interests set out in Article 42 of the Air Business Law, including the need to permit airlines to cover their costs and earn a reasonable profit. Although the Secretary of Transportation increased the reference airfare, and consequently the maximum airfare cap, during the course of Claimants' ownership of the Airlines between 2001 and 2008, the increases to the airfare and other measures adopted did not keep pace with the steadily increasing costs faced by the Airlines during the period in question. As a result, the airfares set between 2001 and 2008 did not comply with the TER standard. Further, Respondent's failure to adjust airfares sufficiently to meet the TER standard affected the Airlines' ability to operate efficiently and earn a reasonable margin of return. Finally, the Tribunal is unable to conclude that the alleged inefficiencies and poor management of the Airlines explain or account for the Airlines' losses from 2005 through 2008. The Tribunal now considers whether the failure to set domestic airfares in accordance with the TER standard amounted to a breach of the FET standard under the Treaty.

### 3.    Does the failure to set airfares in accordance with the TER standard amount to a breach of FET under the Treaty?

#### Positions of the Parties

654.    Claimants submit that Respondent failed to abide by its specific commitments, promises and guarantees regarding Claimants' ability to charge economically reasonable airfares. Claimants say that their legitimate expectations were grounded on clear rights and specific commitments and guarantees provided in the regulatory framework at the time of their investment.[760] They specify that they were entitled and expected Respondent to comply with the following specific commitments, promises and guarantees regarding domestic airfares:

---

[760] Cl. Mem. ¶ 481.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

- The legal obligation to grant the Argentine Airlines Economically Reasonable Airfare, pursuant to the applicable regulatory framework, specifically the Air Business Law and Decree 6875/1971;

- The contractual obligation to set airfares permitting ARSA to obtain a reasonable margin of return, pursuant to the General Transfer Contract by which the GOA privatized ARSA;

- The obligation to conduct periodical airfare reviews, according to specific and detailed legal mechanisms pursuant to Decree 6875/1971;

- The obligation to review airfares in case of cost increases and changes in market conditions affecting the items to be taken into account in setting airfares, specifically (i) direct costs, (ii) indirect costs, (iii) financial costs, and (iv) reasonable rate of return, according to specific and detailed legal mechanisms pursuant to Decree 6875/1971;

- The ability to implement meaningful yield management and price differentiation techniques on the basis of reasonable airfare bands[.][761]

655. Claimants also argue that during the period of their investment they obtained a number of additional assurances and commitments:

- Through Decree 1654/2002, Argentina recognized that it was not providing air carriers with Economically Reasonable Airfares, and thus promised to implement (i) a 50% cut in the value-added tax (VAT) for fuel; (ii) a tax exemption from the VAT for aircraft leased with a purchase option; (iii) the right to use VAT surpluses to pay any other taxes and Social Security obligations; and (iv) a tax exemption from the VAT applied to insurance policies purchased outside Argentina;

- The promise to increase airfares made specifically to Claimants' representatives in 2005 during meetings with Argentina's highest Government officials;

- During the negotiations of the June 2006 Agreement, and in exchange for increasing its stockholding in ARSA, Argentina promised to increase airfares, setting them in accordance with the regulatory TER standard;

- Through Decree 1012/2006, Argentina again specifically recognized that it was not providing air carriers with Economically Reasonable Airfares, and thus promised to implement (i) a 50% cut in the value-added tax (VAT) for fuel; (ii) a tax exemption from the VAT for aircraft leased with a purchase option; (iii) the right to use VAT surpluses to pay any other taxes and Social Security obligations; and (iv) a tax exemption from the VAT applied to insurance policies purchased outside Argentina;

- In the May 2008 Agreement, Argentina made the additional promises to grant a series of relief measures, including airfare increases, subsidies and debt relief, to make the Argentine Airlines economically viable.[762]

---

[761] Cl. Reply ¶ 480 (footnotes omitted).
[762] Cl. Reply ¶ 482 (footnotes omitted).

Claimants say that Respondent disregarded these rights, guarantees or commitments.[763]

656.    In response to Respondent's arguments, Claimants say their position has never been that Respondent should have changed the regulatory framework in place at the time of their investment in order to benefit them nor do they argue that the FET standard should operate as an insurance policy against bad investments.   Rather, Claimants say that they were entitled to charge economically reasonable airfares, covering their direct and indirect costs and providing a reasonable margin of return, but Respondent refused to adjust airfares or implement alternative relief measures throughout the entire period of their investment.[764]

657.    Amongst other sources, Claimants rely on the decision in the *Suez* case[765] which they say addressed a very similar pattern of conduct where the tribunal found that, by refusing to adjust tariffs and using claimant's ensuing difficulties in order to unilaterally force the renegotiation of that concession, Argentina had frustrated the claimant's legitimate expectations regarding the legal framework in force and the obligation to provide investors with a stable and predictable legal framework.[766]   Claimants also relied on the decision in the *EDF v. Argentina* case,[767] which they say also analyzed a factual pattern similar to the one at issue here, where they say the tribunal found that Argentina was required to provide the investor "'long-term political and regulatory stability… [and specifically] tariffs were to be determined in a way that afforded the concessionaire sufficient income to cover all costs associated with the distribution of electricity as well as to obtain a reasonable return on its investments'".   Claimants say that, in that case, Argentina was found to be in breach of its obligations under the FET standard, not because it actively changed the regulatory framework substantially, but because it had failed to adjust tariffs to the largely

---

[763] Cl. Reply ¶¶ 482-483.

[764] Cl. Reply ¶ 484 and the sources cited there.

[765] *Suez, Sociedad General de Aguas de Barcelona S.A., and Interagua Servicios Integrales de Agua S.A., v. Argentine Republic*, ICSID Case No. ARB/03/17, Decision on Liability, July 30, 2010: C-328 [hereinafter: *Suez*].

[766] Cl. Reply ¶ 485; Cl. Mem. ¶¶ 419-420.   In their Memorial, Claimants went on to refer to a variety of cases addressing the breach of an investor's legitimate expectations: Cl. Mem. ¶¶ 421-435.   Claimants went on to argue that they legitimately expected that their right to apply economically reasonable tariffs would be upheld: Cl. Mem. ¶¶ 437-443.

[767] *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23, Award, June 11, 2012: C-904 (hereinafter:*EDF*).

modified economic and financial conditions governing the investment, and specifically the tariffs in place.[768]

658.    Relying on *Suez* and *EDF*, Claimants say that Respondent violated the FET standard by frustrating the Claimants' legitimate expectations by failing to abide by its own legal and contractual commitments, promises and guarantees.  Claimants say that these included the ability to charge economically reasonable airfares and obtain a reasonable margin of return on their investment.[769]

659.    For its part, Respondent denies any breach of the FET standard with respect to the domestic airfares under the legal regulatory framework.  It denies the scope that Claimants attribute to the FET standard and says, rather, that that standard reflects only the minimum standard of customary international law.  It also disputes that the expectations of an investor are a source of obligations under the FET standard.[770]  Without conceding Claimants' arguments regarding legitimate expectations, Respondent says that if these were to be taken into account for the purpose of argument, any expectations must be considered in the factual circumstances of each case and the circumstances relating to each investor as well as the conduct of the host state.  Further, it says that the subjective expectations of a claimant are not relevant and that, in those cases which have accepted the concept of legitimate expectations, the claimant was required to demonstrate legitimate and reasonable expectations in light of all the circumstances.  The tribunal must approach the question from an objective and reasonable point of view.[771]

660.    Respondent says that in the circumstances of this case, Claimants could not have had the legitimate expectations they claim in light of the state of the Airlines when the Marsans Group took over in 2001, the token price of USD 1 (for which it received USD 803 million from SEPI), ARSA's insolvency proceedings, the situation in the commercial air transport market after the attack of September 11, 2001 and the serious economic, political and social crisis in Argentina.

---

[768] Cl. Reply ¶¶ 486-487.
[769] Cl. Reply ¶ 488.  Claimants also argue that Respondent failed to act consistently and transparently towards Claimants' investment, that it grossly failed to exercise its regulatory powers in good faith and in a reasonable manner. *See* Respondent's position set out at: Resp. CM ¶¶ 651-681; Resp. Rej. ¶¶ 590-639.
[770] *See* Respondent's position set out at: Resp. CM ¶¶ 651-681; Resp. Rej. ¶¶ 590-639.
[771] Resp. CM ¶¶ 665-666, quoted from the decisions in *Saluka Investments B.V. v. The Czech Republic*, UNCITRAL Arbitration, Partial Award,March 17, 2006 ¶ 304: AL RA-268 [hereinafter: *Saluka*]; *Suez* ¶ 228: AL RA-282.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 244 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

Further, Respondent says that Claimants conducted no due diligence prior to signing the SPA.[772] Respondent also says that investment treaties and the FET standard are not insurance policies against bad business decisions made by investors. It says that Claimants had invoked the FET standard to hold it liable for the consequences of their poor management and poor business decisions.[773]

661.    Respondent also denies that the FET standard includes the notion of legal stability or, in this case, the stability of the regulatory framework. In any event, Respondent says that the regulatory framework in this case did not change throughout the relevant period. Rather, it says that it was Claimants who wanted to have the regulatory framework changed by way of de-regulation.[774] In this regard, Respondent distinguishes the *Suez* and *EDF* cases upon which Claimants rely. Although it does not accept the decisions in those cases, Respondent says that they illustrate why Claimants' claim in this case is substantially different and unfounded. Respondent says that in both *Suez* and *EDF*, the tribunals found that there had been fundamental alterations of the regulatory framework.[775] In addition, Respondent says that it responded to the requests from the airline industry to increase airfares and took other measures to assist it.[776]

662.    Respondent also maintains that the regulation of domestic air transport services was fair and reasonable in all of the circumstances. It also denies the rights, guarantees and commitments which Claimants allege arose after they took over the management of the Airlines.[777]

**The Tribunal's Decision on Scope of the FET Obligation**

663.    Respondent's obligation to provide fair and equitable treatment to an investment arises from Article IV(1) of the Treaty, which provides that "[e]ach Party shall guarantee in its territory fair and equitable treatment of investments made by investors of the other Party." While the expression of this obligation is general and somewhat vague, the Tribunal is assisted in interpreting

---

[772] Resp. CM ¶¶ 668-669; Resp. Rej. ¶¶ 613-614.
[773] Resp. CM ¶ 670; Resp. Rej. ¶¶ 615-616.
[774] Resp. Rej. ¶¶ 619-624.
[775] Resp. CM ¶ 671; Resp. Rej. ¶¶ 626-630.
[776] Resp. CM ¶¶ 675-678; Resp. Rej. ¶ 630. Respondent emphasizes that the measures it took applied to all companies operating in the airline industry, not only to the Airlines.
[777] Resp. CM ¶¶ 631-681; Resp. Rej. ¶ 715.

the content of this obligation by both the context of the Treaty itself and the decisions of other tribunals who have developed the content of this obligation by interpreting this particular Treaty, as well as numerous other treaties with similar provisions in different factual scenarios.

664.    The Tribunal is guided by the Vienna Convention, which directs that the Treaty "shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose" and that the purpose can be gleaned from the text of the Treaty, its preamble and annexes and other related agreements.  The preamble of the Treaty provides:

> The Argentine Republic and the Kingdom of Spain, hereinafter referred to as "the Parties",
>
> Desiring to intensify economic cooperation for the economic benefit of both countries,
>
> Intending to create favorable conditions for investments made by investors of either State in the territory of the Other State,
>
> Recognizing that the promotion and protection of investments in accordance with this Agreement will encourage initiatives in this field…

665.    Thus, the general obligation to treat the investment fairly and equitably arises in the context of the Treaty, the stated purpose of which is to "intensify economic cooperation", "create favorable conditions for investments", and to promote and protect investments in order to encourage investment.  "Treatment" according to the Oxford dictionary definition is "the manner in which someone behaves towards or deals with someone or something."  In the case of the Treaty, the treatment that is to be fair and equitable relates to the treatment of the investment by the Government of Argentina.  Previous tribunals which have turned their mind to the definition have adopted the formulation of the standard by the *S.D. Myers* tribunal that the standard is breached where there has been "treatment in such an unjust or arbitrary manner that the treatment rises to the level that is unacceptable from the international perspective."[778]

666.    In terms of content, the Tribunal is of the view that fair and equitable treatment is not only the minimum standard of treatment at international law, as that term is not used in the Treaty.  The minimum standard of treatment is a customary international law principle that sets out the

---

[778] *S.D. Myers Inc. v. Canada,* 140 ILM 1408, ¶ 263; *Saluka*, ¶ 297, C-325; *Suez* at ¶ 231.

obligations owed by a State to aliens and, as such, evolves over time as State practice and *opinio juris* changes to include today's notions of minimum standards.[779]  As discussed above, the Vienna Convention directs the Tribunal to interpret the words of the Treaty "in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."[780]

667.    While the term legitimate expectations is also not found in the Treaty, the fair and equitable treatment language has been interpreted to oblige a State not to frustrate an investor's legitimate expectations, either at the time of the investment or in the course of the investment, as long as those expectations were objectively reasonable, created by the State (the State intended for the investor to rely upon them) and relied upon by the investor.[781]  In determining what constitutes legitimate expectations, the Tribunal agrees that these must be considered in light of all of the circumstances of a case from an objective and reasonable point of view.  In other words, what would have been the legitimate and reasonable expectations of a reasonable investor in the position of the Claimants here at the time they made their investment?[782]

668.    The aspect of the fair and equitable treatment obligation that relates to legitimate expectations responds to change - usually in a State's changes to a regulatory regime upon which an investor relied in making its investment.  It has also been consistently held that it is not legitimate for investors to expect that a regulatory regime or laws will never change and that a State has the right to change its laws.  In doing so, it will not breach its obligation to treat investors fairly and equitably if it changes its laws in a legitimate exercise of its regulatory authority.[783]

669.    Turning first to the question of Claimants' legitimate expectations at the time of their investment in October 2001, the Tribunal has reached the conclusion that in all of the relevant circumstances, Claimants could not reasonably or legitimately have held the expectations they

---

[779] Even the U.S. and Canada, which both specifically link the minimum standard of treatment or general international law obligations with the fair and equitable treatment standard in their investment agreements, recognize that the standard evolves.

[780] *See* ¶ 478, above.

[781] *See*, for example, *Duke Energy Electroquil Partners and Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, August 18, 2008, ¶ 340.

[782] Resp. CM ¶¶ 665-669, quoting from *Suez* ¶ 228: AL RA-282.

[783] *Saluka*.

claim with respect to airfares under the existing regulatory framework (listed above at paragraph 654).

670.    The Tribunal recalls, first, the circumstances in which the SPA was concluded and Claimants took over the Airlines.  As noted previously, both Airlines were facing serious financial difficulties, with ARSA in insolvency proceedings since June 2001.  Liabilities exceeded USD 1 billion and forecasted operating losses for 2001 were in excess of USD 350 million.  ARSA was losing approximately USD 40 million per month and had cancelled all its international routes except one and was operating only 30% of its domestic routes.  Although it had not filed for insolvency protection, AUSA was in similarly difficult circumstances.[784]

671.    By October 2001, the Argentine economy was also in very difficult circumstances and on the verge of economic crisis.  The international airline industry had also been affected by the events of September 11, 2001.  Further, the airlines operating in Argentina were engaged in a destructive airfare war which was depressing airfares.[785]  The evidence also indicates that SEPI was keen to free itself of a significant portion of accumulated liabilities and to put an end to the continuous contributions made to support the Airlines over a period of approximately 10 years.[786]

672.    The evidence also indicates that Claimants and Air Comet performed very little, if any, due diligence before agreeing to the SPA.  Other than what Minister Bastos described as the "general regulatory conditions" and that Argentina did not have an open-sky policy, that routes were granted by concession, that other airlines operated in the domestic area and that international services competed with other international airlines, there was no indication that Claimants engaged in a review of the regulatory framework or relied on any representation or commitment by Respondent.[787]  Notably, there was no indication that Claimants had reviewed the General Transfer Contract nor made any inquiry in respect of the concept of the TER.  It also appears that Minister Bastos advised the representatives of Claimants that the Government of Argentina wished to see

---

[784] *See* ¶ 372 above and the various sources cited there.
[785] RA-538: Decree 1654/2002; Resp. CM ¶¶ 385, 876; Resp. Rej. ¶¶ 338, 384-386.
[786] C-9: SEPI's Summary Report pp. 3, 12-13.
[787] Bastos WS ¶ 36.

the Airlines to continue in operation, but that it was not prepared to contribute public funds to assist them.[788]

673.     It appears that Claimants prepared a business plan for the purposes of SEPI's tender process and the SPA.   However, the only business plan in evidence was a summary of the general parameters of the management which the Marsans Group intended to implement over the next three years.[789]   This summary plan does not reflect any inquiry into the airfare system nor any assumptions on the evolution of airfares.   This is consistent with the evidence of Mr. Muñoz Perez that very little in the way of due diligence had been done before the signature of the SPA.[790]

674.     Turning to the regulatory framework in place in 2001, this has been described above. Although the Tribunal has concluded that the framework did provide for the setting of airfares in accordance with the TER standard, this required a close examination and interpretation of the various laws and decrees.   There was no evidence that Claimants had made any inquiries or sought any clarification or assurances in respect of the regulatory framework at the time of their investment.   Further, despite the fact that the regulatory framework had been in place for some time, there is no indication that Claimants made any inquiries as to how airfares were set under the regime, nor how they had been set in the past.   This is despite the insolvency of ARSA and the very substantial accumulated liabilities and ongoing losses suffered by the Airlines.

675.     Finally, although there was no specific evidence of Claimants' reliance on it, the Tribunal has considered the nature and content of the regulatory regime governing domestic air transportation at the relevant time in order to determine whether, objectively, it could have given

---

[788] Bastos WS ¶¶ 6, 36.  Minister Bastos also indicated that Claimants' representatives did not request any special treatment or privilege from the Government which, in any event, could not have been granted.

[789] *See* Cl. Reply ¶ 73; SPA: C-18; *Plan de Negocio - Resumen Memoria Explicativa Sobre Grandes Parámetros*: RA-266.  It is not entirely clear whether this document is the *Plan de Negocio* referred to in SEPI's summary: C-9.  Further, the date of the document is not entirely clear (it bears a date of "11/09/01" on its front page).  According to Claimants, they periodically revised the Airlines' business plan.  However, there was no other business plan in evidence, other than a projection of the development of the Airlines' active fleet: C-42.

[790] In his statement before the Argentine Congress, Mr. Muñoz Perez stated, in part:
     … I did not know what I was going to find.  I signed a contract in 2001 without having seen anything.
     I hadn't even seen an account.  I hadn't seen the offices even.  I bought on the basis of the documents
     I was shown without having verified anything.
*See* C-1104: transcript of the proceedings before the Senate Committee on Infrastructure, Housing and Transportation of September 1, 2008, p. 35.

rise to the legitimate expectations claimed by Claimants.  In this regard, the Tribunal finds that the regulatory regime governing air transportation in Argentina differed in a number of ways from the regulatory regimes governing other public utilities or services, including gas distribution, water and sewage concessions and electrical power distribution concessions.[791]  For example, the regulatory regime addressed in the *Suez* case was quite different from the one governing airfares in the domestic transportation industry under consideration here.[792]  In that case, the bidding rules pursuant to which the concession contract was awarded to the claimants, and the concession itself, specifically provided for tariff revisions on the basis of increases in costs and extraordinary revisions caused by specified economic factors, including modification of the ARS/USD exchange rate.[793]

676.    Similarly, in the case of *EDF*, the regulatory framework, particularly with respect to tariffs payable to electricity distributors, was considerably more detailed than the provisions of Law 19,030 and Decree 6875/1971 in respect of domestic airfares.[794]  The relevant provincial legislation provided specifically for how electricity tariffs were to be set and provided for both ordinary and extraordinary tariff reviews.  Further, importantly, the relevant concession agreement specifically provided that accounting of costs reflected in the tariff schedule and periodic adjustment was to be in USD and tariff adjustments, to be done every 12 months, were to be conducted on the basis of U.S. producer and consumer price indices.[795]  Further, the Tribunal notes that in these, and in other industries such as gas distribution, the relevant concession holders were granted exclusive rights as opposed to the competition permitted in the domestic air transportation industry.

---

[791] Resp. Rej. ¶¶ 375-377, 625-630; Resp PHB ¶¶ 94-95.

[792] *See* C-328/RA-283: *Suez* ¶¶ 64-115.

[793] *Suez* ¶¶ 91, 101-102.  While the tribunal in the *Suez* case recognized that the concession at issue there did not contain certain elements found in other privatized concessions in other sectors, it was clear that the concession sought to protect the concessionaire from changes in the legal parity of the ARS with the USD and from significant cost increases: ¶¶ 114-115, 212.

[794] *EDF* ¶¶ 50-91, where the tribunal describes the relevant federal and provincial legislation, the info-memo, bidding terms and the relevant concession contract.

[795] *EDF* ¶¶ 80-87.  The terms of the concession in this respect reflected the information provided in the info-memo presented to promote to potential investors participation in the bidding process for the purchase of shares in the privatized electrical distribution company.  These same terms were incorporated in the draft concession agreement which formed part of the bidding terms pursuant to which the claimants acquired their interest in the newly formed privatized company.

677.    As a result, the Tribunal finds that the regulatory framework for domestic air transportation at the time of Claimants' investment did not provide an objective basis for much in the way of expectations on the part of Claimants.  The applicable legislation was very general in nature, and did not reflect any specific intention or commitment to protect tariffs by way of reviews on the basis of currency stability, foreign indices or other mechanisms.  While the General Transfer Contract did make reference in general terms to the calculation of domestic airfares in accordance with Law No. 19,030 (of 1971) pursuant to Articles 42 through 46 of that Law, no further provision was made with respect to the currency in which airfares would be calculated or to their revision in accordance with a foreign price index.  Further, there was no evidence of any specific reliance placed by Iberia or Air Comet and Claimants on the terms of the General Transfer Contract.

678.    In conclusion, the Tribunal finds that Claimants have not demonstrated on an objective basis any legitimate expectations in respect of the regulatory regime, particularly airfares, relating to their investment in the Airlines in 2001.  Rather, the Tribunal concludes that while investing in the Airlines pursuant to the bidding process conducted by SEPI may have offered Claimants an opportunity, it also brought with it significant financial and other risks.

679.    This does not, however, exclude the expectation that the conduct of Respondent subsequent to Claimants' investment would be fair and equitable.  In this regard, the Tribunal accepts that Claimants could expect that Respondent would comply with its laws and regulations and act transparently, grant due process and refrain from taking arbitrary or discriminatory measures or exercising coercion.[796]  The Tribunal now turns to this question, commencing with Claimants' allegations relating to the setting of domestic tariffs and the "Airfare Squeeze".

680.    Claimants allege that Respondent failed to abide by its specific commitments, promises and guarantees regarding the Airlines' ability to charge economically reasonable airfares by failing to grant increases to domestic airfares.  Having carefully reviewed the detailed evidence with respect to the setting of airfares between October 2001 and July 2008, the Tribunal is not persuaded that Respondents' conduct amounted to a breach of the FET standard set out in the Treaty.  While

---

[796] *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, August 27, 2009,  ¶ 141 [hereinafter: *Bayindir v. Pakistan*], as cited in *Suez* ¶¶ 206-207.

during that period costs increased very substantially and domestic airfares did not keep pace with these, the Tribunal is not persuaded that the failure to grant the fare increases requested amounted to a breach of the FET standard.

681.    The Tribunal notes that, unlike other cases involving Respondent, this is not a case where fundamental changes were made to a regulatory regime providing specific terms for the setting, review and revision of public service tariffs.  In fact, no changes to the basic regulatory framework governing domestic airfares were made during the period of Claimants' investment.  Claimants acknowledge this, as well as the fact that four airfare increases were granted between 2002 and 2008.  Claimants' complaint is that Respondent did not properly apply the regulatory framework by granting airfare increases which would have permitted them to charge domestic airfares at the TER standard.  Nevertheless, it is useful to bear in mind the distinction between the circumstances of this case and the various other cases dealing with tariff adjustments relating to concessions in other services.  Another distinguishing aspect between this and other cases is that the domestic airfares were not frozen and the Secretary of Transportation and the Government of Argentina did grant airfare increases in response to requests from the Airlines and other airlines.

682.    As noted above, in September 2002, Decree 1654/2002 declared a state of emergency in the air transportation sector and, recognizing the increase in costs in the sector, provided for an increase in domestic airfares of approximately 41% in nominal terms and re-established airfare bands at approximately 60%.  The Decree also provided for the preparation of a bill to provide additional assistance to assist airlines to meet the cost increases and difficult circumstances they were facing.  While Claimants maintain that this increase was inadequate to meet the TER standard, the Tribunal accepts that, unlike in other industries, an increase to the airfares was granted in difficult economic times.  Further, it does appear that the bill requesting tax measures to assist the airline industry was prepared, although it was never adopted by Congress.  While reference to these tax measures in Decree 1654/2002 reflects a recognition of the need to provide additional assistance to airlines, the Tribunal is unable to conclude that it constituted any commitment or guarantee of actually obtaining the adoption and implementation of those measures.

683.     The next request for airfare increases was made by the Airlines in 2004 in the amount of 8%.  Although the Secretary of Transportation rejected the Airlines' request for a larger fare increase, this was done on the basis of a study conducted by the Secretariat of Transportation on the basis that the airlines had increased their airfares, as permitted by Decree 1654/2002 and achieved positive operating results and profits for both 2003 and 2004.  The Airlines' appeals were dismissed by the Secretary of Transportation, again on the basis of a report prepared by the Secretariat.[797]  Claimants argue that the denial of the airfare increase requested in 2004 was in contravention of the regulatory framework since, in its view, the increase in its revenues or the fact that it had achieved a profit did not disentitle it to an airfare increase in accordance with the TER standard.  Whether or not Claimants are correct in this regard is not determinative.  In the Tribunal's view, what is relevant is that the Secretary of Transportation considered the Airlines' request and determined it on the basis of a reasoned study.  The Tribunal also notes that the Airlines substantially improved their operational and economic situation and earned profits in both 2003 and 2004.  In these circumstances, even if the decision to deny the airfare increases was not in compliance with the TER standard, it does not appear to have been made arbitrarily or in bad faith.

684.     After 2004, the increase in costs, particularly the cost of jet fuel, accelerated sharply.  Further, in November 2005, a significant strike affecting all airlines operating in Argentina occurred.  This and the increasing costs in the industry led to meetings with representatives of Claimants, the Government of Argentina and unions.  This was followed by negotiations which, eventually, led to the June 2006 Agreement and Addendum.[798]

685.     Shortly after the adoption of Decree 1012/2006, the Airlines wrote to the Secretary of Transportation complaining that the airfare increase granted was insufficient to allow them to charge economically reasonable airfares.  This letter was followed by others from the Airlines and from CLARA.  It appears that the Airlines met with the Secretary of Transportation to discuss the

---

[797] *See* above at ¶ 395.  Although Mr. Cirielli supported the initial recommendation not to increase airfares, the decision was by the Secretary of Transportation.  Further, it appears that Mr. Cirielli played no role in the appeal, in light of the challenges brought against him by the Airlines in the courts.

[798] *See* ¶¶ 398-406, above.  This was followed by the adoption of Decree 1012/2006 on August 7, 2006.  That decree, amongst other things, continued the state of emergency in commercial air transportation in Argentina, an increase in airfares of approximately 20% and the establishment of an aviation fuel subsidy scheme.

need to revise airfares and their increasing costs and salary demands from the unions representing their employees.[799]  Correspondence and discussions appear to have continued throughout 2007. In early 2008, the Secretariat of Transportation was studying the air transportation industry and the improvement of service.  In that context, it requested comments from the Airlines on proposed measures to increase airfares by approximately 30% and to fix the maximum price for jet fuel at ARS 1.80 per liter.[800]  This was followed by the adoption of Resolution ST No. 257/2008 on April 11 and Resolution ST No. 315/2008 on May 16, 2008.  Each of these resolutions provided for airfare increases of approximately 18%.  Resolution ST No. 257/2008 made reference to the increasing costs faced by airlines, the complexity inherent in determining air transportation costs and the need for external technical assistance to identify a satisfactory adjustment procedure in order to determine economically reasonable airfares.  Resolution ST No. 315/2008 made reference to technical studies which indicated that the airfare increases provided for in Decree 1012/2006 were insufficient to cover cost increases since August 2006.[801]

686.    It also appears that the Secretariat of Transportation was considering other steps to address the financial situation of the Airlines.  This is reflected in the May 2008 Agreement which provided for the entry of another private sector shareholder in the ownership of the Airlines.[802]  As previously indicated, the proposed investor did not proceed to invest and the May 2008 Agreement was not implemented.[803]  The Tribunal addresses separately, below, the Parties' allegations regarding the alleged breach of the May 2008 Agreement.

687.    The Tribunal's review of all of the evidence relating to the various communications between Claimants and the Secretariat of Transportation and other representatives of the Government of Argentina with regard to airfares does not lead it to conclude that Respondent's failure to approve the various airfare increases requested by the Airlines amounts to a breach of the FET standard in the Treaty.  As noted by Respondent, no change was made to the regulatory

---

[799] *See* ¶¶ 409 and 413, above.
[800] C-78/RA-371.
[801] C-181/RA-341; C-182/RA-342.  Resolution ST No. 315/2008 also made reference to the need for an economic-financial equation covering the economic equilibrium for airline operators in order to achieve a better service for users.
[802] *See* ¶¶ 417-420, above.
[803] *See* ¶ 428, above.

framework during the period of Claimants' investment.  Further, Respondent did respond to requests by the Airlines, and other airlines operating domestically, for airfare increases and other forms of relief to meet the difficult circumstances of the industry.  The evidence indicates that the Secretary of Transportation reviewed the status of the Airlines and granted airfare increases in 2002, 2006 and 2008.  While Claimants say that the Secretary of Transportation improperly denied their request for an airfare increase in 2004, this was done on the basis of studies prepared to address the Airlines' request and, in the circumstances, was not arbitrary.  The Tribunal notes that the Airlines had competitors in the domestic market and that the various conditions which led to the increase in costs were common to all airlines.  The decision to deny the airfare increase requested applied to the entire industry and, therefore, was not, in the Tribunal's view, discriminatory.

688.     Claimants also complained that Respondent was slow in implementing the airfare increases it did grant as well as other measures such as the fuel subsidies.  However, in this regard, as well as the question of setting airfares more broadly, the Tribunal accepts that the issues involved were complex and that Respondent had other concerns to address, including the maintenance of service to various parts of the country and prices to users.  In this regard, the Tribunal accepts that some deference or leeway should be granted to Respondent in balancing these interests.[804]

689.     Finally, the regulatory framework governing domestic air transportation was general in nature and not well developed.  This includes the notion of the TER which, eventually, the Secretary of Transportation came to recognize required the assistance of technical experts to calculate.[805]  There was no indication that the Secretary of Transportation had ever calculated the TER and the available evidence tends to indicate that, in fact, this had never been done since the adoption of the Air Business Law and Decree 6875/1971.

---

[804] In this regard, *see*: Resp. CM ¶ 835; Resp. Rej. ¶ 743 where Respondent refers to the award in the *Kardassopoulos v. Georgia* case where the tribunal held that the respondent State was entitled to a measure of deference in determining whether a measure was in the public interest.  The Tribunal believes that in the circumstances of this case, a similar approach should be adopted on this issue.

[805] *See* Resolution ST No. 257/2008: C-181/RA-341, discussed above.

690.   On balance, the Tribunal is unable to conclude that Respondent's conduct in the setting of airfares and denying the Airlines' requests for increases during the period from 2001 through 2008 rises to the level of a breach of the fair and equitable treatment standard.  As a result, Claimants' claim that Respondent's role in the alleged "airfare squeeze" constituted a breach of the FET standard under the Treaty fails.

691.   The Tribunal now turns to the other conduct or measures of Respondent that Claimants allege breached the FET standard protected in the Treaty.

### D.   Other Acts of Alleged "Re-Argentinization" and Undue Pressure Exerted by the Government of Argentina

692.   According to Claimants, "President Kirchner's administration was hostile towards Claimants' management of the Argentine Airlines and seemed driven by a desire to ultimately 're-Argentinize' the companies. The administration sought to—and ultimately did—reach this goal by taking a number of measures which destabilized the legal and business environment surrounding the Claimants' investment."[806] Claimants point to 1) the appointment and maintenance in office of Mr. Cirielli as Undersecretary of Air Transportation; 2) alleged pressure exerted on Claimants by the Government of Argentina through the unions; 3) the judicial challenges filed by Respondent against three of ARSA's financial statements; 4) the negotiation of an agreement with Respondent in 2006, by which they allege Respondent extracted a greater shareholding in the Airlines in return for a promise to raise airfares; and 5) Respondent's alleged pressure on Claimants to sell their controlling interest in the Airlines.[807]

---

[806] Cl. Mem. ¶ 164.
[807] *See also* Cl. Mem. ¶ 211 ("In sum, the GOA illicitly pressured Claimants by (i) refusing to perform their regulatory function of providing legally-required and financially-adequate airfares in accordance with Argentine law; (ii) supporting and encouraging APLA's and APTA's strike in November 2005; (iii) requiring that Claimants negotiate with APLA and APTA an end to the November strike with the promise of an immediate airfare increase but then delaying the airfare increase for months; (iv) crippling Claimants' financial position so as to be in a stronger position to acquire an increased shareholder percentage of ARSA; and (v) attempting to deceive Claimants by swapping the text of the true agreement with a different version.  This behavior is certainly in violation of the BIT and customary international law.").

### 1.    The Role of Undersecretary of Air Transportation Ricardo Cirielli

693.    Claimants assert that there was one key individual who embodied—and helped execute— the Government of Argentina's backhanded strategy: Mr. Cirielli, Undersecretary of Air Transportation. Claimants request a finding that Respondent's appointment and maintenance in office of Undersecretary Cirielli as well as his harmful conduct toward Claimants in his capacity as an organ of the Government were arbitrary, unfair and inequitable under the Treaty.[808]

694.    Mr. Cirielli was appointed Undersecretary by President Kirchner on May 29, 2003, and he remained in office until the end of his term in December 2007.[809] Mr. Cirielli served under Secretary of Transportation Jaime, who himself was in office between 2003 and 2009.[810] Prior to his appointment, Mr. Cirielli was the Secretary General of APTA (*Asociación del Personal Técnico Aeronáutico*), which Claimants characterize as one of the Argentine airline sector's most powerful unions. During his tenure as Undersecretary, Mr. Cirielli remained on an unpaid leave of absence from APTA, and he returned there at the end of his term in office.

695.    Claimants assert that in his capacity as Secretary General of APTA, Mr. Cirielli spoke out against Claimants on several occasions.[811] While in office, Claimants assert that he made a number of negative statements about Claimants, transforming his earlier anti-Claimant position into official government policy.[812] According to Claimants, Mr. Cirielli coined the phrase "re-Argentinization" to refer to his position that the Airlines should have Argentine owners,[813] and

---

[808] Cl. PHB ¶ 24.

[809] C-88.

[810] In terms of hierarchy, it should be noted that the Argentine Undersecretariat of Commercial Air Transportation reported to the Argentine Secretariat of Transportation, who reported in turn to the Ministry of Federal Planning, Public Investment and Services, *see* Resp. Rej. ¶ 322.

[811] *See, e.g.*, APTA 2001-2003 press releases: C-91 to C-95.  Claimants point in particular to a statement made by Mr. Cirielli two weeks before taking office, in which he referred to "Antonio Mata/Air Comet-Marsans, Spanish enemies of the "Argentina that could be." (C-95).

[812] Cl. Mem. ¶ 168.

[813] Claimants refer to the following quotes and media reports regarding Mr. Cirielli on this point: *Compromiso español por Aerolíneas*, LA NACIÓN, Sept. 16, 2005: C-106 (quoting Mr. Cirielli as stating, "We have to re-argentinize Aerolíneas Argentinas . . . "); *Polémica por la situación de Aerolíneas*, LA NACIÓN, Nov. 17, 2005: C-107 (adding that "re-argentinization" of ARSA "d[id] not mean to nationalize it, but rather for it to be owned in majority by Argentine interests."); *Paro exagerado deja al país sin vuelos*, ÁMBITO, Nov. 28, 2005: C-108 ("In Aerolíneas, they are certain since the beginning of this government that Ricardo Cirielli, Undersecretary of Air Transportation and Secretary general (albeit on leave) of APTA – one of the rebel unions – is seeking the state-ownership of Aerolíneas, or, in the worst case, its "renationalization", which implies the disappearance of Marsans as shareholder and their

they note that Mr. Cirielli advised President Kirchner in August 2003 to transfer the Airlines from Claimants to Argentine investors.[814] Claimants additionally assert that Mr. Cirielli called for strikes,[815] opposed the Airlines' request for a fare increase in December 2004,[816] and "personally instigated" the Government of Argentina's challenge of ARSA's 2002, 2003 and 2004 financial statements.[817]

696.    Respondent, on the other hand, rejects Claimants' suggestion that the Undersecretary of Air Transportation was tasked with regulating in its entirety the commercial air transport sector in Argentina; rather, this matter fell within the province of the Secretary of Transportation.[818] It asserts, for example, that Secretary of Transportation Jaime and not Mr. Cirielli was responsible for the December 2004 fare increase rejection, and that in any case, this rejection was obviated by the subsequent fare increase granted in 2006.[819]

697.    Respondent also argues that, to the extent that Claimants allege that the Government of Argentina used Mr. Cirielli and his influence over the labor unions to put pressure on the airlines, Claimants have failed to meet their burden of proof.[820] Specifically, Respondent notes that comments made by APTA after Mr. Cirielli took office cannot be attributed to Mr. Cirielli.[821] It also argues that Claimants have provided only the scantest evidence (newspaper articles and opinion pieces) in support of their contention that Mr. Cirielli supported the unions' strikes. Moreover, Respondent says that this evidence does not demonstrate that the Government of Argentina exercised effective control over the strikes.[822]

---

replacement by a national group"); *Los dueños de Aerolíneas abren la puerta al ingreso de un socio local*, CLARÍN, Apr. 18, 2008: C-109 ("The union leader and former Undersecretary of Air Transportation, Ricardo Cirielli (APTA), strongly opposed Marsans, quickly supported the 'argentinization' of Aerolíneas.").

[814] C-872.
[815] *See* Cl. Mem., fns. 188 and 194; Cl. Reply, fns. 406 and 407.
[816] Cl. Mem. ¶¶ 126-128, noting that Secretary of Transportation Jaime's rejection was based on two technical reports issued by Cirielli's office (C-82).
[817] Cl. Reply ¶ 200; C-947.
[818] Resp. Rej. ¶ 320.
[819] Resp. CM ¶ 371.
[820] Resp. CM ¶ 368.
[821] Resp. CM ¶ 369.
[822] Resp. CM ¶ 696.

698.    Claimants note that a November 15, 2005 decision by a Federal Court of Appeals in Buenos Aires found that Mr. Cirielli had a conflict of interest with respect to certain matters concerning ARSA.[823] The Argentine Anti-Corruption Office also held on March 29, 2006 that Mr. Cirielli had failed to recuse himself despite his views on ARSA and a prior defamation case he had brought against ARSA's then president, Mr. Mata.[824] Mr. Cirielli was required to refrain from any future involvement in any case involving ARSA's interests.

699.    Respondent argues that the Anti-Corruption Office's resolution "was precisely intended to avoid conflict of interest situations in the actions taken by the then Undersecretary of Commercial Air Transport."[825] Respondent notes that the resolution simply outlined that Mr. Cirielli's function could have led to conflict of interest situations, but did not affirm that such event actually occurred.[826] Respondent further argues that Claimants do not identify any occasion on which Mr. Cirielli violated the resolution.[827]

700.    With respect to the issue of attribution of state responsibility, Claimants assert that under Article IV(2) of the ILC Articles on State Responsibility, Mr. Cirielli in his capacity as Undersecretary of Air Transportation qualifies as an organ of the State.[828] Claimants assert that the acts taken by Mr. Cirielli, described in the preceding paragraphs, are all attributable to the Republic of Argentina. They also assert that the only conduct of a government official that would not be attributable to the State is "purely private conduct," which is not applicable in the current case since Mr. Cirielli's actions were carried out in his capacity as Undersecretary of Air Transportation.[829]

---

[823] C-123.
[824] C-96.
[825] Resp. CM ¶ 366.
[826] Resp. CM ¶ 367.
[827] Resp. Rej. ¶ 323.
[828] Cl. Reply ¶ 200.  *See* International Law Commission, *Draft Articles on Responsibility of States for Internationally Wrongful Acts*, November 2001, Supplement No. 10 (A/56/10), chp.IV.E.1: C-286.  Article IV provides: "(a) The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State. (b) An organ includes any person or entity which has that status in accordance with the internal law of the State."
[829] Cl. Reply ¶¶ 202-203.

701.    Respondent asserts that only the conduct of Mr. Cirielli while he held office is relevant in the instant case with a view to determining the alleged responsibility of the Argentine State.[830] Nonetheless, it argues that Claimants have relied upon the conduct of Mr. Cirielli before he was in office, which cannot be relevant for the purposes of determining the international responsibility of Argentina.[831] The only acts actually performed by Mr. Cirielli during the period of his tenure as a government official, that Claimants invoked as the basis of their FET claim are his opposition to the requests for airfare increases for the Airlines and his alleged support for strikes.  As noted above, Respondent asserts that Claimants have not established their burden of proof in respect of these acts.[832] Respondent further argues that news articles that speculate about Mr. Cirielli's personal intentions are not attributable to the State under ILC Article IV.[833]

702.    Commencing with the question of attribution, the Parties agree that insofar as the conduct of Mr. Cirielli as the Undersecretary of Air Transportation is concerned, the applicable principles are contained in Article IV of the ILC Articles on State Responsibility (the ILC Articles).  The Tribunal notes the Parties also appear to agree that only Mr. Cirielli's conduct while in office is directly attributable to Respondent.  Accordingly, only the conduct of Mr. Cirielli during his tenure as Undersecretary of Air Transportation is relevant to this claim.  Claimants acknowledge this when they state that the evidence of Mr. Cirielli's statements made before his appointment are submitted only to show his alleged public animosity towards Claimants and not in order to legally attribute those statements to Respondent.[834]  The Parties also seem to agree that the purely private conduct of Mr. Cirielli during his tenure as Undersecretary of Air Transportation is not attributable to Respondent.[835]

703.    The Tribunal has considered Claimants' complaints regarding the conduct of Mr. Cirielli in accordance with these principles.  In the Tribunal's view, Claimants have not demonstrated that

---

[830] Resp. CM ¶ 691, citing Decision on Jurisdiction at ¶ 276.
[831] Resp. CM ¶ 692.
[832] Resp. CM ¶¶ 694-696.
[833] Resp. CM ¶ 693.
[834] Cl. Reply ¶ 198.
[835] Resp. CM ¶ 693 and the sources cited there; Cl. Reply ¶¶ 202-203 and the sources cited there.
Claimants refer to Article VII of the ILC Articles which provides that if a person empowered to exercise elements of governmental authority acts in that capacity, their conduct is considered an act of the state, even if it exceeds that person's authority or contravenes instructions.

the conduct complained of constitutes a breach of Respondent's obligation to provide fair and equitable treatment pursuant to the terms of the Treaty.

704.    Claimants say that Mr. Cirielli made a number of negative statements about the Marsans Group and Spanish ownership of the Airlines while in office.  According to them, these statements reflected earlier statements made by him, while still in his position as the head of APTA, that the Airlines should be owned by Argentine interests and that this, and his expressed hostility to the Marsans Group, became Respondent's official policy.  In reviewing these allegations, the Tribunal notes that most of the evidence upon which Claimants rely are either press articles or APTA press releases made after Mr. Cirielli's appointment as Undersecretary of Air Transportation and during his leave of absence from the union.[836]

705.    Claimants say that Mr. Cirielli's views and strong opposition to the ownership and management of the Airlines by the Marsans Group was carried over to, and continued throughout, his tenure as Undersecretary of Air Transportation.  Claimants rely on press reports and a press release by another union to support this.  While the Tribunal accepts Respondent's position that newspaper articles do not provide direct proof of Mr. Cirielli's personal views or intentions and must be treated with caution,[837] it accepts, on the basis of all of the evidence submitted in respect of this issue, that Mr. Cirielli held, and likely maintained during his tenure as Undersecretary of Air Transportation, a negative view of the Airlines' ownership by the Spanish Marsans Group. However, the relevant issue is whether Claimants have demonstrated that this attitude influenced Mr. Cirielli's conduct in such a way as to affect the Airlines, and Claimants, to the extent that their right to fair and equitable treatment was breached.

706.    In the Tribunal's view, the fact that Respondent may have appointed Mr. Cirielli as Undersecretary of Air Transportation and maintained him in office until 2007 does not, in itself, amount to a breach of Claimants' rights.  While this appointment may have resulted in an Undersecretary of Air Transportation who was sympathetic to stakeholders other than the Airlines and their owners, this was a political appointment which Respondent was entitled to make.  In

---

[836] C-92; C-; C-94; and C-95.
[837] *See* Resp. CM ¶370.

order to prove a breach of Claimants' right to fair and equitable treatment under the Treaty, Claimants must show that Mr. Cirielli's conduct as Undersecretary of Air Transportation resulted in the arbitrary or discriminatory treatment of Claimants' investment in the Airlines.

707.    In this regard, Claimants allege that Mr. Cirielli called for and supported strikes against the Airlines in support of a policy to "re-Argentinize" the Airlines.  They rely on a number of newspaper articles and certain press releases by other unions in support of this contention.[838] Having reviewed these various articles and documents, the Tribunal is not persuaded that they provide sufficient, reliable proof of Claimants' allegations.

708.    Claimants also allege that Mr. Cirielli's attitude towards the Marsans Group and its ownership of the Airlines led him to oppose the Airlines' request for an airfare increase in December 2004.  As discussed above, the denial of the Airlines' request was on the basis of an internal study of the Secretariat of Transportation.  While Mr. Cirielli supported the study's conclusion that the airfare increases requested were not warranted, there was no indication that Mr. Cirielli, himself, had authored the report or influenced its conclusion.  Further, the decision on whether or not to grant the airfare increases was made by the Secretary of Transportation, and not Mr. Cirielli.

709.    Claimants also allege that Mr. Cirielli personally instigated the Government's challenge of ARSA's financial statements for the years 2002, 2003 and 2004.[839]  It appears that there was some discussion between various Government ministries, and within the Secretariat of Transportation, as to whether the financial statements of ARSA for 2002, 2003 and 2004 should be approved by the Government as a shareholder.  It appears Mr. Cirielli was of the view that the financial statements should not be approved and that he disagreed with the Secretary of Transportation in this regard.  As described previously, ARSA's financial statements for 2002 through 2005 were not approved until the signature of the June 2006 Agreement.[840]  As will be discussed below, the

---

[838] *See, inter alia,* Cl. Mem. footnotes 188 and 194; Cl. Reply footnotes 406 and 407.
[839] *See* Mr. Cirielli's statement before the Argentine Senate Commission on August 28, 2008: C-947 p. 3; Article in *La Nacion* dated October 3, 2005: C-873.
[840] *See* ¶¶ 403 - 411, above.  As part of the June 2006 Agreement, the Parties agreed to transfer shares of ARSA to the Government of Argentina to achieve a total of 5% of ARSA's stock and to permit the Government to increase its

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 262 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

approval of ARSA's financial statements generated considerable discussion and controversy for some time.  While, ultimately, the Government agreed to approve the financial statements, the objections to their approval were not entirely unfounded.[841]  As a result, the Tribunal is not persuaded that Mr. Cirielli acted arbitrarily in raising his objections to the approval of the financial statements.  In any event, Claimants have not demonstrated that Mr. Cirielli's views determined, or affected, Respondent's conduct in respect of the financial statements.

710.    The Tribunal has also considered the decisions of the Federal Court of Appeals of November 15, 2005 and the Anti-Corruption Office of March 29, 2006 finding that Mr. Cirielli had a conflict of interest between his position as Secretary General of APTA, albeit while on leave of absence, and his dealings with ARSA as the Undersecretary of Air Transportation and required him to refrain from dealing with any matters in which ARSA had an interest.  There is no indication that Mr. Cirielli failed to comply with these directions after they were rendered.[842]

711.    In conclusion, the Tribunal finds that the only conduct of Mr. Cirielli that was attributable to Respondent was his conduct while he was in office as Undersecretary of Air Transportation.  The evidence tendered in respect of that conduct was not sufficient to persuade the Tribunal that Mr. Cirielli's apparently negative view of the Spanish ownership of the Airlines affected the treatment of the Airlines and Claimants' rights in respect of them.  Accordingly, Claimants' claim that Mr. Cirielli's conduct amounted to a breach of the FET standard by Respondent must fail.

**2.    Unions**

712.    Claimants assert that, as part of Respondent's plan to "re-Argentinize" the Airlines, the Government of Argentina "found in two of the Argentine Airlines' powerful unions an alliance of convenience."[843] Claimants describe damaging strikes and unreasonable demands made by the APLA and APTA unions, which weakened Claimants financially and made their need for fare

---

shareholdings up to 20%.  In addition, the Parties agreed that the financial statements of ARSA for 2005 would be approved.  As described below, all of the financial statements for 2002 through 2005 were approved.
[841] The debate around the approval of the financial statements appears to have centered on the subrogation of ARSA's debt by Air Comet and how this should be accounted for: C-873.
[842] *See*, for example, RA-303.
[843] Cl. Mem. ¶ 10.

increases even more urgent.  They allege that Respondent directed and encouraged or supported these strikes.

713.    Claimants point to an eleven-day strike in November 2005 that they claim "took a serious toll" on ARSA's economic performance (estimated at approximately ARS 27 million) during high season.[844] According to Claimants, the strike prompted negotiations between the Airlines and the Government in December, culminating in a provisional agreement with the unions regarding a 10-20% salary increase to take effect in March 2006, at the same time that the Government would increase the airfares.[845] However, Claimants state that by March 2006, the Government had failed to implement the fare increases, and the unions were again pressing for salary increases. Claimants state that they met again with the Government in May 2006, and President Kirchner promised to grant fare increases, but on the condition of the conclusion of a 25% salary increase for the unions. Claimants assert that they complied with the Government's request and concluded an agreement with certain unions on May 15, 2006.[846]

714.    Claimants also point to a "campaign of harassment" by the unions in 2007, which they alleged involved a strike on average every fifteen days.[847] Claimants assert that these strikes constituted a "final attack" against Claimants' ownership of the Airlines.[848]

715.    Respondent does not contest the occurrence of the strikes, but asserts that the strikes were not due to any secret conspiracy but rather a number of specific conflicts between the Airlines and the unions. Respondent asserts that the mandatory conciliations ordered by the Ministry of Labor demonstrate that the issues between the Airlines and the unions included non-compliance with collective bargaining agreements, deductions on account of unauthorized union leaves, remuneration categories, non-wage monthly payments, formalization of temporary-to-permanent employment, and airline-imposed restrictions on union activity.[849]

---

[844] Cl. Mem. ¶ 184, citing C-37 and C-38.
[845] Cl. Mem. ¶ 188.
[846] Cl. Mem. ¶¶ 190-193.
[847] Cl. Mem. ¶ 220, citing Pascual Arias WS ¶ 55.
[848] Cl. Mem. ¶ 220.
[849] Resp. CM ¶ 358; Resp. Rej. ¶ 293, citing Caneto WS2 ¶ 6.

716.    More generally, Respondent argues that these kinds of strikes are not unusual, were not specific or limited to Claimants, and were entirely foreseeable. Respondent asserts that the aviation industry is one of the most highly unionized, due to the number of unions, and the high level of unionized personnel in a large workforce.[850] It also asserts that Claimants were or should have been fully aware of this dynamic, and points out that Mr. Díaz Ferrán himself noted that union and employee relations were "highly conflicted" when Claimants took control of the Airlines.[851] Finally, Respondent notes that union conflicts continue to occur at ARSA and AUSA.

717.    Finally, the Parties strongly disagree over the Government of Argentina's alleged role in encouraging the unions to strike. Claimants assert that there is ample evidence that unions like APTA and APLA in various instances acted "on the instructions or under the direction or control" of the Government of Argentina, per Article VIII of the ILC Articles on State Responsibility.[852] Claimants assert that the "overall control" standard should be applied in the instant case,[853] and that this standard is satisfied.

718.    Specifically, Claimants assert that the Government of Argentina gave "implicit support" to the APLA and APTA strikes.[854] They also argue that it exercised control over APTA through Undersecretary Cirielli, citing media and union press statements that describe Mr. Cirielli's influence on the strikes.[855] Claimants also assert that there is evidence that the Government of Argentina controlled "or was at least aligned in interest" with APLA.[856]

---

[850] Resp. CM ¶¶ 346-347.
[851] Resp. CM ¶¶ 353-355, referencing Díaz Ferrán WS ¶ 9.  Respondent also cites the testimony of Mr. Pascual de Riva (Pascual de Riva WS, ¶ 72) and Mr. Carlos Bastos (Bastos WS ¶¶ 6, 17).
[852] Cl. Reply ¶ 206.
[853] Cl. Reply ¶¶ 207-208, citing *Prosecutor v. Tadic*, International Tribunal for the Former Yugoslavia, Case IT-94-1-Tbis-R117 (1999, ILM, vol. 38, No. 6, Nov. 1999 (n 19) ¶ 115: C-504; *Loizidou v. Turkey*, Merits, ECHR, Judgment, Dec. 18, 1996, ¶ 56: C-505.
[854] Cl. Mem. ¶ 182; Cl. Reply ¶ 210, fns. 404-407.
[855] *See* Cl. Reply ¶ 210 ("Commentators described Mr. Cirielli's influence with respect to the November 2005 strike in the following terms: "[T]he conflict is spearheaded by the mechanics' union, whose Secretary General Ricardo Cirielli is also the Deputy Secretary of Commercial Aviation … paralyzing the Argentine Airlines in his role as union leader."  Shortly thereafter, the air crew union, AAA, asked for Mr. Cirielli's discharge because he was "a public officer and at the same time organize[d] a public strike which could leave 8,500 people unemployed.")
[856] Claimants cite the demotion of a senior ARSA pilot as the result of his refusal to participate in the 2005 strike led by APLA, as the reason for the strike. Cl. Reply ¶ 211.

719.    Respondent asserts that, as a general principle, the conduct of individuals or entities is not attributable to the State under international law.[857] Exceptional circumstances may be invoked when the conduct of a person or group of persons was engaged in under the instructions, the direction or the control of the State.  In such cases, the applicable standard of control under international law in order to determine whether such conduct is attributable to the State is that of "effective control."[858]

720.    Respondent argues that Claimants have failed to present any convincing evidence that either the Government of Argentina generally, or Undersecretary Cirielli specifically, controlled the unions or induced them to strike.[859] Respondent notes that the Argentine Ministry of Labor presided over numerous conciliation proceedings between the Airlines and the unions with the purpose of avoiding strikes and resetting relationships.[860] Respondent also notes that both APLA and APTA filed a complaint with the International Labor Organization against the Government of Argentina regarding its role as an intermediary in the labor conflicts with the Airlines during Claimants' management, alleging that the Government of Argentina had undermined their rights of association.[861]

721.    The Parties agree that the question of the attribution of the conduct of the unions are subject to the principles contained in Article VIII of the ILC Articles.  That Article provides as follows: "the conduct of a person or a group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct."

722.    The Parties disagree as to the standard for determining whether a person or group of persons is acting "under the direction or control of" the State.  Claimants maintain that the standard

---

[857] Resp. CM ¶ 684.
[858] *See* Testimony of Prof. Kingsbury, Transcript pp. 586-587.  *See* Case concerning Military and Paramilitary Activities in and against Nicaragua (*Nicaragua v. United States*), 1986 I.C.J. 14, ¶ 115 (27 June) (AL RA-75); Case concerning Application of the Convention on the Prevention and Punishment of the Crime of Genocide (*Bosnia and Herzegovina v. Serbia and Montenegro*), 2007 I.C.J. 43, ¶ 396 et seq. (26 February) (AL RA-76).
[859] Transcript p. 286 ("Where is the proof of coordination by the State of the conduct of the unions? Where is the proof of the planning of the unions' activities? And where is the proof of the financing or support?").
[860] Resp. CM ¶ 359; Resp. Rej. ¶ 293.
[861] Resp. Rej. ¶¶ 299, 301.

should be that of "overall control", while Respondent says that the appropriate test is "effective control".[862]  Having reviewed the Parties' arguments and the various authorities cited, the Tribunal finds Professor Kingsbury's opinion on this point persuasive and concludes that in the circumstances of this case, the test is effective control.[863]

723.    The Tribunal is not persuaded that Claimants have demonstrated such control by Respondent, through Mr. Cirielli or otherwise, over the various unions involved in strikes against the Airlines, notably APTA and APLA.  In this regard, the Tribunal finds the evidence of Mr. Caneto, the Deputy Director of Labor Relations for the Ministry of Labor, persuasive.[864]  The Tribunal's review of this and other evidence does not indicate that the strikes that Claimants complain of were carried out on the instructions of, or under the directions or control of Respondent.  As a result, the Tribunal finds that Respondent did not have effective control over the unions and that their conduct cannot be attributed to it.

724.    The Tribunal has also considered Claimants' argument that Respondent exercised overall control over APTA through Mr. Cirielli, as Undersecretary of Air Transportation.  As indicated above, the Tribunal believes that the appropriate test for the attribution of the unions' conduct to Respondent is effective control.  In any event, even applying the lower "overall control" test advocated by Claimants, the Tribunal is not persuaded that Mr. Cirielli, or Respondent, exercised such control over the unions.  While Mr. Cirielli may have been sympathetic to the unions, there is no reliable indication that he was involved in organizing, coordinating or planning the unions' activities, nor that he financed, organized or provided operating support while he was the Undersecretary of Air Transportation.[865]  As a result, the Tribunal is not satisfied that the conduct of the unions of which Claimants complain can be attributed to Respondent.  Accordingly, a breach of the FET standard under the Treaty on this basis must be dismissed.

---

[862] *See* Resp. CM ¶¶ 312-319; Cl. Reply ¶¶ 207-211; Resp. PHB ¶¶ 123-125.
[863] Kingsbury ER ¶¶ 53-54; *White Industries Australia Limited v. India*, UNCITRAL Case, Award dated November 30, 2011: AL RA-289; Resp. CM ¶¶ 684-688.  *See also* Kingsbury, Transcript pp. 586-588.
[864] *See* Caneto WS ¶¶ 9-15; Transcript pp. 533-536, 547-551.  Mr. Caneto's evidence indicated that the Ministry of Labor was involved on a number of occasions in attempts to resolve disputes between the unions and the Airlines and also imposed mandatory conciliation by APTA and APLA against Argentina and the Airlines before the ILO: AC-9; AC-10; AC-8.
[865] *See* Resp. Rej. ¶¶ 317-318 and the sources cited there.  Further, the Tribunal notes, again, that Claimants rely primarily on newspaper articles which, in the Tribunal's view, must be treated cautiously.

### 3.   Financial statements

725.   Claimants assert that the Government intentionally undermined the Airlines by challenging ARSA's financial statements in its capacity as ARSA's minority shareholder. Claimants assert that the Government's representative in ARSA voted against the approval of the 2002, 2003 and 2004 ARSA financial statements, and Respondent also brought judicial challenges against all three sets of financial statements.[866] According to Claimants, these challenges were baseless, since the Government had been timely provided with the necessary documentation and because the statements had been audited. Claimants also assert that the Government was perfectly willing to drop the judicial challenges as a condition of concluding the 2006 Agreement.[867]

726.   In response, Respondent argues that the Airlines commingled assets in a non-transparent way and failed to provide the Government with sufficient access to relevant information.[868] It asserts that it had a legitimate right as a minority shareholder to take legal measures in the face of the irregularities in the statements.[869] Respondent also says that by purchasing and subrogating the claims of creditors in ARSA's insolvency and then contributing them to ARSA's capital, Air Comet diluted Respondent's shares in ARSA to less than 2%.[870] Respondent also maintains that due to these and other issues, there were a number of inconsistencies and irregularities in the financial statements until these were corrected in 2006.[871]

727.   Respondent also says that as a consequence of the dilution of its shareholding to less than 2%, its shareholding fell below the minimum required by law to request information from the company and, as a result, it was converted into a simple passive shareholder.[872]

---

[866] Cl. Mem. ¶ 178.
[867] Cl. Mem. ¶¶ 179-180; Cl. Reply ¶ 246.
[868] Resp. Mem. on Juris. ¶¶ 312-317; Resp. CM ¶ 437.
[869] Resp. CM ¶ 438; Resp. Rej. ¶¶ 418-427.
[870] Resp. CM ¶ 439; Resp. Rej. ¶¶ 420-424.  It asserts that it had a legitimate right to challenge the resolutions of ARSA's Board of Directors approving the financial statements in question.
[871] Resp. CM ¶¶ 437-438.
[872] Resp. Rej. ¶ 424.  It appears that Respondent was also concerned about the number of directors its shareholding entitled it on the ARSA Board.  *See*, in this regard, Mr. Llorens' letter of November 21, 2006 on behalf of the Ministry of Planning to the Secretary of Transportation providing a favorable opinion on the steps taken by ARSA's Board to address Respondent's complaints regarding limited access to information, adjust the draft financial statements, the reinstatement of the State's 5% shareholding, the addition of one more appointee to ARSA's Board and the designation of one member of the Company's audit committee.  The letter also notes the amendments agreed (in the June 2006 Agreement) to give Respondent the power to veto certain decisions of strategic importance.  *See* RA-363.

728.    From its review of the Parties' arguments and the relevant evidence, the Tribunal is unable to conclude that Respondent intentionally undermined the Airlines by challenging ARSA's financial statements.  Independent of the ultimate merits of Respondent's complaints outlined above, Respondent had the right, as a shareholder, to vote against the adoption of the financial statements it challenged and to have recourse to the courts to annul the resolutions adopting them. The Tribunal is unable to determine, on the basis of the available evidence, the merits of Respondent's complaint about the lack of information provided to it.  However, it does note that some changes were made with respect to the information made available to shareholders and that adjustments were made to ARSA's 2005 financial statements to the satisfaction of the Ministry of Planning.

729.    With respect to Respondent's agreement to withdraw its court challenges to the financial statements, the Tribunal is not persuaded that Respondent's willingness to do this reflects that the initial challenges were baseless.  Rather, the withdrawal of the lawsuits was part of a compromise which resolved a contentious issue between the shareholders of ARSA.[873]  Finally, the fact that Respondent was able to negotiate the transfer of approximately 3.8% of ARSA's shares to bring it back to its original shareholding of 5% does not, in the Tribunal's view, reflect improper conduct. Rather, it forms part of a compromise negotiated between the shareholders of ARSA.

### 4.    The June 2006 Agreement

730.    Claimants assert that they continued to negotiate with the Government through the first half of 2006 to find a solution to the Airlines' financial difficulties. According to Claimants, Secretary of Transportation Jaime demanded that the Government be allowed to increase its control and shareholding participation in ARSA as a condition of increasing airfares and of withdrawing the judicial challenges against ARSA's financial statements.[874] Claimants assert that they felt obligated to negotiate an agreement, since they so badly needed an airfare increase.

---

[873] In this regard, the Tribunal notes that the challenges to the financial statements and lawsuits were based on Respondent's complaints relating to the implementation of the SPA and the capitalization of ARSA's debt.
[874] Cl. Mem. ¶ 200; Cl. Reply ¶ 242; Transcript p. 1614 (Claimants' Closing).

However, they believe that they were "extorted" [875] and "coerced" [876] by the Government into signing the June 21, 2006 agreement on these terms.

731.    Claimants request that the Tribunal find that Argentina violated the FET provision in the Treaty: (i) by unlawfully pressuring Claimants to sign the June 2006 Agreement and relinquish to the Government of Argentina 3.8% of their shares in ARSA with the promise to grant Economically Reasonable Airfares and the withdrawal of groundless challenges to ARSA's financial statements; (ii) by unilaterally and in bad faith modifying the text of the June 2006 Agreement, and (iii) by violating the June 2006 Agreement, including by not setting TER-compliant airfares and failing to comply with its 15% stock option of ARSA by making the corresponding cash contribution. Specifically, Claimants request that the Tribunal find that this conduct breaches the FET standard under the Treaty and forms part of a creeping expropriation process, which culminated in the confiscation of Claimants' investment in 2008.[877]

732.    In response, Respondent argues that the June 2006 Agreement did not bind the Government of Argentina to Claimants since the latter were not parties to the Agreement.   Moreover, Respondent says that a simple breach of contract cannot constitute a breach of the FET standard; otherwise the distinction between treaty and contract would collapse and contracts could be brought into the treaty framework in a way not supported by most of the jurisprudence.   In any event, Respondent says that it did not repudiate or breach the June 2006 Agreement.[878]

733.    On June 20, 2006, the Government of Argentina signed the Agreement with ARSA and Interinvest. The Agreement provided for 1) the approval of the 2005 financial statements, 2) the increase of the Government of Argentina's share in ARSA of a minimum of 5%, with the possibility of an additional 15% increase, 3) certain modifications to the voting rights of Class A shares, 4) the Government's agreement to desist in its lawsuits concerning the financial statements

---

[875] Cl. Reply ¶ 242.
[876] Transcript p. 1614 (Claimants' Closing) ("It was definitely a coerced agreement because the Government refused to increase airfares otherwise.  And under that Agreement, the Government obtained 3.8% of the shares for free, without having to pay for them; an option to acquire an additional 15 percent; a right to appoint two Board Members and one Audit Committee member; and a veto right over discontinuing any routes of the Airlines.  In return for that, the Government promised to raise airfares to an economically reasonable level.").
[877] Cl. PHB ¶ 103.
[878] Resp. PHB ¶ 134.

of 2002, 2003 and 2004 and 5) an agreement for the parties to take steps to arrange an eventual public offering of shares.[879] An "addendum" to the Agreement dated June 21, 2006 altered certain terms of the June 2006 Agreement, notably with respect to the rights of Class "A" shareholders.

734.    The Parties disagree on the motivation behind Respondent's demand for a share increase through the June 2006 Agreement. Respondent argues that Air Comet had acted fraudulently in capitalizing certain claims following ARSA's bankruptcy in 2001, and this had had the effect of diluting the Government of Argentina's shares in the company.[880] Respondent complains in particular about "false entries" with respect to the capitalization in 2001 of funds provided by SEPI; these alleged false entries resulted in the dilution of Respondent's shares in the airlines to less than the 2% minimum that allows shareholders to request information and file claims.[881] Accordingly, Respondent asserts that the share increase provided by the June 2006 Agreement served to "reinstate" its interest in the Airlines that had been previously reduced.[882]

735.    Respondent argues, moreover, that the June 2006 Agreement consisted of mutual concessions: the "regained" shareholding for Respondent, on one hand, and the withdrawal of Respondent's legal challenges to the financial statements on the other.[883] Respondent asserts that there was no coercion on its part. It notes that the Marsans Group never made any statement regarding the alleged coercion at the time the Agreement was executed.[884] It also points to an Interinvest Board of Directors meeting, which described the June 2006 Agreement as follows:

> … Recuerda que Interinvest también participó y suscribió los documentos, que reflejaron entre otras cuestiones que la sociedad debía solucionar la restitución del 5% de la participación que el Estado Nacional tenía en Aerolíneas Argentinas, participación que se había visto disminuida en razón de los aportes irrevocables efectuados por esta Compañía y sus controlantes. …Esta transferencia [de acciones] no será gravosa para las partes. Puesto a consideración del Directorio la propuesta es aprobada por unanimidad de los presentes[.]"[885]

---

[879] C-134.
[880] Resp. Rej. ¶¶ 420-422.
[881] Resp. CM ¶ 439; Resp. Rej. ¶ 424.
[882] Resp. CM ¶ 443.
[883] Resp. PHB ¶ 136.
[884] Resp. PHB ¶ 138.
[885] *See* RA-364 (Minutes of the Board of Directors of Interinvest S.A., October 24, 2006).

736.   For their part, Claimants deny that their repayment of ARSA's debts resulted in the dilution of Argentina's shares in the Airlines, and they argue that at any rate, Argentina could have matched Interinvest's capital contributions to avoid dilution. Claimants therefore dispute that the June 2006 Agreement's provisions regarding Argentina's 5% option serve to "restore" what had been taken from Argentina. Rather, they assert that the June 2006 Agreement gave Respondent a 3.8% shareholding "without paying a dollar," and that, as such, it was unlawfully taken by the Government in violation of the Treaty and international law.[886]

737.   Claimants also assert that Respondent failed to observe most of the commitments of the June 2006 Agreement. Specifically, they allege that the August 2006 fare increase granted per Decree 1012/2006 was insufficient and late.[887] Claimants also assert that even though Respondent later exercised its 15% stock option in ARSA under the June 2006 Agreement, it then failed to follow through and never made the required cash contribution.[888]

738.   In response, Respondent notes that neither the June 2006 Agreement nor its addendum contained any stipulation regarding a commitment of airfare increases. Moreover, Respondent points out that on August 7, 2006, the Argentine Executive issued Presidential Decree 1012, providing an additional 20% fare increase, extending the state of emergency in the commercial air sector, continuing an exemption from taking out commercial aviation insurance within Argentina, and establishing an Aviation Fuel Subsidy Scheme.[889]

739.   Finally, Claimants submit that Respondent deceived them in the formal signing of the Agreement. Claimants allege that the Agreement that the Government presented and that Claimants signed during an official visit of President Kirchner to Spain was, unbeknownst to Claimants, different from the terms to which the parties had previously agreed. According to Claimants, the new agreement gave the Government shareholding privileges that Claimants had previous rejected in earlier drafts of the Agreement. Claimants state that with the support of the

---

[886] Claimants' Opening, Transcript p. 161.
[887] Cl. PHB ¶ 101.
[888] *Id.*
[889] Resp. CM ¶ 465.

Spanish executive, they confronted the Government about the deception, and that the parties signed an addendum to the Agreement restoring the originally-agreed terms.[890]

740.     Respondent denies that any deception occurred in the signing of the June 2006 Agreement, and that Claimants have failed to produce any evidence to support their assertions.[891] Respondent also argues, in the alternative, that Claimants are estopped from arguing deception when they did not fulfill the duty of diligence to read the Agreement before signing it.[892]

741.     The relevant particulars of the 2006 Agreement are quoted above at paragraph 404.  The Addendum modified certain terms of the Agreement. With respect to the provisions concerning the rights of Class A shareholders, the following changes were made to the original language:

> PRIMERO
>
> …
>
> c) La modificación del Estatuto Social de AASA a efectos de que este prevea y refleje:
>
> …
>
> ii) que será necesario el voto favorable de las Acciones Clase "A" ~~o y en su caso~~ de los dos directores designados a propuesta de los accionistas de la Clase "A" según sea el caso, para ~~decisiones estratégicas como por ejemplo~~ las siguientes decisiones:
>
>> 1)    aumentos significativos de capital de la sociedad, salvo que ello fuere necesario para garantizar el normal funcionamiento y desarrollo de la misma,
>>
>> 2)    ~~alianzas estratégicas u operaciones que afecten la línea de bandera nacional o deban alinearse con la política aerocomercial argentina,~~ El ingreso a alianzas con otras aerolíneas internacionales del tipo de la "One World" "Star Alliance";
>>
>> 3)    ~~resolver la~~ eliminación o reducción sustancial de los servicios de transporte aerocomercial de cabotaje. No obstante, si los Directores por Clase "A" no estuvieren a favor de dicha eliminación o reducción, asegurará el cumplimiento de la aplicación de la tarifa económica retributiva (Art. 42, Ley 19.030).

742.     The June 2006 Agreement is entitled "Letter of Intent between the State of Argentina and Aerolíneas Argentinas S.A. and Interinvest S.A.".  It states that it is the parties' intention to discuss

---

[890] Cl. Mem. ¶¶ 203-209.
[891] Resp. CM ¶ 447.
[892] Resp. CM ¶ 449.

256

a number of issues at the next annual/special meeting of the shareholders of ARSA.  As Respondent submitted, no reference is made to an increase in airfares in the text of the June 2006 Agreement, nor the Addendum.

743.   Nevertheless, Claimants submit that an increase in airfares had been promised by Respondent and formed part of the June 2006 Agreement which Respondent breached when it failed to increase airfares in an amount sufficient to cover the Airlines' costs and achieve the TER standard.[893]   Claimants say that they relied on the promises made to it by the Government of Argentina to increase airfares to meet the TER standard to agree to the terms of the June 2006 Agreement.[894]   Claimants also say that Respondent's representatives told them that airfare increases would only be granted if ARSA granted wage increases to APTA and APLA's members.[895]   Therefore, Claimants argue that Respondent conditioned airfare increases on their political needs and coerced their agreement to the June 2006 Agreement.

744.   The evidence surrounding the negotiation of the June 2006 Agreement, commencing with the strike by the unions, APTA and APLA, in November 2005, is complex and not altogether clear. It appears that the strike by the unions, which lasted nine days, led to a request by the Government of Argentina that representatives of the Marsans Group travel to Argentina to discuss the resolution of the strike.[896]   It appears that during the course of discussions, Mr. Díaz Ferrán advised Respondent that the Airlines could not increase wages to resolve the strikes without an airfare increase, to which the Government responded that it would increase airfares and provide a subsidy for jet fuel once an agreement was reached with the union.  This led to the signature of a provisional agreement with the unions in December 2005 and the resolution of the strike.[897]

---

[893] Cl. Reply ¶¶ 234-264 and the sources cited there, including Díaz Ferrán WS ¶¶ 36-38, 45-49.  *See also* ¶¶ 398-403, above.
[894] Cl. Reply ¶ 262.
[895] Cl. Reply ¶¶ 34, 36, 240, 242.  Claimants say that Respondent's representatives included the President, Mr. Kirchner, his Chief of Cabinet, Mr. Fernández, and Secretary Jaime.  Claimants also say that they agreed to the transfer of ARSA shares to the Government in return for the promised airfare increases and withdrawal of the lawsuits challenging ARSA's financial statements.
[896] Cl. Mem. ¶¶ 184-190.
[897] *See* ¶ 398, above, and Díaz Ferrán WS ¶¶ 31-34; Cl. Mem. ¶¶ 188-190.

745.   Although the precise details of the strike and the negotiations between Claimants' representatives, the unions and representatives of the Government are not clear, the Tribunal accepts that the Government was concerned about the strike which had paralyzed the operations of the Airlines and affected air transportation in Argentina and that it would seek to act as an intermediary to resolve the situation.   The Tribunal also accepts that, in this context, the Government would summon the unions' representatives to discuss a solution with Mr. Díaz Ferrán and other representatives of the Airlines.   While there appears to have been some familiarity between the Government and the union leaders, the Tribunal does not find this necessarily surprising and is unable to conclude that the Government orchestrated or supported the strike. Finally, the Tribunal does not find it surprising that in the context of discussions surrounding the strikes, increases in airfares and other measures were discussed and that the Government indicated that it would increase airfares in order to assist in finding a solution to the strike.

746.   The Tribunal notes that neither the increase in airfares nor the increase in union salaries are referred to in the June 2006 Agreement.   This is perhaps not surprising given the nature of the June 2006 Agreement.   The June 2006 Agreement is in the form of an agreement between the shareholders of ARSA to discuss and resolve certain issues at the next shareholders' meeting. However, the Tribunal is unable to accept that the increase in airfares discussed between the representatives of Claimants and the representatives of Respondent during the course of the various meetings relating to the June 2006 Agreement formed part of that agreement.   As a result, the alleged delay and inadequacy in the airfare increase granted in Decree 1012/2006 in August 2006 cannot give rise to a breach of the agreement.   Rather, the question of the increase of the airfares, and Claimants' allegations that it was inadequate, falls to be decided within the more general question of whether Respondent permitted the Airlines to charge economically reasonable tariffs. As discussed above, the Tribunal has concluded that Respondent's conduct in this regard does not amount to a breach of the FET standard (see paragraphs 654 - 691, above).

747.   With respect to the items listed in the June 2006 Agreement, the Tribunal finds that each of the parties complied with their obligations: Interinvest transferred approximately 3.2% of ARSA's stock to Respondent free of charge and provided an option for Respondent to increase its stock holdings to up to 20%; amendments to ARSA's by-laws were made in order to provide for

certain rights which would attach to Class "A" shares; and Respondent withdrew the legal proceedings challenging the approval of ARSA's financial statements for the years 2002, 2003 and 2004.[898]  As a result, the Tribunal finds that neither Party breached the June 2006 Agreement.

748.    The Tribunal has also considered Claimants' complaint regarding the alleged deception by Respondent in the drafting of paragraph 1(c) of the June 2006 Agreement relating to Section 1(c)(ii) of ARSA's by-laws in respect of the voting rights attaching to Class "A" shares held by Respondent.[899]  In the Tribunal's view, the alleged deception was more likely due to a lack of communication or complication in the process of finalizing the June 2006 Agreement.  It appears that any intentional deception was unlikely since one could normally anticipate that the agreement would be reviewed before signing and that any departure from the agreed final version would be noticed by Claimants.  In any event, the modification made by Respondent's representatives was noticed and an addendum containing the parties' agreed, revised language was signed.

749.    With respect to Claimants' allegations regarding the transfer of Class "A" shares to Respondent to achieve a 5% shareholding and the withdrawal of Respondent's challenges to the financial statements, these have been addressed in the previous section.  For the reasons stated there, the Tribunal is unable to conclude that these demonstrate arbitrary or other conduct which rises to the level of a breach of the FET standard set out in the Treaty.

**5.      Respondent's pressure on Claimants to sell the Airlines**

750.    The Parties agree that the Airlines were in a very difficult financial condition by the end of 2007 and early 2008. Claimants note that "[b]y 2007, ARSA had an EBITDA of US$4 million, net losses amounting to US$116 million, and an increase in the company's accounts payable (or commercial debts with suppliers) of US$34 million compared to 2006. AUSA's situation was not much better. By the end of 2007, its EBITDA had dropped to US$ 4 million, net losses amounting to US$21 million, and AUSA's account payables (short term debt with suppliers) increased US$20

---

[898] As indicated above, Respondent consented to the approval of the 2005 financial statements after certain adjustments which it requested were made.
[899] Cl. Mem. ¶¶ 201-211; Cl. Reply ¶¶ 249-256; Resp. PHB ¶ 102.

million between December 2007 and June 2008."[900] Respondent characterizes the Airlines as being in a state of "imminent collapse" by the spring of 2008.[901]

751.    Claimants attribute this "financial agony" of the Airlines to Argentina's policies (described in the preceding sections of this Section), abetted by the unions' frequent strikes.[902]

752.    In contrast, Respondent attributes the Airlines' condition to Claimants' alleged mismanagement of the Airlines. Respondent also asserts that by the spring of 2008, the Airlines were "threatening" to cease all services in several destinations and to reduce flight frequency in others.[903]

753.    In this context of the Airlines' financial turmoil, Claimants assert that Respondent placed increased pressure on them "to compel them to sell part or all of their stake in the Argentine Airlines to a local businessman or to the GOA itself."[904] They argue that Argentina's ever-increasing "asphyxiation" strategy culminated in 2008 with a series of measures that concluded in the formal expropriation of the Airlines.

754.    Specifically, Claimants assert that the Government of Argentina's attempts to pressure them into giving up their control of the Airlines, first through *de facto* government representatives and then subsequently through the May and July 2008 Agreements, constitutes a part of Argentina's creeping expropriation of the Airlines.[905] Claimants also assert that Respondent then breached both the May and July 2008 Agreements, violating the Treaty's FET clause as well as the umbrella clause in Article II(2)(c) of the U.S.-Argentina BIT, imported through the Treaty's MFN clause in Article IV(2).

---

[900] Cl. Mem. ¶ 223.
[901] Resp. Rej. ¶ 447.
[902] *See, e.g.*, Cl. Mem. ¶ 217; Cl. Reply ¶¶ 265, 275.
[903] *See, e.g.*, Resp. Rej. ¶¶ 444-446; C-78; C-79; C-371.
[904] Cl. Mem. ¶ 215.
[905] Cl. Mem. ¶¶ 368-369; Cl. Reply ¶¶ 412, 495; *see also* Cl. PHB ¶¶ 108-109.

**Early 2008 attempts to negotiate a sale of the Airlines**

755.    According to Claimants, they were approached in early 2008 by a group of investors interested in purchasing the Airlines.  This group was led by Mr. Manuel Vázquez, a purported advisor to Secretary of Transportation Jaime, and Mr. Miguel Angel Llorente, a private investor.[906] While it does not appear that Mr. Vázquez had an official government position, Claimants state that he was nonetheless an "advisor" to Secretary of Transportation Jaime, and that the negotiations he led were therefore "*de facto*" negotiations with the Argentine government.[907] According to Claimants, it was clear from Mr. Vázquez that the Government of Argentina wanted a sale and transfer of control settled quietly and without any publicity.[908]

756.    Respondent rejects the assertion that the group of investors who offered the $150 million for the Airlines were *de facto* representatives of the Government. Respondent asserts that the letters between Claimants and the potential investors do not mention Mr. Vázquez, and certainly do not include the Government of Argentina as part of this group of investors.[909]

757.    The relevant facts relating to this are summarized above at paragraph 417.  While Claimants' witnesses, Messrs. Pascual de Riva, Pascual Arias and Muñoz Pérez, all testify to the *de facto* involvement of the Government of Argentina in this attempted deal, the documentary evidence on the record is inconclusive. An April 2, 2008 letter from Mr. Angel Llorente to Messrs. Díaz Ferrán and Pascual Arias, which includes the proposed terms of the offer, does not mention Mr. Vázquez or the Government of Argentina.[910] An April 3, 2008 response letter, written by Mr. Muñoz Pérez, counters with a higher sale price, and also includes as a condition that each of the prospective buyers be identified by name and percentage of ownership.[911]

---

[906] Cl. Mem. ¶ 229.
[907] Cl. Mem. ¶ 232; Cl. Reply ¶ 225; se*e also* Pascual de Riva WS ¶¶ 97-98; Pascual Arias WS ¶¶ 67-68, Muñoz Pérez WS1 ¶¶ 6-10.
[908] *See, e.g.*, Testimony of Muñoz Pérez, Transcript pp. 447-449.
[909] Resp. Rej. ¶ 456.
[910] C-121.
[911] C-122.

758.    Claimants assert that after some negotiations, Mr. Muñoz Pérez rejected the $150 million offer, which they considered to be too low.[912]

759.    While Respondent may have encouraged or facilitated the approach by Mr. Vázquez, the Tribunal is unable to find that this formed part of the alleged attempt by Respondent to force out Claimants.  Further, while ARSA may have been facing another strike (this time by APLA), the evidence does not bear out that this was coordinated by the Government through Mr. Perez Tamayo to put additional pressure on Claimants.

**The May 2008 Agreement**

760.    Claimants say that the Government of Argentina subsequently made an official attempt to induce an investor to take over the Airlines.  According to Claimants, in mid-April 2008, Mr. Ernesto Gutiérrez advised Mr. Pascual Arias that he had been asked by the Government of Argentina to act as an intermediary for the purpose of allowing Argentine investors to acquire participation in ARSA and in increasing the Government of Argentina's shareholding.  It appears that in May 2008, Mr. Gutiérrez introduced Mr. López Mena to Claimants.  Claimants say that Mr. López Mena was interested in acquiring a controlling participation in the Airlines and that he had the Government of Argentina's support.  Further, in May 2008, Messrs. Pascual Arias and López Mena agreed to initiate a due diligence process for the purchase of a majority share of the Airlines.[913] Claimants assert that Mr. López Mena insisted that the Government of Argentina grant him certain guarantees that would allow the Airlines to improve their performance.[914]

761.    In the meantime, representatives of the Government of Argentina and of the "Air Comet-Interinvest Group", as the majority shareholder of the Airlines, negotiated the May 2008 Agreement.

762.    As indicated previously, the proposed local investor provided for in the May 2008 Agreement, Mr. López Mena, did not proceed with the contemplated investment.[915]   Claimants

---

[912] Cl. Mem. ¶ 231; Cl. Reply ¶ 273; C-172.
[913] Cl. Mem. ¶ 238.
[914] Cl. Mem. ¶ 239, citing Pascual Arias WS ¶ 75.
[915] *See* ¶ 428, above.

say that this was due to Respondent's failure to comply with the terms of the agreement. Claimants say that but for an insufficient airfare increase of 18% and an incomplete fuel subsidy, Respondent failed to implement the other commitments it undertook in the agreement.[916]

763.    Claimants say that Respondent's failure to comply with the May 2008 Agreement constitutes a breach of the FET standard under the Treaty and forms part of a creeping expropriation process that culminated in the formal expropriation of Claimants' investment in 2008. Claimants also say that the terms of the May 2008 Agreement confirm Respondent's failure to approve economically reasonable airfares.[917]

764.    Respondent argues in response that it did not repudiate or fail to meet its obligations under the Agreement. Moreover, it argues that the May 2008 Agreement does not bind the Government of Argentina to an agreement with Claimants, who are not parties to the Agreement. It also argues that a simple contract breach cannot constitute a breach of the FET standard; otherwise the distinction between treaty and contract collapses and contracts may be brought into the treaty framework in a way not supported by most jurisprudence.[918]

765.    Respondent says that the May 2008 Agreement failed because the Marsans Group failed to make sufficient financial and operational information of the Airlines available to Mr. López Mena.[919]  Respondent also says that Mr. López Mena's failure to participate was the result of the serious situation of the Airlines.[920]

766.    Finally, Respondent says that it complied with its commitments in the May 2008 Agreement to grant an airfare increase of 18% and that it signed an agreement to provide fuel to airlines at a subsidized price.[921]

---

[916] Cl. Reply ¶¶ 283-284; Resp. PHB ¶ 116.
[917] Cl. PHB ¶ 117.
[918] Resp. PHB ¶ 134.
[919] Resp. PHB ¶¶ 144-147 and the sources cited there.
[920] Resp. PHB ¶ 147.
[921] Resp. PHB ¶ 142.  By way of Resolution No. 315/2008 (RA-342), the Secretary of Transportation granted an 18% increase in airfares.  The jet fuel supply agreement was dated June 19, 2008: RA-375.

767.   The May 2008 Agreement provided for two main features: 1) a new corporate structure and ownership chain (with the controlling indirect interest in the Airlines going to the new investor), and 2) Argentina's agreement to implement specific measures to assist the Airlines.

768.   With respect to the first feature, the Agreement provided for the reallocation of shares in the Airlines from Interinvest to a new corporate vehicle which would hold 70% of ARSA's share, divided 48% to the Air Comet-Interinvest Group and 52% to the new investor; the Government of Argentina (up to 20%) and Airline employees (up to 10%).[922]   Specifically, the Agreement contemplated that (i) Claimants would sell AUSA to ARSA, (ii) the Government of Argentina would make an equity contribution in ARSA and increase its participation in ARSA by 15%, and (iii) Claimants would sell a controlling indirect interest in both airlines to Mr. López Mena.[923] The price to be fixed for the shares for the public sector's interest and the Argentine private company's interest was to be based on "the average of the appraisals conducted by three consulting firms with expertise in international quality appraisals selected by the Shareholders with the approval of the Argentine State"—namely, PricewaterhouseCoopers, Deloitte and Morgan Stanley.[924]

769.   Claimants   subsequently   obtained   the   valuations   of   AUSA   from PricewaterhouseCoopers,[925] Deloitte[926] and Morgan Stanley[927] that were contemplated by the Agreement.  The valuation of AUSA by PricewaterhouseCoopers indicated a range of USD 130.3 million to 369.4 million (comparable valuation) or USD 381 million (DCF valuation); by Deloitte USD 476 million (DCF valuation); and by Morgan Stanley a range of USD 450 million to 550 million (DCF valuation and comparable valuation).[928]

770.   With respect to the second feature of the May 2008 Agreement, the "Viability Measures for Aerolíneas and Austral," these measures included an increase in airfares by 18%, a price cap of ARS 1.85 per liter for fuel, exemptions on VAT and other taxes, renewal of the fleet, resolution

---

[922] The details of this share transfer are quite complex.  *See* Claimants Opening, Slide 81 for more details.
[923] Cl. Mem. ¶ 243.
[924] Articles 1.1 and 1.2.
[925] C-377.
[926] C-375.
[927] C-376.
[928] *Id.*; *see also* CLEX ER Supp. Report at Figure XIII.  These valuations averaged USD 450 million for AUSA alone.

of ARSA's debts, among other measures (Articles 2.1-2.11). According to Claimants, these provisions constituted recognition on the part of the Government of Argentina "that new and urgent airfare increases, tax exemptions and fuel subsidies were needed to make the Argentine Airlines viable"[929] and to make the transaction with Mr. López Mena go forward.

771.    The Parties agree that the transaction with Mr. López Mena that was contemplated by the May 2008 Agreement did not materialize. However, the Parties disagree on the reasons for the failure of the transaction.  Specifically, each Party attributes blame to the opposing Party for Mr. López Mena's withdrawal from the proposed transaction.

772.    Claimants allege that the Government of Argentina failed to provide adequate assurances on the airfare increases and subsidies promised under the May 2008 Agreement.[930]  Claimants point, in particular, to a press interview with Mr. López Mena on May 9, 2008, before the Agreement was signed, in which he asserted that he would not invest in the Airlines if Respondent did not reduce taxes and provide subsidies.  With respect to the measures promised by Respondent, Mr. López Mena asserted, "What we are asking, and I'm asking this through you, is that the Government treats us in the same way airlines are treated in serious countries."[931]  According to Mr. Pascual Arias, Mr. López Mena was then "scared away" from the deal contemplated under the May 2008 Agreement, due to the Government of Argentina's record of not fulfilling its commitments and the lack of certainty that the situation would be any different this time.[932]

773.    In response to Claimants' assertion, Respondent argues that the Argentine Secretariat of Transportation did in fact raise airfares by 18% as required by the Agreement, and did so on May 16, 2008, the day after the Agreement was executed.[933]  Argentina had previously granted an increase of 18% on April 11, 2008.[934]  Respondent also asserts that the Secretariat of Transportation entered an agreement with fuel providers to provide jet fuel at the subsidized price

---

[929] Cl. Reply ¶ 266.
[930] Cl. Mem. ¶ 233.
[931] C-183.
[932] Cl. Mem. ¶ 251, citing Pascual Arias WS ¶ 77.
[933] Resp. Rej. ¶ 451; RA-342.
[934] C-181.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 282 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

of ARS 1.85 per liter to airlines for the domestic transportation of passengers.[935]   Secretary of Transportation Jaime signed this agreement on June 20, 2008.  Respondent's witness, Mr. Llorens conceded that the process to make the tax changes and address other encumbrances was started, but never executed.[936]

774.     Respondent also argues that it was not Argentina's actions but, rather, Claimants' own conduct that dissuaded Mr. López Mena from finalizing the deal. Respondent points to a May 7, 2008 letter from Mr. López Mena to Mr. Pascual Arias clarifying that any such deal was contingent on the favorable results of the audit of the Airlines.[937] Respondent also references a statement made by Mr. López Mena's company, Buquebus: "[M]r. López Mena decided not to proceed with the purchase of the Airlines because he could never become sufficiently familiarized with the economic, financial and operative situation of the Companies, given that, as already stated, the Marsans group failed to furnish the required information."[938]   Mr. Llorens testified that the May 2008 Agreement failed because Interinvest did not provide "in a complete fashion the information needed for the due diligence so as to assess the value of the company."[939] Finally, Respondent notes that Claimants' witness, Mr. Muñoz Pérez, testified to the Argentine Congress in August of 2008 that the May 2008 Agreement failed "because it was not viable," and because "we were unable to implement it in the adequate deadline."[940]

---

[935] Resp. Rej. ¶ 452; RA-375.

[936] Testimony of Undersecretary Llorens, Transcript p. 609.

[937] C-312.

[938] Resp. Rej. ¶ 463, citing RA-555.  It should be noted that this statement is in the form of a letter dated October 21, 2013 and addressed to Mr. Mihanovich, counsel for the Respondent.

[939] Testimony of Undersecretary Llorens, Transcript p. 610.  *See also* Respondent's Opening, Transcript pp. 264-265: "[B]ased on Mr. Mena's group discussions, the conversations with the Marsans Group did not move forward because he failed to provide the information for the due diligence of the airlines."

[940] Respondent's Closing, Transcript p. 1748, citing C-1082, p. 69 [Tribunal's translation] ("*El del 15 de mayo se cayó porque no fue viable, no fuimos capaces de implementarlo en el tiempo adecuado.*").  Note, however, that Muñoz Pérez testified moments earlier in this Congressional hearing that Claimants conducted due diligence and communicated extensively with Mr. López Mena's company, Buquebus.  *Id.* p. 68 ("*En cuanto a la causa por la cual no se llevó adelante el acuerdo del 15 de mayo, fue porque los acontecimientos nos han desbordado. Por nuestra parte hicimos todo lo que estaba en nuestras manos; se contrató y se nombró interlocutor al Credit Suisse, se creó el data room, el due diligence por Internet, se tuvo muchas reuniones con la gente de Buquebus y con otros posibles interesados en entrar en Aerolíneas y se estuvo trabajando al respecto.*").  Also, the reference to being unable to implement the agreement in time, in context, appears to refer to all the parties involved.

775.    The evidence relating to the reasons for Mr. López Mena not proceeding with the deal is inconclusive.  At the time, the Airlines were already in difficult financial conditions and there was evidence of uncertainty surrounding airfares and fuel subsidies.  In addition, the proposed deal was complex and the valuations obtained by Claimants were substantial.  Thus, the negotiation of the proposed deal could have been expected to take time and there were several potential points of disagreement and uncertainty.  As a result, the Tribunal is unable to conclude that either Party was responsible for the failure of the proposed transaction described in the May 2008 Agreement.

776.    Further, the Tribunal is not persuaded that Respondent's involvement in the May 2008 Agreement and its attempt to introduce another private sector investor was improper or amounted to a breach of the fair and equitable treatment due to Claimants' investment in the Airlines.

### The July 2008 Agreement

777.    After the deal contemplated by the May 2008 Agreement fell through, the Airlines' financial situation continued to deteriorate. Claimants assert that "[b]y mid-2008 the Argentine Airline's financial condition hit its worst point since Claimants acquired them in October 2001."[941] Respondent characterizes the Airlines as being "in truly bankrupt condition" by this time.[942] Respondent moreover asserts that it entered an agreement with the aviation unions on July 9, 2008 to maintain normal labor relations and the provision of air services,[943] and that when the Airlines were unable to make payroll for June 2008, the Government of Argentina began to make payments to cover wages and operating expenses as part of its "emergency financial assistance" to the Airlines.[944]

778.    After the failure of the May 2008 Agreement, Interinvest and Respondent began negotiations for the purchase of the Airlines directly by the Government of Argentina.  On July 17, 2008, Interinvest and Argentina signed the July 2008 Agreement. Under the terms of the Agreement, Interinvest agreed to sell all of its shares in the Airlines for a price to be determined

---

[941] Cl. Reply ¶ 287.
[942] Resp. CM ¶ 478; Resp. Rej. ¶ 466.
[943] Resp. CM ¶ 479.
[944] Resp. CM ¶¶ 483-485.  Respondent asserts that during this period, and up until December 2008, it paid a total of ARS 897 million into the Airlines.  Resp. PHB ¶ 149.

pursuant to a defined mechanism.[945]  The Agreement provided that the Parties would take all corporate and statutory steps required to formalize the purchase and sale transaction: Interinvest was required to provide to Respondent all documents required to formalize the transfers provided for in the Agreement; Respondent was required to take all steps legally required for the purchase of Interinvest's entire stockholding in the Airlines.  The Agreement provided for a 60 day transition period to formalize the purchase and sale, during which time a transition board would manage the operations of the Airlines (Article 3). Each party to the Agreement would appoint two members to sit on the Transition Board, which would be presided over by a General Manager appointed by Argentina, who would monitor the Airlines' operation and be in charge of their daily management (Article 3). Article 4 of the Agreement provided a list of things to be completed by the parties within the 60-day period, and Article 5 provided that the parties would prepare an income statement and balance sheet for the Airlines as of July 17, 2008, the date on which the Transition Board would come into operation.

779.    Article 6 of the Agreement spells out the specific mechanism by which the parties agreed to set the sale price for the Airlines' shares. In full, Article 6 provides:

> (i) The purchase price for AUSTRAL's [AUSA's] stock interest shall be determined based on the valuation provided by a valuation entity to be appointed therefor by [Interinvest] and the valuation to be performed at the request of the STATE OF ARGENTINA.
>
> (ii) The purchase price for AEROLÍNEAS' [ARSA's] stock interest shall be determined based on the valuation provided by a valuation entity to be appointed therefor by [Interinvest] and the valuation to be performed at the request of the STATE OF ARGENTINA.
>
> The STATE OF ARGENTINA shall seek the abovementioned valuations from the Appraisal Board, which agency shall assess the value of the airlines as a whole.
>
> Should the valuations thus performed yield different results and/or if an agreement cannot be otherwise reached as to the price of the two stock interests, a third valuation shall be sought from an impartial local or foreign entity of international renown specialized in the purchase and sale and/or valuation of international airlines; the valuation thus obtained shall be final and definitive as between the Parties.
>
> The valuation shall be performed using the discounted cash flow method. Such future cash flows shall be calculated using the following assumptions: (i) the cost of fuel at its current subsidized value of $1.85 (one Argentine peso and eighty-five cents) per liter plus VAT; said price is to be changed using reference prices and proportionately to price variations in the market; and (ii) the current fare for domestic flights, modified proportionately to any changes projected for all other costs.

---

[945] C-190, quoted above at ¶ 435 and below at ¶ 779.

780.    The July 2008 Agreement was signed at a public event on July 17, 2008 by Secretary Jaime on behalf of Respondent and by the representative of the Interinvest S.A. Group, Mr. Eduardo Aranda.  The Agreement provided that it would be ratified by the Federal Minister of Planning and by Messrs. Díaz Ferrán and Pascual Arias on July 21, 2008.[946]  As agreed, the July 2008 Agreement was then ratified on July 21 by Federal Minister of Planning De Vido, the Spanish Ambassador to Argentina, Mr. Estrella, and Messrs. Díaz Ferrán and Pascual Arias.

781.    There was a dispute between the Parties' legal experts on the nature of the July 2008 Agreement.  Respondent's expert, Professor Mata, opined that the July 2008 Agreement was a form of preliminary or "preparatory" agreement for the purchase and sale of the shares.  He also maintained that there was no specific obligation in the Agreement for Interinvest to sell its shares nor for the Government to purchase them.  Rather, he agreed to the suggestion that Interinvest could have decided not to sell or the Government of Argentina could have decided not to buy the shares.[947]  On the other hand, Claimants' expert, Professor Bianchi, was of the view that the July 2008 Agreement was binding in nature and provided Interinvest with the vested right to sell the shares of the Airlines by means of a sale contract at a price to be defined by an agreed mechanism.[948]

782.    In the Tribunal's view, the July 2008 Agreement constituted a binding agreement between Interinvest and the Government of Argentina pursuant to which the two parties agreed to the purchase and sale of Interinvest's shares in the Airlines on the terms set out in the Agreement.  Whether a further, formalized purchase and sale agreement was envisioned by the Parties does not affect the binding nature of the commitments contained in the July 2008 Agreement.  The Parties to the agreement agreed to the purchase and sale of the Airlines on certain terms.[949] The July 2008 Agreement came in to full force and effect upon ratification by the Government's Minister of Federal Planning, Mr. De Vido, on July 21, 2008.  Further, as of that date, the Parties commenced

---

[946] C-90.  Messrs. Díaz Ferrán and Pascual Arias were referred to as the majority shareholders of ARSA and AUSA.
[947] *See* Professor Mata's evidence at Transcript pp. 662, 664-665.
[948] Bianchi ER1 ¶¶ 43-48; Transcript pp. 589-590.
[949] This is reflected in the oral evidence of Mr. Llorens, the Legal Subsecretary of the Federal Ministry of Planning, Public Investment and Services, who agreed that in the July 2008 Agreement, the Government agreed to buy the Airlines provided certain conditions were met.  *See* Transcript p. 633.  Mr. Llorens also accepted that the Agreement provided for a mechanism to set the price for the shares and provided for a DCF valuation methodology.

the implementation of the July 2008 Agreement with the appointment of the Transition Committee and the Interim General Manager, Mr. Alak.  As will be discussed further below, the Parties generally comported themselves in a manner that indicated that they considered themselves bound by the agreement well into November of 2008.

783.    The Tribunal has noted some disagreement between the Parties' legal experts as to whether there was a requirement that the July 2008 Agreement be approved by Congress. Professor Bianchi was of the view that the agreement became fully effective upon formal ratification by Minister De Vido and that if the agreement was subsequently submitted for Congressional approval, this was a political decision by the Executive.  In his opinion, the purchase of a company, in this case of the shares of the Airlines, is administrative matter which fell within the scope of authority of the Executive.[950]  On the other hand, Professor Mata was of the view that the approval of Congress was required since the privatization of ARSA had been approved by an act of Congress.  According to him, the acquisition of the shares of the Airlines entailed reversing the privatization as well as the Government of Argentina's re-assumption of the corporate decision-making power over the Airlines, both of which required the approval of Congress. Further, according to Professor Mata, the purchase of the Airlines' shares implied the need for earmarking within the national budget which required the consideration and approval of Congress.[951]   In the Tribunal's view, whether Congress' approval was required for the implementation of the purchase of the Airlines does not affect the binding nature of the commitments made by the Government of Argentina in the July 2008 Agreement.

784.    In this regard, the agreement does not expressly provide for approval by Congress before it was to come into effect.  Rather, Article 2 of the Agreement provides that Respondent was required to "take [all] the steps legally required for the purchase of [Interinvest's] entire stockholding in Aerolineas and Austral."   After having been signed by the Secretary of Transportation on July 21, 2008, the Agreement was ratified by the Federal Minister of Planning,

---

[950] Bianchi ER1 ¶¶ 49-50; Transcript pp. 602-604.  He also disagreed with Professor Mata that a law approving the Agreement was required because ARSA had been privatized by way of a statute adopted by Congress or because the amount to be paid for the transaction had to be reflected in the budget.  *See* Bianchi ER1 ¶ 50; Transcript pp. 602-603.
[951] Mata ER4 ¶¶ 16-22; Transcript Day 4, pp. 625-626.

Claimants and the Spanish Ambassador to Argentina.  In these circumstances, the Tribunal concludes that the Government of Argentina bound itself to the provisions of the July 2008 Agreement without the condition of approval by Congress.  In any event, Respondent accepts that Law No. 26,412 approved the July 2008 Agreement, albeit with some modifications.[952]

785.   Claimants assert that at the same time the July 2008 Agreement was signed, Interinvest also signed a "List of Non-Contractual Arrangements" with the Government.[953] According to Claimants, this Side Agreement was necessary because the executives of the Airlines "had been the object of persecution in the courts and in the media" and they wanted to ensure that once the Airlines were sold, "the judicial persecution would cease."[954] This "List" provides as follows:

> Stay of all court actions. Immediate.
>
> Upon the signing of the agreement, all court actions will be dropped.
>
> Signing of the Agreement: On Monday 21, before the ambassador to Spain (who will also be signing), the Argentine Minister, and the executing parties.
>
> Oral agreement that there will be no political, media or court persecution and that upon the execution of all final documents, the broadest statutory guarantees will be given.[955]

786.   Respondent strenuously denies that this "extra contractual arrangement" was a part of the July 2008 Agreement and asserts that the alleged signatory was not a State representative.[956]

787.   It appears that the Side Agreement was signed on July 16, 2008 and that one of the signatures was by Mr. Gutiérrez at whose offices the Parties met on that date.[957]  It does not appear that Mr. Gutiérrez was acting in any formal capacity as Respondent's representative.  However, the evidence indicates that he was involved as a *de facto* agent or facilitator on behalf of

---

[952] *See* the testimony of Mr. Llorens at Transcript p. 640.  In addition, Mr. Llorens testified that after the adoption of Law No. 26,412, the pricing mechanism under the agreement continued to be in force and that pursuing its implementation was not inconsistent with Law No. 26,412.
[953] This side agreement is appended to Claimants' copy of the July 2008 Agreement: C-190.  It is not, however, included in Respondent's copy of the July 2008 Agreement: RA-559.
[954] *See* Pascual Arias WS ¶ 80.
[955] C-190.
[956] Resp. Rej. ¶¶ 474-475.
[957] Muñoz Pérez, Transcript pp. 455-456; Cl. Mem. ¶¶ 255-256; Cl. Reply ¶ 298.

Respondent in respect of both the May 2008 Agreement and the July 2008 Agreement.[958] Although the Side Agreement is not formally referred to in the July 2008 Agreement, nor expressly appended to that agreement as an exhibit, it does appear to have been signed contemporaneously with the agreement and lists at least one agreed term relating to the July 2008 Agreement: signature of the July 2008 Agreement on July 21st with the presence and signature by the Spanish Ambassador to Argentina.[959]

788.    Each of the Parties accuses the other of breaching the July 2008 Agreement.  For their part, Claimants say that Respondent effectively repudiated the agreement by failing to simply submit it for approval by the Argentine Congress and, instead, filing a bill for a "repossession" or "*rescate*" law.  In addition, they say that the lengthy Presidential message which introduced the *rescate* bill contained a variety of false statements and many negative remarks in an attempt to generate a strong reaction from Congress against Claimants and the July 2008 Agreement.[960]  Further, Claimants say that Law No. 26,412, which approved Respondent's "repossession" or "*rescate*" of the Airlines, referred only to calculation of compensation for the purchase of the shares by the TTN and made no reference to the July 2008 Agreement or the valuation methodology contained in the agreement.

789.    Claimants also say that after the adoption of Law No. 26,412 in September 2008, Respondent continued to act in an arbitrary and non-transparent manner by acting as if it were abiding by the July 2008 Agreement while, at the same time, repudiating it.  They say that Respondent maintained discussions and meetings with them (primarily relating to the valuation submitted by Claimants) in the pretense that it was going to enforce and comply with the July 2008

---

[958] Pascual Arias WS ¶ 79; Muñoz Pérez WS1 ¶¶ 7, 10, 13; Transcript pp. 450-451, 453, 455-456; Cl. Mem. ¶¶ 253, 258; Cl. Reply ¶ 298.

[959] *See* item (iii) of the Side Agreement at C-190.  The other items in the Side Agreement refer to the freezing or suspension of legal actions and any persecution. Messrs. Pascual Arias (WS ¶ 80) and Muñoz Pérez (WS1 ¶ 12) make some reference to legal actions and threats against the representatives of the Marsans Group and the Airlines, but there was little or no evidence of the alleged legal proceedings in the record.  Further, Mr. Llorens denied having threatened Mr. Muñoz Pérez.  In any event, according to Mr. Muñoz Pérez, he held firm to his position regarding the terms of the July 2008 Agreement and did not give in to the alleged threats.  Subsequently, the Parties negotiated and signed the final text of the July 2008 Agreement.  Muñoz Pérez, Transcript pp. 453-456.

[960] Cl. Reply ¶¶ 299-304.  Claimants say that despite their attempt to have Respondent correct the false statements, this was not done.

Agreement.  However, Claimants say that Respondent did not do this and effectively took control of the Airlines in November 2008 and subsequently expropriated the shares in the Airlines in December 2008.  Claimants say that this conduct violated the FET standard in a number of ways, in particular the requirements that Respondent act transparently and consistently towards Claimants' investment, that it respect Claimants' legitimate expectations and rights and that it act in good faith.[961]

790.    Claimants also say that Respondent breached the July 2008 Agreement by failing to conduct the valuation pursuant to Article 6 of the Agreement in accordance with the DCF methodology agreed.   According to Claimants, the DCF valuation that was prepared for Respondent by the TTN did not adopt the terms of the July 2008 Agreement.[962]

791.    In addition, and in any event, Claimants say that since Credit Suisse's valuation and TTN's valuation differed, the Parties were obliged to appoint a third, independent valuator in accordance with Article 6 of the July 2008 Agreement.   However, Respondent refused to do so despite Claimants' repeated requests.  Claimants maintain that to justify this refusal, Respondent raised a number of invalid objections, including, *inter alia,* that: the Credit Suisse valuation did not bear a holographic signature and was not apostilled; it lacked information to properly asses the Credit Suisse valuation and the Airlines in general; and Marsans Group/Interinvest had failed to submit a draft 2007 balance sheet sufficiently in advance of the shareholders' meeting called to approve it.[963]  Claimants say that, for a number of reasons, these objections were not valid.

792.    Further, Claimants say that although the Transition Committee's powers and term should have expired on October 14, 2008, Respondent continued to control the Airlines through the General Manager, Mr. Alak, appointed under the July 2008 Agreement.   When Claimants

---

[961] Cl. Mem. ¶¶ 453-456; Cl. Reply ¶¶ 304, 479, 496-497.  Claimants say that both the *Rescate* Law and the Expropriation Law repudiated the July 2008 Agreement.
[962] According to Claimants, the TTN's DCF valuation assumed only 5 years of cash flows and terminal value for the Airlines; applied discount rates in ARS to cash flows in USD; did not adjust airfares in proportion to cost increases. *See*, for example, Cl. PHB ¶ 130.  The Tribunal notes that the TTN's primary basis for valuation was an asset valuation: *see* TTN's valuation dated October 10, 2008: C-204.  Claimants also say that under its DCF valuation, the TTN had valued AUSA at USD 79 million, but arbitrarily concluded that since ARSA had a negative value that exceeded AUSA's positive valuation, no compensation was due to Claimants for AUSA: Cl. PHB ¶ 131.
[963] Cl. PHB ¶ 134.

attempted to call a Board of Directors' meeting with a view to removing Mr. Alak as Interim General Manager, Respondent requested and obtained an injunction preventing any change in the Board of Directors or the removal of Mr. Alak.[964]

793.    For its part, Respondent says that Law No. 26,412 was not inconsistent with the July 2008 Agreement nor did it render it invalid.  It says that the Law authorized the executive branch of government to enter into a share purchase agreement and that after the enactment of the Law, it continued to make its best efforts to ensure the requirements and conditions set forth in the Agreement were met.[965]

794.    In this regard, Respondent says that Claimants failed to provide the financial information required under the terms of the July 2008 Agreement.  Specifically, Respondent says that the Credit Suisse valuation submitted by Claimants was not properly signed, nor was it independent.  Further, Respondent says that Claimants failed or refused to provide all of the necessary information to assess the Credit Suisse valuation and therefore it could not consider the valuation as an appraisal under Article 6 of the July 2008 Agreement.[966]

795.    Respondent also says that Claimants failed to comply with the requirement in the July 2008 Agreement regarding the preparation of income statements and balance sheets for the Airlines as at December 31, 2007 and July 17, 2008.  It says that the statements provided were only unaudited, incomplete copies of what was required.[967]

796.    Respondent states that due to Claimants' failures to provide a valuation in accordance with Article 6 of the July 2008 Agreement and to provide adequate financial information, it was not possible to proceed with the purchase contemplated by the July 2008 Agreement.[968]

797.    Respondent says that in view of the condition of the Airlines and the lack of information regarding their financial status, it had to request an injunction preventing any changes to the Board

---

[964] Cl. Mem. ¶¶ 273-274; Cl. Reply ¶ 314; Cl. PHB ¶ 142.
[965] Resp. PHB ¶ 156.
[966] Resp. Rej. ¶¶ 490-493; Resp. CM ¶¶ 507-508; Resp. PHB ¶¶ 159-162.
[967] Resp. PHB ¶ 161; Llorens WS3 ¶¶ 54-60.
[968] Resp. Rej. ¶ 496; Resp. PHB ¶ 162.

of Directors of ARSA, including Mr. Alak, and the designation of a court appointed comptroller.[969] Further, in view of the valuation by the TTN, the findings of the National Audit Office regarding the state of the Airlines and the alleged failure of Claimants to meet their obligations under the July 2008 Agreement, Respondent says that the Argentine Congress adopted Law No. 26,466, which declared that the shares of the Airlines and of their subsidiaries were for the public interest and subject to expropriation.[970]

## Law No. 26,412

798.    On July 24, 2008, the Argentine Executive submitted the July 2008 Agreement for approval to Congress. Along with the Memorandum of Agreement itself, Respondent submitted a bill for "repossession" (*rescate*) along with an introduction.[971]

799.    According to Claimants, this introductory message contained misleading and negative statements regarding Claimants' management of the Airlines.[972] They also point to a statement made by Secretary of Transportation Jaime to the effect that "Aerolíneas Argentinas has been deprived of much. Personally I believe nothing should be paid, but that should be determined by the public valuation agencies."[973]

800.    Respondent, on the other hand, argues that the Executive's request for a "bail out" was necessary for the following reasons: 1) the Airlines were not providing consistent, regular equal services as required under the Aeronautics Code, 2) they were not ensuring employment for workers, and 3) they were not maintaining the aircraft and continuity of service.[974] Respondent argues that Law No. 26,412 "directly results from a series of facts caused by Claimants, which could have arisen—given their own inexperience and negligence—from the cancellation of the

---

[969] Resp. Rej. ¶¶ 498-499.

[970] Resp. Rej. ¶ 501.  According to Mr. Llorens, Claimants never submitted the documentation required to support the Credit Suisse valuation, which constituted a breach of the July 2008 Agreement.  He testified that when "…we communicated this to Congress, Congress moved on with the Expropriation Law."  *See* Transcript p. 656.

[971] *See* Muñoz Pérez WS2 App. 12.

[972] Cl. Mem. ¶ 264; Cl. Reply ¶ 299.

[973] C-196, p. 16/49: transcript of Secretary of Transportation Jaime's statement before the National Congress, August 6, 2008. [Tribunal's translation]

[974] Resp. CM ¶ 491; Resp. Rej. ¶¶ 485-489; *see also* Respondent's Opening, Transcript pp. 263-265.

public service in question,"[975] and that the law itself was "the most suitable mitigating factor to ensure users the continuity of the provision of the commercial air service."[976]

801.    The Presidential message introducing the bill requesting approval of the July 2008 Agreement contains a number of highly critical comments relating to the management of the Airlines by its majority shareholders, Air Comet and Interinvest.  It alleges, amongst other things, that they never complied with their commitments to make investments, increase regular flights and incorporate new aircraft in either domestic or international services.  It also states that the serious situation of the Airlines was due to the deficient management by Marsans Group.  It also referred to alleged repeated failure to comply with agreements with the Government of Argentina and the failure to comply with operating requirements for routes covered by their concessions, as well as the failure to meet technical requirements pursuant to the terms of the Air Transportation Code.[977]

802.    As noted previously, on July 29, 2008, Interinvest wrote to the Federal Minister of Planning and to the Secretary of Transportation to complain that the introductory message contained many incorrect statements contrary to the interests of Interinvest and its management of the Airlines.  Interinvest also complained that the statements in question were unnecessary for the purpose of submitting the bill to Congress.  On September 16, 2008, Interinvest submitted a lengthy and detailed document pointing out the many alleged inaccuracies contained in the Presidential introductory message.[978]

803.    In the Tribunal's view, the message introducing the proposed bill was partial and did not give a fair account of the reasons for the serious financial conditions of the Airlines.  As indicated above, the Tribunal has found that Respondent has not, for the most part, demonstrated the alleged

---

[975] Resp. CM ¶ 497.
[976] Resp. CM ¶ 498.
[977] *See* Muñoz Pérez WS2, App. 12.  The message was also highly critical of the management of the Airlines prior to 2001 and of the privatization policy under which the Airlines had been privatized.  The introductory message also stated that it was in the interest of the State that the final price arrived by application of the provisions in the July 2008 Agreement be subject to approval of Congress.
[978] Muñoz Pérez WS2, App. 13.  Interinvest`s response runs to 44 pages.  It addresses, *inter alia,* the fact that the Airlines were under the supervision of the Secretariat of Transportation and other authorities which regularly reviewed their operations and had renewed the Airlines' concessions.  Interinvest also denied that its management of the Airlines was inadequate and raised the issue of the very significant increase in the costs of the Airlines and the inadequacy of the airfare increases which did not comply with the TER standard.

poor management of the Airlines.  Further, the introductory message took no account of the sharply increasing costs of the Airlines and the fact that these were only offset to a limited extent by measures adopted by the Government, nor the poor market conditions faced by the airline industry. As the Tribunal has found previously, the Government repeatedly acknowledged the crisis faced by airlines by implementing and continuing a state of emergency in the air transportation sector and in the various decrees and resolutions implementing airfare increases and proposed tax measures to assist the industry.  In these circumstances, the Tribunal finds that the introductory message introducing the request for approval of the July 2008 Agreement was not fairly balanced and could not have been of much, if any, support for the approval of the terms of the July 2008 Agreement.

804.    Further, the Tribunal finds that the statement made by the Government representatives to the committee of Congress considering the bill were also not supportive of the adoption of the July 2008 Agreement.  For example, Secretary Jaime was critical of the performance and management of the Airlines and offered his view that ARSA had been deprived of much and that "obviously, I consider that nothing should be paid.  However, it is the appropriate agencies which will determine which is the true price to be paid, one or the other.  That will be determined by Congress."[979] Secretary Jaime's statements were also inconsistent. On occasion he stated that if there was no agreement on the price, then there would be a third valuation by an international entity.  However, at other times, he stated that the third-party valuation would be binding on the Parties and unappealable by them, but not on Congress which could decide not to approve the price determined by the third valuator.[980]

805.    The bill submitting the July 2008 Agreement for approval proposes the repossession or *rescate* of the Airlines and the approval of the agreement which was attached Annex 1.  The bill provided that the TTN would perform the valuation provided for in Article 6 of the July 2008

---

[979] C-196.  "*A Aerolíneas se le ha sacado mucho.  Obviamente, considero que no se debe pagar nada.  Pero, son los organismos que corresponden aquellos que determinarán cuál es el verdadero precio que tendrá que pagar, uno o el otro.  Eso lo determinará el Congreso de la Nación.*"
[980] *See* C-196, pp. 16/49, 42/49, 43/49.

Agreement.  It also provided that the price determined by Article 6 of the Agreement would have to be submitted to Congress for approval before payment.[981]

806.    The Argentine Congress enacted Law No. 26,412 on September 18, 2008, approving the Government's "repossession" of the Airlines.[982] The law provides, in relevant part:

> **SECTION 1** - In order to guarantee the public service of commercial air transport for passengers, mail and cargo, the Argentine State shall redeem the shares in Aerolíneas Argentinas S.A. and Austral Líneas Aéreas - Cielos del Sur S.A, and any other company owned by them (Optar S.A., Jet Paq S.A., Aerohandling S.A.), by purchasing their capital stock.
>
> **SECTION 2** - The National Valuation Office shall assess the companies Aerolíneas Argentinas  S.A. and Austral Líneas Aéreas - Cielos del Sur S.A, pursuant to Section 1 hereof. Valuations will be carried out taking into consideration the values prevailing as of July 1, 2008. The Joint Committee of the House and the Senate for State Reform and Privatization Follow Up created under Section 14 of Law 23,696, shall supervise the valuations, ensuring that they take into account the companies' actual Shareholders' Equity and that they are in keeping with the technical criteria governing the activities that those companies are engaged in.
>
> **SECTION 3** - The price determined shall be submitted to the Honourable Argentine Congress for approval…[983]

807.    Although Article 1 of Law No. 26,412 provides that the redemption of the shares would be achieved by way of their purchase, no reference is made to the July 2008 Agreement nor the methodology contained in it for the determination of the price of the shares.  Rather, the only valuations mentioned were to be performed by the TTN and supervised by the joint committee of Congress, with the price determined to be subject to congressional approval.

808.    The Parties disagree as to whether Law No. 26,412, as enacted, disregarded or breached the July 2008 Agreement. Claimants assert that, "in a clear breach of the July 2008 Agreement, Law No. 26,412 did not make any reference to the July 2008 Agreement section establishing that in case of disagreement between the Parties' valuations, the price of the Argentine Airlines' shares would be set by a third independent and renowned valuation agency."[984] Instead, the law provided only that the Tribunal de Tasaciones, the TTN, would calculate the compensation.[985]

---

[981] Draft bill Articles 2-3: Muñoz Pérez WS2, App. 12.
[982] C-13.
[983] C-388.  The full text of Law 26,412 is set out at para. 442, above.
[984] Claimants' Opening, Transcript pp. 170-171.
[985] Cl. PHB ¶ 126.

809.    Respondent asserts, however, that Law No. 26,412 did not disregard or ignore the July 2008 Agreement. To the contrary, it argues the July 2008 Agreement provided in Article 2 that the Government of Argentina "shall take all steps legally required for the purchase of [Interinvest]'s entire stockholding in AEROLÍNEAS and AUSTRAL."[986] It further argues that Congress was required to approve the July 2008 Agreement because the share purchase needed to be ear-marked in the national budget, and also because the Agreement reversed an older law privatizing the Airlines.[987]

810.    Respondent points out, furthermore, that following the enactment of Law No. 26,412, the Government of Argentina made its best efforts to ensure that the requirements and conditions set forth in the July 2008 Agreement were met.[988]

811.    Although Law No. 26,412 did not refer to the July 2008 Agreement nor incorporate the valuation methodology contained in the agreement, the law was not necessarily inconsistent with the agreement.  There was no express requirement in the July 2008 Agreement for the Government of Argentina to obtain the approval of Congress, nor for it to set out the valuation methodology for determining the price of the purchase of the Airlines' shares.  Rather, the Government of Argentina's obligation was to take all steps legally required for the purchase of Interinvest's entire shareholding in the Airlines.  The agreement also required, in Article 6, that the Government of Argentina should seek the valuations provided for in that article from the TTN.  On its face, Law No. 26,412 provided for valuations of both Airlines by the TTN.  In the Tribunal's view, whether the valuations were properly conducted by the TTN (or Interinvest) and the subsequent failure to propose or agree to appoint a third valuator is a separate matter.  There was no indication that these issues were specifically related to Law No. 26,412.  As a result, the Tribunal cannot conclude that Law No. 26,412 itself breached the July 2008 Agreement as alleged by Claimants.  Rather, the relevant question is whether the Parties complied with their obligations under the Agreement to

---

[986] Resp. Rej. ¶ 505; *see also* C-190.
[987] Respondent's Closing, Transcript p. 1750; *see also* Testimony of Ismael Mata, Transcript pp. 625-626.
[988] Resp. PHB ¶ 156; *see also* Testimony of Undersecretary Llorens, Transcript pp. 640-641 (agreeing that Law 26,412 approved the July 2008 Agreement, "with some modifications").

conduct the valuations provided for and, in the event of a failure to agree on a price, to appoint a third valuator to determine the same.

812.    The Tribunal notes that it appears common ground between the Parties that the July 2008 Agreement remained in force irrespective of the adoption of Law No. 26,412.  As discussed below, the Parties continued to address the valuations throughout the month of October and into November 2008.[989]

**The valuations of the Airlines**

813.    After the execution and ratification of the July 2008 Agreement, the Transition Committee commenced its function and Mr. Alak was appointed the General Manager of the Airlines.  At its first meeting, the Transition Committee set out its duties and those of the General Manager who, in addition to control of operations and daily management of the Companies under the instructions of the Transition Committee, was also charged with implementing the necessary actions required to perfect the purchase and sale agreement which was the subject of the July 2008 Agreement. Further, at the request of Interinvest, information requests in respect of the Airlines were to be centralized or channeled through the General Manager.[990]

814.    By October 14, 2008, valuations had been prepared by both the TTN and Credit Suisse and exchanged between Interinvest and Respondent.  The TTN's valuation was dated October 9, 2008 and was submitted to Subsecretary Llorens on October 10, 2008.[991]  The Credit Suisse valuation was dated October 12, 2008.[992]  These two valuations were dramatically different. Credit Suisse's

---

[989] In this regard, Mr. Llorens accepted that the pricing mechanism in Article 6 of the July 2008 Agreement remained in force at the time he wrote his letter of October 30, 2008 and that he was acting consistently with Law No. 26,412: Transcript p. 640; RL-23.
[990] RA-378.  This was confirmed at the second meeting of the Transition Committee where the representatives of the State confirmed that administrative arrangements had been made so that all document or information requests and their receipt should be implemented through the General Manager.  Further, the State's representatives indicated that the teams from the Ministry of Planning, the General Audit Office (AGN) and the Siren would participate in information requests and assist the General Manager.  With respect to the valuations of the shares of ARSA and AUSA, the minutes record that the valuations would be performed by entities appointed by Interinvest and the State pursuant to the DCF methodology in accordance with Article 6 of the July 2008 Agreement and that the members of the Transition Committee requested that the valuating entities consider that, to the extent possible, the valuations should be technically comparable.  RA-379, p. 2.
[991] Llorens WS1, Ex. 12; C-204.
[992] C-2001.  A certified and apostilled copy of the Credit Suisse report was also prepared on October 31, 2008.

valuation for the Airlines ranged between USD 330 million to USD 540 million.[993]  The TTN's valuation found the Airlines to have a negative value of USD 832 million.[994]

815.    The Parties have three fundamental disagreements with respect to the valuations. First, they disagree as to whether the valuation submitted by Interinvest complied with the requirements of the July 2008 Agreement. As outlined below, Respondent asserts that Claimants breached the agreement by failing to provide a valid valuation, which it says required a signed and apostilled independent valuation.  Respondent also says that Interinvest failed to provide all of the financial information it was required to provide such that the TTN could fully analyze the Credit Suisse valuation.  Claimants assert that Respondent had access to all the information and unjustifiably rejected the Credit Suisse valuation.  Second, the Parties disagree as to whether the TTN's valuation was independent and in compliance with the Agreement. Third, the Parties accuse each other of breaching the July 2008 Agreement with respect to the obligation to finalize the Airlines' financial statements.

816.    After receiving Claimants' Credit Suisse valuation, Undersecretary Llorens[995] requested on October 15, 2008 that Interinvest submit supporting materials for the Credit Suisse valuation, specifically with respect to the valuation's EBITDA, WACC and TIR indexes.[996] Undersecretary Llorens reiterated this request on October 23, 2008.[997] On that same day, Interinvest requested the exhibits supporting the TTN's first valuation,[998] and these exhibits were provided to Interinvest on October 27, 2008.[999] On October 27, 2008, Interinvest presented supplementary materials. However, Undersecretary Llorens asserts that these materials were insufficient.[1000]

---

[993] Cl. Mem. ¶ 269; Credit Suisse Valuation, October 12, 2008, at 7: C-201.

[994] Cl. Mem. ¶ 270; Tribunal de Tasaciones de la Nación October 2008 Valuation, at 1: C-204.  Claimants also note that the Tribunal de Tasaciones de la Nación drafted two additional valuations of the Airlines at the request of the Government of Argentina in November 2008 and January 2009.  Those valuations also resulted in billionaire negative values in ARS.  These were submitted as C-380 and C-379, respectively.

[995] Undersecretary Llorens notes that the Secretariat of Transportation reports to the Ministry of Federal Planning, Public Investment and Services, and that the Undersecretariat of Legal Affairs therefore handles legal issues for the Secretariat of Transportation.

[996] RL-13.

[997] RL-16.

[998] RL-15.

[999] RL-19.

[1000] Llorens WS1, ¶ 41.

817.    Concurrent with Undersecretary Llorens' requests for supplemental materials supporting the Credit Suisse valuation, he also requested that Interinvest submit a signed copy of the Credit Suisse valuation that complied with the requirements of the Hague Convention of 1961.[1001] According to Respondent and Undersecretary Llorens, the Credit Suisse valuation as submitted by Interinvest did not have a holographic signature.[1002]   Undersecretary Llorens asserts that he met with a representative from Interinvest and a representative from Credit Suisse to discuss the outstanding issues on October 29, 2008.   According to Undersecretary Llorens, the Credit Suisse representative clarified that the Credit Suisse report was indeed a valuation, but that it should not be considered to be independent.[1003]   Respondent points out that Mr. Muñoz Pérez confirmed that the Credit Suisse valuation was based on the Business Plan prepared by the Board of Directors of the Marsans Group.[1004]

818.    On October 30, 2008, Undersecretary Llorens sent a letter responding to Interinvest's request for the appointment of a third-party independent valuator per the terms of Article 6 of the July 2008 Agreement.[1005] In this letter, the Undersecretariat of Legal Affairs asserted that it could not consider the Credit Suisse documents submitted as an appraisal under Article 6, as Interinvest and Credit Suisse had not responded to the Undersecretariat's requests for signatures and verification. In the letter, Interinvest was warned that it was required to submit the valuation within 48 hours on penalty of breach of the July 2008 Agreement.

819.    On November 4, 2008, Interinvest submitted the Credit Suisse valuation "with the appropriate certifications and authentications under the law governing its execution and the international certification pursuant to the Apostille system established by The Hague Conference," according to Undersecretary Llorens.[1006] However, Undersecretary Llorens asserts that this valuation only partially complied with the letters sent by the Undersecretariat of Legal Affairs.[1007]

---

[1001] Llorens WS3, ¶ 41; *see* letters from Undersecretariat of Legal Affairs to Interinvest of October 24 (RL-17) and October 28, 2008 (RL-20).
[1002] Llorens WS3 ¶ 34; *see also* Respondent's Closing, Transcript p. 1752.
[1003] Llorens WS ¶¶ 42-43.
[1004] Resp. PHB ¶ 40, citing Testimony of Muñoz Pérez, Transcript p. 489.
[1005] RL-23.
[1006] Llorens WS3 ¶ 47.
[1007] Llorens WS3 ¶ 47.

On November 7, 2008, Undersecretary Llorens issued a letter to Interinvest repeating the request for specific documentation supporting the Credit Suisse valuation.[1008] In this letter, Interinvest was informed of the Undersecretariat's view that it was not possible to finalize discussion of the valuations, or to affirm the lack of consensus as to a price for the transfer of shares until Interinvest satisfied these requests for documents and information.[1009]

820.    Claimants assert a number of arguments in response to the issues raised by Respondent through Undersecretary Llorens.  First, Claimants argue that although they were unnecessary, Credit Suisse did in fact provide the signatures and formalities required by the Undersecretariat, and within a week of its first request.[1010]  Second, with respect to the supporting documents requested by Respondent, Claimants argue that TTN President, Mr. Daniel Martín, conceded that he had sufficient information to analyze the Credit Suisse valuation.[1011]  Third, with respect to the assertion that Credit Suisse's valuation was not "independent," Claimants argue that "the GOA could have simply disregarded Credit Suisse's valuation and appointed together with Interinvest a third independent valuator, as the July 2008 Agreement provided."[1012]  Claimants assert that they requested in writing the appointment of a third independent valuator at least six times between late October and mid-November 2008, and that Respondent failed to appoint a third valuator.[1013]

821.    Further, Claimants assert that the TTN did not observe the terms agreed to under the July 2008 Agreement with respect to the valuation.[1014]   The TTN's primary valuation was not performed on a DCF basis but, rather, on an asset valuation or liquidation basis.  Further, they assert that the TTN's DCF valuation i) assumed only five years of cash flows and no terminal value for the Airlines, ii) applied discount rates in ARS to cash flows in USD, and iii) did not adjust airfares in proportion to cost increases.[1015]  Claimants point to testimony given by Mr. Martín to Congress, in which he stated that "the valuation that we are conducting is different

---

[1008] RL-25.
[1009] *Id.*
[1010] Claimants' Closing, Transcript p. 1657.
[1011] Claimants' Closing, Transcript p. 1658.
[1012] Cl. Reply ¶ 310.
[1013] Cl. PHB ¶ 133; *see also* C-202; C-209; RL-24; C-210; and C-886.
[1014] Cl. Reply ¶ 307.
[1015] Cl. PHB ¶ 130.

from the one agreed in the [July 2008 Agreement].  In this respect, we have contacted Credit Suisse, the agency in charge of valuing the [Argentine Airlines] in accordance with the methodology agreed in the [July 2008 Agreement]."[1016]  Furthermore, Claimants argue that as an agency of the Ministry of Federal Planning, Public Investment, and Services, the TTN lacked independence in conducting its own valuation.[1017]  Finally, Claimants' legal expert, Dr. Bianchi, asserts that the TTN lacks the technical standards and rules needed to appraise the shares of going concerns like the Airlines.[1018]

822.    The Parties also disagree over whether Claimants complied with the requirement in the July 2008 Agreement regarding the preparation of income statements and balance sheets for the Airlines at December 31, 2007 and July 17, 2008.  For its part, Respondent argues that the Marsans Group did not have available sufficient accounting information to determine the real state of the Airlines at the time the July 2008 Agreement was executed.[1019]  Respondent says that Interinvest, as majority shareholder in the Airlines, provided only unaudited, incomplete copies of the July 17, 2008 financial statements as required pursuant to Article 6 of the July 2008 Agreement.[1020] Claimants, in response, argue that both the Interim General Manager, Mr. Alak, and the TTN had access to these statements.[1021]

823.    Commencing with Respondent's allegations that the Credit Suisse valuation did not comply with the requirements of the July 2008 Agreement, the Tribunal has concluded that these are not valid.  In relation to Respondent's complaint that the Credit Suisse valuation was not signed and apostilled, the Tribunal notes that neither was required by the terms of the July 2008 Agreement.  In any event, Credit Suisse explained that it does not normally sign its valuation reports and, in any event, confirmed at a meeting on October 29, 2008 their authorship of the

---

[1016] Cl. PHB ¶ 130, citing Transcript of Mr. Martín's address before the Argentine Congress, August 28, 2008, p. 64: C-1092.
[1017] Cl. Reply ¶ 311.
[1018] Cl. Reply ¶ 311, citing Bianchi ER1 ¶ 84 *et seq*.
[1019] Resp. PHB ¶¶ 152, 159, 161.
[1020] Llorens WS3 ¶¶ 54-60. *See also* Resp. PHB ¶ 161, describing other issues related to the 2007 and July 17, 2008 Financial Statements.
[1021] Claimants' Closing, Transcript p. 1659; Cl. PHB ¶¶ 139-140.

valuation report.[1022]  Further, Credit Suisse then submitted a signed and apostilled version of its valuation report.[1023]

824.    As concerns Respondent's position that the Credit Suisse valuation was not independent, the Tribunal again notes that there was no requirement in the July 2008 Agreement that the valuations performed by the Parties were to be "independent".   Evidence in the record demonstrates that Interinvest had requested the assistance of Credit Suisse earlier in 2008 to assist it with a valuation of the Airlines when Interinvest had been approached by Mr. Llorente regarding the purchase of the Airlines (January 2008) and in respect of the May 2008 Agreement.[1024]   In these circumstances, it seems logical for Interinvest to have had recourse, again, to Credit Suisse when it required a valuation pursuant to the July 2008 Agreement terms.   In the Tribunal's view, the fact that Credit Suisse had previously performed services for Interinvest did not disqualify it as an appropriate entity for the valuation of the Airlines' shares pursuant to Article 6 of the July 2008 Agreement.   Similarly, the TTN's relationship with Respondent on the basis of lack of independence does not disqualify it as an appropriate entity for the valuation of the Airlines.

825.    Insofar as Respondent alleges that the Credit Suisse valuation was not independent in the sense that Credit Suisse did not independently verify or audit the documents and information used for the purposes of its valuation, the Tribunal finds that this was neither required by the July 2008 Agreement, nor was it practical.   Further, Article 6 of the July 2008 Agreement specified certain agreed parameters for a DCF valuation and Respondent did not object to the Credit Suisse valuation on that basis.   In any event, neither of the valuations prepared by Credit Suisse and the TTN were binding on the Parties.   Either Party was entitled to disagree with the valuation provided by the other Party and proceed to valuation from "…an impartial, local or foreign entity of international renown specialized in the purchase and sale and/or valuation of international airlines."   By agreement of the Parties, that valuation was agreed to be "final and definitive" as

---

[1022] Public deed of meeting, October 29, 2008: C-2008.
[1023] Letter from Interinvest to Mr. Llorens, dated November 4, 2008: RL-24; C-201.
[1024] *See*, for example, Pascual Arias WS ¶ 68; *See also* RA-555: the letter from Buquebus dated October 21, 2013 in which that company states that Claimants had designated Credit Suisse as their contact for obtaining information and due diligence in relation to the May 2008 Agreement.

between the Parties (July 2008 Agreement, Article 6).  In the Tribunal's view, Respondent's complaints regarding the Credit Suisse valuation were highly formal and artificial.

826.    Turning to the question of whether Respondent and the TTN had sufficient information to assess the value of ARSA and AUSA, the Tribunal concludes that they did, in fact, have sufficient information and that Respondent's complaints with respect to what was provided by Interinvest do not amount to a breach by Claimants of the terms of the July 2008 Agreement.  In addressing this question, it is important to bear in mind the context leading up to the adoption of the agreement.

827.    In this regard, as a shareholder and through its representation on the Board of Directors, Respondent had challenged the financial statements of ARSA for the years 2002 through 2005 and, as described above, eventually approved those statements as part of the June 2006 Agreement. By way of this process, Respondent must have had considerable information and familiarity with ARSA's financial statements and financial situation more generally.  Further, by way of the June 2006 Agreement, the Government of Argentina appointed a second member of the Board of Directors of ARSA and appointed a member to ARSA's audit committee.  As a result, in the words of Mr. Llorens, after the June 2006 Agreement, Respondent "started to participate in the day-to-day operations of the Company."[1025]  Further, the May 2008 Agreement involved the production of three different valuations of AUSA by international valuation firms and must have provided considerable additional information in that context.  Finally, upon the appointment of the Transition Committee and Mr. Alak as the Interim General Manager, Respondent had broad access to the information of the Airlines.  As noted previously, all requests for information from Respondent and its various entities were channeled through Mr. Alak as Interim General Manager of the Airlines.  The evidence also indicates that Interinvest did produce, and make available, information in response to the Respondent's requests.

828.    A review of the evidence indicates that the TTN was able to assess Credit Suisse's valuation.  This is reflected in the minutes of the meeting held between the TTN and Credit Suisse on October 29, 2008 and, in particular, the TTN's supplemental report dated November 12, 2008

---

[1025] Transcript of Mr. Llorens' testimony, Hearing on Jurisdiction, Day 2, p. 298, quoted at Cl. PHB ¶ 100.

in which it confirmed its valuation and addressed Interinvest's complaints regarding the TTN valuation and critiqued Credit Suisse's valuation.[1026]   In addition, Mr. Martín accepted in his testimony that the TTN was able to analyze the Credit Suisse valuation and provide its views on it.[1027]

829.   For these reasons, the Tribunal is not persuaded that Claimants breached the July 2008 Agreement by failing to provide a valid valuation or by failing to provide the financial information required such that the TTN and Respondent could adequately analyze the Credit Suisse valuation.

830.   Turning to Claimants' argument that the TTN valuation was not in accordance with the terms of the July 2008 Agreement, the Tribunal is not persuaded that this has been made out. While it appears that Article 6 of the July 2008 Agreement provides that all of the valuations were to be conducted on a DCF basis and the TTN's primary valuation was not conducted on that basis, the TTN, nevertheless, conducted a DCF valuation which it set out in its report of October 10, 2008.[1028]   Claimants assert that the DCF valuation performed by the TTN was not carried out in accordance with the terms of the July 2008 Agreement for a number of reasons.[1029]   These include the fact that the TTN's analysis assumed only five years of cash flows and no terminal value for the Airlines; applied discount rates in ARS to cash flows in USD; and did not adjust airfares in proportion to cost increases.   These criticisms of the TTN's DCF valuation appear to be valid and would affect the reliability of that valuation.   However, they do not in themselves amount to a breach of the July 2008 Agreement.   In the Tribunal's view, the issues between the Parties in respect of these matters are what was intended to be resolved by the third valuator to be appointed under Article 6 of the July 2008 Agreement.   Further, as expressed above, the Agreement did not require that the valuations prepared and submitted by the Parties be independent.

---

[1026] C-208; C-380.

[1027] Transcript pp. 675-676.  Mr. Martín also accepted that no complaint was made in the TTN supplementary report regarding the lack of information.  *See also* the testimony of Mr. Llorens at Transcript p. 647, accepting that the TTN was able to analyze the Credit Suisse valuation.

[1028] C-204.  In its report, the TTN states that, in its view, the best method for valuing the Companies is the substantive or patrimonial value (*valor sustantivo o patrimonial*) and valued the Companies' assets and liabilities at market value. It also explained why the DCF methodology was not appropriate.  It also explained that it had performed a second valuation on the basis of cash flows for five years and a discount rate of 15.6% (pp. 25-27).

[1029] *See* Cl. PHB ¶¶ 130-131 and the sources cited there.

831.    Finally, the Tribunal addresses Respondent's argument that Interinvest failed to provide an audited income statement and balance sheet for the Airlines as at July 17, 2008.[1030]   In the Tribunal's view, this does not amount to a breach of the July 2008 Agreement.

832.    Pursuant to Article 5 of the July 2008 Agreement, the Parties were to prepare an income statement and balance sheet for ARSA and AUSA as of July 17, 2008 and once those statements had been prepared and audited (within the 60-day transition period) the Parties were to review and approve these.   Article 5 also provides that the financial statements in question were to be approved by the shareholders of ARSA and AUSA pursuant to the relevant statutory procedures.   At the outset, the Tribunal notes that the obligation contained in Article 5 of the July 2008 Agreement is upon the Parties to the Agreement, not solely on Interinvest.   Further, although the July 17, 2008 statements were not audited, it appears that drafts of the statements had been circulated by August 28, 2008 when Mr. Alak, the Interim General Manager appointed under the July 2008 Agreement, appeared before Congress.[1031]

833.    At the ARSA shareholders' meeting of November 12, 2008, the July 17, 2008 financial statements were approved by the majority of the shareholders although the statements had not been audited.   The approval of the statements was opposed by the representatives of the Class "A" shares (the Government of Argentina) and the Class "B" shares (employee shareholdings).[1032]

834.    Although the July 17, 2008 financial statements had not been audited prior to their approval, the evidence indicates that they had been circulated, together with the 2007 financial statements, prior to August 28, 2008.   Further, as described above, the TTN was able to analyze and comment on the Credit Suisse valuation despite the lack of audited financial statements at July

---

[1030] Resp. PHB ¶ 161.   Respondent submits that ARSA's auditors, PwC, did not sign the July 17, 2008 statements and the Board did not retain another firm to replace PwC and provide the audited statements.   It also submits that the financial statements were approved by the Board, without any audit in November 2008: see the minutes of the ARSA Board meetings of August, September and October 2008: RA-493; notarial certificate of the shareholders' meeting of November 12, 2008: RL-26.

[1031] Transcript of Mr. Alak's appearance before Congress: C-947, p. 46.   In his statement, Mr. Alak indicated that drafts of the 2007 financial statements and the July 17, 2008 financial statements had been prepared and circulated. Although the 2007 financial statements had not been studied by the Board of Directors, they had been submitted to the State's General Audit Office (AGN) for its review and the AGN was in the process of reviewing them.

[1032] RL-26.

17, 2008. In the circumstances, the Tribunal is unable to conclude that the lack of audited financial statements at July 17, 2008 constituted a breach of the July 2008 Agreement by Claimants. In this regard, the Tribunal notes that the Parties did not strictly enforce all of the terms of the July 2008 Agreement. For example, the 60-day transition period appears to have expired on or about October 14, 2008.[1033] Nevertheless, the Parties continued discussions of their respective valuations and considered that the Agreement remained in effect.[1034]

835.    The Tribunal's review of the evidence indicates that the Credit Suisse and TTN valuations were very different and there was an impasse between the Parties on reaching agreement on the price to be paid for the shares of ARSA and AUSA. In these circumstances, the appointment of a third valuator to determine the price of the shares was appropriate and required. Clearly, the valuations yielded different results and, in addition, it was plain that agreement could not be reached as to the price of the shares, as provided in Article 6 of the July 2008 Agreement. In these circumstances, Interinvest requested the appointment of a third, independent valuator a number of times, commencing on October 29, 2008.[1035]

**Management of the Airlines and the Injunction**

836.    In its letter of November 12, 2008 to the Minister of Planning and the Secretary of Transportation, Interinvest complained that since October 8, 2008, Respondent's appointees to the Transition Committee had not attended any meetings, although duly invited to do so. As a result, the Transition Committee did not have a sufficient quorum to provide directions to the General Manager appointed under the terms of the July 2008 Agreement. Despite this, the Interim General Manger had continued to manage the Airlines. As a result, Interinvest requested an urgent meeting

---

[1033] It appears that on the basis of working days counted from July 21, 2008 when the Agreement was formally ratified, 60 days expired on or about October 14, 2008.

[1034] In this regard, *see* Mr. Llorens' letters of October 30 and November 7, 2008, RL23, RL25. See also the evidence of Mr. Llorens at Transcript pp. 640-641.

[1035] *See* letters from Interinvest to the Federal Minister of Planning, Mr. De Vido, and the Secretary of Transportation, Mr. Jaime, dated October 29 (C-202); October 30 (C-209); November 4 (RL-24); November 5 (Interinvest's letter of November 12, 2008 referred to in C-210); November 10 (C-886); and November 12, 2008 (C-210). None of these received a favorable response from Respondent.

of the Transition Committee.  Interinvest also requested that Respondent proceed with the selection of a third valuator.[1036]

837.    At the Board of Directors meeting of ARSA on November 19, 2008, representatives of Interinvest raised the question of Mr. Alak's continuation as General Manager without the supervision of the Transition Committee which had not met since October 8, 2008 due to the failure of the Government of Argentina's representatives to attend the meetings of the Committee.  The representatives of Interinvest stated that this constituted a breach of the terms of the July 2008 Agreement and that the General Manager had proceeded to adopt important measures relating to the Airlines without the authorization of the Transition Committee.  In addition, Mr. Aranda Unzurrunzaga stated that it had been reported that the Minister of Planning had stated to the press that there would be no third valuator and that it was Congress which had the final word in determining the price of the shares under the July 2008 Agreement.  In light of these events, Mr. Aranda proposed that the same powers of General Manager held by Mr. Alak should be given to the Assistant General Manager, Mr. Molina, and that the General Manger could only act jointly with the Assistant General Manager until the Government of Argentina clarified its position with respect to the continuing effect of, and compliance with, the July 2008 Agreement.  Mr. Alak objected to the resolution as it was not on the agenda for the meeting.  After some discussion, the Board agreed to call another meeting on November 25, 2008 to discuss the proposal of Mr. Aranda.[1037]

838.    On November 21, 2008, an Argentine court issued a preliminary injunction ordering that: 1) the current membership of the Airline's board of directors not be modified; 2) Mr. Julio Alak continue as the Airlines' Interim General Manager and as a director of ARSA; and 3) a comptroller (*interventor judicial veedor e informante*) be appointed to oversee the operations of the Airlines and provide a report to the court.[1038]

---

[1036] C-210.
[1037] Minutes of the Board Meeting of ARSA, November 19, 2008 C-212, pp. 29-34.
[1038] Cl. Mem. ¶ 274; Llorens WS3 ¶¶ 52, 84; C-213.

839.    According to Claimants, this injunction "was obviously aimed at harassing the airlines' directors and at consolidating the GOA's *de facto* control[.]"[1039]

840.    According to Respondent's witness, Undersecretary Llorens, precautionary measures were justifiable to ensure the continuity of service and to protect the Airlines from an uncertain future.[1040]  Undersecretary Llorens states that, in the wake of the injunction,

> At this stage, based on the appraisal performed by the Argentine Valuation Board, which had yielded a negative value for the companies, and the company's dilatory and reluctant behavior in terms of the discussion and analysis of the appraisal, it could only be concluded that it was no longer feasible to purchase the companies pursuant to the Memorandum of Agreement of July 2008, and expropriation was the only step to be taken in order to safeguard the public service involved.[1041]

## Law No. 26,466

841.    On the same date the injunction was issued, November 21, 2008, members of the House of Representatives submitted a draft bill to the Congress with a view to expropriating Claimants' investment.[1042] On December 22, 2008, the Senate passed Law No. 26,466, authorizing the expropriation of the Airline's shares.[1043] In Article 1 of Law No. 26,466, the Senate and Chamber of Deputies declare as "public utility and subject to expropriation" the shares of ARSA and AUSA and their controlled entities Optar S.A., Jet Paq S.A. and Aerohandling S.A. Article 1 also designates the TTN to perform the valuation of the Airlines pursuant to Law No. 21,499 ("Argentine Expropriation Law").

842.    On December 30, 2008, Decree 2347/2008 was enacted, establishing the Ministry of Federal Planning as the entity charged with carrying out the expropriation under Law No. 26,466. Under the terms of Decree 2347/2008, the Government of Argentina shall "exercise any and all rights granted by the shares to be expropriated" starting from the date of publication of the law and "until the relevant expropriation process set forth in the above law has been completed."[1044]  This

---

[1039] Cl. Reply ¶ 318.
[1040] Llorens WS3 ¶ 85, citing RL-27.
[1041] Llorens WS3 ¶ 86. *See also* Resp. CM ¶ 508.
[1042] C-214.
[1043] R-314.  The law was first approved by the Chamber of Deputies on December 17, 2008.
[1044] C-217, cited in Cl. Mem. ¶ 277. "*Que asimismo, la Ley Nº 26.466 también ha establecido que para garantizar la continuidad y seguridad del servicio público de transporte aerocomercial de pasajeros, correo y carga, el mantenimiento de las fuentes laborales y el resguardo de los bienes de las empresas mencionadas en el artículo 1º de*

was to be done by an administrative entity created in the decree and consisting of four members named by the Government, including Mr. Alak.  According to Claimants, the practical implication of this was that Claimants continued to hold the title to their shares in the Airlines, through their subsidiaries, but were unable to exercise any control over the Airlines through these shares.[1045]

843.    In accordance with Law No. 26,466, Law No. 21,499 and Decree 2347/08, Respondent sent Interinvest the TTN's updated valuation of the Airlines' shares, in the amount of negative ARS 3,087,748,413[1046] on January 15, 2009.  This valuation, which provided an even greater negative valuation of the Airlines than the TTN's prior valuations, was, according to Respondent's expert and TTN President, Mr. Martín, due to the difference in valuation with two additional aircraft that were not in operation.[1047]  Argentina offered a token ARS 1.00 in compensation for the expropriation.

844.    Respondent requested Interinvest to inform it, within five days of being served, whether it accepted that valuation.  On January 21, 2009, Interinvest rejected the TTN's valuation.[1048]  The Parties then proceeded to court via the procedures set forth in the Expropriation Law (Law No. 21,499).[1049]

### Conclusions on the July 2008 Agreement and Subsequent Events

845.    As outlined above, Claimants assert that in breach of the FET standard in the Treaty, Respondent repudiated the July 2008 Agreement.  They say that that Argentina's violation of the Agreement in and of itself constitutes a breach of the FET standard because it: breached a sovereign contractual commitment that Claimants had relied on; undermined the transparency of the divestment process in which the Government pressured Claimants to engage; and demonstrated

---

*la ley mencionada; en los términos de los artículos 57 y 59 de la Ley Nº 21.499, el PODER EJECUTIVO NACIONAL, a través del organismo que designe, ejercerá desde el momento de la publicación de la referida ley todos los derechos que las acciones a expropiar le confieren. / Que a fin de dar cumplimiento a lo previsto en el artículo 2º de la Ley Nº 26.466, resulta necesario crear una UNIDAD ADMINISTRATIVA a fin de ejercer, en el marco del artículo 59 de la Ley Nº 21.499 y hasta tanto se concluya el proceso expropiatorio, todos los derechos que las acciones a expropiar confieren.”*

[1045] Cl. Mem. ¶ 279.
[1046] C-379.
[1047] Testimony of Mr. Martín, Transcript p. 699.
[1048] C-216.
[1049] *See* Resp. CM ¶ 529 *et seq*. Also see para. 954 *et seq.,* below.

bad faith due Respondent's disregard of its commitment to rely on a third-party valuation expert in order to limit the compensation payable to Claimants for the expropriation of the shares of the Airlines to an absurdly low number.[1050]   Claimants also allege that Respondent's conduct following the adoption of the July 2008 Agreement was arbitrary, ambiguous and lacked transparency.[1051]   Claimants also say that under the pretense of complying with the July 2008 Agreement, Respondent engaged in a dilatory strategy while, in reality, repudiating the Agreement by failing to implement the agreed valuation methodology for the purchase of the Airlines' shares and effectively taking control of the Airlines and proceeding with the expropriation of their shares.[1052]

846.   Respondent denies having breached the terms of the July 2008 Agreement in any way. Rather, it says that despite breaches of the Agreement by Interinvest, including the failure to provide the information required under the terms of the Agreement and a valid valuation, it continued making every effort to ensure the successful conclusion of the process initiated under the Agreement.[1053]   It says that at the time the July 2008 Agreement was executed, the accounting information available made it impossible to know the real state of affairs of the Airlines.  It says that as the process under the July 2008 Agreement advanced, it discovered the catastrophic state of the Airlines.[1054]   In these circumstances, Respondent says that the performance of the July 2008 Agreement became impossible to fulfill, for reasons not attributable to it.  Accordingly, the only viable alternative in order to maintain the provision of air transportation service was to proceed with expropriation pursuant to Law No. 26,466.[1055]

847.   As described above, the Parties exchanged valuations pursuant to the terms of the July 2008 Agreement.   While Respondent alleged a number of deficiencies in the Credit Suisse valuation, it had adequate information to assess it and, in fact, did analyze it.  The valuations were clearly very different and the Parties were unable to agree on a price for the purchase of the

---

[1050] Cl. Mem. ¶¶ 453-457.
[1051] Cl. Mem. ¶ 454; Cl. Reply ¶ 496.
[1052] Cl. Reply ¶¶ 304-328; Cl. PHB ¶¶ 132-141.
[1053] Resp. PHB ¶¶ 159-162.
[1054] Resp. PHB ¶¶ 151-161.
[1055] Resp. CM ¶ 508.  *See also* the evidence of Undersecretary Llorens, Llorens WS3 ¶ 86, quoted above at ¶ 840.  *See also* Mr. Llorens' evidence at the hearing: Transcript Day 3.

Airlines' shares. For the reasons set out above, the Tribunal has found that Respondent's criticisms and allegations that Interinvest was in breach of the July 2008 Agreement are unfounded. As a result, the next appropriate step under the terms of the Agreement was for the Parties to proceed with the appointment of a third valuator to determine the price at which the shares of the Airlines were to be purchased.

848. Rather than proceeding in this manner, Respondent continued to object to the Credit Suisse valuation and a number of disputes arose between Interinvest and Respondent at the level of both the Board of Directors and at shareholders meetings. Instead of proceeding with valuation of the shares by an independent third valuator pursuant to Article 6 of the July 2008 Agreement, Respondent proceeded by way of an injunction appointing a comptroller (*veedor*) to oversee the Airlines and to maintain Mr. Alak as the General Manger of the Airlines. This was followed by the expropriation of the Airlines by way of Law No. 26,466. Pursuant to the terms of that law, the valuation of the Airlines was to be conducted on an entirely different basis than had been provided for under the July 2008 Agreement for the determination of the price of the Airlines' shares.

849. Having carefully reviewed all of the relevant evidence and the Parties' arguments, the Tribunal has concluded that in proceeding as it did, Respondent failed to comply with the July 2008 Agreement and the commitments given by it in that agreement. In the Tribunal's view, this amounted to a breach of the FET standard.

850. As the Tribunal has found, the July 2008 Agreement was a binding contract between the Government of Argentina and Interinvest S.A., executed and ratified by authorized signatories for each of those parties. It provides for the purchase and sale of the shares in the Airlines and defines the mechanism for determining the key element of the Agreement, the determination of the price at which the shares were to be purchased. The Agreement provides that the transition period of 60 days was for the purpose of formalizing the purchase and sale of the stock that was the subject matter of the Agreement. Although the transition period of 60 days appears to have expired on or about October 14, 2008, the Parties continued performing under the Agreement by continuing their discussions regarding their respective valuations in an attempt to reach agreement on the sale price of the shares. Neither Party purported to terminate the Agreement and, indeed, the conduct of both

of the Parties reflected an understanding that the Agreement remained in full force and effect until at least mid-November 2008.[1056]

851.    In the Tribunal's view, the July 2008 Agreement was binding on both Parties.  There was no express condition that the Agreement was subject to the approval of the Argentine Congress. The Tribunal is unable to accept Respondent's argument that the reference in Article 2 of the Agreement that the Government of Argentina "…shall take all steps legally required for the purchase of [Interinvest]'s entire stockholding in Aerolineas and Austral" subjected the agreement or the determination of the price for the purchase of the shares to the approval of Congress.  Rather, Article 2 of the agreement requires the Government of Argentina to take all the steps legally required to complete the purchase of the shares.  Article 6 of the agreement clearly states that the third valuation to be sought from an impartial entity "… shall be final and definitive as between the Parties."

852.    The Tribunal has carefully considered Respondent's argument that at the time it executed and ratified the July 2008 Agreement, it had insufficient information regarding the true state of the affairs of the Airlines and that it was only after the TTN conducted its valuations that it discovered the true situation of the Airlines such that the purchase and sale of the shares became unviable. The Tribunal is unable to accept this argument.  Since the June 2006 Agreement, Respondent had two representatives on the Board of Directors of ARSA and one representative on its audit committee and, in the words of Mr. Llorens, it began to participate in the daily affairs of ARSA. Further, from that time forward, Interinvest and the Airlines had written to, and met with, the Secretariat of Transportation, as well as other Government entities, regarding the difficult financial circumstances of the Airlines and the need to implement airfare increases and other measures to help them cover their costs.  This difficult situation was repeatedly reflected in the various decrees

---

[1056] In this regard, the Tribunal notes that at the meeting of the Board of Directors of ARSA on November 19, 2008, Mr. Alak submitted a report to the Board regarding suggested improvements in ARSA's internal controls and information systems.  Mr. Alak also reported that with respect to the National Audit Office all of its requirements to date had been met, except for some documentation which would be provided the following day.  See the Board Minutes at C-212, pp. 28-29.  Later during the course of the meeting, one of Interinvest's appointees to the Board, Mr. Aranda, raised the issue of the State's compliance with the terms of the July 2008 Agreement in light of Mr. Alak's continued function as General Manager of the Airlines despite the fact that the Transition Committee had not met since October 8, 2008.  As described above, after some discussion, a decision was made to schedule a new meeting of the Board to discuss this issue on November 25, 2008.

and resolutions adopted, including the continuation of the state of emergency in the air transportation sector by Decree 1012/2006.  Of particular note are Interinvest's letters of March 26 and April 29, 2008, referred to above at paragraphs 412, 514 and 515, in which the very difficult circumstances of the Airlines were set out in detail.  After this, the Parties entered into the May 2008 Agreement pursuant to which the Parties agreed to a reallocation of the capital stock of the Airlines.[1057]

853.     In these circumstances, the Tribunal is unable to accept that Respondent did not have access to sufficient information and was unaware of the state of the Airlines when it signed the July 2008 Agreement.   The Tribunal also notes that the Government of Argentina made the first two contributions to ARSA's capital to cover wages and other expenses and made its submission to the court handling ARSA's continuing insolvency proceedings prior to signing and ratifying the July 2008 Agreement.

854.     The Tribunal has also considered Respondent's argument that not every breach of contract by a State constitutes a violation of the duty of fair and equitable treatment.[1058]  The Tribunal accepts this proposition.[1059]   However, the July 2008 Agreement was not simply a commercial agreement and, in the Tribunal's view, Respondent failed to comply with an essential element of that agreement.  As described previously, the July 2008 Agreement was signed and ratified by the Government of Argentina.  Further, as reflected in the preamble and in Respondent's arguments and evidence throughout these proceedings, Respondent's purpose for entering into the July 2008 Agreement was to fulfill its public obligation to guarantee the provision and continuity of air transportation services in Argentina.  In order to affect that purpose, it agreed to a specific mechanism to determine the purchase price for all of Interinvest's shares in the Airlines, which

---

[1057] The May 2008 Agreement is entitled "Framework Agreement between the Owners of the Air Comet - Interinvest Group and the Argentine State in connection with the <u>Viability</u> of Aerolineas Argentinas S.A. and Austral Lineas Aéreas - Cielos del Sur S.A. and the Allocation of their Capital Stock".  The Agreement also provided that Respondent would increase its direct interest in the shares of ARSA and that the employees of the Company could hold up to a maximum of 10% of the stock.  Pursuant to the terms of the Agreement, the price to be paid for the increase in the capital stock of ARSA was to be fixed on the basis of the average of the appraisals conducted by the three consulting firms identified in the Agreement.

[1058] Resp. Rej. ¶ 655 and the sources cited there, including Kingsbury ER ¶ 28.

[1059] The Tribunal notes that the issue discussed here is different from the question of the breach of an umbrella clause, which is discussed separately below.

represented the Claimants' entire investment.  The July 2008 Agreement was intended to put an end to the long and difficult relationship between Respondent and Interinvest, Air Comet and the Marsans Group.  In the Tribunal's view, the July 2008 Agreement was not a simple commercial agreement.

855.    In these circumstances, the Tribunal finds that Interinvest and Claimants legitimately expected Respondent to comply with its commitment to purchase all of the shares in the Airlines at the price determined by the agreed mechanism in Article 6 of the July 2008 Agreement.  The Parties commenced performance under the terms of the agreement and Respondent sought to enforce its terms by insisting on the production of Interinvest's valuation in the appropriate format and what it maintained was the required supporting information.  Further, although Law No. 26,412 did not specifically refer to the July 2008 Agreement, Respondent consistently maintained that the law enabled it to proceed with the purchase of the shares and to comply with the July 2008 Agreement.  It was not until some point in November 2008 that Respondent apparently decided that the July 2008 Agreement was not viable and decided to proceed by way of expropriation without notice to Interinvest or Claimants.

856.    In the Tribunal's view, this conduct amounts to a breach of the FET standard.  In addition, the Tribunal finds that Respondent's conduct, described above, in relation to the introductory message and bill seeking approval of the July 2008 Agreement, the adoption of Law No. 26,412, the objections as to the form the Credit Suisse valuation, the injunction appointing a comptroller over the Airlines, the maintenance of Mr. Alak as General Manager of the Airlines and the decision to proceed by expropriation lacked transparency and was arbitrary.

857.    In conclusion, the Tribunal finds that Respondent's conduct in failing to comply with its commitment under the July 2008 Agreement to proceed with the purchase of Interinvest's shares in the Airlines on the basis of the agreed mechanism contained in the agreement breached the FET standard in the Treaty.

## 6.    Assumption of Obligations under the Airbus Purchase Orders

858.    The Tribunal has considered Claimants' arguments relating to Respondent's alleged breach of the FET standard by failing to respect its commitment to assume ASTRA's obligations under the purchase orders placed with Airbus.  Claimants say that Respondent reneged on its promise to purchase 35 aircraft purchased by ASTRA (as part of its purchase of 73 aircraft from Airbus between December 2006 and October 2007).[1060]  At the heart of this claim is Claimants' allegation that Respondent initialled the Draft Agreement (the draft "Agreement for the Implementation of Law 26,466") which they say Respondent agreed to for the purpose of subrogating into ASTRA's aircraft purchase orders with Airbus and compensating them for the expropriation of the Airlines.[1061]

859.    The complex and extensive details of the various negotiations and draft agreements are summarized above at paragraphs 456 through 464.  Claimants say that the Draft Agreement would have entailed the following benefits:

- Claimants would recover US$ 116,691,789 from Airbus in respect of pre-delivery payments ("PDPs") and buyer-furnished equipment payments ("BFEs") made by Astra to Airbus for aircraft allocated to ARSA and AUSA.

- Claimants would not be forced to pay the penalties associated with the cancellation of Astra's order for ARSA and AUSA.

- Claimants would receive US$150 million from Argentina in respect of the compensation for the expropriation of the Argentine Airlines.

- Claimants would be able to maintain the Airbus contract and resell the remaining 38 Airbus "slots" for a profit.[1062]

860.    Claimants say that due to Respondent's failure to honor its commitments, ASTRA was forced to cancel the Airbus purchase agreements and, as a result, the benefits set out above were lost.  Claimants say that coupled with the expropriation of the Airlines, the failure of the Draft Agreement precipitated the collapse of the entirety of the Marsans Group.  Claimants say that Respondent's failure to honor the terms of the Draft Agreement and proceed with the assumption

---

[1060] Cl. Mem. ¶¶ 284-312, 458-460 and the sources cited there; Cl. Reply ¶¶ 329-349, 497; Cl. PHB ¶¶ 151-161.
[1061] *See* Cl. Reply ¶ 338; Cl. PHB ¶ 152; C-235.
[1062] Cl. PHB ¶ 153 (footnotes omitted).

of the Airbus purchase orders constitutes a violation of the FET standard and the obligations relating to expropriation under Article V of the Treaty.[1063]

861.    Respondent denies that there was any agreement giving rise to any commitment relating to the Airbus purchase orders.  It says that it neither executed any agreement with ASTRA or Airbus, nor undertook any commitments to them.  It says that the negotiations with Interinvest were not successful and did not give rise to any commitments regarding the settlement of the dispute between the Parties.[1064]

862.    The Tribunal has reviewed the extensive evidence relating to Claimants' allegation regarding the assumption of the obligations under the Airbus purchase orders and concluded that Respondent did not enter into any binding obligation in that regard.  There was evidence of negotiations between Interinvest and Respondent regarding the taking over of 35 of the purchase orders from Airbus and that Respondent had some interest in doing so in order to acquire the aircraft for the Airlines.  There was also evidence of the dealings between Interinvest and ASTRA and Airbus as well as between Respondent and Airbus regarding the assumption of the purchase orders by Respondent.  However, none of the relevant agreements under discussion were concluded.

863.    As discussed above, the proposed Draft Agreement is at the heart of Claimants' claim. However, this agreement was never executed and the Tribunal is not persuaded that Respondent committed to signing and concluding that agreement.  While Mr. Muñoz Pérez testified that Interinvest and Respondent had each initialed a copy of the Draft Agreement and provided it to the other, Mr. Llorens denied that he had initialed or signed the Draft Agreement.[1065]  While there was some evidence that the initial on Interinvest's copy of the Draft Agreement was that of

---

[1063] Cl. PHB ¶ 161.  Claimants also say that Respondent's alleged promise to subrogate into ASTRA's Airbus orders constitutes a direct and express acknowledgement by it of the obligation to compensate Claimants for the confiscation of the Airlines.
[1064] Resp. CM ¶¶ 560-570; Resp. Rej. ¶¶ 509-531; Resp. PHB ¶¶ 163-171.  Respondent also alleges that ASTRA recovered USD 34 million from Airbus in respect of the cancelled purchases.  There is a dispute between the Parties as to whether this sum was related to any of the payments said to have been undertaken by Respondent under the Draft Agreement.  *See* Cl. Reply ¶¶ 346-349; Resp. Rej. ¶¶ 532-539; Resp. PHB ¶ 168.
[1065] *See* Transcript pp. 621-623, 660.

Mr. Manuel Vázquez,[1066] this was not clear.  In any event, the Draft Agreement was never signed on behalf of Respondent.[1067]

864.    In contrast with the signature of the July 2008 Agreement, it does not appear that the Parties' negotiations led to any final agreement between them.  The Tribunal accepts that there were serious negotiations between the Parties to arrange for Respondent to take over ASTRA's purchase orders from Airbus for aircraft intended for the Airlines and to settle the disputes between them.  The Tribunal also accepts that such an agreement would have represented significant value for both Respondent and Interinvest and Claimants.  The Parties' negotiations and the Draft Agreement also confirm that ASTRA had identified a number of the aircraft it had ordered from Airbus for use by the Airlines.  However, the Tribunal is not persuaded that a final agreement was ever reached.  In these circumstances Claimants have not demonstrated that Respondent's conduct was in breach of a commitment or legitimate expectation such as to give rise to a breach of the FET standard.

### E.    Conclusion on the alleged breaches of the FET standard

865.    For the reasons set out above, the Tribunal finds that Respondent breached the obligation of fair and equitable treatment under the Treaty in respect of its conduct relating to the July 2008 Agreement, described above at paragraphs 777 through 857.  The Tribunal also finds that Claimants have failed to prove a breach of the fair and equitable treatment standard in respect of the other claims addressed in this section.  Accordingly, the latter must be denied.

### IX.    MFN: FULL PROTECTION AND SECURITY/UMBRELLA CLAUSE

866.    Claimants invoked the MFN Clause contained in Article IV(2) of the Treaty to incorporate provisions from the US-Argentina BIT in support of claims that Respondent failed to accord them

---

[1066] Transcript pp. 649-654; Cl. Mem. ¶¶ 289-290; Muñoz Pérez WS3, Annex 3; email between Mr. Manuel Vázquez and Secretary Jaime.

[1067] Mr. Llorens noted that the Draft Agreement had his name beneath the signature line and that he was not authorized to sign an agreement of this nature on behalf of Respondent: Transcript pp. 622-623.  In addition, Mr. Llorens testified that the Parties were unable to reach agreement in respect of the Draft Agreement since agreement on behalf of Respondent was dependent upon acceptance by Interinvest of a release or waiver of all judicial proceedings against Respondent, including the proceedings in this case, and Interinvest was unwilling to accept that term: Transcript pp. 620-621.

full protection and security and failed to observe obligations in regard of their investments. Claimants also claim that Respondent failed to afford their investments protection pursuant to Article III(1) of the Treaty.

867.    Respondent disputes that Article IV(2) of the Treaty permits invoking the provisions of the US-Argentina BIT that Claimants seek to apply.  Respondent also disputes the merits of Claimants' claims in respect of both full protection and security and breach of the umbrella clause contained in the US-Argentina BIT.

868.    Article IV of the Treaty reads in relevant part as follows:

<div style="text-align:center">TREATMENT</div>

> 1.    Each Party shall guarantee in its territory fair and equitable treatment of investments made by investors of the other Party.
>
> 2.    In all matters governed by this Agreement, such treatment shall be no less favourable than that accorded by each Party to investments made in its territory by investors of a third country.[1068]

869.    The relevant provisions of the US-Argentina BIT which Claimants seek to invoke provide as follows:

<div style="text-align:center">ARTICLE II</div>

> …
>
> 2. a) Investment shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security and shall in no case be accorded treatment less than that required by international law.
>
> …
>
> c) Each Party shall observe any obligation it may have entered into with regard to investments.[1069]

870.    Claimants submit that the MFN Clause contained in Article IV(2) of the Treaty is very broad and has been invoked and applied by previous tribunals to incorporate more favorable provisions in other BITs concluded by Argentina or Spain.  Further, they submit that many

---

[1068] C-1.
[1069] C-348.

tribunals have imported through MFN clauses more favorable substantive standards of treatment accorded to investors of third countries.

871.    Claimants say that the umbrella clause in the US-Argentina BIT is a standard of treatment granted to investors and, therefore, "a matter governed by" the (Spain-Argentina) Treaty. According to them, by definition, the MFN Clause imports provisions that are absent from the base treaty (in this case, the Treaty).    According to Claimants, the most favored nation treatment obligation applies as long as the third-party treaty provision containing the more favorable treatment is of the same type, in this case, the same "matter regulated by" the base treaty.  In other words, as long as the third-party treaty addresses the protection of foreign investors, it applies.  In this regard, Claimants point to the award in *MTD v. Chile* where the tribunal incorporated an umbrella clause taken from the Denmark-Chile BIT by means of an MFN clause in the Malaysia-Chile BIT.[1070]

872.    Claimants say that the fact that the Treaty is broad and covers the umbrella clause in the US-Argentina BIT is supported by the fact that paragraphs 3 and 4 of Article IV of the Treaty exclude a number of matters such as those granted by way of regional cooperation agreements (Article IV(3)); tax treatment (Article IV(4)) and concessional funding (paragraph 1 of the Protocol to the Treaty).  They say that these matters are much further removed from the provisions in the Treaty than the umbrella clause but that, because of the general nature of the MFN Clause, the contracting parties to the Treaty nonetheless considered it prudent to exclude them.  Claimants say that other matters which are more directly related to the protection of foreign investments, such as the umbrella clause, must be covered by the MFN provision.  They also note that after the conclusion of the Treaty in this case, Argentina has concluded numerous BITs which contain umbrella clauses.  This, they say, demonstrates that there is no public policy reason not to give effect to the MFN Clause in the Treaty with respect to umbrella clauses contained in other BITs.[1071]

---

[1070] *See* Cl. Mem. ¶¶ 47-49; *MTD Equity S.dn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7 [hereinafter: *MTD v. Chile*]: C-323.
[1071] Cl. Mem. ¶ 490 and the various BITs cited there.

873.    In response to Respondent's arguments, Claimants say that the MFN Clause contained in Article IV(2) of the Treaty does not apply only to matters that relate to fair and equitable treatment. They say that Article IV(2) explicitly refers to "all matters" governed by the Treaty. They say that the obligation to observe commitments undertaken towards claimants and their investments is a "matter" that concerns the substantive treatment of investment protection promised by Respondent in the Treaty.[1072]

874.    Claimants also reject Respondent's argument that the MFN Clause does not apply to the umbrella clause in the US-Argentina BIT because the Treaty in this case does not provide for an umbrella clause itself. Claimants say that Respondent's reasoning is circular and would negate the meaning and basic purpose of MFN clauses. They say that if the Treaty contained an umbrella clause, there would be no reason for Claimants to invoke the MFN Clause in the first place.[1073]

875.    Claimants go on to refer to a series of legal and contractual obligations which they say were made with regard to Claimants' investments. These include the commitment to allow the Airlines to charge economically reasonable airfares (pursuant to the Air Business Law, Decree No.6875/171 and the General Transfer Contract); the commitment to review airfares and to do so according to specific and detailed mechanisms; the commitment to compensate airlines forced to operate unprofitable routes; the obligation to allow airline companies to set airfares freely within an air band; the obligation to exempt from VAT the purchase of fuel; and the obligation to exempt from taxes the VAT for aircraft purchased or leased within a purchase option.[1074] With regard to contractual obligations, Claimants say that Respondent undertook obligations in the May 2008 Agreement and the July 2008 Agreement. They say that under the May 2008 Agreement, Respondent made a number of commitments relating primarily to the commitment to relieve ARSA's debt. In the July 2008 Agreement, Claimants say that Respondent committed to

---

[1072] Cl. Reply ¶ 535. Claimants also point to the Decision on Jurisdiction where the Tribunal held that the MFN Clause may apply to matters beyond fair and equitable treatment, noting that "the broad 'all matters' language of the Article IV(2) MFN Clause is unambiguously inclusive."
[1073] Cl. Reply ¶ 535.
[1074] Cl. Mem. ¶ 495.

observing specific valuation procedures for the purchase of the shares of the Airlines and to allow Interinvest to co-manage the Airlines during the transition period.[1075]

876.    Claimants say that the fact that the May 2008 Agreement and the July 2008 Agreement were concluded between Respondent and Interinvest, and not directly between Respondent and Claimants themselves, does not affect the claims based on these agreements.  They say that the umbrella clause in the US-Argentina BIT refers to obligations entered into "with regard to investments".  At the time of the conclusion of these two agreements, Claimants held 99% of Interinvest's shares, which in turn held 94.41% of ARSA's shares and 98.12% of AUSA's shares.  According to Claimants, their interests in Interinvest (and thus, the Airlines) constitute "investments" of Claimants.  Claimants point to a number of awards in which tribunals have found a breach of an umbrella clause as a result of breaches of agreements to which the claimants were not direct parties.[1076]  Claimants also say that Respondent failed to observe the obligations it entered into with regard to Claimants' investments pursuant to the various decrees and laws previously described.  They say that these instruments relate to Claimants' investments and were not in any way limited to Interinvest.  Claimants say that they relied directly on these various commitments when making, maintaining and, over the years, increasing their investment in the Airlines.[1077]

877.    Respondent submitted that the scope of the MFN Clause contained in Article IV(2) of the Treaty is restricted to fair and equitable treatment since it follows Article IV(1) which provides for fair and equitable treatment of investments.  Article IV(2) of the Treaty then refers to "such treatment".  Respondent says that if the Parties to the Treaty had intended to grant the MFN Clause a scope including "all treatments" instead of "such treatment", they would have expressly stated so.[1078]

---

[1075] Cl. Mem. ¶ 497.
[1076] Cl. Mem. ¶ 498 and the sources cited there.  The Tribunal notes that Article IV(2) of the Treaty also refers to "investments made in its territory by investors of a third country."
[1077] Cl. Mem ¶ 499.
[1078] Resp. CM ¶¶ 758-761; Kingsbury ER ¶¶ 42-44; Resp. Rej. ¶¶ 682-689 where Respondent maintains its position regarding the scope of the MFN Clause and seeks to distinguish the various awards relied on by Claimants.

878.    Respondent also says that neither the Umbrella Clause nor the full protection and security provisions in the US-Argentina BIT fall within the scope of the MFN Clause since these are not standards of treatment governed by the Treaty.  Therefore, they cannot be considered as matters governed by the Treaty and any attempt to expand the scope of the MFN Clause would be contrary to the express intention of the Parties to the Treaty.  It says that the States party to the Treaty were fully aware of the existence of the umbrella clauses and full protection and security standards and yet did not include them in the text of the Treaty.[1079]

879.    With respect to the question of full protection and security, Respondent acknowledges that Article III(1) of the Treaty refers to the obligation of each party to "protect within its territory investments made, in accordance with its legislation, or the investors of the [p]arty…".  However, it maintains that in their Memorial Claimants did not raise this provision in support of their claim that the full protection and security provision in the US-Argentina BIT should apply by virtue of the MFN Clause.  Therefore, according to Respondent, this argument was raised late and Claimants should not be permitted to rely upon it.  It says that Claimants attempted to import "full protection and security" under Article II(2)(a) of the US-Argentina BIT as a new guarantee or protection, different from the one contained in Article III(1) of the Treaty.[1080]

880.    The Tribunal commences with Respondent's argument that the MFN Clause contained in Article IV(2) of the Treaty applies only to fair and equitable treatment since the use of the language "such treatment" can only refer to fair and equitable treatment which is provided for in the preceding Article IV(1).  The Tribunal is unable to accept this argument.  Article IV(2) of the Treaty expressly refers to "all matters governed by this Agreement", which the Tribunal has found to be unambiguously inclusive.[1081]  This broad language is inconsistent with the notion that only fair and equitable treatment was intended to be the subject of the most favorable nation treatment. If such were the case, then the MFN Clause would apply only to more favorable FET provisions contained in other BITs.  In the Tribunal's view, the plain or ordinary meaning of the language does not sustain this interpretation.  Rather, reading Articles IV(1) and (2) together, a more

---

[1079] Resp. CM ¶¶ 765-771; Kingsbury ER ¶ 47; Resp. Rej. ¶¶ 684-689.
[1080] Resp. Rej. ¶¶ 690-693.
[1081] Decision on Jurisdiction ¶ 186.

harmonious and logical interpretation is that the parties to the Treaty are required to accord fair and equitable treatment of investments made by investors of a Party and that in all matters governed by the Treaty, the treatment accorded to investments (which must be fair and equitable treatment pursuant Article IV(1)) shall be no less favorable than the treatment accorded to investments made by investors of a third country.

881.    In the Tribunal's view, this interpretation reflects the ordinary meaning of the language of Article IV of the Treaty.  The Tribunal notes that this interpretation is consistent with previous interpretations of Article IV(2) of the Treaty in the decisions in *Maffezini*, *Gas Natural* and *Suez* cases.[1082]  Further, in the Decision on Jurisdiction in this case, the Tribunal determined that the MFN Clause contained in Article IV(2) of the Treaty extends to matters other than fair and equitable treatment when it applied it to the dispute resolution provisions contained in the Australia-Argentina BIT.[1083]  Accordingly, the Tribunal finds that the MFN Clause contained in Article IV(2) of the Treaty is not restricted to fair and equitable treatment provisions and can be used in respect of all matters governed by the Treaty to incorporate more favorable provisions from other BITs concluded by Argentina.

882.    The Tribunal now turns to Respondent's arguments that the MFN Clause does not apply to permit Claimants to invoke the application of the umbrella clause or the full protection and security provisions in the US-Argentina BIT because the Treaty in this case does not provide for an umbrella clause or full protection and security.  In this regard, Claimants argued that the MFN Clause permits importing provisions that are absent from the base treaty and that if this were not so, the MFN Clause would have no effect.  Claimants say that pursuant to the *ejusdem generis* principle, MFN treatment applies as long as the third-party treaty provision containing the more favorable treatment is of the same type as in the base treaty.  In this case, Claimants argue that the Spain-Argentina BIT and the US-Argentina BIT are of the same type, or address the same "matter regulated by the base treaty: the protection of foreign investors."  In this regard, as noted above at

---

[1082] *Emilio Agustín Maffezini v. Kingdom of Spain*, ICSID Case No. ARB/97/7, Decision on Jurisdiction: C-259; *Gas Natural SDG, S.A. v. Argentine Republic*, ICSID Case No. ARB/03/10, Decision on Jurisdiction, June 17, 2005: C-260; *Suez Sociedad General de Aguas de Barcelona S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/03/19, Decision on Jurisdiction, August 3, 2006: C-255.
[1083] *See* Decision on Jurisdiction ¶¶ 160-186.

paragraph 870, Claimants rely on the Award in *MTD v. Chile* which they say incorporated an umbrella clause taken from the Denmark-Chile BIT by means of an MFN clause in the Malaysia-Chile BIT.  In respect of the question of having recourse to the provisions of the US-Argentina BIT in respect of full protection and security, Claimants note that, in any event, the Treaty does provide for protection of investments and, therefore, is specifically included as a matter governed by the Treaty.

883.    Respondent submits that the MFN Clause in Article IV(2) of the Treaty cannot be used to introduce an entire umbrella clause or a full protection and security provision not contained in the Treaty.  Further, it seeks to distinguish the various decisions relied by Claimants (notably, *Maffezini*, *Gas Natural* and *Suez* on the basis that they are irrelevant since they concerned the incorporation of dispute settlement provisions rather than substantive provisions.  Respondent also distinguished the *MTD* and *Bayindir* cases on other grounds.[1084]

884.    In the Tribunal's view, in interpreting the scope of the MFN Clause contained in Article IV(2) of the Treaty, meaning must be given to the critical words "[i]n all matters governed by this Agreement".  According to Claimants, this language should be interpreted as referring generally to the protection of foreign investors.  This interpretation is too broad and disregards the reference to all "matters" governed by the Treaty.  In the Tribunal's view, the plain and ordinary meaning of this language is to refer to the various rights or forms of protection contained in the individual provisions of the Treaty.  The Tribunal accepts that the parties to the Treaty were in all likelihood aware of the existence of umbrella clauses and if they had intended to include such a clause in the Treaty, they would have done so.[1085]  According to Respondent, use of the MFN Clause to incorporate an umbrella clause into the Treaty would result in the incorporation of a new right or standard of treatment not provided for the Treaty.  On the basis of the specific language used by the Parties in the Treaty, the Tribunal finds this argument persuasive.

---

[1084] Resp. Rej. ¶¶ 684-689.  *MTD*, on the ground that in that case Chile had not challenged the use of an MFN clause to invoke provisions contained in other treaties; *Bayindir*, on the basis that in that case Pakistan had only raised an objection on a temporal issue and on the basis that the tribunal in that case had found that the State parties had clearly contemplated the importance of fair and equitable treatment and that this was relevant for the interpretation of the MFN clause).
[1085] Resp. CM ¶¶ 765-771; Resp. Rej. ¶ 684; Kingsbury ER ¶ 47.

885.    In reaching this conclusion, the Tribunal has considered Claimants' argument that limiting the application of the MFN Clause to the provisions or treatment that is already present in the base treaty would deprive the clause of any effect.  However, this does not appear to be correct since the MFN Clause could clearly "improve" the standards of protection contained in the Treaty by incorporating more favorable standards from another treaty.  In this regard, the MFN Clause could lead to the incorporation of more favorable standards in relation to, for example, discriminatory or unjustified measures, fair and equitable treatment, expropriation and transfers of income or earnings.[1086]  As a result, the MFN Clause would not be deprived of any meaning or effect were its scope to be limited to rights or standards contained in the Treaty.

886.    The Tribunal has also considered the various authorities relied upon by Claimants in support of their position that the MFN Clause can be applied to invoke the application of rights or standards not contained in the Treaty.  In this regard, the Tribunal notes that in the various cases cited by Claimants, the relevant base treaties appear to have provided rights or protection which the claimants sought to improve upon by having recourse to more favorable provisions in other treaties.  For example, in the cases dealing with more favorable dispute resolution provisions, the base treaties already contained similar, albeit less favorable, dispute resolution provisions.

887.    The cases of *MTD v. Chile* and *Bayindir v. Pakistan* are somewhat different.  Nevertheless, they are also distinguishable.  In the case of *MTD v. Chile*, the question that the tribunal considered relevant was whether the provision that the claimants sought to invoke from other treaties (which dealt with the obligation to award permits subsequent to approval of an investment and to fulfillment of contractual obligations) could be considered as part of fair and equitable treatment (which was provided for the in the base treaty).[1087]  The MFN clause at issue provided as follows:

> Investments made by investors of either Contracting Party in the territory of the other Contracting Party shall receive treatment which is fair and equitable, and not less favourable than that accorded to investments made by investors of any third State.[1088]

---

[1086] *See* Resp. Rej. ¶ 767 where Respondent accepts that the MFN Clause covers any substantive issue governed by the Treaty and provides these examples contained in Articles IV, V and VI of the Treaty.
[1087] *MTD v. Chile* ¶¶ 100-103.
[1088] *MTD v. Chile* ¶ 101, quoting Article III(1) of the Malaysia-Chile BIT.  In addition, the Malaysia-Chile BIT also contained a separate FET provision which provided that "investments of investors of either Contracting Party shall at all times be accorded fair and equitable treatment…": as quoted in *MTD v. Chile* ¶ 107.

In addressing that question, the tribunal held as follows:

> 104.  The Tribunal considers the meaning of fair and equitable treatment below and refers to that discussion.  The Tribunal has concluded that, under the BIT, the fair and equitable standard of treatment has to be interpreted in the manner most conducive to fulfill the objective of the BIT to protect investments and create conditions favourable to investments.  The Tribunal considers that to include as part of the protections of the BIT those included in Article III(1) of the Denmark BIT and Article III(3) and (4) of the Croatia BIT is in consonance with this purpose.[1089]

In the Tribunal's view, this distinguishes the *MTD v. Chile* case since the tribunal in that case appears to have based its decision to permit the invocation of the clauses invoked from the Croatia-Chile BIT and Denmark-Chile BIT on its interpretation of the fair and equitable treatment standard in the base treaty between Malaysia and Chile.[1090]  In addition, the language of the relevant MFN clause in the *MTD v. Chile* case is different from that of Article IV(2) of the Treaty in this case in that it does not contain the language "in all matters governed by this Agreement".

888.    In the *Bayindir v. Pakistan* case, the respondent does not appear to have raised the same objection under consideration here.  Rather, it argued the importation of a FET clause from another BIT is only possible if it is not excluded by the intention of the Contracting Parties.[1091]  The relevant MFN clause in the Turkey-Pakistan BIT provided as follows:

> Each Party shall accord to these investments, once established, treatment no less favourable than that accorded in similar situations to investments of its investors or to investments of investors of any third country, whichever is the most favourable.

The preamble to that treaty also contained the following language:

> Agreeing that fair and equitable treatment of investment is desirable in order to maintain a stable framework for investment and maximum effective utilization of economic resources.

889.    The tribunal of the *Bayindir v. Pakistan* case found that while this language of the BIT offered little assistance since the preamble does not establish any operative obligation, it was

---

[1089] *MTD v. Chile* ¶ 104.  It is worth noting that, as pointed out by Respondent, the respondent in the *MTD v. Chile* case did not argue against the application of the provisions sought to be incorporated by use of the MFN clause. Nevertheless, the tribunal considered it appropriate to examine the MFN clause in the base treaty and satisfy itself that its terms permitted the use of the provisions from the other treaties.
[1090] In its final decision, the tribunal found that certain of the respondent's conduct had breached the obligations under Article III(1) of the Malaysia-Chile BIT, quoted above.
[1091] *Bayindir v. Pakistan* ¶ 150.

relevant for the interpretation of the MFN clause in its context and in light of the treaty's object and purpose.  It was of the view that the reference to FET in the preamble, together with the absence of an FET clause in the treaty, did not rule out the possibility of importing an FET obligation through the MFN clause contained in the treaty.  Rather, it stated that "[t]he fact that the States parties to the Treaty clearly contemplated the importance of the FET rather suggests the contrary. Indeed, even though it does not establish an operative obligation, the preamble is relevant for the interpretation of the MFN clause…".[1092]

890.    The Tribunal also notes that the language of the MFN clause at issue in the *Bayindir v. Pakistan* case is different from the language of the Treaty.  Again, there is no reference to the relevant language relating to the scope of Article IV(2) of the Treaty: "in all matters governed by this Agreement".  In the Tribunal's view, the *MTD* and *Bayindir* decisions are distinguishable from this case.  The language of the relevant MFN clauses is different and the context and the provisions sought to be included from third-party treaties are also different.  In the *MTD* and *Bayindir* cases, the MFN clause was used to invoke FET provisions in circumstances where there was reference to fair and equitable treatment in the base treaties.  In this case, Claimants seek to invoke the MFN Clause to incorporate an umbrella clause in circumstances where there is no umbrella clause in the Treaty, nor any reference to or mention of such a clause.

891.    As a result, the Tribunal is not persuaded that the decisions in the *MTD* and *Bayindir* cases support Claimants' claim to invoke the umbrella clause in the US-Argentina BIT in this case.

892.    For these reasons, the Tribunal concludes that Article IV(2) of the Treaty does not apply to permit Claimants to invoke the umbrella clause from the US-Argentina BIT.  Accordingly, Claimants' claim based on this clause must fail.

893.    Claimants' arguments with respect to invoking the full protection and security provisions from the US-Argentina BIT are somewhat different.  Claimants advanced a claim on the basis of Article III(1) of the Treaty which provides that "each Party shall protect within its territory

---

[1092] *Bayindir v. Pakistan* ¶ 155.  The tribunal went on to refer to the *MTD v. Chile* decision and concluded that on the basis of the MFN provision in the Turkey-Pakistan BIT, the claimant could invoke the application of the FET standard in the Switzerland-Pakistan BIT.  *See Bayindir v. Pakistan* ¶¶ 158-159 and 167.

investments made, in accordance with its legislation, or the investors of the other Party…". In addition, Claimants invoked Article II(2)(a) of the US-Argentina BIT which requires "full protection and security" to the extent that treatment was more favorable than the treatment accorded under Article III of the Treaty. In its Reply, Claimants responded to Respondent's argument that since the Treaty did not contain any provision relating to "full protection and security" (or an umbrella clause), the full protection and security standard did not constitute a matter governed by the Treaty and therefore exceeded the scope of the application of the MFN Clause. Claimants argued that it was not necessary for them to resort to the MFN Clause in order to apply a "full" protection and security standard on the basis that there was no significant difference between "protection" and "full protection and security". In any event, Claimants submitted that should the Tribunal find that Article III(1) of the Treaty does not in and of itself require "full" protection and security, it invoked the MFN Clause to apply the full protection and security standard contained in Article II(2)(a) of the US-Argentina BIT. In that regard, Claimants argued that the Treaty does contain a protection clause and, therefore, they did not seek to import an entirely new, substantive standard but, rather, sought to improve an existing one.[1093]

894.    For its part, Respondent argued that this was a new claim or argument that should have been presented in Claimants' Memorial. Further, Respondent argued that the Tribunal should not accept Claimants' argument that they had implicitly raised this argument in their Memorial when they argued that it was not necessary to resort to the MFN Clause to apply a "full" protection and security standard since the Treaty already contained a provision on protection. Respondent argued that Claimants should not be permitted to introduce a new argument at the reply stage.[1094]

895.    In the Tribunal's view, in their Memorial, Claimants based their claim for a breach of the standard of protection on both Article III(1) of the Treaty and, through the MFN Clause, Article II(2)(a) of the US-Argentina BIT. They argued that there was no significant difference between the two standards but that in the event the Tribunal disagreed, they sought to invoke the more favorable provision of the US-Argentina BIT. On this basis, the Tribunal finds that

---

[1093] Cl. Reply ¶¶ 499-508.
[1094] Resp. Rej. ¶¶ 690-693.

Claimants did implicitly raise the argument that it was not necessary to resort to the MFN Clause in order to apply a "full" protection and security standard in this case.  In any event, the Tribunal finds that when it raised in its Reply the argument that the Treaty contained a protection clause and that it simply sought to improve the treatment accorded by that clause by having recourse to the US-Argentina BIT, Respondent had ample opportunity to respond and has not demonstrated any prejudice flowing from what it says are new arguments.  Accordingly, Respondent's objection as to the timing of Claimants' argument is dismissed.

896.    Article III(1) of the Treaty contains an obligation that each Party shall protect within its territory investments made by investors of the Party.  As a result, protection of investments is a matter governed by the Treaty and, for the reasons set out above, the MFN Clause contained in Article IV(2) of the Treaty permits Claimants to invoke the full protection and security provision contained in Article II(2)(a) of the US-Argentina BIT.  The Tribunal now turns to whether there is any significant difference between the standards in question and the merits of Claimants' claim that Respondent failed to protect their investments.

897.    Having reviewed the authorities cited by Claimants, the Tribunal is of the view that there is no significant difference between the duty to protect investments under Article III(1) of the Treaty and the duty of full protection and security in Article II(2)(a) of the US-Argentina BIT for present purposes. [1095]  In any event, to the extent the standard of "full protection and security" may be more favorable, the Tribunal applies that standard as set out in Article II(2)(a) of the US-Argentina BIT.

898.    Claimants summarize the full protection standard as follows:

☐    Generally, the standard imposes an obligation of "due diligence" and "vigilance" on the host State with respect to the protection and security of investments (*AAPL*, *AMT*)

☐    More specifically, a host State is required to take all measures necessary to ensure the protection and security of investments (*AAPL*, *AMT*)

---

[1095] Cl. Mem. ¶¶ 464-466; Cl. Reply ¶¶ 500-502.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

□   The standard is violated if a host State fails to comply with its own national laws or the standard of protection required by international law (*AMT*)

□   The standard is violated by a failure immediately to address and rectify acts that have harmed an investment, such as a failure immediately to restore seized properties to an investor's possession (*Wena Hotels*)

□   A government will be charged with violating the standard if it could have directed others to take such restorative acts but failed to do so (*Wena Hotels*)

□   The standard extends beyond "physical" security and requires a "secure investment environment" (*CME, Siemens, Azurix, Vivendi II, Frontier Petroleum, Biwater Gauff, National Grid*)

□   The standard is violated if a government, through its laws or administrative applications, withdraws approval of or devalues an investor's investment (*CME*)[1096]

899.   Claimants allege that Respondent breached this standard in the following ways.  First, Respondent failed to permit Claimants to charge economically reasonable airfares which had been guaranteed in numerous Argentine laws, decrees and contractual commitments.   Second, Respondent failed to protect Claimants' investments by appointing and maintaining in office, as Undersecretary of Air Transportation, Mr. Cirielli.  Third, Claimants say that Respondent breached the May 2008 Agreement and the July 2008 Agreement and then unlawfully expropriated the Airlines.

900.    In response to Respondent's arguments, Claimants submit that the weight of relevant jurisprudence indicates that full protection and security clauses are not limited to physical harm and cover the protection and security of intangible assets.  Further, Claimants say that they do not claim that the full protection and security standard amounts to "an obligation to assume full responsibility".  However, the standard compels the host State to act with due diligence, requiring the reasonable measures of prevention which a well-administered government could be expected to exercise in the circumstances.   They note that the threshold for finding a violation of this standard is low, since a mere lack of diligence will suffice and there is no need to establish malice

---

[1096] Cl. Reply ¶ 512.

or negligence.  Finally, Claimants note the close relationship between the full protection and security standard and the fair and equitable treatment standard.[1097]

901.   Respondent says that the full protection and security standard covers the obligation to afford physical protection only.  In any event, Respondent says that the standard could never amount to an obligation to assume full responsibility on the basis of a strict or absolute obligation upon the host State since it cannot be required to avoid any kind of act that may be detrimental to a foreign investor.  According to Respondent, the obligation entails the adoption of reasonable measures, under the circumstances of the case, aimed at preventing hostile acts by the State itself or a third party towards a foreign investor.  Finally, Respondent says that the obligation to provide full protection and security does not require a host State to refrain from altering its law, nor does it extend to encompass the maintenance of a stable legal and commercial environment.[1098]  With respect to the alleged similarity between the full protection and security standard and the FET standard, Respondent says that since the Treaty provides for fair and equitable treatment and protection and security in two distinct clauses, the Parties must have intended them to mean two different things, and so in interpreting these two standards the Tribunal give effect to that intention by giving the two concepts distinct meanings and fields of application.[1099]

902.   In respect of the specific merits of Claimants' allegations, Respondent responded as follows:

- The regulatory framework governing airfares applied to all airlines and was in place well before the Marsans Group became involved in the Airlines.  While the Airlines were under the management of the Marsans Group, there were four airfare increases which were sufficient to cover the costs of the Airlines during the relevant period.  Further, the relevant context was that of acute widespread crisis in Argentina.

- In respect of the conduct of Mr. Cirielli, he took a leave of absence from his position as Secretary General of APTA when he was appointed as Undersecretary of Commercial Air

---

[1097] Cl. Reply ¶¶ 509-511 and the sources cited there.
[1098] Resp. CM ¶¶ 774-780; Resp. Rej. ¶¶ 695-704 and the sources cited there.
[1099] Resp. Rej. ¶ 702, referring to *Suez*, Decision on Liability dated July 30, 2010 ¶ 161: AL RA-412.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

Transport.  Therefore, he did not perform in both capacities at the same time.  Further, there is no evidence to support the allegation that Mr. Cirielli encouraged the strike in November 2005, referred to by Claimants.  Finally, Respondent notes that it was through State mechanisms that measures were implemented in order to prevent Mr. Cirielli from acting in cases where there could be a conflict of interest with the Airlines.

• In respect of the May 2008 Agreement and July 2008 Agreement, Respondent says that they did not fail due to its conduct.  Rather, the Agreements were breached by Interinvest or Air Comet.  Respondent also says that the Agreements became meaningless due to the reality of the Airlines' condition which, when Respondent became aware of it, made it impossible to maintain a purchase option in relation to the Airlines.

• In respect of the expropriation of the shares in the Airlines, Respondent says that it acted in accordance with the applicable substantive and procedural laws.[1100]

903.    Having considered the Parties' arguments regarding the nature of the obligation to protect investments and to provide them full protection and security, there is no significant difference for the present purposes.  As Claimants have invoked the application of the full protection and security standard contained in the US-Argentina BIT, which the Tribunal has found to be valid, the relevant question is whether Respondent has breached the obligation of providing full protection and security.

904.    In respect of the relationship between the standard of full protection and security and that of fair and equitable treatment, the Tribunal finds the distinction drawn in the *Suez* Decision on Jurisdiction, cited by Respondent, persuasive.[1101]    In the Treaty, the provisions regarding protection of investments and fair and equitable treatment are contained in two distinct articles, which leads to the conclusion that the Parties must have intended them to address different things.

---

[1100] Resp. CM ¶¶ 781-786; Resp. Rej. ¶¶ 705-709.
[1101] *Suez Sociedad General de Aguas de Barcelona S.A. and Vivendi Universal S.A. v. Argentina*, ICSID Case No. ARB/03/19: AL RA-412 ¶ 172.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

As a result, the Tribunal believes that these two standards should be given distinct meanings and fields of application.[1102]

905.    Nevertheless, the Tribunal accepts there is considerable overlap between the concepts of fair and equitable treatment and full protection and security, as submitted by Claimants.  In the Tribunal's view, the fair and equitable standard is broader than that of full protection and security.  As a result, while a breach of the full protection and security clause would likely constitute a violation of fair and equitable treatment, the converse is not necessarily the case.  Not all violations of the fair and equitable treatment standard automatically constitute violations of the full protection and security standard.  Finally, having reviewed the various awards and authorities cited by the Parties, the Tribunal is of the view while the traditional notion of full protection and security addresses the protection of property from physical threats and injury, it can, in appropriate circumstances, include the protection of intangible assets which fall within the scope of the definition of an investment in the relevant treaty.

906.    On the basis of the findings it has made in respect of the application of the FET standard, set out above, the Tribunal concludes that Claimants have not demonstrated a breach of the full protection and security standard in respect of their allegations relating to the regulatory framework governing airfares and the appointment and maintenance of Mr. Cirielli as the Undersecretary of Air Transportation.  With respect to Claimants' allegations relating to the May 2008 Agreement and July 2008 Agreement and the expropriation of the Airlines, the Tribunal is of the view that these relate more closely to the standard of fair and equitable treatment and the standard for expropriation and are more appropriately considered as part of Claimants' claims under those standards.

907.    In respect of Claimants' claim relating to the regulatory framework and the Airlines inability to charge economically reasonable airfares, the Tribunal has found that the conduct of Respondent of which Claimants complain does not amount to a breach of the fair and equitable

---

[1102] The Tribunal reaches this conclusion despite the fact that the full protection and security provision contained in Article II(2)(a) of the US-Argentina BIT refers to both fair and equitable treatment and full protection and security in the same article.

316

treatment standard.  In that regard, the Tribunal found that although the airfares provided under the regulatory framework were not sufficient to cover the Airlines' costs, for various reasons this did not amount to a breach of the fair and equitable treatment standard.  As a result, the Tribunal is not persuaded that Respondent's conduct in relation to the airfares amounts to a breach of the full protection and security standard.

908.    The Tribunal reaches the same conclusion with respect to Claimants' allegations relating to the appointment and maintenance in office of Mr. Cirielli.  For the reasons stated above at paragraphs 693 through 711, the Tribunal concludes that Respondent's conduct does not amount to a breach of the obligation to accord fair and equitable treatment.  As a result, the Tribunal is not persuaded that Respondent's conduct in relation to the appointment and maintenance in office of Mr. Cirielli amounts to a breach of the full protection and security standard.

909.    As indicated above, Claimants' allegations with respect to the May 2008 Agreement and July 2008 Agreement and the expropriation of the Airlines are more closely linked to and appropriately addressed under Claimants' claims for breaches of the fair and equitable treatment standard and the breach of Article V of the Treaty in respect of expropriation.  As set out above at paragraphs 777 through 857, the Tribunal has found that Respondent breached the obligation of fair and equitable treatment in respect of the July 2008 Agreement.[1103]  The Tribunal addresses Claimants' allegations with respect to expropriation below.

910.    In conclusion, the Tribunal finds that Claimants have not demonstrated a breach of the full protection and security standard in respect of its allegations relating to the regulatory framework, the appointment and maintenance of Mr. Cirielli as the Undersecretary of Air Transportation and the May 2008 Agreement.  Further, the Tribunal finds that the claims relating to the July 2008 Agreement and the expropriation of the Airlines are more appropriately considered as part of Claimants' claims of a breach of the FET standard and of unlawful expropriation.

---

[1103] As set out at paragraphs 760 - 776 above the Tribunal has dismissed Claimant's claim relating to the breach of the FET standard in respect of the May 2008 Agreement.

## X.   UNJUSTIFIED AND DISCRIMINATORY MEASURES

911.   Claimants also allege that Respondent breached Article III(1) of the Treaty.  That provision reads as follows:

> PROTECTION
>
> 1.   Each Party shall protect within its territory investments made in accordance with its legislation by investors of the other Party and shall not obstruct, by unjustified or discriminatory measures, the management, maintenance, use, enjoyment, extension, sale and, where appropriate, liquidation of such investments.[1104]

912.   Claimants say that the phrase "unjustified or discriminatory measures" uses the disjunctive "or" and therefore either "unjustified" or "discriminatory measures" will violate Article III(1) of the Treaty.[1105]

913.   According to Claimants, the ordinary meaning of "unjustified" is "unreasonable" or "arbitrary".  They say there is no relevant distinction between these terms in the context of impairment clauses in BITs.  In response to Respondent's arguments on the meaning of arbitrary, Claimants summarized that arbitrary treatment encompasses actions that: (i) bear no rational relation to their stated purposes; (ii) were coercive, retaliatory or in bad faith; and (iii) were taken in willful disregard of legal standards, due process and proper procedure.[1106]

914.   Claimants say that the following measures adopted by Respondent were all unjustified, unreasonable or arbitrary:

- The maintenance of Ricardo Cirielli as the public official responsible for the air transportation sector, despite findings by a federal appellate court and the Argentine Anticorruption Office, that he had a conflict of interest with respect to the Argentine Airlines;

- The GOA's rejection of the Argentine Airlines' requests for airfare increases and failure to respect the legal framework in place at the time of and throughout the Claimants' investment;

---

[1104] The Spanish text of Article III(1) of the Treaty provides as follows:

> *PROTECCION*
>
> *1.-   Cada Parte protegerá en su territorio las inversiones efectuadas, conforme a su legislación, o inversores de la otra Parte y no obstaculizará, mediante medidas injustificadas o discriminatorias, la gestión, el mantenimiento, la utilización, el disfrute, la extensión, la venta ni, en su caso, la liquidación de tales inversiones.*

[1105] Cl. Mem. ¶ 480, citing *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12: C-282 ¶ 391.

[1106] Cl. Mem. ¶ 482; Cl. Reply ¶¶ 518-526.

- • The GOA's judicial challenge of ARSA's financial statements;

- • The GOA's breach of the May 2008 Agreement; and

- • The GOA's breach of the July 2008 Agreement and expropriation of the Argentine Airlines.[1107]

915. Claimants also say that Respondent adopted discriminatory measures against their investments. In this regard, they say that discrimination entails two elements: the measures directed against a particular party must be for reasons unrelated to the substance of the matter; and, discrimination entails like persons being treated in an equivalent manner.[1108]

916. Claimants say that Respondent and its officials treated their investments discriminatorily due to the fact that they were Spanish, and not Argentine. In this regard, Claimants point to the following examples: Mr. Cirielli's antagonism against Air Comet's purchase of a controlling share in the Airlines; favoring other Argentine airlines, including SOL, over the Airlines by, *inter alia*, subsidizing fuel costs for certain flights; targeting the Airlines by refusing to sufficiently raise airfares until it took control of them; expropriating the Airlines, at least in part, because Air Comet and Claimants were Spanish (noting that none of the other airlines in Argentina were expropriated).[1109]

917. Respondent disputed Claimants' interpretation of both "unjustified" and "discriminatory measures". It also denied that any of the conduct identified by Claimants constituted either unjustified or discriminatory conduct.[1110]

918. With respect to unjustified measures, Respondent submitted that "unjustified" measures are very similar to the notion of arbitrariness. It relies on the definition of arbitrariness set out in the *ELSI* Decision of the International Court of Justice to the effect that arbitrariness is something opposed to the rule of law and is a willful disregard of due process of law, an act which shocks, or

---

[1107] Cl. Mem. ¶ 483 (footnotes omitted). *See also* Cl. Reply ¶¶ 527-530.
[1108] Cl. Mem. ¶ 485. Claimants also say that anti-discrimination provisions in BITs prohibit measures that are discriminatory in effect as well as those which are intentionally discriminatory. Claimants contest Respondent's test for discriminatory treatment.
[1109] Cl. Mem. ¶ 486; Cl. Reply ¶ 534.
[1110] Resp. CM ¶¶ 719-756; Resp. Rej. ¶¶ 660-681.

at least surprises, a sense of juridical propriety.[1111]  Respondent also relies upon the decision in *Noble Ventures v. Romania* for the proposition that in examining the existence of arbitrariness, account should be taken of whether the measures adopted by the State were a short-term solution to avoid collapse and whether they were reasonable and well founded.  Accordingly, it says that it is important to consider the circumstances in which the measures were taken.[1112]

919.   On the merits of Claimants' claim of unjustified measures, Respondent contested each of the allegations on the following basis:

- The Federal Court of Appeals and the Argentine Anti-Corruption Office addressed the potential conflict of interest of Mr. Cirielli and did not request his removal. Further, Mr. Cirielli took a leave of absence from his union duties upon appointment as Undersecretary of Air Transportation.  Finally, Respondent submits that Claimants have not provided reliable evidence of any discriminatory conduct.

- Respondent complied with the regulatory framework at the time the initial investment was made and throughout its course.  The rejection of any request for airfare increases was justified on technical grounds and, even if these grounds were incorrect (which is not admitted), this would not convert well justified measures into unjustified measures.  Further, the airfare increases granted were adequate.

- The challenge of ARSA's financial statements before the courts was appropriate.

- Even assuming that there was any breach of the May 2008 Agreement and the July 2008 Agreement (which is denied), that would be, at best, contrary to a contractual provision and would not amount to a breach of the standard of arbitrariness articulated in the *ELSI* case.

---

[1111] Resp. CM ¶ 727, quoting from *Elettronica Sicula S.p.A. (United States v. Italy)*, 1989 I.C.J. 15 ¶ 128: AL RA-45.
[1112] Resp. CM ¶¶ 728-732.  Respondent also argues that with reference to unjustified or discriminatory measures, these apply only to investments made in accordance with the law.  In addition, Respondent argues that the Tribunal should also bear in mind that the investments invoked by Claimants caused serious economic losses to both Argentina and Spain.

- The expropriation of the shares in the Airlines was conducted in accordance with Argentine law and Article V of the Treaty, both of which were in place long before Claimants' investment was made.[1113]

920.   In respect of the alleged discriminatory measures, Respondent submits that a breach of Article III(1) of the Treaty requires treatment: (a) that is different for a foreign investor by reason of its nationality; (b) that is less favorable than that accorded to other investors in like circumstances; (c) that is intended to harm the foreign investor; (d) that causes actual harm to the foreign investor; and (e) that is not justified by sufficient reasons.  According to Respondent, these elements are cumulative and must all be present in order for a measure to be deemed discriminatory.[1114]

921.   In respect of the substance of Claimants' allegation of discriminatory conduct, Respondent made the following points:

- Claimants did not provide proof that either Mr. Cirielli or the Government denied airfare increases or expropriate the shares of the Airlines because they were owned by Spanish entities.

- Claimants did not demonstrate how the other airlines alleged to have been favored over the Airlines were in a similar situation.

- There was no evidence of a campaign to "re-Argentinize" the Airlines.  If, in the end, the Airlines had to be expropriated, this was due to the condition of the Airlines which, in order to maintain public air transport service, left no other choice.[1115]

922.   The underlying facts and alleged measures relating to Claimants' allegations of unjustified and discriminatory conduct have been examined in detail by the Tribunal and addressed in the section above dealing with fair and equitable treatment.  This permits the Tribunal to address and

---

[1113] Resp. CM ¶¶ 734-742; Resp. Rej. ¶¶ 669-674.
[1114] Resp. CM ¶¶ 743-751.
[1115] Resp. CM ¶¶ 752-756; Resp. Rej. ¶¶ 678-681.

determine the claims relating to unjustified and discriminatory measures expeditiously.   The Tribunal's conclusions set out below refer to and rely upon its earlier findings.

923.    Commencing with the claims relating to unjustified measures under Article III(1) of the Treaty, it appears to be common ground between the Parties that unjustified measures are equivalent to arbitrary measures.  This is consistent with the Tribunal's view that the ordinary or plain meaning of unjustified and arbitrary is very similar.  With respect to the Parties' difference over the interpretation of "arbitrary" or "arbitrariness", the Tribunal finds Claimants' position more persuasive.  Since the *ELSI* decision, several tribunals have gone beyond the limited notion of arbitrariness set out in that case and, relying on the ordinary meaning of the term, have articulated a broader notion of arbitrary treatment.  In this regard, the Tribunal finds the definition of "arbitrary", in the decisions in *Azurix*, *Siemens*, *LG&E* and *National Grid*, reasonable and persuasive.[1116]

924.    Turning to the measures that Claimants allege were unjustified or arbitrary, the Tribunal finds that with the exception of the measures related to the July 2008 Agreement and the expropriation of the shares of the Airlines, none of the impugned measures amount to unjustified or arbitrary measures.  These measures are reviewed above in the context of the allegations of breach of the fair and equitable treatment standard.[1117]  In each case, the Tribunal found that the

---

[1116] *See* Cl. Reply ¶¶ 519-525 and the sources cited there.  Among these, Claimants refer to Prof. Christophe Schreuer, who writes that various categories of measures can be described as arbitrary or unreasonable:

- a measure that inflicts damage on the investor without serving any apparent or legitimate purpose.  The decisive criterion for the determination of the unreasonable or arbitrary nature of a measure harming the investor would be whether it can be justified in terms of rational reasons that are related to the facts.  Arbitrariness would be absent if the measure is a reasonable and proportionate reaction to objectively verifiable circumstances;

- a measure that is not based on legal standards but on discretion, prejudice or personal preference;

- a measure taken for reasons that are different from those put forward by the decision maker.  This applies, in particular, where a public interest is put forward as a pretext to take measures that are designed to harm the investor; and

- a measure taken in willful disregard of due process and proper procedure.

*See* C. Schreuer, *Protection against Arbitrary or Discriminatory Measures*, Chapter 10 in R.P. Alford & C.A. Rogers, eds. *The Future of Investment Arbitration* (Oxford: University Press, 2007): C-912.

[1117] The relevant ¶¶ are as follows: (i) the conduct relating to Mr. Cirielli - ¶¶ 693 - 711; (ii) the regulatory framework and the failure to grant economically reasonable airfares - ¶¶ 501 - 602; (iii) the judicial challenge of ARSA's financial statements - ¶¶ 725 - 729; and (iv) the May 2008 Agreement - ¶¶ 760- 776.

alleged conduct did not amount to a breach of the fair and equitable treatment standard.  For the same reasons, the Tribunal finds that the measures in question were not unjustified or arbitrary in breach of Article III(1) of the Treaty.

925.     However, as set out above at paragraphs 823 through 857, the Tribunal has found that Respondent's conduct in respect of the July 2008 Agreement and its failure to observe its commitment to purchase the shares of the Airlines in accordance with the third party valuation mechanism contained in the agreement amounted to a breach of the fair and equitable treatment standard.  In reaching that conclusion, the Tribunal found that Respondent's objections to the Credit Suisse valuation submitted by Interinvest were artificial, that Respondent had sufficient information to assess that valuation and, despite this, on the basis of these excuses failed to proceed with the valuation procedure agreed with Interinvest.  It then obtained an injunction to maintain its appointee as the General Manager of the Airlines and proceeded to expropriate the shares of the Airlines.  The Tribunal has found that such conduct lacked transparency, was arbitrary and amounted to a breach of the FET standard.  For the same reasons, the Tribunal concludes that the conduct in question also amounts to unjustified measures under Article III(1) of the Treaty.

926.     In respect of Claimants' allegations that Respondent hindered by discriminatory measures Claimants' investments in the Airlines, the Tribunal finds that these have not been proved.  For the reasons set out previously, Claimants have not demonstrated that the conduct of Mr. Cirielli or Respondent was discriminatory.  Further, the conduct Claimants complain of in regard to the regulatory framework and the airfare increases applied to all airlines operating in Argentina and did not single out the Airlines for special treatment.  In addition, in respect of the alleged favoring of rival airlines over ARSA and AUSA, Claimants have not sufficiently identified these incidents, nor have they established that the other airlines and ARSA and AUSA were in similar or like circumstances.  Finally, with respect to the expropriation of the shares in the Airlines, Claimants have not demonstrated that the expropriation was carried out because the shares were owned by Spanish or foreign interests.  Accordingly, Claimants' claims in respect of discriminatory measures have not been made out.

927.   For the foregoing reasons, the Tribunal finds that Respondent has not breached the obligation not to obstruct by discriminatory measures, but has breached the obligation not to hinder by unjustified measures the management, maintenance, use, and sale of Claimants' investment pursuant to Article III(1) of the Treaty.

## XI.   ALLEGED BREACHES - CREEPING EXPROPRIATION

928.   In addition to their central claim that the Airlines were illegally expropriated by Respondent, Claimants maintain that there was also an indirect or creeping expropriation of their investment. In this regard, Claimants point to a number of the measures already discussed above in the context of their claim for a breach of the FET standard:

(a)   The "airfare squeeze"[1118]

(b)   The "serious conflict of interests" posed by Undersecretary Cirielli[1119]

(c)   The acts taken by the "government-supported" air transportation unions[1120]

(d)   Respondent's acts with respect to the June 2006 Agreement, including Respondent's coercion of Claimants to obtain additional shares at no cost, its unilateral modification of the text of the June 2006 Agreement, and its breach of the June 2006 Agreement by failing to set TER-compliant airfares and contributing to the promised 15% stock option of ARSA[1121]

(e)   Respondent's "lowball purchase offer," made by *de facto* Government representatives in early 2008[1122]

(f)   Respondent's failure to comply with the May 2008 Agreement[1123]

---

[1118] Cl. PHB ¶¶ 108-109; Cl. Mem. ¶ 356.
[1119] Cl. Mem. ¶ 361.
[1120] Cl. Mem. ¶ 362.
[1121] Cl. Mem. ¶¶ 363-364; Cl. PHB ¶ 103.
[1122] Cl. PHB ¶¶ 108-109.
[1123] Cl. PHB ¶ 117.

(g)      Respondent's *de facto* confiscation in 2008[1124]

929.    In light of the overlap between the claims for breach of FET and creeping expropriation, the Tribunal considers it most efficient to address the creeping expropriation claims at this stage and before turning to the claims of direct expropriation.

## A.      Positions of the Parties on Indirect or Creeping Expropriation Claims

930.    Claimants assert that the sum of Argentina's measures, including the formal expropriation of the Airlines and those measures constituting a breach of the FET obligation, also constitute creeping expropriation under Article V of the Treaty.[1125] Claimants assert that "[t]hrough its conduct, the GOA gradually deflated the value of Claimants' investment and deprived Claimants of legal and contractual rights fundamental to their investment, as well as the use and enjoyment of that investment."[1126]

931.    Respondent asserts that the acts cited by Claimants do not constitute creeping expropriation. According to Respondent, they are merely regulatory and contractual claims that fall outside the scope of this Tribunal's jurisdiction and which, in any case, have not resulted in either a substantial deprivation of the alleged investment or a loss of control.[1127]

## B.      Tribunal's Analysis

932.    The Tribunal will review the claims for unlawful expropriation in detail in the following section.  At this stage of the Award, the Tribunal will address only the claims that there was also an indirect or creeping expropriation of Claimants' investment.  Claimants argue that the measures noted at paragraph 928 above, in addition to amounting to unfair and inequitable treatment, also resulted in a creeping expropriation of their investment that culminated in a formal taking at the end of 2008.  In this regard, Claimants rely on Article V of the Treaty and the decisions of other

---

[1124] Cl. PHB ¶181.
[1125] *See* Claimants' Skeleton Submission ¶ 47 for a list of the alleged acts that collectively constitute the creeping expropriation.
[1126] Cl. PHB ¶ 179.
[1127] Respondent's Skeleton submission ¶ 64.

arbitral tribunals which have developed the test for finding an indirect or "creeping" expropriation occurred.  Article V of the Treaty provides:

> Nationalization, expropriation <u>or any other measure having similar characteristics or effects</u> that might be adopted by the authorities of one Party against investments made in its territory by investors of the other Party shall be effected only in the public interest, in accordance with the law, and shall in no case be discriminatory.  The Party adopting such measures shall pay the investor or his assignee appropriate compensation without undue delay and in freely convertible currency.

> [Emphasis added]

933.    Claimants note that Article V of the Treaty explicitly covers both direct and indirect expropriation, as it refers not only to nationalization and expropriation but also "any other measure having similar characteristics or effects".[1128] The Tribunal agrees with this position. For an indirect expropriation, the focus of the analysis is on measures other than nationalization or expropriation that have "similar characteristics or effects" to those measures.   Any measure with similar characteristics or effects in order to be lawful under Article V of the Treaty must be affected only in the public interest, in accordance with the law, without discrimination and must be accompanied by appropriate compensation. Tribunals have considered the nature of nationalization or expropriation in deciding whether certain measures had similar characteristics or effects so as to engage the requirements for expropriation under treaties or customary international law.

934.    In the decision in *Santa Elena v. Costa Rica*, the tribunal considered the nature of expropriation in the following passage:

> What has to be identified is the extent to which the measures taken have deprived the owner of the normal control of his property…There is ample authority for the proposition that a property has been expropriated when the effect of the measures taken by the state has been to deprive the owner of title, possession or access to the benefit and economic use of his property…Stated differently, international law does not lay down any precise or automatic criterion, such as the date of the transfer of ownership […] or judicial determination of the amount of compensation or by payment of compensation. …[what matters is] the date on which the governmental "interference" has deprived the owner of his rights or has made those rights practically useless … Although the expropriation by the decree of 5 May 1978 was only the first step in a process of transferring the Property to the Government, it cannot reasonably be maintained […] that this Decree expressed no more than an "intention" to expropriate or that, in 1978, the Government merely "sought to expropriate" … As of that date, the practical and economic use of the Property by the Claimant was irretrievably lost,

---

[1128] Cl. Mem. ¶¶ 378-381.

notwithstanding that [the Claimant] remained in possession of the property. As of 5 May 1978, Claimant's ownership of Santa Elena was effectively blighted or sterilized…"[1129]

935.    Thus, in *Santa Elena*, it was recognized that the essence of expropriatory measures is "to deprive the owner of the normal control of his property" and that this occurs when "governmental 'interference' has deprived the owner of his [ownership] rights or has made those rights practically useless".

936.    Relying on *Tippets, Abbett, McStratton v. TAMS-AFFA*, Claimants argue that an expropriation can occur even when legal title to the property has not been affected if "events demonstrate that the owner was deprived of fundamental rights of ownership" and noted that the appointment of a government manager has been found to be an act of expropriation, as it denied the investor's rights to manage and control their investment.[1130]   Claimants describe the 2008 formal expropriation as "the <u>culmination</u> of a long process of financial strangulation and gradual expropriation of Claimants' investment."[1131]

937.    The Tribunal considers that to the extent that Claimants argue that particular measures deprived them of their rights of ownership, including legal title to their shares, the right to manage the Airlines or actual control over them, it is clear that those measures would be expropriatory. The essence of expropriation is a taking or deprivation of *de facto* or *de jure* rights of ownership. There is no doubt that the formal taking of the Airlines through Law No. 26,466 on December 17, 2008 was expropriatory in that it authorized the expropriation of the investor's indirectly held shares of the Airlines and the exercise of the shares' corporate rights by the Government.   Law 26,412, which was enacted on September 18, 2008 and which approved Government of Argentina's "repossession" of the Airlines, was also expropriatory in nature as it contemplated the taking of Claimants' shares following valuation of compensation by the TTN. Whether the formal taking of Claimants' investment was lawful will be discussed in the next section of this award. At this stage of the analysis, the Tribunal must consider whether any other acts in the series of

---

[1129] *Compañia del Desarrollo de Santa Elena S.A. v. Republic of Costa Rica*, ICSID Case No. ARB/96/1, Award, February 17, 2000, ¶¶ 76-81 [hereinafter: *Santa Elena*]: C-292, as cited in Cl. Mem. ¶ 352.

[1130] Cl. Mem. ¶¶ 353-354 citing *Tippetts, Abbett, McStratton v. TAMS-AFFA*, US-Iran Claims Tribunal Award No. 141-7-2 (June 22, 1984): C-293 and *Starrett Housing Corp. v. Iran*, 4 Iran-US CTR 123, (1984) 23 ILM 1090: C-294.

[1131] Cl. Mem at ¶ 355.

measures in this case - short of the formal taking of their ownership rights - were also expropriatory.

938.    Working back in time from these clearly expropriatory acts, the next measure that was alleged to be expropriatory in nature was the transition in day-to-day management of the Airlines from Claimants to Respondent through the appointment of a General Manager, Mr. Alak.

939.    As has been discussed in detail in the section on FET, through the July 2008 Agreement, Claimants agreed to sell their shareholdings in both ARSA and AUSA to Respondent within 60 days.  Claimants were to appoint valuators to value each airline on a DCF basis with specific agreed assumptions as to the cost of fuel and domestic airfares and Respondent was to seek the same valuations of the Airlines as a whole from the TTN.  In the event of differing results, a third valuation was to be sought from an impartial, experienced and respected valuator.[1132]  During the 60-day transition period, the Parties were to set up a Transition Board made up of two representatives of Claimants and two representatives of Respondent to manage the operations of the Airlines.[1133]  The Transition Board was to manage the Airlines and instruct the General Manager to be appointed by Respondent and it was tasked with providing the necessary information for the stock transfer and valuation.[1134]  Although Mr. Alak's appointment was made pursuant to the July 2008 Agreement, which contemplated that the State-appointed General Manager would take instructions from a transition committee jointly appointed by Claimants and Respondent, the evidence indicates that, at some point in time, the General Manager began acting on his own and was no longer instructed by the Transition Board.

940.    On July 21, 2008, Mr. Julio Alak assumed the role of the Airlines' General Manager.[1135] Claimants, relying on the testimony of Mr. Muñoz, submit that as of that date, the Government of Argentina took *de facto* control over the Airlines.[1136]  However, the contemporaneous documents indicate that Interinvest did not complain about the functioning of the Transition Committee until

---

[1132] C-190, Article 6.
[1133] C-190, Article 3.
[1134] C-190, Articles 3-4.
[1135] RA-378, Minute 1.
[1136] Cl. PHB, para. 124 citing Muñoz testimony, Transcript p. 457, line 12 - p. 458, line 17.

November 12, 2008.  On that date, Interinvest wrote to Secretary Jaime to request that the Transition Committee meet indicating that Argentina's representatives had not attended any of the committee's weekly meetings since October 8, 2008.[1137]  Interinvest indicated that, as a result, Mr. Julio Alak as General Manager was managing the Airlines without the guidance of the Transition Committee.[1138]

941.    The Tribunal agrees that taking over management of an investment constitutes an indirect expropriation and that there was evidence that Argentina did assume the management of the investment at some point after the July 2008 Agreement and before the formal expropriation of Claimants' shares.  In the Tribunal's view, this amounted to an indirect expropriation.  However, the record is not entirely clear as to precisely when Argentina in fact took over the management of the Airlines such as to amount to an expropriation.  In light of the fact that Argentina proceeded to formally expropriate Claimants' shares in the Airlines thereby completing a *de jure* taking, the Tribunal does not consider it necessary to determine the precise date at which a *de facto* taking occurred.  Accordingly, the Tribunal will discuss the consequences flowing from the indirect expropriation of the Airlines through the takeover of management in the following section on expropriation.

942.    The Tribunal has also considered the events alleged to form part of the creeping expropriation that took place before July 2008.  The expropriatory nature of the other individual impugned measures preceding the assumption of the day-to-day management is less clear.  Having reviewed the events and found that an indirect expropriation occurred at some point during the course of events following the July 2008 Agreement, the Tribunal finds it convenient to address the other components of Claimants' creeping expropriation claims in chronological order.

943.    Claimants argue that the airfare squeeze "gradually emptied the value of Claimants' investment and enabled the ultimate 'Argentinization' (nationalization) of the two airlines at an

---

[1137] C-210.
[1138] C-210.  In addition, Interinvest again requested that Argentina provide a response to its request to appoint a third-party valuator.  *See also* C-212, pp. 29-33: minutes of the meeting of the Board of Directors of ARSA on November 19, 2008.

orchestrated, artificially-low price."[1139]   Claimants complain that in 2006, Respondent "coerced Claimants to grant it an option to raise its stake in ARSA, first to 5% and then to 20%."[1140]   In 2006, Respondent exercised its first option increasing its shareholding in ARSA from 1.2% to 5%. Then in 2007, Respondent exercised its second option to increase its ownership to 20%. The exercise of the second option was never perfected as Respondent failed to make the necessary capital contribution for the shares.  Finally, in 2008, Respondent took full control over the Airlines. Claimants state that each progressive taking was without any compensation and that Respondent required Claimants to transfer shares in exchange for promises to increase airfares and approve the financial statements.[1141]   Claimants summarize their position as follows:

> Argentina's plan, initiated in late 2004, had finally come to fruition: After years of financial asphyxiation, instrumentalized by: (i) preventing the Argentine Airlines from charging economically reasonable airfares; (ii) blocking the adoption of ARSA accounts which, in turn, prevented the financial expansion of the airlines; and (iii) escalating government-supported union strikes and unreasonable salary demands leading to social unrest and a near paralysis in the operation of the airlines, the GOA had essentially eviscerated the value of Claimants' investment.  Formal expropriation in December 2008 was but the *coup de grace*, delayed only so as to allow the authorities to walk away at lower cost.  In the end, however, the GOA refused even to pay the deflated 2008 value of Claimants' investment.  After four years of harassment, unfair treatment and fraudulent maneuvers, it simply decided not to pay any compensation at all.[1142]

944.    Claimants argue that a "creeping" expropriation resulted from the series of measures, which over time substantially impaired the value of the investment, even though each individual measure standing alone would not appear to amount to expropriation.[1143]   In support of their position, Claimants also quote Professors Reisman and Sloane on creeping expropriation:

> Discrete acts, analyzed in isolation rather than in the context of the overall flow of events, may, whether legal or not in themselves, seem innocuous vis-à-vis a potential expropriation.  Some may not be expropriatory in themselves. Only in retrospect will it become evident that those acts comprised part of an accretion of deleterious acts and omissions, which in the aggregate expropriated the foreign investor's property rights.[1144]

---

[1139] Cl. Mem. ¶ 356.
[1140] Cl. Mem. ¶ 363.
[1141] Cl. Mem. ¶ 363.
[1142] Cl. Mem ¶ 371.
[1143] Cl. Mem ¶¶ 373-375 citing *Santa Elena*: C-292 at ¶76; B.H. Weston, "Constructive Takings under International Law: A Modest Foray into the Problem of 'Creeping Expropriation'", 16 Va. J. of Int'l L. 103, 112-113 (1975): C-295.
[1144] W.M. Reisman & R. Sloane, "Indirect Expropriation and its Valuation in the BIT Generation," 74 Brit. Y.B. Int'l L. 115, 123-125 (2004): C-296.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 347 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

945.    Thus, Claimants submit that it is not necessary for each of the measures complained of to be either illegal or expropriatory in themselves; as long as the measures formed part of a series of "deleterious acts and omissions, which in the aggregate expropriated the foreign investor's property rights."[1145]  Claimants submit that the tribunal in *Siemens v. Argentina* similarly defined creeping expropriation and it noted that "[o]bviously, each step must have an adverse effect but by itself may not be significant or considered an illegal act."[1146]

946.    In specific response to the allegations that the measures constituted a creeping expropriation (beyond those already discussed above in the context of Claimants' FET claims), Respondent submits:

(a)    that the increase in Respondent's participation in the Airlines was related to an agreement entered into between Argentina and Interinvest, which was never challenged by the parties and no coercion or duress was ever invoked in relation to its execution.  Further, Respondent emphasizes that Government of Argentina made contributions for the payment of the companies' fuel and wages;[1147]

(b)    that there was no evidence that any of the agreements entered into between Interinvest and Argentina were entered into under coercion;[1148]

(c)    that even in a creeping expropriation the final result of each measure must be an actual expropriation or deprivation of property rights;[1149] and

(d)    that the impact required to give rise to a finding of expropriation must be substantial, i.e. an alleged partial reduction in the value of the shares does not amount to expropriation.[1150]

---

[1145] *Id*.

[1146] Cl. Mem. ¶ 374 quoting *Siemens AG v. Argentine Republic*, ICSID Case No/ARB/02/8, Award, February 6, 2007: C-299.

[1147] Resp. CM ¶ 823

[1148] Resp. CM ¶ 824.

[1149] Resp. CM ¶¶ 826-831 citing *Pope & Talbot Inc. v. Canada*, UNCITRAL Case (NAFTA), Interim Award of June 26, 2000 (AL RA 317) and *Santa Elena* at ¶76.

[1150] Resp. CM ¶¶ 826-831 citing *Generation Ukraine, Inc. v. Ukraine*, ICSID Case No. ARB/00/9 Award,September 16, 2003, ¶¶ 20-22 (AL RA 315); *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v.*

947.    As a result, Respondent submits that there was no creeping expropriation and that its expropriation in December 2008 was lawful.[1151]

948.    As just summarized, the Parties disagree as to whether, in order to prove that a creeping expropriation occurred, the final result of each individual measure must be an actual expropriation or deprivation of property rights. The Tribunal agrees that the relevant focus of the inquiry for this purpose is the effect or result of the measure, as opposed to the purpose for which each measure was undertaken. A creeping expropriation is a particular type of indirect expropriation, which requires an inquiry into the particular facts. The use of the term "creeping" to describe this type of expropriation indicates that the entirety of the measures should be reviewed in the aggregate to determine their effect on the investment rather than each individual measure on its own. As summarized by Reisman and Sloane:

> A creeping expropriation therefore denotes, in the paradigmatic case, an expropriation accomplished by a cumulative series of regulatory acts or omissions over a prolonged period of time, no one of which can necessarily be identified as the decisive event that deprived the foreign national of the value of its investment.  Moreover, they may be interspersed with entirely lawful state regulatory actions.  By definition, then, creeping expropriations lack the vividness and transparency not only of formal expropriations, but also of many regulatory or otherwise indirect expropriations, which may be identified more closely with a few discrete events.  The gradual and sometimes furtive nature of the acts and omissions that culminate in a creeping expropriation tends to obscure what tribunals ordinarily denominate the 'moment of expropriation'.[1152]

949.    However, it is still necessary for the individual measures to culminate in a taking or deprivation of property rights.  The Tribunal has found that the takeover of the day-to-day management of the Airlines was an indirect expropriation; it was a substantial and permanent deprivation of property rights.  This event was expropriatory on its own even without reference to the earlier impugned events.  In the Tribunal's view, a substantial and permanent deprivation of property rights did not occur until the events of 2008.  In order to conclude that a creeping expropriation took place, the Tribunal must conclude that the earlier impugned events formed part of the chain of events that led to the eventual substantial and permanent deprivation of property

---

*Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, October 3, 2006, ¶ 191 (AL RA 278) and *Metalpar S.A. and Buen Aire S.A. v. Argentine Republic*, ICSID Case No. ARB/03/5), Award, June 6, 2008, ¶¶ 173-174 (AL RA 284).
[1151] Resp. CM ¶¶ 831-860.
[1152] Reisman and Sloane, C-296 at p. 128.

rights.  In the circumstances of this case, the same measures are alleged to form the basis of both the FET claim and the creeping expropriation claim.  The measures have already been reviewed in detail in the context of the FET claims in the previous section.  Accordingly, the Tribunal will return to these only in a summary fashion here:

(a)  The "airfare squeeze" - the Tribunal has found that although airfares were not sufficient to cover the costs of airline operators and provide a rate of return, this did not amount to a breach of the FET standard.  Further, the Secretariat of Transportation considered the requests for increases and did grant a number of increases;[1153]

(b)  The "serious conflict of interests" posed by Undersecretary Cirielli - the Tribunal has found that while Mr. Cirielli may have had an unfavorable view of the Spanish ownership of the Airlines, Claimants have not demonstrated that Mr. Cirielli's views or his conflict of interest caused the breach or impairment of the Airlines' rights;[1154]

(c)  The acts taken by the "government-supported" air transportation unions - the Tribunal has found that Claimants have not demonstrated that the Government controlled or sponsored the transportation unions or their strikes;[1155]

(d)  Respondent's acts with respect to the June 2006 Agreement, including Respondent's coercion of Claimants to obtain additional shares at no cost, its unilateral modification of the text of the June 2006 Agreement, and its breach of the June 2006 Agreement by failing to set TER-compliant airfares and contributing to the promised 15% stock option of ARSA - the Tribunal is not persuaded that Respondent coerced Claimants to accept the June 2006 Agreement nor that Respondent breached that agreement.  Although Respondent did not contribute to

---

[1153] Cl. PHB ¶¶ 108-109; Cl. Mem. ¶ 356.
[1154] Cl. Mem. ¶ 361.
[1155] Cl. Mem. ¶ 362.

increase its shareholdings in ARSA, this was an option and not an obligation on Respondent;[1156]

(e)     Respondent's "lowball purchase offer," made by *de facto* Government representatives in early 2008 - while Respondent may have encouraged or facilitated the approach by Mr. Llorente, the Tribunal has been unable to conclude that the approach was made by *de facto* representatives of the Government or that the approach was an attempt to force out Claimants; [1157] and

(f)     Respondent's failure to comply with the May 2008 Agreement - the Tribunal has found that neither Respondent nor Interinvest breached the May 2008 Agreement.[1158]

950.    In light of these findings, the Tribunal is unable to conclude that a creeping expropriation of Claimants' investment occurred.  In most instances, Claimants' underlying factual premises have not been made out.  While Claimants have demonstrated that the conduct they complain of culminated in a deprivation of Claimants' rights of ownership, they have not demonstrated that there was a link between the individual measures and the ultimate taking.

951.    Accordingly, the Tribunal finds that an indirect expropriation took place following the July 2008 Agreement, but that the Claimants have failed to make out their claim for creeping expropriation. Since there are also claims of unlawful expropriation, whether the indirect expropriatory acts that preceded the formal expropriation in December 2008 were unlawful will be discussed in the wider context of the claims related to the formal expropriation.

## XII.    ALLEGED BREACHES OF UNLAWFUL EXPROPRIATION

952.    Claimants argue that Respondent unlawfully expropriated their investment while Respondent maintains that its expropriation was entirely lawful.

---

[1156] Cl. Mem. ¶¶ 363-364; Cl. PHB ¶ 103.
[1157] Cl. PHB ¶¶ 108-109.
[1158] Cl. PHB ¶ 117.

## A.    Did Respondent Expropriate Claimants' Investment?

953.    As set out at paragraph 951, above, the Tribunal has determined that an indirect expropriation took place following the July 2008 Agreement, once Respondent took over the management of the Airlines when Mr. Alak continued to act as General Manager without reporting to the Transition Committee and following the injunction proceedings in the Argentine courts and the injunction of November 21, 2008.  For completeness, the Tribunal will briefly set out the events related to the direct expropriation of Claimants' investment.

### 1.    Argentine Judicial Expropriation Proceedings

954.    After Interinvest rejected the TTN's January 2009 valuation prepared pursuant to Law No. 26,466 (see paragraphs 841 to 844, above), the Government of Argentina filed an expropriation lawsuit against Interinvest with the Argentine judiciary. On February 27, 2014, the Argentine Federal Administrative Court rendered its decision on expropriation against Interinvest. The decision perfected the expropriation of the shares by confirming the rejection of Interinvest's request for compensation and by transferring the title to the shares.[1159]

955.    Respondent criticizes Interinvest's participation in the Argentine legal proceedings.  It asserts that in answering the court complaint, Interinvest raised "generic objections" to Law No. 26,466, but did not specifically question the constitutionality of the act or the declaration of public interest or the non-discriminatory nature of the expropriation.[1160] Respondent asserts that after the judge requested a valuation from the TTN, as required under the Expropriation Law, Interinvest was entitled to appoint a member to the TTN, ensuring an adequate right of defense.[1161] However, Respondent alleges that Interinvest forfeited this right by failing to appoint a qualified individual.[1162] Upon the TTN's report valuing the Airlines at ARS - 3.275 billion, Interinvest protested the valuation, arguing that the valuation was not fair and that the assessment methods used were not compatible with international standards. However, according to Respondent,

---

[1159] C-1197.
[1160] Resp. CM ¶ 532.
[1161] Resp. CM ¶¶ 521-522.
[1162] Resp. CM ¶¶ 542-543.

Interinvest did not question the TTN's compliance with Law No. 21,499, the Law on Expropriation.

956.     Respondent also argues that throughout the pendency of the lawsuit, Interinvest needlessly delayed the court proceedings by petitioning for the suspension of proceedings and by failing to produce documentary evidence required by the judge.[1163]

957.     Finally, Respondent argues that

> [T]he fact that Claimants—through their controlled company Interinvest—had the opportunity to object to the rules on expropriation and to the conclusion of the valuation in the case of expropriation, but deliberately chose not to do so, renders any challenge to those measures in this arbitration inadmissible. Claimants cannot assert something that is contrary to their own actions and adopt a legal position that is inconsistent with that taken at the expropriation proceedings (especially, without providing any justification for such change of mind).[1164]

958.     In response, Claimants argue that Interinvest did in fact raise the argument, during the Argentine proceedings, that Law. No. 26,466 and the subsequent measures taken by Argentina were unconstitutional.[1165] However, they note that "in 100 years of the Argentine Supreme Court case law dealing with expropriation cases, there was not one declaration of unconstitutionality of either the general expropriation statute or the relevant individual expropriations approved by Congress under such statute."[1166] Claimants also point to what they allege is "the Argentine judiciary's lack of independence and vulnerability to political pressure."[1167] Claimants allege that the judge granted Interinvest only five days to challenge the TTN's new report, after the TTN had 180 work days to prepare the report.[1168]

959.     Finally, Claimants concede that they requested suspension of the lawsuit, however, they assert that their request was justified because "[i]n the context of intense settlement negotiations between the parties that would have put an end to that local proceeding, it was entirely reasonable for Interinvest to request the suspension of the local expropriation proceeding initiated by the

---

[1163] Resp. CM ¶¶ 537-540, 557-558.
[1164] Resp. PHB ¶ 70.
[1165] Cl. Reply ¶ 324; C-887.
[1166] Cl. PHB ¶ 149, citing Testimony of Mr. Bianchi, Transcript p. 614.
[1167] Cl. Reply ¶ 326.
[1168] Cl. Reply ¶ 327.

GOA."[1169] Moreover, Claimants assert that it was their right under the Treaty to choose this Tribunal and arbitration in order to obtain compensation.[1170]

## 2.    Investment Directly and Indirectly Expropriated

960.    As set out at paragraph 951, above, the Tribunal has determined that an indirect expropriation took place following the July 2008 Agreement, once Respondent had taken over the management of the Airlines following injunction proceedings in the Argentine courts.  That Respondent also formally expropriated Claimants' shares in the Airlines in December 2008 through Law 26,466 is not disputed. [1171]  The Tribunal pauses to note that it is possible, as occurred in the circumstances of this case, for a State to both indirectly and directly expropriate the same investment by different measures.  The Tribunal notes that Claimants claim that both takings were unlawful, but did not argue that they should be treated separately in the analysis of whether the taking of shares complied with the expropriation provisions of the Treaty.  Accordingly, in this section of the Award, the Tribunal will determine whether the expropriation of Claimants' investment was in accordance with the Treaty in light of the events of late 2008.

961.    As has been discussed in detail in previous sections of this award,[1172] Claimants and Respondent had reached an agreement in May 2008 whereby Claimants would reduce their shareholdings in the Airlines by selling their shares to Respondent, employees and other private investors.  The private investor walked away from the deal leaving Claimants and Respondent to negotiate a different solution to the Airlines' distress.

962.    Through the July 2008 Agreement, Claimants agreed to sell their shareholdings in both ARSA and AUSA to Respondent following a 60 day transition period.  Claimants were to appoint valuators to value each airline on a DCF basis with specific agreed assumptions as to the cost of fuel and domestic airfares and Respondent was to seek the same valuations of the Airlines as a

---

[1169] Cl. Reply ¶ 325.
[1170] Cl. PHB ¶ 148.
[1171] Cl. PHB ¶ 181; Cl. Mem. ¶ 349; Resp. CM ¶815 although Respondent submitted that the expropriation was not yet complete as of the date of the filing of that submission.
[1172] *See*, in particular, the discussion at paragraph 760 *et seq.*, above.

whole from the TTN.[1173]   In the event of differing results, a third valuation was to be sought from an impartial, experienced and respected valuator.[1174]   During the 60-day transition period, the Parties were to set up a Transition Board made up of two representatives of Claimants and two representatives of Respondent to manage the operations of the Airlines.[1175]   The Transition Board was to manage the Airlines and instruct the General Manager appointed by Respondent.   It was tasked with ensuring the performance of various tasks by the Parties, including the provision of necessary information, in order to perfect the purchase and sale of the shares.[1176]

963.   On July 21, 2008, Mr. Julio Alak assumed the role of the Airlines' General Manager.[1177] Claimants, relying on the testimony of Mr. Muñoz Pérez, submit that as of that date, the Government of Argentina took *de facto* control over the Airlines.[1178]   However, the contemporaneous documents indicate that Interinvest did not complain about the functioning of the Transition Committee until November 12, 2008.   On that date, Interinvest wrote to Secretary Jaime to request that the Transition Committee meet indicating that Argentina's representatives had not attended any of the committee's weekly meetings since October 8, 2008.[1179]   Interinvest indicated that, as a result, Mr. Julio Alak as General Manager was managing the Airlines without the guidance of the Transition Committee.[1180]

964.   As discussed above, the Tribunal agrees that taking over management of an investment can constitute expropriation of an investment and that there was evidence that Argentina did assume the management of the investment at some point after the July 2008 Agreement and before the formal expropriation of Claimants' shares.   The Tribunal has concluded that in seeking and obtaining the injunction that prevented the removal of Mr. Alak as General Manager, Respondent indirectly expropriated Claimants' investment.   However, the Tribunal does not agree with

---

[1173] C-190, Article 6, which is reproduced at para. 779, above.
[1174] C-190, Article 6.
[1175] C-190, Article 3.
[1176] C-190, Articles 3-4.
[1177] RA-378, Minute 1.
[1178] Cl. PHB, para. 124 citing Munoz testimony, Transcript p. 457, line 12 - p. 458, line 17.
[1179] C-210.
[1180] C-210.   In addition, Interinvest again requested that Argentina provide a response to its request to appoint a third-party valuator.   *See also* C-212, pp. 29-33: minutes of the meeting of the Board of Directors of ARSA on November 19, 2008.

Claimants' position that this was a direct expropriation.  In the Tribunal's view, a *de facto* taking, without a transfer of title or physical seizure of the investment, is not a direct expropriation.  The classification of the expropriation as direct versus indirect has no consequence for the Tribunal's analysis as to its lawfulness, as Article V of the Treaty sets out Respondent's obligations with respect to both direct and indirect expropriation, which are identical.  What is relevant is whether the takeover of the day-to-day management of the investment was done in accordance with Article V of the Treaty.

965.    In addition, in light of the fact that Argentina proceeded to formally expropriate Claimants' shares in the Airlines thereby completing a *de jure* taking of the investment by separate measures, it is necessary to review the events surrounding the takings in order to determine whether they were carried out in accordance with the Treaty.

## B.    The Standard for Lawful Expropriation

966.    Claimants' arguments with respect to unlawful expropriation relate to their claims of both direct and indirect expropriation, which rely on Article V of the Treaty, which provides:

> Nationalization, expropriation or any other measure having similar characteristics or effects that might be adopted by the authorities of one Party against investments made in its territory by investors of the other Party shall be effected only in the public interest, in accordance with the law, and shall in no case be discriminatory.  The Party adopting such measures shall pay the investor or his assignee appropriate compensation without undue delay and in freely convertible currency.

967.    Respondent agrees that Article V of the Treaty governs expropriation.[1181]

968.    Article V of the Treaty provides that, in order for expropriation to be lawful: i) it must be affected in the public interest; ii) it must be carried out in accordance with the law; iii) it must not be discriminatory; and iv) it must be accompanied by appropriate compensation.

969.    Claimants allege that Respondent unlawfully expropriated Claimants' shares in the Airlines in 2008, in violation of Article V of the Treaty. Claimants' specific arguments relate to various omissions and acts taken by Respondent in the expropriation process.  In summary,

---

[1181] Resp. CM ¶816.

Claimants assert that Respondent failed to pay adequate compensation;[1182] that the expropriation was not in the public interest;[1183] that the expropriation was unlawful because it violated due process, the Argentine Constitution, and Argentina's statutory obligations;[1184] and that the expropriation was discriminatory.[1185]  In addition, Claimants argue that Respondent, at the time of the taking, was of the view that some compensation was owed to Claimants and that Respondent's failed promise to subrogate Claimants' Airbus orders, which would have compensated Claimants for their expropriated investment in the amount of USD 366-466 million, was also unlawful.[1186] Claimants submit that the unlawfulness of the expropriation is crucial in this arbitration, as it determines the date of valuation (date of the award) as well as the damages to which Claimants are entitled.[1187]

970.    Respondent strenuously denies that the expropriation was unlawful.

971.    The factual background relating to Claimants' claims for expropriation has been set out in detail in section V, above, and further discussed in the Tribunal's analysis of Claimants' claims for breaches of the FET standard and creeping expropriation.  Accordingly, this discussion will not be repeated in this section of the award and the factual background will only be set out to the extent it is necessary to review it in analyzing the lawfulness of the expropriation claims.

## C.    "Only in the public interest"

## 1.    Positions of the Parties

972.    Claimants assert that the expropriation was unlawful because it was not in the public interest. According to Claimants, Respondent's alleged desire stated in Law No. 26,466 "to guarantee continuity and safety in the provision of the public service of commercial air transportation, the protection of the workers' jobs and the preservation of the assets of the airlines" runs against its own actions.[1188] Claimants assert that if Respondent had truly wanted to ensure the

---

[1182] Cl. PHB ¶¶ 150, 164.
[1183] Cl. PHB ¶ 165.
[1184] Cl. PHB ¶ 169.
[1185] Cl. PHB ¶ 170.
[1186] Cl. PHB ¶ 161.
[1187] Cl. Skeleton ¶ 48.
[1188] Cl. PHB ¶ 165.

continuity and safety of the Airlines' operations, it would not have refused to raise airfares, appointed Undersecretary Cirielli, challenged ARSA's financial statements or failed to grant the promised tax benefits and subsidies.[1189] According to Claimants, these acts by Respondent put the Airlines into their difficult situation in 2008.[1190]

973. Claimants argue that international law requires that expropriation only be carried out when it is necessary to serve the "public interest".[1191] Claimants refer to various expressions of a genuine public interest as "overriding purely individual or private interests"[1192] or "a *bona fide* public purpose".[1193] Claimants submit that it is not sufficient for Argentina to declare that the Airlines' shares were of public interest - Respondent must demonstrate that its expropriation was in the public interest[1194] and the Tribunal must determine that there was some genuine interest of the public.[1195]

974. Further, Claimants argue that the particular wording of the Treaty that expropriation be effected "only in the public interest" increases the burden of proof on Argentina to demonstrate that the expropriation was solely in the public interest.[1196] In this vein, to the extent that the stated public interest was connectivity of remote areas by commercial air transport routes, Claimants assert that Respondent could have taken other measures to guarantee continuity of flights; namely, a state-owned airline called Líneas Aéreas del Estado.[1197]

975. Claimants' argument with respect to the public interest is encapsulated in the following submission:

> In the present case, there is no apparent reason why the GOA must own what were previously private airlines.  Lest it be forgotten, this is not a case in which the GOA privatized public utilities such as water or electricity supply and subsequently withdrew the concession for supply of certain public services.  In this dispute, no public utility or service is at stake.  What were expropriated were shares

---

[1189] *Id.*
[1190] Cl. PHB ¶ 166.
[1191] Cl. Mem. ¶ 383.
[1192] Cl. Mem. ¶ 383 citing Article 4 of the 1962 General Assembly Resolution No. 1803 on Permanent Sovereignty over Natural Resources.
[1193] Cl. Mem. ¶ 383 citing *LETCO v. Liberia*, C-302 at 366.
[1194] Cl. Mem. ¶ 388.
[1195] Cl. Mem. ¶ 386 citing *ADC v. Hungary*, C-280 at para. 432.
[1196] Cl. Mem. ¶ 384; Cl. Reply ¶ 416.
[1197] Cl. PHB ¶ 167, citing Testimony of Professor Marina Donato, Transcript pp. 713-714.

in a private company, supplying a <u>commercial</u> service of air transportation, in competition with other, privately-held airlines.[1198]

976.   Claimants state that "any 'public interest' related to purely commercial air transportation would have been much better served if the GOA would simply have abided by its own rules and guarantees…[t]here was simply no need for an expropriation as higher tariff caps, subsidies and other compensation…could have ended the strikes and put the airlines back on track."[1199] Claimants note that these measures were taken by Respondent after it took control of the Airlines.[1200]

977.   Claimants argue that it is "particularly troubling" that Respondent also expropriated AUSA, a private airline for domestic and regional flights, in which it was not previously a shareholder along with the shares of ARSA, the original, state-owned airline of Argentina.[1201]  In their reply, Claimants also note that Respondent expropriated their shareholdings in Optar SA, Jet Paq SA, Aerohandling SA and Air Patagonia SA, all of which provide services other than airline transportation.[1202]  Claimants submit that the question under the Treaty is whether the measure enacted was in the public interest, not whether the underlying sector of activity constitutes a public service.[1203]

978.   Respondent argues that regular air transportation is a public service,[1204] and that the Argentine Republic had a very clear public interest in ensuring the connectivity of the country.[1205] Respondent points to the third recital in the July 2008 Agreement, which refers to the duty of the Government of Argentina "to guarantee the provision of the air transport service."[1206]  Respondent also notes that the Airlines themselves took the position that commercial air transport was a regular public service.[1207]  Respondent asserts that "the public interest purpose of the expropriation is

---

[1198] Cl. Mem. ¶385.
[1199] Cl. Mem. ¶391.
[1200] Cl. Mem. ¶391.
[1201] Cl. Mem. ¶392.
[1202] Cl. Reply ¶418.
[1203] Cl. Reply ¶418.
[1204] Resp. PHB ¶ 215.
[1205] Resp. PHB ¶ 217, citing Testimony of Professor Marina Donato, Transcript pp. 714-715.
[1206] Resp. PHB ¶ 217, Annex RL 33.
[1207] Resp. CM ¶ 833.

manifest",[1208] as there is an inextricable link between public service and public interest and that it is therefore undeniable that there were public interest reasons for the expropriation.[1209] Respondent submits that even Claimants recognize this when they accept that "[t]he Tribunal must grant the State a measure of deference in determining whether expropriation is in the public interest"[1210] and that Claimants' expert, Dr. Bianchi, confirmed that air transportation is a public service.[1211]

979.    Respondent says that "[t]his does not mean that the Tribunal must accept the declaration of public interest contained in Article 1 of Argentine Law No. 26,466 as absolutely conclusive for the purpose of the BIT, but that: i) the threshold for determining that there were no public interest reasons is high (and was not met by Claimants), and ii) it is not for this Tribunal to consider whether the measure was the best one bearing in mind the public interest involved, but to assess, with the degree of deference referred to above, whether Claimants have successfully demonstrated that there were no public interest reasons."[1212]

980.    Respondent asserts that Claimants "did not comply with the Argentine regulatory and company laws by engaging in a conduct that was terribly detrimental to the Argentine Airlines."[1213] As a result, the Argentine State was forced "to take control of an airline that was totally abandoned, which, in turn, implied a risk for the country's connectivity."[1214] Respondent argues that expropriation "was the only viable alternative left in order to ensure the continued and uninterrupted provision of the public service and connectivity in the country, considering the circumstances and, particularly, the behaviour of the Marsans Group with respect to the Airlines, which led to a situation of actual collapse."[1215]  Respondent therefore asserts that this is a case of public interest "par excellence".[1216]

---

[1208] Resp. CM ¶ 834.
[1209] Resp. Rejoinder ¶¶ 740 - 743.
[1210] Resp. CM ¶ 835 citing *Ioannis Kardassopoulos v. Georgia*, ICSID Case No. ARB/05/18, Award, March 3, 2010, ¶¶ 391-392 [herein after: *Kardassopoulos v. Georgia*], AL RA 318; Resp. Rej. ¶743.
[1211] Resp. PHB ¶215 citing the Testimony of Dr. Bianchi, Transcript p. 588:3-8 (English version).
[1212] Resp. Rej. ¶ 743.
[1213] Resp. CM ¶ 264.
[1214] Resp. CM ¶ 266.
[1215] Respondent's Skeleton Submission ¶ 59.
[1216] Resp. Rej. ¶744.

981.    In specific response to Claimants' argument that Respondent's expropriation of AUSA could not have been in the public interest as it had never been the flag carrier, Respondent says that the origin of the company is irrelevant to the declaration of public interest and that "it cannot be seriously argued that [AUSA] and [ARSA] were two separate companies[.]"[1217]

982.    Respondent disputes Claimants' arguments that rather than resorting to expropriation of the Airlines, the state-owned Líneas Aéreas del Estado could have taken over the Airlines' routes to ensure continuing service. Respondent makes two submissions.  First, Respondent submits that this airline does not present a viable alternative, as it is limited in its fleet and staff, and would not be in a position to take over the Airlines' routes.[1218]  Second, Respondent says that this argument is also legally irrelevant, as there is no "only way" standard that applies to expropriation for a public purpose.[1219]

## 2.    Tribunal's Analysis

983.    For the reasons that follow, the Tribunal is of the view that Respondent has adequately demonstrated that its expropriation of the shares of the Airlines (and their related entities) was done in the public interest.

984.    As submitted by both Parties, the analysis of whether the expropriation was in the public interest must go beyond a State's declaration.  In this case, the fact that the Airlines provided a public service was not in dispute.  As is clear from the discussion elsewhere in this award, the entire regulatory regime is premised on air transport being a public service.  In addition, Respondent consistently treated the Airlines' services as not only providing a public service, but also serving the identified public interest of connectivity.  Argentina's geography makes regular air transport services for passengers and cargo necessary to ensure connectivity of remote areas within the country.  The Tribunal considers the stated and demonstrated need for connectivity in Argentina to be a genuine public interest that overrides purely individual or private interests.[1220]

---

[1217] Resp. CM ¶ 839.
[1218] Resp. PHB ¶ 218.
[1219] Resp. PHB ¶ 219.
[1220] Cl. Mem. ¶ 383 citing Article 4 of the 1962 General Assembly Resolution No. 1803 on Permanent Sovereignty over Natural Resources.

The evidence suggests that, although ultimately inadequate in the execution of measures, Respondent recognized the need to provide for higher airfares and other assistance for Airlines facing higher costs in order to maintain the industry as a whole, but also to ensure that lesser trafficked routes continued to have service despite their commercial unattractiveness. Respondent also provided bail out funds in 2008 in order to keep the Airlines in operation, which lends support to the conclusion that the Airlines provided an important public service and that Government of Argentina had an interest in their continued operation. In this context, the Tribunal is of the view that Respondent's decision to expropriate the Airlines' shares and to continue operating the Airlines were steps taken in the *bona fide* public interest to preserve connectivity.

985.    In reaching this conclusion, the Tribunal has noted and considered Claimants' arguments with respect to whether there were other measures (short of expropriation of the Airlines) that Respondent could have taken in furtherance of its public interest and that the expropriation was not "only" in the public interest. The Tribunal agrees that a State must be accorded a certain amount of deference in determining how to best advance its public interest once a public interest has been demonstrated as the reason for which an expropriation occurred. Further, there is no requirement at international law that expropriation, in order to be in the public interest, must be the only means available for the State to meet that interest. Moreover, there is also no requirement that the entity being expropriated had to have previously been a State-owned entity. In light of the substantial proportion of the domestic market served by ARSA and AUSA and their ongoing financial difficulties, it was reasonable for Respondent to expropriate both airlines to ensure that the public interest of connectivity continued to be served.

986.    In summary, the Tribunal declines to find that the expropriation was not in the public interest. Claimants' challenge to the lawfulness of the expropriation on the basis that it was not in the public interest is rejected.

## D.   "In accordance with the law"

### 1.   Positions of the Parties

987.   Claimants make several arguments to support their assertion that Respondent's expropriation of the Airlines was not "in accordance with the law."

988.   Claimants submit that Respondent's alleged creeping expropriation was not in accordance with the law.  As discussed above at paragraphs 928 to 951, Claimants argue that from October 2004 to December 2008, Respondent's measures amounted to a creeping expropriation of their investment.  Claimants argue that the measures constituting this alleged creeping expropriation violated Argentine law, including statutory rights and contractually agreed commitments and were contrary to basic principles of due process.[1221]

989.   In support of this aspect of their unlawful expropriation claim, Claimants import and rely upon their claims of breach of the FET standard as conduct "*a fortiori* conduct not 'in accordance with the law'".[1222]  Claimants also say that in disregarding its contractual obligations under the July 2008 Agreement for a third-party valuation in the event of disagreement between valuations and in subsequently relying on the TTN "who had already found that the airlines were worthless", their basic due process rights were violated resulting in Respondent failing to expropriate the investment "in accordance with the law".[1223]  Further, in connection with this argument, Claimants assert that the Credit Suisse valuation they submitted fully complied with the provisions of the July 2008 Agreement, and that Respondent's rejection of their valuation was groundless.[1224]

990.   Claimants also argue that Respondent breached the July 2008 Agreement by failing to conduct a valuation (through the TTN) that was carried out in accordance with the agreed valuation parameters set out in the July 2008 Agreement.[1225]  Claimants submit that the TTN also failed to value the proper subject matter - instead of valuing the shares that Respondent was expropriating,

---

[1221] Cl. Mem. ¶ 395.
[1222] Cl. Mem. ¶ 395.
[1223] Cl. Mem ¶¶ 397-404; Cl. Reply ¶ 424.
[1224] Cl. PHB ¶ 134.
[1225] Cl. PHB ¶ 168.

the TTN valued the personal and real property of the Airlines.[1226]  Claimants say this amounted to a 'constitutional irregularity' that tainted the entire process.[1227]

991.    Further, Claimants argue that Law No. 26,412, which was enacted on September 18, 2008, the so-called "bail-out" law, was in breach of Argentine law.[1228]  Law No. 26,412 approved Respondent's "repossession" of the Airlines with compensation to be calculated by the TTN and, in effect, approved the July 2008 Agreement.[1229]  In particular, Claimants submit that Law 26,412 was contrary to section 17 of the Argentine Constitution, which requires compensation before expropriation and abolishes the confiscation of property by the state, including the forced sale of property.[1230]  Claimants say that Respondent never paid full compensation for the expropriated shares and thus the expropriation was not in accordance with the law.

992.    In addition, Claimants argue that Law No. 26,466 was also unlawful, as Respondent unlawfully circumvented its constitutional and statutory obligations to pay compensation before taking the property by ordering the "abnormal temporary occupation" of the Airlines' shares to effectively formalize the *de facto* control it already had.[1231]

993.    Finally, Claimants argue that the formal expropriation of the shares was not in accordance with the law, as Respondent violated due process by failing to provide for an independent valuation of the Airlines.[1232]

994.    In response to Claimants' arguments relating to the alleged creeping expropriation, Respondent submits that it fully complied with the laws in force from 2004 to 2008.[1233]  In effect, Respondent says that there was no creeping expropriation, much less an unlawful one.  Respondent also points out that "[t]he Argentine Republic has never had - and does not have - any contractual

---

[1226] Cl. Reply ¶ 427.
[1227] Cl. Reply ¶ 427 citing Bianchi ER1 at ¶ 78.
[1228] Cl. Reply ¶ 428; citing Bianchi ER1 ¶¶ 62, 64 and 159(iv).
[1229] Cl. PHB ¶ 127 citing testimony of Undersecretary Llorens, Transcript p. 640, lines 14-22.
[1230] Cl. Reply ¶ 428; Cl. PHB ¶ 169.
[1231] Cl. Reply ¶ 432; Cl. PHB ¶ 169; Bianchi ER1 ¶¶ 116-121 and 134-143.
[1232] Cl. Reply ¶ 442.
[1233] Resp. CM ¶ 841.

commitment to Claimants."[1234]   Accordingly, Respondent argues that it has no obligations to Claimants arising from either contract or the Treaty.

995.   Respondent argues that the due process of law requirement under the Treaty requires an applicable legal procedure regarding the expropriation that allows the affected party to have its claim heard and that such procedure must be followed[1235] and that the "in accordance with the law" standard refers to "the specifically-relevant law of the state whose expropriation is challenged."[1236] By this standard, Respondent argues that the expropriation of Claimants' shares was conducted in accordance with the laws in force at the time of the expropriation—laws that had been in place before Claimants took control of the Airlines and remained unaltered during their tenure.[1237]   Respondent cites *Kardassopolous v. Georgia* in support of its position:

> The Tribunal agrees with the reasoning of the ADC tribunal and, in particular, with the proposition that whatever the legal mechanism or procedure put in to place, it "must be of a nature to grant an affected investor a reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard" if it is to be found to have been carried out under due process of the law.[1238]

996.   Respondent says that the legal system in force in Argentina embraces these principles and was complied with.  Respondent submits that "[t]his fact has not been seriously questioned by Interinvest, which is controlled by Claimants, which are - in turn - party to these proceedings."[1239] Respondent asserts, moreover, that Interinvest decided not to argue, during the course of the Argentine judicial proceedings, that the expropriation process was not conducted in accordance with the law. Respondent asserts that this alone is reason for this Tribunal to dismiss Claimants' expropriation claim.[1240]

997.   Respondent submits that within the framework of the Expropriation Law and Argentine Law No. 26,466, the TTN was to value the asset expropriated and that this valuation was carried out in accordance with the applicable rules.[1241]  Respondent says that the use of a different method

---

[1234] Resp. CM ¶ 842.
[1235] Resp. CM ¶ 843.
[1236] Kingsbury Report ¶ 59.
[1237] Resp. PHB ¶ 222.
[1238] Resp. CM ¶ 843 citing *Kardassopoulos v. Georgia*,¶ 396.
[1239] Resp. CM ¶ 844.
[1240] Resp. PHB ¶ 223.
[1241] Resp. CM ¶ 849.

than the DCF method for estimating the value of a company with negative shareholders' equity has been recognized in international arbitration, by the World Bank Guidelines and by SEPI in relation to the Airlines in 2001.[1242]

998.    With respect to Claimants' other allegations, Respondent argues that the July 2008 Agreement was not part of the law applicable to the expropriation process[1243] and that, in any event, it was Claimants, and not Respondent, that failed to follow the requirements for the valuation under the July 2008 Agreement, thereby breaching the Agreement. Specifically, Respondent argues that Interinvest continually breached its obligations under the July 2008 Agreement to disclose information and to provide signed copies of the required documents.[1244]

999.    In reply, Claimants submit that Interinvest's failure to participate in the local expropriation proceeding in 2009 was a result of its request for a suspension of those proceedings in favor of intense settlement discussions ongoing at the time.  Claimants also say that their decision was justified by "the Argentine judiciary's lack of independence and vulnerability to political pressure".[1245]  Further, Claimants submit that it was reasonable for Interinvest not to participate in proceedings before the TTN because it was not an independent body and did not have the expertise to assess the value of going concerns.[1246]  In addition, Claimants note that the proceedings before the TTN had as their sole purpose to value the Airlines in complete disregard of the July 2008 Agreement, pursuant to which they had already challenged the TTN's valuation reports.[1247]

1000.    In its rejoinder, Respondent expands on its submission that Interinvest's decision not to request the invalidation of the expropriation before the Argentine courts entails acquiescence to that measure and leads to inadmissibility of the claim submitted in the arbitration.[1248]  Respondent says that if the expropriated company does not request the annulment of the expropriation under the local law, which applies according to the Treaty, "then the indirect and controlling shareholders

---

[1242] Resp. CM ¶ 849. Also *see* the sources cited there.
[1243] Resp. CM ¶ 846.
[1244] Resp. CM ¶ 507; Resp. Rej. ¶ 490; Resp. PHB ¶¶ 159-160.
[1245] Cl. Reply ¶ 436 citing their Appendix on the Lack of Independence of the Judiciary.
[1246] Cl. Reply ¶ 437.
[1247] Cl. Reply ¶ 438.
[1248] Resp. Rej. ¶ 747.

of the company cannot be allowed to invoke such invalidity in an arbitration proceeding."[1249]  In addition, Respondent disputes Claimants' allegation that the Argentine courts were not independent and notes that Claimants did not submit any evidence in support of their assertion.

## 2.    Tribunal's Analysis

1001.  The Tribunal begins its analysis by noting that in the circumstances of this case in order to determine whether the expropriation was "in accordance with the law", it must consider the process for both the indirect taking of the investment and the process for the direct taking of the investment through Law 26,466.  The Parties agree that the "law" in issue for this branch of the test under the Treaty is Argentine law and the requirements of due process.  An expropriation that is carried out in accordance with the local law will satisfy this branch of the test, but may still be unlawful at international law if the other conditions for lawful expropriation have not been met.

1002.  Turning first to Law 26,466 and the process for the direct expropriation of Interinvest's shares, the Tribunal notes that the evidence indicates that the law provided for expropriation in accordance with the provisions of the Expropriation Law.  Claimants did not seriously dispute that the expropriation process provided Interinvest with a legal procedure that granted it "a reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard".  Regarding the direct expropriation process, the evidence demonstrates that Interinvest was afforded the opportunity to claim its rights before the Argentine courts and to have its claims heard.  It appears that Claimants could have done so within a reasonable time and, in fact, Interinvest chose to seek a suspension of those proceedings to provide time for settlement negotiations to continue.

1003.  Claimants' arguments in this respect focused on the provision of Law 26,466 that allowed Respondent to effect an "abnormal temporary occupation" of the shares, thus circumventing the constitutional obligation to pay compensation before a taking.  Both Parties submitted expert opinion evidence on the Argentine law of expropriation and agreed that Government of Argentina's power to expropriate is limited by the Argentine Constitution.  In the ordinary course

---

[1249] Resp. Rej. ¶ 747.

of expropriation proceedings in Argentina, in the event of a disagreement as to the value of the property being taken, Government of Argentina may take possession of the property once it has made a deposit of the value as determined by a tribunal.[1250]  However, as Professor Mata explained, "the State is empowered, in its capacity as the conceding authority, to directly provide any public service in situations where its continuity or regularity is compromised."[1251]   While Claimants' expert, Professor Bianchi, challenges Government of Argentina's selection of the use of an "abnormal temporary occupation" for this purpose, he did not challenge Government of Argentina's ability to order temporary occupation.  It was not shown that Respondent selected this method of occupation in order to circumvent Constitutional guarantees for compensation to be paid in advance.  In addition, the evidence indicates that at the time Law 26,466 was passed Respondent had been advised that the Airlines had negative shareholders' equity.  Whether or not this was correct, in these circumstances, it does not seem unreasonable for Government of Argentina to have proceeded on the basis of an abnormal temporary occupation pending the final valuation of the shares through the formal expropriation process.  The formal expropriation as commenced by Law 26,466 and the process that followed appears to have been in accordance with Argentine law.

1004.   The Tribunal finds that Claimants' argument that the local process, which allegedly did not provide for independent valuation, was in violation of due process is also without merit.  While the TTN was a government-appointed body and therefore not "independent" of the government, the evidence indicated that the valuation process allows an affected party to challenge the TTN's valuations and submit its own evidence of value.  The Tribunal considers this ability to provide for due process such that this element of the expropriation was also in accordance with the law.

1005.   The Tribunal does not accept Respondent's admissibility argument: that Claimants could not argue in this arbitration that the expropriation was not in accordance with the law because Interinvest did not challenge the lawfulness of the expropriation before the Argentine courts.  Respondent has not pointed to any requirement in the Treaty that the investor must have

---

[1250] *See, for example,* Mata ER3 ¶¶ 77-80.
[1251] Mata ER3, ¶ 82.

participated in and challenged the legality of the local proceedings in order to be able to argue that the expropriation was not in accordance with the law pursuant to the Treaty. While the failure to raise arguments in the local expropriation proceedings can cause practical issues when asking an international tribunal to assess whether those proceedings were in accordance with the local law, this does not affect the admissibility of the arguments or claims in the arbitration.

1006. Turning next to Claimants' claims that the alleged creeping expropriation was not in accordance with the law, the Tribunal simply notes that Claimants have failed to make out their claims of creeping expropriation. Accordingly, it is unnecessary for the Tribunal to consider those measures and whether they were in accordance with the law.

1007. Finally, the Tribunal turns to Claimants' claims that the indirect expropriation of Interinvest's shares was not in accordance with the law. Claimants' main arguments in this respect are that the failure to accord the investment fair and equitable treatment is expropriation not in accordance with the law; that Respondent failed to carry out the valuation agreed to in the July 2008 Agreement; that Respondent's rejection of the Credit Suisse valuation was groundless; and that the TTN valued the wrong asset.

1008. Respondent takes the position that the July 2008 Agreement (and Law 26,412) were not parts of the law applicable to the expropriation process and thus are irrelevant to a determination of whether the expropriation was conducted in accordance with the law.

1009. The Tribunal cannot agree with this position. The Tribunal has found that Respondent indirectly expropriated the Airlines by taking over the day-to-day management before it passed Law 26,466 purporting to directly expropriate the shares. In order to determine whether that indirect expropriation was in accordance with the law, it would not be appropriate to have recourse to the Expropriation Law, which was not the process by which Respondent indirectly took the investment. Accordingly, for the determination of whether the indirect expropriation was in accordance with the law, it is necessary to review whether Respondent's measures following the July 2008 Agreement met the requirements of due process and were in accordance with Argentine law.

1010.   As an initial matter, Claimants have made out their claim of breach of FET, as it relates to Respondent's measures following the July 2008 Agreement.  In particular, Respondent's lack of transparency in agreeing to the July 2008 Agreement, passing Law 26,412 which resulted in the TTN applying a valuation methodology that was inconsistent with that agreed to in the July 2008 Agreement and its arbitrary decision to expropriate the investment rather than proceed to a third-party valuation as agreed, have all been found to be a breach of the FET obligations.  The Tribunal finds that Respondent's breach of the FET obligations also meant that the indirect expropriation of the investment was not in accordance with the law.  Further, Claimants have demonstrated that, according to Argentine law, the July 2008 Agreement created a vested right to a DCF valuation of their shares, which they had agreed to sell to Respondent and that, as a result, Respondent's failure to carry out that valuation and instead indirectly expropriate the investment was also not in accordance with the law.

1011.   Accordingly, the Tribunal finds that Respondent's expropriation of the shares was not in accordance with the law.

### E.      "Shall in no case be discriminatory"

### 1.      Positions of the Parties

1012.   Claimants assert that the expropriation of the Airlines was also discriminatory.[1252]   In support of this argument, Claimants return to many of the allegations that also feature in their FET claims.  Claimants submit that other airlines received more favorable treatment in the form of fuel subsidies and approval of new international routes.  They also say that their investment in the Airlines was singled out for expropriation because ARSA was the former flag carrier now in foreign hands.

1013.   Regarding more favorable treatment, Claimants assert that Respondent provided fuel subsidies of between 70 - 100% for flights to Santa Fe to Sol, one of ARSA's and AUSA's competitors,[1253] and that similar subsidies were not provided to the Airlines despite the fact that

---

[1252] Cl. Mem ¶¶ 406-408; Cl. Reply ¶ 439.
[1253] C-191.

the stated purpose of the subsidies was to address the escalating cost of jet fuel and the issues this caused for the airline industry.[1254]   A second example of alleged discrimination raised by Claimants is evidenced by a 2006 report of the Argentine Chamber of Tourism.  That report indicates that the only step taken by Respondent to address the emergency situation in the airline industry was the subsidization of fuel for one of ARSA's and AUSA's competitors, Southern Winds, which operated in cooperation with LAFSA.[1255]  This report criticizes the Government for using public funds to assist one carrier and not others.

1014.  In their initial memorial, Claimants also alleged that Respondent approved new international routes for other airlines but not the Airlines and that this was discriminatory. Claimants did not provide any concrete examples or evidence to support this allegation and its argument in this regard was not developed in its later pleadings.  As a result, the Tribunal will not address this particular aspect of Claimants' discriminatory expropriation claim any further.

1015.  Claimants assert that Respondent's hostility towards the Airlines under Claimants' control was due to its desire to "re-Argentinize" the Airlines and remove them from the control of a Spanish owner.[1256]  Claimants submit that "[a]n expropriation 'that singles out aliens generally, or aliens of a particular nationality, or particular aliens, would violate international law.'"[1257] Claimants point to statements made by Mr. Cirielli during his tenure as Undersecretary of Air

---

[1254] Cl. Mem. ¶ 406.

[1255] Claimants' Closing presentation, slide 115; Argentine Chamber of Tourism Report, Analysis and Proposals, pp. 29-30: C-861.

[1256] Cl. Mem. ¶ 406.  With respect to this argument, Claimants cite to the following evidence: Díaz Ferrán WS ¶ 77 ("… the 'we have to throw out the Galicians,' repeated ad nauseam by various people in Argentina, was, in the end, the objective shared by both the Kirchner administration and the two unions (APTA and APLA).  To be able to justify their objective, they had to burden us financially to later leave us, in the end, without any better alternative than to sell, or, if not, get out of the companies.") and n. 6 (quoting an Argentine parliamentarian as saying "they were turning the company into a hunting ground where the ultimate objective consisted of throwing out the Galicians.  Those were the marching orders, at any cost."); *Paro exagerado deja al pais sin vuelos*, ÁMBITO, Nov. 28, 2005: C-108 ("In Aerolíneas, they are certain since the beginning of this government that Ricardo Cirielli, Undersecretary of Air Transportation and Secretary general (albeit on leave) of APTA – one of the rebel unions – is seeking the state-ownership of Aerolíneas, or, in the worst case, its "renationalization," which implies the disappearance of the Marsans Group as shareholder and their replacement by a national group"); *Los dueños de Aerolíneas abren la puerta al ingreso de un socio local*, CLARÍN, Apr. 18, 2008: C-109 ("The union leader and former Undersecretary of Air Transportation, Ricardo Cirielli (APTA), strongly opposed to the Marsans Group, quickly supported the 'Argentinization' of Aerolíneas.").

[1257] Cl. Mem. ¶ 408 citing *Restatement*, C-308 at ¶ 712, Comment (f).

Transportation as evidence of the purpose behind the expropriation and claim that this was discriminatory.[1258]

1016.   Respondent rejects Claimants' assertions on discrimination, arguing that there was no discrimination during the expropriation proceedings, which were conducted for the sole purpose of ensuring the provision of a public service.[1259] Moreover, Respondent submits that Claimants did not even attempt to demonstrate that there were other airlines in a similar situation to their own, which would be necessary to prove allegations of discrimination.[1260]  Finally, Respondent says that if they were of the view that the expropriation was discriminatory, Claimants were free to challenge this in the Argentine courts and that their failure to do so is telling.[1261]

1017.   In support for its position that there was no discrimination, Respondent suggests that the successful entry of LAN into the Argentine market is evidence that airfares were sufficient and that there was no discriminatory treatment toward Claimants.  In reply, Claimants argue that Respondent failed to increase airfares despite repeated requests, that this refusal resulted in the financial strangulation of the Airlines.  Further, Claimants submit that LAN could not be directly compared to ARSA and AUSA because it proposed air services only with respect to the busiest and most profitable routes.  Claimants also note that LAN registered a positive net income in 2008, but that its income was negative from 2005 to 2007.[1262]

1018.   In reply to Respondent's position that Claimants could and should have made their discrimination arguments in the Argentine courts, Claimants say that Interinvest did participate in the domestic expropriation proceedings and challenged Government of Argentina's allegations and valuation.[1263]

---

[1258] Cl. Reply ¶ 439 and the sources cited there.
[1259] Resp. CM ¶¶ 752 - 756 and 851 - 853; Respondent's Skeleton Submission ¶ 62; Resp. PHB ¶ 220.
[1260] Resp. PHB ¶ 220.
[1261] Resp. CM ¶ 853.
[1262] Cl. Reply ¶ 440.
[1263] Cl. Reply ¶ 441.

## 2.      Tribunal's Analysis

1019.   In analyzing whether the expropriations were unlawful because they were discriminatory, the Tribunal must focus on the expropriations themselves and the evidence surrounding them. Claimants' arguments that Respondent discriminated against them in providing subsidies to competitors but not the Airlines relate to measures found not to have been linked to the expropriation of the investment.[1264]   In order to make out this element of their claim, Claimants must demonstrate that Respondent expropriated their investment in a discriminatory manner. Discrimination requires differential treatment of Claimants' investment from other similar investments in like circumstances.

1020.   As has been discussed in detail above,[1265] Claimants have failed to demonstrate that Mr. Cirielli's and other individual government members' statements about the alleged goal of "re-Argentinizing" the Airlines led to discriminatory treatment that was unfair or inequitable.  Further, Claimants have not demonstrated that any of the government members alleged to have demanded the re-Argentinization of the Airlines were involved in or had any influence on Respondent's decision to expropriate.  Claimants have failed to prove that their investment was expropriated because it was owned by foreigners.

1021.   Further, Claimants did not provide evidence of other similar investors in like circumstances whose investments were not expropriated.  The evidence indicates that Claimants' investment was expropriated because its continued operation by Respondent would allow Government of Argentina to fulfil the public interest of connectivity.

1022.   As set out above, the Tribunal does not accept Respondent's argument that an investment's failure to participate in the local expropriation proceedings affects the admissibility of the claims under the Treaty.

---

[1264] *See* Section X, above.
[1265] See ¶¶ 693 to 706.

## F. "Adequate compensation"

### 1. Positions of the Parties

1023. The Parties do not dispute that Argentina did not pay Claimants when it expropriated the Airlines in December 2008. Rather, they dispute whether compensation was in fact owed to Claimants for the Airlines.

1024. Claimants assert that Respondent did not pay Claimants "appropriate compensation, without undue delay and in freely convertible currency" as required by Article V of the Treaty. Claimants cite the following facts in support of their assertion that they were owed more than ARS 1 for the Airlines:

(a) Just before the Government of Argentina started the process of creeping expropriation (in October 2004) and breaches of fair and equitable treatment (in September 2002), the Airlines generated net income of USD 47 million (in 2003) and USD 44 million (in 2004).[1266]

(b) An advisor to the Secretary of Transportation, Mr. Vázquez, offered to buy the Airlines in May 2008 for USD 150 million. Claimants rejected this offer, because they considered it too low.[1267]

(c) The valuations of Deloitte, Morgan Stanley, and PricewaterhouseCoopers for AUSA alone, done as a result of the May 2008 Agreement, averaged USD 450 million.[1268]

(d) Claimants further allege that if Respondent had complied with the May 2008 Agreement and its option to purchase 15% of ARSA under the 2006 Agreement, it

[1266] Cl. Mem. ¶ 412; Cl. Reply ¶ 443. Claimants cite ARSA's Financial Statement for 2001 (C-34), 2002 (C-35), 2003 (C-36), and 2004 (C-37), and AUSA's Financial Statements for 2001(C-27), 2002 (C-28), 2003 (C-29), and 2004 (C-30).
[1267] Claimants cite Pascual Arias WS ¶¶ 68-69; C-171: letter from Mr. Angel Llorente to Messrs. Pascual Arias and Díaz Ferrán, Apr. 2, 2008; C-172: letter from Mr. Muñoz Pérez to Mr. Angel Llorente, Apr. 3, 2008.
[1268] Deloitte May 2008 Valuation: C-375; Morgan Stanley May 2008 valuation: C-376; PricewaterhouseCoopers May 2008 Valuation: C-377.

would have had to make a capital contribution in ARSA of at least USD 75 million (which is 15% of USD 450 million, which is the average valuation made by the three independent valuators under the May 2008 Agreement).[1269]

(e)     In October 2008, Credit Suisse valued the Airlines at between USD 330 and USD 540 million.[1270]

1025.   Claimants submit that there is ample case law and commentary at international law that the payment of compensation for an expropriated investment is a necessary element of lawful expropriation.[1271]   In particular, Claimants refer to a number of recent arbitral awards where expropriations were found to be unlawful because compensation had not been paid, including *Vivendi II, Siemens* v. *Argentina* and *Azurix* v. *Argentina*.[1272]   Claimants distinguish this case from others where the expropriating government did not pay the full amount of compensation in a timely manner and highlight that no compensation at all was paid.[1273]

1026.   Moreover, Claimants assert that, in fact, Argentina did attribute a positive value to Claimants' expropriated investment, as judged by its behavior. Claimants argue that the facts demonstrate that the Airlines could not have had a negative value because, in that situation, Claimants would not have wanted to keep the investment (but they did) and no rational government would be keen to take it (as Argentina was).[1274]   Again, Claimants assert that in April 2008 it offered (through Mr. Vázquez) USD 150 million for the purchase of the Airlines. They also note that in November 2008, Respondent valued AUSA at USD 79.9 million, and that in February 2009 it offered Claimants compensation of USD 150 million 'to solve the problem of the expropriation.'[1275]

---

[1269] Cl. PHB ¶ 114; Cl. Reply ¶ 286.
[1270] Credit Suisse Valuation, Oct. 12, 2008, at 7: C-201.
[1271] Cl. Mem. ¶¶410 and the sources cited there.
[1272] Cl. Mem. ¶ 410; C-321 at s. 7.5.21; C-299 at ¶273; C-291 at ¶ 324.
[1273] Cl. Mem. ¶ 412.
[1274] Cl. Mem ¶ 413.
[1275] Cl. PHB ¶ 163.

1027.   Accordingly, Claimants submit that Respondent has not paid appropriate compensation for the shares of the Airlines, which it formally expropriated in 2008.

1028.   Respondent argues, on the other hand, that under international law, there are circumstances in which expropriation may be lawful even when the amount of compensation to be paid is zero.[1276] Respondent argues that the circumstances of this case make it appropriate for Claimants not to receive any compensation for their shares in the Airlines because appropriate compensation must reflect the market value of the expropriated asset.[1277]   Respondent relies on *Biwater Gauff v. Tanzania* for the proposition that a company may have negative shareholders' equity at the time of expropriation and in those cases, the appropriate compensation is zero.[1278]

1029.   Respondent notes that Claimants purchased the Airlines in 2001 for only one dollar and that this amount was the same as the representative value found to be owing in the expropriation process.[1279] It notes, moreover, that the evidence in this case demonstrates that the expropriated property had a negative market value. In these circumstances, Respondent says that the appropriate compensation was zero.[1280]  It also notes that Claimants did not challenge the appraisal submitted by the TTN in the expropriation proceedings, nor did they exercise their right to submit an appraisal of their own or, alternatively, challenge the valuation of the TTN.[1281]

1030.   Respondent submits that it had to make enormous contributions for the sole purpose of keeping the Airlines afloat and that the negative shareholders' value is reflected in the three valuations carried out by the TTN, which are consistent with the restated financial statements as of December 2008.[1282]   Respondent also says that the negative value of the Airlines was also reflected in the valuations submitted by Interinvest in the context of the 2008 Agreement, as the positive valuations were reliant on substantial capital injections.[1283]

---

[1276] Resp. PHB ¶ 226, referencing *Biwater Gauff (Tanzania) Limited v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, July 24, 2008. [hereinafter: *Biwater v. Tanzania*]
[1277] Resp. CM ¶ 854.
[1278] Resp. CM ¶ 855 citing AL RA 266 at para. ¶¶ 795, 797, 804, 806.
[1279] Resp. CM ¶ 854; Resp. PHB ¶ 229.
[1280] Resp. CM ¶ 854.
[1281] Resp. CM ¶ 859; Respondent's Skeleton Submission ¶ 63.
[1282] Resp. CM ¶¶ 856-857.
[1283] Resp. CM ¶ 858 citing KPMG Report § 23.

1031.   In reply, Claimants reiterate the contemporaneous evidence that indicated that Respondent considered the Airlines to have a positive value.[1284]   Claimants also note that the TTN valuations were not done in accordance with the methodology in the July 2008 Agreement and that they were flawed for the following reasons.   They did not consistently apply the DCF method; the TTN lacked the technical know-how to assess the value of a going concern and, as a result, valued the Airlines' assets and liabilities rather than their shares; and the TTN is not an independent third party, but rather a public agency whose members are all appointed by the Executive.[1285]   Claimants argue that the valuation done by SEPI in 2001 is of little to no use in determining the value of the Airlines seven years later and that the date of valuation should be the date closest to the date of the award.[1286]   In reply to the suggestion that Claimants should have presented its own valuation expert in the domestic court proceedings, Claimants submit that Interinvest sought to suspend the domestic proceedings which overlapped with this arbitration for good and justified reasons.[1287]

1032.   In their Rejoinder, Respondent criticizes Claimants' reliance on a legal expert, Dr. Bianchi, for the proposition that the TTN lacks the technical know-how to assess the value of a going concern company because he is not an expert on valuation techniques.[1288]   Respondent also reiterates its position that Interinvest's decision not to participate in the local expropriation proceedings was unreasonable and that, as a result, the claim for inappropriate compensation for the expropriation is inadmissible.[1289]

## 2.      Tribunal's Analysis

1033.   Article V of the Treaty and customary international law both require Respondent to pay prompt, adequate and effective compensation when an investment is expropriated.   Tribunals have consistently concluded that adequate compensation is the fair market value of the investment immediately before the expropriation was known, i.e. the value of the investment unaffected by

---

[1284] Cl. Reply ¶¶ 443-445.
[1285] Cl. Reply ¶ 447; C-203.
[1286] Cl. Reply ¶ 448.
[1287] Cl. Reply ¶ 449.
[1288] Resp. Rej. ¶ 761.
[1289] Resp. Rej. ¶ 762.

the State's decision to expropriate.  As conveniently summarized in the World Bank Guidelines on the Treatment of Foreign Direct Investment:

> 1.      A State may not expropriate or otherwise take in whole or in part a foreign private investment in its territory, or take measures which have similar effects, except where this is done in accordance with applicable legal procedures, in pursuance in good faith of a public purpose, without discrimination on the basis of nationality and against the payment of appropriate compensation.
>
> 2.      Compensation for a specific investment taken by the State will, according to the details provided below, be deemed "appropriate" if it is adequate, effective and prompt.
>
> 3.      Compensation will be deemed "adequate" if it is based on the fair market value of the taken asset as such value is determined immediately before the time at which the taking occurred or the decision to take the asset became publicly known.
>
> 4.      Determination of the "fair market value" will be acceptable if conducted according to a method agreed by the State and the foreign investor (hereinafter referred to as the parties) or by a tribunal or another body designated by the parties.
>
> 5.      In the absence of a determination agreed by, or based on the agreement of, the parties, the fair market value will be acceptable if determined by the State according to reasonable criteria related to the market value of the investment, i.e., in an amount that a willing buyer would normally pay to a willing seller after taking into account the nature of the investment, the circumstances in which it would operate in the future and its specific characteristics, including the period in which it has been in existence, the proportion of tangible assets in the total investment and other relevant factors pertinent to the specific circumstances of each case.[1290]

1034.   Respondent has argued that it paid adequate compensation by providing a representative ARS 1 for the shares of Interinvest because the investment was loss-making at the time of expropriation and that, as a result, the shareholders' equity had a negative valuation.  Respondent has also argued that ARS 1 was adequate compensation, because that was the valuation attributed to the Airlines by SEPI when it sold the shares of Interinvest to Air Comet in 2001.

1035.   The Tribunal notes that the relevant time period for determining whether the compensation paid for the expropriation of an investment is adequate is immediately before the taking or immediately before the taking became known.  Accordingly, the valuation of the Airlines' shares in 2001 is irrelevant to the amount of compensation to be paid for the taking of those shares by Respondent in 2008.

---

[1290] World Bank Guidelines on the Treatment of Foreign Direct Investment, Article IV. RA 481.

1036.  The Tribunal agrees with Respondent that there are circumstances in which no compensation can be adequate compensation for an expropriation.  This may be the case when an investment is loss-making and no longer a going concern.  In these circumstances, the State can demonstrate that the investor did not suffer a financial loss as a result of the taking.  In this case, had the formal expropriation of the Airlines' shares in December 2008 been the first measure taken by the Respondent and had the Respondent otherwise treated the investment fairly and equitably, it is possible that adequate compensation for the shares may have been ARS 1.  However, in the circumstances of this case, the Tribunal is not persuaded that Respondent paid adequate compensation for the taking of Claimants' investment.

1037.  In this case, there was a lengthy and politically-charged relationship between Claimants, their investment and Respondent that preceded Respondent's decision to directly expropriate the investment.  The Tribunal has dismissed many of Claimants' claims with respect to the measures that pre-dated the July 2008 Agreement.  However, the Tribunal has found that the Parties entered into that binding agreement, the purpose of which was to provide for Respondent to purchase the Airlines' shares at a price to be determined by a particular valuation technique.

1038.  In the circumstances of this case, the July 2008 Agreement coincides with the time at which the decision to take the asset became publicly known.  In addition, the July 2008 Agreement recorded the method agreed by Government of Argentina and the investor to determine the fair market value of the investment.  In the Tribunal's view, whether either Credit Suisse or the TTN conducted its respective DCF valuation in accordance with the July 2008 Agreement is irrelevant for the determination of whether adequate compensation was paid by Respondent.  The July 2008 Agreement provided for an independent, third party valuation in the event that the Parties' respective valuations yielded different results and the Parties could not agree to a value.  It was not open to Respondent to unilaterally change the agreed valuation method.

1039.  Had Respondent not breached the July 2008 Agreement and had the DCF analysis described in that agreement been conducted by a third independent valuator as agreed, the resulting valuation would have represented adequate compensation for the taking pursuant to the Treaty.  This is because in these circumstances the Parties had agreed to the method for determining the

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 379 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

fair market value of the investment being expropriated. In refusing to complete that valuation and instead proceeding to a formal expropriation on a different valuation methodology, Respondent failed to provide adequate compensation for the taking of the investment.

## G.    Tribunal's Conclusions on Unlawful Expropriation

1040.   In conclusion, the Tribunal finds that the expropriation of the Airlines was unlawful, as that taking was not in accordance with the law and Respondent failed to pay adequate compensation.

## XIII.   THE DEFENSE OF NECESSITY

1041.   In the event that the Tribunal were to find that Respondent breached the Treaty regarding its measures related to airfare increases, Respondent invokes the defense of necessity.[1291] Respondent asserts that "the crisis that hit Argentina in late 2001 amounts to a state of necessity precluding any potential international responsibility in relation to the increase in airfares granted to the airlines."[1292] It argues that the Argentine Republic was forced to act as it did because it was the only way to safeguard an essential interest against a grave and imminent peril, and it notes that all of the emergency measures were taken to the benefit of the commercial air sector.[1293] Respondent submits that if the measures were not sufficient, as alleged by Claimants, it is entitled to rely on the defense of necessity to preclude any wrongfulness or liability under the Treaty with respect to the sufficiency of the measures granting airfare increases.[1294]

1042.   Respondent further argues that the emergency measures it adopted were critical to overcoming the crisis and regaining economic, social, political and institutional normalcy. Specifically, Respondent notes that the adoption of Emergency Law No. 25,561 and Presidential Decrees No. 1654/02 and 1012/06 and the grant of other benefits to Argentine airlines was "the best that could be done to preserve the air transport public service without affecting other essential

---

[1291] Resp. CM ¶ 863; Resp. Rej. ¶763.
[1292] Resp. CM ¶ 867.
[1293] Resp. CM ¶ 869.
[1294] Resp. CM ¶¶ 861 - 866.

interests of the State, which were also at stake, in a historical context of acute national emergency."[1295]

1043.   For their part, Claimants argue that Argentina's refusal to grant airfare increases, to which the Airlines were legally entitled in the period between September 2002 and December 2008 and especially after 2004 and up to the formal expropriation in 2008, bears no logical or temporal connection with the 2001 economic crisis.[1296]

1044.   Both Parties agree that the standard for Respondent's necessity defense is Article 25 of the International Law Commission's Articles on State Responsibility.[1297] Article 25 provides as follows:

> 1.    Necessity may not be invoked by a State as a ground for precluding the wrongfulness of an act not in conformity with an international obligation of that State unless the act:
>
> (a)    is the only way for the State to safeguard an essential interest against a grave and eminent peril; and
>
> (b)    does not seriously impair an essential interest of the State or States towards which the obligation exists, or of the international community as a whole.
>
> 2.    In any case, necessity may not be invoked by a State as a ground for precluding wrongfulness if:
>
> (a)    the international obligation in question excludes the possibility of invoking necessity; or
>
> (b)    the State has contributed to the situation of necessity.[1298]

1045.   The Parties each made detailed submissions on the applicability of the defense of necessity in the circumstances of the instant case and addressed each of the four components of the defense set out in Article 25 of the International Law Commission's Articles on State Responsibility.[1299] Claimants also argued that, unlike other investment treaties entered into by Respondent, which

---

[1295] Resp. CM ¶¶ 873-875.

[1296] Cl. Reply ¶ 560.

[1297] *See* Resp. CM ¶ 868; Cl. Reply ¶ 563.

[1298] The International Law Commission, Articles On Responsibility of States for Internationally Wrongful Acts, Report of the International Law Commission of The Work of Its Fifty-Third Session, UN GAOR, 56th Sess., Supp. No. 10, UN Doc. A/56/10 (2001), (hereinafter "ILC Articles on State Responsibility & Commentary"): C-925.

[1299] *See* Resp. CM ¶¶ 867 - 877; Resp. Rej. ¶ 775 - 818; Cl. Reply ¶¶ 579, citing ILC Articles on State Responsibility & Commentary Art. 25, cmt. 14 and ¶¶ 562 - 590 more generally.

formed the basis of other tribunals' findings that Argentina was entitled to rely on the defense of necessity, the Treaty has no analogous provision and thus the defense is unavailable.

1046.   The Tribunal has dismissed Claimants' claims for breach of FET to the extent that those claims relate to the sufficiency of the airfare increases granted by Argentina during the period of Claimants' ownership of Interinvest.   As Respondent only raises the defense of necessity in the event that the claim relating to the airfare increase was accepted, it is not necessary for the Tribunal to consider Respondent's defense of necessity or Claimants' specific arguments opposing that defense.

## XIV.   RESPONDENT'S COUNTERCLAIM

1047.   While maintaining its objections to jurisdiction and reserving its rights with respect to ICSID's jurisdiction over Claimants' claims, Respondent submitted a Counterclaim seeking US $1,636,600,000 in damages for what it says were the losses it suffered because of the poor state of the Airlines at the time of expropriation.[1300]   Claimants submit that the alleged Counterclaim was vague and unsubstantiated and that it did not meet even the minimum requirements to constitute a claim to which they could properly respond.   As a result, Claimants submit that the Counterclaim should be dismissed.[1301]

1048.   For the reasons that follow, the Tribunal agrees with Claimants' submission that Respondent's Cunterclaim should be dismissed.

### A.      Applicable Law

1049.   Respondent submits that the rules applicable to its Counterclaim are Article 46 of the ICSID Convention and Arbitration Rule 40.   Article 46 of the Convention provides:

> Except as the parties otherwise agree, the Tribunal shall, if requested by a party, determine any incidental or additional claims or counterclaims arising directly out of the subject-matter of the dispute provided that they are within the scope of consent of the parties and are otherwise within the jurisdiction of the Centre.

---

[1300] Resp. CM ¶¶ 878 and 907.
[1301] Cl. Reply ¶¶ 591 and 609.

1050.   Respondent says that Article 46 of the Convention obliges an ICSID tribunal "to determine a counter-claim filed by one party provided that it arises directly out of the subject matter of the dispute, is within the scope of the consent of the parties and is otherwise within the jurisdiction of the Centre."[1302]

1051.   While Claimants agree that this article addresses counterclaims, they submit that Respondent's damages claim is not a counterclaim, which is required to "be independent of the principal claim in so far as it constitutes a separate 'claim', that is to say an autonomous legal act the object of which is to submit a new claim[.]"[1303]   As such, Claimants submit that the Counterclaim fails to meet the threshold requirement in Article 46.   Claimants say that Respondent's Counterclaim is more appropriately viewed as a set of arguments related to the valuation of the expropriated Airlines and a defense against Claimants' claims.[1304]

1052.   In its Rejoinder, Respondent indicates that Claimants' interpretation of the requirement that counterclaims "aris[e] directly out of the subject-matter of the dispute" is inconsistent with a requirement that a counterclaim be independent of the principal claim.[1305]   Respondent also makes further submissions as to how its Counterclaim is a separate claim - the claim for damages goes beyond the value of the expropriated shares.[1306]   Respondent clarifies that the basis for its Counterclaim is "article 46 of the ICSID Convention, Rule 40 of the Arbitration Rules and articles X.1 and X.5 of the BIT, which grant the Tribunal jurisdiction to consider counterclaims 'in connection with investments', in accordance with the BIT, Argentine law and international law."[1307]

1053.   The Parties agree that Article 46 obliges the Tribunal to "determine any incidental or additional claims or counterclaims arising directly out of the subject-matter of the dispute provided that they are within the scope of consent of the parties and are otherwise within the jurisdiction of

---

[1302] Resp. CM ¶ 880.
[1303] Cl. Reply ¶ 597 citing C-945, Application of the Convention on the Prevention and Punishment of the Crime of Genocide, Order, Dec. 17, 1997, ICJ Reports 1997, ¶ 27.
[1304] Cl. Reply ¶¶ 597 - 600.
[1305] Resp. Rej. ¶ 837. *Also see* ¶ 839.
[1306] Resp. Rej. ¶ 838.
[1307] Resp. Rej. ¶ 839.

the Centre."   Accordingly, if Respondent establishes that (1) it has a counterclaim, (2) arising directly out of the subject matter of the dispute that is (3) within the scope of consent of the parties and otherwise within the jurisdiction of the Centre, the Tribunal agrees that it is obliged to determine Respondent's Counterclaim.   However, if Respondent fails to establish any of these three requirements, the Tribunal does not have jurisdiction to resolve Respondent's Counterclaim.

1054.   Respondent notes that Arbitration Rule 40 also governs counterclaims and restates the requirements set forth in Article 46 of the ICSID Convention.[1308]  Rule 40 provides:

> (1) Except as the parties otherwise agree, a party may present an incidental or additional claim or counter-claim arising directly out of the subject-matter of the dispute, provided that such ancillary claim is within the scope of the consent of the parties and is otherwise within the jurisdiction of the Centre.

> (2) An incidental or additional claim shall be presented not later than in the reply and a counter-claim no later than in the counter-memorial, unless the Tribunal, upon justification by the party presenting the ancillary claim and upon considering any objection of the other party, authorizes the presentation of the claim at a later stage in the proceeding.

> (3) The Tribunal shall fix a time limit within which the party against which an ancillary claim is presented may file its observations thereon.

1055.   Respondent takes the position that since its Counterclaim is included in its Counter Memorial filed in the case, it has fulfilled the temporal requirement contained in Rule 40.[1309]  Claimants respond that since Respondent has failed to even identify the legal cause of action for its Counterclaim, there is no claim to which to apply the provisions of the ICSID Convention or Rules.[1310]  Claimants elaborate that by not even identifying the legal cause of action for its claim, Respondent has failed to present any such claim as required by Rule 40.[1311]

---

[1308] Resp. CM ¶ 882.
[1309] Resp. CM ¶¶ 882 - 883.  The Tribunal notes that Respondent's Rejoinder did contain some vague references to "the obligation not to harm and the responsibility for any damage caused" being fundamental principles of law and to Article 1109 of the Argentine Civil Code, which imposes a duty to repair harm caused by fault or negligence.  See Resp. Rej. ¶ 839.  However, Respondent did not indicate how those legal obligations related to Claimants or Interinvest, on what basis any such duties would be owed to Respondent or the basis on which causation could be shown.  Even if these later formulations of a potential legal dispute had been elaborated, the Tribunal notes that these were not presented in time to meet the temporal requirement of Rule 40.
[1310] Cl. Reply ¶¶ 599 - 605.
[1311] Cl. Reply ¶ 605.

1056.  Respondent relies on these provisions of the ICSID Convention and Arbitration Rules and submits that the parties are entitled to present ancillary claims, including counterclaims and that ICSID tribunals must determine such claims if all applicable conditions are met.[1312]  Claimants say that in addition to having to prove a legal basis for its claim, Respondent must also substantively prove and support its Counterclaim.  Claimants argue that "the gist of the counterclaim is to total two sums: (i) the Argentine Airlines' non-operating liabilities as of December 2008, and (ii) their expected losses from December 2008 onward."[1313]

1057.  As noted above, the Tribunal agrees that the ICSID Convention and the Arbitration Rules provide a procedural basis and, in fact, an obligation for the Tribunal to decide Respondent's Counterclaim if Respondent's claim meets the requirements in the applicable provisions.  Respondent does not seem to argue that these provisions provide the legal basis for its Counterclaims, as it acknowledges that the counterclaim must be based on the substantive law that applies to the dispute.

1058.  Respondent cites the provisions of Article X.5 of the Treaty and submits that the counterclaim, like the Claimants' claim, must be decided on the basis of the Treaty and any other treaties in force between Argentina and Spain; Argentine law, including its norms of private international law; and the general principles of international law.[1314]  The Tribunal agrees with this submission as the proper construction of the provisions of the Treaty and the ICSID Convention.  Article 46 of the Convention only permits a tribunal to determine counterclaims that "are within the scope of the consent of the parties."  The consent of the parties arises from the Treaty.  Thus, the determination of whether the claims are within the scope of that consent requires that they arise from the Treaty and be disputes over which the parties granted their consent to ICSID arbitration.  Respondent relies on the Decision on Jurisdiction as the basis for its argument that its Counterclaim falls within the scope of the consent of the parties.[1315]

---

[1312] Resp. CM ¶ 884.
[1313] Cl. Reply ¶ 606.
[1314] Resp. CM ¶¶ 885 - 886.
[1315] Resp. CM ¶¶ 887 - 889.

## B.    Is Respondent's Counterclaim a Claim?

1059.    As noted above, Article 46 of the ICSID Convention applies to "any incidental or additional claims or counterclaims" and any such counterclaim must substantively be based on the provisions of the Treaty.   The provision relates both to incidental or additional claims and counterclaims. Thus, the first requirement is that Respondent's Counterclaim be a counterclaim.

1060.    Respondent submits that its Counterclaim "is based on the damage it suffered and which resulted from Claimants' administration of the Argentine Airlines and the state of such companies as a consequence of such administration."[1316]   Claimants submit that this is not a counterclaim because, in order to be a counterclaim, it must be "an autonomous legal act the object of which is to submit a new claim to the Court."[1317]   Claimants submit that the counterclaim is really a defense against Claimants' compensation claim for expropriation and other Treaty breaches and not a separate claim.[1318]

1061.    In its Counter Memorial, Respondent does not set out a legal basis for its Counterclaim. Other than the general reference above to Article X.5 and the statement that the counterclaim must be based on the Treaty, Respondent does not cite any obligations contained in the Treaty (or other treaties, Argentine law or international law referenced as potential sources of substantive law contained in the Treaty) that were allegedly breached by Claimants.[1319]   Instead, Respondent refers to the Tribunal's characterization of Claimants' claims in the Decision on Jurisdiction as the basis for its argument that the counterclaim meets the relevant requirements.

1062.    Respondent summarizes the Tribunal's jurisdiction as having been asserted "on the basis of a dispute whose purpose would be: i) Respondent's 'regulatory treatment' 'of Claimants' investments in the Argentine Airlines and Interinvest,' and ii) 'the valuation of Interinvest's shares in the Argentine Airlines.'"[1320]   Respondent also suggests that "the Tribunal concluded that the

---

[1316] Resp. CM ¶ 890; Resp. Rej. ¶¶ 820 - 822.
[1317] Cl. Reply ¶ 597 citing Application of the Convention on the Prevention and Punishment of the Crime of Genocide, Order, Dec. 17, 1997, ICJ Reports 1997, ¶ 27. C-945.
[1318] Cl. Reply ¶ 598.
[1319] *See* note 1309, above.
[1320] Resp. CM ¶¶ 887 - 889.

Case 1:21-cv-02250-JMC   Document 1-1   Filed 08/24/21   Page 386 of 646

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

dispute is not limited to claims based on alleged Treaty violations, but also extends to contract issues and matters of domestic law."[1321]  Leaving aside the accuracy of Respondent's summary of the Decision on Jurisdiction, Respondent did not suggest that it had a counterclaim independent of the claims submitted by Claimants and over which the Tribunal found that it had jurisdiction.

1063.  Respondent did not present its Counterclaim as a claim that was based on specific provisions of the Treaty and that would fall within the scope of the jurisdiction as found by the Tribunal. Respondent instead relies upon its summary of the Decision on Jurisdiction to submit that because:

> …Claimants seek damages allegedly <u>arising out of the treatment received during their administration of the Argentine Airlines</u> and Argentina seeks damages arising out of that administration, the relationship between the claim and counter-claim is direct.  They are two sides of the coin, <u>two competing claims based on the same facts</u>:  the administration of the Argentine Airlines by the Marsans Group. [Emphasis added]

1064.  According to this submission, Respondent's Counterclaim is based on the treatment received by Claimants during their administration of the Airlines.  While the Treaty imposes obligations on the States party to the Treaty to accord certain treatment to investments made by investors, it does not impose reciprocal obligations on investments or investors.  Respondent has not pointed to any right that it has under the Treaty to certain treatment by an investment or an investor.  Similarly, in its Counter Memorial, Respondent pointed to no other right under Argentine law or general principles of international law on which it based its Counterclaim.

1065.  In its submissions regarding whether its Counterclaim was "otherwise within the jurisdiction of the Centre", Respondent noted that in order to meet this requirement the counterclaim must involve "a legal dispute".[1322]  Paragraph 26 of the Report of the Executive Directors on the Convention addresses this fundamental jurisdictional requirement:[1323]

> 26. Article 25(1) requires that the dispute must be a "legal dispute arising directly out of an investment."  The expression "legal dispute" has been used to make clear that while conflicts of rights are within the jurisdiction of the Centre, mere conflicts of interests are not.  <u>The dispute must concern the existence or scope of a legal right or obligation</u>, or the nature or extent of the reparation to be made for breach of a legal obligation. [Emphasis added]

---

[1321] Resp. CM ¶ 889.
[1322] Resp. CM ¶ 894.
[1323] RA - 440.

1066. Thus, in order to come within the jurisdiction of the Tribunal for determination, Respondent's Counterclaim must meet this threshold; it must concern the existence or scope of a legal right or obligation (and be a dispute arising directly out of an investment).  Again, in its Counter Memorial, Respondent did not identify any legal right or obligation on which it relied for its Counterclaim.  In its Rejoinder, Respondent focuses again on the relationship of the matters in the counterclaim to the investment as the basis for jurisdiction *ratione materiae*,[1324] but does not address a legal basis for its claim based on the Treaty.  At best, Respondent's Counterclaim is a defense to Claimants' claims for the damages arising from Respondent's alleged breaches of the Treaty.  As concluded by the *Hamester* tribunal, "in the absence of any submissions on the nature of the Respondent's Counterclaim under the BIT, the Tribunal is unable to analyse whether it is capable, in accordance with Article 46 of the Convention, of falling within the parties' scope of consent."[1325]  Argentina's Counterclaim suffers the same deficiencies and precludes an analysis of whether its claims fall within the scope of consent.

## C.    Tribunal's Conclusion with respect to Respondent's Counterclaim

1067.   For the foregoing reasons, the Tribunal dismisses Respondent's Counterclaim.

## XV.   DAMAGES

1068.   The Tribunal has found that Respondent is liable for the following breaches of the Treaty:

(a)    The obligations of fair and equitable treatment and not to take unjustified or discriminatory measures, by breaching the July 2008 Agreement and by its non-transparent and arbitrary behavior following the signing of that agreement; and

(b)    Unlawful expropriation for its taking of the Airlines "not in accordance with the law" and without payment of appropriate compensation.

1069.   Of relevance to the damages assessment, Claimants have failed to prove that the facts related to the Airfare Squeeze amounted to a breach of the Treaty.

---

[1324] Resp. Rej. ¶ 825.
[1325] Cl. Reply, ¶ 603.

1070.   Claimants rely upon their valuation experts to quantify their damages claims.   They instructed the experts to provide their opinion on the damages flowing from the following measures, which Claimants alleged to be unlawful: the Airfare Squeeze and the expropriation of Claimants' investment.   Claimants alleged breaches of a number of treaty provisions in relation to the same measures, but the measure of damages claimed does not depend upon the particular provision of the Treaty alleged to have been breached.   Therefore, their approach to damages related to the particular measures and was independent from the legal theories upon which those measures were said to be unlawful.   However, Claimants submitted that the timing of the assessment of damages could vary depending on the Tribunal's findings with respect to the lawfulness of the expropriation.   In support of their damages claims, Claimants submitted evidence of the alleged historical losses related to the Airfare Squeeze and the value of the Airlines in 2008, 2010 and 2013.

1071.   At the hearing and in their Post-Hearing Brief, Claimants' request for damages is structured upon the Tribunal's finding one of three potential "Scenarios" of liability under the Treaty.

(a)     Scenario 1 envisions that this Tribunal would find that Respondent's formal expropriation of the Airlines was lawful and that there were no Treaty breaches prior to the Airlines' nationalization. In this case, Respondent would owe Claimants compensation for the lawful expropriation of the Airlines in the middle of 2008.[1326] Claimants calculate this amount at USD 445 million, based on the "as is" value of AUSA,[1327] as of January 1, 2008, before interest as of the date of this Award.[1328]

(b)     Scenario 2 envisions that this Tribunal would find that Respondent's formal expropriation was lawful, but that Respondent breached the Treaty prior to the expropriation.[1329]  Specifically, Claimants point to the "airfare squeeze" that

---

[1326] Cl. PHB ¶ 185; Claimants' Opening, Transcript p. 204-205; Claimants' Closing, Transcript p. 1670.
[1327] Cl. PHB ¶ 186.  Claimants' calculations have varied during the course of their pleadings and during the hearing. *See, e.g.*, Claimants' Closing, Transcript p. 1677-1678.
[1328] Claimants also include interest calculations including two different levels of interest on the two different 2008 valuations provided, the average of the contemporaneous third party valuations and CL's AUSA valuation:  at an interest rate of LIBOR + 2%, or at an interest rate of 8.75%. *See* Cl. PHB ¶¶ 190, 200.  The claims for interest will be discussed in further below.
[1329] Claimants' Opening, Transcript p. 212; Claimants' Closing, Transcript p. 1679.

preceded formal expropriation.[1330] In this case, Respondent would owe USD 625 million, measured as the as-is value of AUSA plus damages from the airfare squeeze in the amount of USD 268 million, before interest as of the date of the Award.[1331]

(c)    Scenario 3 envisions that this Tribunal would find that Respondent's formal expropriation was unlawful, and that Respondent also breached the Treaty prior to the expropriation. Under this scenario, the Tribunal would value the Airlines as of today, as if Claimants continued to operate them.[1332] The calculation for this Scenario 3 is USD 1.3357 billion for AUSA and USD 254.3 million for ARSA, for a total of USD 1.59 billion calculated with interest through July 31, 2013.[1333]

1072.    Respondent took issue with Claimants' Scenarios arguing that they were new valuation methods that were not supported by Claimants' experts.[1334]

1073.    In response to this particular criticism, Claimants submit that there is no requirement at international law that it present a litigation valuation by a party-retained expert. Claimants submit that "true third-party contemporaneous non-litigation valuations, as exist here, are widely considered to be the best and most reliable indicators of value."[1335]

1074.    In light of the fact that none of the various scenarios presented by Claimants precisely reflects the Tribunal's liability findings, the Tribunal does not consider it necessary to review in detail all three scenarios presented. The Tribunal notes that Scenario 1 is the most suitable starting point, as it proposes valuations not based on the Airfare Squeeze. The specifics of the 2008 valuations and the criticisms of those valuations by Respondent will be discussed further below in

---

[1330] *Id.*
[1331] Cl. PHB ¶¶ 191-194; Claimants' Closing, Transcript p. 1688-1689.
[1332] Cl. PHB ¶ 201.
[1333] Cl. PHB ¶ 201. In this case, there are three components to Claimants' damages calculation: 1) losses sustained by the Airlines between 2002-2008 due to the unfairly low airfares; 2) the but-for cash flows from the Airlines between 2009 and 2010; and 3) expected cash-flows from 2010 and onward. Claimants' calculation here is a date-of-award calculation, and no pre-award interest is needed. Claimants' Closing, Transcript p. 1694.
[1334] *See, for example,* Resp. PHB ¶¶ 266 - 270.
[1335] *See* Cl. PHB note 307.

the context of the evidence on damages.  The Tribunal's damages analysis will look first to the legal basis for damages and then turn to the evidence submitted by Claimants to support those damages claims.

## A.    Applicable Law

1075.  Claimants submit that the remedy for unlawful expropriation is not found in the Treaty; instead it is found in customary international law and is usually referred to as "damages" or "reparation". [1336]  Claimants argue that when a State lawfully expropriates an investor's property, it must pay compensation, usually described as appropriate or adequate compensation payable without undue delay as provided by the Treaty.  However, Claimants submit that when an investment is unlawfully expropriated, customary international law principles apply to the amount of compensation to be paid.  Claimants say that customary international law requires the State to pay damages that restore the investor to the position that it would have been in but for the unlawful acts.  Claimants submit that these damages include either restitution in kind or its monetary equivalent and any additional loss that flows from the breach that has been proven to have been suffered by the investor.

1076.  Claimants rely on the oft-cited articulation of reparation as a principle of customary international law found in the *Chorzów Factory* case:

> The essential principle contained in the actual notion of an illegal act - a principle which seems to be established by international practice and in particular by decisions of arbitral tribunals - is that reparation must, as far as possible, wipe out all of the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed.
>
> …
>
> It follows that the compensation due to the German Government is not necessarily limited to the value of the undertaking at the moment of dispossession, plus interest to the day of payment.  This limitation would only be admissible if the Polish Government had had the right to expropriate.
>
> …
>
> Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it. [1337]

---

[1336] Cl. Mem. ¶ 503.
[1337] *Factory at Chorzów* Case, PCIJ 1928, Ser. A, No 17 at 47. C- 363.

1077. Claimants also rely upon the 2001 Draft Articles on State Responsibility of the International Law Commission ("ILC Articles"), which address the elements of internationally wrongful acts of States, attribution and the legal consequences of those acts. Article 31 contains the general principle that a State must make reparation:

*Article 31*

*Reparation*

1.     The responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act.

2.     Injury includes any damage, whether material or moral, caused by the internationally wrongful act of a State.

1078. Chapter II of the ILC Articles deal with reparation for injury and Claimants have specifically invoked Articles 35 and 36 in support of their claim for damages. The Tribunal considers it useful to set out here the text of Articles 34 through 36:

*Chapter II*

*Reparation for Injury*

*Article 34*

*Forms of reparation*

Full reparation for the injury caused by the internationally wrongful act shall take the form of restitution, compensation and satisfaction, either singly or in combination, in accordance with the provisions of this chapter.

*Article 35*

*Restitution*

A State responsible for an internationally wrongful act is under an obligation to make restitution, that is, to re-establish the situation which existed before the wrongful act was committed, provided and to the extent that restitution:

(a)     is not materially impossible;

(b)     does not involve a burden out of all proportion to the benefit deriving from restitution instead of compensation.

*Article 36*

*Compensation*

1.      The State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby, insofar as such damage is not made good by restitution.

2.      The compensation shall cover any financially assessable damage including loss of profits insofar as it is established.

1079.   Respondent submits that the compensation standard for lawful expropriation and unlawful expropriation (if unlawful for failure to pay compensation) is the same and is the one provided for by the Treaty.[1338]  With respect to compensation for other Treaty breaches or expropriation that is unlawful for reasons unrelated to compensation, Respondent agrees that the principles of customary international law apply but disputes that those principles arise from either the *Chorzów Factory* case or the ILC Articles.[1339]  Respondent submits that customary international law "requires evidence of a general practice of the States with *opinio iuris*."[1340]  Respondent says that neither the *Chorzów* decision nor the Draft Articles on State Responsibility are sources of international law *per se*.[1341]

1080.   Respondent argues that international customary law as it relates to compensation for expropriation is reflected in the Charter of Economic Rights and Duties of States, approved by the General Assembly of the United Nations with 120 votes in favor.[1342]  Article II(2)(c) provides:

> Each State has the right [t]o nationalize, expropriate or transfer ownership of foreign property, in which case appropriate compensation should be paid by the State adopting such measures, taking into account its relevant laws and regulations and all circumstances that the State considers pertinent.

1081.   Based on this, Respondent submits that the applicable principle evidenced by the practice of States accepted as law is that of "appropriate" or "fair" compensation.[1343]

---

[1338] Resp. CM ¶¶ 908 - 909 citing *Biwater v. Tanzania*, ¶ 744. AL RA 266.
[1339] Resp. CM ¶ 910.
[1340] Resp. CM ¶ 910.
[1341] Resp. CM ¶ 910.
[1342] Resp. CM ¶ 911 citing UN Resolution 3281 (XXIX). AL RA 338.
[1343] Resp. CM ¶ 911.

1082.  Further, Respondent states that the ILC Articles are not *prima facie* applicable *per se* to any compensation for damage sustained by a person or entity other than a State.[1344]  Respondent relies on the ILC's Report commentary to Article 28, which states that "[Part Two] does not apply to obligations of reparation to the extent that these arise towards or are invoked by a person or entity other than a State." Respondent accepts that "certain general principles of international customary law may be derived from the [ILC Articles]" but submits that they are not fully applicable to this case.[1345]

1083.  Respondent notes that the ILC considered the significance of proportionality of compensation in relation to damage caused, which Respondent says impacts the principle of full reparation allegedly arising from or as articulated in the *Chorzów* case.  Respondent cites the ILC's Report as it relates to Article 34 of the ILC Articles:

> Concerns have sometimes been expressed that the principle of full reparation may lead to disproportionate and even crippling requirements so far as the responsible State is concerned.  The issue is whether the principle of proportionality should be articulated as an aspect of the obligation to make full reparation.  In these articles, proportionality is addressed in the context of each form of reparation, taking into account its specific character.  Thus restitution is excluded if it would involve a burden out of all proportion to the benefit gained by the injured State or other party.  Compensation is limited to damage actually suffered as a result of the internationally wrongful act, and excludes damage which is indirect or remote.  Satisfaction must "not be out of proportion to the injury".  Thus, each of the forms of reparation takes such considerations into account.[1346]

1084.  Respondent submits that the general principles that must govern the quantification of damages in this case are the specific content of the primary obligations allegedly breached, the behavior of both parties, and the achievement of an equitable outcome.[1347]  Respondent says that the relevant criteria for fair compensation set forth by the general principles of international law are the following:

- There must be a close causal link between the damage sustained by the Claimant and the violation of international law;

- Compensation must be reasonable;

---

[1344] Resp. CM ¶ 912.
[1345] Resp. CM ¶ 912.
[1346] Resp. CM ¶ 913 citing Report of the International Law Commission on the Work of its 53rd Session, Chap. IV, commentary to Art. 34(5), ¶ 3, U.N. GAOR, 56th Sess., Supp. No. 10, U.N. Doc A/56/10 (2001) - AL RA 69.
[1347] Resp. CM ¶ 915 citing the ILC's Report as to Article 36 at ¶ 7. AL RA 69.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

- The damage must be certain, not hypothetical or vague;

- Compensation must only cover the period during which the wrongful act took place;

- The investor is under an obligation to mitigate the damage;

- The tribunal must not run the risk of compensating the same damage twice; and

- The investor must prove the causal link, the amount of the damages sought and

- The fact that damages are recoverable in accordance with the applicable law.[1348]

[Footnotes with citations omitted]

1085. Respondent notes that these general principles of international law are substantially in accordance with Argentine law and thus, according to both, "the existence of an obligation to compensate on the part of the Argentine State is subject to the satisfaction of a number of requirements."[1349]

1086. In their Reply, Claimants state that the damages concepts as articulated by Respondent "(other than the last two)" are uncontroversial and that Claimants have no fundamental disagreement with any of them. Claimants submit that their damages claim is consistent with these principles.[1350] Claimants maintain that the standard of compensation in international law for unlawful expropriation is "full reparation" measured as the higher of the value of the expropriated asset on the date of the taking or date of the award.[1351] Claimants say that this theory is sound because it may be necessary to account for post-expropriation events that would have accrued to a claimant's benefit in absence of the unlawful taking.[1352] Further, Claimants submit that "current value is necessary as an alternative to restitution, since if the State refuses to restore the expropriated asset in response to an arbitral award to that effect, the investor should receive the asset's value as of the date of the State's refusal."[1353]

1087. In specific response to Respondent's principles of damages, Claimants say that:

---

[1348] *See* Resp. CM ¶916 and the sources cited there.
[1349] Resp. CM ¶ 919.
[1350] Cl. Reply ¶ 617.
[1351] Cl. Reply ¶ 618.
[1352] Cl. Reply ¶ 618.
[1353] Cl. Reply ¶ 618.

(i) Claimants' claim satisfies the requirement of causation, (ii) the duty to mitigate is not implicated here, and (iii) Claimants' damages claim is reasonable as it [is] comprehensively evidenced in CL's reports, as well as supported by the third-party valuations that did not even take account of the 2002-2008 airfare squeeze yet still concluded that the airlines were worth on average of US$445 million shortly before the expropriation.[1354]

1088.   The Tribunal notes that the Parties are in substantial agreement regarding the principles applicable to damages in international law with one significant exception.  Respondent takes the position that compensation for expropriation, whether lawful or unlawful because of a failure to pay adequate compensation at the time of taking, is governed by the appropriate compensation standard in the Treaty.  With respect to all other breaches, Respondent seems to argue that fair compensation must be paid with regard to a number of criteria, but denies that there is a general principle of customary international law to provide full reparation in these circumstances.  Respondent does not seem to dispute that the ILC Articles in general codify principles of international law, including the obligation for a State to make full reparation in the event of a breach of an international obligation.  Instead, Respondent submits that that because of the scope of the ILC Articles, the obligation to make reparation is only owed to other States.  Respondent also takes the position that the *Chorzów Factory* case cannot be used on its own as a source of customary international law, as customary international law requires *opinio iuris*.

1089.   The Tribunal does not accept these technical objections.  The *Chorzów Factory* case is not the source of the customary international law principle of full reparation, but the tribunal in that case determined that that principle was one that had been established by international practice. The adoption of the ILC Articles, which clearly articulate a State's obligation to provide full reparation in the event of a breach of an international obligation, and the practice of States in paying reparations in these circumstances, suggest that States accept this obligation.  This is not to say that the general principle of international law that a State that has been found to have breached an international obligation must make full reparation for any damages caused by its breach has any impact on a State's right to expropriate a foreigner's property at international law.  A State's right to do so exists at international law and, so long as the property is lawfully expropriated, there is an obligation to compensate the owner, but not to make full reparation.  The State's obligation to

---

[1354] Cl. Reply ¶ 619.

make full reparation is related to its breach of international law.  Respondent's concerns about the obligation to make full reparation leading to disproportionate compensation are dealt with in the limiting factors that the Parties agree are principles relating to damages in international law.  With respect to compensation, the ILC noted that "[c]ompensation is limited to damage actually suffered as a result of the internationally wrongful act, and excludes damage which is indirect or remote."  This is consistent with Respondent's submissions on the "requirements" before damages can be awarded, as set out above.

1090.   The Tribunal notes that the principle of full reparation has been consistently applied by tribunals.  For example, the *Vivendi II* tribunal concluded:

> …it is generally accepted today that, regardless of the type of investment, and regardless of the nature of the illegitimate measure, the level of damages awarded in international investment arbitration is supposed to be sufficient to compensate the affected party fully and to eliminate the consequences of the state's action.

1091.   The Annulment Committee in *Azurix* stated this in slightly different terms:

> It is not in dispute between the parties, nor in the Committee's view could it seriously be disputed, that the Tribunal had the power in this case to award damages for any loss that the Tribunal found to have been suffered by Azurix as a result of breaches of the BIT for which Argentina was responsible.[1355]

1092.   Accordingly, international law requires Respondent to make reparation to Claimants for Respondent's breaches of the Treaty and the Tribunal's award of damages should seek to put Claimants in the position they would have been in but for Respondent's breaches.  As with any claim, it is for Claimants to prove that the damages suffered were caused by Respondent's breaches and the quantum of those damages.

## B.   Restitution in Kind

1093.   At the hearing and in their Post-Hearing Brief, Claimants indicated that their preferred remedy was the "restitution of their corporate rights in the Argentine Airlines (through Interinvest)".  Claimants said that Respondent did not question their right to restitution and that,

---

[1355] *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, , Decision of the Application for Annulment, September 1, 2009, ¶ 315.

as a result, the Tribunal should award it as the primary form of relief.  In addition, Claimants suggest that the Tribunal's award should also include compensation as an alternative, since an award of restitution is not easily enforceable in the event Respondent refuses to comply with the Tribunal's award.[1356]

1094.   Although Claimants' request for relief in their Memorial includes a request for an award of "restitution or the monetary equivalent of all damages caused",[1357] the Tribunal notes that Claimants initially indicated that they were not seeking the return of their corporate rights in this arbitration:

> Argentina must, therefore, "re-establish the situation which existed" before the wrongful act, that is, before the expropriation, was committed. <u>Since Claimants are **not** requesting restitution in kind of their investment, Argentina must pay the monetary equivalent</u>, that is, in the words of the *Chorzów Factory* case, a sum which would "wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed." In addition, Argentina must pay "damages for loss sustained which would not be covered by restitution in kind or payment in place of it.[Emphasis added][1358]

1095.   Unsurprisingly, Respondent's Counter-Memorial does not specifically address Claimants' request for restitution in kind.  Respondent does, in the context of its submissions on the requirement of proportionality of compensation in relation to the damage caused, refer to the principle that restitution is excluded "if it would involve a burden out of all proportion to the benefit gained by the injured State or other party."[1359]

1096.   In their Reply, for the first time Claimants make clear that they "seek first and foremost restitution of the corporate rights attached to their shares in the expropriated Argentine Airlines, plus all historical and consequential damages, including interest up to the effective payment of the award."[1360]  Claimants argue that although they still hold legal title to their shares in the Airlines, Respondent confiscated their legal corporate rights attached to those shares.  Claimants allege that "Argentina has not challenged Claimants' right to restitution of their investment."[1361]

---

[1356] Cl. PHB ¶ 182.
[1357] Cl. Mem ¶542(iii).
[1358] Cl. Mem. ¶508.
[1359] Resp. CM. ¶ 913.
[1360] Cl. Reply ¶ 610.
[1361] Cl. Reply ¶ 610.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

1097.   In light of the confusion created by the way restitution in kind is addressed in Claimants' Memorial, the Tribunal is of the view that it was not a fair characterization of Argentina's position in the Claimants' Reply to say that it had not challenged Claimants' right to restitution.   In any event, Claimants did not address Argentina's general argument that the damages awarded, including the possibility of restitution, must be proportionate to the benefit gained by Respondent. In the Tribunal's view, if Claimants were serious that restitution of their corporate rights was their primary claim for damages, then they were under an obligation to establish that right in the circumstances of this case and demonstrate that such an award was reasonable and proportionate.[1362]   The Tribunal notes that through the July 2008 Agreement Claimants agreed to sell their shares in the Airlines to Respondent, thereby exiting the market.   This indicates Claimants' acknowledgment that damages are a sufficient remedy.

1098.   Further and in any event, the Tribunal is of the view that, in the circumstances of this case, restitution in kind is neither practical nor practicable.   Claimants are in bankruptcy and the Airlines have now been operated by Respondent for a number of years. Accordingly, the Tribunal dismisses Claimants' request for restitution in kind and turns now to the assessment of their alternative claim for the monetary equivalent of all damages caused to its investments.

## C.    Assessment of Damages

1099.   Claimants argued that Respondent's measures, the Airfare Squeeze and expropriation of their investment, were breaches of the Treaty and caused them damages.   The Tribunal has rejected Claimants' contention that the Airfare Squeeze rose to the level of a Treaty breach.   The Tribunal has found a breach of the FET standard related to Respondent's measures following the July 2008 Agreement and its subsequent breach of that agreement.   The Tribunal has also found that Respondent's expropriation of the Airlines was unlawful.

---

[1362] The Tribunal notes that Claimants' submissions did not set out a different damages scenario based on the return of the shares to Interinvest, as opposed to the appropriate compensation for the expropriation of those shares.  In this case, it would be inconsistent with restitution in kind to award both appropriate compensation for the shares and the return of those shares to Interinvest.

1100.   The Tribunal finds that while there were multiple breaches of the Treaty, there was only one set of consequences flowing from those breaches.  The Tribunal found that the July 2008 Agreement was a binding agreement in which Respondent agreed to purchase the shares of Interinvest based on an agreed valuation methodology with certain agreed parameters.  As has been discussed in detail in earlier sections of this Award, Respondent, after executing the July 2008 Agreement, comported itself in an arbitrary and non-transparent manner and, eventually, refused to carry out the valuation process set out in that agreement.  Instead of purchasing the shares as agreed, Respondent unlawfully expropriated those shares and the ownership rights that attached to them.  Accordingly, Respondent's Treaty breaches deprived Claimants of the payment for their shares of Interinvest as determined by the agreed valuation methodology in the July 2008 Agreement.  This is the consequence of Respondent's breach of the FET standard.  It is also the consequence of Respondent's unlawful expropriation of Claimants' investment.

1101.   As has been noted above, Claimants provided a simplified summary of their damages submissions based on various possible liability findings.  They referred to these as Scenarios 1, 2 and 3.[1363]  Claimants explained their rationale for presenting multiple damages scenarios: "we wanted to draw the Tribunal's attention to how it could reasonably quantify damages based on the existing record regardless of its ultimate determinations on liability."[1364]  Claimants indicated that they wished to avoid a further, separate quantum phase after a full hearing on liability, merits and quantum had already been concluded.[1365]   In this context, Claimants provided references to evidence in the record of the value of the Airlines in 2008.

1102.   Scenario 1 was described by Claimants to be the minimum compensation payable by Respondent, representing what they submitted was "fair market value of their investment in the Argentine Airlines in their 'as is' condition as of the date of nationalization in 2008."[1366]  Claimants rely on the third-party valuations prepared by the accounting firms and investment banks in 2008.  Claimants note that these valuations were performed by Deloitte, Morgan Stanley

---

[1363] Claimants submitted Scenarios 2 and 3 in the event that the Tribunal found that there had been an Airfare Squeeze that amounted to a breach of the Treaty.  Since this has not been proved, these scenarios will not be discussed further.
[1364] Cl. Closing Argument, Transcript p. 1670:4-7.
[1365] Cl. Closing Argument, Transcript pp. 1669:7 - 1670:9.
[1366] Cl. PHB ¶ 185.

and PwC in the context of the May 2008 Agreement and that the average valuation of AUSA averaged USD 415 million and for ARSA the average was USD 30 million.  Claimants also referred to the valuation prepared by Credit Suisse in the context of the July 2008 Agreement.

1103.  At the hearing, Respondent objected to the third-party valuations on the basis that they were not submitted during the merits phase of the case and that Scenario 1 was never valued by Claimants' experts.[1367]  Respondent argued that Claimants had never submitted an expert valuation of the Airlines as of 2008 and that this was a "fatal flaw" for Claimants' case.[1368]

1104.  Claimants respond that from the first page of their Memorial on the Merits, they maintained the position that these valuations "were a reliable indicator of the minimum level of compensation owed."[1369]  Further, as noted above, Claimants submit that there is no requirement at international law that it present a litigation valuation by a party-retained expert.  Claimants submit that "true third-party contemporaneous non-litigation valuations, as exist here, are widely considered to be the best and most reliable indicators of value."[1370]

1105.  In response to Respondent's challenges during the proceedings to these third-party valuations, which were all in the record,[1371] Claimants asked their experts to extract from their valuation model a comparison to what the third-party valuators did in 2008.[1372]  Compass Lexecon adjusted their 2010 value for the additional cash flows that AUSA would have generated in 2009 - 2010 but for Argentina's measures and discounted this value to January 2008 to arrive at a value of USD 356 million.[1373]  Compass Lexecon updated this value to USD 357 million to reflect the audited 2007 Financial Statements.[1374]  Dr. Abdala testified that using this valuation for AUSA in 2008 was a fair proxy for a lawful expropriation valuation.[1375]  Compass Lexecon did not provide a 2008 valuation for ARSA that did not take into account the Airfare Squeeze.  Claimants say that

---

[1367] Resp. Closing, Transcript pp. 1791:9 - 1794:6.
[1368] Resp. Closing, Transcript pp. 1791:18 - 1792:15.
[1369] Cl. Closing Argument, Transcript p. 1670:17-22.
[1370] *See* Cl. PHB note 307.
[1371] C-375, C-376, C-377 and C-201.  *Also see* note 389, above.
[1372] Cl. Closing, Transcript pp. 1673:15-1674:5.
[1373] CLEX ER Supp., ¶ 146; Cl. Reply note 1017.
[1374] CLEX ER3.
[1375] Abdala Testimony, Transcript p. 1366.

Compass Lexecon's calculation confirms the reliability of the other third-party valuations performed in 2008. Claimants submit that there was a convergence in these valuations, which supports their reliability as evidence of the Airlines' value in 2008.

1106.   The Tribunal is of the view that the third-party valuations of the Airlines in the record are evidence of the Airlines' value in 2008. There is no requirement for a claimant to submit an expert valuation prepared for the arbitration in order to found its claim for damages. While expert evidence is often used to support a damages analysis, this is not necessarily a requirement if other reliable evidence exists to support quantification of damages. This case is unusual in that there are a number of contemporaneous valuations in the record. While those valuations were not prepared for the purpose of the arbitration, the Tribunal does not consider that a factor that makes them less reliable indicators of value. In fact, the fact that they were prepared to support arm's length negotiations for the sale of the Airlines makes them sound indicators of the fair market value in 2008. However, because they were not prepared for the arbitration, the third party valuations may not perfectly address the specific damages to be awarded. The Tribunal must be cautious to consider the basis on which the valuations were performed in order to determine their relevance to the damages being claimed in this case in light of the Tribunal's liability findings.

1107.   The Tribunal notes that the third-party valuations prepared in relation to the May 2008 Agreement were all DCF valuations based on the Airlines' projections as of early 2008. The May 2008 Agreement contemplated the share price being established by the average of three valuations, but that deal did not complete. The evidence indicates that the financial status of the Airlines worsened between May and July 2008. Accordingly, these third-party valuations are not of direct value in determining Claimants' damages. They do, however, provide support for the general range in values for the Airlines in the period preceding the July 2008 Agreement.

1108.   The Tribunal has found that Respondent's complaints about lack of access to financial information about the Airlines or the true state of the extent of the Airlines' financial difficulties when they entered into the July 2008 Agreement were unfounded.[1376]   The July 2008 Agreement

---

[1376] See paras. 852 - 853, above.

was negotiated with the express intent of keeping the Airlines in operation in order to maintain Respondent's public interest in connectivity.  Respondent was purchasing two operating airlines with the intention of continuing to operate them.  At the time, with knowledge of the financial circumstances, the Parties - negotiating at arm's length - agreed that the purchase price would be determined using a DCF valuation.

1109.   As the Tribunal has noted, although Claimants have proved multiple breaches of the Treaty, the damages flowing from those breaches are all related.  But for the breach of FET, Claimants would have transferred their shares to Respondent at a price arrived at pursuant to an agreed methodology.  But for the unlawful expropriation, Claimants would have been paid fair market value for their investment in 2008.  As the Tribunal will discuss further below, it considers the best evidence of fair market value to be the price for the shares to be determined by the pricing mechanism agreed by Interinvest and Respondent in July 2008.

1110.   The DCF methodology and parameters agreed in the July 2008 Agreement were a negotiated compromise.  In this way, the Credit Suisse valuation (performed pursuant to the July 2008 Agreement) differed from the other third-party valuations prepared in the context of the May 2008 Agreement, which did not have similar negotiated constraints on the cash flow estimates.  Article 6 of the July 2008 Agreement provided (in relevant part):

> The valuation shall be performed using the discounted cash flow method. Such future cash flows shall be calculated using the following assumptions: (i) the cost of fuel at its current subsidized value of $1.85 (one Argentine peso and eighty-five cents) per liter plus VAT; said price is to be changed using reference prices and proportionately to price variations in the market; and (ii) the current fare for domestic flights, modified proportionately to any changes projected for all other costs.

1111.   Thus, the Parties agreed to limit both the extent of the costs (through the subsidized fuel price with market increases) and the projected revenues (by using current fares increased proportionately by projected costs).  This was the best valuation that Claimants were able to negotiate in the then financial circumstances of the Airlines, which were known to Respondent. In the Tribunal's view, the result of this valuation is the best approximation of fair market value of the Airlines in July 2008.

1112.   As discussed in detail at paragraphs 813 through 829, Credit Suisse prepared its valuation pursuant to the July 2008 Agreement and returned a value of between USD 0 to USD 60 million for ARSA and USD 330 million to USD 480 million for AUSA.[1377]   Respondent made a number of formalistic objections to the Credit Suisse valuation, which the Tribunal has rejected.[1378]   The evidence indicates that the TTN was able to assess the Credit Suisse valuation and that the controversies at the time did not focus on the substance of the valuation.[1379]   The TTN clearly disagreed with the use of a DCF methodology for the valuation of the Airlines.[1380]   However, that was the methodology agreed by the Parties.   The Tribunal has found that the DCF analysis that was performed by the TTN did not breach the July 2008 Agreement.   Nevertheless, a number of issues related to the substance and methodology of the TTN's DCF valuation were raised at the time and appear to be valid criticisms.[1381]   In these circumstances, the Tribunal considers the Credit Suisse valuation to be the most reliable expression of the value of the Airlines as agreed by the Parties under the July 2008 Agreement and the best evidence of the fair market value of the Airlines in late 2008.

1113.   In addition, Claimants' experts adjusted their model in order to provide a proxy for the value of AUSA in 2008 assuming no breaches of the Treaty and determined that value to be USD 357 million.[1382]   This provides the Tribunal with a check on the reasonableness of the Credit Suisse valuation.   The Tribunal does not accept Respondent's criticism that this calculation did not represent a value as of 2008 because the experts discounted from the 2010 valuation to arrive at the figure.   The valuation date does not change the underlying cash flows (Compass Lexecon added in the cash flows for 2009 and 2010).   Thus, the difference between the value at the two different dates is a simple mathematical exercise to account for the time value of money (discounting by the WACC).   The Tribunal notes that this valuation proxy was provided to value AUSA as of January

---

[1377] C-201, p. 7.
[1378] *See* ¶¶ 823 - 825.
[1379] *See* ¶¶ 826 - 828 and the sources cited there.
[1380] The TTN's valuations were based on the liquidation value approach.  Compass Lexecon explains that this approach is also inappropriate from an economic perspective, as it attributes no value to the intangible assets of the Airlines, it only values assets owned by the Airlines and most of the assets were leased, and it fails to value any synergies between the assets, which is inappropriate for a business that operates its assets in a network rather than as individual assets. *See* CLEX ER Supp. pp. 108 - 109
[1381] *See* ¶ 830.
[1382] CLEX ER Supp. ¶ 146 and CLEX ER3.

2008 and that the value of the Airlines deteriorated during 2008.  Also, this proxy was provided for AUSA only, as the negative cash flows for ARSA in 2009 and 2010 did not permit a similar exercise for ARSA.

1114.   Accordingly, Claimants have proved that the fair market value of the Airlines in 2008 was at least USD 330 million (USD 0 for ARSA and USD 330 million for AUSA) and that they suffered damages of at least USD 320,760,000, which corresponds to their 97.2 percent shareholding in AUSA.[1383]  In reaching this conclusion, the Tribunal has considered Respondent's position that the two Airlines must be valued together because the claim in the arbitration was brought with respect to Claimants' share in Interinvest as the holding company that controlled both Airlines.[1384]  Since the Tribunal has accepted the Credit Suisse valuation performed on the basis of the agreed DCF methodology in the July 2008 Agreement as the basis for Claimants' damages and that valuation did not return a negative valuation for either ARSA or AUSA, Respondent's argument in this respect is irrelevant.  Further and in any event, the July 2008 Agreement clearly provided for separate valuations of the shares of AUSA and ARSA.

1115.   Claimants argued that in an unlawful expropriation scenario, they were entitled to the greater of the fair market value at the time of the taking and the fair market value at the date of the Award.  While the Tribunal agrees that this may be an appropriate determination of reparation when a State expropriates an obviously profitable asset, it is not appropriate in these circumstances.  The Airlines were in financial difficulty and the record indicated that significant cash investments were required to allow them to continue to operate.  Even if it were appropriate to award Claimants a value that reflected a restructured and refinanced asset, the Tribunal is not persuaded that Claimants have adequately proved a higher value for the shares of the Airlines than the USD 330 million, which reflects the minimum value calculated in the Credit Suisse valuation.

---

[1383] Claimants acquired a 97.4% participation in ARSA and 96.6% participation in AUSA in 2001.  After Claimants increased their participation in Interinvest, they had a 98.0% share in ARSA and 97.2% share in AUSA.  As a result of the June 2006 Agreement, Claimants transferred a 3.8% stake in ARSA to Respondent leaving them with 94.2% participation in ARSA.  *See* LECG ER1 ¶ 21.

[1384] Resp. Closing, Transcript pp. 1794:17 - 1795:12.

1116.   In summary, the Tribunal finds that Claimants have proved damages in the amount of USD 320,760,000 for their shareholding in AUSA and ARSA flowing from Respondent's breaches of the Treaty.

## D.    Interest

1117.   Claimants have requested the payment of pre-award and post-award compound interest until the effective date of payment.[1385]   In their Memorial, Claimants requested the payment of post-award interest at an "appropriate rate of interest, compounded at least semi-annually." According to Claimants, the award of compound interest is becoming widely accepted as an appropriate and necessary component of compensation for expropriation.[1386]

1118.   Claimants request that if the Tribunal chooses a historical date of valuation, such as 2008, that it calculate the value of pre-award interest as of the date of the award.[1387]   With respect to the applicable rate of interest, Claimants submit that the Tribunal should award interest at either LIBOR plus 2% or "the 8.75% rate that Argentina used in its recent settlement with Repsol".[1388] In their Reply submission, Claimants submitted that the post-award rate should be at the weighted average cost of capital (WACC) rate, compounded quarterly, until the date of payment.[1389]

1119.   Respondent takes the position that any interest awarded should be at a risk-free rate, which it says is the usual practice in international arbitration.   It also says that compound interest is exceptional.[1390]   With respect to the appropriate risk-free rate, Respondent points to a number of awards in which the tribunals awarded interest at a risk-free rate using the US six-month Treasury Bill rate or the rate for US six-month Certificates of Deposit.[1391]

---

[1385] Cl. Mem. ¶ 541; Cl. Reply ¶ 643; Cl. PHB ¶ 219.
[1386] Cl. Mem. ¶ 541. Claimants rely on the award in *Waguih Elie George Siag and Clorinda Vecchi v. Arab Republic of Egypt*, ICSID Case No. ARB/05/15, ¶ 595 [hereinafter: *Siag v. Egypt*]: C-342. Claimants refer to the tribunal's statement in *Siag v. Egypt* that interest compounded at half yearly intervals is a modest and appropriate request.
[1387] Cl. PHB ¶ 212. They say that if the Tribunal were to award damages in accordance with the scenarios 1 or 2, then pre-award interest would be due. However, if the Tribunal were to apply Claimants' scenario 3, which used a valuation date of July 31, 2013, no pre-award interest would be payable since it involves a date-of-award valuation.
[1388] Cl. PHB ¶¶ 190, 200.  This was with respect to its scenarios 1 and 2.
[1389] Cl. Reply ¶ 642. Claimants do not specify that rate nor justify its application in their Reply or their Post-Hearing Brief.
[1390] Resp. CM ¶¶ 963-966, 987-989.
[1391] Resp. CM ¶¶ 976-977; Resp. Rej. ¶¶ 965-966.

1120.   The Tribunal notes that the ILC Articles also address interest as a component of a State's obligation to make full reparation.  Article 38 provides:

*Interest*

1.      Interest on any principal sum due under this chapter shall be payable when necessary in order to ensure full reparation.  The interest rate and mode of calculation shall be set so as to achieve that result.

2.      Interest runs from the date when the principal sum should have been paid until the date the obligation to pay is fulfilled.

1121.   The Tribunal has no hesitation in accepting that the payment of interest forms part of the obligation to make full reparation for a breach of an international obligation.  This appears to be common ground between the Parties.  Accordingly, as the Tribunal has found breaches by Respondent of its obligations under the Treaty, it is appropriate to award interest.  The relevant questions are the appropriate rate of interest, whether interest should be simple or compound and the date from which interest should run.

1122.   Claimants have proposed two alternative rates of interest: (i) LIBOR plus 2% or (ii) the rate of 8.75% which they say is the rate Respondent agreed to use in a recent settlement.  However, Claimants have not supported these rates of interest in any way nor demonstrated how they relate to the harm suffered by the delay in payment to them of the sums awarded.  In this case, unlike in *Siag*, the Treaty does not provide any guidance on the rate of interest applicable to compensation due under the Treaty.[1392]

1123.   On the other hand, Respondent submits that any interest payable should be at a risk-free rate and it points to a number of awards in which such a rate was awarded and, in particular, the rate for 6-month US Treasury Bills.[1393]

1124.   In these circumstances, the Tribunal is not persuaded that it should award either of the higher rates proposed by Claimants.  Accordingly, the Tribunal finds that the appropriate interest rate is the US six-month Treasury Bill rate.

---

[1392] C-342: *Siag v. Egypt* ¶ 597 where the tribunal notes that Article V of the Italy-Egypt BIT at issue in that case provided that compensation for expropriation should include interest at the current six-month LIBOR rate of interest.
[1393] *See* Resp. CM ¶¶ 976-977; Resp. Rej. ¶¶ 965-966 and the awards cited there.

1125.   With respect to whether interest should be awarded on a simple or a compound basis, the Tribunal is persuaded that the latter is appropriate.  In this regard, the Tribunal agrees with the tribunal in the *Siag* award that compound interest has been awarded more often than not and is becoming widely accepted as an appropriate and necessary component of compensation.  In the Tribunal's view, compound interest will better compensate for actual damages suffered since it is consistent with contemporary financial practice and would have been available had the amount awarded been paid in a timely manner.[1394]  In the Tribunal's view, compounding on a semi-annual basis would be appropriate.

1126.   With respect to the date from which interest should commence, the Tribunal finds that December 30, 2008 is the appropriate date.  This is the date on which the Argentine Congress adopted Decree 2347/2008 by which Respondent declared that all the rights granted by the shares of the Airlines were to be exercised by the administrative entity appointed by the Government until the expropriation process had been completed.  While various aspects of Respondent's breach of the FET standard occurred somewhat earlier than this date, the Tribunal finds this an appropriate and practical point from which to calculate interest.

1127.   Accordingly, the Tribunal grants interest at the US six-month Treasury Bill rate compounded semi-annually on the principal sum awarded as of December 30, 2008 until payment in full.

1128.   With respect to the amount awarded for costs in the next section, the Tribunal believes that interest on the amount awarded should be at the same six-month US Treasury Bill rate as of the date of this Award.  The Tribunal fixes this date on the basis that it is not in a position to determine the dates on which the various costs were incurred by Claimants.

1129.   Finally, Claimants requested that the Tribunal calculate the value of pre-award interest.  Given the variable nature of the interest rate awarded over the relevant period, the Tribunal declines this request.

---

[1394] In this regard, *see,* for example, *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1, July 9, 2007, ¶¶ 103,105: C-326.

## XVI.   COSTS OF THE PROCEEDING

1130.   Claimants and Respondent each requested an award of costs against the other.[1395]

1131.   Claimants submitted that they should be granted an award of all their costs and expenses, including legal and experts' fees on the basis of the principle of "loser pays" or that costs follow the event.  They also submitted that Respondent's conduct justified such an award.  In this regard, Claimants pointed to Respondent's reluctance or failure to provide access to certain documentation as one example of that conduct.  Claimants also say that Respondent's conduct increased their costs and this also supports their payment by Respondent.[1396]

1132.   In addition, Claimants submitted that the unlawful expropriation of their investment was at the core of this case and that through one of its witnesses Respondent had acknowledged that it owed Claimants at least USD 150 million for that expropriation.  As a result, Claimants were forced to incur significant costs and to wait a number of years to be compensated.  They say that if they are not compensated for these costs, they would not be made whole as required by international law.[1397]

1133.   In their First Statement Quantifying Costs, Claimants set out a breakdown of legal fees and expenses and experts' fees and expenses as well as other related expenses including translation and reporting fees and the fees and expenses of the Tribunal.  The total amount claimed was USD 16,115,716.06.  Claimants submitted that the fees and expenses claimed were necessary for the proper conduct of the case and are reasonable and appropriate given the complex circumstances of the case and the amount in controversy.

1134.   In their Second Statement on Costs, Claimants updated their previous claim, again providing a breakdown.  Claimants' updated claim for costs was as follows:

---

[1395] The Parties' requests for costs were set out in their pleadings in general terms and further specified in their post-hearing briefs.  Pursuant to the Tribunal's instruction, the Parties made additional submissions in which they quantified their claims for costs.  These were made by way of initial statements on July 7, 2014 and updated statements on December 16, 2016.

[1396] Cl. PHB ¶ 215.  In this regard, Claimants rely on the award in *Siag v. Egypt*: C-342 ¶¶ 621-622.

[1397] Cl. PHB ¶ 216, relying on *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, October 2, 2006, ¶¶ 532-533: C-280; and a number of other awards.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

| CATEGORY | AMOUNT (IN US$) |
|---|---|
| **Legal Fees & Expenses** | |
| • King & Spalding | |
|    *Fees* | $ 11,976,662.00 |
|    *Expenses* | $727,837.00 |
| • Fargosi & Asociados | |
|    *Fees* | $ 815,056.00 |
|    *Expenses* | $ 104,623.00 |
| Experts' Fees & Expenses | $ 2,424,857.00 |
| • ICSID Payments | $ 1,425,000.00 |
| **TOTAL** | **$ 17,474,035.00** [1398] |

1135.   In its request for costs, Respondent reviewed the various practices regarding the allocation of costs under Article 61(2) of the ICSID Convention, including a *pro rata* allocation according to the outcome of the dispute and that each party bears its own costs.  Respondent also submitted that the conduct of the parties during the proceedings, as well as the circumstances of the case as a whole, are significant and should be taken into account.

1136.   Respondent submitted that on the basis of Claimants' conduct, the Tribunal should order Claimants to pay all costs, including the fees and expenses incurred by it as well as the fees and expenses of the Tribunal and other charges.  Respondent says this is appropriate since Claimants' resort to arbitration was abusive when, in the local expropriation proceedings which were lawful, Claimants adopted a passive stance.  Further, Respondent says that Claimants adopted an obstructive approach and concealed information.[1399]

1137.  In its First Statement on Costs, Respondent provided a breakdown of its costs which totalled USD 2,243,572.44.  Those costs were broken down as follows:

---

[1398] Claimants' Second Statement of Costs ¶ 5.
[1399] Resp. PHB ¶¶ 293-296.

| CONCEPTO | PESOS | EUROS | LIBRAS | DOLARES |
|---|---|---|---|---|
| TRADUCCIONES | 77.134,81 | | | |
| | | | | |
| | | | | |
| subtotales | 77.134,81 | | | |
| EXPERTOS | | | | |
| | 1.383.490,00 | 36.948,00 | | 25.000,00 |
| | | | | |
| | | | | |
| subtotales | 1.460.624,81 | 36.948,00 | | 25.000,00 |
| CORREO | 17.843,80 | | | |
| PASAJES, HOTEL Y VIÁTICOS | | | | 168.800,00 |
| COMUNICACIONES | 18.000,00 | | | |
| LIBRERÍA | 30.000,00 | | | |
| FOTOCOPIADO | 30.849,75 | | | |
| COSTOS CIADI | | | | 950.000,00 |
| COSTOS PERSONAL DE LA PTN | 6.900.629,24 | | | |
| TOTALES | 8.535.082,41 | 36.948,00 | - | 1 .143.800,00 |
| DÓLAR AL CAMBIO | | | | 8,13 |
| TOTALES EN DÓLARES | 1.049.567,44 | 50.205,00 | | 1.143.800,00 |
| COSTO TOTAL EN DÓLARES | | | | 2.243.572,44 [1400] |

1138.   In its Second Statement on Costs, Respondent updated this figure to include additional costs and expenses which were set out as follows:

| DESCRIPTION | DOLLARS (USD |
|---|---|
| Argentina's statement of costs dated 7 July 2014 | 2,243,572.44 |
| ICSID Costs | 300,000.00 |
| Treasury Attorney-General's Office personnel cost | 33,910.22 |
| Airline tickets, hotel and travel expenses | 125,579.80 |
| External legal assistance | 33,580.69 |
| Translations | 5,673.71 |
| Stationery | 1,592.36 |
| Telecommunications | 191.08 |
| **TOTAL** | **USD 2,744,100.30** [1401] |

1139.   It was common ground between the Parties that the Tribunal is required to assess the expenses incurred by the Parties in connection with the arbitration and decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid.   In addition, Rule 28 of the ICSID Arbitration Rules

---

[1400] Respondent's First Statement of Costs. While this statement includes an amount for expert fees and expenses, it appears not to have included other legal fees since it was represented by members of the Treasury Attorney General's Office.

[1401] Respondent's Second Submission on Costs, December 16, 2016.

provides how the Tribunal may fix and allocate costs. Each of the Parties based their arguments on the exercise of the Tribunal's discretion.

1140.   In regard to the allocation of costs, having carefully considered the various pleadings and applications, including Claimants' various applications for interim measures, during the course of these lengthy and complex proceedings, the Tribunal has determined that the appropriate basis on which to allocate costs is the *pro rata* or proportional approach since Claimants were, ultimately, successful in respect of a substantial part of their claim.

1141.   In reaching this conclusion, the Tribunal has considered the degree of success of each of the Parties in the various interim measures and other applications made during the course of the arbitration. In this regard, Claimants achieved mixed success. On the other hand, Claimants were successful in defending against Respondent's objections to jurisdiction and its Counterclaim.

1142.   The Tribunal has also considered the Parties' respective submissions regarding the conduct of the other during the course of the arbitration. In that regard, the Tribunal is not persuaded that either Party's conduct was such as to justify a special allocation of costs or departure from the proportional approach adopted.

1143.   In their claim, Claimants claimed restitution or the monetary equivalent of all damages caused to their investments, including historical and consequential damages. The Tribunal has found that restitution is not practical and has awarded approximately 20% of Claimants' claim of USD 1.59 billion under its scenario 3. The Tribunal believes that it would be appropriate to allocate to Claimants their costs in approximately the same proportion. Accordingly, the Tribunal determines that Claimants are entitled to payment of 20% of their costs claimed.

1144.   Turning to the quantum of the costs claimed, the Tribunal notes that the Parties did not raise any objections to the amounts claimed by the other. The Tribunal recognizes that Claimants' costs are substantially higher than those of Respondent, primarily due to the difference in the legal fees and expenses of external counsel. In this regard, Respondent was represented by the Treasury Attorney General's department, in respect of which Respondent have not made any claim for legal fees.

1145.   In respect of the legal costs sought by Claimants, the Tribunal is satisfied that the amount claimed for legal fees and expenses is in line with the level of fees charged by a major international law firm in a case of this size and complexity.  As a result, the Tribunal concludes the legal fees and expenses claimed by Claimants are reasonable.

1146.   Accordingly, taking into account all of the circumstances of the case, the Tribunal concludes that it would be appropriate, in the exercise of its discretion, to order Respondent to pay to Claimants the sum of USD 3,494,807 as a reasonable contribution towards their costs and expenses.  To this amount is added interest at the rate determined above at paragraph 1128 commencing as of the date of this award.

## XVII.  DECISION OF THE TRIBUNAL

1147.  For all the foregoing reasons, the Tribunal issues the following award.  The Tribunal:

(a)  declares that Respondent, the Argentine Republic, has acted in breach of Article IV(1) of the Treaty by failing to grant Claimants fair and equitable treatment of their investments;

(b)  declares that Respondent, the Argentine Republic, has acted in breach of Article III(1) of the Treaty by its unjustified measures in interfering with Claimants' rights in respect of their investments;

(c)  declares that Respondent, the Argentine Republic, has breached Article V of the Treaty by unlawfully expropriating Claimants' investments;

(d)  directs Respondent, the Argentine Republic, to pay compensation to Claimants in the amount of USD 320,760,000;

(e)  directs Respondent, the Argentine Republic, to pay to Claimants interest compounded semi-annually at the six-month US Treasury Bill rate commencing on December 30, 2008 until payment in full;

(f)  directs Respondent, the Argentine Republic, to pay to Claimants the sum of USD 3,494,807, being a contribution toward their reasonable legal and other costs of these proceedings, such costs to bear interest at the six-month US Treasury Bill rate compounded semi-annually from the date of this Award until payment in full; and

(g)  declares that Respondent's Counterclaim and all other claims are hereby dismissed.

Made in Washington, D.C., in English and Spanish, both versions equally authentic.

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)

Award

Mr. Henri C. Alvarez Q.C.
Arbitrator

Dr. Kamal Hossain
Arbitrator

Date: *July 11, 2017*

Date:
Subject to the attached dissenting opinion

Judge Thomas Buergenthal
President of the Tribunal

Date: JULY 15, 2017

398

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**WASHINGTON, D.C.**

IN THE PROCEEDING BETWEEN

Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.

(CLAIMANTS)

and

The Argentine Republic

(RESPONDENT)

(ICSID Case No. ARB/09/1)

_____

**DISSENTING OPINION OF KAMAL HOSSAIN**

_____

1.  I regret that I am compelled to give a separate dissenting opinion. In my respectful submission my main disagreement with my colleagues centres around setting out of contentious factual positions regarding the identity of the Claimants and their investment in Argentina. These issues have remains unresolved from the Decision on Jurisdiction (when I provided a Separate Opinion) and were to be dealt with in the Award on the Merits. The Award does not deal with or settle those outstanding issues.  My objections related to the preliminary, but fundamental, unresolved issues which were to be dealt with in the Award on the merits upon consideration of the evidence on record, such as the identity of the Claimants which is dealt with, but not resolved in the Award, in turn giving rise to other abnormalities.

2.  To determine the identity of the Claimants, the following simple, but crucial, issues should have been resolved:

    - Who are the Claimants?

    - How and when did the Claimants invest in the Argentine Republic?

    - What is the "investment" made by the Claimants?

    - Does King and Spalding have a valid Power of Attorney ?

3.  In the Award the term "Claimants" is used not only to refer to the three named Claimants - Teinver S.A., Transportes de Cercanías S.A., and Autobuses Urbanos del Sur S.A. – but also to Air Comet, Interinvest, and/or other entities and individuals operating with the

Marsans Group. I cannot agree with this particularly because Claimants do not spell out the ownership structure of the Marsans Group.

4.  It may be useful at the outset to review the facts regarding the identity of the numerous parties involved. It is crucial that we identify the "Claimants" and distinguish them from other parties or non-entities. It is only the three named Claimants who can be considered as asserting their own "rights" and claiming their "reliefs" for the infringement of their rights of which only the Claimants can claim protection of the Argentina-Spain Bilateral Investment Treaty ("BIT" or "Treaty").

**IDENTITY OF CLAIMANTS**

5.  The three named Claimants have failed to establish their investment in Argentina which is protected by the BIT. The facts surrounding the identity of the Claimants are set out below.

6.  In the 1980s the Government of Argentina ("GOA") initiated a general privatization process pursuant to which the state-owned *Aerolíneas Argentinas Sociedad del Estado* ("AASE") was to be privatized. In 1990 AASE's assets were transferred to a newly-formed company named *Aerolíneas Argentina Sociedad Anónima* ("ARSA") which was acquired by a group of investors including the Spanish state-owned airline *Iberia Líneas Aéreas de España, S.A.* ("Iberia"). Iberia controlled 20% of the shares, other Spanish investors 9.5%, and Argentine investors 55.5%. Subsequently, between 1990 and 1996, the Spanish Government increased its participation in ARSA from 20% to 84%.

3

7.  In 1971 *Austral Líneas Aéreas, S.A.* ("Austral") was formed by the merger of two privately-owned airlines *Austral Compañía Argentina de Transportes Aéreos Comercial e Industrial* and *Aerotranportes Litoral Argentino*. In 1985, Austral was purchased by *Cielos del Sur S.A.*, a holding company, which became *Austral-Cielos del Sur S.A* ("AUSA"). During 1991 *Iberia Líneas Aéreas de España, S.A.* ("Iberia") a Spanish state-owned airline acquired Cielos del Sur. By 1991, the Spanish Government acquired AUSA and became a significant shareholder in both ARSA and AUSA (collectively referred to as the Argentine Airlines). It may be noteworthy that the Spain-Argentina BIT came into force on 28 September 1992.

8.  In 1994, Iberia incorporated a fully-owned Argentine subsidiary, Interinvest S.A. ("Interinvest"), to serve as the holding company for the Spanish investments in the Argentine Airlines. As a result, Interinvest became the Argentine Airlines' controlling shareholder.

9.  In 1995, the Spanish Government constituted *Sociedad Estatal de Participaciones Industriales* (SEPI) to operate as the holding company for all companies fully or partially owned by the Spanish Government. As a consequence, SEPI acquired Iberia's shareholding participation in Interinvest.

10. In 2001, the Argentine Airlines were owned by SEPI. SEPI was a holding company for all companies fully or partially owned by the Spanish government. SEPI owned the Argentine Airlines through an Argentine intermediary company called Interinvest. SEPI owned 99.2% of Interinvest, and Interinvest in turn held 92.1% of ARSA's shares and 90% of AUSA's shares.[1] By mid 2001 the Argentine Airlines were experiencing financial difficulties and ARSA filed for bankruptcy reorganization. In 2001 SEPI announced it would sell its participation in Interinvest through a bidding process.

11. Air Comet, a Spanish company, entered into a Share Purchase Agreement ("SPA") dated October 2, 2001 with SEPI for the purchase of shares in Interinvest for a consideration of United States Dollar One (US$ 1).   It is important to note that Air Comet is not a Claimant in this arbitration.

12. The changes in the shareholding of Air Comet were as follows:

   **2001:**
   In 2001 the shareholders in Air Comet were as follow:
   *Autobuses Urbanos* - 35%
   *Transportes de Cercanías* -35%
   *Proturin S.A.* -29.8%
   *Segetur S.A.* -0.2%

   **July 2006:** Teinver purchased the shareholding of *Proturin* and *Segetur*.

   **2006-2007:** There were changes in the share structure of Air Comet several times, which becomes majority shareholder of Air Comet and the shareholding in Air Comet stood as follows:

---

[1] Ex. C-11.

**October 2, 2007:**
Teinver - 56%
Autobuses Urbanos -22%
Transportes de Cercanías -22%


**December 31, 2007**, Teinver purchased additional shares from Transportes de Cercanías so that the shareholdings in Air Comet stood as follows:

Teinver - 66.67%
Autobuses Urbanos -22%
Transportes de Cercanías -11.33%


**December 11 2008:**
Request for Arbitration was received by ICSID from the Claimants on 11 December 2008, on which date the shareholding in Air Comet stood as follows:
Teinver - 96.77%
Autobuses Urbanos -2.13%
Transportes de Cercanías -1.1%

13. On 30 January 2009 ICSID registered the Request and notified the parties, the case being registered as ICSID Case No. ARB/09/1.


14. Two of the Claimants held shares in Air Comet, which was a Spanish company, when Air Comet entered into the SPA with SEPI by investing US$1 to acquire the shares of Interinvest, an Argentine company, holding shares of the Argentine Airlines. The third Claimant, Teinver, was not even a shareholder of Air Comet when Air Comet acquired the shares from SEPI through the SPA. Teinver cannot claim to have "acquired their investment" by way of the SPA between Air Comet and SEPI when Teinver was not even a shareholder of Air Comet. Similarly, for the other two Claimants (Spanish companies),

their shareholding in Air Comet (another Spanish company) cannot constitute an "investment" in the Argentine Airlines under the Spain-Argentine BIT.

15. Since Air Comet is not a Claimant, the burden of proof rests on the three named Claimants to prove that their "investment" in the Argentine Airlines, to show what liabilities were assumed, and what contributions were made by each of the Claimants to the Argentine Airlines. Claimants have not discharged this burden of proof to show that their shares in Air Comet, a Spanish limited liability company, falls within the definition of "investment" under the BIT. Claimants made no financial contribution (since they were not parties to the SPA) and assumed no liabilities under the SPA. The liabilities were assumed by Air Comet, and not by Claimants. The rights of Claimants do not exist independently of the rights of Air Comet. Claimants have not satisfied how their shareholding rights in Air Comet can be treated as a protected investment under the BIT.

16. No shares in Argentine Airlines were ever sold to the three named Claimants. Claimants had the burden of showing when the shares in the Argentine Airlines were sold to the three Claimants, which they have failed to do. The SPA between Air Comet and SEPI does not provide proof of acquisition of shares by the Claimants, given the fact that the Claimants were not even parties to the SPA.

17. Claimants' shares in Air Comet were not shares in Argentine entities. Air Comet was a company incorporated in Spain. Claimants were all Spanish shareholders with no

connection to Argentina. The Claimants' shareholding in Air Comet (under the laws of Spain) could not have been an investment "acquired or effected in accordance with the legislation of" Argentina or "shares in Argentine entities". The Claimants' shareholdings thus fail to meet the territoriality requirement of the BIT.[2]

## MARSANS GROUP

18. The composition and legal character of the "Marsans Group" remain undefined. It is evident that the "Marsans Group" is not a legal entity nor can it be treated as a party to these proceedings. "Marsans Group" is also not party to any agreement related to the transactions involved in these proceedings.  Assertions that Claimants were "part of the Marsans Group,"[3] a Spanish consortium that was owned by the late Mr. Gonzalo Pascual Arias and by Mr. Gerardo Díaz Ferrán, do not give them any *locus standi* in this arbitration. To make matters even more complex, the assets of the so-called Marsans Group, including Teinver, were sold by Mr. Díaz Ferrán and Mr. Pascual Arias to a

---

1.  The term "investments" in Article I of the BIT is defined to mean "*any kind of assets, such as property and rights of every kind, **acquired or effected in accordance with the legislation of the country receiving the investment** and in particular, but not exclusively, the following:*
    *- **Shares and other forms of participation in companies**;  ...*
    *The content and scope of the rights corresponding to the various categories of assets shall be determined by the laws and regulations of the Party **in whose territory the investment is situated**. ...*
    *4. **The term "territory" shall mean the land territory of each Party**, as well as the exclusive economic zone and the continental shelf beyond the limits of the territorial sea of each Party over which it has or may have, in accordance with international law, jurisdiction and sovereign rights for the purposes of prospection, exploration and conservation of natural resources.*

[3]RFA ¶ 3.

Spanish entity called "Posibilitum Business" in July 2010.[4]  Mr. Pascual Arias died on June 21, 2012. Mr. Díaz Ferrán was provisionally detained on December 5, 2012 in connection with the Operación Crucero criminal investigation conducted in Spain, where he currently remains in detention.[5]

19. On April 14, 2010 Claimants entered into the "Burford Funding Agreement" with Burford Capital Limited ("the Funder" or "Burford"), an investment company headquartered in Guernsey, Channel Islands. The Burford Funding Agreement which concerned the financing of Claimants' litigation expenses in this arbitration. Respondent has argued that Burford is a "vulture fund" that will be the primary beneficiary of any ICSID award in this case.

20. According to the Burford Funding Agreement the Funder will get the following allocations from any compensation paid to the Claimants by the Tribunal:

> 40% of the first $100 million
> 30% of the net recovery amount between $100 million and $500 million
> 25% of the net recovery amount between $500 million and $800 million
> 15% of the net recovery amount above $800 million

21. The so-called "Marsans Group" cannot claim to be entitled to any relief since an undefined group which was neither a party to the SPA, nor was it named as a Claimant, can clearly not be treated as Claimant. In these proceedings Claimants can only be those

---

[4]*See* Merits Hearing p. 54. *See also* Respondent's Memorial on Jurisdiction, ¶ 282 ("The transaction entailed selling assets such as ViajesMarsans and Teinver S.A., which comprise the Hotetur hotel chain, the Air Comet S.A. airline, SegurosMercurio and Newco handling company, among more than 50 travel companies.").

[5]CM ¶ 111; *see* Ex. RA-180, Annex P03.

entities or persons who have instituted the arbitration, in other words, Claimants-on-record.

22. These Claimants on record are:

- *TRANSPORTES DE CERCANÍAS S.A.*
- *AUTOBUSES URBANOS DEL SUR S.A.*
- *TEINVER S.A.*

23. None of the three Claimants nor "the Marsans Group", the late Mr. Gonzalo Pascual Arias, Mr. Gerardo Díaz Ferrán, or Burford were a party to the SPA dated October 2, 2001. It was Air Comet which invested US$1 to acquire the shares of Interinvest in Argentine Airlines. Air Comet, however, is not a Claimant. The Claimants were not parties to the SPA and undertook no contractual responsibilities under the SPA.

24. The real identity of the "Claimants" is not an issue that can remain unresolved. Equally important is how and when any investment was made by the three named Claimants, which can claim to be protected under the BIT.

25. The scope of protection that can be claimed and granted to parties could be gathered from the provisions of the BIT. The BIT will have to be reasonably construed, giving due weight to the object of the BIT as set out in the following terms:

> *The Argentine Republic and the Kingdom of Spain, hereinafter referred to as "the Parties",*

*Desiring to intensify economic cooperation for the economic benefit of both countries,*

*Intending to create favourable conditions for investments made by investors of either State in the territory of the other State,*

*Recognizing that the promotion and protection of investments in accordance with this Agreement will encourage initiatives in this field."*

26. The Claimants Memorial on Merits ("CMM") states in paragraph 2 that "Claimants purchased the Argentine Airlines in 2001 and operated them until the GOA nationalized them in 2008". There are a number of statements in the CMM which instead of clarifying the identity of the Claimants obscures it by confusing references to Claimants with references to Air Comet and/or to the Marsans Group as summarized below:

(a)      In paragraph 34 of the CMM it is stated that out of nine offers SEPI pre-selected four bidders including the Claimants through **Air Comet** as part of the Marsans Group.

(b)      In paragraph 35 it is stated that "SEPI ultimately selected **Claimants'** offer.

(c)      In paragraph 36 it is stated that "(a) Claimants offered certain synergies, (b) **Air Comet** was owned by the Marsans Group" as explained by Gerardo Diaz Ferran, former co-owner of Marsans Group.

(d)      The Argentine Airlines was thus to become part of a larger network of companies ...". We were owners of "Viajes Marsans, the number one  travel agency in Spain ... **Air**

**Comet** which operated charter flights to the Caribbean, South America and Canary Island".

(e)       In paragraph 40 it is stated that: "on 2 October 2001, SEPI and **Air Comet** entered into a Share Purchase Agreement ("SPA") through which the latter acquired 99.2% of the share of Interinvest while the purchase price was US$1, and **Claimants** undertook a number financial commitments:

- To assume Interinvest's, ARSA's and AUSA's liabilities (ARSA's liabilities at the time were in excess of US$1 billion);
- To retain ARSA's and AUSA's personnel for a period of two years;
- To maintain a majority interest in the Argentine Airlines for a period of two years;
- To restart flights on existing routes and develop new routes as soon as possible;
- To make a US$50 million capital contribution;  and
- To modernize and expand the airlines' fleet.

**WHAT IS THE INVESTMENT? WHO MADE THE INVESTMENTS, WHEN AND HOW?**

27. As indicated above, instead of clarifying the identity of the Claimants the averments reproduced above have made this task difficult, if not impossible. This is further evident from the averments made regarding who are the investors and what investments are claimed to have been made by them and on what dates. These are summarized below:

12

28. In Paragraph 41 of the CMM it is stated that:

    (a)    "In exchange for these commitments, SEPI agreed to contribute up to US$248 million to be applied by Claimants' Air Comet in the  implementation of a business plan,

    (b)    US$300 million to be applied to the payment of specific pre-existing debts.  In addition, given that the financial statements upon which SEPI launched the bidding process and Claimants made their offer were updated as of July 2001, SEPI later agreed to contribute an additional amount of US$205 million to cover the operational losses suffered by the Argentine Airlines between July and October 2001."

29. In  Paragraph 1 of the Claimants' Post Hearing Brief ("CPHB"), it is stated that the Claimants rely on their memorials which are hereby incorporated by reference, and then go on to state in paragraph 7 as follows:

    "7. During the merits hearing, Argentina argued that Claimants' invested "not even one peso" in the Argentine Airlines. But in fact, Claimants and their subsidiaries invested millions of dollars in the Argentine Airlines. Claimants made cash contributions of US$13.5 million in Interinvest, US$9.9 million in ARSA, and US$0.8 million in AUSA. KPMG confirmed it. Further, Claimants also reinvested in the Argentine Airlines the US$106 million in profits that ARSA and AUSA made during 2002, 2003, and 2004."

13

30. The averments made in the pleadings, in the CMM and CPHB somewhat disingenuously refer to Grupo Marsans as the Claimants without any attempt to define the composition and character of Grupo Marsans or to explain how an undefined consortium, embracing a large number of entities (according to one report, consisting of at least 117 companies) can be referred to as Claimants disregarding the fact that there are three named Claimants of which one (Teinver) did not even acquire any shares before 2006/2007.  Example of such averments are summarized below:

(a)      In paragraph 4 of the CPHB the Claimants expert Ricover is quoted as saying that "I do not see any reasons to support that Grupo Marsans was not running the Argentine Airlines efficiently"

(b)      in the next paragraph 5, it is stated that "Claimants have demonstrated that these achievements were direct consequences of their investments and sound management of the Argentine Airlines."

(c)      In paragraph 6 Grupo Marsans is indicated to have been the bidder which had entered into SPA, blatantly ignoring the fact that it was Air Comet which was bidder and party to the SPA.

(d)      Matters are not made clearer, by the further averments in paragraph 6 as follows: This Tribunal already acknowledged the complexity of this transaction in which

Claimants and other companies of Grupo Marsans made a number of significant commitments". It is noteworthy that Air Comet did not institute the arbitration as a Claimant.

31. Article 25 of the ICSID Convention limit's the Centre's jurisdiction to the legal disputes arising 'directly out of an investment'. While the term 'investment' has been construed widely, it is not without limits. The key to determining whether a activity constitutes an investment is not "the area of economic activity covered, but the form and nature of that activity". In *Fedax NV v Republic of Venezuela*[6] the basic features of an investment have been described as involving a certain duration, a certain regularity of profit and return, assumption of risk, a substantial commitment and a significance for the host State's development. Schreuer observes that the ICSID Convention 'does not imply unlimited freedom for parties…the term "investment" has an objective meaning independent of the parties' disposition'.

32. The Spain-Argentina BIT contains a definition of 'investment' and provides that:

> The term "investments" shall mean any kind of assets, such as property and rights of every kind, acquired or effected in accordance with the legislation of the country receiving the investment and in particular, but not exclusively, the following:
> - Shares and other forms of participation in companies;
> -Rights derived from any kind of contribution made with the intention of creating economic value, including loans directly linked with a specific investment, whether capitalized or not;
> - Movable and immovable property and real rights such as mortgages, privileges, sureties, usufructs and similar rights;

---

[6] ICSID Case No. ARB/96/3.

-Any kind of rights in the field of intellectual property, including patents, trade marks, manufacturing licenses and know-how;
- Concessions granted by law or by virtue of a contract for engaging in economic and commercial activity, in particular those related to the prospection, cultivation, mining or development of natural resources.

33. The Preamble to the Spain-Argentina BIT provides:

> "The Argentine Republic and the Kingdom of Spain, hereinafter referred to as "the Parties",
>
> Desiring to intensify economic cooperation for the economic benefit of both countries,
>
> Intending to create favourable conditions for investments made by investors of either State in the territory of the other State,
>
> Recognizing that the promotion and protection of investments in accordance with this Agreement will encourage initiatives in this field,
>
> Have agreed as follows:"

The purpose of the BIT was the promotion and protection of investment and the creation of favourable conditions for investments made by investors in the territory of the host state for the "economic benefit" of the host state.

34. The relevant test for the Tribunal to determine whether it has jurisdiction is a "double keyhole approach" or a "double-barreled" test. Claimants have to satisfy the requirements of both the ICSID Convention and the BIT. Under the double-barreled test the activities of Claimants have to meet the definition of "investment" in the BIT as well as the

16

"objective" criteria of an investment within the meaning of Article 25 of the ICSID Convention (as held in *CSOB v Slovakia*[7], *Salini v Morocco*[8], and *Joy Mining v Egypt*[9]).

35. The ICSID Convention expressly states in Article 25 clause (1):

> "The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre."

For the purpose of proper definition of "investment" we need to interpret Article 25 of the ICSID Convention.  Article 31 of the Vienna Convention requires that courts and arbitral tribunals shall interpret treaties "in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose". The Vienna Convention specifically states that the preamble and the annexes qualify part of the text for the purposes of interpretation (Article 31(2)) and that context includes "any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation" and "(c) any relevant rules of international law applicable" (Article 31(3)(b) and (c)).  The current leading decision on the definition of "investment" in ICSID arbitration, *Salini v Morocco*[10], has existed for more than a decade. It laid down the test that requires investment to have four

---

[7] *Ceskoslovenska obchodni banka, a.s. v. Slovak Republic* (ICSID Case No. ARB/97/4), Decision on Objections to Jurisdiction (May 24, 1999), available at http://www.worldbank.org/icsid/cases/csob_decision.pdf; Decision of the Tribunal on the Further and Partial Objection to Jurisdiction of December 1, 2000, 15 ICSID Rev.—FILJ 530 (2000).
[8] *Salini Construttori S.p.A. and Italstrade S.p.A. v. Kingdom of Morocco* (ICSID Case No. ARB/00/4), Decision on Jurisdiction of July 23, 2001, 129 Journal du droit international 196 (2002) [French original]; English translation in 42 ILM 609 (2003).
[9] *Joy Mining Machinery Limited  v The Arab Republic of Egypt* (ICSID Case No. ARB/03/11), Award on Jurisdiction of 06 August 2004.
[10] ICSID Case No. ARB/00/4

elements: (i) a contribution of money or other assets;  (ii)   a  certain  duration;  (iii)  an element of risk;  (iv)   a contribution to the host State's development.

36. Claimants' had not transferred any financial resources to the host state, Argentina, when Air Comet bought shares in the Argentine Airlines for US$1. The SPA did not involve any contribution of assets by Claimants. Air Comet received payments from SEPI to meet the liabilities of the Argentine Airlines. Air Comet made a nominal payment of US$1 for the  shares.  There  was  no  risk  borne  by  Claimants.  In  relation  to  the  activities  or obligations undertaken by Air Comet under the SPA:

- there was no transfer of financial resources from Claimants to Argentina;

- the SPA involved a one-off transaction and not of any certain duration;

- there was no risk borne by Claimants; and

- there  was  no  substantial  commitment  or  significant  contribution  to  Argentina's development.

37. Acquiring  of  the  shares  by  Air  Comet  and  subsequent  transfers  to  the  three  named Claimants could not properly, therefore, be treated as protected "investment".

38. The  Tribunal's  Decision  on  Jurisdiction  is  based  on  a  *prima  facie*  assessment.  The Tribunal in *Siemens AG v Argentina* (ICSID Case No. ARB/02/8, Decision on Jurisdiction, 3 August 2004) explained the position in the following terms:

> "At this [jurisdictional] stage of the proceedings, the Tribunal is not required to consider whether the claims under the Treaty made by Siemens are correct. This is a matter for the merits. **The Tribunal simply has to be satisfied that, if the**

> **Claimant's allegations would be proven correct, then the Tribunal has jurisdiction to consider them**." [*emphasis added*]

39. Nothing stated by the Tribunal at the jurisdictional phase is conclusive on the basic issue to whether Claimants have rights which fall under the definition of "investments" as contained in Article I of the BIT and in respect of which protection can be granted under the BIT.

40. The identification of the "investment", that is the subject matter of the present claim, and the identities of the investors, who are entitled to claim damages, are crucial issues to be determined at the merits stage. The alleged violation of the investors' rights, and the potential relief than can be awarded, will depend on the answer to the following questions:

- What constituted the "investment"?

- Who are the investors? What are the identities of the investors who can claim damages under the BIT?

41. In the present case, the identification of the "investment" is difficult since the investment arises from a complex transaction under which Claimants were purportedly undertaking responsibilities and risks in assuming debts and liabilities of the airlines going forward and the undertaking to maintain and expand the operations of the airlines. The questions which need to be answered at the outset are:

- Which Claimant assumed what liability?

- Whether Claimants assumed liabilities, by what means, and in relation to which creditors?

42. Regardless of the complexity of the transactions, Claimants' "investment" of which they seek protection under the BIT has to be identified.

43. Can the shares that Claimants held in Air Comet S.A., a Spanish limited liability company, fall under the definition of "investment" which states that the "investment" has to be "*acquired or effected in accordance with the legislation of the country receiving the investment*" *and that the "content and scope of the rights corresponding to the various categories of assets shall be determined by the laws and regulations of the Party in whose territory the investment is situated"*?  Do we not need to consider under which Argentine law Claimants acquired rights which can be treated as "investment" under the BIT?

44. It seems disingenuous for Claimants to allege making an "investment" in the Argentine Airlines. The Argentine Airlines were in operation long before Claimants bought on different dates (as late as 2006 in the case of Teinver) shares in Air Comet, a Spanish company. We need to ask the further questions –

Whether and how did each of the Claimants acquire shares in Air Comet? Can Claimants' acquisition of shares, in the circumstances of the case, be treated as an investment made "in accordance with the legislation of" Argentina? What are the

20

content and scope of the rights acquired by Claimants as determined by Argentine law?

45. Since there is no evidence that Claimants made any financial contribution which can be characterized as "investment" in the Argentine Airlines, it is not clear how any right in respect of Claimants' shares in Air Comet can be said to be protected under the BIT.

46. The issue to be decided is whether Claimants (as shareholders of Air Comet) may claim compensation for alleged violations of the BIT when Air Comet (the company which actually held the shares in Interinvest, the holding company of the Argentine Airlines) itself does not make such claims before the Tribunal. Claimants have failed to show how their shareholder rights exist independent of the rights of Air Comet and how those shareholder rights can be treated as a protected investment.

47. It is necessary to look at the precise content and scope of the rights which Claimants allege are their investments and to consider whether these rights constitute investments which can claim to be protected by the BIT.

48. The term "investments" in Article I of the BIT is defined to mean

> "*any kind of assets, such as property and rights of every kind, **acquired or effected in accordance with the legislation of the country receiving the investment** and in particular, but not exclusively, the following:*
>
> *- **Shares and other forms of participation in companies**;*
>
> *- Rights derived from any kind of contribution made with the intention of creating economic value, including loans directly linked with a specific investment, whether capitalized or not;*

*- Movable and immovable property and real rights such as mortgages, privileges, sureties, usufructs and similar rights;*

*- Any kind of rights in the field of intellectual property, including patents, trade marks, manufacturing licenses and know-how;*

*- Concessions granted by law or by virtue of a contract for engaging in economic and commercial activity, in particular those related to the prospection, cultivation, mining or development of natural resources.*

*The content and scope of the rights corresponding to the various categories of assets shall be determined by the laws and regulations of the Party **in whose territory the investment is situated**.*

*No modification in the legal forum in which assets and capital have been invested or reinvested shall affect their status as investments in accordance with this Agreement.*

*3. The terms "investment income or earnings" shall mean returns from an investment in accordance with the definition contained in the preceding paragraph and shall expressly include profits, dividends and interest.*

*4. **The term "territory" shall mean the land territory of each Party**, as well as the exclusive economic zone and the continental shelf beyond the limits of the territorial sea of each Party over which it has or may have, in accordance with international law, jurisdiction and sovereign rights for the purposes of prospection, exploration and conservation of natural resources.*

49. Claimants cannot claim that their rights in respect of which they claim protection of the BIT were "acquired or affected in accordance with the legislation of the country receiving the investment" (that is the Argentine law) since Claimants' rights are those of a shareholder of Air Comet S.A., a limited liability company in Spain.

50. The precise content and scope of the rights alleged by Claimants as being violated must be identified and the question that must be answered is whether the rights of Claimants can be treated as "investments" as defined in Article I of the BIT.

22

## IV. ISSUE OF ADMISSIBILITY AND STANDING NOT ADDRESSED IN THE DECISION ON JURISDICTION

51. The issue of the Power of Attorney of King & Spalding to represent Claimants arose in the context of the insolvency proceedings in respect of Claimants and of Air Comet.

52. Insolvency Proceedings were commenced in respect of each of the Claimants on the dates as noted below:

   - Teinver in December 2010.

   - Transportes de Cercanias in February 2011.

   - Autobuses Urbanos del Sur in April 2012.

   - Air Comet in March 2008.[11]

53. The issue for this Tribunal to determine is whether King & Spalding has valid powers of attorney at the present stage of this arbitration, now that each of Claimants' administrative powers have been suspended. Claimants argue that the powers of attorney are still valid and that the Claimants' reorganization administrators are simply "stepping into the shoes" of Claimants for purposes of the continuation of this arbitration. Respondent argues, to the contrary, that Claimants' power of attorney was extinguished by the bankruptcy, that a new power of attorney is needed, and that a valid new power of attorney has not yet been granted to King & Spalding or anyone else.

---

[11] Vol. 6, page 994-998.

54. The bankruptcy of Air Comet and of all three Claimants is related to certain factual and legal disputes in this case. First, Respondent has asserted that Claimants' bankruptcy terminated King & Spalding's power of attorney to represent Claimants in this case. Second, the Parties disagree on the causes of Claimants' and Air Comet's bankruptcy. Claimants, through witness Díaz Ferrán, assert that the bankruptcies were the direct result of Respondent's unlawful acts and policies towards the Airlines. Respondent argues that the bankruptcies were due to reasons wholly unconnected to Respondent's actions, including Claimants' poor business management, lack of liquidity and failure to make payments. With respect to Air Comet's bankruptcy, Respondent argues that the company was in a state of bankruptcy as early as April 2008, predating the expropriation of the Airlines later in 2008. These arguments with respect to the causation of the Claimants' insolvencies are relevant to both Claimants' claims and Respondent's counterclaim.

55. Moreover, Respondent argues that King & Spalding's attempts to "ratify" its power of attorney fail. While Claimants have produced letters written by the trustees in insolvency for each of the Claimants that purport to ratify the power of attorney, Respondent asserts that these letters are flawed. It notes that the letters are not addressed directly to ICSID but rather to the King &Spalding attorneys representing Claimants. It also notes that the letters are undated, and that they do not appear to have been notarized. Finally, Respondent notes that the letters appear to have been executed unilaterally by the trustees, and do not appear to be the result of an order from a commercial court of Madrid. According to Respondent, the trustees lack the right to ratify the acts taken by King & Spalding and to authorize the firm to carry on its activities. Respondent asserts

that "every lawyer is aware that, in order for a power of attorney to be renewed within the context of an insolvency proceeding, there must be a court order authorizing such renewal."

56. Claimants argue that the reorganization administrators "are not required to seek authorization from the courts hearing Claimants' reorganization proceedings," noting that "[i]n accordance with Article 51(2) of the Spanish Bankruptcy Law, the court's authorization would only be required in order to withdraw, to accept a claim, in whole or in part, and to settle disputes".

57. With respect to the power of attorney granted to King & Spalding, Claimants' expert witness Aurora Martinez Florez asserts that after the suspension of powers, the board of trustees directly steps into the shoes of the debtor in the agreements and powers of attorney granted by the debtor before the declaration of bankruptcy.

58. With respect to Article 48(3) of the Bankruptcy Law, which provides that "Any power of attorney existing at the time of the initiation of the insolvency proceedings shall be affected by the suspension or control of financial and property-related powers," Martinez Florez argues that "affected" does not mean that powers of attorney are terminated.

59. The Respondent's expert J.J. Cigaran Magan has testified that

Page 987, lines

12  …   Well, I think that in the courts, it is a
13  basic, essential rule, and any attorney knows that

25

14  they cannot go to a court without Powers of Attorney
15  granted in notarial instruments.

60. The onus was on the Claimants of proving that their standing and the continued capacity of their lawyers to represent them subsisted after the commencement of the insolvency proceedings. This onus has not been discharged. The undated non-notarized letters from the trustees in insolvency which were not directly addressed to this Tribunal cannot be accepted as proof that King & Spalding fulfilled the legal requirement for representing the Claimants after the insolvency proceedings had commenced.

61. The issue is further complicated by the third party funding arrangement which exists under the Burford Funding Agreement. The Funding Agreement, with effective date April 14, 2010, is between

(i)      Teinver S.A.,

(ii)     Transportes de Cercanías S.A. and

(iii)    Autobuses Urbanos del Sur S.A. (all companies incorporated under the laws of Spain and have their principal place of business in Madrid, Spain), and

(i)      Burford Capital Limited (described as a "closed-ended investment company organized under the laws of Guernsey having its principal place of business at Regency Court, Glategny Esplanade, St Peter Port, Guernsey GY1 1 WW").

62. The first point to note is that the Funding Agreement was executed by (i) Gerardo Díaz Ferrán and (ii) Gonzalo Pascual Arias. These individuals are not Claimants. It is not

understood how these individuals, not being Claimants, could execute the Funding Agreement which states in the recital that

- Claimant "requires funding to meet the costs of preparing, submitting and enforcing the Claim",

- Claimant "sought to make arrangements to obtain funds",

- Claimant "has approached the Funder",

- and Funder has a "common legal interest" with the Claimant.

63. Gonzalo Pascual Arias and Gerardo Díaz Ferrán are persons against whom the Spanish authorities had initiated criminal proceedings for embezzlement, and who have since been convicted by the Spanish Courts. The criminal proceedings against Gonzalo Pascual Arias (now deceased) and Gerardo Díaz Ferrán (now convicted and serving sentence in a Spanish prison) is dealt with in a separate section below.

64. The Funding Agreement was not executed by Air Comet, which was a party to the SPA and arguably may claim to have made an investment under the BIT. The reason Air Comet did not, and could not, execute the Funding Agreement was that by April 14, 2010 Air Comet was already in insolvency proceedings.

65. On January 4, 2010 ICSID informed that parties that the present Tribunal had been constituted. The Funding Agreement, by which Burford got involved in this arbitration, was executed within about four months from the constitution of the Tribunal, and well before the filing of the Claimants' Memorial on Merits dated September 29, 2010.

66.  The Funding Agreement states

"WHEREAS
(A) Burford Capital Limited is an investment company headquartered in Guernsey and publicly traded on the AIM Market of the London Stock Exchange.
(B) The Claimant requires funding to meet the costs of preparing, submitting, conducting and enforcing the Claim (as defined below). The Claimant has therefore sought to make arrangements to obtain funds for such purpose that would allow repayment of such funds to the Funder, plus consideration for the attendant risk, to be conditional upon recovery of proceeds from the Claim.
(C) The Claimant has approached the Funder and for this purpose. The Funder has concluded that the Claim is meritorious and the Funder has a common legal interest with the Claimant in seeing that such Claim is pursued adequately."

67. Schedule 2 of the Funding Agreement states:

"The Recovery Amount shall be determined and distributed as follows.
1.First, the Expenses paid by the Funder shall be repaid to it and the Funder shall also receive a priority return of three times the Expenses.
2.      Any premiums or success fees due to counsel shall be paid.
3.      The amount remaining after those payments shall be the "Net Recovery Amount" which shall be allocated as follows:
3.1     In the event of a Settlement within twelve month of the Effective Date, 20% of Net Recovery Amount to Funder and the remainder to the Claimant, provided however that the total Recovery Amount payable to the Funder pursuant to section 1 and this section 3.1 shall not exceed 25% of the Award less the Expenses.
3.2     Absent such a settlement,
40% of the first US$100 million of Net Recovery Amount to the Funder,
30% of any Net Recovery Amount between US$100 million and US$500 million to the Funder,
25% of any Net Recovery Amount between US$500 million and US$800 million to the Funder, and
15% of any Net Recovery Amount above US$800 million to the Funder, in each case with the remainder to the Claimant.
4.      Notwithstanding the foregoing, the Funder shall be entitled [to] receive a minimum amount so as to provide the Funder with an internal rate of return of not less than 50%."

68. Clause 6 of the Funding Agreement states

"6.1 In consideration of the Funder's undertakings in this Agreement, the Claimant agrees to pay the Funder the Recovery Amount immediately following receipt of all or any part of the Award…

6.2 … if the Claimant comes into possession of any Award proceeds, it shall immediately pay all such proceeds immediately to the Nominated Lawyers [King & Spalding LLP] or the escrow agent. The Claimant and the Funder both direct the Nominated Lawyers or the escrow agent to pay the Recovery Amount to the Funder as soon as practicable, to pay any outstanding invoices and to pay the remainder to the Claimant."

69. As would be evident from the Funding Agreement (in particular clauses 6.1 and 6.2) the Funder, which is not an "investor" under the BIT, is intended to be the principal beneficiary, along with the Nominated Lawyers, of the proceeds of any award. The award proceeds are to be immediately paid to the Nominated Lawyers (King & Spalding LLP) or an escrow agent for payment to the Funder and payment of any outstanding invoices (including those of the Nominated Lawyers). Only the remainder will be paid to Claimant.

70. Despite not being an "investor" under the BIT and the funds provided by Burford not being "protected investment" under the BIT, these proceedings have continued because Burford and the Nominated Lawyers have been assured of receiving significant amounts from any award which may be made by the ICSID Tribunal. Burford is a third party and as the Respondent states "is abusing the ICSID system by bringing forward a claim that is contrary to the purposes and goals of the Convention in order to make astronomical profits" .

71. In addition, according to Schedule 2, paragraph 4 of the Funding Agreement, Burford is guaranteed an internal rate of return of not less than 50% on its "investment".

72. Burford may have "invested" in the present arbitration proceedings by agreeing to fund the legal expenses but such an "investment" based on speculating on the prospect of obtaining a substantial portion the proceeds of any award resulting from a pending arbitration cannot be treated as protected "investment" under the BIT. The BIT guarantees the rights of "investors" who have made an "investment" in the territory of the host state. The BIT is not intended to enable payment of awards to third party funders who are not "investors" and who have no protected "investment", and who only come into the situation in the circumstances described above to advance funds in order to speculate on the outcome of a pending arbitration.

73. The practice of third party funding investment arbitration continues to be criticized by academics and professionals. The Funder's role in this case may well be characterized as "champerty", which has long been considered under English common law as being against public policy as it encourages vexatious litigation.  A contract may be void for champerty, though it may not strictly amount to criminal offence. The purchase of a law suit by an attorney is champerty in its most odious form as has been held in a judgment of the English Chancery Division:

So odious in the eyes of the law are these contracts, that they confer no rights on the parties making them, and if one pay out money under them he cannot recover it. [12]

74. Burford cannot, on any reasonable construction be characterized as an investor entitled to protection under the BIT. The Tribunal cannot, in these circumstances, be considered to

---

[12] *Rees v de Bernardy* [1896] 2 Ch 437.

have jurisdiction to grant an award to a party, such as Burford, which is not an investor under the BIT and has made no "investment" which can claim to be protected by the BIT.

75. The questions about how any activities of the Marsans Group can be attributed to the Claimants remain pertinent.

76. It was not the Claimants but Air Comet which had entered into the SPA with SEPI. Claimants were not a party to the SPA.  The Claimants' management of the Argentine Airlines is not established, nor have their claim, or what they had "invested". The burden of proof was on Claimants and they have failed to discharge it.

77. Air Comet, the party to the SPA, received from SEPI US$300 million which was to be used for liquidating ARSA's liabilities. There is no evidence that Air Comet used the funds for the purpose stipulated in the SPA. So there can be no basis for a claim by Air Comet nor by the three named Claimants as indirect shareholders of Air Comet to be treated as an "investor".

78. Since the Marsans Group are not Claimants and indeed the composition and status of the Marsans Group have remained undefined, no alleged contribution of the so-called Marsans Group can be treated as "investment" within the meaning of the BIT.

79. Mr Gerardo Diaz Ferran has been found criminally liable and sentenced to two years and two months' imprisonment by the Judgment of the Spanish Central Criminal Court No.1

31

(RA 669). The judgment (RA 669) sheds clear light on how through a complex set of transactions the funds which were meant to be applied to liquidate the liabilities of ARSA (and if indeed had they been applied might be treated as an "investment") had in fact been misappropriated.

80. The relevant portions of the Spanish Court Judgment (RA 669) are reproduced below:

*"ESTABLISHED FACTS*

*In accordance with the private agreement entered into between AIR COMET and its shareholders on 3 December 2001, which was notarially recorded on the same day, AIR COMET S.A. irrevocably agreed that <u>the claims acquired would only be used as funds of its own to increase capital or make irrevocable capital contributions to ARSA and undertook to fulfil such commitment within six months</u> as from approval of ARSA's Reorganization Plan. If the claims were not used as agreed upon, SEPI would be entitled to require the parties to repay any sum that was otherwise allocated.*

*...*

*In view of the fact that the claims assigned to AIR COMET remained effective, <u>AIR COMET obtained a benefit since these claims were acquired using funds provided by SEPI for no valuable consideration.</u>*

Thus no investment can be said to have made by Air Comet. The Spanish Court Judgment (RA 669) further concludes:

*...*

*CONCLUSIONS OF LAW*

*Nonetheless, **in reality, the millions of dollars given by SEPI to meet INTERINVEST's liabilities were used by AIR COMET to purchase the claims, thereby subrogating to the rights of ARSA's creditor and participating in its reorganization proceedings** (Report issued by the Spanish Court of Audit).*

*...*

*It is thus evident that Air **Comet was the only holder of the claims acquired through the USD 300 million provided by SEPI**.*

*...*

*In accordance with the agreement of 3 December 2001 between AIR COMET and its shareholders (Transportes de Cercanías, Busursa, Segetur and Viajes Marsans), the company [Air Comet] undertook to acquire a series of claims [debts] to be paid by ARSA, thus subrogating to the rights of the creditors.*

It may be noted that the two of the three named Claimants were not shareholders of Air Comet at the relevant time. Regarding the fraud committed by Air Comet the Spanish Court Judgment (RA 669) noted:

*...The claims acquired were used to increase ARSA's capital. Therefore, **AIR COMET ended up increasing its stake in ARSA by using funds granted by SEPI to INTERINVEST**, which were aimed at paying ARSA's liabilities.*

*...In fact, since AIR COMET acquired the claims —assets— without having the necessary funds to do so —with funds granted by INTERINVEST— **this was actually an assignment***

*for no consideration, a gift or a case of unjust enrichment*, if not a mere present given by the donor. The ultimate beneficiary was AIR COMET, since it was its value that increased, and this fact cannot be concealed.

...

The claims were not settled. If they had, they would have produced no benefits, which is the theory advanced by the accused at trial in stating that Air Comet was "a simple agent". However, since those claims remained effective, Air Comet, in acquiring them, received the benefit deriving from its inclusion as a new creditor in ARSA's reorganization.

…In this respect, Judgment STS 979/2011 should be highlighted, among others: "The companies constitute a business structure that is controlled by a single person (in this case, the accused and their companies). There is no separation of assets in the conduct of their business that justifies the conclusion that they operate independently of each other. Their respective personalities are nothing but a front. **There is actually a single economic structure that is used to commit fraud or to harm a third party and thus cannot enjoy the protection granted by the law** to an entity that has a legal personality of its own".

81. From the above judgment the following facts become clear that under the SPA by which Air Comet obtained shares of Interinvest for USD 1, SEPI had provided USD300,000 for the reduction of liabilities of Argentine Airlines and Air Comet had undertaken to utilize

that amount for the specific purpose of reduction of liabilities of Argentine Airlines. This was not done.

82. Despite contributions by SEPI for reducing the liabilities of ARSA the fact is that ARSA remained indebted since the obligations undertaken by Air Comet in the SPA were not fulfilled. The assertion that Air Comet "invested" that amount is, in fact, palpably unwarranted. The millions of dollars given by SEPI to meet Interinvest's liabilities were not so used but were used by Air Comet to purchase the claims. This cannot be treated as an investment of Air Comet in the Argentine Airlines.

83. The effect of this transaction was that the Interinvest's liabilities (and Argentine Airlines' liabilities) continued to be liabilities while Air Comet illegally acquired claims over the Argentine Airlines through fraudulent means.

84. Through the fraud so committed harm was caused to the Argentine Airlines to the extent that SEPI funds meant for reducing the liabilities of the Argentine Airlines were not so used, but were actually used to increase the share capital of Air Comet. Such a misuse of the funds which were intended to reduce the liabilities, but were misappropriated, cannot be regarded as Claimants' "investment".

85. Air Comet's acquisition has been found by the Spanish Court to have been **"an assignment for no consideration, a gift or a case of unjust enrichment"**.

86. The Spanish Court has found that in this transaction there is **"actually a single economic structure that is used to commit fraud or to harm a third party [the Argentine Airlines] and thus cannot enjoy the protection granted by the law".**

87. In such a situation, where a Spanish Court has found that a fraud had been committed by Air Comet and Mr Ferran to harm the Argentine Airlines, it cannot be legally tenable to treat such misuse of the funds as an "investment" which may seek the protection of the BIT.

## ALLEGED BREACHES OF THE FAIR AND EQUITABLE TREATMENT PROVISION

88. My concerns regarding the identity of the Claimants are also relevant in assessing the Memorandum of Agreement signed between the Government of Argentina and Interinvest ("the July 2008 Agreement").[13]

89. The crucial issue remains that none of the three Claimants were parties to this July 2008 Agreement and thus had no rights under the July 2008 Agreement. As Professor Kinsbury has stated in his expert opinion an investor cannot invoke commitments under an agreement unless it is "a contract between the Claimant and the Government". I am in agreement with Professor Kinsbury and am of the view that since none of the three named Claimants were parties to the July 2008 Agreement they cannot claim for

---

[13] Claimant's Exhibit C-190.

contractual breaches of that July 2008 Agreement. Further, in Professor Kinsbury's opinion a simple breach of contract cannot be regarded as a breach of the BIT.[14]

90. The issue is whether the Claimants can claim a treaty breach under the BIT for any violations of the July 2008 Agreement between Interinvest and the Argentine Government. If there was a breach Interinvest, being an Argentine company, could not claim under the Spain-Argentina BIT. Air Comet, the Spanish shareholders of Interinvest, did not lodge any claims before this Tribunal and are not the Claimants. I am of the view that Claimants do not have standing to bring claims for treaty breaches for any alleged violations of the contractual terms of the July 2008 Agreement by Argentina.

91. The factual and legal context of the July 2008 Agreement is important in order to assess breaches of the Claimants' treaty rights by the Respondent.

92. The July 2008 Agreement was executed between Argentina and Interinvest since a potential investor, Mr. Mena, withdrew and "the reason Mr. Lopex Mena withdrew from the acquisition of the Airlines was that he could never have sufficient information of the economic, financial and operational situation of the Airlines because, as was said, the Marsans Group did not provide the necessary information".[15]

93. It is important that the July 2008 Agreement is not an agreement for sale of shares. The price of the shares which were to be transferred from Interinvest, arguably the most

---

[14] Respondent's PHB, Para 134.
[15] Exhibit RA 555; Respondent's PHB, Para 144.

crucial element of any transfer of shares, remained to be agreed between Interinvest and the Respondent.

94. The main disagreement between Interinvest and Argentina that led to the failure of the July 2008 Agreement was the price valuation of the Argentine Airlines. Regardless of the price valuation, it was an agreed position that the financial condition of the Argentine Airlines was very bad – Respondent characterizes the Airlines as being "in truly bankrupt condition"[16] and Claimants assert that by mid 2008 "the Argentine Airline's financial condition hit its worst point since Claimants acquired them in October 2001"[17]. It may be pertinent that in 2001 when the SPA was executed the valuation of the Argentine Airlines was US$1. If the financial position in July 2008 was worse than that in 2001 then it appears that the Respondent's negative valuation (as conducted by TTN) of the Airlines is more credible than the Claimants' non-independent valuation conducted by Credit Suisse.

95. Since the price of the shares was not agreed between Interinvest and the Respondent, I cannot agree with the conclusion in paragraph 782 of the Award that the July 2008 memorandum "constituted a binding agreement between Interinvest and the Government of Argentina pursuant to which the two parties agreed to the purchase and sale of Interinvest's shares in the Airlines on the terms set out in the Agreement". Since the price was not agreed, the memorandum of July 2008 (referred to as July 2008 Agreement) cannot be treated as a binding agreement for the sale and purchase of the Airlines. A

---

[16] Respondent's Counter Memorial, Para 478; Respondent's Rejoinder, Para 466.
[17] Claimant's Reply, Para 287.

binding agreement for sale was yet to be reached upon agreement of the price between the parties. The failure to reach an agreement cannot be treated as a breach of the treaty rights of the Claimants. There was no guarantee from the Government that the shares of the Airlines would be purchased. The July 2008 Agreement was merely an agreement to explore for a limited period of 60 days the possibility of a purchase of shares provided that the price valuation could be carried out.

96. The failure of the parties to agree to appoint an independent expert cannot be attributed as a treaty breach of the Claimants' rights under the BIT by the Respondent. The Respondent has consistently held that Interinvest failed to provide financial information required under the July 2008 Agreement.[18] Mr Munoz Perez also confirmed that even Credit Suisse valuation was done on the basis of a "Business Plan" prepared by "the Board of Directors of the Marsans Group".[19] A credible valuation by Credit Suisse would have required the auditors to independently to verify or carry out any audit the documents. This was not done. I cannot agree with the Tribunal that Respondent's complaints regarding the Credit Suisse valuation were formal and artificial.

97. I am of the view that the 2008 Agreement contained no commitments from the Respondent to the three named Claimants. The 2008 Agreement was not a binding agreement for the sale of shares but was a memorandum to explore the option of the sale of shares provided the price of the shares could be agreed at and other conditions could be met within a transition period of 60 days, which expired on 14 October 2008. For

---

[18] Respondent's Rejoinder, paras 490-493; Respondent's Counter Memorial, paras 507-508; Respondent's PHB, Para 159-162.
[19] Respondent's PHB, Para 40, citing testimony of M Perez, transcript p.489.

these reasons, the 2008 Agreement cannot be the basis of finding a treaty breach of obligations owed to the three named Claimants by the Respondent.

98. In conclusion, for all the reasons stated above, I consider and find that this Tribunal has no jurisdiction to grant reliefs under the Argentina-Spain Treaty to the Claimants in the form of declarations set out in paragraphs 1148 (a)-(c) or the directions set out in paragraphs 1148 (d)-(g) of the majority award, as Claimants have failed to establish that they are investors entitled to protection under the Treaty or that their investments in respect of which protection was sought are protected investments under the Treaty. With due respect to my co-arbitrators, I cannot concur in the majority award and enter this dissenting opinion.

Kamal Hossain
Date: 13 July 2017

*Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.*
*v. Argentine Republic* (ICSID Case No. ARB/09/1)
Award

# APPENDIX I

*Date of dispatch to the parties*: December 21, 2012

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES
WASHINGTON, D.C.


IN THE PROCEEDING BETWEEN


Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.
(CLAIMANTS)

and

The Argentine Republic
(RESPONDENT)


(ICSID Case No. ARB/09/1)


_____

DECISION ON JURISDICTION
_____


*Members of the Tribunal*
Judge Thomas Buergenthal, President
Henri C. Alvarez Q.C., Arbitrator
Dr. Kamal Hossain, Arbitrator


*Secretary of the Tribunal*
Mrs. Mercedes Cordido-Freytes de Kurowski


| *Representing the Claimants* | *Representing the Respondent* |
|---|---|
| Mr. Roberto Aguirre Luzi, Partner | Dra. Angelina María Esther Abbona |
| Mr. R. Doak Bishop, Partner | Procuradora del Tesoro de la Nación |
| Mr. Craig S. Miles, Partner | Argentina |
| Ms. Silvia Marchili, Foreign Legal Consultant | Posadas 1641 |
| Mr. Esteban Lecesse, Foreign Legal Consultant | C1112ADC, Buenos Aires |
| Mr. Jorge Mattamouros, Associate | Argentina |
| King & Spalding LLP | |
| 1100 Louisiana Street, Suite 4000 | |
| Houston, Texas 77002 | |

Ms. Lorraine I. de Germiny, Associate
King & Spalding LLP
12 Cours Albert 1er
Paris, France 75008

Mr. Guillermo Aguilar-Alvarez, Partner
Ms. Rocio Digon, Associate
King & Spalding LLP
1185 Avenue of the Americas
New York, New York. 10036

Prof. Joost Pauwelyn
King & Spalding LLP
7 Quai du Mont Blanc
CH-1201 Geneva
Switzerland

## TABLE OF CONTENTS

I.   Facts Relevant to Jurisdiction ............................................................................................ 1
   a.   Parties............................................................................................................................ 1
   b.   Dispute .......................................................................................................................... 1
      i.   Acquisition of the Argentine Airlines............................................................... 1
      ii.   Nature of the Dispute ......................................................................................... 2
II.   Procedural Matters ........................................................................................................... 3
   a.   Request for Arbitration and its Registration by ICSID................................................ 3
   b.   Constitution of the Arbitral Tribunal .......................................................................... 3
   c.   Arbitral Procedure........................................................................................................ 4
III.   Position of the Parties on Jurisdiction .............................................................................. 10
   a.   Respondent's position ................................................................................................ 10
   b.   Claimants' position .................................................................................................... 11
IV.   Analysis........................................................................................................................... 12
   a.   First Jurisdictional Objection: Claimants' Fulfillment of the Procedural Requirements of Article X of the Treaty ............................................................................................... 12
      i.   Compliance with the Requirements of Article X .............................................. 13
         1.   Position of Respondent ............................................................................. 13
         2.   Position of Claimants ................................................................................ 15
         3.   Analysis of the Tribunal............................................................................ 19
            (a)   The Requirements of X(1) and X(2) ............................................... 19
               i.   The Commencement of the 6-Month Period ............................ 20
               ii.   The Requirement of Formal Notification ................................ 21
               iii.   Determining When the Dispute Began...................................... 22
            (b)   Futility ............................................................................................ 25
            (c)   The Local Court Requirement of Articles X(2) and (3) ................. 26
      ii.   The Application of the Most-Favored Nation Clause (Article IV(2)) to Dispute Settlement Provisions ...................................................................................... 28
         1.   Position of Respondent ............................................................................. 29
         2.   Position of Claimants ................................................................................ 31
         3.   Analysis of the Tribunal............................................................................ 33
   b.   The Ordinary Meaning of Article IV ......................................................................... 33
            (a)   Jurisprudence Concerning the Application of MFN Clauses to Dispute Settlement Provisions................................................................................ 36
               i.   UNCTAD's Case Taxonomy ................................................... 37
               ii.   Other Interpretative Issues....................................................... 38
            (b)   The dispute settlement clause of the U.S.-Argentina BIT and the Australia-Argentina BIT ............................................................................................. 41
   c.   Second Jurisdictional Objection: Claimants' Standing............................................... 42
      i.   Claimants' Investment in Interinvest and the Argentine Airlines .................... 42
         1.   Position of Respondent ............................................................................. 42
         2.   Position of Claimants ................................................................................ 45
         3.   Analysis of the Tribunal............................................................................ 47
            (a)   Respondent's "Derivative Claim" Argument.................................. 47
               i.   Article I of the Treaty .............................................................. 47

ii.      ICJ Case Law ........................................................................... 49
iii.     The ICSID Convention ............................................................ 51
iv.      Argentine Law ....................................................................... 52
(b)     Respondent's "Intermediary Investor" Argument ............................ 53
(c)     Respondent's Policy Arguments ...................................................... 54
ii.   Claimants' Other Investments ..................................................................... 55
1.   Positions of the Parties ....................................................................... 55
2.   Analysis of the Tribunal ...................................................................... 55
iii.   Claimants' Third-Party Funding Agreement and Assignment of Award Proceeds.. 55
1.   Position of Respondent ....................................................................... 56
2.   Position of Claimants .......................................................................... 57
3.   Analysis of the Tribunal ...................................................................... 59
(a)     Existence of Jurisdiction .......................................................... 59
d.   Third Jurisdictional Objection: Issues of State Attribution ............................ 61
i.   Position of Respondent ............................................................................. 61
ii.   Position of Claimants ................................................................................ 63
iii.   Analysis of the Tribunal ........................................................................... 64
e.   Fourth Jurisdictional Objection: The Legality of Claimants' Investment ........... 66
i.   Position of Respondent ............................................................................. 66
ii.   Position of Claimants ................................................................................ 71
iii.   Analysis of the Tribunal ........................................................................... 75
1.   Timing of the Alleged Illegality ........................................................ 75
2.   Claimants' Alleged Illegalities .......................................................... 77
3.   Claimants' Alleged Lack of Good Faith ............................................ 78
V.   Costs ................................................................................................................ 79
VI.   Decision on Jurisdiction ................................................................................. 80

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| The Treaty | Agreement between the Argentine Republic and the Kingdom of Spain on the Reciprocal Promotion and Protection of Investments of October 3, 1991 |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of other States, Washington D.C., 1965 |
| MFN clause | Most-Favored Nation clause |
| VCLT | Vienna Convention on the Law of Treaties, 1969 |
| Assignment Agreement | Credit Assignment Agreement among Teinver, Transportes de Cercanías and Autobuses Urbanos as the assignors and Air Comet as the assignee, dated January 18, 2010 |
| Funding Agreement | Funding Agreement made between Claimants and Burford Capital Limited, effective as of April 14, 2010 |
| RFA | Claimants' Request of Arbitration, filed on December 11, 2008 |
| Merits | Claimants' Memorial on the Merits, filed on September 29, 2010 |
| Mem. | Respondent's Memorial on Jurisdictional Objections, filed on December 6, 2010 |
| CM | Claimants' Counter-Memorial on Jurisdiction, filed on January 24, 2011 |
| Rep. | Respondent's Reply on Jurisdictional Objections, filed on March 10, 2011 |
| Rej. | Claimants' Rejoinder on Jurisdiction, filed on April 27, 2011 |
| Exh. C- | Claimants' Exhibits and Legal Authorities |
| Exh. E- | Respondent's Exhibits |
| LA AR | Respondent's Legal Authorities |
| Tr. Day [#], [page:line] | Transcript of the Hearing on Jurisdiction and Provisional Measures<br>Day 1: May 27, 2011<br>Day 2: May 28, 2011<br>Day 3: May 30, 2011 |

# I.   Facts Relevant to Jurisdiction

### a.   Parties

1.   This claim is brought by Teinver S.A. ("Teinver"), Transportes de Cercanías S.A. ("Transportes de Cercanías") and Autobuses Urbanos del Sur S.A. ("Autobuses Urbanos") (collectively, "Claimants"), all companies incorporated in the Kingdom of Spain, against the Argentine Republic ("Respondent"), under the Agreement between the Argentine Republic and the Kingdom of Spain on the Promotion and Protection of Investments of October 3, 1991 (the "Treaty").[1]   Claimants are members of a group of companies known collectively as the Grupo Marsans.

### b.   Dispute

2.   This dispute concerns Claimants' allegations that Respondent has violated the Treaty, international law, and Argentine law, as well as commitments and representations made by the Respondent to Claimants, by unlawfully re-nationalizing and taking other measures regarding Claimants' investments in two Argentine airlines: Aerolíneas Argentinas S.A. ("ARSA") and Austral-Cielos del Sur S.A. ("AUSA") (collectively, "the Argentine Airlines").[2]

### i.   Acquisition of the Argentine Airlines

3.   By 1991, the Spanish government, through asset purchases made by the state-owned airline Iberia Líneas Aéreas de España, S.A. ("Iberia"), was a significant shareholder in both of the Argentine Airlines.  In 1994, Iberia incorporated a fully-owned Argentine subsidiary, Interinvest S.A. ("Interinvest"), to serve as the holding company for the Spanish investments in the Argentine airline industry.[3]   In 1995, the Spanish government created the Sociedad Estatal de Participaciones Industriales ("SEPI") to operate as the holding company for all companies fully or partially owned by the Spanish government.[4]   As such, SEPI acquired Iberia's shareholdings in Interinvest at that time.

4.   By mid-2001, the Argentine Airlines were experiencing financial difficulties, and ARSA filed for bankruptcy reorganization.[5]   In June 2001, SEPI announced that it would sell its participation in Interinvest through a bidding process.  At the time, SEPI owned 99.2% of Interinvest, and in turn Interinvest held 92.1% of ARSA's shares and 90% of AUSA's shares.[6]   Air Comet S.A. ("Air Comet"), a Spanish subsidiary of Grupo Marsans, bid on Interinvest and won.  At this time,

---

[1] The authentic language of the Treaty is the Spanish text.  This Decision will generally refer to the English-language translation (Ex. C-1(ENG)), although it will revert to the authentic Spanish text where the translation is ambiguous or otherwise unsatisfactory.

[2] RFA ¶¶ 2, 11.

[3] Interinvest was incorporated in order to comply with Argentine law, which requires companies in the aeronautic sector to be held directly by an Argentine company or national.  *See* Merits ¶ 25, fn. 16.

[4] Merits ¶ 26.

[5] Merits ¶ 28, Arias Wit. ¶ 13.

[6] Ex. C-11.

Air Comet was owned by two of the three Claimants, Autobuses Urbanos (35%) and Transportes de Cercanías (35%), as well as by two other Spanish companies, Proturin S.A. (29.8%) and Segetur S.A. (0.2%).[7]   (Claimant Teinver became a shareholder of Air Comet later, that is, on July 20, 2006, when it purchased Proturin's and Segetur's entire shareholdings.[8])

5.   On October 2, 2001, Air Comet and SEPI entered into a Share Purchase Agreement ("SPA"), through which Air Comet acquired SEPI's 99.2% interest in Interinvest (which, in turn, maintained the interests in the Argentine Airlines noted above).[9]

6.   Air Comet paid a purchase price of US$1 for the interest in Interinvest.[10]   Under the SPA, Air Comet agreed, in accordance with the industrial plan it created for the Argentine Airlines, to assume the assets and liabilities of the Airlines, to retain airline employees for two years, to make a US$50 million capital increase, to maintain its majority interest in the corporations, to service specified flight routes, and to expand aircraft fleets.[11]   For its part, SEPI agreed to assume the airlines' liabilities up to US$300 million, and to assume commitments resulting from the implementation of the industrial plan up to US$248 million.[12]   SEPI later agreed to contribute an additional US$205 million to cover the operational losses suffered by the airlines between July and October 2001.[13]

7.   In December 2002, ARSA and a majority of its creditors reached a settlement on debt restructuring, which was subsequently approved by an Argentine commercial court, as well as a court of appeals.[14]

## ii.   Nature of the Dispute

8.   Claimants allege that Respondent has unlawfully expropriated their investment in the Argentine Airlines.[15]   Claimants characterize this expropriation as consisting of two parts.   The "formal" expropriation occurred when the Argentine Congress "purposefully and explicitly" enacted the nationalization of the companies in December 2008.[16]   However, this formal expropriation was

---

[7] Claimants' Letter of June 16, 2011, 5; RFA Ex. C-5.
[8] *See* Claimants' letter of June 16, 2011 at 5.  Since Teinver's initial share purchase in 2006, the shareholding structure of Air Comet has changed several times.   On October 2, 2007, Teinver became Air Comet's majority shareholder, with the following distribution of shares: Teinver (56%), Autobuses Urbanos (22%) and Transportes de Cercanías (22%).   *Id*.   Teinver purchased additional shares from Transportes de Cercanías on December 31, 2007, with the following distribution of shares: Teinver (66.67%), Autobuses Urbanos (22%) and Transportes de Cercanías (11.33%).   *Id*. at 6.   On February 8, 2008, Claimants' respective participations shifted substantially: Teinver (96.77%), Autobuses Urbanos (2.13%) and Transportes de Cercanías (1.1%).   *Id*. at 6.   This was the ownership structure in place at the time that Claimants instituted this arbitration on December 11, 2008.   During this time, Air Comet has kept its shareholdings in Interinvest, which in turn has kept its shareholdings in ARSA and AUSA.   *Id*. at 5.   On December 10, 2009, Transportes de Cercanías and Autobuses Urbanos sold their remaining shareholdings in Air Comet to Teinver, leaving Teinver as the sole shareholder of Air Comet.   *Id*. at 6.
[9] Ex. C-18.
[10] *Id*. at § 2.
[11] *Id*. at § 7.
[12] *Id*. at § 9.
[13] Merits ¶ 41.
[14] Merits ¶ 46, Ex. C-526, C-530, C-531.
[15] Merits ¶ 2.
[16] Merits ¶ 357.

allegedly the culmination of a long process of "creeping" expropriation which started in October 2004 or earlier.[17]  As such, according to Claimants, the dispute centers on two primary issues: (i) a disagreement between the Parties as to the Argentine regulatory framework—regarding airfare caps in particular—within which the Argentine Airlines were required to operate between 2002 and 2008, and (ii) disagreement between the Parties as to the remedy due to Claimants for the expropriation of their shares in those airlines.[18]

# II.    Procedural Matters

### a.    Request for Arbitration and its Registration by ICSID

9.    On December 11, 2008, the International Centre for Settlement of Investment Disputes ("ICSID" or "the Centre") received a Request for Arbitration ("the Request") against Respondent from Claimants.  The Request concerned the alleged nationalization of two commercial airlines, and their subsidiaries, in which Claimants alleged having invested.

10.   In the Request, Claimants invoked Argentina's consent to dispute settlement through ICSID arbitration provided in the Treaty, and, by way of an Most-Favored Nation ("MFN") clause contained in Article IV(2) of the Treaty, in the 1991 Bilateral Investment Treaty between the United States of America and the Argentine Republic (the "U.S.-Argentina BIT").

11.   On December 17, 2008, ICSID, in accordance with Rule 5 of the ICSID Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings ("ICSID Institution Rules"), acknowledged receipt of the Request and transmitted a copy to the Argentine Republic and to the Argentine Embassy in Washington D.C.

12.   On January 30, 2009, the Acting Secretary-General of the Centre registered the Request and notified the Parties thereof, pursuant to Article 36(3) of the Convention on the Settlement of Investment Disputes between States and Nationals of other States ("the ICSID Convention") and in accordance with Rules 6(1)(a) and 7(a) of the ICSID Institution Rules.  The case was registered as ICSID Case No. ARB/09/1.  On that same date, and in furtherance of Rules 7(c) and (d) of the ICSID Institution Rules, the Secretary-General invited the Parties to communicate any agreements reached regarding the number of arbitrators and the method for their appointment, and to constitute an arbitral tribunal as soon as possible.

### b.    Constitution of the Arbitral Tribunal

13.   On April 3, 2009, Claimants requested that the Arbitral Tribunal be constituted in accordance with the formula set forth in Article 37(2)(b) of the ICSID Convention; that the Tribunal shall consist of three arbitrators, one appointed by each Party and the third, the President of the Tribunal, be appointed by agreement of the Parties.  On that same date, ICSID acknowledged Claimants' letter, and further advised the Parties that pursuant to Rule 3(1) of the ICSID Rules of

---

[17] Merits ¶ 357.
[18] CM ¶ 99.

Procedure for Arbitration Proceedings ("ICSID Arbitration Rules"), either Party was to proceed to name two persons, one as their party-appointed arbitrator, and the other for the position of the President of the Tribunal.  This first Party was to then invite the other Party to concur on the proposal for the position of the President of the Tribunal, and to name its party-appointed arbitrator.

14.  On April 27, 2009, Claimants appointed Henri C. Alvarez, a Canadian national, as arbitrator.

15.  On May 12, 2009, Claimants informed ICSID that Respondent had failed to appoint an arbitrator and had made no proposals for the position of the President of the Tribunal, and in accordance with Article 38 of the ICSID Convention and Rule 4(1) of the ICSID Arbitration Rules requested that the Chairman of the Administrative Council appoint the two arbitrators that had not been appointed.  The following day, ICSID informed Respondent that unless notification was received by May 29, 2009 that it had appointed an arbitrator, and that the Parties had reached an agreement on the appointment of the President of the Tribunal, then ICSID was to proceed to make the appointments in accordance with the relevant provisions of the ICSID Convention, ICSID Arbitration Rules and the normal procedures of the Centre.

16.  On June 1, 2009, Respondent appointed Dr. Kamal Hossain, a Bangladeshi national, as arbitrator.

17.  Following some exchanges between the Parties and ICSID, the Parties were informed on December 14, 2009, that ICSID was to propose to the Chairman of the ICSID Administrative Council the appointment of Judge Thomas Buergenthal, a United States national, as the President of the Tribunal.  The Parties were invited to provide observations to the proposed appointment by December 21, 2009.

18.  On December 21, 2009, both Parties informed ICSID that they did not have any observations on the proposed appointment of Judge Thomas Buergenthal as President of the Tribunal.

19.  On December 28, 2009, the Chairman of the ICSID Administrative Council appointed Judge Thomas Buergenthal as President of the Tribunal.

20.  By letter of January 4, 2010, in accordance with Rule 6(1) of the ICSID Arbitration Rules, the Secretary-General of ICSID informed the Parties and the arbitrators that the Tribunal was thus constituted by (i) Mr. Henri C. Alvarez, QC (appointed by Claimants), (ii) Dr. Kamal Hossain (appointed by Respondent), and (iii) Judge Thomas Buergenthal (appointed by ICSID pursuant to Article 38 of the ICSID Convention).  Further, the Tribunal was informed that Dr. Sergio Puig, Counsel at ICSID, would serve as the Secretary to the Tribunal.  He was subsequently succeeded in this capacity by Mrs. Mercedes Cordido-Freytes de Kurowski, Counsel, ICSID.

**c.    Arbitral Procedure**

21.  The First Session of the Tribunal with the Parties was held on March 22, 2010, at the World Bank's Paris Conference Centre, at which the Parties confirmed their agreement that the Tribunal had been properly constituted in accordance with the relevant provisions of the ICSID

Convention and the ICSID Arbitration Rules, and that they did not have any objections in this respect.

22. During the session, the Parties also agreed on a number of procedural matters, and that Claimants' Memorial on the Merits would be filed by September 22, 2010. The Tribunal then proposed two schedules for the written and oral pleadings in this case.

23. On April 16, 2010, both Parties confirmed their agreement with the schedule proposed. Respondent, however, made a reservation to its agreement, noting that should the Tribunal decide to bifurcate, then a specific schedule for the proceedings on jurisdiction should be established.

24. On April 23, 2010, Respondent informed ICSID and the Tribunal of newspaper publications, in which it was reported that the alleged majority shareholder of some of the Claimants had transferred part of its ICSID claim to a U.S. investment fund in exchange for a contribution to pay the costs arising in the proceedings. Respondent requested that the Tribunal require Claimants to provide all available information regarding the matter and the content of the agreement that was signed with said investment fund, and to also submit all related documentation.

25. On May 28, 2010, Claimants filed their response stating that they had not sold their claim as alleged by Respondent. Claimants stressed that they had no obligation to disclose any agreements with third parties with respect to the funding of costs in this proceeding, and that Respondent did not argue the necessity or relevance of its request. Claimants further argued that due to Respondent's conduct (alleged nationalization) and refusal to pay any compensation, Claimants' group of companies were in a distressed financial state, and thus had no choice but to obtain external funding in order to afford the costs of the arbitration and pursue their claim against Respondent. Claimants lastly noted that in any instance, this financing did not affect the jurisdiction of the Tribunal.

26. The Parties were informed on June 16, 2010 that after careful consideration of their respective positions on the matter of obtaining third-party funding, the Tribunal had decided not to grant Respondent's request at this early stage as it did not consider the currently available information on record as sufficient. However, the Tribunal added that it did not preclude granting a similar request in the future once the main pleadings had been filed.

27. On September 21, 2010, the Tribunal granted an extension of the deadline for the filing of Claimants' Memorial on the Merits until September 29, 2010, as agreed by the Parties, noting that Respondent would then have a one-week extension of the deadline for the filing of its subsequent submission.

28. On September 29, 2010, Claimants filed their Memorial on the Merits.

29. On December 6, 2010, Respondent filed its Memorial on Jurisdiction, and Claimants' Counter-Memorial on Jurisdiction was subsequently filed on January 24, 2012.

30. On February 4, 2011, the Tribunal issued Procedural Order No.1, ruling that Respondent's jurisdictional objections would be dealt with as a preliminary question, and that the proceeding on merits was accordingly suspended. The Tribunal also decided that a second round of pleadings on jurisdiction would be filed, with Respondent to file their Reply on Jurisdiction by March 7, 2011, and Claimants to file their Rejoinder on Jurisdiction within thirty (30) days of their receipt of Respondent's Reply on Jurisdiction. Additionally, the Tribunal proposed two sets of dates for the hearing on jurisdiction.

31. On February 9, 2011, the Respondent filed a request for the Tribunal to decide on production of documents. Subsequently, Claimants filed observations on the Respondent's request on February 14, 2011, and Respondent filed a response on February 21, 2011.

32. On February 24, 2011, the Parties were invited to consult in regard to the schedule for the forthcoming hearing, and to submit an agreed proposal by April 25, 2011.

33. On February 28, 2011, Claimants filed a reply on Respondent's request for production of documents.

34. On March 1, 2011, the Parties were informed that the Tribunal, after careful and due deliberation, had decided not to grant Respondent's Request for the Production of Documents at this jurisdictional stage. It was added, however, that the Tribunal did not preclude a similar request at a later stage.

35. On March 10, 2011, Respondent filed its Reply on Jurisdiction.

36. On April 12, 2011, Claimants filed a request for provisional measures, asserting that Respondent had initiated measures to collect taxes that would result in Respondent's effective acquisition of title to Claimants' Argentine holding company, Interinvest S.A. ("Interinvest"), and was thus requesting that the Tribunal order Respondent to halt any court or administrative collection proceedings against this company. Specifically, Claimants sought an interim order directing Respondent to withdraw or otherwise cease and desist from enforcing the tax-related payment orders that it had issued until the Tribunal rendered its award. They also requested that the Tribunal issue an immediate order preserving the *status quo ante* until such time as it ruled on this application for provisional measures. Claimants further requested that the Tribunal issue an emergency, temporary order prohibiting Respondent from enforcing the existing tax payment orders or from issuing any new ones.

37. On April 13, 2011, the Tribunal fixed a procedural calendar for the filing of the Parties' submissions on Claimants' request for the Tribunal to decide on provisional measures.

38. On April 20, 2011, Respondent submitted its observations on Claimants' request for an emergency, temporary order, stating that neither the ICSID Convention nor the Arbitration Rules made provision for the issuing of emergency, temporary orders, and that in any case, the absence of urgency was manifest in this instance. As such, Respondent requested that the Tribunal reject the request, and in addition reserved its rights and the State's power to levy taxes and to enforce

such rights through such channels and in such courts, tribunals and otherwise as may be appropriate.

39. On April 26, 2011, Respondent requested an extension of the deadline that had been set out during the first session for the filing of new documents.

40. After consulting with the Parties, on April 27, 2011, the Tribunal extended the deadline for the Parties to submit new documents; fixed a procedural calendar for the filing of the Parties' subsequent submissions on Claimants' requests for provisional measures; and invited the Parties to confer and to reach agreement on the structure, schedule and other matters regarding the hearing.

41. Also on April 27, 2011, Claimants filed their Rejoinder on Jurisdiction.

42. On April 29, 2011, the Tribunal issued Procedural Order No. 2, denying Claimants' request for an emergency, temporary order, noting that the Parties would be able to fully present their arguments in such regard during the hearing on jurisdiction.  The Parties were further invited to refrain from aggravating or extending the dispute.

43. On the same date, Claimants renewed their request for an emergency, temporary order, in light of the fact that Interinvest had been served with a notice for immediate payment of taxes. Respondent was invited to comment on Claimants' request by May 4, 2011.

44. Also on April 29, 2011, Respondent filed observations on Claimants' request for provisional measures of April 12, 2011.  Claimants filed a response on May 4, 2011.

45. On May 6, 2011, Claimants informed the Tribunal of the Parties' agreement concerning the organization of the hearing on jurisdiction, which was later confirmed by the Respondent.  On the same date, Claimants filed their Reply on their Request for Provisional Measures.

46. On May 13, 2011, the Parties were informed that further to their exchanges on the matter of Claimants' request for an emergency temporary order of April 29, 2011, the Tribunal had determined that in view of the proximity of the hearing, there was no imminent or sufficiently imminent threat until the hearing, and as such Claimants' request was denied.

47. Also on May 13, 2011, Respondent filed a Rejoinder on Provisional Measures.

48. On May 27-31, 2011, the Tribunal held a hearing on jurisdiction and Provisional Measures at the seat of the Centre in Washington D.C.

49. On June 8, 2011, the Tribunal issued Procedural Order No. 3, posing questions to the Parties after the hearing.

50. The Parties filed their answers to the questions posed by the Tribunal in accordance with the procedural calendar that was set forth in Procedural Order No. 3, and on July 5, 2011, Claimants made a further submission to complement their answers.

51.   On August 26, 2011, Ms. Annalise Nelson was appointed Assistant to the President of the Tribunal with the agreement of the Parties.

52.   On August 30, 2011, Claimants filed a letter concerning the conclusion of the reorganization proceedings of Aerolíneas Argentinas S.A. in Argentina and addressing recent case law, including the recent Decision on Admissibility and Jurisdiction in *Abaclat and others v. Argentina*[19], and the Order Taking Note of the Discontinuance of the Annulment Proceeding in *ATA v. Jordan*.[20]

53.   On October 26, 2011, Respondent filed a letter in response to Claimants' letter of August 30, 2011, and adjoining the expert report of Mr. Juan Antonio Cabezudo Álvarez.

54.   On November 8, 2011, Claimants filed a letter in response to Respondent's letter of October 26, 2011.  In their letter, Claimants characterized portions of Respondent's letter as rearguing out-of-time its jurisdictional objection arising out of Claimants' alleged lack of *jus standi*.   Claimants requested the Tribunal to strike Argentina's belated arguments and disregard the new expert report from Mr. Juan Antonio Cabezudo Álvarez.   Claimants also noted recent case law, including the *Impregilo v. Argentina* award[21] and the Decision on Jurisdiction in *Hochtief*.[22]

55.   On December 15, 2011, the Tribunal informed the Parties, that it had taken note of the arguments made in Respondent's October 26, 2011 letter and Claimants' November 8, 2011 letter as they relate to the pleadings on jurisdiction, with the exception of the expert report of the Spanish attorney, Mr. Juan Antonio Cabezudo Álvarez, attached to Respondent's letter, and Respondent's arguments based thereon.

56.   Also on December 15, 2011, Respondent requested leave from the Tribunal to file certain dissenting opinions in recent case law.  The Tribunal granted Respondent's request on December 20, 2011.

57.   On December 22, 2011, Respondent filed a letter attaching the above-mentioned dissenting opinions, including those of (i) Professor Brigitte Stern in *Impregilo*; (ii) Mr. Chris Thomas in *Hochtief;* and (iii) Professor Georges Abi-Saab in *Abaclat*.

58.   On February 17, 2012, Respondent filed a letter requesting leave from the Tribunal to introduce into the record the recently adopted decisions of the United States Court of Appeals for the

---

[19] *Abaclat and others v. Argentine Republic* (case formerly known as *Giovanna a Beccara and others*) (ICSID Case No. ARB/07/5), Decision on Jurisdiction and Admissibility, August 4, 2011 (hereinafter "*Abaclat v. Argentina*"), Exhibit C-769.

[20] *ATA Construction, Industrial and Trading Company v. Hashemite Kingdom of Jordan* (ICSID Case No. ARB/08/2), Order Taking
Note of the Discontinuance of the Proceeding, July 11, 2011 (hereinafter "*ATA v. Jordan*"), Exhibit C-770.

[21] *Impregilo S.p.A. v. Argentine Republic*(ICSID Case No. ARB/07/17), Award, June 21, 2011 (hereinafter "*Impregilo v. Argentina*"), Exhibit C-772.

[22] *Hochtief AG v. Argentine Republic* (ICSID Case No. ARB/07/31), Decision on Jurisdiction, October 24, 2011 (hereinafter "*Hochtief v. Argentina*"), Exhibit C-773.

District of Columbia Circuit in *Republic of Argentina v. BG Group plc* of January 17, 2012,[23] and of the arbitral tribunal in the UNCITRAL case, *ICS v. Argentine Republic*.[24]

59. On February 22, 2012, the Tribunal accepted Respondent's letter of February 17, 2012, and provided Claimants with the opportunity to respond to this letter.

60. On February 28, 2012, Claimants filed a letter in response to Respondent's letter of February 17, 2012.

61. On March 26, 2012, Claimants filed a second request for provisional measures, alleging that Respondent had taken unlawful actions on March 14, 2012 that irreparably threaten to harm Claimants' investment and the rights Claimants seek to protect in this arbitration. Specifically, Claimants asserted that Respondent, acting through the Boards of Directors of the Argentine Airlines and their related service companies, which Respondent now controls, announced that they would submit Amended Financial Statements for the fiscal year ending December 31, 2008 for approval at upcoming Shareholders' Meetings. According to Claimants, the amended 2008 financial statements would also amend previously-approved and final financial statements for the fiscal years ending in 2004, 2005, 2006, and 2007.[25]

62. In their second request for provisional measures, Claimants sought an interim order directing Respondent to stop any procedures aimed at approving any formal or material changes to the financial statements of the Argentine Airlines for any year prior to 2008; to stop any procedures aimed at approving the 2008 Amended Financial Statements; to make available to Claimants' representatives in Interinvest, in their capacity as shareholders of the Argentine Airlines, all information available and subject to discussion and vote in any shareholders' meeting(s) to be scheduled in this respect; and to authorize Claimants' representatives in Interinvest to attend, participate and/or exercise their voting rights in any shareholders' meeting(s) to be scheduled in connection with the alleged "adjustments" to the Argentine Airlines financial statements, and in all cases free of any coercion, or physical or legal threat, until the Tribunal renders its Award.[26] Claimants also requested that the Tribunal issue an emergency temporary order preserving the *status quo ante* with respect to the financial statements until such time as it ruled on this application for provisional measures.

63. Also on March 26, 2012, Respondent filed a letter, with attachments, informing the Tribunal of "some new developments of a serious nature" that had unfolded in criminal proceedings in Spain.

64. On March 28, 2012, the Tribunal fixed a procedural calendar for the filing of the Parties' submissions on Claimants' second request for the Tribunal to decide on provisional measures and for Claimants' response to Respondent's letter regarding the Spanish criminal proceedings.

---

[23] *Republic of Argentina v. BG Group plc*, United States Court of Appeals for the District of Columbia Circuit, January 17, 2012 (hereinafter "*Argentina v. BG*"), Exhibit C-775.

[24] *ICS Inspection and Control Services Limited v. The Argentine Republic*, UNCITRAL, PCA Case No. 2010-9, Award on Jurisdiction, February 10, 2012 (hereinafter "*ICS v. Argentina*"), Exhibit C-774.

[25] Claimants' Second Application for Provisional Measures, March 26, 2012, ¶ 4.

[26] *Id.* at ¶ 5.

65.   On April 1, 2012, and following correspondence from the Parties, the Tribunal amended the procedural calendar for the filing of the Parties' submissions on Claimants' second request for provisional measures.  The Tribunal directed the Parties to take no actions or steps to aggravate the dispute or to render Claimants' application moot pending the Tribunal's consideration of it.

66.   On April 4, 2012, Claimants filed a response to Respondent's March 26, 2012 letter concerning the "new developments" in the Spanish criminal proceedings.

67.   On April 11, 2012, Respondent filed observations on Claimants' second request for provisional measures.

68.   On April 23, 2012, Claimants filed observations in reply to their second request for provisional measures.

69.   On May 4, 2012, Respondent filed observations in rejoinder on Claimants' second request for provisional measures.

70.   On May 24, 2012, Respondent filed further observations concerning Claimants' second request for provisional measures and Respondent's fourth objection on jurisdiction.  On May 25, 2012, the Tribunal invited Claimants to file a response to Respondent's submission by June 1, 2012. On June 1, 2012, Claimants filed a response to Respondent's submission of May 24, 2012

71.   On September 28, 2012, Respondent directed the Tribunal's attention to (i) the award rendered on August 22, 2012 in *Daimler Financial Services AG v. Argentine Republic* (ICSID Case No. ARB/05/1); (ii) the decision rendered by a Swedish court on November 9, 2012 concerning the award rendered on October 1, 2007 in the case *RosInvestCo UK Ltd. v. The Russian Federation,* SCC Case No. V079/2005; and (iii) to a recent submission before the United States Court of Appeals for the Second Circuit in the case of *Thai-Lao Lignite (Thailand) Co., Ltd & Hongsa Lignite (Lao PDR) Co., Ltd v. Government of the Lao People's Democratic Republic*. By letter of October 9, 2012, Claimants, upon invitation from the Tribunal, provided their comments on Respondent's submission of September 28, 2012.

## III.   Position of the Parties on Jurisdiction

### a.   Respondent's position

72.   In its written and oral submissions on jurisdiction, Respondent argues the following:

    i.   The Tribunal lacks jurisdiction because Claimants failed to meet the requirements set forth in Article X of the Treaty;
    ii.   The Tribunal lacks jurisdiction because Claimants have no legal standing to claim for legal rights that belong to another legal person;

    iii.   The Tribunal lacks jurisdiction to adjudicate certain of Claimants' allegations that concern the acts of non-state entities, which cannot be attributed to Respondent; and

    iv.   The Tribunal lacks jurisdiction because the investment invoked by Claimants is not an investment protected by the Treaty.

The Respondent requests the Tribunal to declare, pursuant to Rule 41(5) of the ICSID Arbitration Rules, that the Centre has no jurisdiction and that the Tribunal has no competence over this case and, therefore, to dismiss the claim, ordering costs and fees against Claimants, plus interest, pursuant to Rule 47(1)(j) of the Arbitration Rules.[27]

    **b.**    **Claimants' position**

73.    In their written and oral submissions on jurisdiction, Claimants argue the following:

    i.   The Tribunal has jurisdiction over Claimants' claims because Claimants have satisfied the procedural provisions of the Australia-Argentina BIT, which they may rely on through the application of the Treaty's MFN clause;

    ii.   The Tribunal has jurisdiction, in the alternative, because Claimants have satisfied and/or are excused for reasons of futility from the requirements set forth in Article X of the Treaty;

    iii.   The Tribunal has jurisdiction over Claimants' claims because Claimants are legitimate parties to this arbitration;

    iv.   The Tribunal should defer questions of state attribution for acts of non-state entities to the merits phase of this arbitration or, in the alternative, determine that the acts alleged are attributable to Respondent; and

    v.   The Tribunal has jurisdiction over Claimants' claims because Claimants' investment was acquired and effected in accordance with the legislation of Argentina and in good faith.

Claimants request the following relief: i) a declaration that the dispute is within the jurisdiction of the ICSID Convention and within the competence of this Tribunal; ii) an order dismissing all of Respondent's objections to the admissibility of the dispute and dismissing all of Respondent's objections to the jurisdiction of the Centre and the competence of the Tribunal; and iii) an order that Argentina pay the costs for these proceedings,[28] including the Tribunal's fees and expenses, and the costs of Claimants' representation, subject to interest until the day of payment.[29]

---

[27] Rep. ¶ 388.

[28] The Tribunal understands Claimants' submission in paragraph 385(iii) as seeking the costs in respect of deciding on the objections to its jurisdiction.

[29] Rej. ¶ 385.

## IV.   Analysis

### a.   First Jurisdictional Objection: Claimants' Fulfillment of the Procedural Requirements of Article X of the Treaty

74.   Respondent's first jurisdictional objection to this dispute is rooted in Article X of the Treaty, which provides that

> 1. Disputes arising between a Party and an investor of the other Party in connection with investments within the meaning of this Agreement shall, as far as possible, be settled amicably between the parties to the dispute.
>
> 2. If a dispute within the meaning of section 1 cannot be settled within six months as from the date on which one of the parties to the dispute raised it, it shall be submitted, at the request of either party, to the competent tribunals of the Party in whose territory the investment was made.
>
> 3. The dispute may be submitted to an international arbitral tribunal in any of the following circumstances:
>
> *(a)* At the request of one of the parties to the dispute, when no decision has been reached on the merits after a period of 18 months has elapsed as from the moment the judicial proceeding provided for in section 2 of this article was initiated or
>
> When such a decision has been reached, but the dispute between the parties persists;
>
> *(b)* When both parties to the dispute have so agreed.

75.   According to Respondent, Claimants have failed to meet the requirements of Article X. Specifically, Respondent alleges that Claimants have not attempted to amicably settle their dispute in accordance with Article X(1) and (2) of the Treaty.  Respondent also alleges that Claimants have not subjected their dispute to the Argentine courts for a period of eighteen months before seeking this arbitration, in accordance with Article X(3).

76.   The Claimants have made two responses to this objection.  First, Claimants assert that they are entitled to invoke the Treaty's MFN clause in Article IV(2) in order to benefit from the more favorable dispute settlement provisions of other BITs negotiated by Argentina.   Second, Claimants assert that even if the Treaty's MFN clause does not permit them to borrow the dispute settlement provisions from other Argentine BITs, they have satisfied the requirements of Article X of the Treaty, or, in the alternative, that they should be excused from Article X's requirements for reasons of futility.

77.   As the Parties' submissions concern two distinct arguments in the alternative, the Tribunal will address each of them in turn.  The Tribunal will first address the issue of Claimants' compliance

with the requirements of Article X of the Treaty.  The Tribunal will then assess, on an alternative basis, the issue of the applicability of the MFN clause to Article X of the Treaty.

### i.    Compliance with the Requirements of Article X

### 1.    Position of Respondent

***6-month requirement***

78.   Respondent argues that Claimants resorted to the jurisdiction of ICSID without first conducting amicable negotiations for at least six months with the Argentine Republic, even though the fulfillment of this requirement is one of the conditions upon which Respondent's consent to ICSID arbitration is based.[30]

79.   Under Article X(1) and (2) of the Treaty, disputes "shall, if possible, be amicably settled" within a term of six months.[31]   Article X(2) provides that the 6-month negotiation period must be counted from the date of submission of such dispute by either party.[32]  According to Respondent, the period starts to run once a party claims that there is disagreement about the facts and rights related to the Treaty, not when the Treaty is breached.[33]

80.   Respondent asserts, moreover, that investors must give formal notice of the dispute to Respondent's competent authorities, in order for the government to be aware of the dispute.[34] This notice should describe the nature of the dispute and express the intent to commence amicable negotiations for the purpose of resolving the conflict within the framework of the Treaty.[35]

81.   Respondent contends that Claimants failed to give notice to the Argentine authorities of the formal commencement of amicable negotiations and that these negotiations never actually took place.[36]  It was only on November 20, 2008 that Claimants notified Respondent of the filing of their claim under the Treaty, when they sent a letter informing Respondent that Claimants had decided to submit an investment dispute under the Treaty.[37]

82.   Respondent further submits that none of the documents submitted by Claimants as proof of negotiations mention the rights provided for in the Treaty, international arbitration proceedings, or even the Treaty's requirement to hold amicable negotiations for a term of six months.[38] Although Claimants reference meetings with Argentine officials, nothing demonstrates that those discussions were held within the context of Article X(1).  To the contrary, those meetings

---

[30] Mem. ¶ 10.
[31] Mem. ¶ 2.
[32] Rep. ¶ 34.
[33] Rep. ¶ 36.
[34] Rep. ¶ 32.
[35] *Id.*
[36] Mem. ¶ 15.
[37] Mem. ¶ 13.
[38] Mem. ¶ 24.

concerned the local legal framework applicable to Argentina's commercial air transportation industry.[39]

83.   Respondent notes that Claimants have submitted purported evidence, including newspaper articles and statements by Argentine senators and congressmen, that Respondent was aware that Claimants would resort to ICSID proceedings, but Respondent argues that this evidence is irrelevant.[40]   Respondent's objection is based on Claimants' failure to meet the 6-month amicable settlement requirement.[41]   Claimants' obligation under Article X(1) and (2) is not fulfilled by media discussions regarding the possibility of resorting to ICSID in the event that negotiations are unsuccessful.[42]   Likewise, the statements made by Respondent's congressmen and senators regarding Claimants' possible resort to ICSID do not constitute negotiations; such statements are speculative and do not express the will of the National Congress or the Respondent.[43]

### *18-month local court requirement*

84.   According to Respondent, the language of Article X(2) and (3) of the Treaty requires that disputes must first be submitted to the domestic courts of competent jurisdiction before they can be submitted to international arbitration.[44]   This language is mandatory, and the prior submission of disputes to the local courts is a jurisdictional requirement which may not be set aside or disregarded.[45]

85.   Respondent disputes Claimants' assertion that they have met this requirement, based on an expropriation suit that was filed by the Argentine Republic against Interinvest in the Argentine courts.   According to Respondent, the expropriation lawsuit under Argentine law and the present arbitration are clearly different, as they do not involve the same parties or subject matter.[46]   The purpose of the expropriation lawsuit is for the domestic court to determine the value of the property expropriated by Argentina, while the subject of the arbitration is not only expropriation but also allegations of unfair treatment, arbitrary measures, and failure to grant full protection and security, which are all governed by the Treaty.[47]

86.   Respondent further argues that the Request for Arbitration filed with ICSID should have been submitted only *after* the dispute had been submitted to the local courts for 18 months.   However, the expropriation suit commenced on February 5, 2009, while the Request for Arbitration was filed by Claimants earlier, on December 11, 2008.[48]

---

[39] Mem. ¶ 21.
[40] Rep. ¶¶ 44, 45.
[41] Rep. ¶ 45.
[42] Rep. ¶ 47.
[43] Rep. ¶¶ 48, 49.
[44] Rep. ¶ 9.
[45] Rep. ¶ 17.
[46] Rep. ¶ 71.
[47] Rep. ¶ 72.
[48] Rep. ¶ 69.

87. Finally, Respondent argues that Claimants' assertion that they have satisfied the 18-month court requirement contradicts their invocation, through the Treaty's MFN clause, of the Argentina-U.S. or Argentina-Australia BITs. Both of the latter BITs establish that disputes may only be submitted to international arbitration if they have *not* been submitted to the local courts.[49]

### *Futility*

88. Respondent argues that Claimants are not entitled to an excuse from the requirements of Article X by reason of futility. Argentine law guarantees the judicial protection of the rights at issue, and Claimants did not encounter any obstacles in the filing of judicial claims. The Argentine courts routinely adopt final and provisional decisions in less than eighteen months, in both ordinary and expedited summary proceedings.[50] Moreover, there is no basis for Claimants to assert that they would be required to incur disproportionate court costs in pursuing a remedy before the Argentine courts, and there is no basis on which to conclude that the Argentine courts lack independence.[51]

### 2.     Position of Claimants

### *6-month requirement*

89. Claimants assert that they have complied with the 6-month period in the Treaty, as they submitted their request for arbitration well after six months had elapsed from the time Argentina "instigated" the dispute.[52] By December 11, 2008, the Parties had gone through more than a year of intense negotiations and no fewer than three attempted settlement agreements.[53]

90. Claimants assert that Article X requires neither a formal notice nor express allegations of Treaty breaches. The first part of Article X(1) of the Treaty broadly defines the term "disputes" as "[d]isputes arising between a Party and an investor of the other Party in connection with investments within the meaning of this Agreement." This broad definition of disputes does not refer to the legal basis of such disputes nor does it require that any settlement negotiations be formally held under the Treaty or address or allege breaches of specific Treaty provisions. It requires only that the dispute be related to an investment.[54]

91. According to Claimants, Article X(1) provides a "best-efforts" clause to attempt to settle the dispute, and Article X(2) provides a "cooling-off" period whereby either party can proceed to the next stage as soon as six months have passed since the instigation or initiation of the dispute itself.[55] The sole condition for proceeding from amicable settlement attempts to the next step is that the dispute "cannot be settled within six months from the date on which one of the parties to the dispute instigated it."[56]

---

[49] Rep. ¶ 73.
[50] Rep. ¶ 75.
[51] Rep. ¶¶ 76-84.
[52] CM ¶ 22(ii).
[53] Rej. ¶ 11.
[54] CM ¶ 76.
[55] Rej. ¶¶ 5, 70-71.
[56] CM ¶ 82.

92.  Claimants assert that the Treaty's 6-month cooling off period starts to run as of the date on which one of the parties to the dispute "instigated" ("*promovió*") the dispute.[57]  This "instigation" of a dispute refers to the act or omission actually triggering the dispute.  Thus, the 6-month period starts to run not when a formal breach of the treaty is alleged, raised or communicated, but rather when the disputed conduct occurs.[58]

93.  Claimants note that while other treaties to which one of the Parties is a signatory may explicitly require a notification of the dispute under the BIT before the 6-month period can began to run, no such requirement is included in Article X of the Treaty.[59]  Furthermore, under Article X, there is no requirement that a claimant raise formal or explicit allegations of the Treaty breach.[60]  Considering that the dispute is to be submitted first to local tribunals and only thereafter to international arbitration, Article X cannot reasonably be construed to require that formal *treaty* allegations be made for the "dispute" to exist.[61]  Furthermore, international jurisprudence holds that it is not necessary for a State to expressly refer to a specific treaty in its exchanges with the other State—what matters is that the exchanges "refer to the subject-matter of the treaty."[62]

94.  Claimants assert that, as a matter of fact, Respondent "instigated" this dispute as early as October 2002, after it failed to implement promised relief measures for the Argentine Airlines.[63]  Alternatively, Claimants assert that the "dispute" began in October 2004, when Respondent rejected Claimants' request for an airfare increase.[64]  The dispute intensified in 2005 and 2006, and, after lengthy negotiations, Respondent again promised relief measures.  However, by approving an insufficient airfare increase and failing to provide promised subsidies, Respondent again breached its agreement with Claimants.[65]

95.  According to Claimants, the dispute continued in April 2008, when Claimants requested Respondent to take urgent action to correct governmental measures impacting its operations, including the approval of airfare increases or subsidies.[66]  In May 2008, Respondent, Interinvest and the Argentine Airlines concluded an agreement to change the Airlines' corporate structure, increasing Respondent's interest and granting a controlling interest to a prospective private Argentine investor.  As part of this agreement, Respondent agreed to raise domestic fares and grant relief measures.  However, Respondent failed to do so, and the deal with the prospective investor ultimately fell through.[67]

96.  On July 17, 2008, the Parties reached an agreement regarding the sale of the Argentine Airlines to Respondent.  Under the agreement, the Parties agreed that the purchase price would be

---

[57] *Id.*
[58] CM ¶ 87.
[59] CM ¶ 96.
[60] Rej. ¶ 97.
[61] Rej. ¶¶ 97, 113.
[62] Rej. ¶ 132.
[63] CM ¶ 100.
[64] Rej. ¶ 16.
[65] *Id.*
[66] Rej. ¶ 17.
[67] CM ¶ 106; Rej. ¶ 17.

determined by independent appraisers appointed by each Party and that, if there were still a disagreement on the price, the Parties would appoint a third independent appraiser.[68] According to Claimants, however, Respondent continued the dispute on July 24, 2008, when it submitted a bill to Congress for the "repossession" of the Argentine Airlines. In doing so, Claimants allege, Respondent breached the July 17, 2008 Agreement.[69] On September 18, 2008, the Argentine Congress passed a law approving Respondent's repossession of the Argentine Airlines. However, Congress determined that the amount of compensation would be calculated exclusively by the Argentine *Tribunal de Tasaciones de la Nación*, in disregard of the third-party valuation mechanism set out in the July 2008 Agreement, thus further entrenching the dispute.[70]

97. Finally, Claimants assert that even if this Tribunal required the "dispute" between the Parties to concern the Treaty, Claimants have met this requirement. Respondent was aware that, if the ongoing negotiations failed, Claimants could submit an ICSID complaint. The dispute between Claimants and Respondent was a national event and was extensively discussed in the Argentine press starting in early 2008.[71] During a Congressional debate in August 2008, various congressmen acknowledged that Claimants were preparing their ICSID arbitration under the Treaty. Moreover, during a September 1, 2008 Congressional hearing, Claimants' representatives confirmed they would resort to international arbitration if Respondent failed to pay fair compensation.[72]

98. Therefore, according to Claimants, even if a "dispute" did not exist between the Parties between 2002 and 2007, the evidence demonstrates that the current dispute in connection with Claimants' investments had been instigated, raised and formally discussed by May 2008. The evidence also demonstrates that the Parties had attempted to solve this dispute amicably through several negotiations that lasted more than six months, including the negotiations that surrounded the May 15, 2008 Agreement and the July 17, 2008 Agreement.[73]

### *18-month local court requirement*

99. According to Claimants, the 18-month local court requirement of Article X(3) has been satisfied, because Argentine tribunals have had the opportunity to undo the measures giving rise to this dispute for more than eighteen months, and yet have failed to do so.[74] Claimants cite to multiple actions brought before the Argentine courts. First, the *Tribunal de Tasaciones*, in two different valuations, in October 2008 and in January 2009, found that the Argentine Airlines were worth approximately negative US$832 million and negative US$770 million.[75] Second, following Interinvest's rejection of the January 2009 valuation, Respondent initiated a lawsuit in an Argentine court seeking the expropriation of the shares of the Argentine Airlines. That court has not yet issued a substantive decision in the case.[76]

---

[68] CM ¶ 111.
[69] CM ¶ 112.
[70] CM ¶ 123.
[71] CM ¶ 135.
[72] CM ¶ 136.
[73] CM ¶ 127.
[74] CM ¶ 22(iii).
[75] CM ¶ 140.
[76] *Id.*

100. Claimants acknowledge that both the *Tribunal de Tasaciones*' valuation and the expropriation lawsuit initiated by the GOA are based exclusively on Argentine law.  However, these suits relate to the same subject matter now before this Tribunal: the question of compensation for Respondent's take-over of Claimants' investments.[77]

101. Claimants also acknowledge that the 18-month period had not lapsed when they requested arbitration on December 11, 2008.  However, at present, Respondent's expropriation lawsuit has been before Argentine tribunals for well over 18 months without resulting in any substantive decision.[78]  Claimants assert, as a result, that (i) Argentine courts have had more than 18 months to decide the main issues in this dispute and that (ii) the core purpose of the local court requirement—to give the host State the opportunity to consider and/or remedy the disputed measures before they are brought to international arbitration—has been satisfied.[79]  International jurisprudence supports the position that under these circumstances, such preconditions have been met.[80]

102. Finally, Claimants assert that their satisfaction of the 18-month local court requirement of Article X(3) does not contradict the dispute settlement provisions of the U.S.-Argentina BIT.[81]  The U.S.-Argentina "fork in the road" clause requires the investor to choose either a local court remedy or international arbitration.  However, here, it was Respondent, and not Claimants, who initiated the local expropriation suit.[82]  According to Claimants, this position is fully in accordance with Article X(2) of the Treaty, which makes clear that the proceedings before local tribunals may be submitted "at the request of either party."[83]

### *Futility*

103. Claimants submit that even if this Tribunal were to determine that the requirements of Article X have not been met, it would be futile to require Claimants to make further attempts at amicable settlement or to require Claimants to resubmit the dispute to the Argentine courts for an additional 18 months.[84]

104. According to Claimants, they have attempted to amicably settle the present dispute on several occasions from September 2002 onwards, and with even greater focus as of May 2008.[85]  In addition to these negotiations, Claimants have also held additional negotiations with Argentina, from October 2008 until early 2010, specifically concerning the compensation due to Claimants for the expropriation of their investment.[86]

---

[77] CM ¶ 139.
[78] Rej. ¶ 161.
[79] *Id.*
[80] Rej. ¶¶ 162-165.
[81] Rej. ¶ 171.
[82] CM ¶ 143.
[83] *Id.*
[84] CM ¶ 22(iv).
[85] CM ¶ 158.
[86] CM ¶ 159.

105. Claimants also argue that requiring them to resubmit the dispute once they have satisfied the 18-month local court requirement would serve no purpose whatsoever and would only add cost and time to the proceedings.[87]  Furthermore, the fact that the core matter of the dispute has already been pending for more than 18 months demonstrates that it would be futile to now require Claimants to litigate for an additional 18 months.[88]  Jurisprudence supports the view that when a requirement to resort to local courts would be futile, ineffective and/or would not provide the claimant with appropriate means of legal redress, that requirement should be waived.[89]

106. Claimants argue that in any event, the failure to comply with the 6- and 18-month waiting periods is not a bar to jurisdiction.  According to Claimants, the majority of ICSID tribunals addressing this issue have found that such waiting periods constitute procedural, rather than jurisdictional, requirements.[90]

### 3.   Analysis of the Tribunal

#### (a)   The Requirements of X(1) and X(2)

107. Article X(1) and (2) reads as follows:

> 1. Disputes arising between a Party and an investor of the other Party in connection with investments within the meaning of this Agreement shall, as far as possible, be settled amicably between the parties to the dispute.
>
> 2. If a dispute within the meaning of section 1 cannot be settled within six months as from the date on which one of the parties to the dispute raised it, it shall be submitted, at the request of either party, to the competent tribunals of the Party in whose territory the investment was made. *[Si una controversia en el sentido del párrafo 1 no pudiera ser dirimida dentro del plazo de seis meses, contando desde la fecha en que una de las partes en la controversia la haya promovido, será sometida a petición de una de ellas a los tribunales competentes de la Parte en cuyo territorio se realizó la inversión.]*
> …

108. The Tribunal agrees with Claimants that Article X(1) can fairly be interpreted as a general "best efforts" obligation for the parties to attempt to amicably settle their dispute.  However, it would be an overly literal interpretation of Article X(2)'s "cannot be settled within six months" language to read it as simply requiring that the Parties *wait* for six months after the dispute began before they proceed to the next step in the dispute settlement process.  The natural reading of Articles X(1) and (2) together is that the Parties are obligated to make their best efforts to amicably settle their dispute, and that they are required to do so for six months before proceeding to the next step.

---

[87] CM ¶ 22(iv).
[88] Rej. ¶ 182.
[89] Rej. ¶ 192.
[90] CM ¶ 168.

### i.     The Commencement of the 6-Month Period

109. Claimants assert that the relevant moment for Article X(2) is the date on which Respondent's substantive *conduct* that is in dispute takes place.[91]  In other words, the key inquiry is when the act or omission that triggered the dispute occurred.  To reach this conclusion, Claimants point to the use of the word "*promover*" in the Spanish language original of Article X(2), the relevant portion of which reads "*contando desde la fecha en que una de las partes en la controversia la haya promovido.*"  They translate "*promover*" as "initiate," "provoke," "give rise to," "cause," and "instigate."[92]  From this, Claimants conclude that "*promover una controversia*" refers to the "substantive conduct, acts or omissions" committed by Respondent that are at the origin of this dispute.[93]   Claimants note that "*promover*" is different from the verbs used in the dispute resolution preconditions of other BITs, which instead require the parties to "*someter*" a dispute or define the date that a dispute "*surgió.*"[94]

110. Claimants' interpretation does not ascribe a natural or ordinary meaning to the phrase "*promover una controversia*" or "instigate a dispute."  Claimants' argument focuses almost exclusively on the word "*promover*," while largely ignoring the meaning or importance of the word "dispute."  While "instigate" or "initiate" or "provoke" all suggest the commencement of something, that something in question is the dispute itself, not the acts giving rise to the dispute.  Both "dispute" and "*controversia*" are synonyms for "argument" or "disagreement."  As stated by the PCIJ in *Mavrommatis*, "[a] dispute is a disagreement on a point of law or fact, a conflict of legal views or of interests between two persons."[95]  To instigate a dispute, therefore, refers to the time at which the *disagreement* was formed, which can only occur once there has been at least some exchange of views by the parties.  It does not refer to the commission of the act that caused the parties to disagree, for the very simple reason a breach or violation does not become a "dispute" until the injured party identifies the breach or violation and objects to it.

111. Claimants assert that their interpretation is not unprecedented and that other investment treaties have similar provisions.  However, the only provision Claimants have identified is NAFTA Article 1120, which has starkly different language from Article X(2).[96]  NAFTA Article 1120 includes the clause "provided that six months have elapsed since the events giving rise to a Claim."  But Article X(2) makes no mention of "the events giving rise to the claim," and it would be a stretch to read such a phrase into the plain meaning of "*promover una controversia.*"  Furthermore, to the extent that the purpose of the 6-month requirement is to grant the host state the opportunity to redress the problem before the investor submits the dispute to arbitration, measuring from the date that the breach occurred would not further this policy goal.[97]  Without

---

[91] CM ¶ 87.

[92] CM ¶ 84.

[93] CM ¶¶ 85, 86.

[94] Rej. ¶¶ 129-30.

[95] *Mavrommatis Palestine Concessions, Judgment No. 2, 1924, P.C.I.J., Series A, No. 2*, p. 11. (hereinafter "*Mavrommatis*").

[96] Rej. ¶ 124.

[97] *See, e.g., Ronald S. Lauder v. The Czech Republic* (UNCITRAL Case), Award of September 3, 2001, ¶ 185 (hereinafter "*Lauder v. Czech Republic*"), Exhibit C-329 ("[T]he waiting period does not run from the date [on] which the alleged breach occurred, but from the date [on] which the State is advised that said breach has occurred.

some exchange of views, Respondent could have no idea that an investor believed it to be in breach.

## ii.    The Requirement of Formal Notification

112.   The ordinary meaning of Article X(1) supports Claimants' argument that they were not required to give formal notice in order to commence settlement negotiations.  Article X(1) simply defines "disputes" as "arising between a Party and an investor of the other Party in connection with investments within the meaning of this Agreement."  There is nothing in this language that suggests that Claimants must formally notify Respondent that there is a dispute under the Treaty or identify the specific provisions of the Treaty that are the basis of the dispute.  All that is required for a dispute to exist under Article X(1) is that it be "in connection with investments." In this regard, Claimants' citation of *Vivendi I* is on point.[98]   *Vivendi I* concerned the France-Argentina BIT, which contained an article with a similar definition of disputes as "relating to investments made under this Agreement."  The tribunal concluded that this article "does not use a narrower formulation, requiring that the investor's claim allege a breach of the BIT itself. Read literally, the requirements for arbitral jurisdiction in Article 8 do not necessitate that the Claimant allege a breach of the BIT itself: it is sufficient that the dispute relate to an investment made under the BIT."[99]

113.   Claimants correctly point out that other BITs expressly define "dispute" with reference to the dispute's legal basis under those BITs.  For example, the U.S.-Ecuador BIT describes disputes as follows:

> For purposes of this Article, an investment dispute is a dispute between a Party and a national or company of the other Party arising out of or relating to: (a) an investment agreement between that Party and such national or company; (b) an investment authorization granted by that Party's foreign investment authority to such national or company; or (c) an alleged breach of any right conferred or created by this Treaty with respect to an investment.[100]

114.   The U.S.-Ecuador BIT was addressed by the tribunals in *Murphy*[101] and *Burlington*,[102] which determined that a dispute does not exist, and settlement of this dispute cannot be attempted, until it has been articulated in terms of a treaty breach.  Specifically, the tribunal in *Murphy* held that the claimants were required to inform the respondent of their intention to hold talks for purposes of settling their claim under the BIT.[103]   However, both *Murphy* and *Burlington* are

---

This results from the purpose of the waiting period, which is to allow the parties to enter into good-faith negotiations before initiating the arbitration.").

[98] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic* (ICSID Case No. ARB/97/3), Decision on Annulment, July 3, 2002 (hereinafter "*Vivendi I v. Argentina*"), Exhibit C-403.

[99] *Vivendi I v. Argentina,* Decision on Annulment, at ¶ 55.

[100] Rej. ¶ 105, citing Article VI(1) of the U.S.-Ecuador BIT.

[101] *Murphy Exploration and Production Company International v Republic of Ecuador*, Decision onJurisdiction, (ICSID Case No ARB/08/4), December. 15, 2010, at ¶ 104 (hereinafter "*Murphy v. Ecuador*"), Exhibit C-417.

[102] *Burlington Resources Inc. v. Republic of Ecuador* (ICSID Case No. ARB/08/5), Decision on Jurisdiction, June 2, 2010, at ¶ 337 (hereinafter "*Burlingtonv. Ecuador*"), LA AR 6.

[103] *See Murphy v. Ecuador,* Decision on Jurisdiction, at ¶¶ 107-109.

distinguishable based on the language of the U.S.-Ecuador BIT, and both tribunals make clear that their determination is predicated on the treaty's definition of "dispute."[104]

115.  International jurisprudence also supports the general proposition that there is no requirement that a party formally notify the other party that negotiations are occurring under a particular treaty, in order for negotiations to be occurring with respect to a dispute.  As the International Court of Justice ("ICJ") has stated:

> [I]t does not necessarily follow that, because a State has not expressly referred in negotiations with another State to a particular treaty as having been violated by conduct of that other State, it is debarred from invoking a compromissory clause in that treaty. The United States was well aware that Nicaragua alleged that its conduct was a breach of international obligations before the present case was instituted; and it is now aware that specific articles of the 1956 Treaty are alleged to have been violated.  It would make no sense to require Nicaragua now to institute fresh proceedings based on the Treaty, which it would be fully entitled to do.[105]

116.  Because Article X and international jurisprudence are clear that, under these circumstances, Claimants were not obligated to initiate formal negotiations under the Treaty or to notify Respondent of their possible resort to ICSID arbitration under the Treaty, the Parties' voluminous materials regarding discussions in the Argentine media and within the Argentine Senate regarding the possibility of recourse to ICSID arbitration are not relevant.

### iii.      Determining When the Dispute Began

117.  Considering that a formal notification of the existence of the dispute or the start of the negotiation period was not required, the issue for the Tribunal is to identify when the "dispute" can be considered to have begun.  Considering that the Request for Arbitration was brought on December 11, 2008, the critical date is therefore June 11, 2008, six months earlier.

118.  It is clear from the voluminous briefing on this subject that the two sides have had differing views on the regulation and control of the Argentine Airlines for years, and that the Parties have had numerous communications and exchanges, that have included the highest levels of the Argentine government.[106]  However, the disagreements during this period have been dynamic, and Claimants' arguments reflect this.  Claimants have identified two "core issues" to their dispute: 1) a disagreement over the regulatory framework that was applied to Claimants

---

[104] *See Burlington v. Ecuador*, Decision on Jurisdiction at ¶¶ 335-337 ("[T]he "dispute" to which Article VI(3)(a) refers is one that relates to "an alleged breach of any right conferred or created by this Treaty with respect to an investment." Stated otherwise, as long as no allegation of Treaty breach is made, no dispute will have arisen giving access to arbitration under Article VI."); *see also Murphy v. Ecuador*, Decision on Jurisdiction, at ¶ 103.

[105] *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States of America)*, Jurisdiction and Admissibility, Judgment, I.C.J. Reports November 26, 1984, ¶ 83 (hereinafter *"Nicaragua v. U.S.A."*), Exhibit C-406.  *See also Case Concerning Application of the International Convention on the Elimination of All Forms of Racial Discrimination (Georgia v. Russian Federation)*, Preliminary Objections, Judgment, April 1, 2011, ¶ 30, Exhibit C-554, (hereinafter *"Georgia v. Russian Federation"*).

[106] *See, e.g.,* CM ¶ 103.

(regarding the airfare caps imposed upon the Argentine Airlines) and 2) a disagreement over the compensation owed to Claimants for the expropriation of their investment (through Respondent's direct expropriation of Interinvest's shares).[107]   The first issue, an alleged "creeping expropriation" of the *Argentine Airlines*, purportedly began in 2004.[108]   The second issue, the alleged direct expropriation of *Interinvest's* shares in the Argentine Airlines, began much later.

119.   International courts and tribunals agree that for a dispute to exist, it must have crystallized into an actual disagreement.   As the ICJ held in *Mavrommatis*, "A dispute is a disagreement on a point of law or fact, a conflict of legal views or of interests between two persons."[109]   It must be shown that "the claim of one party is positively opposed by the other."[110]   As the *Maffezini* tribunal recognized, the dispute "must relate to clearly identified issues between the parties and must not be merely academic…The dispute must go beyond general grievances and must be susceptible of being stated in terms of a concrete claim."[111]   A diplomatic request by an investor to a host State for further assistance does not, on its own, necessarily express disagreement on the parties' rights and obligations.[112]   Instead, only when a request "manifest[s] a disagreement over the rights and obligations" can it be considered a dispute.[113]

120.   It is clear that a disagreement between the Parties regarding the *regulatory treatment* of the Argentine Airlines had developed long before the June 11, 2008 critical date, and that the Parties had conducted substantial negotiations regarding this disagreement.   Claimants assert that a dispute has existed in this case since late 2004, when the Respondent rejected the Argentine Airlines' request for an increase in airfare caps.[114]   This dispute allegedly escalated in 2006 when, despite prior promises to increase the airfare caps, Respondent now conditioned this and other measures on Claimants' transfer of a percentage of their shares in ARSA.[115]   It is true that many of the discussions between the Parties took the form of a *request* from Claimants for various promised regulatory changes.   However, a 2004 letter from the Argentine Airlines to Respondent makes clear their position that Respondent has failed to properly apply its

---

[107] CM ¶ 99.

[108] Rej. ¶ 91.

[109] *Mavrommatis, Judgment No. 2,* p. 11.

[110] *South West Africa (Ethiopia v. South Africa; Liberia v. South Africa),* Preliminary Objections, Judgment, I.C.J. Reports 1962, p. 328; *Armed Activities on the Territory of the Congo (New Application: 2002) (Democratic Republic of the Congo v. Rwanda),* Jurisdiction and Admissibility, Judgment, I.C.J. Reports 2006, p. 40, para. 90.

[111] *Emilio Agustín Maffezini v. Kingdom of Spain* (ICSID Case No. ARB/97/7), Decision on Jurisdiction, January 25, 2000(hereinafter "*Maffezini v. Spain*"), at ¶ 94 (internal citations omitted).

[112] *See Burlington v. Ecuador,* Decision on Jurisdiction, at ¶ 298 ("While Claimant's expectation is conceivably a diplomatic request for further assistance in connection with the indigenous opposition in the Block, this request for assistance does not express disagreement with the manner in which the Respondent has fulfilled its obligation to provide protection and security in the Block. In and of itself, a request for assistance does not express disagreement on the parties' rights and obligations are, unless the surrounding context suggests otherwise, *i.e.* that the party whose assistance is requested has thus far failed to abide by its duty to assist.").

[113] *See id.* at ¶ 320 ("In the view of the Tribunal, the 4 December 2002 letter is sufficient to raise a "dispute" within the meaning of Article VI(3) of the Treaty. While the main purpose of the letter is to request assistance from PetroEcuador with the episodes of violence and the opposition met in the Block, the tone and the context of the letter do manifest a disagreement over rights and obligations.")

[114] CM ¶ 101.

[115] CM ¶ 102.

regulations.[116]   This demonstrates that Claimants plainly disagree with Respondent over the application of Argentine laws and regulations to them.

121.   It is less clear that a disagreement between the Parties regarding the *expropriation* of Interinvest's shares existed before June 11, 2008.   While Claimants assert that they disagreed with Respondent over the fair valuation of their investment by April 2008,[117] the evidence on this is not so clear.   At that point, Respondent's first attempt to find a buyer for the Argentine Airlines had failed, because Claimants had rejected the potential buyer's purchase offer.[118] However, it seems difficult to characterize Claimants' rejection of a *third party's* purchase offer as a *legal* dispute with Respondent, rather than simply a failed business transaction.   The Parties subsequently executed an agreement providing for Respondent to buy the shares of the Argentine Airlines on July 17, 2008.   While Claimants argue that the negotiating environment of this agreement was hostile and threatening,[119] it is conceptually difficult to view an executed *agreement* as constituting a legal *dispute*.[120]

122.   The issue, therefore, is whether it is enough for purposes of Article X(2) that by June 11, 2008, a disagreement existed concerning the *regulatory treatment of the Argentine Airlines* (and was being negotiated), even if a clear disagreement regarding the *valuation of Interinvest's (ultimately expropriated) shares in the Argentine Airlines* had not yet crystallized.   In other words, are these two disagreements sufficiently related that negotiations under the first disagreement are enough to satisfy Article X(2)?

123.   The answer to this question is yes.   International jurisprudence suggests that the *subject matter* of the negotiations should be the same as the dispute that is brought before the court or tribunal.   In the recent *Georgia v. Russia* case, the ICJ noted that "the exchanges must refer to the subject-matter of the treaty with sufficient clarity to enable the State against which a claim is made to identify that there is, or may be, a dispute with regard to that subject-matter."[121]   The tribunal in *CMS*, describing the existence of multiple types of sovereign actions that could constitute disputes, noted that "as long as [these multiple different actions] affect the investor in violation of its rights and cover the same subject matter, the fact that they may originate from different

---

[116] *See, e.g.,* Merits ¶ 124, citing an October 4, 2004 letter from the Argentine Airlines to the Argentine Secretary of Transportation, Mr. Ricardo Jaime, in which they request an increase in the airfare caps.   In this letter, the Argentine Airlines assert that the current airfare caps imposed on them are "completely out of step with the cost increases brought about by the fuel price increase, thereby distorting the remunerative rate concept established in Law No. 19,030, the Law on Commercial Aviation Policy."   *See* Ex. C-71.

[117] Rej. ¶ 91.

[118] CM ¶ 104.

[119] CM ¶ 107.

[120] Later, on September 18, 2008, Congress passed a law approving Respondent's repossession of the Argentine Airlines, and authorized compensation to be calculated by the *Tribunal de Tasaciones de la Nación*, in disregard of the third-party valuation mechanism of the July 2008 agreement.   CM ¶ 123.   Following a disagreement between the *Tribunal de Tasaciones* and Credit Suisse, Claimants' valuator, as to the value of the Argentine Airlines, Congress passed a law on December 22, 2008 authorizing the expropriation of the Argentine Airlines' shares that belonged to Interinvest.   Merits ¶ 276.

[121] *Georgia v. Russian Federation,* Preliminary Objections, Judgment, April 1, 2011, ¶ 30, Exhibit C-554.   *See also Generation Ukraine Inc. v. Ukraine* (ICSID Case No. ARB/00/9), Award, September 15, 2003, ¶ 14.5, Exhibit C-297, noting that, in that case, "[t]here is no doubt that the subject matter of the two mediations was the Claimant's Parkview Project and the conduct of Ukrainian authorities in respect thereto.   This is sufficient for the purposes of the requirement in Article VI(2) of the BIT."

sources or emerge at different times does not necessarily mean that the disputes are separate and distinct."[122]

124. Claimants have characterized the subject matter of their dispute as concerning Respondent's treatment of Claimants' investments in the Argentine Airlines and Interinvest.[123]   Respondent has retorted that the subject matter of the negotiations between the Parties was merely contract issues and matters of domestic law, which is different from the subject matter of a BIT claim.[124]   However, Respondent's argument is really just a general assertion that the claim must be characterized in the same terms (and possibly employing the same legal theories) when it is being negotiated as when it is finally subjected to arbitration.   Again, nothing in the text of Article X(1)'s reference to "a dispute in connection with investments" requires that the dispute be characterized solely in terms of Treaty violations.

125. Given that the formal expropriation alleged does indeed appear to be closely related to, and follow, what the Claimants characterize as "only the culmination of a creeping expropriation" that began in October 2004,[125] it appears reasonable to conclude that these two core issues are related to the point that they share the same subject-matter.   Therefore, given that the dispute had crystallized before June 11, 2008, and that the Parties continued to exchange views and work towards agreement after this point, it is clear that the Claimants have satisfied the 6-month amicable settlement period.

### (b)   Futility

126. Even if the Tribunal were to find that Claimants had not formed a "dispute" within the meaning of Article X(1) before June 11, 2008, and had not attempted to amicably settle the dispute by the time they filed the Request for Arbitration on December 11, 2008, the Claimants' failure to comply with this obligation should be excused for reasons of futility.   Claimants have asserted that further negotiations with Respondent would be futile, because they have attempted to settle this dispute from 2002 until May 2008, and then again between October 2008 and early 2010.

127. ICSID tribunals have held that waiting periods may be waived when further negotiations would be futile.   For example, the tribunal in *Occidental* held that additional "attempts at reaching a negotiated solution were indeed futile in the circumstances" where the investor had sought to rebut allegations in a *caducidad* proceeding, to no avail, for 18 months before the *caducidad* decree was finally issued.[126]

128. Claimants assert that they continued negotiations with Respondent between October 2008 and early 2010.[127]   These negotiations concerned a potential transaction whereby Respondent would assume Claimants' obligations and rights with respect to purchase orders Claimants had placed

---

[122] *CMS Gas Transmission Company v. Argentine Republic* (ICSID Case No. ARB/01/8), Decision on Jurisdiction, July 17, 2003, at ¶ 109 (hereinafter, "*CMS v. Argentina*").
[123] Rej. ¶ 132.
[124] Mem. ¶¶ 39-40.
[125] Merits ¶ 501.
[126] *Occidental Petroleum Corporation et al. v. Republic of Ecuador* (ICSID Case No. ARB/06/11), Decision on Jurisdiction, September  9, 2008, ¶¶ 93-95, Exhibit C-439.
[127] CM ¶¶ 159.

for several Airbus aircraft on the Argentine Airlines' behalf.  According to Claimants, Respondent was interested in assuming these commitments in exchange for the termination of these ICSID proceedings.[128]  Respondent has not challenged this assertion.[129]  While a draft agreement was initialed on February 8, 2009, and although Respondent later obtained financing from the Spanish government for this agreement, Respondent ultimately did not sign the agreement.[130]

129.  This failed transaction, the negotiations for which lasted at least six months, demonstrates that even after Respondent had received formal notice of Claimants' legal claims against Respondent under the Treaty, the Parties continued to attempt but were ultimately unable to reach any sort of amicable agreement.  It is clear, therefore, that requiring Claimants to engage in any further settlement attempts would serve no further purpose.

<p style="text-align:center"><b>(c)      The Local Court Requirement of Articles X(2) and (3)</b></p>

130.  Respondent also argues that Claimants have failed to comply with Articles X(2) and (3), which require that Claimants' dispute must be submitted to a local court of the host State for a period of 18 months before they may submit the dispute to this Tribunal.[131]  In response, Claimants have identified two different proceedings that they assert "count" for purposes of Articles X(2) and (3): first, the valuations of the Argentine Airlines that were conducted in October 2008 and January 2009, and second, the expropriation lawsuit that was initiated by Respondent against Interinvest shortly after the January 2009 valuation was completed.

131.  Respondent raises several issues with Claimants' identified proceedings.  First, Claimants' Request for Arbitration should have been filed only after the dispute was brought before the Argentine courts; in fact, the expropriation proceedings post-date the filing of these ICSID proceedings.  Second, the expropriation proceedings only concern local laws, not international investment claims.  Third, the parties in the expropriation proceeding—namely, Respondent and Interinvest—are not identical to the parties to this arbitration proceeding.

132.  The Tribunal does not agree with Respondent's assertion that the subject matter of the expropriation suit in domestic court is not the same as the subject matter of this arbitration.  It is

---

[128] Merits ¶¶ 284-303; CM ¶¶ 158-65.

[129] *See also* Exhibit C-235, containing a February 8, 2009 draft agreement between Respondent and Interinvest.  In Section 3.1(b) of the agreement, Interinvest would be required to "*desistirá íntegra y expresamente de todos los derechos que pudiera eventualmente invocar, como también a todas las acciones entabladas o en curso, fundados o vinculados a las medidas mencionadas en el párrafo anterior [la re-nacionalización, estatización, expropiación relativa a las empresas del Grupo AA], así como también a cualquier tipo de solicitud de arbitraje y/o conciliación, demanda judicial...*".

[130] CM ¶ 162.

[131] "2.  If a dispute within the meaning of section 1 cannot be settled within six months as from the date on which one of the parties to the dispute raised it, it shall be submitted, at the request of either party, to the competent tribunals of the Party in whose territory the investment was made.

3. The dispute may be submitted to an international arbitral tribunal in any of the following circumstances: *(a)* At the request of one of the parties to the dispute, when no decision has been reached on the merits after a period of 18 months has elapsed as from the moment the judicial proceeding provided for in section 2 of this article was initiated or When such a decision has been reached, but the dispute between the parties persists; *(b)* When both parties to the dispute have so agreed."

true that the Argentine court proceedings only involved the determination of the value of the expropriated assets, while the ICSID proceeding raises specific issues related to the validity of the expropriation (i.e., fair and equitable treatment, arbitrary and unjustified measures, and full protection and security).  As a matter of substance, however, the goal of both suits is to make the Claimants (and Interinvest, in the case of the Argentine proceeding) whole for the economic loss suffered as a result of the nationalization.  As the ICJ Chamber in *ELSI* noted,

> [T]he local remedies rule does not, indeed cannot, require that a claim be presented to the municipal courts in a form, and with arguments, suited to an international tribunal, applying different law to different parties: for an international claim to be admissible, it is sufficient if the essence of the claim has been brought before the competent tribunals and pursued as far as permitted by local law and procedures, and without success.[132]

133.   The Tribunal also finds that the fact that the local court proceeding was brought by Respondent against Interinvest rather than against Claimants themselves does not affect Claimants' fulfillment of this requirement.  As the *ELSI* Chamber acknowledged, international legal remedies may apply "different law to different parties" than local law remedies do, and this should not be a barrier to the fulfillment of any local court remedy requirements.  That the domestic expropriation proceedings were brought against Interinvest, an Argentine company owned by Claimants through Air Comet, does not prevent those proceedings from counting for purposes of Article X(2) and (3) when the subject matter of those proceedings is the same as that before this Tribunal.

134.   The Tribunal notes, moreover, that the Treaty permits either party to initiate local court proceedings for purposes of Article X.  In this case, it was Respondent that initiated the dispute against Interinvest.  Therefore, the manner in which the proceedings have been cast by Respondent in local courts should not give rise to a successful objection against the Claimants that they failed to comply with the procedural requirements of Article X, as long as the subject matter of the dispute under the Treaty was considered in the local proceedings, which, in this case, it was.

135.   Finally, while Claimants concede that the 18-month local court period had not lapsed at the time they filed their Request for Arbitration, they are correct to note that 18 months have subsequently passed, and the local suit remains pending.  As such, the core objective of this requirement, to give local courts the opportunity to consider the disputed measures, has been met.  To require Claimants to start over and re-file this arbitration now that their 18 months have been met would be a waste of time and resources.[133]

---

[132] *Case concerning Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, Judgment, I.C.J. Reports, July 20, 1989, ¶ 59, Exhibit C-437.

[133] *See, e.g., Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina* v. *Yugoslavia)*, Preliminary Objections, Judgment, I.C.J. Reports 1996 (II), at 613, ¶ 26 ("For the purposes of determining its jurisdiction in this case, the Court … need only note that, even if it were to be assumed that the Genocide Convention did not enter into force between the Parties until the signature of the Dayton-Paris Agreement, all the conditions are now fulfilled to found the jurisdiction of the Court *ratione personae*. It is the case that the jurisdiction of the Court must normally be assessed on the date of the filing of the act instituting proceedings.  .  .  .   The present Court applied this principle in the case concerning the Northern Cameroons (I.C.J.

136. For the reasons articulated above, this Tribunal finds that the Claimants have satisfied the requirements of Article X(1)(3) of the Treaty.  However, because the Claimants invoked, in the alternative, the application of the Treaty's Most-Favored Nation Clause in relation to Respondent's first objection, the Tribunal now turns to this claim.

### ii.    The Application of the Most-Favored Nation Clause (Article IV(2)) to Dispute Settlement Provisions

137. Article IV(2) of the Treaty provides that

> In all areas governed by this Treaty, such treatment shall not be less favourable than that accorded by each Contracting Party to investments made within its territory by investors of a third country.

138. In their Request for Arbitration, Claimants invoked the MFN clause in Article IV(2), and asserted that this clause entitles them to use "the more favorable treatment accorded to investors under, for example, the U.S.-Argentina BIT."[134]   In their Memorial on the Merits, Claimants again invoke the MFN clause, reference the U.S.-Argentina BIT as an example, and assert that they have complied with all the requirements of the U.S.-Argentina BIT in order to access ICSID arbitration.[135]   Then, in their Counter-Memorial, Claimants assert that they rely on the dispute settlement provisions of the Australia-Argentina BIT.[136]   Article 13(1) of the Australia-Argentina BIT provides that

---

Reports 1963, p. 28), as well as in *Nicaragua Jurisdiction*, when it stated: 'It would make no sense to require Nicaragua now to institute fresh proceedings based on the Treaty, which it would be fully entitled to do.' (I.C.J. Reports 1984, pp. 428-429, para. 83.)"); *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Croatia v. Serbia)*, Preliminary Objections, Judgment, I.C.J. Reports 2008, p. 412 (hereinafter "*Croatia v. Serbia*") ¶ 85, Exhibit C-579 ("The Court observes that as to the first of these two arguments, given the logic underlying the cited jurisprudence of the Court deriving from the 1924 Judgment in the Mavrommatis Palestine Concessions case (Judgment No. 2, 1924, P.C.I.J., Series A, No. 2), it does not matter whether it is the applicant or the respondent that does not fulfill the conditions for the Court's jurisdiction, or both of them — as is the situation where the compromissory clause invoked as the basis for jurisdiction only enters into force after the proceedings have been instituted.  What matters is that, at the latest by the date when the Court decides on its jurisdiction, the applicant must be entitled, if it so wishes, to bring fresh proceedings in which the initially unmet condition would be fulfilled.  In such a situation, it is not in the interests of the sound administration of justice to compel the applicant to begin the proceedings anew— or to initiate fresh proceedings — and it is preferable, except in special circumstances, to conclude that the condition has, from that point on, been fulfilled.").

[134] RFA ¶ 44.

[135] Merits ¶¶ 328-331.  Article VII(2) of the U.S.-Argentina BIT provides that in the event of a dispute, the parties "should initially seek resolution through consultation and negotiation."  If this is unavailing, the investor may choose to submit the dispute for resolution before a) the courts or administrative tribunals of the State party to the dispute; b) in accordance with any previously-agreed procedures; or c) in accordance with the terms of sub-provision 3.  Article VII(3), in turn, provides that if the investor has not submitted the dispute for resolution under VII(2)(a) or (b), and that six months have elapsed from the date the dispute arose, the investor may submit the dispute to ICSID, ICSID Additional Facility, in accordance with UNCITRAL Arbitration Rules, or any other mutually agreed arbitration rules. *See* Ex. C-3.

[136] CM ¶ 7; *see* Ex. C-394.

Any dispute which arises between a Contracting Party and an investor of the other Contracting Party relating to an investment shall, if possible, be settled amicably. If the dispute cannot so be settled, it may be submitted, upon request of the investor, either to:

(a) the competent tribunal of the Contracting Party which has admitted the investment; or

(b) international arbitration in accordance with paragraph 3 of this Article.

Article 13(3), in turn, provides that the investor may choose international arbitration proceedings through either ICSID, a tribunal governed by UNCITRAL Rules, or any other mutually-agreed arbitration rules.

### 1.    Position of Respondent

139. Respondent asserts that the MFN clause of Article IV(2) of the Treaty may not be used by Claimants to access the dispute settlement provisions of another BIT to which Argentina and a third State are parties, for the following reasons:

140. First, Respondent argues that the obligations contained in Article X—to first hold negotiations and to submit the dispute to the Argentine courts for 18 months—are *jurisdictional* requirements that may not be set aside or disregarded.[137]

141. Second, Respondent characterizes Article X as part of its standing, unilateral offer to arbitrate.[138] This unilateral offer must be accepted by the investor in order for there to be an arbitration agreement, and in accepting the offer the investor is not entitled to alter the terms of acceptance.[139] Arbitration is based on consensus, and if there is no respect for the established conditions of Respondent's offer, there can be no consent to arbitration.[140]

142. Third, Respondent asserts that as a rule, MFN clauses contained in BITs are neither arbitration agreements nor part of the treaty's offer to arbitrate; they cannot therefore be applied to jurisdictional matters.[141]   An MFN clause may *only* apply to jurisdictional matters where the State Parties have so consented.  This consent, in turn, must be based on the States' clear and unequivocal intentions as expressed in the treaty.[142]

143. Respondent concedes that arbitral tribunals have not adjudicated this issue uniformly.  However, according to Respondent, starting with *Maffezini v. Spain*, those tribunals applying MFN clauses to jurisdictional matters have failed to understand that MFN clauses do not extend to dispute settlement provisions and are not a part of offers to arbitrate.[143]  Nor do such decisions reflect the

---

[137] Mem. ¶ 32; Rep. ¶ 96.
[138] Mem. ¶ 39.
[139] Mem. ¶ 40-41.
[140] Mem. ¶ 44.
[141] Mem. ¶ 48; Rep. ¶ 111.
[142] Mem. ¶ 48.
[143] Mem. ¶ 52.

majority view on the subject.  Indeed, an "equal number of decisions" have rejected recourse to dispute settlement provisions through a treaty's MFN clause.[144]  Respondent also notes that "many" States have subsequently explicitly limited the scope of the MFN treatment in their bilateral investment treaties in order to avoid the result reached in *Maffezini*.[145]

144.  Fourth, Respondent argues that the ordinary meaning of the Treaty's MFN clause does not demonstrate the two States' clear and unequivocal intention to apply it to the provisions on the settlement of disputes, either in accordance with the rules on treaty interpretation in the Vienna Convention on the Law of Treaties ("VCLT") or in accordance with the *ejusdem generis* principle.[146]

145.  To the contrary, argues Respondent, substantial evidence demonstrates that the States' intention was for the MFN clause *not* to apply to matters of jurisdiction and procedure.[147]  Respondent asserts that the 18-month clause is an essential provision of the Treaty which was specifically negotiated by Argentina and Spain, as it has been in some—but not all—of Argentina's BITs.[148]  Moreover, at the time the Treaty was concluded, both Parties had entered into other BITs that did not contain local court preconditions.  It is therefore impossible that the Parties intended for the Treaty's MFN clause to apply to dispute settlement provisions, because such an interpretation would have immediately deprived Article X of all effect.[149]  Finally, Argentina continued to include 18-month court provisions in subsequent BITs.  Such provisions would be meaningless if it was possible for them to be set aside by applying an MFN clause.[150]

146.  Fifth, Respondent asserts that Claimants cannot be allowed to import parts of the dispute settlement clause of the U.S.-Argentina BIT, which contains a fork-in-the-road provision.[151]  The dispute settlement provisions of the Treaty and the U.S.-Argentina BIT are fundamentally different and incommensurate.  Under the Treaty, if the dispute is *not* submitted to the Argentine courts, it may not proceed to international arbitration, whereas under the U.S.-Argentina BIT, if the dispute *is* submitted to the Argentine courts, it may not subsequently proceed to international arbitration.  There is no evidence that Spain and Argentina accepted, through the application of the Treaty's MFN clause, such a "radical change" in their consent to international jurisdiction.[152]

147.  Sixth, Respondent argues that the authentic interpretation of the State Parties to the Treaty is clear.  In *Maffezini*, in which an Argentine investor sued Spain under the Treaty, the Kingdom of Spain adopted the same position as the Argentine Republic is taking in the instant case regarding the inapplicability of the MFN clause to dispute settlement provisions.[153]  The unilateral interpretation previously made by Spain has now been upheld by the Argentine Republic, thus

---

[144] Rep. ¶ 132; *see also* Respondent's Letters of February 17 and September 28, 2012.
[145] Mem. ¶¶ 54-55.
[146] Mem. ¶¶ 57-68.
[147] Mem. ¶ 28.
[148] Mem. ¶ 70.
[149] Rep. ¶ 113.
[150] Rep. ¶ 145.
[151] Mem. ¶¶ 74-75.
[152] Rep. ¶ 124.
[153] Mem. ¶ 83.

making it an authentic interpretation of the Treaty in accordance with Article 31(3) of the VCLT.[154]

148. Seventh, Respondent asserts that Claimants' invocation of Article 13 of the Australia-Argentina BIT, through application of the MFN clause in their Counter-Memorial, is not timely and must be dismissed.[155]  To change the instrument upon which they are relying at this point is against the principle of good faith and should be barred by estoppel.[156]  It also severely affects Respondent's right to defend itself and turns the jurisdiction of this Tribunal into a moving target.[157]

### 2.    Position of Claimants

149. Claimants assert that through the operation of the MFN provision in Article IV(2) of the Spain-Argentina BIT, they may rely on the procedural rules on admissibility of investor-state claims contained in Article 13 of the Australia-Argentina BIT, rather than the provisions set forth in Article X of the Treaty.  Article 13 of the Australia-Argentina BIT provides neither the 6-month nor the 18-month requirements contained in the Treaty's Article X.[158]

150. Claimants assert that the text of Article IV(2) of the Treaty clearly indicates that the MFN standard can be relied on with respect to the waiting periods provided in Article X.[159]  The MFN clause is extremely broad because it encompasses "all matters" dealt with in the Treaty.[160]  The third and fourth paragraphs of Article IV list exhaustively those matters that are excluded from the scope of the MFN clause.  This list does not include dispute-resolution provisions or "waiting periods."[161]  Therefore, on the basis of *expressio unius est exclusio alterius*, the MFN clause extends to all matters not expressly excluded.[162]

151. Second, according to Claimants, there is no rule that an MFN clause can only be deemed to apply to dispute settlement provisions where there is evidence that this is the Parties' clear and unequivocal intention.  Argentina's reliance on this purported special presumption finds no support in either the VCLT or international jurisprudence.[163]

152. Third, Claimants assert that the case law decided under the Treaty's MFN clause[164] unanimously supports Claimants' position.  In each of the four cases, the claimants invoked Article IV(2) to

---

[154] Rep. ¶ 125.
[155] Rep. ¶ 104.
[156] Rep. ¶ 105.
[157] Rep. ¶ 106.
[158] CM ¶ 23.
[159] CM ¶ 24.
[160] CM ¶ 26.
[161] *Id*.
[162] *Id*.
[163] Rej. ¶¶ 29-32.
[164] CM ¶ 29 et seq.  Claimants make reference to *Maffezini v. Spain*; *Gas Natural SDG SA v. Argentine Republic* (ICSID Case No ARB/03/10), Decision on Jurisdiction , June 17, 2005 (hereinafter, "*Gas Natural v. Argentina*"), Exhibit C-260; *Suez, Sociedad General de Aguas de Barcelona S.A. and Intergua Servicios Integrales de Agua S.A. v. Argentine Republic* (ICSID Case No. ARB/03/17), Decision on Jurisdiction, May 16, 2006 (hereinafter "*Suez InterAguas v. Argentina*"), Exhibit C-400; *Suez, Sociedad General de Aguas de Barcelona S.A., and Vivendi Universal S.A. v. Argentine Republic* (ICSID Case No. ARB/03/19), Decision on Jurisdiction, August 3, 2006

displace the provisions of Article X.  In each case, the tribunals emphasized the inclusive "in all matters" language of Article IV(2).  And in each of the cases, the tribunals did not deny application of the MFN clause to the "waiting periods."[165]

153.  Fourth, Claimants note that a number of other arbitral tribunals have permitted claimants to invoke MFN clauses of their applicable BITs in order to bypass waiting periods.  In those cases, despite the fact that the base BIT contained waiting periods, the tribunals granted the claimants the more favorable treatment of other treaties.[166]  According to Claimants, only three[167] out of a total of thirteen tribunals have rejected the invocation of an MFN clause to displace an 18-month local court precondition to international arbitration.[168]  However, the MFN clauses of the applicable BITs in *Wintershall*, *ICS* and *Daimler* were substantially different from that of the present Treaty's MFN clause, and the facts of those cases were also substantially different.[169]

154.  Claimants argue that Respondent is wrong to characterize the jurisprudence on this issue as being sharply divided.[170]  Instead, Respondent included in its case survey a series of decisions which are distinguishable from the instant case.[171]  Those cases did not concern use of the MFN clause to bypass procedural or admissibility-related waiting periods (which depend solely on the action and filing date of the claimant).  Instead, the claimants in those cases sought to use the MFN clause to extend the Tribunal's substantive jurisdiction.[172]

155.  Fifth, Claimants assert that Respondent's treaty negotiation practice demonstrates that it did not include waiting periods in many of its BITs.  Only 10 of the 50 BITs referenced in Respondent's Memorial provide for the 18-month period.  This further confirms that such provisions are procedural and technical in nature, and do not relate to matters of fundamental public policy for Argentina.[173]

156.  Sixth, according to Claimants, Respondent has not put forth an "authentic interpretation" of the text based on the State Parties' subsequent practice.[174]  What Argentina is claiming is not an

---

(hereinafter "*Suez Vivendi v. Argentina*"), Exhibit C-255 (note that *Suez Vivendi v. Argentina* was consolidated with *AWG Group Ltd. v. Argentine Republic*, a related arbitration brought under the UNCITRAL Rules).

[165] CM ¶ 29.

[166] CM ¶ 44.

[167] *Wintershall Aktiengesellschaft v. Argentine Republic* (ICSID Case No. ARB/04/14), Award, December. 8, 2008 (hereinafter "*Wintershall v. Argentina*"), LA AR 7; *ICS v. Argentina*, UNCITRAL, PCA Case No. 2010-9, Award on Jurisdiction, February 10, 2012; *Daimler Financial Services AG v. Argentine Republic* (ICSID Case No. ARB/05/1), Award, August 22, 2012 (hereinafter "*Daimler v. Argentina*").

[168] CM ¶ 51; Claimants' Letter of February 28, 2012, at 2; Claimants' Letter of October 9, 2012, at 1.

[169] CM ¶ 52, 57; Claimants' Letter of February 28, 2012, at 2, 4; Claimants' Letter of October 9, 2012, at 2-4.

[170] Rej. ¶ 44.

[171] According to Claimants (CM ¶ 59), these cases include *Salini Costruttori SpA and Italstrade SpA v. Hashemite Kingdom of Jordan* (ICSID Case No. ARB/02/13), Decision on Jurisdiction, November 15, 2004 (hereinafter "*Saliniv. Jordan*"), LA AR 21; *Plama Consortium Limited v. Republic of Bulgaria* (ICSID Case No. ARB/03/24), Decision on Jurisdiction, February 8, 2005 (hereinafter "*Plamav. Bulgaria*"), LA AR 11; *Telenor Mobile Communications v. Republic of Hungary* (ICSID Case No. ARB/04/15), Award, September 13, 2006, (hereinafter "*Telenor v. Hungary*"), Exhibit C-254; and *Vladimir Berschader and Moïse Berschader v. The Russian Federation* (SCC Case No. 080/2004), Award, April 21, 2006 (hereinafter "*Berschader v. Russian Federation*"), LA AR 19.

[172] CM ¶ 59.

[173] CM ¶ 71.

[174] Rej. ¶ 60.

interpretation of Article IV of the Treaty, but rather an amendment to the text of Article IV.[175] Even if it was an interpretation, Respondent must demonstrate an agreement and/or consistent subsequent practice between the State Parties as to the interpretation. Respondent, however, relies only on statements made by Spain in the context of a single dispute, the *Maffezini* case, in which Spain was the respondent.[176]

157. Seventh, the Claimants believe there is no contradiction in using Article 7(3) of the U.S.-Argentina BIT because of its fork-in-the-road choice between local court remedies and international arbitration. Claimants themselves have not submitted the present dispute to the Argentine courts; rather, it was Respondent that submitted the question of compensation to local courts. Claimants, therefore, would not be precluded from going to international arbitration under the U.S.-Argentina BIT.[177]

158. Finally, Claimants assert that their invocation of the Australia-Argentina BIT is not untimely. According to Claimants, they relied on the MFN clause even before they submitted their Request for Arbitration.[178] Moreover, Claimants relied on the Australia-Argentina BIT for the first time in their Counter-Memorial on Jurisdiction because Argentina itself only raised its objection with respect to the 6-month waiting period for the first time in its Memorial on Jurisdiction.[179]

### 3. Analysis of the Tribunal

### b. The Ordinary Meaning of Article IV

159. Article IV, captioned "Treatment," provides as follows:

> 1. Each Party shall guarantee in its territory fair and equitable treatment of investments made by investors of the other Party.

> 2. In all matters governed by this Agreement, such treatment shall be not less favourable than that accorded by each Party to investments made in its territory by investors of a third country.

> 3. Such treatment shall not extend, however, to the privileges which either Party may grant investors of a third State by virtue of its participation in:
> -a free trade area;
> -a customs union;
> -a common market;
> -a regional integration agreement; or

---

[175] Id.

[176] Rej. ¶ 61.

[177] Rej. ¶ 21.

[178] Rej. ¶ 14. *See* Claimants' letter to the President of the Argentine Republic, November 20, 2008, Ex. C-265 ("In that sense, pursuant to Article X(4) of the Treaty, and invoking its Article IV(2) which provides investors with the right to invoke the most favoured nation treatment that the Republic has granted to investors of other countries, as for example to the investors of the United States or the Republic of Chile").

[179] Rej. ¶ 56.

An organization of mutual economic assistance by virtue of an agreement concluded prior to the entry into force of this Agreement, containing terms analogous to those accorded by that Party to participants of the said organization.

4.   The treatment accorded under this article shall not extend to tax deductions or exemptions or other analogous privileges granted by either Party to investors of third countries by virtue an agreement to prevent double taxation or any other tax agreement.

160.   On its face, the language of Article IV(2) is broad.  It applies to "all matters governed by this Agreement."  Its language in Spanish is no less broad: "*en todas las materias regidas por el presente Acuerdo*."  "All," or "*todas*," is unambiguously inclusive.  "Matters," or "*materias*," is also broad and general.  While not decisive on the issue, it is illustrative to note that other BITs have confined the application of MFN treatment to a smaller category of activities than Article IV(2)'s broad "all matters" language.  The Argentina-Germany BIT,[180] for example, contains more constrained provisions:

-   Article 3(1): None of the Contracting Parties shall accord in its territory *to the investments of nationals or companies of the other Contracting Party or to investments in which they hold shares*, a less favorable treatment than the treatment granted to the investments of its own nationals or companies or to the investments of nationals or companies of third States.

-   Article 3(2): Neither Contracting Party shall in its territory subject nationals or companies of the other Contracting Party, *as regards its activities related to investments*, to a less favorable treatment than the one accorded to its own nationals and companies or to nationals and companies of third States.[181]

161.   The MFN clause in the Italy-Jordan BIT at dispute in *Salini v. Jordan* also contains a more limited scope of application:

-   Both Contracting Parties, within the bounds of their own territory, *shall grant investments effected by, and the income accruing to, investors of the Contracting*

---

[180]   The Argentina-Germany BIT was at issue in *Wintershall*, *Hochtief, Daimler* and *Siemens AG v. Argentine Republic* (ICSID Case No. ARB/02/8), Decision on Jurisdiction, August 3, 2004 (hereinafter "*Siemens v. Argentina*"), Exhibit C-330.

[181]   Treaty between the Federal Republic of Germany and the Republic of Argentina for the Promotion and Reciprocal Protection of Investments, April 9, 1991, UNTS Vol. 1910, 171 (1996)(emphasis added).  Ad Article 3 in the Protocol to the Argentina-Germany BIT provides as follows: "(a) The following shall more particularly, though not exclusively, be deemed "activity" within the meaning of article 3, paragraph 2: the management, utilization, use and enjoyment of an investment. The following shall more particularly, though not exclusively, be deemed "treatment less favourable" within the meaning of article 3: less favourable measures that affect the purchase of raw materials and other inputs, energy or fuel, or means of production or operation of any kind or the marketing of products inside or outside the country. Measures that are adopted for reasons of internal or external security or public order, public health or morality shall not be deemed "treatment less favourable" within the meaning of article 3."

*Party* no less favourable treatment than that accorded to investments effected by, and income accruing to, its own nationals or investors of Third States.[182]

162. Likewise, the MFN clause in the U.K.-Argentina BIT at dispute in *ICS v. Argentina* contains a more limited scope of application:

- Neither Contracting Party shall in its territory subject investors of the other Contracting Party, *as regards their management, maintenance, use, enjoyment or disposal of their investments*, to treatment less favourable than that which it accords to its own investors or to investors of any third State.[183]

163. In the BITs referenced above, MFN treatment only applies to qualifying "investments," "activities related to investments," "income accruing" to investors, or "management, maintenance, use, enjoyment or disposal" of those investments. Such terms are narrower than the general "matters" language contained in the Treaty. Moreover, none of these other BITs contains the simple and expansive "all" of the Treaty.[184]

164. Other subsections of Article IV of the Treaty contain explicit carve-outs to the application of MFN treatment. Article IV(3) provides that MFN treatment shall not extend to the treatment either Party extends to third states by virtue of their common participation in a free trade area, a customs union, a common market, a regional integration agreement or an organization of mutual economic assistance. Article IV(4) provides that MFN treatment shall not extend to the treatment either Party extends to investors of third states concerning tax deductions or similar provisions. The issues of jurisdiction and admissibility are absent from this list of explicit carve-outs.

165. The Tribunal notes that investment arbitration jurisprudence on the ordinary meaning of MFN provisions has not been entirely consistent, even when the same BIT is concerned. Notably, each of the cases that has addressed Article IV(2) of the Treaty has concluded that the broad language of the MFN clause applies to the Article X dispute resolution provisions.[185] However, other

---

[182] *Salini v. Jordan,* Decision on Jurisdiction, at ¶ 66.

[183] *ICS v. Argentina,* Award on Jurisdiction, at ¶ 65. As noted above, the *ICS* Tribunal determined that the MFN clause of the U.K.-Argentina BIT did not apply for purposes of dispute settlement provisions. In reaching this conclusion, the tribunal pointed to 1) the state of the law at the time the BIT was concluded and the expectation of the parties were such that, without express language in the treaty, treatment could not have extended to dispute resolution mechanisms (¶¶ 285-296); 2) the contextual language established that "treatment" only referred to the "management, maintenance, use, enjoyment or disposal of" an investment (¶¶ 297-304); and 3) the phrase "in its territory" imposes a territorial limitation that excludes international arbitration, which is in the nature of an extra-territorial dispute settlement procedure (¶¶ 305-309).

[184] *See also Maffezini v. Spain,* Decision on Jurisdiction, at ¶ 60 (noting that with respect to the BITs concluded by Spain, "the only one that speaks of 'all matters subject to this Agreement' in its most favored nation clause, is the one with Argentina. All other treaties, including those with Uruguay and Chile, omit this reference and merely provide that 'this treatment' shall be subject to the clause, which is of course a narrower formulation.").

[185] *Maffezini v. Spain,* Decision on Jurisdiction, at ¶ 64; *Gas Natural v. Argentina,* Decision on Jurisdiction, at ¶¶ 30-31; *Suez InterAguas v. Argentina,* Decision on Jurisdiction, at ¶ 54-55; *Suez Vivendi v. Argentina,* Decision on Jurisdiction, at ¶ 54-55. *See also Impregilo v. Argentina,* Award, at ¶ 108, in which the majority of arbitrators determined that the broad "all matters" language of the MFN clause in the Italy-Argentina BIT extended to dispute settlement provisions. Note, however, that one of the arbitrators, Brigitte Stern, dissented on this particular point. *Impregilo v. Argentina,* Concurring and Dissenting Opinion, at ¶ 46 et seq.

tribunals have disagreed.  The Belgium/Luxembourg-Soviet Union BIT applied by the tribunal in *Berschader* contained "all matters" language similar to that of the Spain-Argentina BIT. Nonetheless, the *Berschader* tribunal rejected the claimant's attempt to use the MFN clause.  In contrast with the tribunals in *Maffezini*, *Gas Natural* and the *Suez* cases, the tribunal in *Berschader* noted that "all matters covered by the present treaty" cannot be interpreted "literally," because the MFN clause is not capable of being applied at all to several of the matters covered by the BIT.[186]

166. Likewise, the tribunals that have adjudicated the MFN provisions of the Argentina-Germany BIT have not uniformly interpreted the ordinary meaning of that BIT's MFN provisions.[187]  The tribunals in *Siemens* and *Hochtief* concluded that the language of the MFN provisions (language that is less sweeping and more particularized than the MFN clause in the instant Treaty) implicitly included dispute settlement provisions.[188]  However, the tribunals in *Wintershall* and *Daimler* disagreed.[189]  The *Wintershall* tribunal  determined that the BIT's MFN clause in Article 3 "does *not* mention that the most-favoured-nation "treatment" as to investments, and investment related activities, *is to be in respect of "all relations" or that it extends to "all aspects" or covers "all matters in the treaty*.""[190]  The *Daimler* tribunal, for its part, determined that the language of the Argentina-Germany BIT's MFN clause was territorially limited, that "treatment" was intended by the parties to refer only to treatment of the investment, and that the BIT did not extend MFN treatment to "all matters" subject to the BIT.[191]

### (a)   Jurisprudence Concerning the Application of MFN Clauses to Dispute Settlement Provisions

167. This Tribunal is not bound by the decisions of previous tribunals, and it makes its determination on a basis of the text of the Treaty and the factual and legal arguments put forth by the Parties. Nonetheless, the Tribunal acknowledges that it does not adjudicate in a vacuum.  The issue of application of MFN clauses to dispute settlement provisions has been addressed by numerous panels and in numerous factual scenarios.  Moreover, both Parties have made extensive analyses and arguments on the case law on this issue.  Below, the Tribunal will identify the points on which the different case holdings can be distinguished, and the points on which there is analytical disagreement between tribunals.

---

[186] *Berschader v. Russian Federation,* Award, at ¶ 192.

[187] The MFN clauses of the Germany-Argentina BIT are contained in numerous provisions.  *See* ¶ 158 of this decision, *supra*.

[188] *Siemens v. Argentina,* Decision on Jurisdiction, at ¶ 85 et seq.; *Hochtief v. Argentina,* Decision on Jurisdiction, at ¶ 66 et seq. (note, however, the dissenting opinion of Christopher Thomas, Q.C., on this particular issue.  *Hochtief v. Argentina*, Separate and Dissenting Opinion, at ¶ 45 et seq.

[189] *Wintershall v. Argentina,* Award, at ¶ 162 et seq.; *Daimler v. Argentina,* Award, ¶ 179 et seq. (note, however, the dissenting opinion of Charles N. Brower on this particular issue).  *Daimler v. Argentina*, Dissenting Opinion, at ¶ 17 et seq.

[190] *Wintershall v. Argentina,* Award, at ¶ 162 (emphasis added).

[191] *Daimler v. Argentina,* Award, at ¶¶ 224, 230-231, 236.

### i.   UNCTAD's Case Taxonomy

168. As noted by Claimants, UNCTAD's recent publication on *Most-Favoured-Nation Treatment*[192] categorizes the cases addressing the application of MFN clauses to jurisdiction in a way that largely corresponds with each case's outcome.

169. UNCTAD sorts the cases into two categories. In the first category, claimants "have invoked the MFN treatment clause to override a procedural requirement that constitutes a condition for the submission of a claim to international arbitration."[193] UNCTAD refers to this category of cases as concerning "admissibility" requirements. In the second category, claimants "have attempted to extend via MFN the jurisdictional threshold, i.e., the scope of the mandate of the arbitral tribunal, beyond that specifically set forth in the basic treaty. This use of the MFN clause would give the arbitral tribunal jurisdiction to hear issues or disputes that the basic treaty does not contemplate or expressly excludes."[194] UNCTAD refers to this category of cases as concerning "scope of jurisdiction."

170. UNCTAD identifies the following cases as fitting within the "admissibility" [195] category: *Maffezini*, *Siemens*, *Gas Natural*, *National Grid*,[196] *Suez InterAguas*, *AWG Group*[197] and *Wintershall*. To these cases, the Tribunal would add *Impregilo*,[198] *Hochtief* ,[199] *Abaclat*,[200] *ICS*,[201] and *Daimler*.[202] In each of these cases, the claimant was required under the respective terms of its BIT's dispute settlement provisions to seek a remedy before a local court of the host State for a period of time before bringing arbitration. Each of the claimants in these cases sought to use its BIT's MFN clause in order to "borrow" a dispute settlement provision from another treaty that did not contain a local court requirement as a precondition of arbitration. With the exceptions of *Wintershall*, *ICS* and *Daimler* the claimants' arguments were successful.

171. UNCTAD identifies the following cases as fitting within the "scope of jurisdiction"[203] category: *Salini*, *Plama*, *Telenor*, *Berschader*, and *Tza Yap Shum*.[204] In these cases, the claimants sought to use the MFN clause to expand the scope of jurisdiction under their applicable BIT. In *Salini*, the claimant attempted to use the MFN clause to bring in contract claims before an ICSID tribunal. In *Plama*, the claimant attempted to use the MFN clause to broaden the scope of

---

[192] "Most Favoured-Nation Treatment," UNCTAD Series on International Investment Agreements II at 66-67, UNCTAD/DIAE/IA/2010/1, January 24, 2011 (hereinafter "UNCTAD *MFN Treatment*"), Exhibit C-563.

[193] *Id.* at 66.

[194] *Id.* at 67.

[195] *Id.* at 67-73.

[196] *National Grid Plc v. Argentine Republic* (UNCITRAL), Decision on Jurisdiction, June 20, 2006, (hereinafter "*National Grid v. Argentina*"), LA AR 25.

[197] *See Suez Vivendi v. Argentina,* Decision on Jurisdiction.

[198] *Impregilo v. Argentina,* Award, at ¶¶ 79 et seq. (note, again, the dissenting opinion of B. Stern on this issue).

[199] *Hochtief v. Argentina,* Decision on Jurisdiction, at ¶¶ 59 et seq. (note, again, the dissenting opinion of C. Thomas on this issue).

[200] *Abaclat v. Argentina,* Decision on Jurisdiction and Admissibility, at ¶¶ 568 et seq.

[201] *ICS v. Argentina,* Award, at ¶¶ 243 et seq.

[202] *Daimler v. Argentina,* Award, ¶¶ 179 et seq.

[203] UNCTAD *MFN Treatment*, at 73-79.

[204] *Tza Yap Shum v. The Republic of Peru* (ICSID Case No. ARB/07/6), Decision on Jurisdiction and Competence, June 19, 2009.

jurisdiction beyond that of its applicable BIT, which only provided jurisdiction to resolve issues of compensation in the case of an expropriation.[205]  Similarly, in *Telenor* and *Berschader*, the claimants attempted to use the MFN clause to broaden jurisdiction beyond their BITs, which only provided jurisdiction over expropriation claims.[206]  In each of these cases, the claimant's attempts to rely on the MFN clause were rejected by the tribunals.  UNCTAD identified only one case within this category, *RosInvestCo*, that departed from this trend.[207]

172.  Looking at the taxonomy above, it is clear that Claimants' position falls within the "admissibility" category of cases cited by UNCTAD, in which tribunals normally rule in favor of applying the MFN clause.  Claimants are seeking to apply the Treaty's MFN clause in order to dispense with the requirements of Article X, namely, that the Parties attempt to amicably settle their dispute for 6 months, and that their dispute be subjected to the local courts of Argentina for 18 months.

### ii.  Other Interpretative Issues

173.  In addition to looking at case law according to outcome, the Tribunal considers the interpretative assumptions underlying tribunals' decisions.  At least one of the tribunals in the "admissibility" cases identified by UNCTAD looked for evidence that the State parties did *not* intend to include dispute settlement provisions within the scope of the MFN clause.  As the tribunal in *Gas Natural* stated, "Unless it appears clearly that the state parties to a BIT or the parties to a particular investment agreement settled on a different method for resolution of disputes that may arise, most-favored-nation provisions in BITs should be understood to be applicable to dispute settlement."[208]

174.  In contrast, tribunals in the "scope of jurisdiction" cases have taken as a starting principle that the extension of the MFN clause to cover jurisdictional issues *cannot be assumed*.  As the tribunal in *Plama* set forth, "an MFN provision in a basic treaty does not incorporate by reference dispute settlement provisions in whole or in part set forth in another treaty, unless the MFN provision in the basic treaty leaves no doubt that the Contracting Parties intended to incorporate them."[209]  According to *Plama*, "an arbitration clause must be clear and unambiguous and the reference to an arbitration clause must be such as to make the clause part of the contract (treaty)."[210]

175.  Likewise, tribunals have differed in their views on whether dispute settlement provisions constitute a vital protection of foreign investors.  Many of the tribunals following the *Maffezini*

---

[205] *Plama v. Bulgaria,* Decision on Jurisdiction, at ¶¶ 186-187.

[206] *Telenor v. Hungary,* Award, at ¶¶ 81-83, *Berschader v. Russian Federation,* Award, at ¶¶ 151-153.

[207] *RosInvestCo UK Ltd. v. The Russian Federation,* Arbitration Institute of the Stockholm Chamber of Commerce, Case No. 079/2005, Award, October 2007; *see also* UNCTAD *MFN Treatment,* at 79.  *The Russian Federation v. RosInvestCo UK Ltd,* Case No. T24891-07, Order, Stockholm District Court, November 9, 2011. In a default judgment rendered November 9, 2011, the Stockholm District Court declared that the arbitration agreement, which had arisen through the claimant's request for arbitration under the Russia-U.K. BIT, did *not* give the arbitrators jurisdiction to determine whether Russia had undertaken measures of expropriation against the claimant. .

[208] *Gas Natural* Decision on Jurisdiction, at ¶ 49.

[209] *Plama v. Bulgaria,* Decision on Jurisdiction, at ¶ 223.

[210] *Id.* at ¶ 218.  *See also Berschader v. Russian Federation,* Award, at ¶ 181.

Decision on Jurisdiction have determined that these provisions are a fundamental part of the "treatment" or protection owed to investors:

- "Notwithstanding the fact that the basic treaty containing the clause does not refer expressly to dispute settlement as covered by the most favored nation clause, the Tribunal considers that there are good reasons to conclude that today *dispute settlement arrangements are inextricably related to the protection of foreign investors,* as they are also related to the protection of rights of traders under treaties of commerce."[211]

- "From the point of view of the promotion and protection of investments, the stated purposes of both the Argentina-Spain BIT and the Argentina-U.K. BIT, *dispute settlement is as important as other matters governed by the BITs and is an integral part of the investment protection regime that the respective sovereign states have agreed upon.*"[212]

- "[T]he Tribunal considers that the critical issue is whether or not the dispute settlement provisions of bilateral investment treaties constitute part of the bundle of protections granted to foreign investors by host states. As the Tribunal sees the history, first of the ICSID Convention, which created the institution of investor-state arbitration, and subsequently of the wave of bilateral investment treaties between developed and developing countries (and in some instances between developing countries *inter se*), *a crucial element – indeed perhaps the most crucial element – has been the provision for independent international arbitration of disputes between investors and host states. The creation of ICSID and the adoption of bilateral investment treaties offered to investors assurances that disputes that might flow from their investments would not be subject to the perceived hazards of delays and political pressures of adjudication in national courts."[213]

- "*Access to [dispute settlement] mechanisms is part of the protection offered under the Treaty. It is part of the treatment of foreign investors and investments and of the advantages accessible through a MFN clause.*"[214]

- "Article X['s dispute settlement provision] is a benefit conferred on investors and designed to protect their interests and the interests of a State Party in its capacity as a host State party to a dispute with an investor: *it is a protective right that sits alongside the guarantees against arbitrary and discriminatory measures, expropriation, and so on.*"[215]

---

[211] *Maffezini v. Spain,* Decision on Jurisdiction, at ¶ 54 (emphasis added).

[212] *Suez InterAguas v. Argentina,* Decision on Jurisdiction, at ¶ 57 (emphasis added).

[213] *Gas Natural v. Argentina,* Decision on Jurisdiction, at ¶ 29 (emphasis added).

[214] *Siemens v. Argentina,* Decision on Jurisdiction, at ¶ 102 (emphasis added).

[215] *Hochtief v. Argentina,* Decision on Jurisdiction, at ¶ 68 (emphasis added).

176. The above tribunals do not share the concern expressed by Respondent, and by a few other tribunals, that such an approach disregards the fundamental requirement that a State Party consent to jurisdiction.  For example, the tribunal in *Telenor* noted, "[W]hat has to be applied is not some abstract principle of investment protection in favour of a putative investor who is not a party to the BIT and who at the time of its conclusion is not even known, but the intention of the States who are the contracting parties."[216]  Because consent is a basic requirement for jurisdiction over a State, and because the terms of consent to arbitration are negotiated on an individual basis for each BIT, these tribunals were unwilling to assume, without explicit language by the State Parties on this point, that the jurisdictional requirements of one BIT can be borrowed by an investor of a third State.

177. The position taken by each tribunal may very well be influenced to an extent by the facts before it.  The tribunals that considered whether MFN protection could extend to admissibility requirements were not asked to extend the reach of MFN protection to provisions that would change the arbitral forum or the scope of matters that could be subjected to arbitration.  In contrast, the tribunals that considered the latter issue were not required to assess whether MFN protection could cover admissibility requirements.

178. In *Plama*, for example, while the tribunal held that the MFN clause could not be used to substitute the BIT's dispute settlement mechanism in favor of ICSID arbitration, it also expressed a certain sympathy for the *Maffezini* tribunal:

> The decision in *Maffezini* is perhaps understandable. The case concerned a curious requirement that during the first 18 months the dispute be tried in the local courts. The present Tribunal sympathizes with a tribunal that attempts to neutralize such a provision that is nonsensical from a practical point of view. However, such exceptional circumstances should not be treated as a statement of general principle guiding future tribunals in other cases where exceptional circumstances are not present.[217]

What the *Plama* tribunal characterized as *Maffezini's* "curious" 18-month local court requirement has not proved to be as "exceptional" as the *Plama* tribunal suggests.  Since the *Plama* decision on jurisdiction was issued, numerous tribunals have addressed the application of MFN clauses to 18-month local court requirements.[218]  In any case, the *Plama* tribunal's dictum suggests a view that treatment of a requirement may vary depending on the nature of that requirement.

179. Moreover, the tribunal in *Maffezini* itself was careful to stress that its decision was bounded by "important limits arising from public policy considerations."[219]  *Maffezini* included within these limits BIT clauses that provide for a specific arbitration forum, such as ICSID, and that provide

---

[216] *Telenor v. Hungary,* Award, at ¶ 95.  See also *Wintershall v. Argentina,* Award, at ¶ 179, which notes with approval the tribunals that do not "regard as sufficient a consent of the Host State to international arbitration which would be a merely presumed consent."

[217] *Plama v. Bulgaria,* Decision on Jurisdiction, at ¶ 224.

[218] *See, e.g., Gas Natural, National Grid, Suez Vivendi, Suez InterAguas, Impregilo, Hochtief, Abaclat.*

[219] *Maffezini v. Spain,* Decision on Jurisdiction, at ¶ 56.

for a highly institutionalized system of arbitration with precise rules of procedure.[220]   For the *Maffezini* tribunal, such provisions cannot be replaced or bypassed.

180.   To be sure, several tribunals have criticized the *Maffezini* public policy limits.   The *Plama* tribunal noted that *Maffezini* did not specify the origin or the basis of these "public policy" considerations.[221]   The *Salini* and *Wintershall* tribunals asserted that the limits identified by *Maffezini* did not do enough to prevent the risk of treaty shopping.[222]   Nonetheless, a significant number of tribunals have either directly applied *Maffezini's* four limitations or have used its discussion as the basis for an inquiry into what public policy considerations animated the State parties' formulation of their MFN clauses.   For example, in *Plama* and *Berschader*, the tribunals found it significant that the BIT was concluded while the State respondents were still communist governments, favoring limited dispute settlement and limited protections for investors.[223]

181.   In light of the above discussion, the Tribunal is cognizant of the concern articulated by numerous tribunals that the reach of the MFN clause not extend beyond appropriate limits.   The Tribunal also acknowledges that the nature of the dispute settlement provisions that Claimants seek to replace via the Article IV(2) MFN clause is relevant to any such determination.

182.   In that respect, the Tribunal finds it significant that Claimants have not requested that the Tribunal apply the MFN clause in order to replace the Treaty's provisions on the arbitral forum or rules.   Nor have Claimants requested that the Tribunal apply the MFN clause in order to broaden the scope of legal issues that may be adjudicated through arbitration.   Instead, they have argued that the procedural requirements of Article X, namely the negotiation and local court requirements, may be bypassed in favor of the more procedurally limited dispute settlement provisions of the Australia-Argentina BIT.

### (b)   The dispute settlement clause of the U.S.-Argentina BIT and the Australia-Argentina BIT

183.   As a final argument, Respondent has protested Claimants' invocation of the U.S.-Argentina BIT and the Australia-Argentina BIT on two grounds.   First, Respondent asserts that Claimants cannot take advantage of the U.S.-Argentina BIT's dispute settlement provisions because there is no advantage to take; the U.S.-Argentina BIT's fork-in-the-road provisions (providing for either a local court remedy or an arbitral remedy) are not better, but simply constitute a different settlement regime.[224]   Second, Respondent argues that Claimants' invocation of the Australia-

---

[220] *Id.*, at ¶ 63.

[221] *Plama v. Bulgaria,* Decision on Jurisdiction, at ¶ 221.

[222] *Salini v. Jordan,* Decision on Jurisdiction, at ¶ 115, *Wintershall v. Argentina,* Award, at ¶ 182.

[223] *Plama v. Bulgaria,* Decision on Jurisdiction, at ¶ 195-97; *Berschader v. Russian Federation,* Award, at ¶¶ 200, 203.

[224] The relevant provisions of Article VII of U.S.-Argentina BIT, on dispute settlement include the following: Article VII(2): "In the event of an investment dispute, the parties to the dispute should initially seek a resolution through consultation and negotiation.   If the dispute cannot be settled amicably, the national or company concerned may choose to submit the dispute for resolution: (a) to the courts or administrative tribunals of the Party that is a party to the dispute; or (b) in accordance with any applicable, previously agreed dispute-settlement procedures; or (c) in accordance with the terms of paragraph 3."   Article VII(3) provides that "Provided that the national or company concerned has not submitted the dispute for resolution under paragraph 2 (a) or (b)… the national or

Argentina BIT is inadmissible because it was untimely presented, and that modifying the dispute settlement procedures invoked "severely affects" its right to defend its interests.

184. On the first point, it is clear that the U.S.-Argentina BIT (and the Australia-Argentina BIT) has advantages that the Treaty does not; under the former, it is possible to access arbitration with fewer procedural preconditions. Moreover, Claimants have not already selected the local court "fork" under the U.S.-Argentina BIT. Article X(3)(a) of the Treaty is satisfied when *either* the Respondent or the investor brings the suit before a local court. Here, it was the Respondent that brought a suit against Interinvest in the Argentine courts relating to the expropriation of the Argentine Airlines. As such, it is clear that Claimants have not already "picked" the local court "fork," thereby forfeiting their access to arbitration.

185. On the second point, the Tribunal notes that Respondent does not point to any actual or perceived harm, nor is there any evidence that Claimants' switch from relying on the U.S.-Argentina BIT to relying on the Australia-Argentina BIT would have any effect on the arguments made by Respondent. As such, the Tribunal rejects this argument.

186. To conclude, the Tribunal finds that Claimants may equally rely on the Article IV(2) MFN clause of the Treaty to make use of the dispute resolution provisions contained in Article 13 of the Australia-Argentina BIT. The broad "all matters" language of the Article IV(2) MFN clause is unambiguously inclusive. Moreover, applying the dispute settlement provisions contained in Article 13 of the Australia-Argentina BIT would not change the scope, the forum or the rules applicable to this arbitration. Claimants have satisfied the requirements of Article 13 of the Australia-Argentina BIT, which states that any dispute "shall, if possible, be settled amicably," and which permits an investor to submit the dispute to international arbitration in the event that it cannot be settled.[225] Claimants have clearly complied with this provision.

c.   **Second Jurisdictional Objection: Claimants' Standing**

i.   **Claimants' Investment in Interinvest and the Argentine Airlines**

1.   **Position of Respondent**

187. Respondent argues that Claimants' claims, which are based on the alleged violation of rights held by Interinvest and the Argentine Airlines, are derivative and indirect in nature. As such, argues Respondent, Claimants do not have standing to bring this claim. On one hand, Claimants are claiming rights that are vested in third parties (namely, Interinvest and the Argentine

---

company may choose to consent in writing to the submission to the dispute for settlement by binding arbitration" to ICSID, to the ICSID Additional Facility, in accordance with the UNCITRAL Arbitration or to any other mutually agreed arbitration institution. Note that Respondent's argument could be extended to the Australia-Argentina BIT invoked by Claimants. Article 13 of the Australia-Argentina BIT provides that "1. Any dispute which arises between a Contracting Party and an investor of the other Contracting Party relating to an investment shall, if possible, be settled amicably. If the dispute cannot so be settled, it may be submitted, upon request of the investor, either to: (a) the competent tribunal of the Contracting Party which has admitted the investment; or (b) international arbitration," including to ICSID, in accordance with the UNCITRAL Arbitration Rules or to any other mutually agreed arbitration institution.

[225] Australia-Argentina BIT, art. 13, Exhibit C-394.

Airlines) who are not parties to this arbitration.[226]   On the other hand, Claimants have only indirect shareholdings in these companies, which they hold through the Spanish intermediary company Air Comet S.A.[227]

188. According to Respondent, Claimants bring two different indirect claims.  The first of these claims relates to Interinvest S.A.'s rights.  Respondent asserts that Interinvest, an Argentine company which is not protected under the Treaty, is the only entity with legal standing to complain of the alleged expropriation of the Argentine Airlines' shares.[228]  The second of these claims relates to the rights of ARSA and AUSA.  Here, according to Respondent, Claimants also invoke a set of rights which are not held by them.[229]  The only entities with legal standing to complain of the adoption of airfare regulatory measures are ARSA and AUSA, the parties whose assets were affected by the measures.[230]

189. Respondent asserts that it did not adopt any measure to the detriment of Claimants' own investment.  None of Claimants' shares in Air Comet were expropriated.  Furthermore, the rights deriving from those shares were not infringed, nor was their exercise limited in any way.[231]  There is a distinction between the rights of companies and of their shareholders,[232] and it would be unjust to award compensation to a person or an entity that is not entitled to obtain redress.[233]

190. According to Respondent, Claimants' indirect claim is inadmissible under the Treaty, which affords no protection to indirect shareholders.[234]  Respondent notes that while some investment treaties refer to the "direct or indirect" control of assets or provide for the protection of both the rights and interests of investors, the Treaty does not allow indirect claims to be filed.[235]  Moreover, in defining "investment," the Treaty includes property and rights acquired by foreign investors.[236]  It does not protect the mere shareholders' *interests* in the companies in which they have an indirect shareholding.[237]

191. Furthermore, Respondent asserts that Claimants' indirect claim is inadmissible under general international law.[238]  It is a general principle of law that the company's shareholders cannot complain of alleged violations of rights vested in the company in which they hold shares.[239]  The decisions rendered by the International Court of Justice have consistently maintained that, under international law, shareholders are not entitled to assert the rights of the companies in which they have a shareholding.  In other words, derivative claims are not valid.[240]  Respondent notes that

---

[226] Rep. ¶ 222.
[227] Rep. ¶ 223.
[228] Mem. ¶ 108.
[229] Mem. ¶ 114.
[230] Mem. ¶ 116.
[231] Mem. ¶¶ 102, 115.
[232] Mem. ¶123.
[233] Mem. ¶ 126.
[234] Rep. ¶ 172.
[235] Mem. ¶ 153.
[236] Mem. ¶ 159.
[237] Mem. ¶ 160.
[238] Mem ¶ 128.
[239] Mem. ¶ 130.
[240] Rep. ¶ 175.

the European Court of Human Rights has also rejected the admissibility of indirect actions.[241] Under international law, indirect or derivative claims can only be accepted where a treaty has expressly provided for indirect or derivative actions.[242]

192. Respondent also argues that the ICSID Convention does not allow indirect or derivative claims to be filed. Article 25 of the ICSID Convention lays down the objective criteria for a dispute to fall within the jurisdiction of the Centre.[243] When the ICSID Convention was drafted, the drafters considered allowing controlling shareholders of domestic companies to bring claims to enforce the rights of the companies in which they held shares.[244] However, the drafters ultimately rejected this possibility. Instead, they drafted Article 25(2)(b), which provides for the possibility of a domestic but foreign-controlled company to sue its own State when the parties agreed that the domestic company would be treated as a national of the other State due to its foreign control.[245]

193. It is further Respondent's view that neither the ICSID Convention nor international investment law or customary or general international law provide for a *jurisprudence constante* principle.[246] The judicial decisions cited favorably by Claimants that concern BITs permitting indirect shareholding are not applicable to this dispute.[247]

194. Respondent also urges that Claimants' indirect claim is inadmissible under Argentine law. Argentine law does not allow indirect claims to be filed, and the corporation is the only entity empowered to defend its own interests.[248] Respondent notes that general international law and the Treaty require that the Tribunal apply the domestic law of the State in which the shareholder holds interests in order to decide on the rights that may be invoked by a shareholder under international law.[249] It has been recognized in ICSID decisions that domestic law is relevant for the purposes of determining ICSID's jurisdiction.[250]

195. Respondent makes a number of policy claims regarding Claimants' standing. It asserts that Claimants disregard the set of legal relationships existing among the companies which are part of the corporate chain connecting Teinver S.A. to the Argentine Airlines, as well as those relationships between these companies and their own creditors.[251] If the Tribunal were to order Respondent to pay Claimants compensation, then Claimants would be allocated payments that should have been prioritized for the Argentine Airlines' creditors and the remaining intermediary companies. Claimants, as the last link in this chain of creditors and shareholders, would be unjustly enriched.[252]

---

[241] Mem. ¶ 136.
[242] Mem. ¶ 141.
[243] Mem. ¶ 165.
[244] Mem. ¶ 167.
[245] Mem. ¶ 168.
[246] Rep. ¶ 195.
[247] Rep. ¶ 204.
[248] Mem. ¶ 182.
[249] Rep. ¶ 238.
[250] Rep. ¶ 240.
[251] Mem. ¶¶ 196-98.
[252] Mem. ¶ 205.

196. Furthermore, Respondent asserts that there is an actual risk of double or multiple claims, because there is nothing to prevent Interinvest S.A. from filing an action before the Argentine courts in parallel with the present arbitration.[253]   Multiple claims could potentially lead to a situation of double recovery.[254]   In addition, allowing Claimants to file this indirect action erroneously implies that shareholders have a right to the preservation of the value of their holdings, when in fact, the value of stockholdings varies according to the fluctuations in corporate assets.[255]

197. Finally, Respondent points out that only Teinver S.A. currently owns shares in Air Comet. Between October 2007 and December 2009, both Transportes de Cercanías and Autobuses Urbanos transferred all of their shares in Air Comet to Teinver.   As such, Transportes de Cercanías and Autobuses Urbanos are neither direct nor indirect shareholders in the Argentine companies.[256]

## 2.    Position of Claimants

198. Claimants assert that they are not claiming rights held by Interinvest and/or the Argentine Airlines.   Rather, they are claiming in their own name and on their own behalf, on the basis of the rights conferred on them by the Treaty and the ICSID Convention.[257]   Claimants reiterate that their own claims include the following actions taken by Respondent: 1) formally expropriating Claimants' investment in the Argentine Airlines without any compensation; 2) effectuating the creeping expropriation of their investments in the Argentine Airlines; 3) failing to treat Claimants' investment in Interinvest and the Argentina Airlines fairly and equitably; 4) impairing by unjustified and discriminatory measures the management, maintenance, use, enjoyment, extension or disposal of Claimants' investments in Interinvest and the Argentine Airlines; 5) failing to provide the required protection to Claimants' investments in Interinvest and the Argentine Airlines; and 6) violating specific obligations entered into with respect to Claimants' investment in Interinvest and the Argentine Airlines.[258]

199. Claimants argue that these claims arise directly from their rights under the Treaty, that is, the protection that Respondent owes directly to Claimants as Spanish investors in Argentina. Claimants are thus not asserting contractual rights held by the Argentine companies in question. Claimants are entitled to claim that Respondent's conduct was in breach of the Treaty, regardless of whether that conduct may also amount to a breach of Interinvest's or the Argentine Airlines' rights under local law.[259]

200. Claimants assert that claims by both direct and indirect shareholders for measures impacting their shareholdings are admissible under the Treaty and the ICSID Convention, and are well recognized in international law.   First, Claimants assert that claims by shareholders for harm caused to their shareholdings have been unanimously upheld by ICSID tribunals.   While

---

[253] Mem. ¶ 209.
[254] Mem. ¶ 211.
[255] Mem. ¶ 212.
[256] Rep. ¶ 154.
[257] CM ¶ 220.
[258] CM ¶ 221.
[259] CM ¶ 225, Rej. ¶ 246.

Respondent asserts that a shareholder may not recover damages for harm caused to its "shares and other forms of participation" in companies incorporated in the host-State, virtually all ICSID tribunals that have decided similar objections unanimously have rejected them.[260]  Moreover, ICSID tribunals have acknowledged that an *indirect* shareholder could claim damages "suffered by a company in which it holds shares," even though the applicable BIT did not contain the "direct or indirect" wording.[261]

201.  Second, Claimants argue that claims by indirect shareholders are admissible under the wording of the Treaty.  While the Treaty does not contain "direct or indirect" language, Article I(2) of the Treaty provides that "any kind of assets, such as property and rights of every kind [including] shares and other forms of participation in companies" constitute qualifying investments.  Under this inclusive formulation, indirect shareholders may pursue claims for measures affecting their "shares and other forms of participation in companies."[262]  This conclusion was also reached by other ICSID tribunals interpreting Article I(2) of the Treaty.[263]  Furthermore, the object and purpose of the Treaty is to create favorable conditions and to promote capital flow and investment between investors of the Contracting Parties.  This aim is equally pursued through direct and indirect ownership of investments.[264]

202.  Third, Claimants argue that international law does not support Respondent's position, and that Argentina's reliance on ICJ case law is misplaced.  According to Claimants, the question addressed in those cases was not whether the shareholders had a cause of action under international law, but whether, under customary international law, a State could exercise diplomatic protection over its nationals, who are shareholders with investments affected by a third State.[265]  The right of a particular State to exercise diplomatic protection in favor of its nationals—even if they are shareholders in foreign companies—is irrelevant to the issue of whether an investor has standing under a BIT to claim for measures impacting its shareholding in local companies.[266]

203.  Fourth, in Claimants' view, Respondent misinterprets Article 25(2)(b) of the ICSID Convention.  Article 25(2)(b) is not applicable to the present dispute, since the Treaty lacks any reference to the Parties' consent to treat a company incorporated in the host State and controlled by a foreign investor as a foreign investor for the purposes of the Treaty.  Claimants have not even attempted to invoke 25(2)(b) as a source of jurisdiction.[267]  Furthermore, Argentina misunderstands the negotiating history of this provision.  The issue before the drafters concerned whether to allow local companies access to the ICSID Convention in certain situations such as when they were owned by foreign nationals.[268]

---

[260] CM ¶ 226.
[261] CM ¶ 246; Rej. ¶ 229 (citing *Siemens v. Argentina,* Decision on Jurisdiction, at ¶ 137).
[262] CM ¶ 234.
[263] CM ¶ 235 (citing *Gas Natural v. Argentina,* Decision on Jurisdiction, at ¶ 34).
[264] CM ¶ 237.
[265] CM ¶¶ 248-50.
[266] CM ¶ 252.
[267] CM ¶ 259.
[268] Rej. ¶ 282.

204. Fifth, Claimants assert that Argentine corporate law is irrelevant to decide whether Claimants have *jus standi* under the Treaty and international law.  Claimants' claims are Treaty claims, and they do not constitute an exercise of rights under Argentine domestic law.[269]

205. Sixth, Claimants argue that Argentina's policy concerns are immaterial to the outcome of the current arbitration and, in any case, are misleading and unfounded.  Claimants assert that none of Respondent's policy objections has any support in the Treaty, the ICSID Convention or international law, including investment case law.[270]  Respondent's concerns about preferential treatment over third parties (including creditors), double recovery and double-payment pertain to the merits of the dispute, not to the jurisdictional stage.[271]

206. Finally, Claimants assert that Transportes de Cercanías and Autobuses Urbanos are legitimate parties to the arbitration.  Transportes de Cercanías and Autobuses Urbanos transferred their shares to Teinver on December 10, 2009, but this transfer has no impact on their standing in the current arbitration.  The relevant dates for determining ICSID jurisdiction are the dates of consent and/or registration of the dispute.[272]  Transportes de Cercanías and Autobuses Urbanos indirectly held shares in Interinvest and the Argentine Airlines both when consent was perfected and at the time the Request for Arbitration was submitted.[273]

### 3.   Analysis of the Tribunal

207. In maintaining that the Claimants do not have standing because they are merely "indirect" shareholders in Interinvest and the Argentine Airlines, Respondent advances two distinct legal arguments.[274]  The first argument addresses the question whether Claimants, as shareholders, can recover damages for harms that were inflicted *upon the companies* in which Claimants invested (i.e., Interinvest and the Argentine Airlines), as opposed to harms that were inflicted directly upon Claimants themselves.  This will be referred to below as Respondent's "derivative claim" argument.  Respondent's second legal argument concerns the question whether Claimants must be direct shareholders, in the sense that they must *directly* own the shares in Interinvest, rather than through an intermediary subsidiary such as Air Comet.  This will be referred to below as Respondent's "intermediary investor" argument.

### (a)   Respondent's "Derivative Claim" Argument

### i.   Article I of the Treaty

208. According to Respondent, the Treaty provides no protection to "derivative" shareholders.  While it protects the shareholders' *direct* rights arising out of the shares, it does not, in Respondent's view, protect the shareholders' "mere interests" in the companies in which they have the shareholding.  Respondent asserts that while some investment treaties may provide for the

---

[269] CM ¶ 265.
[270] CM ¶ 269.
[271] CM ¶ 270.
[272] Rej. ¶ 300.
[273] *Id.*
[274] Rep. ¶¶ 222-23.

protection of both the rights and interests of investors, the Treaty does not provide for this possibility.  Respondent contrasts the language of Article I(2) with the analogous provision of the U.S.-Argentina BIT, which extends protections to "a company or shares of stock or *other interests in a company or interests in the assets thereof.*"[275]  Respondent also notes that the U.S.-Argentina BIT, in contrast to the Treaty, protects investments that are "owned or controlled *directly or indirectly.*"[276]

209. While Respondent is correct to note that Article I(2) of the Treaty does not explicitly include or exclude "indirect" investments from its coverage, the broad and inclusive language of this provision suggests that "indirect" shareholders are protected by the Treaty.  Article I(2) sets forth the definition of "investments" that are protected under the Treaty:

> The term "investments" shall mean any kind of assets, such as property and rights of every kind, acquired or effected in accordance with the legislation of the country receiving the investment and in particular, but not exclusively, the following:
>
> -shares and other forms of participation in companies;
> ….

210. This definition is broad and inclusive.  "Investment" encompasses "any kind of assets," "property and rights of every kind," and the list of qualifying investments that follows the definition is exemplary rather than exclusive.  Other ICSID tribunals interpreting the Treaty have noted the breadth of this definition.  The tribunal in *Gas Natural* noted that "while the ICSID Convention does not define the term 'investment,' the BIT clearly does so in an inclusive way," and that the Treaty's definition "follows the almost universal practice of BITs to define the subject of the Treaty as comprehensively as possible."[277]

211. The other ICSID tribunals that have looked at the Treaty have found Article I(2)'s broad language to implicitly permit the kinds of claims that Claimants have advanced.  In the *Suez Vivendi* and *Suez InterAguas* arbitrations, Argentina raised an identical argument, asserting that the shareholder claimants had no standing to bring the dispute because they were alleging a merely "derivative" injury based on the injury to the company in which they hold shares, rather than a direct injury claimants had suffered.  The tribunals in these cases rejected this argument, finding that claimants had a valid "investment" under the terms of the Treaty:

> "[U]nder the plain language of these BITs, the Tribunal finds that Suez's as well as AGBAR's and InterAguas' shares in APSF are "investments" under the Argentina-France and Argentina-Spain BITs. These shareholders thus benefit from the treatment promised by Argentina to investments made by French and Spanish nationals in its territory. Consequently, under Article 8 of the French treaty and Article X of the Spanish treaty, these shareholder Claimants are entitled to have recourse to ICSID arbitration to enforce their treaty rights. Neither the

---

[275] Mem. ¶ 162.
[276] Mem. ¶ 152.
[277] *Gas Natural v. Argentina,* Decision on Jurisdiction, at ¶¶ 33-34.

Argentina- France BIT, the Argentina-Spain BIT, nor the ICSID Convention limit the rights of shareholders to bring actions for direct, as opposed to derivative claims. This distinction, present in domestic corporate law of many countries, does not exist in any of the treaties applicable to this case."[278]

212. It is notable that the *Suez* tribunals described the Treaty as not *limiting* the rights of shareholders to bring "derivative" claims. The tribunals explicitly rejected the notion that there is any "default" under international investment law that restricts what kinds of claims can be brought. In this respect, the tribunals refused to take their cues from domestic corporate law. Under this logic, the fact that the Treaty does not explicitly permit "derivative" actions is irrelevant, because the very concept of a "derivative" claim is alien to the Treaty or the ICSID Convention.

213. The tribunal in *Gas Natural* reached a similar result as the *Suez* tribunals, using a slightly different reasoning. In *Gas Natural*, Argentina again argued that claimant, a shareholder in an Argentine company that was granted concessions, lacked standing to bring its claim. The tribunal disagreed. After finding claimant's shareholdings in the Argentine company to constitute a valid "investment" under the Treaty, it found the claimant to have standing because "a claim asserting the impairment of the value of the shares held by Claimant as a result of measures taken by the host government gives rise to an investment dispute within the meaning of Article X of the BIT[.]"[279] The tribunal in *Gas Natural* accepted that a diminution in the value of the claimant's shares constituted an injury under the Treaty. Like the *Suez* tribunals, the *Gas Natural* tribunal was simply not perturbed by the possibility that this claim was merely "derivative" of an injury to the Argentine company.[280]

214. In light of the language of Article I(2), this Tribunal finds that the Claimants have standing based on their investments in the Argentine Airlines. Respondent's subsequent legal arguments, which draw on ICJ case law, the ICSID Convention and Argentine law, assert that the "derivative" distinction matters for purposes of interpreting the Treaty. However, none of Respondent's arguments, which are analyzed below, undermine the conclusions reached by this Tribunal in light of the text of Article I(2).

### ii.   ICJ Case Law

215. Respondent asserts that general international law does not permit indirect claims brought by shareholders for harms suffered by the companies in which they hold shares. Specifically,

---

[278] *Suez InterAguas v. Argentina,* Decision on Jurisdiction, at ¶ 49; *see also Suez Vivendi v. Argentina,* Decision on Jurisdiction, at ¶ 49.

[279] *Gas Natural v. Argentina,* Decision on Jurisdiction, at ¶¶ 34-35.

[280] The *Gas Natural* tribunal also implies that it is generally understood that foreign investors acquire rights under the ICSID Convention and the applicable BIT when they purchase shares in a locally-established corporation: "Indeed, the standard mode of foreign direct investment, followed in the present case and in the vast majority of transnational transfers of private capital, is that a corporation is established pursuant to the laws of the host country and the shares of that corporation are purchased by the foreign investor, or alternatively, that the shares of an existing corporation established pursuant to the laws of the host country are acquired by the foreign investor. The scheme of both the ICSID Convention and the bilateral investment treaties is that in this circumstance, the foreign investor acquires rights under the Convention and Treaty, including in particular the standing to initiate international arbitration." (*Id.* at ¶ 34).

Respondent points to *Barcelona Traction (Belgium v. Spain)*, in which the ICJ held that Belgium lacked *jus standi* to exercise diplomatic protection of Belgian national shareholders with respect to measures taken by Spanish authorities that affected the Canadian company in which the Belgian nationals held shares.

216. Claimants argue that *Barcelona Traction* is not applicable, because the case's holding does not concern the direct standing of shareholders, but only whether a right of a *state* had been violated as a result of its nationals having suffered an infringement of their rights as shareholders. However, in order to determine whether Belgium had a right to bring its case, the Court had to first address the scope of the Belgian nationals' rights as shareholders. On that issue, the Court concluded that "Not a mere interest affected, but solely a right infringed involves responsibility, so that an act directed against and infringing only the company's rights does not involve responsibility towards the shareholders, even if their interests are affected."[281]

217. Nonetheless, *Barcelona Traction*'s discussion of shareholder rights is inapposite to the circumstances of the present case for two reasons.

218. First, the Court's decision was made in the absence of the specific framework of a BIT. The Court noted that such treaties, while not applicable to the Belgian shareholders, could give shareholders a "direct right to defend their interests against states."[282] This indeed is the Claimants' case since they brought their claim under a BIT that explicitly protects investments they have made in any kind of assets, including shares.

219. Second, the Court acknowledged that international law was silent on the issue of shareholder rights. In the absence of any international authority, the Court explicitly resorted to municipal law to provide the content of the shareholders' rights.[283] In the present case, there is no reason to resort to municipal law when the treaty instrument provides the source of the rights asserted by the Claimants.

220. The Court's analysis in *Barcelona Traction* was confirmed in its 2007 judgment on preliminary objections in *Ahmadou Sadio Diallo (Guinea v. DRC)*, where the Court noted that foreign investment treaties have taken primacy under international law in adjudicating the rights of companies and their shareholders:

> The Court is bound to note that, in contemporary international law, the protection of the rights of companies and the rights of their shareholders, and the settlement of the associated disputes, are essentially governed by bilateral or multilateral agreements for the protection of foreign investments, such as the treaties for the promotion and protection of foreign investments, and the Washington Convention of 18 March 1965 on the Settlement of Investment Disputes between States and Nationals of Other States, which created an International Centre for Settlement of Investment Disputes (ICSID), and also by contracts between States and foreign investors. In that context, the role of diplomatic protection somewhat faded, as in

---

[281] *Barcelona Traction, Light and Power Co., Ltd. (Belgium v. Spain)*, 1970 I.C.J. 3, ¶ 46 (February 1970).
[282] *Id.* at ¶ 90.
[283] *Id.* at ¶ 50.

practice recourse is only made to it in rare cases where treaty régimes do not exist or have proved inoperative.[284]

In *Diallo*, for the reasons explained in *Barcelona Traction*, the Court was compelled to resort to the municipal law of the DRC to assess the scope of Mr. Diallo's rights in the absence of an applicable BIT.[285]

221.   Contrary to Respondent's assertions, *Barcelona Traction* and *Diallo* do not solidify any general principle of international law on shareholder rights that should be applied to the present dispute. Indeed, the Court has taken pains in both *Barcelona Traction* and *Diallo* to distinguish these cases from the situation in which an investment treaty regime would apply.

### iii.   The ICSID Convention

222.   Respondent argues that the ICSID Convention does not extend protections to claims by shareholders.   Specifically, Respondent asserts that the ICSID Convention's drafters had discussed the possibility of allowing shareholders of domestic companies to bring claims, but that this idea was ultimately rejected in favor of Article 25(2)(b) as it currently stands.

223.   However, there is no evidence that the ICSID Convention's drafters rejected the possibility of shareholders bringing "derivative" suits under the ICSID Convention.   The history cited by Respondent only concerns a very specific issue that arose in the ICSID Convention's negotiations concerning the nationality of claimants.   As Christoph Schreuer explained in his authoritative *Commentary*, while the ICSID Convention was intended for disputes between a State and a national of another State, and not for disputes between a State and its own nationals, the drafters were aware that the reality on the ground could be more complicated.   Many States required a foreign investor to carry out its activities under a locally incorporated company.[286] While such a company would otherwise be precluded from bringing a suit because of its nationality, the drafters ultimately created Article 25(2)(b) as an exception to the nationality requirement to accommodate this situation.

224.   Therefore, to the extent that the drafters "rejected" the suggestion that the local company's shareholders be granted standing, it was only in this specific and limited context.   Moreover, the drafters rejected this suggestion in this specific context for practical reasons rather than because of any general view that "derivative" actions should not be permitted under the ICSID Convention: they noted that such an arrangement "would not be feasible where shares are widely scattered and their owners are insufficiently organized."[287]

---

[284] *Case Concerning Ahmadou Sadio Diallo (Republic of Guinea v. Democratic Republic of Congo)*, 2007 I.C.J. 1 (May 24), ¶ 88 (hereinafter "*Ahmadou Sadio Diallo* case").

[285] *Id.; see also Ahmadou Sadio Diallo* case,, 2010 I.C.J. 1, ¶ 104.   Respondents also cite to European Court of Human Rights case law.   Mem. ¶ 136, citing *Agrotexim and others v. Greece*, 1995 Eur. Ct. H.R. 42, ¶¶ 64-66 (LA AR 47); *Tadeusz Olczak v. Poland*, European Court of Human Rights, Decision on Admissibility of 7 November 2002, ¶ 59 (LA AR 54). However, these cases involve an adjudication of a shareholder's rights under a specific instrument—the ECHR—that is simply not comparable to an investment treaty.

[286] *See* Christoph Schreuer, The Icsid Convention: A Commentary (2nd Ed.), AR LA-63 at 296.

[287] *Id.* at 297.

225. Finally, Article 25(2)(b) simply is not relevant to these proceedings. Claimants are nationals of another State, not a local Argentine company. Moreover, in order for Article 25(2)(b) to apply, the State parties to a BIT must agree to treat locally incorporated companies in this manner. Spain and Argentina did not so agree in their Treaty or elsewhere.

### iv.    Argentine Law

226. Respondent has asserted that Argentine law does not permit "derivative" claims to be brought by shareholders to recover for injuries done to the companies in which shareholders own shares. However, Respondent fails to demonstrate how Argentine corporate law is relevant to the issue of jurisdiction.

227. Respondent has argued that "it has been recognized that domestic law is relevant for the purposes of determining ICSID's jurisdiction."[288] Respondent is, of course, correct that domestic law may be "relevant" to jurisdictional issues. However, the cases cited by Respondent address the situation in which domestic law is used by a tribunal to determine a *question of fact* in connection to a jurisdictional issue.[289] In none of these cases does domestic law *define* the basic jurisdictional requirements. Instead, domestic law may be used by a tribunal in order to determine whether a claimant has, as a matter of fact, satisfied the legal requirements for ICSID jurisdiction that are set by the applicable BIT and the ICSID Convention.

228. Respondent itself has acknowledged that the jurisdictional requirements for this dispute are contained in the ICSID Convention and in the applicable BIT. It stated in its Memorial on Jurisdiction that "The question relating to the competence of this Tribunal consists, therefore, in determining how a foreign investor may acquire *ius standi*. The answer to this question may be found in the Treaty and the ICSID Convention."[290] Furthermore, investment arbitration case law on this point is well-documented and consistent.[291] In *BG Group plc v. Argentina*, for example, the tribunal rejected the very argument made here by Respondent. As that tribunal noted:

---

[288] Rep. ¶ 240.

[289] *See, e.g., Inceysa Vallisoletana S.L. v. Republic of El Salvador* (ICSID Case No. ARB/03/26), Award, August 2, 2006, ¶¶ 149, 157 (hereinafter "*Inceysa v. El Salvador*")(regarding the reliance upon domestic law in order to determine whether an investment was illegal or fraudulent), LA AR 77; *Camuzzi International S.A. v. Argentine Republic* (ICSID Case No. ARB/03/2), Decision on Jurisdiction, May 11, 2005, ¶ 57 (hereinafter "*Camuzzi v. Argentina*"), Exhibit C-402 ( "Even though particular aspects relating to the meaning and scope of the rights relating to the assets are governed by the law and regulations of the Argentine Republic, it must be borne in mind, as noted above, that as regards jurisdiction the applicable law is that of the Convention and the Treaty."); see also *Government of the Province of East Kalimantan v. PT Kaltim Prima Coal and others* (ICSID Case No. ARB/07/3), Award, December 28, 2009, ¶ 166 (LA AR 194)("A review of ICSID cases shows that *tribunals do refer to national law, for instance to determine whether the requirements of nationality or of the existence of an investment are fulfilled*. In other words, depending on the circumstances, certain jurisdictional requirements under Article 25 of the ICSID Convention may sometimes have to be assessed taking into account national law.")(emphasis added).

[290] Mem. ¶ 151.

[291] *See, e.g., CMS v. Argentina,* Decision on Jurisdiction, at ¶ 42 ("the applicable jurisdictional provisions are only those of the Convention and the BIT, not those which might arise from national legislation."); *Azurix Corp. v. Argentine Republic* (ICSID Case No. ARB/01/12), Decision on Jurisdiction, December 8, 2003, ¶ 50, Exhibit C-490 ("The jurisdiction of the Centre is determined by Article 25 of the Convention. In addition, the competence of the Tribunal is governed by the terms of the instrument expressing the parties' consent to ICSID arbitration. Therefore, the task of the Tribunal [at the jurisdictional stage] is to assess whether the Claimant's request for arbitration falls within the terms of said Article 25 of the Convention and (…) the BIT."); *Siemens v. Argentina,* Decision on

Argentina's reliance on principles of domestic corporate law must fail. BG's claim is made under the Argentina-UK BIT. BG is an "Investor" who has made an "Investment" in Argentina within the definition of Article 1(a)(ii) of the treaty. It is further uncontroverted that BG's shares in [the local companies] are "assets" within the meaning ascribed to the term in this award pursuant to Argentine law. *The meaning of the BIT is to be determined not by analogy with private law rules, but from the words of [the] treaty itself and in the light of the purpose which it sets out to achieve.*[292]

### (b)    Respondent's "Intermediary Investor" Argument

229.    In addition to its "derivative claim" arguments, Respondent also argues that the Treaty does not provide standing to an "indirect" shareholder who only owns shares in the allegedly injured company through an intermediary (in this case, Air Comet).[293]   Respondent suggests that because Article I(2) does not explicitly refer to investments made "directly or indirectly," indirectly-held investments are not protected.

230.    Contrary to Respondent's assertions, nothing in the broad language of Article I(2) of the Treaty suggests that shares held through subsidiaries are excluded from coverage under Article I(2). Again, the language of Article I(2) affirmatively extends the definition of protected "investments" to "any kind of assets" and "property and rights of every kind."  For this reason, the Tribunal considers that Claimants' shareholdings in the Argentine Airlines constitute "investments" under Article I(2).

231.    Moreover, the Tribunal's conclusion is consistent with previous awards.   In *Siemens v. Argentina,* which concerned a BIT with language very similar to Article I(2) of the Treaty, the tribunal conducted a close textual analysis of the relevant treaty provision that is instructive to the present dispute.   The claimant in *Siemens* was a German investor who held shares in an intermediary company, which in turn held shares in a local company.   The tribunal concluded that the claimant's investment was covered by the BIT, using the following reasoning:

> The Tribunal has conducted a detailed analysis of the references in the Treaty to "investment" and "investor." The Tribunal observes that there is no explicit reference to direct or indirect investment as such in the Treaty. The definition of "investment" is very broad. An investment is any kind of asset considered to be

---

Jurisdiction, at ¶ 31 ("Argentina in its allegations has not distinguished between the law applicable to the merits of the dispute and the law applicable to determine the Tribunal's jurisdiction. This being an ICSID Tribunal, its jurisdiction is governed by Article 25 of the ICSID Convention and the terms of the instrument expressing the parties' consent to ICSID arbitration, namely, Article 10 of the Treaty.").

[292] *BG Group plc v Argentine Republic*, UNCITRAL, Final Award, December 24, 2007, ¶¶ 203-04, Exhibit C-340. Note, that the Final Award rendered by the Tribunal was subsequently denied enforcement on different grounds by the United States Court of Appeals for the District of Columbia Circuit.  The D.C. Circuit decided the appeal on the basis of arbitrability, finding that BG and Argentina had not agreed to submit the arbitrability question itself to arbitration, and that the BG tribunal did not have jurisdiction to consider the matter of its own competence. *See Republic of Argentina v. BG Group plc*, D.C. Cir., No. 11-7021 (January 17, 2012).

[293] Rep. ¶¶ 207-208.

such under the law of the Contracting Party where the investment has been made. The specific categories of investment included in the definition are included as examples rather than with the purpose of excluding those not listed. The drafters were careful to use the words "not exclusively" before listing the categories of "particularly" included investments. One of the categories consists of "shares, rights of participation in companies and other types of participation in companies." The plain meaning of this provision is that shares held by a German shareholder are protected under the Treaty. *The Treaty does not require that there be no interposed companies between the investment and the ultimate owner of the company*. Therefore, a literal reading of the Treaty does not support the allegation that the definition of investment excludes indirect investments.[294]

232. Several other ICSID tribunals have found indirectly-held shareholdings to constitute investments, even where the BIT does not explicitly refer to "directly or indirectly" held investments. For example, the tribunals in *Kardassopoulos v. Georgia*,[295] *Cemex v. Venezuela*,[296] and *Mobil v. Venezuela*[297] addressed similar fact patterns and reached similar conclusions to that in *Siemens*.

(c) **Respondent's Policy Arguments**

233. In addition to its legal arguments regarding the issue of the "indirectness" of Claimants' shareholdings, Respondent has advanced a number of policy arguments against Claimants' standing in this dispute. According to Respondent, the Claimants are upsetting the hierarchy of creditor claims against the Argentine Airlines and Interinvest, and it is inappropriate to award damages to a shareholder rather than to the company that has actually suffered injury. Respondent also expresses its concern that this suit could increase the risk that Respondent could be subjected to double-payment, because Interinvest could recover through the Argentine Courts in addition to any recovery by the Claimants under the Treaty.

234. Respondent's assertions could have relevance in the merits proceeding of this case, but Respondent fails to demonstrate why these assertions are relevant at the jurisdictional stage. Moreover, Respondent has failed to articulate why these policy issues, as specifically applied to the facts at hand, should affect the outcome of this jurisdictional objection. Respondent has not attempted to demonstrate the extenuating nature of the facts here, or to differentiate the facts in this case from the large number of other ICSID cases in which claimant shareholders were found to have standing.

235. To conclude, the Tribunal finds that Claimants, as indirect shareholders, have standing to recover for damages that were inflicted upon the companies—i.e., Interinvest and the Argentine

---

[294] *Siemens v. Argentina,* Decision on Jurisdiction, at ¶ 137 (emphasis added).

[295] *Ioannis Kardassopoulos v. Georgia*, (ICSID Case No ARB/05/18), Decision on Jurisdiction, July 6, 2007, ¶¶ 123, Exhibit C-486, at ¶¶ 123-124 (following *Siemens*).

[296] *Cemex Caracas Investments B.V. and Cemex Caracas II Investments B.V. v. Bolivarian Republic of Venezuela,* (ICSID Case No. ARB/08/15), Decision on Jurisdiction, December 30, 2010, at ¶¶ 149-58, Exhibit C-482.

[297] *Mobil Corporation and others v. Bolivarian Republic of Venezuela*, (ICSID Case No. ARB/07/27), Decision on Jurisdiction, June 10, 2010, at ¶¶ 162-65, Exhibit C-483.

Airlines—in which Claimants invested.  The ordinary language of Article I(2) is designed to protect "all assets"—including indirect shareholdings.  The Tribunal also finds that Claimants are not deprived of standing by the fact that their investments were made through their subsidiary, Air Comet.

### ii.     Claimants' Other Investments

#### 1.     Positions of the Parties

236. Claimants assert that they have made several qualifying investments under Article I(2) of the Treaty, and that these investments in Argentina go beyond the ownership and control of "shares and other forms of participation in companies."[298]  Specifically, Claimants assert that they have also made the following qualifying investments under the Treaty: (a) significant capital contributions to expand and support the Argentine Airlines' operations, (b) concessions to operate in the Argentine airlines sector, (c) investment in management and know-how, (d) rights relating to aircraft, engines, a flight simulator, etc., and (e) movable and immovable property.[299]

237. Respondent disputes that these investments qualify under Article I(2).  Specifically, Respondent asserts that Claimants have not substantiated by evidence their capital contributions, nor would such contributions confer any rights other than those vested in shareholders.[300]  Respondent asserts that Claimants do not directly hold concessions to operate in the Argentine airlines sector and that they did not invest in other property and rights already within the possession of the Argentine Airlines at the time of investment.[301]  Finally, Respondent asserts that Claimants have not demonstrated that they actually made investments in the Argentine Airlines' aircrafts, or that the Argentine Airlines were the recipients of aircrafts ordered by Astra, an Irish subsidiary of Claimants, nor would these activities constitute qualifying "investments" under the Treaty.[302]

#### 2.     Analysis of the Tribunal

238. The Tribunal will not address Claimants' other alleged investments at this time.  The Tribunal has concluded that Claimants' indirect shareholdings constitute an "investment" under the Treaty.  Consequently, Claimants have standing to bring this dispute.  The Tribunal may consider Claimants' other alleged investments at the merits stage of these proceedings.

### iii.    Claimants' Third-Party Funding Agreement and Assignment of Award Proceeds

239. During the hearing on jurisdiction, Respondent raised its concern that Claimants' and Air Comet's recent reorganization proceedings in Spain could affect Claimants' authorization to bring this case.[303]  In its post-hearing submissions, Respondent has also questioned two

---

[298] Rej. ¶¶ 199-202.
[299] CM ¶¶ 217-219; Letter of June 16, 2011, at 3.
[300] Rep. ¶ 163.
[301] Rep. ¶ 166.
[302] Rep. ¶ 164.
[303] *See, e.g.,* Tr. Day 3 at 495, 505 and 578, Respondent's Letter of June 23, 2011, ¶ 8 et seq.

agreements entered into by Claimants subsequent to commencing this arbitration.  One of these, a Credit Assignment Agreement among Teinver, Transportes de Cercanías and Autobuses Urbanos as the assignors and Air Comet as the assignee (the "Assignment Agreement"), dated January 18, 2010, concerned the assignment to Air Comet of the proceeds of a potential award in this arbitration.  The other, a Funding Agreement made between Claimants and Burford Capital Limited, an investment company headquartered in Guernsey, and effective as of April 14, 2010 (the "Funding Agreement"), concerned the financing of Claimants' litigation expenses in this arbitration.

240.  The Parties do not dispute that Air Comet commenced voluntary reorganization proceedings on April 20, 2010.[304]   Nor do they dispute that the Claimants each commenced voluntary reorganization roughly a year later, with Teinver on December 23, 2010, Autobuses Urbanos on January 28, 2011, and Transportes de Cercanías on February 16, 2011.[305]

241.  The Parties also acknowledge that Claimants concluded the Assignment Agreement, by which Claimants agreed to assign to Air Comet proceeds of an eventual award in this case.[306]   In addition, the Parties acknowledge that Claimants executed the Funding Agreement with Burford.[307]   However, the Parties disagree as to the effects of these agreements on Claimants' standing in this case.

### 1.   Position of Respondent

242.  As a procedural matter, Respondent asserts that Claimants concealed their reorganization proceedings as late as April 12, 2011, and that Claimants were under a duty to make registration documents and court filings available to the Tribunal and Respondent.[308]

243.  Respondent asserts that Claimants' assignment to Air Comet of proceeds from an eventual award in this case was "fraudulent," because it was made on a date "suspiciously close" to Air Comet's reorganization, and "gratuitous," because it was not backed by consideration.[309]   Respondent asserts that Claimants should have notified Respondent as the alleged debtor of the agreement.[310]   Moreover, Respondent argues that the agreement contravenes Spanish public policy on collection preferences, and that consequently the parties to the agreement were required to obtain judicial authorization from the Spanish courts in order to proceed.[311]

244.  As for the assignment itself, Respondent maintains that Claimants assigned to Air Comet a right they never owned, because Claimants themselves lack jurisdiction to bring this dispute and claim a remedy.  Such an assignment would violate the general principle of law under which "a person

---

[304] Claimants' Letter of June 16, 2011, at 16-17.
[305] *Id.*, at 12, Respondent's Letter of June 23, 2011, ¶ 9.
[306] Claimants' Letter of June 16, 2011, at 16; Respondent's Letter of June 23, 2011, ¶ 17.
[307] Claimants' Letter of June 30, 2011, at 5-6; Respondent's Letter of June 23, 2011, ¶ 23.  While the Funding Agreement became effective on April 14, 2010, the transaction contemplated by it only closed on July 4, 2010.  *See* Ex. RA-160, Schedule 1 No. 3(a) and Claimants' Letter of June 30, 2011, at 6.
[308] Respondent's Letter of June 23, 2011, ¶¶ 10, 15.
[309] *Id.* at ¶ 18.
[310] *Id.* at ¶ 19.
[311] *Id.* at ¶ 27.

can transfer no greater right than he owns[.]"[312]  Moreover, Claimants' lack of standing is clear in light of the very text of the assignment to Air Comet and related court-filed writings, which note that "AIR COMET is the one that is in fact affected by the expropriation since it owns 100% of Interinvest S.A., which in turn owns 100% of Aerolineas Argentinas' shares…"[313]

245.  Regarding Claimants' Funding Agreement with Burford, Respondent asserts that it is Burford, and not Claimants, that is the real party interested in this arbitration.  According to Respondent, Burford has "not only invoked that it holds a purported "common legal interest" with the Claimants in this proceeding, but it is also the only party that would seem to be potentially benefited in the case of a hypothetical award against Argentina in the instant case."[314]

246.  According to Respondent, Burford does not meet the basic jurisdictional requirements under the ICSID Convention.  Burford is not an investor in Argentina, nor is it a company organized in Spain that could invoke the Treaty relied upon by Claimants to institute this arbitration proceeding.[315]  Thus, allowing Burford to benefit from a dispute settlement mechanism authorized under the Treaty is contrary to the object and purpose of the latter, and would impermissibly bypass the limits of Argentina's and Spain's consent to arbitral jurisdiction.[316]

## 2.    Position of Claimants

247.  Claimants contest Respondent's assertion that Claimants have purposefully concealed information from this Tribunal regarding the voluntary reorganizations.  Claimants assert that they have disclosed in good faith all relevant facts during this arbitration proceeding, and that the allegedly "concealed" reorganizations have no bearing on this Tribunal's jurisdiction.  Likewise, the Assignment Agreement and the Funding Agreement are irrelevant to the question of the jurisdiction of this Tribunal.[317]

248.  According to Claimants, Respondent's assertions are misplaced for the following reasons: (i) Claimants' standing to bring this arbitration is exclusively governed by the ICSID Convention and the Treaty; (ii) under the ICSID Convention, the Treaty and international law, the relevant date for the purposes of determining the Tribunal's jurisdiction is the date of the institution of the proceedings; and (iii) both the Spanish reorganization proceedings and the Assignment Agreement post-date the institution of the proceedings.[318]

249.  Claimants emphasize that Article 25 of the ICSID Convention defines "national of another contracting state" as "any juridical person which had the nationality of a Contracting State other than the State party to the dispute *on the date on which the parties consented to submit such dispute to conciliation or arbitration*."[319]  According to Claimants, this principle has been firmly

---

[312] Respondent's Letter of October 26, 2011, at 13.
[313] *Id*. at 12-13.
[314] Respondent's Letter of June 23, 2011, ¶ 39.
[315] *Id*. at ¶ 42.
[316] Respondent's Letter of October 26, 2011, at 9-10.
[317] Claimants' Letter of June 30, 2011, at 10.
[318] Claimants' Letter of June 16, 2011, at 9-11.
[319] *Id*. at 8 (emphasis added).

established by ICSID tribunals, and moreover, is a firmly established rule in international adjudication.[320]

250. Claimants note that consent was perfected on November 20, 2008, that the Request for Arbitration was filed on December 11, 2008, and that registration of their Request by ICSID took place on January 30, 2009. No events between those dates would affect the Claimants' standing in these proceedings.[321] Each of Respondent's allegations occurred after the institution of these proceedings, and is therefore irrelevant to the issue of jurisdiction. Specifically, the Assignment Agreement between Claimants and Air Comet was executed January 18, 2010. The Funding Agreement between Claimants and Burford took effect on April 14, 2010. Claimants' Spanish reorganization proceedings occurred starting in late December, 2010.

251. With respect to Claimants' Spanish reorganization proceedings, Claimants note that these proceedings were voluntarily initiated, and that Claimants have kept the administration and disposition powers over their assets.[322] Claimants assert that under Spanish law, they do not need the express authorization of their respective reorganization administrators to continue any arbitration proceedings, including the instant one before ICSID, unless they were to withdraw, to accept a counter-claim, or to settle the dispute.[323] Nonetheless, their respective reorganization administrators have provided letters demonstrating their knowledge and acquiescence to continue this arbitration.[324]

252. Claimants argue that their assignment of the rights of the net proceeds of this arbitration to Air Comet has no bearing on Claimants' standing to bring this arbitration. The Assignment Agreement is a valid transaction which remains in full force and effect. Even if the Assignment Agreement was declared null and void, such circumstance would not undermine Claimants' standing to bring the present claim against Argentina. Claimants' position as Argentina's creditor would remain unaltered, and Air Comet would be the only one affected by the declaration of nullity.[325]

253. Furthermore, Claimants argue that Respondent incorrectly characterizes the Air Comet assignment as an "assignment of a claim." In fact, Claimants have executed an assignment of the rights to the net proceeds that may be obtained from an eventual award against Argentina. Claimants remain the legal holders of the claim against Argentina.[326] Under the assignment, Air Comet is to receive any proceeds that may remain after deducting all payments.[327]

254. Finally, with respect to the Burford Funding Agreement, Claimants submit that Burford is not a party to the arbitration. The Claimants did not sell or transfer the claim to Burford. Rather, Burford funds the arbitration in exchange for a percentage of the recovery in the case of a successful claim. Such financing agreements are frequently made, and Respondent has pointed

---

[320] *Id.* at 8-9.
[321] *Id.* at 9.
[322] *Id.* at 14.
[323] *Id.* at 15.
[324] *Id.* at 15, Claimants' Letter of June 30, 2011, at 16.
[325] Claimants' Letter of June 30, 2011, at 11.
[326] *Id.*
[327] *Id.* at 11-12.

to no investment award or decision finding third-party funding to be illegitimate, unlawful or inappropriate.[328]

### 3.    Analysis of the Tribunal

### (a)    Existence of Jurisdiction

255.   First, international case law has consistently determined that jurisdiction is generally to be assessed as of the date the case is filed:

-   The Court recalls that, according to its settled jurisprudence, its jurisdiction must be determined at the time that the act instituting proceedings was filed. Thus, if the Court has jurisdiction on the date the case is referred to it, it continues to do so regardless of subsequent events.[329]

-   [I]t is generally recognized that the determination of whether a party has standing in an international judicial forum, for purposes of jurisdiction to institute proceedings, is made by reference to the date on which such proceedings are deemed to have been instituted. … This is not only a principle of ICSID proceedings, it is an accepted principle of international adjudication that jurisdiction will be determined in the light of the situation as it existed on the date the proceedings were instituted. Events that take place before that date may affect jurisdiction; events that take place after that date do not. The ICJ developed cogent case law to this effect in the *Lockerbie* case. (…)   The consequence of this rule is that, once established, jurisdiction cannot be defeated. It simply is not affected by subsequent events. Events occurring after the institution of proceedings (…) cannot withdraw the Tribunal's jurisdiction over the dispute.[330]

256.   Second, to the extent that Respondent's standing argument is based on the assertion that Claimants transferred their rights or interests in this case to Burford after initiating this arbitration, this argument is unavailing.  As Schreuer notes, "ICSID Tribunals have applied [the principle that jurisdiction is determined as of the date of filing] consistently.  In some cases the claimants had divested themselves of or had transferred the rights that had given rise to the dispute after the institution of proceedings.  Tribunals have rejected the argument that, as a consequence, claimants in the proceedings were no longer the real parties in interest."[331]   In *CSOB v. Slovakia*, the claimant had, subsequently to filing the arbitration, assigned its arbitral claims against the respondent to a third party.  The tribunal in *CSOB* held that

---

[328] Claimants' Letter of June 30, 2011, at 5-7.

[329] *Case Concerning the Arrest Warrant of 11 April 2000 (Democratic Republic of Congo v. Belgium)*, Judgment, February 14, 2002, I.C.J. Reports 2002, p. 3, ¶ 26, Ex. C-762.

[330] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentina* (ICSID Case No. ARB/97/3), Decision on Jurisdiction, November 14, 2005, ¶¶ 60, 61 and 63.  *See also* Schreuer, The Icsid Convention: A Commentary, Ex. C-761 at 92 ("It is an accepted principle of international adjudication that jurisdiction will be determined by reference to the date on which the judicial proceedings are instituted. This means that on that date all jurisdictional requirements must be met.  It also means that events taking place after that date will not affect jurisdiction.").

[331] *Id.* at 92.

it is generally recognized that the determination whether a party has standing in an international judicial forum for purposes of jurisdiction to institute proceedings is made by reference to the date on which such proceedings are deemed to have been instituted. Since the Claimant instituted these proceedings prior to the time when the two assignments were concluded, it follows that the Tribunal has jurisdiction to hear this case regardless of the legal effect, if any, the assignments might have had on Claimant's standing had they preceded the filing of the case.[332]

257. Third, to the extent that Respondent's characterization of the Assignment Agreement as "fraudulent" implies that Claimants committed illegalities under Spanish law with respect to the performance of their investment, this argument is similarly unavailing. In *Hamester v. Ghana*, the respondent argued that claimant had committed illegalities in the performance of the investment.[333] Like the Treaty, the BIT in *Hamester* required the investment to be legally acquired. However, the Tribunal found that *subsequent* illegality did not affect its jurisdiction over claimant's dispute.[334]

258. Respondent has not countered these cases with any opposing case law, nor has it seriously sought to distinguish the facts in the current dispute. As a factual matter, Respondent does not contest Claimants' assertion that consent to this arbitration was perfected on November 20, 2008, that the Request for Arbitration was filed on December 11, 2008, and that registration took place on January 30, 2009. Nor does Respondent assert that any of the events it alludes to occurred prior to this time. Ordered chronologically, the subsequent events referred to by Respondent in its pleadings occurred as follows:

- January 10, 2010: Assignment Agreement executed assigning potential proceedings of an award under this arbitration from Claimants to Air Comet
- March 23, 2010: Reorganization proceedings of Air Comet commence
- April 14, 2010: Funding Agreement executed between Burford and Claimants regarding the financing of this arbitration
- April 24, 2010: Agreement executed between King & Spalding, counsel for Claimants, and Claimants
- June 21, 2010: Agreement between Air Comet and its reorganization administrators

---

[332] *See Ceskoslovenska Obchodni Banka, a.s. (CSOB) v. The Slovak Republic* (ICSID Case No. ARB/97/4), Decision on Jurisdiction, May 24, 1999, at ¶ 31 (hereinafter "*CSOB v. Slovak Republic*"), Exhibit C-539.

[333] *Gustav F.W. Hamester GmbH & Co. KG v. Republic of Ghana* (ICSID Case No. ARB/07/24), Award, June 18, 2010, at ¶ 96 (hereinafter "*Hamester v. Ghana*"), LA AR 73.

[334] *Id.* at ¶ 127 ("The Tribunal considers that a distinction has to be drawn between (1) legality as at the *initiation* of the investment ("made") and (2) legality *during the performance* of the investment. … Legality in the subsequent life or performance of the investment is not addressed in Article 10. It follows that this does not bear upon the scope of application of the BIT (and hence this Tribunal's jurisdiction) – albeit that it may well be relevant in the context of the substantive merits of a claim brought under the BIT. Thus, on the wording of this BIT, the legality of the creation of the investment is a jurisdictional issue; the legality of the investor's conduct during the life of the investment is a merits issue. Therefore, in this first step of the analysis of the case relating to jurisdiction, the Tribunal is only concerned with allegations of fraud in the initiation of the investment, and not with the multiple allegations of fraudulent conduct during the life of the investment. . . .").

- December 22, 2010: Spanish judge authorizes Air Comet's reorganization administrators to consent to the Burford Agreement
- December 23, 2010: Reorganization proceedings of Teinver commence
- January. 28, 2011: Reorganization proceedings of Autobuses commence
- February 16, 2011: Reorganization proceedings of Cercanías commence

259. Based on the fact that each of the allegations made by Respondent concerns an event—the Claimants' reorganizations, the Assignment Agreement and the Funding Agreement—that post-dates the filing of the arbitration, the Tribunal finds this sufficient grounds to reject Respondents' objection. The Tribunal will not address Respondent's remaining allegations regarding the Assignment Agreement and the Funding Agreement as they concern Claimants' standing, without prejudice to further submissions by the Parties in respect of the Respondent's allegations in so far as they affect the merits of Claimants' claims, as appropriate, during the merits stage.

### d.    Third Jurisdictional Objection: Issues of State Attribution

260. In their Memorial on the Merits, Claimants have asserted that the administration of Argentine President Nestor Kirchner was "hostile towards Claimants' management of the Argentine Airlines and seemed driven by a desire to ultimately "re-Argentinize" the companies."[335] Claimants assert that the administration took a number of measures that destabilized the legal and business environment surrounding Claimants' investment.[336]

261. In particular, Claimants highlight President Kirchner's appointment of Mr. Ricardo Cirielli as Undersecretary of Air Transportation. Claimants describe Mr. Cirielli as a powerful union leader who had a record—both before and after his appointment—of being openly critical of Claimants' management of the Argentine Airlines.[337] Claimants assert, moreover, that during his appointment as Undersecretary of Air Transportation, Mr. Cirielli repeatedly lent his support to the unions and spoke out against airfare increases requested by the Argentine Airlines.

262. Claimants also assert that the Government of Argentina "implicitly support[ed]" strikes organized by the Argentine Aeronautical Technical Staff Association ("APTA") and the Argentine Airline Pilots Association ("APLA").[338] Claimants point to a 9-day strike that was organized by APLA and APTA in November 2005. Claimants allege that this strike severely affected the Argentine Airlines generally and ARSA in particular, affecting around 95,000 passengers, causing nearly 380 flights to be suspended and causing a loss of approximately US$12 million to the Argentine Airlines.[339]

### i.    Position of Respondent

263. Respondent argues that Claimants have attempted to attribute responsibility to Respondent for acts by non-state entities. According to Respondent, Claimants make the following allegations:

---

[335] Merits ¶ 164.
[336] Id.
[337] Id.
[338] Merits ¶ 182.
[339] Id. ¶¶ 170-71, 184-190.

1) that Respondent is responsible under international law for the acts of two Argentine labor unions, APTA and APLA; 2) that Respondent is responsible under international law for the acts of these unions because they were coordinated by Mr. Ricardo Cirielli to commit acts detrimental to the Argentine Airlines and thus force the nationalization of the companies; and 3) that Respondent is responsible for the acts of Mr. Cirielli before he took office as Undersecretary of Air Transportation in Argentina.[340]

264. Respondent asserts that it is not responsible for the acts of the two unions, which are not state organs and do not exercise governmental authority or act on the instructions or under the direction or control of Respondent.[341]   Under international law, a labor union is neither a "State organ" nor does it exercise elements of "governmental authority" as defined in Articles 4 and 5 of the Articles on Responsibility of States for Internationally Wrongful Acts of the International Law Commission ("ILC Articles").[342]   Nor have Claimants met the test of attribution set forth in Article 8 of the ILC Articles.[343]   Claimants have failed to prove the existence of an instruction or order by Respondent to individuals or entities or the existence of the *effective control* by the Government over them.   Moreover, the "overall control" standard relied on by Claimants is inappropriate to use as a standard here.[344]   In any case, the evidence submitted by Claimants in these proceedings does not even rise to the level of satisfying the "overall control" standard.[345]

265. Respondent also argues that the acts committed by Mr. Cirielli prior to his appointment as Undersecretary or following his period in public office cannot be attributed to the Argentine Government.[346]   Moreover, while Claimants also seek to attribute responsibility for the acts committed by Mr. Cirielli as a public officer based on the control that he allegedly exerted over the labor unions, Claimants do not point out any act giving rise to the responsibility of States.[347]   The fact that Mr. Cirielli was the Secretary General of APTA before and after becoming a public officer does not mean that APTA's actions can be attributed to him.[348]

266. Finally, according to Respondent, the issue of attribution of responsibility under international law is jurisdictional in nature.[349]   Claimants must prove that they have a *prima facie* case of attribution of responsibility in order for the subject-matter of the attribution to be argued on the merits of the case.[350]   According to Respondent, case law has held that it is more appropriate to examine this question at the jurisdictional stage where it becomes apparent that the State is not involved at all or where the question of attribution may be resolved on the basis of a preliminary analysis.   This is exactly the case here.[351]

---

[340] Mem. ¶ 218.
[341] Mem. ¶ 219.
[342] Mem. ¶ 224.
[343] Rep. ¶¶ 264-265.
[344] Rep. ¶¶ 266-269.
[345] Rep. ¶ 270.
[346] Mem. ¶¶ 221, 230.
[347] Rep. ¶ 278.
[348] Rep. ¶ 261.
[349] Mem. ¶ 220.
[350] Rep. ¶ 245.
[351] Rep. ¶ 247.

### ii.    Position of Claimants

267. Claimants assert that questions of state attribution should be decided in the merits phase of this arbitration.[352]   Several investment law awards have held that whether state attribution is a question of jurisdiction or of merits is not clear-cut, and depends on the given case.[353]   Here, because the question of state attribution is closely intermingled with the merits, and because it requires an in-depth analysis of the complex relationships between certain acts and the state, it is appropriate to resolve these issues during the merits phase.[354]

268. In the alternative, Claimants argue that the acts of the unions are attributable to Respondent. There is ample evidence that in various instances, APTA and APLA acted "on the instructions or under the direction or control" of Respondent.[355]   Respondent maintains that the acts of the unions can only be attributable to the GOA if the government exercised "effective control" over them.   Some tribunals have, however, rejected this "effective control" test in favor of an "overall control" test, including the Appeals Chamber of the International Criminal Tribunal for the former Yugoslavia and the European Court of Human Rights.[356]   Claimants assert that there is ample evidence that Respondent exerted overall control over the unions, especially through Mr. Cirielli.[357]   By appointing Mr. Cirielli as Undersecretary of Air Transportation while allowing him to simultaneously retain a position as union leader, Respondent created the situation of control over the union.[358]   Respondent also, at least implicitly, supported strikes organized by APLA and APTA, including strikes in November 2005, September and October 2007, and January 2008, which caused the Argentine Airlines significant harm.[359]

269. Claimants assert that they do not currently seek to attribute to Respondent acts by Mr. Cirielli made prior to his appointment as Undersecretary.[360]   Claimants simply seek to demonstrate that the Argentine Government knowingly appointed and kept in office an Undersecretary of Air Transportation who had previously served as the Secretary General of the powerful APTA union and who was openly hostile to Claimants' management of the Argentine Airlines as an element of their allegations of unfair treatment under the Treaty at the hands of the Respondent.[361]   Moreover, Respondent does not dispute that the acts by Mr. Cirielli during his tenure as Undersecretary are attributable to Respondent.[362]   Citing Article 4 of the ILC Articles, Claimants assert that such acts are attributable to Respondent, even if they amount to an abuse of power.[363]

---

[352] CM ¶ 291.
[353] CM ¶¶ 291-293.
[354] CM ¶ 298.
[355] CM ¶ 299.
[356] CM ¶¶ 299-300.
[357] CM ¶ 301; Rej. ¶ 314.
[358] Rej. ¶ 314.
[359] Id.
[360] Rej. ¶ 317.
[361] CM ¶ 305; Rej. ¶ 317.
[362] CM ¶ 302.
[363] CM ¶ 303.

### iii.      Analysis of the Tribunal

270.  The Tribunal notes that Respondent has not asserted that *none* of the acts alleged in Claimants' Memorial on the Merits are attributable to the Argentine Government.   Rather, Respondent's arguments in this regard concern only whether certain alleged acts committed by two Argentine labor unions and by the Argentine Undersecretary of Air Transportation may be attributed to the State.

271.  While Respondent asserts that substantial case law supports its position that the question of attribution is jurisdictional in nature,[364] this case law also recognizes that not all questions of attribution are identical or involve an identical context.   Case law on this subject *does* support the conclusion that matters of state attribution should be adjudicated at the jurisdictional stage when they represent a fairly cut-and-dry issue that will determine whether there is jurisdiction.

272.  For example, the issue before the *Maffezini* tribunal concerned the question whether the dispute between the claimant and respondent, a private commercial corporation established by the Spanish government, constituted an investor-State dispute under the meaning of Article 25 of the ICSID Convention, or whether it merely constituted a private dispute.   The *Maffezini* tribunal determined that the question whether the respondent could be considered a state entity was critical to whether the tribunal could take jurisdiction over the case.[365]   In *CSOB*, and also for purposes of determining whether the dispute constituted an investor-State dispute under Article 25, the tribunal had to determine whether the claimant was a private entity or subject to state control.[366]

---

[364] Mem. ¶ 220.

[365] *Maffezini v. Spain,* Decision on Jurisdiction, at ¶ 75.   The tribunal noted that the issue of whether the private commercial corporation was a state entity for purposes of determining the jurisdiction of the Centre and the competence of the tribunal was necessarily an issue to be decided at the jurisdictional stage of these proceedings. However, the tribunal noted that the issue of whether the actions and omissions complained of by the claimant were imputable to the State was an issue that "bears on the merits of the dispute and can be finally resolved only at that stage." *Id.*

[366] *CSOB v. Slovak Republic,* Decision on Jurisdiction, at ¶ 27.   In *CSOB*, the respondent had argued that the claimant did not meet the requirement of Article 25(1) that a dispute must be between a Contracting State and a national of another Contracting State.   Specifically, the respondent had argued that the dispute was between two Contracting States because the claimant was purportedly a state agency of the Czech Republic rather than an independent commercial entity, and because the real party in interest to the dispute was the Czech Republic.   The tribunal concluded, however, that the respondent failed to sustain its contention that the Centre lacked jurisdiction and the tribunal competence to hear the case on the ground that the claimant was acting as an agent of the State or discharging essentially governmental activities.   *See also Hamester v. Ghana,* Award, at ¶ 141 ("For a jurisdictional objection to prosper, it has to be such a definitive impediment that the Tribunal has no right to entertain, or enquire into, the dispute. If, for example, one takes the jurisdictional requirements *ratione personae* as set out in Article 25 of the ICSID Convention, i.e. that the dispute is a legal dispute between a Contracting State of the ICSID Convention and investors of another Contracting State, the determinative criteria are clear and easily answered: the two Parties must respectively be a foreign investor from a Contracting State, and a Contracting State, for jurisdiction to exist. Here, as jurisdiction depends on the German/Ghana BIT, the Tribunal can deal with a dispute between the German company Hamester and the Republic of Ghana. In other words, if Hamester was not a German company, or if the case had been brought against a State other than Ghana, there would evidently have existed a clear jurisdictional objection.   Not all issues, however, are so discrete or easily answered.   Many—as is the case with attribution—entail more complex considerations, which could be characterized both as jurisdictional and relevant to the merits (and so to be considered only if the Tribunal has jurisdiction).   Moreover, each of the alleged acts is closely connected to the question of whether Respondent has committed substantive violations of the BIT.").

273. Here it is not necessary for the Tribunal to attribute the acts of the unions and Mr. Cirielli to the Respondent in order for this Tribunal to have jurisdiction over the dispute. The Claimants allege actions by Argentine government institutions contrary to the Treaty, whose attribution to the Respondent is not in dispute. Moreover, the issue of the attribution of the acts by the unions and Mr. Cirielli is not clear-cut. As the tribunal in *Hamester* noted:

> [I]n many instances, questions of attribution and questions of legality are closely intermingled, and it is difficult to deal with the question of attribution without a full enquiry into the merits. In any event, whatever the qualification of the question of attribution, the Tribunal notes that, as a practical matter, this question is usually best dealt with at the merits stage, in order to allow for an in-depth analysis of all the parameters of the complex relationship between certain acts and the State… This approach — to deal with the question of attribution as a merits question — is particularly appropriate, in the Tribunal's view in this case. The Tribunal is not faced here with a situation where it is readily evident that the State is not involved at all, or where the issue is capable of an answer based upon a limited enquiry (akin to other jurisdictional issues).[367]

Respondent argues, based on *Hamester*, that it is clear that Respondent is not involved at all with these alleged acts, and that this issue can be resolved on a preliminary basis. However, the issue is not as straight-forward as Respondent asserts.

274. Claimants' assertions regarding the unions and Mr. Cirielli are closely connected to their allegation that Respondent has violated the Treaty. Both sets of assertions concern the difficult and fact-intensive question of whether the Argentine government tolerated or encouraged or otherwise supported the union activities in question. In the case of the unions, Claimants assert that Respondent's support of the unions was part of its broader goal to renationalize the Argentine Airlines.[368] In the case of Mr. Cirielli, Claimants seek to demonstrate that Respondent knowingly appointed and kept in office an individual who was hostile to the Claimants' presence in Argentina.[369] If the Tribunal were to resolve these issues at this jurisdictional stage, it would do so only on the basis of the Parties' arguments from their jurisdictional pleadings. The Tribunal would not have the benefit of the Parties' further pleadings on the merits or any further evidentiary submissions that may touch upon these issues. Given the fact-intensive nature of Claimants' allegations, the Tribunal must postpone adjudication of this issue until the merits phase. Consequently, Respondent's jurisdiction objection is rejected.

275. Given this conclusion, it is not necessary for the Tribunal to address in detail the substance of Respondent's arguments regarding attribution. The Tribunal does note, however, that Respondent has requested the Tribunal to expressly declare that the acts of labor unions are not attributable to the Argentine Republic under Articles 4 or 5 of the ILC Articles,[370] which address, respectively, the conduct of organs of a State and of persons or entities that are empowered by

---

[367] *Hamester v. Ghana,* Award, at ¶¶ 143-45.
[368] CM ¶ 301.
[369] CM ¶ 305.
[370] Rep. ¶ 257.

the law of that State to exercise elements of government authority. Claimants have responded to this request, arguing that they do not in fact maintain that the unions fall within Articles 4 or 5 of the ILC Articles. Rather, to Claimants, the issue is whether they fall within Article 8 of the ILC Articles,[371] which concerns conduct of a person or group acting on the instructions of, or under the direction or control of a State. Because the two Parties agree that Article 8, and not Articles 4 or 5, would be relevant to the analysis of the unions' conduct,[372] there is no need for this Tribunal to make any such declaration.[373]

276. Finally, it should be clarified that both Parties agree that the current objection on the attribution of state acts refers to Mr. Cirielli's acts *before and after* his tenure as the Undersecretary of Air Transportation. While Claimants discuss Mr. Cirielli's acts *during* office in their pleadings,[374] this issue was not within the scope of Respondent's original objection.[375] Furthermore, Claimants assert that they do not seek to attribute liability to Respondent for Mr. Cirielli's pre-office acts.[376] As such, the Parties do not appear to actually disagree on the issue of attribution as it concerns Mr. Cirielli's conduct before and after holding his office.[377]

### e. Fourth Jurisdictional Objection: The Legality of Claimants' Investment

#### i. Position of Respondent

277. In Respondent's fourth and final objection, it asserts that Claimants' investment is not protected by the Treaty because of alleged illegalities connected to that investment. Specifically, Respondent asserts that Claimants, by certain actions taken with respect to their investment, have violated Spanish and Argentine law and have committed other misdeeds.

---

[371] Rej. ¶ 307

[372] *See also* Rep. ¶ 256.

[373] The Tribunal notes that while the Parties agree that Article 8 of the ILC Articles applies to the unions' activities, they remain at odds over the proper interpretation of the term "control" as used in Article 8. As noted above, Respondent maintains that the rigorous standard of "effective control," which has been used in *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v. United States),* Merits, Judgment, ("*Nicaragua Merits*") I.C.J. Reports 1986, ¶ 115, and *Case Concerning the Application of the Convention on the Prevention and Punishment of the Crime of Genocide* (Bosnia and Herzegovina v. Serbia and Montenegro), 2007 ICJ Reports 1, ¶ 396 et seq. (February 26) (LA AR 75), and which is described in the ILC Commentary at Article 8, ¶ 4, is the appropriate legal standard. Claimants maintain, instead, that the proper standard to be applied to the unions is the less rigorous standard of "overall control," which has been used in *Prosecutor v. Duško Tadic*, International Tribunal for the Former Yugoslavia, Case IT-94-1-A (1999), ILM, vol. 38, No. 6 (November 1999), p. 1518, at 1541, ¶ 117 and p. 1546, ¶ 145, Exhibit C-504; and in *Loizidou v. Turkey*, Merits, ECHR, Judgment, December 18, 1996, ¶ 56, Exhibit C-505.

[374] CM ¶ 302.

[375] Mem. ¶ 228.

[376] CM ¶ 304; Rej. ¶ 317.

[377] The Tribunal notes that the Parties appear to disagree on the legal standard applicable to Mr. Cirielli's conduct while in office. Claimants assert that ILC Article 4 is applicable to his acts (CM ¶ 302, Rej. ¶ 316), while Respondent suggests that Article 8 should apply (Rep. ¶ 279). For the reasons indicated previously, and because Mr. Cirielli's conduct while in tenure of his position was not the subject of Respondent's objection, the Tribunal declines to address these arguments at this time.

### *Alleged Violations of Spanish Law*

278.  Respondent bases its allegations on a pending proceeding in Spain involving the directors of Air Comet.  Respondent alleges that subject matters of the investigation have a direct impact on and relation to this arbitration.[378]

279.  Respondent bases its allegations on facts alleged by the Office of the Attorney General in an ongoing Spanish court investigation of directors of SEPI and Air Comet, involving acts related to the 2001 Share Purchase Agreement ("SPA") between SEPI and Air Comet.[379]  According to Respondent, the investigation concerns whether these actors were guilty of misappropriation of public funds, fraud or illegal exaction, document forgery, fraudulent use of process, and/or crimes against the federal treasury in connection with the SPA.[380]

280.  The SPA, which provided for the transfer of SEPI's 99.2% shareholding in Interinvest to Air Comet, was approved by the Spanish Cabinet and was subsequently executed on October 2, 2001.  As part of the SPA, SEPI sold to Air Comet S.A. its interest in Interinvest for US$ 1 dollar, while SEPI agreed to transfer $300 million to Interinvest to service ARSA's liabilities (in addition to transferring other funds to Air Comet).[381]  Respondent alleges that instead of complying with the terms of the SPA, Air Comet used the SEPI funds to buy the existing claims against ARSA, with Air Comet subrogated as a creditor.[382]

281.  According to Respondent, the defendants in this investigation purportedly have asserted that SEPI and Air Comet executed a supplemental private agreement, signed on October 15, 2001, in which the parties agreed that Air Comet would subrogate the claims as described above.  However, the Spanish Office of the Attorney General believes this document may either be a false document created after its indicated date, or, to the extent it is an authentic document, it concerns conduct that deviates from that which was authorized in the SPA by the Spanish Cabinet.[383]

282.  Respondent alleges that Air Comet committed tax fraud in connection with its subrogation of ARSA's debt claims.  Respondent asserts that Air Comet failed to declare its subrogation for tax purposes, even though it created a taxable event under Spanish law when it acquired claims against ARSA.[384]  According to Respondent, several of the defendants in the proceeding have already made court statements and the State Agency of the Tax Administration has issued an expert report.[385]

283.  Respondent notes that the Spanish Central Court for Investigative Proceedings No. 6 of Madrid concluded on September 7, 2011 that the investigations in this proceeding allow the inference that Díaz Ferrán, Pascual Arias and Mata Romayo were involved in conduct that could be

---

[378] Rep. ¶ 286.
[379] Mem. ¶ 254.
[380] *Id.*
[381] Rep. ¶ 282.
[382] Mem. ¶ 257.
[383] Mem. ¶ 259.
[384] Mem. ¶ 261-262.
[385] Mem. ¶ 267.

"presumably and initially qualified as a crime against the Treasury Department committed by Air Comet."[386]   Respondent also notes that the Prosecution of the Spanish National Court has requested a penalty of imprisonment for Mr. Díaz Ferrán, Mr. Pascual Arías and Mr. Antonio Mata Ramayo, along with a joint compensation amounting to 99 million euros.[387]

284. In addition to this investigation, Respondent notes a number of "new developments" as of March 26, 2012 in pending Spanish criminal proceedings that directly involve Mr. Díaz Ferrán and Mr. Pascual Arías.[388]

285. First, Respondent notes that the Central Court for Investigation Proceedings No. 1 of Madrid admitted a criminal investigation proceeding on February 2, 2012 against Mr. Díaz Ferrán, Mr. Pascual Arías and Mr. Iván Losada (administrator of Teinver S.L.) in connection with their management of Viajes Marsans.[389]

286. Second, Respondent notes that Mr. Díaz Ferrán and Mr. Pascual Arías are being investigated in another proceeding by the Spanish National Court in connection with the potential commission of procedural fraud.   According to Respondent, the two men allegedly submitted false documentation to a judge in order to obtain an unfair judicial resolution.[390]

287. Third, Respondent notes that one of the Marsans Group's creditors has brought a criminal action against Mr. Díaz Ferrán, Mr. Pascual Arías, Mr. Iván Losada and Mr. Ángel de Cabo in the Court for Investigation Proceedings No. 8 of Madrid, concerning their actions with respect to insolvency proceedings.  According to Respondent, Mr. Díaz Ferrán and Mr. Pascual Arías sold their companies to Possibilitum Business, controlled by Mr. de Cabo, which had engaged in illegal activities in the course of reorganization proceedings.[391]

288. Fourth, Respondent points to a proceeding pending before Commercial Court No. 12 of Madrid, and notes that the Province of Madrid's Prosecutor (Economic Crimes Section) has requested the court that Mr. Díaz Ferrán, Mr. Pascual Arías and Possibilitum Business be declared guilty with respect to acts taken as the *de facto* and *de jure* administrators in the reorganization of Viajes Marsans S.A., Viajes Crisol S.A.U., Rural Tours S.A.U. and Tiempo Libre S.A.U.[392]

289. Fifth, Respondent notes that the Commercial Court No. 9 of Madrid found Mr. Díaz Ferrán and Mr. Pascual Arías "guilty of the bankruptcy of Seguros Mercurio S.A."[393]  Respondent notes that the court also found Teinver and other Marsans Group companies "liable as accomplices to the bankruptcy."[394]  Specifically, Teinver and the other companies directly took part in transactions,

---

[386] Respondent's Letter of October 26, 2011, at 2, citing the September 7, 2011 Order of the Central Court for Investigation Proceedings No. 6 in Madrid, Ex. AR-172, at 2.
[387] Respondent's Letter of March 26, 2012, at 2, citing Annex I.
[388] *See* Respondent's Letter of March 26, 2012.
[389] *Id*. at 3, *see also* Annex II.
[390] *Id*. at 5; *see also* Annexes IV and V.
[391] *Id*. at 6.
[392] *Id*. at 6-8; see also Annex VII.
[393] Respondent's Letter of May 24, 2012, at 1.
[394] *Id*. at 1-2.

particularly in 2008 and 2009, intended to fraudulently remove assets owned by Seguros Mercurio.[395]

### *Alleged Violations of Argentine Law*

290.  Respondent notes that Air Comet was engaged in "irregular and fraudulent behavior" during the course of ARSA's reorganization proceedings.[396]   Respondent asserts that during the reorganization proceedings, Air Comet was both the controlling company of the airline *and* its main creditor, thereby acting in an impermissible double role under Argentine law.[397]

291.  Respondent also notes that a criminal investigation has been filed in the Argentine courts against Antonio Mata Ramayo, Díaz Ferrán, Pascual Arias and others, as directors of ARSA, regarding the "fraudulent administration" of the company.[398]   The investigation comprises several components.  First, and similar to the Spanish investigation above, the subjects of investigation have been charged with causing Air Comet's fraudulent diversion of SEPI funds intended to settle ARSA's liabilities.[399]   Second, the investigation concerns ARSA's December 31, 2001 balance sheet, which allegedly included bogus entries regarding SEPI's alleged capital contribution of ARS 1.238 million in 2001.  Respondent asserts that these bogus entries resulted in the dilution of the Argentine State's shares in the airlines, reducing its participation below the minimum legal threshold for active participation as a shareholder.[400]   Third, the investigation concerns possible crimes committed by Mr. Mata and others in relation to Air Comet's subrogation of claims previously held by third-party creditors.  Allegedly, Air Comet re-assigned these claims to another company, Royal Romana Playa S.A., for valuable consideration, allowing the latter to cast a vote in ARSA's reorganization plan.[401]

292.  Finally, Respondent asserts that it is irrelevant that the Commercial Court of Buenos Aires ended ARSA's reorganization proceedings on June 17, 2011.[402]   The termination of those proceedings does not demonstrate that Claimants committed no illegalities with respect to ARSA's reorganization, and indeed, the criminal investigations in Spain and Argentina are ongoing with respect to Claimants' fraudulent conduct and irregularities in connection with ARSA.[403]

### *Other Alleged Misdeeds*

293.  Respondent also points to a number of "issues" with the business management of the Grupo Marsans and of the Argentine Airlines.  Respondent characterizes Marsans' management worldwide as "deplorable," noting that Air Comet's operations halted in 2009, that a number of writs of attachment have been issued against Marsans' owners, Díaz Ferrán and Pascual Arias, that other legal suits that have been brought against certain Marsans affiliates, and that certain

---

[395] *Id.* at 2.
[396] Mem. ¶ 269; Rep. ¶ 309.
[397] Mem. ¶¶ 270-271.
[398] Mem. ¶ 272; *see also* RA 168.
[399] Mem. ¶ 274.
[400] Mem. ¶ 275; Rep. ¶ 319.
[401] Mem. ¶ 276.
[402] Respondent's Letter of October 26, 2011, at 3.
[403] *Id.*, at 1-2.

Marsans affiliates are undergoing reorganization.[404]   Respondent also notes "accounting irregularities" in the Argentine Airlines, including the commingling of assets.[405]

### *The Relevant Inquiry of Legality for Purposes of Jurisdiction*

294. Respondent asserts that the Treaty only protects investments that were made and carried out in accordance with the laws of the host state.[406]   The purpose of Article I(2), which defines "investments," is to prevent the Treaty from protecting investments that should not be protected.[407]   Moreover, there is consensus within international investment law that fraud is prohibited according to good practices and international public policy.[408]

295. Respondent does not believe that the jurisdictional issue solely concerns whether the investments were *made* in accordance with Argentine law; this interpretation leads to results contrary to the object and purpose of the Treaty.[409]   If the investment's *inception* was the only relevant criterion at the jurisdictional stage, this would lead to an absurd situation in which transactions that were made legally, but were followed by "an everlasting series of illegal acts" following their creation, nonetheless still benefit from the Treaty's protections.[410]   Moreover, it would be necessary to consider the time at which each investment was made, which would be infeasible in most disputes in which there are numerous investment transactions involved.[411]

296. Respondent asserts that even if the jurisdictional test is limited to the time of the investment's inception (here, the acquisition by Air Comet of Interinvest), the Tribunal is not limited to assessing only the formal act of executing the SPA.[412]   Rather, the Tribunal must take account of the whole complex transaction leading to the "inception" of the investment, which includes both the execution of the SPA and the breach of or compliance with its terms.[413]

297. Finally, Respondent notes that even though this Tribunal is not bound by the conclusions made by local authorities, they may be of "substantial assistance" for the Tribunal to determine the legality of Claimants' investments.[414]   Furthermore, the "presumption of innocence" criminal law standard cannot be imputed into the context of international investment law, as Claimants have argued.[415]

---

[404] Mem. ¶¶ 279-307; Rep. ¶ 305-308.
[405] Mem. ¶¶ 308, 312.
[406] Mem. ¶ 319.
[407] Mem. ¶ 322.
[408] Mem. ¶ 325.
[409] Rep. ¶¶ 347-48, 356.
[410] Rep. ¶ 356.
[411] Rep. ¶ 363.
[412] Rep. ¶ 365-66.
[413] *Id.*
[414] Rep. ¶¶ 369-71.
[415] Rep. ¶¶ 374-75, citing CM ¶ 331.

### *Good Faith*

298. As a final argument, Respondent asserts that an investment that "deliberately runs afoul of the law of the state" cannot be considered to have been made in good faith.[416]  Respondent points to Claimants' alleged breach of good faith in Air Comet's subrogation of ARSA's creditors' claims and in Air Comet's failure to declare this subrogation to the Spanish authorities due to its character as a taxable event.[417]  Respondent also accuses the Grupo Marsans of ignoring good faith principles "in multiple jurisdictions."[418]

### ii.      Position of Claimants

299. Claimants argue that Respondent has failed to establish that Claimants' investments do not conform to Argentine or Spanish law.  According to Claimants, Respondent's allegations of illegality are "meritless."[419]   The mere existence of investigations in Spain and Argentina regarding Claimants' investments does not provide grounds for the Tribunal to deny jurisdiction.[420]  Moreover, Respondent fails to demonstrate how the issues at play in the Spanish investigation would render Claimants' acquisition of its investment illegal under Argentine law.[421]  Claimants assert that, in any event, the Treaty only requires that the investment be in conformity with the host State's law at the time of the initiation of the investment, which it did.

### *Alleged Violations of Spanish Law*

300. According to Claimants, the Spanish legal investigations are not relevant to the jurisdictional inquiry because they do not concern Claimants' *acquisition* of their participation in the Argentine Airlines.  Respondent has not claimed that Claimants made their acquisition through, for example, an act of corruption or fraud.[422]  Instead, the Spanish investigations concern 1) whether, in the performance of the SPA, SEPI should have requested prior consent of the Spanish Cabinet before allowing Air Comet to subrogate the rights of ARSA creditors,[423] and 2) whether Air Comet should have considered the acquisition of those credits for purposes of corporate income tax.[424]

301. Moreover, Claimants assert that Air Comet properly used the funds provided by SEPI,[425] and it did so with SEPI's consent.[426]  Claimants state that Respondent is also mistaken in its allegation that Air Comet gratuitously increased its patrimony with SEPI funds while failing to add them to its asset base for Spanish corporate tax purposes.  Those credits against ARSA never actually entered into Air Comet's patrimony.  Air Comet acted in accordance with the SPA and the

---

[416] Mem. ¶¶ 338, 340.
[417] Mem. ¶ 342.
[418] Mem. ¶ 345.
[419] CM ¶ 316; *see also* Claimant's Letter of April 4, 2012.
[420] CM ¶¶ 317, 319.
[421] CM ¶ 318
[422] CM ¶ 342.
[423] CM ¶ 343.
[424] CM ¶ 345.
[425] CM ¶ 322; CM ¶ 340.
[426] CM ¶ 344.

December 2001 Agreement in using SEPI's funds in direct benefit of ARSA's shareholder (Interinvest), which in return capitalized the credits, increasing its stockholding in ARSA and reducing the airline's debt.[427]

302. Claimants argue that the "mere existence" of the investigations and court proceedings in Spain and Argentina is insufficient to demonstrate an illegality.[428]   Claimants note that even if a Spanish or Argentine court was to render a decision finding that Claimants had breached domestic law when making their investments, such a decision would not be binding on this Tribunal.[429]   Respondent must prove its allegations of illegality before this Tribunal.

303. More specifically, Claimants disagree with Respondent regarding the contents of the September 7, 2011 Spanish court order.  Claimants assert that the order did *not* make a final determination that crimes had been committed.[430]   Rather, the court decided to continue with its investigation based on its finding that a crime may have been committed against the Spanish Treasury with respect to Air Comet's Spanish corporate income tax for 2002.[431]   In that same order, however, the court also ordered the dismissal of every other accusation against Air Comet and the other individuals, including Díaz Ferrán and Pascual Arias, which included the crimes of falsification, unlawful exaction, procedural fraud, and misappropriation of public funds.[432]   With respect to the alleged crimes against the Spanish Treasury, there has been no decision on the preliminary investigation.[433]

304. According to Claimants, even assuming that Respondent had provided sufficient legal and factual elements for the Tribunal to find a violation of Spanish law, it fails to demonstrate how such breaches of Spanish law could amount to breaches under Argentine law, which is the only standard under the Treaty (Art. 1(2)).[434]

305. With respect to the "new developments" alleged by Respondent, Claimants assert that these developments have no bearing on either the inception of Claimants' investment or on Argentine law, and that in any case, these developments consist of "mere allegations."[435]

306. First, with respect to the proceedings at the Central Court for Investigation Proceedings No.1 of Madrid regarding the alleged embezzlement by Mr. Díaz Ferrán, Mr. Pascual Arías and Mr. Ivan Losada, Claimants assert that these proceedings are totally unrelated to the jurisdiction of this Tribunal and to the subject matter of the arbitration.[436]

---

[427] CM ¶ 345.
[428] CM ¶ 331.
[429] CM ¶ 332.
[430] Claimants' Letter of November 8, 2011, at 3.
[431] *Id.* at 4.
[432] *Id.* at 5.
[433] Claimants' Letter of April 4, 2012, at 3.
[434] CM ¶ 348.
[435] Claimants' Letter of April 4, 2012, at 2.
[436] *Id.* at 3.

307. Second, with respect to the procedural fraud claims, Claimants deny the validity of the claims as well as Respondent's purportedly unsupported conclusions.[437]

308. Third, with respect to the investigation concerning the legality of operations within the reorganization proceedings pending before the Court for Investigation Proceedings No. 8 of Madrid, Claimants assert that neither the claims nor the reorganizations themselves have any bearing on the present arbitration.[438]

309. Fourth, concerning the reorganization proceeding pending before Commercial Court No. 12 of Madrid, Claimants assert that this proceeding is irrelevant to the present arbitration. Moreover, the Prosecutor's petition has been opposed by the interested parties and no decision has yet been issued.[439]

Fifth, Claimants address the Commercial Court No. 9 of Madrid's findings that Gerardo Díaz Ferrán and Gonzalo Pascual Arias were "guilty of the bankruptcy of Seguros Mercurio, S.A." and that Teinver and other Marsans Group companies were liable as accomplices. Claimants assert that the bankruptcy of Seguros Mercurio S.A. is "unrelated to Claimants' second request for provisional measures, the jurisdiction of this tribunal, or even the subject matter of these proceedings."[440] Moreover, the Court's May 11, 2012 decision is not final, and Claimants understand that such appeal will be filed in due course.[441]

### *Alleged Violations of Argentine Law*

310. Claimants assert that Argentine investigations into fraudulent management are groundless. First, Claimants state that the funds obtained from SEPI were properly used and directly or indirectly resulted in a benefit to ARSA and AUSA.[442] Second, Claimants note that Respondent did not disapprove of ARSA's 2001 balance sheets, and that Respondent's participation levels shrank after it failed to make the necessary contributions to maintain its participation at prior levels.[443] Claimants note that the Argentine proceedings remain at the preliminary investigation stage.[444]

311. Claimants also assert that Air Comet fully complied with the Argentine Bankruptcy Law with respect to the reorganization of ARSA.[445] The majority of ARSA's trustees approved the settlement agreement between ARSA and its creditors, and this settlement was subsequently approved by the responsible Argentine court.[446] Furthermore, the Commercial Court of Buenos Aires ended ARSA's reorganization proceedings on June 17, 2011. The court made no finding that Claimants, Air Comet or Interinvest had committed irregularities or illegalities during the

---

[437] *Id.* at 4.
[438] *Id.*
[439] *Id.*
[440] Claimants' Letter of June 1, 2012, at 2.
[441] *Id.* at 2.
[442] CM ¶ 322.
[443] CM ¶ 321.
[444] Claimants' Letter of June 30, 2011, 18-19.
[445] CM ¶ 351.
[446] CM ¶¶ 352, 355.

reorganization.    This   decision   therefore   confirms   that   Respondent's   accusations   of "irregularities" in the context of ARSA's reorganization are groundless.[447]

### *Other Alleged Misdeeds*

312.   Claimants respond that Respondent has failed to demonstrate the relevance of the bankruptcy proceedings or of the other circumstances surrounding Grupo Marsans' financial difficulties.[448] Furthermore, Claimants assert that it was Respondent's own failure to grant prompt and adequate compensation and to observe its commitments that severely impacted Claimants' group of companies.[449]

### *The Relevant Inquiry of Legality for Purposes of Jurisdiction*

313.   Claimants assert that the Treaty only requires that the investment conform to law of the host State at the time it was "acquired or effected."[450]   In other words, the analysis of the Tribunal at this stage must focus on the initiation of the investment.   This assertion is also confirmed by relevant case law.[451]   Claimants note that Respondent has not denied that Air Comet prevailed at the SEPI auction and legally acquired 99.2% shares of Interinvest, and that the SPA is a legal and binding agreement under Spanish law.[452]

314.   Respondent's allegations refer only to the performance, rather than the inception, of Claimants' investment.[453]   But Respondent has failed to provide any authority in support of its assertion that an investment must conform to the host state's law throughout the course of its operation and not just at the time of its commencement in order for it to fall within the protection of the Treaty.   If such a requirement existed, almost any investment could be disqualified from Treaty coverage by pointing to technical violations of local law in the operation of the investment.[454]   Furthermore, as described above, Respondent has failed to substantiate its allegations on non-performance.[455]

### *Good Faith*

315.   Claimants assert that Respondent has not provided evidence that Claimants acted in bad faith at the time of making the investment (or later).[456]   Unlike the case law cited by Respondent, there is no evidence of fraud on the part of Claimants at the time of the making of their investment, nor is there evidence that Claimants have attempted to gain access to an ICSID arbitration procedure to which they would not otherwise have been entitled.[457]   Respondent has simply repeated certain

---

[447] Claimants' Letter of August 30, 2011, at 1.
[448] CM ¶ 365.
[449] CM ¶¶ 366-67.
[450] CM ¶ 371.
[451] Rej. ¶ 324.
[452] CM ¶ 371; *see also* CM ¶ 313.
[453] CM ¶ 374; *see also* CM ¶ 314.
[454] CM ¶ 374.
[455] Rej. ¶ 328.
[456] CM ¶ 375.
[457] CM ¶ 378.

allegations such as the allegation that Air Comet purportedly committed tax fraud under Spanish law in its acquisition of liabilities of ARSA.[458]

### iii.    Analysis of the Tribunal

316.   The Parties disagree on two initial legal issues regarding the above allegations.  First, they disagree over whether, under the Treaty and international investment law, *all* illegalities committed by investors in connection with an investment can deprive the investor of protection under the Treaty, or only illegalities that are related to the inception of the investment.  Second, the Parties disagree on whether, as a factual matter, the illegalities alleged to have been committed by the Claimants occurred at the "inception" of the investment or at a subsequent time.

### 1.    Timing of the Alleged Illegality

317.   As Respondent notes, it is widely acknowledged in investment law that the protections of the ICSID dispute settlement mechanism should not extend to investments made illegally.  As noted recently by the tribunal in *Hamester v. Ghana*,

> An investment will not be protected if it has been created in violation of national or international principles of good faith; by way of corruption, fraud, or deceitful conduct; or if its creation itself constitutes a misuse of the system of international investment protection under the ICSID Convention. It will also not be protected if it is made in violation of the host State's law (as elaborated, *e.g.* by the tribunal in *Phoenix*).[459]

318.   However, as the Treaty itself makes clear, the critical time period for determining an investment's legality is the time the investment was made.  Articles I(2), II and III(1) of the Treaty address qualifying investments made by investors.  Article I(2) defines "investments" as follows:

> The term "investments" shall mean any kind of assets, such as property and rights of every kind, *acquired or effected in accordance with the legislation of the country receiving the investment*[.] (emphasis added)

The application of ordinary meaning of Article I(2) to the Claimants is perfectly straightforward: in order to qualify as an "investment" under the Treaty, Claimants' investments must have been acquired or effected in accordance with Argentine law, the country receiving the investment.  In other words, the relevant inquiry is whether Claimants' entry into the investment, here its acquisition of shares in Interinvest through Air Comet, is legal.

319.   Other provisions of the Treaty support this interpretation.  Article II(1), which concerns the promotion and acceptance of investments, states that "[e]ach Party shall encourage, to the extent possible, investments *made* in its territory by investors of the other Party and shall accept those

---

[458] *Id.*
[459] *Hamester v. Ghana,* Award, ¶ 123.

investments in accordance with its legislation." (emphasis added)  Article III(1), which addresses the protection of investments, requires each party to "protect within its territory investments *made, in accordance with its legislation,* or the investors of the other Party[.]" (emphasis added).

320.  Case law addressing BITs with similar language also supports this interpretation.  The Germany-Ghana BIT at issue in *Hamester* contained similar language to the Treaty, and the tribunal ruled that only the inception of the investment was relevant for its jurisdictional inquiry:

> The Tribunal considers that a distinction has to be drawn between (1) legality as at the *initiation* of the investment ("made") and (2) legality *during the performance* of the investment. Article 10 legislates for the scope of application of the BIT, but conditions this only by reference to legality at the initiation of the investment. Hence, only this issue bears upon this Tribunal's jurisdiction. Legality in the subsequent life or performance of the investment is not addressed in Article 10. It follows that this does not bear upon the scope of application of the BIT (and hence this Tribunal's jurisdiction) – albeit that it may well be relevant in the context of the substantive merits of a claim brought under the BIT. Thus, on the wording of this BIT, the legality of the creation of the investment is a jurisdictional issue; the legality of the investor's conduct during the life of the investment is a merits issue.[460]

321.  Similarly in *Fraport*, the respondent in that dispute had asserted that in order for the claimant to maintain jurisdictional standing under the Germany-Philippines BIT, the investment must not only be in accordance with the domestic law at the commencement of the investment but must also continually remain in compliance with the domestic law.  While the tribunal ultimately agreed with the respondent that the investment was illegally *acquired,*[461] the tribunal rejected the respondent's interpretation regarding the *continuation* of the investment.  It noted,

> The language of both Articles 1 and 2 of the BIT emphasizes the initiation of the investment. Moreover the effective operation of the BIT regime would appear to require that jurisdictional compliance be limited to the initiation of the investment. If, at the time of the initiation of the investment, there has been compliance with the law of the host state, allegations by the host state of violations of its law in the course of the investment, as a justification for state action with respect to the investment, might be a defense to claimed substantive violations of the BIT, but could not deprive a tribunal acting under the authority of the BIT of its jurisdiction.[462]

322.  Even in *Inceysa*, a case in which the tribunal determined that the claimants had committed numerous fraudulent acts, the tribunal's inquiry was directed towards the *inception* of the

---

[460] *Hamester v. Ghana,* Award, at ¶ 127 (emphasis added).

[461] *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines* (ICSID Case No. ARB/03/25), Award, August 16, 2007 (hereinafter "*Fraport v. Philippines*"), LA AR 84.  This award was subsequently annulled, but the annulment decision was based on different grounds.  *See Fraport v. Philippines,* Decision on Annulment, December 23, 2010, LA AR 145.

[462] *Fraport v. Philippines,* 2007 Award at ¶ 345.

investment: "[T]he foreign investor cannot seek to benefit from an investment *effectuated* by means of one or several illegal acts and, consequently, enjoy the protection granted by the host state, such as access to international arbitration to resolve disputes, because it is evident that *its act had a fraudulent origin* and, as provided by the legal maxim, "nobody can benefit from his own fraud."[463]   All of the *Inceysa* tribunal's factual findings of fraud concerned the inception of the investment, including the claimant's presentation of false information as part of its bid tender, false representations made during the bidding process, false documents submitted as part of its bid, and a hidden relationship with another bidder in contravention of the bidding rules.[464]

323.   In addition, the Tribunal notes that the relevant law for purposes of determining whether the investment was legally made is the law of the host State.   Several of Respondent's arguments concern allegations of illegality under *Spanish* law.   In support of these arguments, Respondent asserts that "the general principles that endorse the non-protection of illegal investments or investments made in bad faith … are not limited to the law of the host State, but also to the laws of other countries that may be involved."[465]   Once again, however, Article I(2) of the Treaty, which refers to investments "acquired or effected in accordance with the legislation of *the country receiving the investment*," makes clear that the relevant law for this issue is the legislation of Argentina.

## 2.   Claimants' Alleged Illegalities

324.   Respondent has failed to demonstrate that Claimants, as a factual matter, committed illegalities in the process of *acquiring* their investment in the Argentine Airlines.   In this respect, the onus is on Respondent.   While Claimants must make a *prima facie* showing that their investment comes within the protections of the Treaty,[466] Respondent has not, with this objection, raised any issue of fact to counter Claimants' showing.[467]

325.   As Claimants note, Respondent has not denied that Air Comet prevailed at the SEPI auction and legally acquired 99.2% shares of Interinvest, and that the SPA is a legal and binding agreement

---

[463] *Inceysa v. El Salvador,* Award, at ¶ 242 (emphasis added).
[464] *Id.* at ¶ 236.
[465] Mem. ¶ 340.
[466] *See, e.g., Salini v. Jordan,* Decision on Jurisdiction, ¶ 151 ("In conformity with [substantial] jurisprudence, the Tribunal will accordingly seek to determine whether the facts alleged by the Claimant in this case, if established, are capable of coming within those provisions of the BIT which have been invoked.").
[467] A number of tribunals have held that a respondent bears the burden of proof with respect to the facts alleged in its jurisdictional objections.   *See, e.g., Rompetrol Group N.V. v. Romania* (ICSID Case No. ARB/06/3), Decision on Jurisdiction, April 18, 2008, ¶ 75, Exhibit C-523. ("It will be seen that the jurisdictional objection entails issues of fact (whether the investments were and are under Mr. Patriciu's dominant control; whether the origin of the investment funds was Romanian), and issues of law (what effect such factual circumstances would have on the Tribunal's jurisdiction to hear a complaint by the investor). The issues of fact are ones which the Respondent bears the burden of proving according to the requisite standard, in order to sustain the claims of law it bases on them. The Parties are in dispute over both the issues of fact and the issues of law."); *Desert Line Projects LLC v. The Republic of Yemen* (ICSID Case No. ARB05/17), Award, February 6, 2008, ¶ 105 (LA AR 83) ("the Respondent has not come close to satisfying the Arbitral Tribunal that the Claimant made an investment which was either inconsistent with Yemeni laws or regulations or failed to achieve acceptance by the Respondent."); *Hamester v. Ghana,* Award at ¶ 132 ("Having carefully considered all the evidence, the Tribunal considers that the Respondent has not fully discharged its burden of proof" with respect to respondent's allegation of illegality in the inception of the investment).

under Spanish law.[468]   Instead, Respondent relies on the argument that account must be taken of the whole complex transaction leading to the "inception" of the investment—i.e., the SPA and its "related legal acts, including the breach of or compliance with its terms."[469]

326.   However, Respondent's reliance on the whole of the SPA "transaction" is misplaced.  The SPA is a contract between SEPI and Air Comet to effectuate an exchange of benefits, liabilities and obligations.   Some of the commitments made by the parties relate to the transfer of share ownership in Interinvest.[470]   However, the SPA's other commitments concern not only SEPI's assumption of liabilities and other economic commitments of the Argentine Airlines, but also obligations as diverse as management structures, the size of the Argentine Airlines' aircraft fleet, the air routes to be taken by the Argentine Airlines, and employee headcount.[471]   Each of these commitments, whether they are related to the transfer of shares or not, represents a promise to perform *once the contract has been executed*.  As such, any question of whether either party has complied with or breached any of these terms of the SPA is a question of *performance*.  Any breach that occurs later does not retroactively invalidate, render illegal or otherwise undermine the integrity or binding nature of the SPA itself; rather, it triggers a party's legal liability under the SPA.

327.   As discussed above, the relevant jurisdictional inquiry is whether Claimants acquired or made their investment in compliance with Argentine law.  Here, Claimants *made* their investment by entering into the SPA.  There is no evidence on the record that Claimants failed to comply with any Argentine laws or committed any illegalities in *entering* the SPA.  No evidence suggests that either Claimants or SEPI were not authorized to sign the agreement, that Claimants committed fraud or made a critical omission in how they represented themselves during the bidding process, or that Claimants engaged in any corruption or failure to comply with bidding or other procurement requirements.

328.   Consequently, this Tribunal finds that each of Respondent's allegations concerns either Claimants' performance under the SPA (i.e., Claimants' subrogation of ARSA's creditors' claims) or other events subsequent to the acquisition of their investment.   Respondent's allegations regarding whether Claimants wrongly approved of ARSA's 2001 balance sheets, whether Claimants' role in ARSA's reorganization violated Argentine law, and whether the Marsans Group "deplorably managed" its investments, are all issues arising *subsequently* to Claimants' acquisition of their investment.

### 3.   Claimants' Alleged Lack of Good Faith

329.   As a final argument, Respondent asserts that Claimants breached good faith principles when Air Comet subrogated ARSA's creditors' claims and when it failed to declare this subrogation to the

---

[468] CM ¶ 313.
[469] Rep. ¶¶ 365-366.
[470] Ex. C-18, §§ 1-6.
[471] *See* Ex. C-18, §§ 7, 9.

responsible tax authorities.[472]   Respondent also generally accuses Grupo Marsans of ignoring good faith principles "in multiple jurisdictions."[473]

330. None of these alleged acts relate to the *acquisition* of Claimants' investment, but rather post-date the making of the investment.   Moreover, the cases cited by Respondent held that the relevant inquiry for whether an investment breaches good faith principles is determined with respect to the *acquisition* of their investment.   In *Inceysa*, the case upon which Respondent principally relies, the tribunal found that the claimant's numerous fraudulent representations violated the fundamental rules of the bidding process and constituted a breach of good faith.[474]   Unlike the present case, *Inceysa* concerned the claimant's acts with respect to the *acquisition* of its investment.   Likewise, in *Phoenix*, the tribunal found that the claimants had made no actual "economic investment" but rather "simply a rearrangement of assets within a family to gain access to ICSID jurisdiction to which the initial investor was not entitled."[475]   *Phoenix* is simply not on point to the circumstances of the present dispute.   Therefore, Respondent has failed to demonstrate that Claimants did not act in good faith in acquiring their investment.

331. In conclusion, for the reasons stated above, the Tribunal rejects Respondent's fourth objection. The Tribunal notes that certain of the allegations raised under this objection may affect the merits of the claim and that it will be open to the Parties to make further submissions in respect of these allegations as appropriate during the merits stage of the Arbitration.

## V.   Costs

332. Both Parties have requested the Tribunal to order costs and fees, plus interest, against the opposing Party.   The Tribunal reserves this question for subsequent adjudication.

---

[472] Mem. ¶ 342.
[473] Mem. ¶ 345.
[474] *Inceysa v. El Salvador,* Award, at ¶¶ 236-37.
[475] *Phoenix Action v. Czech Republic* (ICSID Case No. ARB/06/5), Award, 15 April 2009, LA AR 85, at ¶ 140.

## VI.   Decision on Jurisdiction

333. For the reasons set forth above, the Tribunal declares that:

1) The Objections to Jurisdiction are rejected;

2) It joins to the merits the determination of Respondent's responsibility for the acts of non-state entities.

Judge Thomas Buergenthal
President of the Tribunal

Henri C. Alvarez Q.C.
Arbitrator

Dr. Kamal Hossain
Arbitrator
Subject to the attached
separate opinion

**SEPARATE OPINION OF DR. KAMAL HOSSAIN**

**INTRODUCTION**

While I agree with the Decision on Jurisdiction ("the Decision") to the extent that the Objections to Jurisdiction cannot be accepted at this stage (the jurisdiction stage), I am of the view that some critical issues involved can be properly determined only after consideration of evidence, which may be presented at the merits stage. I am, therefore, setting out below reasons for my Separate Opinion.

**I.  FACTS RELEVANT TO JURISDICTION**

### a. Parties

1.   The statement in paragraph 1 of the Decision that Claimants are members of a group of companies known collectively as the Grupo Marsans does not substantiate or clarify the averments in paragraph 2 of the Claimants' Memorial on Merits dated 29.9.2012 ("CMM") to the effect that the Claimants purchased Argentine Airlines in 2001 and owned and operated them until the Argentine Government nationalized them in 2008. These averments remain unproven assertions and would have to be proved by production of evidence. The rejection of Objections to Jurisdiction, therefore, is subject to the power reserved by the Tribunal to conclusively determine the objections after consideration of the evidence presented at the merits stage.

### b. Dispute

### (i)      Acquisition of the Argentine Airlines

2.   From the evidence thus far produced at the jurisdiction stage it is clear that it was a Spanish Company, Air Comet, which acquired the shares held by Sociedad Estatal de Participaciones Industriales ("SEPI"), a Spanish Government entity for one dollar under the Share Purchase Agreement dated 20 October, 2001 ("SPA"). As noted above in paragraph 1, the Claimants' assertion in the CMM that the Claimants purchased Argentine Airlines in 2001 and owned and operated them until 2008 remains an unproven assertion. Footnote 8 in the Decision starts with the assertion that Teinver's initial share purchase (was) in 2006, which is clearly inconsistent with the statement in paragraph 2 of the Claimants CMM that "Claimants purchased the Argentine Airlines in 2001".  In that footnote, the ownership structure in place at the time that Claimants instituted this arbitration on December 11, 2008 is  described, and it concludes with the following  statement: "During this time, Air Comet has kept its shareholdings in Interinvest, which in turn has kept its shareholdings in ARSA and AUSA."  What is meant by "during this time" in this statement needs to be clarified.

3.   Without these clarifications, and consideration of evidence, the following statements in paragraph 8 of the Decision raise certain questions:

> "[A]cording to Claimants, the dispute centers on two preliminary issues:
>
> > (i)      a disagreement between the Parties as to the Argentine regulatory framework—regarding airfare caps in particular—within

which the Argentine Airlines were required to operate between 2002 and 2008, and

(ii)    disagreement between the Parties as to the remedy due to Claimants for the expropriation of their shares in those airlines".

The questions raised are as follows: Who are "the Parties" referred to in sub-paragraph (i) above, which shares can be described as "their (Claimants') shares" and on what basis can the Claimants assert ownership of shares which are described in sub-paragraph (ii) above as "**their** shares" in the airlines ?

The answer to these questions will have to be taken into account in order to arrive at definitive findings at the merits stage on key questions such as Claimants' investments. The statement in paragraph 2 of the CMM that: "This is a straightforward case of formal expropriation without compensation by the Government of Argentina … the GOA has paid no compensation to the **Claimants** for taking of **their investments**" requires consideration of evidence to determine what is meant by **Claimants' investments** and whether **their** investments have been the subject-matter of expropriation.

## II.    PROCEDURAL MATTERS

### a.    Request for Arbitration and its Registration by ICSID

4.    The Separate Opinion relies on the Procedural History set out in Part II of the Decision.

## III.    POSITION OF THE PARTIES ON JURISDICTION

5.    Respondent' submissions are summarized in paragraph 72 of the Decision as follows:

   i.    The Tribunal lacks jurisdiction because Claimants failed to meet the requirements set forth in Article X of the Treaty;
   ii.   The Tribunal lacks jurisdiction because Claimants have no legal standing to claim for legal rights that belong to another legal person;
   iii.  The Tribunal lacks jurisdiction to adjudicate certain of Claimants' allegations that concern the acts of non-state entities, which cannot be attributed to Respondent; and
   iv.   The Tribunal lacks jurisdiction because the investment invoked by Claimants is not an investment protected by the Treaty.

6.    The Claimants' Submissions on Jurisdiction are summarized in paragraph 73 of the Decision as follows:

   i.    The Tribunal has jurisdiction over Claimants' claims because Claimants have satisfied the procedural provisions of the Australia-Argentina BIT, which they may rely on through the application of the Treaty's MFN clause;

    ii.  The Tribunal has jurisdiction, in the alternative, because Claimants have satisfied and/or are excused for reasons of futility from the requirements set forth in Article X of the Treaty;

   iii.  The Tribunal has jurisdiction over Claimants' claims because Claimants are legitimate parties to this arbitration;

   iv.  The Tribunal should defer questions of state attribution for acts of non-state entities to the merits phase of this arbitration or, in the alternative, determine that the acts alleged are attributable to Respondent; and

    v.  The Tribunal has jurisdiction over Claimants' claims because Claimants' investment was acquired and effected in accordance with the legislation of Argentina and in good faith.

## IV.   JURISDICTIONAL OBJECTIONS

### a.   First Jurisdictional Objection: Claimants' fulfillment of the procedural requirements of Article X of the Treaty

7.     According to Respondent, Claimants failed to meet the requirements of Article 10. Specifically, Respondent alleges that Claimants have not attempted to amicably settle their dispute in accordance with Article X(1) and (2) of the Treaty and further that Claimants have not subjected their dispute to the Argentine courts for a period of eighteen months before seeking this arbitration, in accordance with Article X(3). (Paragraphs 2 to 25 – Respondent's Memorial on Objection to Jurisdiction – "RMOJ").

8.     The Claimants have made two responses to this objection. First, Claimants assert that they are entitled to invoke the Treaty's MFN clause in Article IV(2) in order to benefit from the more favorable dispute settlement provisions of other BITs negotiated by Argentina. Second, Claimants assert that even if the Treaty's MFN clause does not permit them to borrow the dispute settlement provisions from other Argentine BITs, they have satisfied the requirements of Article X of the Treaty, or, in the alternative, that they should be excused from Article X's requirements for reasons of futility. (Paragraphs 7 to 10 – Claimants' Counter-Memorial on Jurisdiction "(MJ").

### i.   Compliance with the requirements of Article X

9.     The Tribunal first addressed the issue of Claimants' Compliance with the requirements of Article X of the Treaty. After a careful and exhaustive consideration of the submissions and the evidence presented and the reasons articulated in paragraphs 107 to 136 the Tribunal found that the Claimants have satisfied the requirements of Article X(1-3) of the Treaty (paragraph 116 of the Decision).

10.    In my view, therefore, since the Tribunal has arrived at an agreed finding that the Claimants have satisfied the procedural requirements of Article X of the BIT, it is not necessary for the Tribunal to embark upon consideration of the alternative submission invoking the MFN clause. In my view when an issue can be resolved, as in this case, by relying on an express provision (Article X) and a clear finding can be, and has been, arrived at that its requirements have been fulfilled, recourse to the MFN clause

is not justified. That would involve reaching out to other agreements and consideration of contested issues on which an agreed interpretation would be difficult and may even prove to be impossible. This is why recourse in these circumstances to the MFN clause may well be avoided. The more so, since jurisprudence on the issue of whether an MFN clause can be applied to jurisdictional issues reveals considerable divergence of juristic views and is the subject of continuing controversy.

11.    The parties had pointed to a significant body of jurisprudence on the issue of whether MFN clauses can be applied to jurisdictional issues. Both parties had acknowledged that this body of case law is not consistent, and that there remains a great deal of controversy on this issue."[1]. The divergence of opinions by tribunals on MFN clauses is not only with regard to the interpretation of ordinary meaning.

12.    Investment arbitration jurisprudence on the ordinary meaning of MFN provisions has not been entirely consistent, even when the same BIT is concerned.  Notably, each of the cases that has addressed Article IV(2) of the Spain-Argentina BIT has concluded that the broad language of the MFN clause applies to the Article X dispute resolution provisions. However, other tribunals have disagreed.  The Belgium/Luxembourg-Soviet Union BIT applied by the tribunal in *Berschader* contained "all matters" language similar to that of the Spain-Argentina BIT.  Nonetheless, the *Berschader* tribunal rejected the claimant's attempt to use the MFN clause.  In contrast with the tribunals in *Maffezini*, *Gas Natural* and the *Suez* cases, the tribunal in *Berschader* noted that "all matters covered by the present treaty" cannot be interpreted "literally," because the MFN clause is not capable of being applied at all to several of the matters covered by the BIT.

13.    I would like to express my reservation with regard to the analysis and observations set out in paragraphs 137 to 186 of the Decision and to express my disagreement with the conclusion expressed in paragraph 186 which commences with statement that: "the Tribunal finds that Claimants may equally rely on the Article IV(2) MFN clause of the Treaty to make use of the dispute resolution provisions contained in Article 13 of the Australia-Argentina BIT."

---

[1]      Cases relating to MFN include: *Maffezini v Kingdom of Spain*, ICSID Case No.ARB/97/7, 2000
*Salini Construttori e Italstrade S. atA. V. Jordan,* ICSID Case No.ARB/02/13, 2004
*Plama Consortium Limited v. Bulgaria,* ICSID Case No.ARB/03/24, 2005
*Vladimir Berschader and Moise Berschader* v *Russia*, SCC Case No. 080/2004 (BLEU-USSR BIT) (Sjovall P., Lebedev & Weiler). Award, 21 April 2006)
*Telenor Mobile Communications A.S. v.  Hungary,* ICSID Case No. ARB/04/15, 2006
*Winfrom Wintershall Aktiengesellschaft v. Argentine Republic,* ICSID Case No. ARB/04/14, 2008
*Renta 4  SVSA,  et al.* v. *The Russian Federation,* SCC Case No. Arbitration V (024/2007). Award on preliminary objections rendered on - 20 March 2009
*Tza Yap Shum* v. *The Republic of Peru* (ICSID Case No. ARB/07/6) - Decision on Jurisdiction and Competence, June 19, 2009
*Austrian Airlines v. Slovak Republic*, UNCITRAL Case, Award of 20 October, 2009
*RosInvestCo UK Ltd.* V. *Russia*, SCC Case No. Arb. V079/2005 (UK-USSR BIT) (Bockstiegel P., Steyn & Berman). Award on Jurisdiction, October 2007
*Impregilo S.P.A. v. Argentina*, ICSID Case No. ARB/07/17, Award, June 21, 2011
*Hochtief Ag v. The Argentine Republic,* ICSID Case No. ARB/07/31, Award, 7 October, 2011

14. I find support for my view in recent juristic writing, in which the cases have been critically analyzed. Newcombe and Paradell[2] after reviewing the jurisprudence observe that: "… the overview of the jurisprudence … highlights (that) tribunals have adopted conflicting approaches to the application of MFN clauses to investor-state arbitration provisions" and that "(t)he use of MFN treatment to obtain the more favourable procedural treatment in other investor-state arbitration provisions has been criticized on the basis that it amounts to cherry picking", and conclude that: "At present, the more persuasive view is that MFN treatment obligations with respect to foreign investment and investors arise only on the basis of an express treaty obligation."

15. Campbell McLachlan QC *et al.* have expressed their views in the following terms:[3] "This analysis led the Tribunal to substitute instead a simple rule of construction to the effect that an MFN provision would not apply to dispute settlement provisions unless the parties expressly provided that it did.  It is submitted that the reasoning of the Tribunal in *Plama* is to be strongly preferred over that in Maffezini …  The result, if , as is suggested, the approach in Plama is preferred, will be that the MFN clause will not apply to investment treaties' dispute settlement provisions, save where the States expressly so provide."

16. A critical review which covers some of the most recent cases by Paparinskis concludes that: [4]

> "The cases after 2007 are less easily read as reflecting an even implicit consensus. Some recent decisions follow the earlier approaches. The 2009 decision in *Tza Yap Shum* and the majority decision in *Austrian Airlines* rejected the investors' argument for the extension of its jurisdiction. The former tribunal explained itself as following both *Plama* and *Maffezini* and the majority of the latter tribunal also relied on the distinction between substantive and procedural rules attracted by the MFN clause. In 2011, a majority of the Impregilo tribunal explicitly situated itself within the *Maffezini* line of decisions. However, the recent general trend rejects earlier practices and explanations."

17. I find the analysis in the Concurring and Dissenting Opinion of Professor Brigitte Stern in the *Impregilo* case persuasive. The following extracts from that Opinion are set out below:[5]

---

[2] *Law and Practice of Investment Treaties, Standards of Treatment,* Chapter 5, "Most Favoured Nation Treatment", pages: 194 to 232, Wolters Kluwer, 2009

[3]  Campbell McLachlan, Laurence Shore and Matthew Weiniger, *International Investment Arbitration, Substantive Principles*, Oxford, 2008, p.75.)

[4] ICSID Review,  Fall 2011,  "MFN Clauses and International Dispute Settlement: Moving beyond *Maffezini and Plama*", pp. 14-35

[5] ICSID Case No. ARB/07/17 references are to paragraphs in the *Concurring and Dissenting Opinion of* Professor Brigitte Stern.

"78.    Just as an MFN clause cannot change the conditions *ratione personae*, *ratione materiae*, and *ratione temporis*, as has just been demonstrated, it must be equally true that an MFN clause cannot change the condition *ratione voluntatis*, which is a qualifying condition for the enjoyment of the jurisdictional rights open for the protection of substantial rights.

79. In other words, before a provision relating to the dispute settlement mechanism can be  imported into the basic treaty, the right to international arbitration – here ICSID arbitration – has to be capable of coming into existence for the foreign investor under the basic treaty, in other words the existence of this right is conditioned on the fulfillment of all the necessary conditions for such jurisdiction, the conditions *ratione personae*, *ratione materiae*, and *ratione temporis* as well as a supplementary condition relating to the scope of the State's consent to such jurisdiction, the condition *ratione voluntatis*.

80. As long as the qualifying conditions expressed by the State in order to give its consent are not fulfilled, there is no consent, in other words no access of the foreign investor to the jurisdictional treatment granted by ICSID arbitration. An MFN clause cannot enlarge the scope of the basic treaty's right to international arbitration, it cannot be used to grant access to international arbitration when this is not possible under the conditions provided for in the basic treaty.

…                         …                              …

83. There appears to be no legal reason to treat differently these two types of requirements that condition the State's consent. On this issue, I am in agreement with my co-arbitrator Charles Brower, who explained in his Separate opinion in *Renta 4*, that " … there is no reason to differentiate between admissibility-related aspects of accessing investor-State arbitration and matters of jurisdiction …"

…                         …                              …

93.    The importance of consent has always been stressed in international arbitration cases and especially in ICSID cases. *Plama*, of course, has laid a great emphasis on the necessity of a clear an unambiguous consent:

> In the view of the Tribunal, the following consideration is equally, if not more, important. ... Nowadays, arbitration is the generally accepted avenue for resolving disputes between investors and states. Yet, that phenomenon does not take away *the basic prerequisite for arbitration: an agreement of the parties to arbitrate.* It is a well-established principle, both in domestic and international law, that *such an agreement should be clear and unambiguous*. In the framework of a BIT, the agreement to arbitrate is arrived at by the consent to arbitration that a state gives in advance in respect of investment disputes falling under the BIT, and the acceptance thereof by an investor if the latter so desires.

> Doubts as to the parties' clear and unambiguous intention can arise if the agreement to arbitrate is to be reached by incorporation by reference".
>
> …                    …                         …
>
> 96.    The decision in *Wintershall* has insisted again on the idea that the State must have given its consent and that this consent is a condition for the access to international arbitration:
>
> In the present case, therefore the BIT between Argentina/and Germany is a treaty undoubtedly providing for a right of access to international arbitration (ICSID) for foreign investors, who are German nationals – but this right of access to ICSID arbitration is not provided for unreservedly, but upon condition of first approaching competent Courts in Argentina … a local-remedies rule may be lawfully provided for in the BIT – under the first part of Article 26; once so provided, as in Article 10(2), *it becomes a condition of Argentina's "consent" – which is, in effect, Argentina's "offer" to arbitrate disputes under the BIT, but only upon acceptance and compliance by an investor of the provisions inter alia of Article 10(2)*; an investor (like the Claimant) can accept the "offer" only as so conditioned."

18.    I am, therefore, of the view that recourse to the MFN clause in the present case is neither necessary nor justified.

**b. Second Jurisdictional Objection: Claimants' Standing**

### i.   Claimants' Investment in Interinvest and the Argentine Airlines

19.    The Respondent's position as elaborated in paragraphs 85 to 215 of the Memorial on Objections to the Jurisdiction dated 6 December, 2010 ("MOJ"), at pages 41 to 79 may be summarized as follows:

(a)    Argentina-Spain BIT does not afford any protection to "indirect shareholders"

(b)    No "investment" **recognized** by **Argentine** law was expropriated.

(c)    The definition of "investment" under the Argentine-Spain BIT is clearly narrower than that under the US-Argentina BIT. The following submission is made in paragraph 164 of the MOJ, page 64:

> "164.  The concept of investment under the US-Argentina BIT is clearly broader than that of the Argentina-Spain BIT. For these reasons, the material scope of the Argentina-Spain BIT should not be extended, as Claimants wrongly expect, to include their mere interests in the indirect shareholdings they currently have (in the case of Teinver S.A.) or previously had (in the case of Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.) in Interinvest S.A., Aerolineas Argentinas S.A. and Austral-Cielos del Sur. Claimants cannot interpret

> the applicable BIT in an extensive manner, distorting its content and invoking a scope of protection that simply does not exist."

20.     I find that the Decision has not addressed the reasoning underlying the above arguments but tends to follow, what in my view, are questionable assertions in some earlier ICSID cases. The facts of this case do not justify simply adopting the interpretations which found favour in earlier cases, in particular in cases such as *Siemens v. Argentine Republic* or *Mobil Corporation v. Venezuela.*

21.     I find it difficult to accept the reasoning in the *Siemens* case which is set out in the following terms (emphasis added):

> "The Tribunal has conducted a detailed analysis of the reference in the Treaty to "investment" and "investor". **The Tribunal observes that there is no explicit reference to direct or indirect investment as such in the Treaty."**
>                     ….                     ….                     …
> **"The Treaty does not require that there be no interposed companies between the investment and the ultimate owner of the company.** Therefore, a literal reading of the Treaty does not support the allegation that the definition of investment **excludes** indirect investments." (paragraph No. 137 of the Decision on Jurisdiction dated 03.08.2004 in *Siemens Ag v. Argentine Republic*.)
>
> **"The tribunal notes that there is no explicit reference to direct or indirect investments in the BIT. The definition of investment given in Article 1 is very broad. It includes "every kind of assets" and enumerates specific categories of investments as examples. One of those categories consists of "shares, bonds or other kinds of interests in companies and joint ventures".**
>                     …                     …                     ..
> **"The BIT does not require that there be no interposed companies between the ultimate owner of the company or of the joint venture and the investment. Therefore, a literal reading of the BIT does not support the allegation that the definition of investment excludes indirect investments."**

I find equally unacceptable the reasoning in the Mobil case referred to which is stated in the following terms:  "Investment as defined in Article 1 could be direct or indirect as recognized in similar cases". (Paragraph No. 165 of the Decision on Jurisdiction dated 10.06.2010 in *Mobil Corporation, Venezuela and others vs. Venezuela.*)

22.     In Article I(2) of the BIT: (emphasis added in dark bold letters):

> "The term **"investments" shall mean any kind of assets, such as property and rights of every kind, acquired or effected in accordance with the legislation of the country receiving the investment** and in particular, but not exclusively, the following:
>
> - Shares and other terms of participation in companies;
>                     ….                     …                     ….

> **The content and scope of the rights** corresponding to the **various categories of assets shall be determined by the laws and regulations of the Party in whose territory the investment is situated."**
>
> ....                                    …                                    …
>
> The words "**in accordance with the legislation of the country receiving investments"** in Article I(2) must be given due weight.

23.     In my view on a plain reading of the words in Article I(2) of the BIT shares **held** in a company means shares **directly** held, unless **indirectly held** shares **are expressly included**. An interpretation, which would **expand** the meaning to include shares "indirectly held" cannot be understood to be the plain meaning of the word "held" since "indirectly held" widens the scope without limit, and enlarges the obligation imposed (also without limit). It is, therefore, reasonable to expect that to include "shares indirectly held" this must be done expressly as in the US BITs.

24.     I think we need to heed the caution counseled by Campbell McLachlan and his co-authors in the following terms:

> "Those involved in investment treaty arbitrations should take care not to allow the use of other awards to transgress the appropriate boundaries. Their citation should not overwhelm a tribunal's consideration of the case before it."[6]

25.     In my view the following submissions merit serious consideration:

(a)     The interpretative principle of *in dubio mitius*, requires that in interpreting treaties, if the meaning of a term is ambiguous, that meaning is to be preferred which is less onerous to the party assuming an obligation, or which interferes less with the territorial and personal supremacy of a party, or involves less general restrictions upon the parties.[7]

(b)     The Respondent in its Memorial on Objections to the Jurisdiction dated 6 December 2010 submits that: "Under international law, indirect or derivative claims cannot be filed. Nonetheless, some treaties have expressly provided for indirect or derivative actions under extraordinary circumstances. This constitutes an exception to the general principle that no person may bring a claim on behalf of another" (p. 56, para 141). In support of its argument the Respondent cites the *Case Concerning Ahmadou Sadio Diallo*[8] and *International Thunderbird Gaming Corp and the United Mexican States*, UNCITRAL case under the NAFTA rules (Submission of the United States of America, paras 4-9.)

---

[6]     Campbell McLachlan *at el.,* op. cit. p. 75

[7]     Jennings, R. Y. & Watts, A. (eds.), Oppenheim's *International Law*, Vol. 1 (9th edn; Essex: Longman, 1992) p. 1278 *Nuclear Tests case*, ICJ Rep 253 (1974) at 267;  *Access of Polish War Vessels to the Port of Danzig*, PCIJ Ser A/B No 43 (1931) at 142;  *Air Transport Services Agreement Arbitration,* 38 ILR 182 (1963) at 243; and *De Pascale Claim*, 40 ILR 250 (1961);  Sornarajah, M., *The International Law on Foreign Investment* (Cambridge: Cambridge University Press, 2007) p. 254.)

[8]     (*Republic of Guinea v. Democratic Republic of Congo*, 2007 I.C.J. 1 (May 24), ¶ 88.

26.     In a recent survey of awards by M. Valasek and P. Dumberry, the following views are expressed:[9]

> "… arbitral tribunals have also recognized the right of intermediate ("shell") corporations to submit their own claims to arbitration. These developments have even led some authors to suggest the existence of a new "rule" of customary international law providing shareholders with a procedural "right" to bring arbitration claims against the State where they make the investment. These are undoubtedly overall positive developments for the protection of foreign investors. This evolution nevertheless gives rise to several legitimate concerns from the perspective of capital-importing States that have entered into numerous BITs.
>
> …                          …                          ….
> The first area of concern relates to the fact that BITs typically do not distinguish between minority and majority shareholders which can submit separate claims from that of the corporation. As a matter of principle, all shareholders big and small, should receive legal protection under a BIT that does not expressly distinguish between them. This situation nevertheless raises some concerns where a corporation's share capital is divided between numerous shareholders each holding a very small percentage of the total number of shares (imagine, for instance, 100 different shareholders each owning a mere 1% of the corporation's share). Nothing (apart, of course, from the high costs of pursuing international arbitration) would prevent all these different shareholders from filing their own separate claims against the host State for the same treaty breach. Another area of concern is related to the protection offered to indirect investments made through multiple layers of intermediate corporations. Again, under a typical BIT, each holding company in a long chain of ownership could file its own separate claim against the host State for the same treaty breach.
>
> As a result, capital-importing countries having entered into a significant number of BIT's will increasingly run the risk of being respondents in multiple (and often simultaneous) arbitration claims filed by different entities included in the increasingly sophisticated and complex corporate structure of foreign investors. Such multiple claims will clearly result in very high legal costs for respondent States. They will also increase the likelihood of inconsistent arbitral decisions.
>
> This possibility is not merely theoretical, as shown by the Lauder saga. Mr. Lauder, a U.S. national, was the ultimate beneficiary of an investment he made in the Czech Republic through an intermediate corporation (CME, a Dutch corporation). Mr. Lauder commenced an arbitration claim under the U.S. – Czech Republic BIT, while CME, 6 months later, started its own proceeding before a different arbitral tribunal under the Netherlands –Czech Republic BIT. Both claims arose from the *same facts*. It should be noted that the Czech Republic refused to consolidate the proceedings as requested by the

---

[9]     "Developments in the Legal Standing of Shareholders and Holding Corporations in Investor-State Dispute", ICSID Review, Spring 2011, p. 73 et seq.

Claimants. The disturbing aspect of these two parallel arbitration cases is that one Tribunal concluded that the Czech Republic had expropriated the investment and awarded $360 million in damages to the Claimant, while the other Tribunal rejected the claim.

The scenarios envisaged above also raise the issue of *remoteness* between a shareholder and the actual investment … This issue was addressed by the *Enron* Tribunal, which summarized a concern raised by Argentina as follows:

The *Enron* Tribunal concluded that such concern raises the "need to establish a cut-off point beyond which claims would not be permissible as they would have only a remote connection to the affected company. For the *Enron* Tribunal, the establishment of a "cut-off point" beyond which claims by indirect shareholders would not be allowed should be based on "the extent of the consent to arbitration of the host State:"

If consent has been given in respect of an investor and an investment, it can be reasonably concluded that the claims brought by such investor are admissible under the treaty. If the consent cannot be considered as extending to another investor or investment, these other claims should then be considered inadmissible as being only remotely connected with the affected company and the scope of the legal system protecting that investment.

The issue of remoteness of claims is likely to be one of the most contentious in the future. While some authors have criticized the *Enron* Tribunal's reasoning on the "cut-off point" as lacking any "legal foundation", recent awards have acknowledged the seriousness of the issue. As explained by the *Phoenix* Tribunal, some concern has indeed been voiced by international tribunals, *and is shared by this Tribunal,* that not any minor portion of indirectly owned shares should necessarily be considered as an investment. For good reasons, tribunals will, however, be reluctant to establish in each case where exactly should be the cut-off point. Indeed, no consensus exists on what "too remote" really means in practical terms."

27. The Argentine Republic has rightly raised a concern about the fact that if minority shareholders can claim independently from the affected corporation, this could trigger an endless chain of claims, as any shareholder making an investment in a company that makes an investment in another company, and so on, could invoke a direct right of action for measures affecting a corporation at the end of the chain.

28. In the instant case, there is no evidence at this stage that participation of the Claimants' investments was specifically sought by the host state so that they may be treated as included within the consent to arbitration given by the Argentine Republic.

29. On the basis of the evidence thus far presented it is not possible to arrive at a finding that the Claimants have established that they have "indirect investment" through multiple-layers of corporate entities which can qualify as "protected investment" under Article I(2) of the BIT. In the article cited above, in paragraph 26, it is stated that some authors suggest the existence of a **new rule** of customary international law providing shareholders with a procedural **right** to bring arbitration claims against the

state where they make the investment. It is noteworthy that both the words "rule" and the word "right" in the passage quoted are advisedly placed within inverted commas indicating that the new rule has yet to be recognized as an established rule on which there is general consensus. Indeed the circumstances in which shareholders may exercise a "right" against the host state of a company located within the state would depend upon the specific facts and circumstances and the terms of the relevant treaty and contractual arrangements.

30.   When a Treaty provision, Article I(2), defines terms which necessarily require consideration of Argentine law, such as whether an investment has been made in accordance with Argentina law, and where it expressly provides that the scope and content of the rights corresponding to the various categories of assets shall be determined by Argentine law, it is necessary to consider whether the "rights" or "assets" are recognized as such by Argentine law.

31.   In paragraph 233 of the Decision Respondent's policy arguments against the Claimants asserting claims on the basis of indirect shareholding are noted. I agree with the observation in paragraphs 234 of the Decision that Respondent's assertion could have relevance in the merits stage proceeding of this case, but are not relevant at the jurisdictional stage.  I, however, disagree with the views expressed in paragraph 235, in particular, with the concluding sentence to the effect that the Claimants have standing **to recover for damages** that were inflicted upon the companies and that ordinary language of Article 1(2) **is designed to protect "all assets" including indirect shareholdings** and the finding "the Tribunal also finds that Claimants are not deprived of standing by the fact that their investments were made through their subsidiary, Air Comet." This should not preclude consideration by the Tribunal at the merits stage of the issue whether reliefs sought on the basis of "rights" asserted in respect of "investments" made through Air Comet can be granted. These "findings" while they may be seen as rejecting the jurisdictional objection to standing cannot definitively determine the question without consideration of the evidence to be presented at the merits stage together with provisions of Argentine law which are relevant to determine whether the Claimants' rights may be enforced and the reliefs claimed may be granted.

32.   The relevant provisions of Argentine corporate law would need to be considered and interpreted before such findings can be arrived at.

### ii.   Claimants' other investments

33.   I agree with the first sentence of paragraph 238 that the Decision to the effect that the Tribunal will not address Claimants' other alleged investments at this time, but cannot agree with the definitive finding expressed in the second sentence that the Tribunal find that Claimants' indirect shareholdings constitute an "investment" under the Treaty.  While for the purpose of determining standing such evidence as has been placed at the jurisdiction stage may be sufficient to justify that finding, this cannot be definitive when other issues are concerned, such as the effect of illegality or fraud committed in the course of performance as well as the effect of an assignment agreement and a funding agreement entered into after the initiation of the arbitration which could materially affect rights relating to that investment and their enforceability in the sense of grant of reliefs claimed in respect of those rights.

### iii. Claimants' third-party funding agreement and assignment of award proceeds

34.　During the hearing on jurisdiction, Respondent raised its concern that Claimants' and Air Comet's recent reorganization proceedings in Spain could affect Claimants' authorization to bring this case. In its post-hearing submissions, Respondent has also questioned two agreements entered into by Claimants subsequent to commencing this arbitration. One of these, a Credit Assignment Agreement among Teinver, Transportes Cercanías and Autobuses Urbanos as the assignors and Air Comet as the assignee (the "Assignment Agreement"), dated January 18, 2010, concerned the assignment to Air Comet of the proceeds of a potential award in this arbitration. The other, a Funding Agreement made between Claimants and Burford Capital Limited, an investment company headquartered in Guernsey, and effective as of April 14, 2010 (the "Funding Agreement"), concerned the financing of Claimants' litigation expenses in this arbitration.

35.　The Parties do not dispute that Air Comet commenced voluntary reorganization proceedings on April 20, 2010. Nor do they dispute that the Claimants each commenced voluntary reorganization roughly a year later, with Teinver on December 23, 2010, Autobuses Urbanos on January 28, 2011, and Transportes de Cercanías on February 16, 2011.

36.　The Parties also acknowledge that Claimants concluded the Assignment Agreement, by which Claimants agreed to assign to Air Comet proceeds of an eventual award in this case. In addition, the Parties acknowledge that Claimants executed the Funding Agreement with Burford. However, the Parties disagree as to the effects of these agreements on Claimants' standing in this case.

37.　I agree with the statement in paragraph 255 of the Decision that international case law has consistently determined that jurisdiction is generally to be assessed as of the date the case is filed. I, therefore, agree with the conclusion of the Tribunal that Respondent's jurisdictional objection may be rejected to the extent that the allegations concern events that post-date the filing of the arbitration. I also agree with the view of the Tribunal expressed in paragraph 259 that it will not address Respondent's allegations regarding Claimants' reorganization, assignment agreement and the funding agreement which post-date the filing of the arbitration, but that these will receive due consideration at the merits stage.

### c.　Third Jurisdictional Objection: Issues of State Attribution

38.　I agree with the view of the Tribunal 274 of the Decision that: "… Given the fact–intensive nature of Claimants' allegations, the Tribunal must postpone adjudication of this issue until the merits phase."

### d. Fourth Jurisdictional Objection: The Legality of Claimants' Investment

### i. Position of Respondent

39.   The Respondent asserted that the Claimants have violated Spanish and Argentine law, and committed other misdeeds and, therefore, they cannot assert any rights claimed under the Claimants' alleged investments or seek to enforce them or obtain any relief with respect to those "rights". The violations of Spanish law are summarized in paragraph 278 to 289 and the violations of Argentine law are summarized in paragraphs 290 to 292. Other misdeeds are referred to in paragraphs 293.

40.   The Respondent by is letter dated 24 May, 2012 notified the Tribunal as follows:

> "… the Commercial matter No. 9 of Madrid found Gerardo Diaz Ferran and Gonzalo Pascual Arias – holders of a controlling interest in Claimants and witnesses in this arbitration – guilty of the bankruptcy of Seguros Mercurio, S.A. Furthermore, the court found Teinver S.L., one of the Claimants in this arbitration proceeding, and other companies of the Marsans Group, such as Viajes Marsans S.A. and Hotetur Club S.L, liable as accomplices to the bankruptcy" and than "… fraudulent acts were carried out by means of complex legal and accounting operations. In the opinion of the court, "all of them are part of a coordinated action aimed at removing the assets of the reorganized company in favour of other companies of the group.

> In this sense, for instance, the court established that "by virtue of a private agreement entered into with a company in which Teinver has a 100% interest, related to Seguros Mercurio and also owned by Diaz Ferran and Pascual Arias through other companies, Seguros Mercurio proceeded to make payments in the amount of 5,847,039.84 euro in favour of other companies of the group other than the purchaser company." In light of the explanations afforded by the accused parties with respect to the terms of such operation, the court concluded that "the explanations provided by Mr. Diaz Ferran at the hearing were devoid of any logic.

> Another questionable operation took place on October 30, 2009 and involves the sale of real property by Teinver to Seguros Mercurio. Oddly enough, it was found that at the time of the sale the property was about to be foreclosed at the request of the mortgagee. In this respect, the court held that "the operation is censurable from the legal point of view since it can be affirmed that, through it, a sham has been attempted in order to convey a property image different from the actual one.

> Specially in relation to Diaz Ferran and Pascual Arias, the judge concluded that they should be reached by the declaration of guilt as "as they acknowledged in the act of the trial, they designed the operations described, controlling and deciding on the management not only of Seguros Mercurio, but of the entire Group, of which they were practically the sole shareholders."

The Respondent submits that the above facts provide a ground to the Tribunal for rejection on the ground of lack of jurisdiction.

41.   I agree with the general observation in the Decision that for the purpose of jurisdiction timing is relevant, and that the Tribunal should focus on illegality at the initiation of the investment. Matters which arise during performance of the investment or which are subsequently found to have occurred would not sustain a jurisdictional objection. I, however, agree with the view elaborated in the *Hamester* case cited in paragraph 320 of the Decision, as follows:

> "… Legality in the subsequent life or performance of the investment is not addressed in Article 10. It follows that this does not bear upon the scope of application of the BIT (and hence this Tribunal's jurisdiction) – albeit that it may well be relevant in the context of the substantive merits of a claim brought under the BIT. Thus, on the wording of this BIT, the legality of the creation of the investment is a jurisdictional issue; the legality of the investor's conduct during the life of the investment is a merits issue."

42.   I am, therefore, of the view that observation in the Decision on issues which are post-commencement would not prejudice the Tribunal's consideration of those matters in the light of evidence and submissions presented at the merits stage.

43.   I, therefore, agree with the conclusions in paragraph 331 of the Decision that "The Tribunal notes that certain of the allegations raised may affect the merits of the claim and that it will be open to the parties to make further submissions in respect of these allegations as appropriate during the merits stage of the arbitration."

## V.   COSTS

44.   I agree with the Tribunal's view in paragraph 332 reserving this question for subsequent adjudication.

## VI.   DECISION ON JURISDICTION

45.   I agree (subject to the observations and reservations set out above in my Separate Opinion) with the Decision of the Tribunal set out in paragraph 333 as follows:

(1)   The Objections to Jurisdiction are rejected;

(2)   It joins to the merits the determination of Respondent's responsibility for the acts of non-state entities.


Date: *12.18.12*

----------------------
Dr. Kamal Hossain
Arbitrator

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Titan Consortium 1, LLC,

                    *Petitioner*,

        v.

The Argentine Republic,

                    *Respondent*.

Civil Action No. _____

**Declaration of Matthew S. Rozen in Support of Petition to Enforce Arbitral Award**

# EXHIBIT B

**ICSID**

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.

### v.

### Argentine Republic

### (ICSID Case No. ARB/09/1)

I hereby certify that the attached document is a true copy of the English version of the *ad hoc* Committee's Decision on Annulment dated May 29, 2019.

Gonzalo Flores
Acting Secretary-General

Washington, D.C., August 20, 2021

International Centre for Settlement of Investment Disputes


In the annulment proceeding between


### TEINVER S.A., TRANSPORTES DE CERCANÍAS S.A. AND AUTOBUSES URBANOS DEL SUR S.A.

Claimants


and


### ARGENTINE REPUBLIC

Respondent


# ICSID Case No. ARB/09/1

---

## DECISION ON ARGENTINA'S APPLICATION FOR ANNULMENT

---


**Members of the *ad hoc* Committee**
Mr. Alexis Mourre, President of the *ad hoc* Committee
Prof. Fernando Cantuarias Salaverrry, Member of the *ad hoc* Committee
Mr. Ricardo Ramírez Hernández, Member of the *ad hoc* Committee


**Secretary of the *ad hoc* Committee**
Ms. Mercedes Cordido-Freytes de Kurowski


*Date of dispatch to the Parties:* May 29, 2019

**REPRESENTATION OF THE PARTIES**

*Representing the Argentine Republic*:

Dr. Bernardo Saravia Frías
Dr. Miguel Francisco Bóo
Dra. María Teresa Gianelli
Procurador del Tesoro de la Nación
Subprocuradores del Tesoro de la Nación
Procuración del Tesoro de la Nación
Posadas 1641
C1112ADC Buenos Aires
República Argentina

*Representing Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.:*

Mr. Roberto Aguirre Luzi
Mr. R. Doak Bishop
Mr. Craig S. Miles
Mr. Eduardo Bruera
Mr. Brian Jacobi
King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, TX 77002
United States of America

TABLE OF CONTENTS

**I.**    INTRODUCTION AND PARTIES ............................................................................ 1

**II.**   PROCEDURAL HISTORY ..................................................................................... 2

**III.**  THE SCOPE OF ANNULMENT ............................................................................ 8

      **(1)**  The Parties' Positions ................................................................................ 8

           a.   Argentina's Position ........................................................................ 8

           b.   The Claimants' Position .................................................................. 9

           c.   The Committee's Analysis ............................................................... 9

**IV.**  THE PARTIES' ARGUMENTS AND THE ANALYSIS OF THE COMMITTEE .......... 10

    A.   Manifest Excess of Powers .......................................................................... 10

      **(1)**  Legal Standard ......................................................................................... 10

           a.   Argentina's Position ...................................................................... 10

           b.   The Claimants' Position ................................................................ 11

           c.   The Committee's Analysis ............................................................. 13

      **(2)**  Exercise of Jurisdiction ........................................................................... 15

           a.   Argentina's Position ...................................................................... 15

           b.   The Claimants' Position ................................................................ 17

           c.   The Committee's Analysis ............................................................. 19

      **(3)**  Lack of Capacity of the Claimants' Counsel ........................................... 26

           a.   Argentina's Position ...................................................................... 26

           b.   The Claimants' Position ................................................................ 28

           c.   The Committee's Analysis ............................................................. 30

      **(4)**  Misappropriation of the SEPI Funds ....................................................... 35

           a.   Argentina's Position ...................................................................... 35

           b.   The Claimants' Position ................................................................ 36

           c.   The Committee's Analysis ............................................................. 38

      **(5)**  The July 2008 Agreement ........................................................................ 41

           a.   Argentina's Position ...................................................................... 41

           b.   The Claimants' Position ................................................................ 44

           c.   The Committee's Analysis ............................................................. 45

    B.   Serious Departure from a Fundamental Rule of Procedure .......................... 49

      **(1)**  Legal Standard ......................................................................................... 49

           a.   Argentina's Position ...................................................................... 49

**b.** The Claimants' Position ................................................................. 49

**c.** The Committee's Analysis ............................................................ 50

**(2)** Exercise of Jurisdiction ........................................................................ 50

    **a.** Argentina's Position ..................................................................... 50

    **b.** The Claimants' Position ................................................................. 52

    **c.** The Committee's Analysis ............................................................ 52

**(3)** Lack of Capacity of the Claimants' Counsel .................................... 53

    **a.** Argentina's Position ..................................................................... 53

    **b.** The Claimants' Position ................................................................. 54

    **c.** The Committee's Analysis ............................................................ 54

**(4)** Funding Agreement and role of Burford ........................................ 55

    **a.** Argentina's Position ..................................................................... 55

    **b.** The Claimants' Position ................................................................. 55

    **c.** The Committee's Analysis ............................................................ 56

**(5)** Misappropriation of Funds Received from SEPI ........................... 60

    **a.** Argentina's Position ..................................................................... 60

    **b.** The Claimants' Position ................................................................. 61

    **c.** The Committee's Analysis ............................................................ 61

**C.** Failure to State the Reasons on Which the Award is Based ........................................ 63

**(1)** Legal Standard ...................................................................................... 63

    **a.** Argentina's Position ..................................................................... 63

    **b.** The Claimants' Position ................................................................. 64

    **c.** The Committee's Analysis ............................................................ 64

**(2)** Jurisdictional finding concerning the existence of an investment ....................... 65

    **a.** Argentina's Position ..................................................................... 65

    **b.** The Claimants' Position ................................................................. 65

    **c.** The Committee's Analysis ............................................................ 66

**(3)** Lack of Capacity of the Claimants' Counsel .................................... 67

    **a.** Argentina's Position ..................................................................... 67

    **b.** The Claimants' Position ................................................................. 67

    **c.** The Committee's Analysis ............................................................ 67

**(4)** Misappropriation of Funds Received from SEPI ........................... 68

    **a.** Argentina's Position ..................................................................... 68

|  |  | b. | The Claimants' Position | 68 |
|  |  | c. | The Committee's Analysis | 69 |
|  | **(5)** | The July 2008 Agreement |  | 72 |
|  |  | a. | Argentina's Position | 72 |
|  |  | b. | The Claimants' Position | 72 |
|  |  | c. | The Committee's Analysis | 73 |

**V.** COSTS ........................................................................................................................... 77

  A. Argentina's Cost Submissions ........................................................................... 77

  B. The Claimants' Cost Submissions ...................................................................... 78

  C. The Committee's Decision on Costs .................................................................. 78

**VI.** DECISION ..................................................................................................................... 80

TABLE OF [SELECTED] ABBREVIATIONS/DEFINED TERMS

| | |
|---|---|
| Annulment Memorial | Argentina's Memorial on Annulment dated May 15, 2018 |
| Annulment Counter-Memorial | Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A.'s Counter-Memorial on Annulment dated July 30, 2018 |
| Annulment Reply | Argentina's Reply on Annulment dated October 1, 2018 |
| Annulment Rejoinder | Teinver's Rejoinder on Annulment dated December 3, 2018 |
| Annulment Hearing | Hearing on Annulment held on February 5 and 6, 2019 at the World Bank in Washington D.C. |
| Award | Award rendered by the Arbitral Tribunal on July 21, 2017 |
| Application for Annulment | Argentina's application for annulment of the Award dated November 17, 2017 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings |
| Argentina/Respondent/Applicant | the Argentine Republic |
| Assignment Agreement | Assignment agreement dated January 18, 2010, pursuant to which the Claimants assigned to Air Comet their rights arising out of this arbitration for no price or consideration |
| Claimants | Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. |
| Committee | *Ad hoc* Committee |
| Decision on Jurisdiction | Decision on Jurisdiction dated December 21, 2012 issued in the case of Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. Argentine Republic (ICSID Case No. ARB/09/1) |
| Decision on Provisional Measures | Decision on Provisional Measures dated April 8, 2016 issued in the case of Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. Argentine Republic (ICSID Case No. ARB/09/1) |
| Funding Agreement | Funding Agreement between Burford Capital Limited and Teinver S.A., Transportes de Cercanías S.A. and |

| | Autobuses Urbanos del Sur S.A., entered into on April 14, 2010 |
|---|---|
| ICSID or Centre | International Centre for Settlement of Investment Disputes |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States |
| July 2008 Agreement | Memorandum of Agreement between the Argentine State and Interinvest dated July 21, 2008 |
| SEPI | Sociedad Estatal de Participaciones Industriales del Reino de España |
| SPA | Agreement for the Purchase of Interinvest S.A.'s Shares entered into between Sociedad Estatal de Participaciones Industriales del Reino de España and Air Comet S.A. on October 2, 2001. |
| Tr. Day [#], [page:line] | English transcript of the Hearing before the Committee |
| TTN | Argentine Valuation Board (*Tribunal de Tasaciones de la Nación*) |

## I.  INTRODUCTION AND PARTIES

1.  This case concerns an application by the Argentine Republic for annulment ("**Argentina's Application**" or the "**Application for Annulment**") of the Award rendered in the underlying arbitration proceedings on July 21, 2017 (the "**Award**"), also comprising the Dissenting Opinion of Kamal Hossain, and the Decision on Jurisdiction dated December 21, 2012 (the "**Decision on Jurisdiction**"), including the Dissenting Opinion of Kamal Hossain.

2.  The Award related to a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" " or "**Centre**") on the basis of the Agreement between the Government of the Argentine Republic and the Kingdom of Spain on the Promotion and Protection of Investments, dated October 3, 1991, which entered into force on September 28, 1992 (the "**Treaty**" or the "**BIT**"), as well as the Convention on the Settlement of Investment Disputes between States and Nationals of other States (the "**ICSID Convention**").

3.  The Parties are the Argentine Republic ("**Argentina**" or the "**Applicant**"), and the Claimants in the original arbitration proceeding: Teinver S.A. ("Teinver"), Transportes de Cercanías S.A. ("Transportes de Cercanías") and Autobuses Urbanos del Sur S.A. ("Autobuses Urbanos") (collectively, the "**Claimants**").

4.  The Applicant and the Claimants are hereinafter collectively referred to as the "**Parties**", and individually referred to as a "**Party**". The Parties' representatives and their addresses are listed above on page (i).

5.  The dispute in the underlying arbitration proceeding related to the Claimants' allegations that Argentina had violated the Treaty, international law, and Argentine law, as well as commitments and representations made by Argentina to the Claimants, by unlawfully re-nationalizing and taking other measures regarding the Claimants' investments in two Argentine airlines: Aerolíneas Argentinas S.A. ("**ARSA**") and Austral-Cielos del Sur S.A.

("**AUSA**") (collectively, the "**Airlines**" or the "**Argentine Airlines**") and their subsidiaries.  Argentina also made a Counterclaim.

6.  In the Award, the Tribunal, by majority, found that Argentina breached: (a) Art. III(1) of the BIT by its unjustified measures in interfering with the Claimants' rights in respect of their investments; (b) Art. IV(1) of the BIT by failing to accord the Claimants a fair and equitable treatment; and (c) Art. V of the BIT by unlawfully expropriating the Claimants' investments in two Argentine airlines. The majority awarded the Claimants USD 320.7 million in damages plus pre-and-post Award compounded interest and USD 3.5 million in legal costs and expenses. Dr. Kamal Hossain attached a Dissenting Opinion concluding that the Tribunal had no jurisdiction, as, in his view, the Claimants failed to establish that they were investors entitled to protection under the Treaty or the ICSID Convention. Dr. Hossain noted that, through a series of agreements, the ultimate beneficiaries of the Award would be a Third-Party Funder and counsel for the Claimants (not the Claimants).

7.  Argentina seeks the annulment of the Award on three of the five grounds for annulment set forth in Article 52(1) of the ICSID Convention: (i) the Tribunal manifestly exceeded its powers (Article 52(1)(b)); (ii) there was a serious departure from a fundamental rule of procedure (Article 52(1)(d)); and (iii) the Award failed to state the reasons on which it is based (Article 52(1)(e)).

## II.   PROCEDURAL HISTORY

8.  On November 17, 2017, the Secretary-General of the International Centre for Settlement of Investment Disputes received an application from Argentina seeking the annulment of the Award and requesting that enforcement of the Award be stayed until the Application was decided.

9.  On November 22, 2017, the Secretary-General registered Argentina's Application. The Parties were also notified that the enforcement of the Award was provisionally stayed pursuant to Rule 54(2) of the ICSID Arbitration Rules.

10.    By letter dated December 21, 2017, the Parties were notified that, in accordance with Rules 6 and 53 of the ICSID Arbitration Rules, an *ad hoc* Committee composed of Mr. Alexis Mourre (a national of France), Prof. Fernando Cantuarias Salaverry (a national of Peru), and Prof. Ricardo Ramírez Hernández (a national of Mexico) (the "**Committee**") had been constituted. The Parties were also informed that Mr. Mourre would be the President of the Committee and Ms. Mercedes Cordido-Freytes de Kurowski, Legal Counsel at ICSID, would serve as Secretary.

11.    As agreed by the Parties, the first session of the Committee was held on March 1, 2018, by telephone conference (the "**First Session**").

12.    The Committee issued Procedural Order No. 1 on March 6, 2018, concerning various procedural matters. The Parties confirmed, among others, that the 2006 ICSID Arbitration Rules would apply to the annulment proceedings.

13.    On May 3, 2018, Argentina requested the admission of new evidence into the record.

14.    On May 11, 2018, the Claimants filed their observations on Argentina's request to introduce new evidence.

15.    On May 15, 2018, in accordance with the procedural calendar set out in Procedural Order No. 1, Argentina filed its Memorial on Annulment ("**Annulment Memorial**"), accompanied by 90 Exhibits and 153 Legal Authorities.

16.    On May 17, 2018, the Committee, after considering the Parties' positions on Argentina's request to introduce new documents into the record, denied Argentina's request mainly because pursuant to section 15.3 of Procedural Order No. 1, "[i]*n principle, no new evidence shall be admitted in this proceeding*", and because in the Committee's view Argentina did not elaborate or provide a detailed explanation as to why the introduction of the new evidence would be necessary.

17.    On June 4, 2018, the Claimants submitted a request to exclude certain new evidence introduced by Argentina in its Memorial, and for the Committee to order Argentina to

submit a revised Memorial removing all citation and references to those documents, as well as any arguments relying upon the same.

18. On June 5, 2018, Argentina filed observations on the Claimants' request for exclusion of evidence.

19. On June 11, 2018, at the Committee's request, the Claimants provided specific indication of the footnotes in Argentina's Memorial (128, 129, 130, 131, 132, 133, 163, 164, 366 and 367) that included reference to the objected documents. Subsequently, by communication of June 11, 2018, the Committee informed the Parties that subject to any eventual observations by Argentina, the references made by Argentina in its Memorial on Annulment, identified in the Claimants' letter, shall not be taken into account by the Committee.

20. On July 30, 2018, the Claimants filed a Counter-Memorial on Annulment ("**Annulment Counter-Memorial**"), accompanied by Exhibits C-1216 to C-1237. A revised Counter-Memorial on Annulment in red lined and clean versions was subsequently filed on August 21, 2018.

21. On October 1, 2018, Argentina filed a Reply on Annulment ("**Annulment Reply**"), accompanied by 21 Exhibits and 41 Legal Authorities.

22. On December 3, 2018, the Claimants filed a Rejoinder on Annulment ("**Annulment Rejoinder**"), accompanied by Exhibits C-1233 and C-1238.

23. On December 17, 2018, the Committee informed the Parties of its availability to hold a Pre-Hearing Organizational Meeting on January 8, 2019, by telephone conference. A Draft Agenda was subsequently sent to the Parties on December 18, 2018. On December 20, 2018, both Parties confirmed their availability on the proposed date.

24. On January 3, 2019, at the invitation of the Committee, the Parties informed the Committee of their agreements on the items of the Draft Agenda for the Pre-Hearing Organizational Meeting, concerning the organization of the Hearing on Annulment and informed the

Committee that the Parties were of the view that the Pre-Hearing Organizational Meeting was no longer necessary.

25.   On January 8, 2019, the Committee confirmed that the Pre-Hearing Organizational Meeting, scheduled to be held on that day, had been cancelled, as agreed by the Parties.

26.   On January 8, 2019, the Claimants filed a request for the Tribunal to authorize the Claimants' insolvency administrators to attend the Hearing on Annulment, scheduled to be held on February 4 and 5, 2019 in Washington, D.C., via videoconference (i.e., Webex).

27.   On January 9, 2019, the Committee issued Procedural Order No. 2 concerning the organization of the Hearing.

28.   On January 11, 2019, Argentina filed observations on the Claimants' request of January 8, 2019 for the insolvency administrators to attend the Hearing via videoconference.

29.   On January 15, 2019, the Claimants filed a response to Argentina's observations of January 11, 2019.

30.   On January 16, 2019, each Party provided its list of participants for the Hearing. Subsequently, on January 17, 2019, the Secretary of the Committee circulated a consolidated List of Participants to the Parties and the Committee.

31.   On January 16, 2019, Argentina filed further observations on the Claimants' requests for the insolvency administrators to attend the Hearing via videoconference in light of the Claimants' list of participants.

32.   On January 17, 2019, the Committee directed the Claimants to submit by January 22, 2019, a request from each of the insolvency administrators who wished to attend the Hearing via videoconference, who would be authorized to do so. The ICSID Secretariat would make the relevant arrangements for a secure videoconference and would inform the Parties.

33.   On January 18, 2019, the Secretary of the Committee informed the Parties of the possibility of holding the videoconference from a venue in Madrid, and of the related costs.

34.     On January 18, 2019, the Claimants informed the Committee the names of the insolvency administrators for Teinver and Air Comet, who would be attending the Hearing in person (instead of by videoconference).

35.     On January 18, 2019, Argentina filed observations on the Claimants' letter of January 18, 2019.

36.     On the same date, the Committee invited the Parties to agree on who would bear the additional costs of the secured platform for the videoconference, and to inform the Committee.

37.     On January 19, 2019, the Committee invited the Claimants to comment on Argentina's communications of January 17 and 18, 2019, regarding the insolvency administrators.

38.     On January 22, 2019, the Claimants provided responses to the Committee's inquiry as to (i) which party shall bear the costs of securing a video conference in Madrid; (ii) Argentina's objections to the insolvency administrators attending the hearing unless they act in a joint manner; and (iii) Argentina's arguments that Air Comet's insolvency administrators may not attend the annulment hearing. Attached to the Claimants' letter were letters from Mr. Luis Arqued and Ms. Antonia Magdaleno, insolvency administrators for Teinver, S.A., and from Messrs. Jesús Verdes and Miguel Villela Barranchina, insolvency administrators for Transportes de Cercanías regarding their participation in the Hearing by video conference.

39.     On January 23, 2019, the Committee authorized the insolvency administrators Mr. Arqued, Ms. Magdaleno, Mr. Verdes and Mr. Villela Barranchina to participate in the hearing by video conference, and the insolvency administrator for Air Comet: Mr. Mariano Hernández and his assistant, Mr. Álvaro Martínez Domingo, to participate in the hearing in person. It was noted that Mr. Arqued might be participating in person. The Committee also decided that the costs related to the video conference in Madrid will be covered with the funds in the case account, subject to the Committee's final decision on costs.

40.     On January 30, 2019, following the Claimants' request of January 28, 2019 and Argentina's observations of January 29, 2019, the Committee authorized Mr. Diego

Fargosi, the Claimants' co-counsel during the original arbitration proceeding, to attend the Hearing in Washington, D.C.

41.    On February 5 and 6, 2019, the Committee held a Hearing on Annulment at the World Bank's headquarters in Washington D.C. (the "**Annulment Hearing**").

42.    The following persons were present at the Hearing:

| COMMITTEE | |
|---|---|
| Mr. Alexis Mourre | President |
| Mr. Fernando Cantuarias Salaverry | Member |
| Mr. Ricardo Ramírez Hernández | Member |

| ICSID SECRETARIAT | |
|---|---|
| Ms. Mercedes Cordido-Freytes de Kurowski | Secretary of the Committee |
| Mr. Sebastián Canon | Intern |

| ARGENTINA | |
|---|---|
| *Counsel:* | |
| Mr. Bernardo Saravia Frías | Procuración del Tesoro de la Nación |
| Ms. María Teresa Gianelli | Procuración del Tesoro de la Nación |
| Ms. María Alejandra Etchegorry | Procuración del Tesoro de la Nación |
| Mr. Francisco Javier García Elorrio | Procuración del Tesoro de la Nación |
| Ms. Inda Valeria Etchechoury | Procuración del Tesoro de la Nación |
| Mr. José Martín Ryb | Procuración del Tesoro de la Nación |
| Mr. Nicolás Duhalde | Procuración del Tesoro de la Nación |

| CLAIMANTS | |
|---|---|
| *Counsel:* | |
| Mr. Doak R. Bishop | King & Spalding |
| Mr. Roberto Aguirre Luzi | King & Spalding |
| Mr. Craig S. Miles | King & Spalding |
| Mr. Eduardo Bruera | King & Spalding |
| Mr. Brian Jacobi | King & Spalding |
| Ms. Carol Tamez | King & Spalding |

| Mr. Diego Fargosi | |
|---|---|
| *Parties:* | |
| Mr. Luis Arqued | Insolvency Administrator, Teinver |
| Mr. Jesús Verdes | Insolvency Administrator, Transportes de Cercanías (via VC) |
| Mr. Miguel Vilella Barranchina | Insolvency Administrator, Transportes de Cercanías (via VC) |
| Mr. Mariano Hernández | Insolvency Administrator, Air Comet |
| Mr. Álvaro Martínez | Assistant to Air Comet's Insolvency Administrator |

| INTERPRETERS | |
|---|---|
| Ms. Silvia Colla | English-Spanish Interpreter |
| Mr. Daniel Giglio | English-Spanish Interpreter |
| Ms. Elena Howard | English-Spanish Interpreter |

| COURT REPORTERS | |
|---|---|
| Mr. David Kasdan | Worldwide Reporting, LLP, English Court Reporter |
| Mr. Paul Pelissier | DR-Esteno, Spanish Court Reporter |
| Mr. Rodolfo Rinaldi | DR-Esteno, Spanish Court Reporter |

43. On March 8, 2019, each Party filed a Statement of Costs.

44. The Committee declared the proceeding closed on April 23, 2019, in accordance with Rules 53 and 38(1) of the ICSID Arbitration Rules.

## III.   THE SCOPE OF ANNULMENT

### (1)   The Parties' Positions

#### a.   *Argentina's Position*

45. Argentina highlights the importance of the annulment proceedings for the integrity of the ICSID system, and it accordingly submits that the scope of annulment proceedings should not be construed restrictively.[1]

---

[1] Annulment Memorial, ¶ 32.

### b.  The Claimants' Position

46.  The Claimants submit that the grounds for annulment provided in Article 52 of the ICSID Convention are "*narrow and limited and that a substantive, or appellate, review of ICSID awards is foreclosed.*"[2] The Claimants also contend that '[t]*hese Proceedings are neither an appeal nor a generalized review of the correctness or persuasiveness of the Tribunal's decision-making (though neither of these aspects is seriously contestable). Rather, the Committee's mandate is limited to ensuring the integrity of the underlying Arbitration. Accordingly, for Argentina to prevail on its annulment claims, it must show that the Tribunal manifestly exceeded its powers; seriously departed from a fundamental rule of procedure; or failed to state its reasons for the decisions it reached.*"[3]

### c.  The Committee's Analysis

47.  The Committee, as a starting point, notes that there is no disagreement between the Parties as to the fact that an annulment committee under Art. 52 of the Convention does not sit in appeal of the arbitral tribunal's decision. As rightly pointed out by the ICSID Updated Background Paper on Annulment, the scope of review that an annulment committee is entitled to perform under Article 52 is limited. Because "*the drafting history of the ICSID Convention demonstrates that assuring the finality of ICSID arbitration awards was a fundamental goal for the ICSID system*", annulment "*was designed purposefully to confer a limited scope of review which would safeguard against 'violation of the fundamental principles of law governing the Tribunal's proceedings*".[4]

48.  In view of the Committee, no question of interpretation of Article 52 is at stake here, and defining the scope of the Committee's review does not require any analysis of whether Article 52 should be construed narrowly or broadly. Article 52 must be applied in accordance with its clear terms, which are exclusive of any review of the substance of the award. In substance, annulment is not an appeal allowing reconsideration of the merits of

---

[2] Annulment Counter-Memorial, ¶¶ 99-107.

[3] Annulment Rejoinder, ¶ 2.

[4] ICSID, Updated Background Paper on Annulment for the Administrative Council of ICSID, May 5, 2016, ("**ICSID's Updated Background Paper on Annulment**"), ¶ 71 (C-1217) (**AL RA 421 bis**), ¶ 71.

the case. As a consequence, an award may only be annulled on the limited grounds listed in Article 52(1).

## IV.   THE PARTIES' ARGUMENTS AND THE ANALYSIS OF THE COMMITTEE

49.   Argentina has argued that the Award should be annulled on grounds of manifest excess of powers (**A**), departure from a fundamental rule of procedure (**B**), and failure to provide reasons (**C**). The Committee will address each of these annulment grounds in turn.

### A.   MANIFEST EXCESS OF POWERS

50.   The Committee will first address the Parties' contentions concerning the legal standard that is applicable to assess whether the Tribunal manifestly exceeded its powers (**1**). The Committee will then address each of the grounds invoked by Argentina to submit that the Award should be annulled on that basis, namely lack of jurisdiction (**2**), the alleged lack of powers of the attorneys representing the Claimants (**3**), the existence of a fraud relating to the use of the SEPI funds (**4**), and the Award's reliance on the July 2008 Agreement (**5**).

#### (1)   Legal Standard

##### a.   *Argentina's Position*

51.   Argentina submits that tribunals derive their power from the parties' consent, and therefore exceed their powers when they act beyond or in breach of such consent.[5]

52.   In the instant case, Argentina contends that the Tribunal exceeded its powers with respect to its exercise of jurisdiction by failing to apply the applicable law and to address all the issues raised by the Parties.[6]

53.   With regard to jurisdiction, Argentina contends that there is an excess of powers when a tribunal assumes jurisdiction when jurisdiction is lacking, when it exceeds the scope of its

---

[5] Annulment Memorial, ¶ 35, relying on *CDC Group plc v. the Republic of Seychelles,* ICSID Case No. ARB/02/14 ("*CDC*"), Decision on Annulment, June 29, 2005, ¶ 40 (**AL RA 420**).

[6] Annulment Memorial, ¶ 36.

jurisdiction, or when it does not exercise jurisdiction when jurisdiction exists.[7] A tribunal also exceeds its powers when it fails to apply the applicable law, or applies a law different from the applicable law.[8] Finally, a tribunal exceeds its powers when it decides on issues not submitted to it for resolution, or fails to address an issue raised by the parties.[9]

54.   Argentina notes that in accordance with Article 52(1)(b) of the ICSID Convention, the excess of powers must be "manifest", that is, "obvious" or "evident". However, Argentina submits, by relying on *Caratube*, *Occidental*, and *EDF*, that assessing a manifest excess of powers may in some cases require an extensive argumentation and analysis.[10]

### b.   The Claimants' Position

55.   The Claimants submit that pursuant to Article 52(1)(b) of the ICSID Convention, only instances of "manifest" excess of a tribunal's powers may lead to an annulment.[11] The

---

[7] Annulment Memorial, ¶¶ 37-40, relying on (i) ICSID's Updated Background Paper on Annulment, ¶ 87 (**AL RA 421 bis**); (ii) *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7 ("*Soufraki*"), Decision on Annulment, June 5, 2007, ¶ 42 (**AL RA 64**); and (iii) *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11 ("*Occidental*"), Decision on Annulment, November 2, 2015, ¶¶ 49-50 (**AL RA 422**); *see also TECO Guatemala Holdings, LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23 ("*Teco*"), Decision on Annulment, April 5, 2016, ¶ 77 (**AL RA 423**); *Caratube International Oil Company v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12 ("*Caratube*"), Decision on Annulment, February 21, 2014, ¶¶ 74-75 (**AL RA 424**).

[8] Annulment Memorial, ¶ 41, relying on (i) *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3 ("*Enron*"), Decision on Annulment, July 30, 2010, ¶ 218 (**AL RA 398**), and (ii) *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5 ("*Tidewater*"), Decision on Annulment, December 27, 2016, ¶ 126 (**AL RA 419**).

[9] Annulment Memorial, ¶ 42 [footnotes omitted].

[10] Annulment Memorial, ¶¶ 43-45, citing, among others, (i) *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23 ("*EDF*"), Decision on Annulment, February 5, 2016, ¶ 192 (**AL RA 433**); *see also Tza Yap Shum v. Republic of Peru*, ICSID Case No. ARB/07/6 ("*Tza Yap Shum* "), Decision on Annulment, February 12, 2015, ¶ 82 ("'*manifest'* does not refer to the gravity of the excess but to the clarity with which the excess of powers can be ascertained") (**AL RA 434**); (ii) *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16 ("*Sempra*"), Decision on Annulment, June 29, 2010, ¶ 211 (**AL RA 413**); *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23; Decision on Annulment, April 5, 2016, ¶ 77 ("Committee considers that an excess of powers is 'manifest' if it is plain on its face, evident, obvious, or clear") (**AL RA 423**); and (iii) *Caratube*, Decision on Annulment ¶ 84 (**AL RA 424**).

[11] Annulment Counter-Memorial, ¶ 108.

Claimants point out that the ordinary meaning of "manifest" is "obvious or clear", and that Argentina agrees with such interpretation.[12]

56. The Claimants rely on several *ad hoc* committees' decisions supporting the above interpretation and note that the ICSID Updated Background Paper on Annulment confirms that "*the 'manifest' nature of the excess of powers has been interpreted by most ad hoc committees to mean an excess that is obvious, clear or self-evident, discernible without the need for an elaborate analysis of the award*."[13] Annulment Committees, in line with the *kompetenz-kompetenz* principle, have affirmed that principle when annulment is sought on jurisdictional grounds.[14] The Claimants point out, in this regard, that in *Lucchetti,* the committee declined to opine whether it agreed with the tribunal's interpretation of jurisdiction, decided that the interpretation was "tenable", and therefore refused to annul the award.[15]

57. As to the application of the law, the Claimants submit that "if a tribunal discusses and considers the proper law, its application (even if incorrect) cannot constitute a failure to apply the applicable law unless that application is so untenable and arbitrary as to raise legitimate questions regarding the tribunal members' integrity."[16]

58. Finally, as to the alleged failure of the Tribunal to address all issues raised by the Parties, the Claimants contend that the Tribunal did address all the issues raised by the Parties, and even if it had failed to do so with respect to certain arguments, that would not constitute a ground for annulment.[17]

---

[12] Annulment Counter-Memorial, ¶ 109.

[13] Annulment Counter-Memorial, ¶ 110.

[14] Annulment Counter-Memorial, ¶¶ 111-112.

[15] Annulment Counter-Memorial, ¶ 113, citing *Industria Nacional de Alimentos, S.A. and Indalsa Perú, S.A. (formerly Empresas Lucchetti, S.A. and Lucchetti Perú, S.A.) v. Republic of Peru*, ICSID Case No. ARB/03/4 ("**Lucchetti**"), Decision on Annulment of September 5, 2007 ¶ 100-101, (**AL RA 444**). Counter-Memorial, ¶ 113, citing Lucchetti.

[16] Annulment Counter-Memorial, ¶ 116.

[17] Annulment Counter-Memorial, ¶ 129.

### c. The Committee's Analysis

59.   Concerning first of all the exercise of jurisdiction, the starting point is that the powers of a
      tribunal are defined by the boundaries of the arbitration agreement. A tribunal can therefore
      not exercise jurisdiction beyond those boundaries, and it has the duty to exercise the
      jurisdiction that is conferred to it by the agreement. As a consequence, exercise of
      jurisdiction that is not conferred upon the tribunal is in principle an excess of powers.[18]
      Likewise, refusal by a tribunal to exercise the jurisdiction conferred to it by the parties is
      also an excess of powers.[19] However, a mere error in the tribunal's jurisdictional findings
      does not constitute a ground for annulment. Such an error also needs to be manifest. As
      decided by many annulment committees, an excess of powers is manifest if it is obvious,
      clear or self-evident.[20] In this regard, the fact that a tribunal has relied to make its decision

---

[18] ICSID's Updated Background Paper on Annulment, ¶ 87, relying on *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, July 3, 2002, ("***Vivendi I***") ¶ 86; *Patrick Mitchell v. Democratic Republic of the Congo*, ICSID Case No. ARB/99/7 ("***Mitchell***"), Decision on the Application for Annulment of the Award, November 1, 2006, ¶¶ 47, 48 & 67; *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8 ("***CMS***"), Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, September 25, 2007, ¶ 47 (quoting *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais*, ICSID Case No. ARB/81/2 ("***Klöckner I***"), Decision of the *ad hoc* Committee, May 3, 1985, ¶ 4); *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12 ("***Azurix***"), Decision on the Application for Annulment of the Argentine Republic, September 1, 2009, ¶ 45 (quoting *Klöckner I*, ¶ 4); *Lucchetti*, Decision on Annulment, ¶ 99; *M.C.I. Power Group, L.C. and New Turbine, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/03/6 ("***MCI***"), Decision on Annulment, October 19, 2009, ¶ 56 (quoting *Lucchetti*, ¶ 99); *Occidental*, ¶ 49-51; *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No.ARB/11/28 ("***Tulip***"), Decision on Annulment, December 30, 2015 ¶ 55; *EDF*, ¶ 191; *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1 ("***Total***"), Decision on Annulment, February 1, 2016, ¶ 242; *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9 ("***Dogan***"), Decision on Annulment, January 15, 2016, ¶ 105; *Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20 ("***Micula***"), Decision on Annulment, February 26, 2016, ¶ 125; *Antoine Abou Lahoud and Leila Bounafeh-Abou Lahoud v. Democratic Republic of the Congo*, ICSID Case No. ARB/10/4 ("***Lahoud***"), Decision on the Application for Annulment of the Democratic Republic of the Congo, March 29, 2016, ¶ 118; *TECO*, ¶ 77.

[19] *Ibid.*

[20] Annulment Rejoinder, ¶ 27, relying on *Compañia Aguas del Aconquija S.A. et al. v. Argentine Republic*, ICSID Case No. ARB/97/3 ("***Vivendi II***"), Decision on Annulment, August 10, 2010, ¶ 245 ("must be 'evident'"), ("obvious by itself"), **(C-1231)**; *Azurix*, Decision on Annulment, ¶ 68 ("obvious"), **(C-291)**; *Soufraki*, Decision on Annulment, ¶ 39 ("obviousness"; citing Webster's Revised Unabridged Dictionary(1913) definition of "manifest" as meaning "'clear,' 'plain,' 'obvious,' 'evident'...."), **(AL RA 64)**; *CDC*, Decision on Annulment, ¶ 41 ("clear or 'self-evident'"), **(AL RA 420bis)**; *MCI*, Decision on Annulment, ¶ 49 ("self-evident"), **(AL RA 445)**; *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16 ("***Rumeli***"), Decision of the *ad hoc* Committee, March 25, 2010, ¶ 96 ("evident on the face of the award"), **(C-1219)**; *Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No. ARB/05/19 ("***Helnan***"), Decision of the *ad hoc* Committee, June 14, 2010, ¶ 55 ("obvious or clear"), **(C-1224)**; see generally ICSID's Updated Background Paper on Annulment, **(C-1217)**.

on tenable solutions adopted in several previous cases may be considered as an indication that an excess of powers is not manifest.

60.     Concerning the allegation that the tribunal failed to apply the proper law, the starting point should be Article 42(1) of the ICSID Convention, pursuant to which the tribunal has the duty to decide the dispute in accordance with the rules of law agreed by the parties. As a consequence, whenever the parties have agreed on the applicable rules of law, failure to apply the same would normally result in an excess of powers.[21] Nonetheless, because annulment committees do not sit in appeal of the tribunal's decisions, a clear distinction must be made between a failure to apply the proper law and an error in the application of the same.[22] Here again, the requirement that an excess of powers be manifest in order to entail annulment comes into play. While entirely disregarding the proper law would normally constitute a manifest excess of powers, an incorrect or imperfect application of such law would not, unless it is so egregious as to amount to a complete failure to apply it.[23]

61.     Finally, as to the arguments relating to the Tribunal's failure to address all the issues raised by the Parties, the Committee considers that a failure to address one or more of the Parties' arguments could be relevant to an annulment ground based on a failure to provide reasons, but not to an alleged manifest excess of powers. The Committee considers in this respect necessary to distinguish between an alleged failure to address one of the parties' claims, which may be considered as an excess of power for failure to exercise jurisdiction, and an alleged failure to respond to each and every argument or sub-argument raised by the parties, which would normally not.[24] The Committee will now turn to each of the grounds invoked by Argentina to submit that the Tribunal manifestly exceeded its powers.

---

[21] *Maritime International Nominees Establishment v. Republic of Guinea*, ICSID Case No. ARB/84/4 ("**MINE**"), Decision on the Application by Guinea for Partial Annulment of the Arbitral Award dated January 6, 1988, December 22, 1989, ¶ 5.03.

[22] *Soufraki*, Decision on Annulment, ¶ 885.

[23] Ibid, ¶ 86.

[24] Concerning failure to provide reasons: *Vivendi I*, Decision on Annulment ¶ 64, (**AL RA 431**). *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No ARB/98/4 ("***Wena***"), Decision on Annulment, February 5, 2002 ¶ 81, (**C-621**); concerning excess of powers:  *CDC* Decision on Annulment, June 29, 2005, and (ii) *Metalclad*. See Tr. Day 2, 345:2 to 346:6.

### (2)    Exercise of Jurisdiction

#### a.    *Argentina's Position*

62.    Argentina's avers, first of all, that the Claimants did not make any protected investment. The Claimants, as a matter of fact, invested in Air Comet, a Spanish company. That same Spanish company, pursuant to a Share Purchase Agreement dated October 2, 2001 ("**SPA**"), acquired from Sociedad Estatal de Participaciones Industriales del Reino de España ("**SEPI**"), another Spanish company, shares in the Argentine company Interinvest S.A. ("**Interinvest**"), the holding of ARSA and AUSA.[25] Argentina therefore contends that the alleged investment was an indirect one which does not fall under the protection of the BIT. Any claim against Argentine should therefore have been brought by Air Comet, not by the Claimants.[26]

63.    Argentina submits, in this regard, that the clear terms of Article I(2) of the BIT, which defines the term "investment", refers to goods and rights "*acquired or undertaken in accordance with the legislation of the investment's host country*".[27] As a consequence, shares acquired in a Spanish company cannot qualify as an investment made in Argentina.

64.    Furthermore, there was no protected investor under the Argentina-Spain BIT given that the Claimants were not parties to the SPA.[28]

65.    Argentina also contends that for an investment to be considered as such under Article 25(1) of the ICSID Convention, four elements must be present: (i) a contribution of money or other assets; (ii) a certain duration; (iii) an element of risk and (iv) a contribution to the hots State's development (the "*Salini* test"). Argentina submits that the SPA did not entail a contribution by the Claimants to the host State (Argentina), an assumption of risk by the Claimants, or a significant contribution by the Claimants to Argentina's development.[29]

---

[25] Annulment Memorial, ¶ 64. Argentina's Opening, slide 10.

[26] *Ibid.,* ¶ 66.

[27] *Ibid.,* ¶ 69. Argentina's Opening, slide 14.

[28] *Ibid.,* ¶ 64.

[29] Annulment Memorial, ¶ 68. Also, Annulment Reply, ¶ 42. Argentina's Opening, slide 16.

66.     Argentina relies, as evidence that the Claimants never had the quality of investors under the BIT, on an assignment agreement dated January 18, 2010, pursuant to which the Claimants assigned to Air Comet their rights arising out of this arbitration for no price or consideration ("**Assignment Agreement**").[30]

67.     Finally, Argentina submits that the purported investment and the arbitration were an abuse of the ICSID system aiming at allowing Burford Capital Limited ("**Burford**" or the "**Funder**"), a third-party funder, to benefit from the BIT and the Convention in spite of the fact that it does not qualify as an investor. Argentina relies, in this regard, on the Funding Agreement dated April 14, 2010 between Burford and the Claimants ("**Funding Agreement**"), and submits that under said Funding Agreement, Burford along with the Nominated Lawyers (King & Spalding), were intended to be the principal beneficiaries of the proceeds of any award in the case.[31]

68.     Argentina notes, in this respect, that there existed a dispute between the insolvency administrators of Air Comet, the Claimants' insolvency administrators, and Burford, concerning the exact identity of the effective beneficiary of the rights arising out of the arbitration.[32]

69.     Argentina relies on decisions made in the *Phoenix*[33] and the *Venezuela Holdings*[34] cases to characterize the claim as an abuse of process which the Arbitral Tribunal should not have condoned. In accepting that situation, Argentina argues, the Arbitral Tribunal manifestly exceeded its powers.

70.     In synthesis, Argentina contends that the Tribunal manifestly exceeded its powers by exercising jurisdiction to adjudicate the Claimants' claims in the absence of an investment

---

[30] *Ibid.,* ¶ 72. Annulment Reply, ¶¶ 47-48. Argentina's Opening, slides 17-18.

[31] *Ibid.,* ¶¶ 76-78. Annulment Reply, ¶¶ 49-51.

[32] *Ibid.,* ¶ 83. Annulment Reply, ¶ 53.

[33] *Ibid.,* ¶ 79, citing *Phoenix Action, Ltd. v. Czech Republic*, ICISD Case No. ARB/06/5 ("***Phoenix***"), Award, April 15, 2009, ¶ 113 (emphasis added) (**AL RA 85**).

[34] *Ibid.,* ¶ 79, citing *Venezuela Holdings B.V. and others v. Venezuela*, ICSID Case No. ARB/07/27 ("***Venezuela Holdings***"), Decision on Jurisdiction, June 10, 2010, ¶¶ 169, 170, 176 (**AL RA 454**).

and an investor protected under the Argentina-Spain BIT,[35] and by allowing a third party (Burford), which was unrelated to the dispute, was not a protected investor under the BIT, and had made no protected investment, to use the arbitration proceeding against the object and purpose of the ICSID Convention and the principle of good faith.[36]

71.     Finally, Argentina submits that the Tribunal's findings relating to the July 2008 Agreement amount to a manifest excess of powers. This argument will be dealt with in Section 5 thereafter.

### b. The Claimants' Position

72.     Concerning, first of all, Argentina's argument that there is no protected investment under the BIT, the Claimants submit that the Tribunal fully addressed this issue and explained that the definition of "investment" in the BIT applies to both directly and indirectly held assets.[37] The Tribunal further explained that, under Article I(2) of the BIT, the term "investment" refers to "*any kind of assets, such as property and rights of every kind, acquired or effected in accordance with the legislation of the country receiving the investment*", and therefore include "*in particular* […] *shares and other forms of participation in companies*". The Tribunal further noted that while "*Article 1(2) of the* [BIT] *does not explicitly include or exclude 'indirect' investments from its coverage… the broad and inclusive language of this provision suggests that 'indirect' shareholders are protected by the* [BIT]."[38]

73.     In light of the above, the Claimants conclude that the Tribunal correctly held that the Claimants' shares in Interinvest, ARSA and AUSA were clearly "*shares and other forms of participation*" in Argentine companies that fell within the BIT's definition of

---

[35] Annulment Memorial, ¶ 85; Annulment Reply, ¶ 35.

[36] *Ibid.,* ¶ 80. Annulment Reply, ¶¶ 49-51, 55. Argentina's Opening, slides 27-28.

[37] Annulment Counter-Memorial, ¶¶ 191-192.

[38] Annulment Rejoinder, ¶ 28, citing the Decision on Jurisdiction, ¶ 209. Tr. Day 1, 179:8.

"investment", and that the fact those shares were held indirectly by the Claimants does not allow to conclude that they are not protected investments under the BIT.[39]

74.    The Claimants further argue that many other tribunals have considered the same arguments in the same context, including under the same BIT, and found that indirect investments are protected.[40]

75.    In addition, a manifest excess of powers under Article 52(1)(b) requires an error that is obvious and self-evident, and Argentina has not met that burden.[41]

76.    As to Argentina's argument that the shares in Interinvest are in any event not an investment because their acquisition does not meet the *Salini* test, the Claimants first of all submit that the Tribunal substantially adhered to these criteria and verified that the investment complied with the conditions of contribution of assets,[42] assumption of risk,[43] and contributed to Argentina's economic development.[44] The Claimants further submit that the *Salini* criteria are mere indicators for the existence of an investment, which a tribunal is not bound to apply.[45] As a consequence, even if the Tribunal had not strictly adhered to each of the *Salini* criteria, there would be no "manifest" error warranting annulment.[46]

77.    The Claimants further refute Argentina's arguments concerning the existence of an abuse of process. First, the Claimants submit that they never assigned the claims prosecuted in the arbitration, but only the proceeds of the arbitration, and that the Tribunal rightly concluded that this assignment did not affect their standing. As to the argument that Burford would be the real beneficiary of the Award, the Tribunal rightly held that it was irrelevant to its jurisdiction.[47] The Claimants submit in this respect that the Funding

---

[39] Annulment Rejoinder, ¶ 29.

[40] Tr. Day 1, 180:17. Claimants' Opening, slide 92.

[41] Annulment Rejoinder, ¶ 27.

[42] *Ibid.,* ¶ 35. Claimants' Opening, slide 94.

[43] *Ibid.,* ¶ 36.

[44] *Ibid.,* ¶ 37. Tr. Day 1, 182:10 to 184:10.

[45] C. Schreuer, THE ICSID CONVENTION: A COMMENTARY, 25:159 (2d Ed. 2009), ("*Schreuer*"), **(C-1233)**.

[46] Annulment Rejoinder, ¶ 33.

[47] Annulment Counter-Memorial, ¶¶ 194-195. Tr. Day 1, 186:16-187:13.

Agreement was executed on April 14, 2010, one year after the arbitral proceedings were instituted.[48] The Tribunal first correctly determined that jurisdiction is to be assessed as of the date when the case is filed.[49] The Tribunal then looked at the relevant facts, and correctly found that both the Assignment Agreement and the Funding Agreement postdate the filing of arbitration.[50] The Tribunal concluded that Burford's rights under the Funding Agreement are irrelevant to the Tribunal's jurisdiction.[51]

78.   The Claimants finally contend that Arbitrator Hossain's policy opinion that third-party funding agreements are undesirable cannot establish a manifest excess of powers in the Tribunal's exercise of jurisdiction.[52]

### c.   The Committee's Analysis

79.   Concerning, first of all, the Tribunal's finding that the Claimants' indirect ownership of shares in Interinvest qualifies as an investment under the BIT, the Committee does not find any reason to annul the Award for manifest excess of powers.

80.   The Committee recalls that for an error of law to be annullable, it must be manifest. As said above, for an error to be manifest, it needs to be obvious, clear or self-evident, and whenever the tribunal has relied to make its decision on tenable solutions that have been consistently adopted in previous cases, there should as a matter of principle be no annulment. For an incorrect or imperfect application of law to be annullable, it needs to be so egregious as to amount to a complete failure to apply the law.

81.   Turning to the Tribunal's analysis, the Tribunal made a distinction between what it defined as Respondents "*derivative claim*" argument,[53] and its "*intermediary investor*" argument.[54] In so doing, it appears to have followed the structure of Argentina's pleadings. The

---

[48] Annulment Rejoinder, ¶ 40.

[49] Tr. Day 1, 185:1 to 185:9.

[50] Tr. Day 1, 185:10-17.

[51] Annulment Rejoinder, ¶ 39.

[52] *Ibid.*, ¶ 39.

[53] Decision on Jurisdiction, ¶ 208 seq.

[54] *Ibid.*, ¶ 229 seq.

distinction between the two arguments is however unclear, for both appear to rely on the fact that the Claimants had no direct rights in Interinvest. And both arguments were in fact rejected on the same basis that an indirectly-held shareholding is a protected investment.[55] Argentina's annulment arguments rest on the argument that the Claimants' shareholding in Air Comet is not an investment acquired in accordance with Argentine law pursuant to the BIT, with no distinction between a "derivative claim" and an "intermediary investor" claim.

82.    The starting point of the analysis should be Article I(2) of the BIT, defining as investment "*any kind of assets, such as property and rights of every kind, acquired or effected in accordance with the legislation of the country receiving the investment*". The Tribunal noted the broad language of the clause and deducted that it does not exclude indirect investments.[56] The Tribunal concluded that the Claimants' indirect nature of their ownership of shares in Interinvest, ARSA and AUSA did not exclude such shares from the definition of an investment under the BIT.[57] The Arbitral Tribunal, in so doing, rejected Argentina's argument that the terms "*acquired or effected in accordance with the legislation of the country receiving the investment*" mean that the investment needed to be directly acquired in Argentina.[58] The Tribunal concluded that shares indirectly acquired by the Claimants in an Argentine company and in accordance with the laws of Argentina were protected by the BIT. The Tribunal also discussed Argentina's arguments based on Barcelona Traction and general international law,[59] and found that they were not applicable in the context of a BIT. It also concluded that the ICSID Convention does not reject the possibility for the indirect shareholders of a domestic company to bring claims for the harm caused to their investment.[60] The Tribunal then rejected Argentina's arguments based on Argentine law as irrelevant to the decision on its jurisdiction,[61] and rejected what it called

---

[55] For the "derivative claim" argument, ¶ 209; for the "intermediary investor" argument, ¶ 232.

[56] Decision on Jurisdiction, ¶ 209 seq.

[57] *Ibid.,* ¶ 207-238; Award, ¶ 249.

[58] *Ibid.,* ¶ 214.

[59] Decision on Jurisdiction, ¶¶ 215-221.

[60] *Ibid.,* ¶¶ 222-225.

[61] *Ibid.,* ¶¶ 226-228.

the "*policy argument*" according to which it would be inappropriate to award damages to a shareholder rather than to the company that has actually suffered injury.[62]

83. The Committee finds no manifest excess of powers in the Tribunal's interpretation of the BIT and of the other legal rules invoked by Argentina. Ultimately, the Tribunal's jurisdiction had to be assessed having regard to the BIT. The Tribunal considered that Article I(2) of the BIT encompasses indirect investments, and in so doing it interpreted the terms "*any kind of assets*" as referring to both directly and indirectly owned assets. It follows, according to the Tribunal, that by acquiring shares in Air Comet, a Spanish company which in turn held 99.2% of Interinvest, the Argentine holding company of ARSA y AUSA, the Claimants made an indirect investment in said Argentine companies and that such investment is protected by the BIT. Irrespective of whether these conclusions are correct or not, there is no manifest error in such reasoning. Nor is there any demonstration on the part of Argentina that such interpretation would be contrary to good faith or inconsistent with the object and purpose of the BIT.

84. The Committee notes, in this regard, that in making its decision, the Tribunal has relied on a number of past jurisdictional decisions, some made under the same Spain/Argentina BIT[63] and others under treaties using similar language,[64] having all concluded that

---

[62] *Ibid.,* ¶ 233.

[63] Decision on Jurisdiction, ¶¶ 210-213, citing *Gas Natural SDG SA v. Argentine Republic*, ICSID Case No ARB/03/10, Decision on Jurisdiction, June 17, 2005 ("***Gas Natural***"), ¶¶ 33-35; *Suez, Sociedad General de Aguas de Barcelona S.A. and Interagua Servicios Integrales de Agua S.A. v. Argentine Republic*, ICSID Case No. ARB/03/17, Decision on Jurisdiction, May 16, 2006 ("***Suez InterAguas***"), ¶ 49; *and Suez, Sociedad General de Aguas de Barcelona S.A., and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/03/19, Decision on Jurisdiction, August 3, 2006 ("***Suez Vivendi***"), ¶ 49.

[64] Decision on Jurisdiction, ¶ 228, providing as examples: *CMS,* Decision on Jurisdiction, ¶ 42 ("the applicable jurisdictional provisions are only those of the Convention and the BIT, not those which might arise from national legislation."); *Azurix,* Decision on Jurisdiction, December 8, 2003, ¶ 50, (**C-490**) ("The jurisdiction of the Centre is determined by Article 25 of the Convention. In addition, the competence of the Tribunal is governed by the terms of the instrument expressing the parties' consent to ICSID arbitration. Therefore, the task of the Tribunal [at the jurisdictional stage] is to assess whether the Claimant's request for arbitration falls within the terms of said Article 25 of the Convention and (…) the BIT."); *Siemens v. Argentina,* Decision on Jurisdiction, at ¶ 31 ("Argentina in its allegations has not distinguished between the law applicable to the merits of the dispute and the law applicable to determine the Tribunal's jurisdiction. This being an ICSID Tribunal, its jurisdiction is governed by Article 25 of the ICSID Convention and the terms of the instrument expressing the parties' consent to ICSID arbitration, namely, Article 10 of the Treaty."). Also, *BG Group plc v Argentine Republic*, UNCITRAL, ("***BG Group***"), Final Award, December 24, 2007, ¶¶ 203-04, (**C-340**). Note, that the Final Award rendered by the Tribunal was subsequently denied enforcement on different grounds by the United States Court of Appeals for the District of Columbia Circuit. The D.C.

indirectly owned assets qualify as protected investments. The Committee also notes that Argentina did not refer to any past decision having in similar circumstances concluded to the contrary. Although this Committee does not need to opine as to whether such past decisions were correct or not, these circumstances lead the Committee to consider that any possible error in the Tribunal's conclusion that indirectly owned assets fall under Article I(2) of the BIT would in any event not qualify as a manifest excess of powers.

85.     Second, Argentina has averred before the Committee that the Tribunal would have exceeded its powers by upholding its jurisdiction in spite of the fact that the investment did not comply with the objective requirements established by the so-called *Salini* test.[65]

86.     As an initial observation, the Committee notes that the *Salini* test has not been raised by Argentina before the Tribunal as a jurisdictional argument, which is the reason why it is not dealt with in the Decision on Jurisdiction. The argument is rather addressed in different parts of the Award dealing with admissibility,[66] where the Tribunal addresses issues of contribution and risk in the context of a debate on the existence of other investments made by the Claimants beyond their indirect acquisition of shares in Interinvest.[67] It is unclear to the Committee why these questions are dealt with in the Award as part of a section on admissibility. At any rate, framed as a jurisdictional question, the argument is inadmissible before the Committee. A rightly explained by Christoph Schreuer: "*a party may not present new arguments on fact and law that it failed to put forward in the original arbitration proceeding*".[68] Because Argentina did not argue the *Salini* test as part of its jurisdictional objections before the Tribunal, it cannot rely on such argument before the Committee to submit that the Tribunal's jurisdictional findings would amount to a manifest excess of powers.

---

Circuit decided the appeal on the basis of arbitrability, finding that BG and Argentina had not agreed to submit the arbitrability question itself to arbitration, and that the BG tribunal did not have jurisdiction to consider the matter of its own competence. *See Republic of Argentina v. BG Group plc*, D.C. Cir., No. 11-7021 (January 17, 2012).

[65] Annulment Memorial ¶ 68. Annulment Reply, ¶ 42, Argentina's Opening, slide 16.

[66] Award, ¶¶ 251, 253, 254, 260, 261, 262.

[67] Award, ¶ 250.

[68] The ICSID Convention, a Commentary, Second Edition, p. 932, ¶ 108.

87.   Even if non-compliance with the *Salini* test were admissible as a jurisdictional annulment argument (which it is not), it would in any event not succeed. Whether the argument relates to jurisdiction or admissibility, the Claimants correctly point out[69] that whether the standards established by the arbitral tribunal in the *Salini v. Morocco* case are mandatory has been much debated. Christoph Schreuer writes in this respect that "*it is not entirely clear whether the tribunals regarded the criteria as essential requirements for the existence of investments or merely as typical characteristics or indicators*",[70] and that "*the development in practice from a descriptive list of typical features towards a set of mandatory legal requirements is unfortunate. […] To the extent that the 'Salini' test is applied to determine the existence of an investment, its criteria should not be seen as distinct jurisdictional requirements each of which must be met separately. In fact, tribunals have pointed out repeatedly that the criteria that they applied were interrelated and should be looked at not in isolation but in conjunction*".[71] An annulment committee has in this respect annulled an award for having elevated one of the *Salini* criteria to the level of a jurisdictional requirement.[72] It follows that a failure to apply the so-called *Salini* test would not in itself constitute a manifest excess of powers.

88.   The Committee is furthermore satisfied that the *Salini* criteria, had they been relevant to this case, were in any event complied with. The Tribunal accordingly found that the conditions of contribution,[73] risk,[74] and contribution to the host State's economic development[75] had been met. As to the criteria of duration, it does not appear to have been discussed by Argentina, but it was clearly met as well in the context of the acquisition of two airlines, which are businesses requiring long term investments and planning.

---

[69] Annulment Rejoinder, ¶ 33.

[70] The ICSID Convention, a Commentary, p. 130, ¶ 159.

[71] *Ibid.,* p. 133, ¶ 171.

[72] *Malaysian Historical Salvors v. Malaysia*, ICSID Case ARB/05/10, Decision on the Application for Annulment, April 16, 2009.

[73] Annulment Rejoinder, ¶ 35; Award, ¶¶ 251, 254.

[74] Annulment Rejoinder, ¶ 36; Award, ¶¶ 253, 261, 262, 373.

[75] Annulment Rejoinder, ¶ 37; Award, ¶¶ 255, 256, 315.

89.     The Committee now turns to Argentina's arguments relating to the alleged simulation that would be evidenced by the assignment, for no consideration, of the proceeds of the Award to Air Comet. Argentina submits that this assignment is an acknowledgement that the claims brought forward in the arbitration belonged in reality to Air Comet, and not to the Claimants.[76]

90.     This Assignment Agreement[77] was however entered into in January 2010, almost 9 years after the investment and more than one year after the Request for Arbitration. The Tribunal held that, in accordance with international case law, jurisdiction is generally to be assessed as of the date the case is filed.[78] This point has not been disputed by Argentina. As a consequence, and as the Claimants rightly point out, the 2010 Assignment Agreement could not affect the Tribunal's jurisdiction.[79] Moreover, as the Claimants also argued, the assignment did not apply to the interests in dispute in the arbitration, but to the claim to money that would possibly arise from the Award.[80] It is therefore clear that the Claimants continued to own their disputed rights against Argentina until the Award, and that their standing to pursue the claims was not affected. The Tribunal finally held that any possible illegality of the assignment would also be irrelevant to jurisdiction as long as the investment had been legally acquired.[81] The Assignment Agreement can therefore not sustain the argument that the Tribunal lacked jurisdiction, that the Claimants had no legal standing in the arbitration, or that the arbitration was a simulation.

91.     The Committee will now address Argentina's argument that the Burford Funding Agreement was the vehicle of a fraud to the ICSID system by allowing a third party, who was not an investor, to act against Argentina.[82] According to Argentina, as a consequence, the Tribunal manifestly exceeded its powers in accepting to entertain a claim made in bad

---

[76] Annulment Memorial, ¶ 72.

[77] RA 159.

[78] Decision on Jurisdiction, ¶ 255.

[79] Annulment Counter-Memorial, ¶ 195.

[80] "*Los cedentes acuerdan expresamente la cesión de los derechos netos de cobro que se obtengan de la demanda presentada ante el Tribunal Internacional CIADI*", RA 159, Clause 1.

[81] Decision on Jurisdiction, ¶ 257.

[82] Annulment Memorial, ¶ 78.

faith and in fraud of Argentina's rights.[83] The Committee does not find merits to the argument.

92.   First, the Funding Agreement was made between the Claimants and Burford Capital in April 2010, which is 16 months after the Request for Arbitration. The Tribunal found that, because it postdates the filing of the case, it is irrelevant to the assessment of both the Tribunal's jurisdiction and the Claimants' standing.[84] That decision finds support in international case law and past investment awards, as analysed by the Tribunal in its Decision on Jurisdiction.[85]

93.   Second, the Funding Agreement[86] does not provide for any assignment in favour of the Funder of the interests in dispute or of the proceeds of the Award. There is nothing in the Funding Agreement that would allow concluding that Burford had become the owner of the claims and the real claimant in the arbitration. The Claimants continued to instruct the Nominated Lawyers. Clause 6.1 of the Funding Agreement provides in this respect that "*in consideration of the Funder's undertakings in this Agreement, the Claimant agrees to pay to the Funder the Recovery Amount immediately following receipt of all or any part of the Award*". As a consequence, pursuant to this provision, the right to enforce the Award and to collect against Argentina continues to belong to the Claimants. Clause 6.2 provides, as a guarantee of the Funder's right, the setting up of an escrow account on which the proceeds of the Award would have to be paid, but this remains an *inter partes* arrangement that would not in any way affect the Claimants' standing in the arbitration. As a consequence,

---

[83] *Ibid.,* ¶ 79.

[84] Decision on Jurisdiction, ¶¶ 256-257.

[85] Decision on Jurisdiction, ¶¶ 255-257, citing *Case Concerning the Arrest Warrant of 11 April 2000 (Democratic Republic of Congo v. Belgium),* Judgment, February 14, 2002, I.C.J. Reports 2002, p. 3, ¶ 26 (**C-762**); *Vivendi II*, Decision on Jurisdiction, November 14, 2005, ¶¶ 60, 61 and 63. See also Schreuer, The ICSID Convention: A Commentary (**C-761**) at 92 ("It is an accepted principle of international adjudication that jurisdiction will be determined by reference to the date on which the judicial proceedings are instituted. This means that on that date all jurisdictional requirements must be met. It also means that events taking place after that date will not affect jurisdiction."); *Ceskoslovenska Obchodni Banka, a.s. (CSOB) v. Slovak Republic*, ICSID Case No. ARB/97/4, Decision on Jurisdiction, May 24, 1999, ("***CSOB***"), ¶ 31 (**C-539**); *Gustav F.W. Hamester GmbH & Co. KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, June 18, 2010 ("***Hamester***"), ¶ 96 (**AL RA 73**).

[86] RA 160.

the Committee does not find support to Argentina's submission that, based on the Funding Agreement, the real claimant in the arbitration was Burford.

94.    Argentina notes that the Funding Agreement gave rise to an exchange of letters between the insolvency administrators of Air Comet and Burford as to the entitlement to the proceeds of the Award.[87] The Committee fails to see how this exchange can be relevant to the annulment proceedings. The Award was in fact made in favour of the Claimants, and neither Air Comet nor Burford have any right to enforce it. Nor was there any uncertainty in the arbitration as to who the claimant parties were. Argentina states in the Reply that this "dispute" between Air Comet and Burford would show the serious consequences deriving from the Tribunal's decision to uphold its jurisdiction.[88] But it fails to explain what these consequences are and why the role of a Funder should be characterized as an abuse of process or a breach of the BIT or the ICSID Convention. Argentina also invokes the recent release by Burford of a communication according to which it transferred its rights on the proceeds of the Award,[89] without however any explanation as to why this circumstance is relevant to its argument that by affirming its jurisdiction the Tribunal exceeded its powers.

95.    Based on the foregoing, the Committee concludes that there is no manifest excess of powers in the Tribunal's Decisions on Jurisdiction.

(3)    **Lack of Capacity of the Claimants' Counsel**

    *a.  Argentina's Position*

96.    Argentina points out that "[a]*fter the original arbitration proceeding was commenced, the three Claimant companies became subject to insolvency proceedings in Spain between late 2010 and early 2011. Subsequently, in April 2013, Claimants' management and disposition powers were suspended and transferred to the respective Trustees in Insolvency.*"[90]

97.    Argentina submits that the insolvency administrators were the persons vested with standing to act in the arbitration proceeding, that the powers of attorney previously granted by the

---

[87] Annulment Memorial, ¶¶ 81-83.
[88] Annulment Reply, ¶ 53.
[89] Annulment Memorial, ¶ 84.
[90] Annulment Memorial, ¶¶ 86, 89.

Claimants no longer conferred capacity to King & Spalding to represent the debtor in the insolvency proceedings, that King & Spalding did not obtain similar powers of attorney from the insolvency administrators, and that they therefore lacked the power to represent them in the arbitration proceeding.[91]

98.   Argentina contends that although the Tribunal recognized that the law applicable to the Claimants' capacity and representation was Spanish law, it nonetheless failed to apply it by holding that: "[I]*n the circumstances of an international arbitration which has been ongoing for a number of years, one must question whether the strict application of the formalities of granting powers of attorney at Spanish law appropriately apply*."[92]

99.   Argentina submits in this regard that neither the 2011 or 2013 letters nor the 2015 public deed relied upon by the Claimants meet the requirements set forth by Spanish law for the granting of powers of attorney.[93] According to Argentina, the reason why King & Spalding did not obtain powers of attorney from the insolvency administrators is that the variation or termination of the existing powers of attorney would have put at risk the Funding Agreement by entitling Burford to unilaterally terminate it and to receive a USD 100 million compensation,[94] an issue that the Tribunal would have failed to address.[95]

100.  Argentina concludes that: "*in considering that King & Spalding's attorneys had capacity of representation for the arbitration proceeding following the suspension of Claimants' management and disposition powers and their replacement by the respective trustees in insolvency, the majority of the Tribunal failed to apply the applicable law, thus manifestly exceeding its powers within the meaning of Article 52(1)(b) of the ICSID Convention*."[96]

---

[91] Annulment Memorial, ¶¶ 86, 88, 105. Annulment Reply, ¶¶ 67-68.

[92] Annulment Memorial, ¶¶ 98, 100 citing Award, ¶¶ 221-222. Annulment Reply, ¶¶ 58-60.

[93] Annulment Reply, ¶¶ 70-73.

[94] Annulment Memorial, ¶¶ 106-107. Annulment Reply, ¶¶ 78-80.

[95] Annulment Memorial, ¶ 108.

[96] Annulment Reply ¶. 81.

### b. The Claimants' Position

101.   The Claimants argues that Argentina's submission is nothing more than a disagreement with the Tribunal's decision.[97] The Tribunal found that, because the Claimants are Spanish nationals, the law applicable to their capacity and to the powers of attorney in dispute is Spanish law,[98] in particular the Spanish Bankruptcy Law. Under that law, the Tribunal found that "*the re-organization administrators step into the shoes of the debtor upon the commencement of liquidation proceedings/suspension of powers of administration and disposition of assets*."[99] The Tribunal also noted that "*each set of re-organization administrators had reaffirmed King & Spalding's powers of representation and ratified the actions taken by that firm on behalf of Claimants*."[100]

102.   The Claimants refute Argentina's submission that, pursuant to Article 48(3) of the Spanish Bankruptcy Law (which provides that "[a]*ny power of attorney existing at the time of the initiation of the insolvency proceedings shall be affected by the suspension or control of financial and property-related powers*"[101]), the powers of attorney were extinguished or terminated. The correct interpretation of Spanish law is that "*the powers of attorney of company administrators (or liquidators) will be affected only to the same extent as the powers of administration and disposition of the bankruptcy estate*" .[102] Since the insolvency administrators remain "*able to perform all other acts provided such acts do not consist in the administration or disposition of the estate*",[103] including the pursuit of claims in arbitration, the powers of attorney relating to the arbitration necessarily remain valid. In its analysis of this matter, the Tribunal observed that when Spanish law does seek to extinguish contractual arrangements through the operation of law, it does so expressly.[104]

---

[97] Annulment Counter-Memorial, ¶ 143.

[98] *Ibid.,* ¶ 144. Award, ¶ 203.

[99] Award, ¶ 218.

[100] Annulment Counter-Memorial, ¶¶ 144-145. Award, ¶ 218.

[101] Annulment Counter-Memorial, ¶¶ 146, citing Award, ¶ 209.

[102] Expert Report of Dr. Aurora Martínez Flórez, July 31, 2013, ("***Expert Report of Dr. Martínez Flórez***") ¶ 34.

[103] Annulment Counter-Memorial, ¶ 146.

[104] Annulment Counter-Memorial, ¶ 146, citing Award, ¶ 220.

103.    The Claimants argue that, based on Spanish law, the Tribunal held that "*the powers of attorney granted to King & Spalding were initially, and have continued throughout these proceedings to be, valid*", so that "*Claimants ha*[d] *proved that there was no obligation at Spanish law to produce a new power of attorney in the circumstances of this case.*"[105]

104.    The Claimants also point out that the insolvency administrators ratified the Claimants' power of attorney by (i) letters from the insolvency administrators of all three Claimants filed on June 16, 2011; (ii) three additional letters, one from each of the three insolvency administrators, submitted with the Claimants' Reply in August 2013; and (iii) public deeds executed by the insolvency administrators, attesting to King & Spalding's powers to act in the arbitration, filed in October 2015. [106]

105.    The Tribunal found on this issue that (i) "*the*[se] *public deeds submitted by the court-appointed receivers should be admitted into evidence in the* [...arbitration] *proceedings*";[107] (ii) "[t]*he public deeds are relevant to a number of issues before the Tribunal* [... and] *they clearly relate to the question of the validity of King & Spalding's powers of attorney and their authority to represent Claimants in the arbitration*";[108] and (iii) "*the statements made in the public deeds are consistent with the previous statements in evidence from the receivers.*"[109]

106.    The Claimants' also note the Tribunal's finding that it was reasonable to assume, based on the public disclosure of the Funding Agreement, "*that the re-organization administrators for each of Claimants were fully aware of the Funding Agreement,*" and that Burford, given its financial stake in the matter, was aware of the Claimants' insolvency proceedings.[110]

107.    With respect to the 2013 Ratification Letters, the Claimants submit that only the Spanish Bankruptcy Law applied to the Arbitration and the Tribunal was therefore correct in

---

[105] Annulment Counter-Memorial, ¶ 147, citing Award, ¶ 223.

[106] Counter-Memorial, ¶¶ 148-150.

[107] Decision on Provisional Measures, ¶ 172.

[108] Decision on Provisional Measures, ¶ 172.

[109] Decision on Provisional Measures, ¶ 172. Annulment Counter-Memorial, ¶ 150

[110] Annulment Counter-Memorial, ¶ 153.

declining to enforce Spanish Civil Procedure rules which only apply in court and to which neither party to the Treaty had agreed.[111] The Tribunal emphasized in this respect that "[t]*he Spanish Bankruptcy Law does not require any particular form in which the re-organization administrators must appear in arbitral proceedings or ratify the conduct of proceedings*".[112] The Tribunal had also admitted into the record the October 2015 deeds confirming the original June 2011 letter provided by the insolvency administrators.[113]

108.    The Tribunal therefore correctly concluded, by applying Spanish Bankruptcy law, that the powers of attorney granted to the Claimants' counsel have always been valid under Spanish law and were not extinguished by the bankruptcy filings.[114] In sum, the Tribunal issued a comprehensive, thoughtful, and correct decision rejecting Argentina's arguments on two separate grounds and did not manifestly exceed its powers on this issue.[115]

### c.   *The Committee's Analysis*

109.    The thrust of Argentina's argument is that the Tribunal manifestly exceeded its powers by failing to apply the relevant Spanish law rules to the question of the validity of King & Spalding's powers of representation after the three claimant companies versed into receivership at the end of 2010 and at the beginning of 2011. More specifically, the Parties disagree on the consequences of the suspension provided by Article 145 of Spanish Bankruptcy law, and as to whether Articles 48.3 and 52.1 of the same law, as well as Article 1732(3) of the Spanish Civil Code (relating to termination of the mandate), were properly applied.

110.    As an initial matter, the Committee agrees that failure to apply the law agreed by the parties may be a basis for annulment for excess of powers. This is because, as rightly pointed out by Christoph Schreuer, "*the provisions on applicable law are essential elements of the*

---

[111] *Ibid.,* ¶ 163.

[112] Award, ¶ 217.

[113] Decision on Provisional Measures, ¶ 172.

[114] Annulment Counter-Memorial, ¶¶ 155-158.

[115] *Ibid.,* ¶ 154.

*parties' agreement to arbitrate*".[116] The Committee also holds that choice of law can be made implicitly, in particular by common reliance on a given law.[117] In the case at hand, both Parties have relied on Spanish law to discuss the question of representation in dispute. As a consequence, a failure by the Tribunal to apply that law may be characterized as an excess of powers. However, because annulment committees do not sit in appeal of the tribunal's decision, a clear distinction needs to be made between non-application of the proper law and a mere error in its application: while a complete disregard of the applicable rule of law may be an excess of power, an incorrect or imperfect interpretation or application of such rule will as a matter of principle not. While the distinction between the two situations may be in practice difficult to draw, the requirement that the excess of power be manifest is of particular relevance to assist committees in deciding whether an award should be annulled. As rightly decided by the *MTD v. Chile ad hoc* committee: "*an award will not escape annulment if the tribunal while purporting to apply the relevant law actually applies another, quite different law. But in such a case the error must be 'manifest', not arguable, and a misapprehension (still less mere disagreement) as to the content of a particular rules is not enough*".[118]

111.   As an initial matter, Argentina has put much emphasis[119] on the first sentence of paragraph 222 of the Award, where the Tribunal says that "*in the circumstances of an international arbitration which has been ongoing for a number of years, one must question whether the strict application of the formalities of granting powers of attorney at Spanish law appropriately apply*". Argentina sees that statement as evidence that instead of applying Spanish law, the Tribunal decided to disregard it in favour of a solution of its own. The Committee, however, does not give relevance to that statement. It is unclear to what formalities the Tribunal referred to, and what is exactly meant by their "*strict application*". As any rate, even if that sentence was perhaps unfortunate, it was surely superfluous to substantiate the Tribunal's reasoning. The basis for the Tribunal's decision that the powers of attorney granted to King & Spalding remained valid throughout the arbitration are to be

---

[116] Commentary, p. 954, ¶ 192.

[117] *Ibid.,* p. 573, ¶ 70.

[118] Decision on Annulment, March 21, 2007, ¶ 47.

[119] Annulment Memorial, ¶¶ 100-101, 225, 258. Annulment Reply, ¶¶ 60, 77.

found elsewhere in the Award. As a consequence, the Committee finds that particular sentence to be irrelevant.

112. The crux of the dispute was whether, in spite of the insolvency proceedings initiated against each of the three claimant parties at the end of 2010 and at the beginning of 2011, and in spite of court decisions made on April 10, 2013 (Autobuses Urbanos), April 22, 2013 (Teinver), and April 23, 2013 (Transportes) to dissolve the three claimant parties, to suspend the representative powers of their legal representatives, and to empower the insolvency administrators to represent the bankruptcy, the Representation Contract and powers of attorney granted by the Claimants to King & Spalding in November 2008 remained valid.

113. The Tribunal's starting point was Article 52 of the Spanish bankruptcy law, according to which "*arbitration proceedings that are pending at the time of the reorganization proceedings declaration shall continue until the award becomes final*".[120] The Tribunal noted however that pursuant to Article 51(2) of that same law, in case of a suspension of the debtor's powers of administration and disposition, the insolvency administrators would have to replace the Claimants in the arbitration with no need of a specific authorization by the court.[121] The Tribunal then noted that the three insolvency administrators each signed an undated letter (which letters were submitted with the Reply in August 2013) ratifying the existing powers of attorneys and stating their intention to appear before the Tribunal. The Tribunal further states that the March 4, 2014 (merits) and November 3, 2015 (provisional measures) hearings were attended by the insolvency administrators Messrs. Arqued, Hernández and Martínez.[122] The Claimants submitted to the Tribunal, on October 22, 2015, the public deeds confirming the capacity of the insolvency administrators.[123]

114. The Tribunal then made a number of findings. First, the Tribunal relied on the opinion of the legal expert witness presented by the Claimants to hold that Article 1732(3) of the

---

[120] Award, ¶ 203.

[121] Award, ¶¶ 204-205.

[122] Award, ¶ 208.

[123] *Ibid.*

32

Spanish Civil Code (which provides that a mandate terminates in case of insolvency or incapacity of the debtor) "*does not apply to contracts like the Representation Agreement*" between the Claimants and King & Spalding.[124] In that same paragraph, the Tribunal also seemed to accept that, although Article 1732(3) does not apply to the Representation Agreement because it is "*a bilateral service agreement*", it may have applied to the power of attorney "*which was granted separately*".[125] Oddly, however, the Tribunal had previously ruled that the Spanish Bankruptcy law should "*primarily*" prevail, as *lex specialis*, over Article 1732.[126] Although these two findings may seem contradictory, the Committee understands that the Tribunal intended to say that whether the Representation contract with King & Spalding and the powers of attorney remained valid or not is an issue that should be resolved by reference to the Bankruptcy law.

115. The Tribunal then held that "*Article 61(2) of the Spanish Bankruptcy law provides that bilateral contracts to which the debtor is a party remain in effect despite the commencement of the re-organization proceedings and their validity is not affected*", that "*the re-organization administrators […] may request from the court the termination of a contract if it is deemed in the interests of the insolvency proceedings*", and that "*the re-organization administrators have not requested the termination of the Retainer Agreement between Claimants and King & Spalding*".[127] As a consequence, the Representation Contract was unaffected by the bankruptcy proceedings.

116. The Tribunal went on by rejecting Argentina's contention that the powers of attorney had terminated by effect of Article 48(3) of the Spanish Bankruptcy law, by holding that the provision of said article - according to which the existing powers of attorney are "affected" by the suspension - does not mean that they are terminated, but rather that "*the actions of*

---

[124] Award, ¶ 219.

[125] *Ibid.*

[126] Award, ¶ 214.

[127] Award, ¶ 218.

*the debtor through its counsel/authorized representative are subject to the approval of the re-organization administrators*".[128]

117.   The Tribunal held that the powers of attorney were in any event ratified by way of the letters submitted to the Tribunal in August 2013, and decided that the objections raised by Argentina to the legal effects of these letters are "*highly formal and somewhat arbitrary*".[129] In this regard, Argentina has submitted that in Spanish law, these letters could not be executed unilaterally by the insolvency administrators, and should have been authorized by the Court.[130] The Tribunal addressed these arguments by saying that "*the Spanish bankruptcy law does not require any particular form in which the re-organization administrators must appear in arbitral proceedings or ratify the conduct of the proceedings. The only specific instances in which court authorization is required are for the withdrawal, acceptance or settlement of claims against the debtor*".[131] The Tribunal added that, in any event, "*as they have been appointed by the court and regularly appeared before it, it is reasonable to assume that they are not likely to engage into unauthorized action, particularly with respect to the pursuance of this arbitration, which is known to the court*".[132]

118.   Again, it is not the Committee's role to act as an appellate body and to assess whether that reasoning was correct in Spanish law. The relevant question here is whether in reaching its conclusion, the Tribunal applied Spanish law. The Committee considers that it did. The reasoning is based on an analysis of the various legal provisions at stake, in view of the legal opinion of a Spanish law professor upon which the Claimants relied. It essentially rests on (i) the Tribunal's analysis of Article 61(2) of the Spanish Bankruptcy law, according to which the Retainer Agreement between the Claimants and King & Spalding was still in force in absence of termination, (ii) the Tribunal's analysis of Article 48(3) of that same law, according to which the powers of attorney had been "*affected or limited*"

---

[128] Award, ¶ 220.
[129] Award, ¶ 221.
[130] Award, ¶ 198; Annulment Memorial, ¶ 103.
[131] Award, ¶ 217
[132] Award, ¶ 221.

34

but not terminated as a consequence of the suspension, and (iii) its finding that said powers had in any event been ratified by way of the undated letters signed by the insolvency administrators and that said ratification was not subject in Spanish law to a specific form. The Tribunal also found that the October 2015 public deeds were relevant to the question of the validity of the King & Spalding's powers of attorney and their authority to represent the Claimants in the arbitration.[133] Irrespective of whether these reasons are correct or convincing, there is no doubt in the eyes of the Committee that in reaching its conclusions, the Tribunal applied Spanish law. As a consequence, there is no manifest excess of powers.

### (4)   Misappropriation of the SEPI Funds

#### a.   *Argentina's Position*

119.   Argentina points out that under the SPA – which is invoked by the Claimants as the basis of their alleged investment –, Air Comet agreed to contribute USD 50 million as a capital increase and received from SEPI about USD 803 million to be distributed as follows:

a) USD 300 million to pay the liabilities of the Argentine Airlines;
b) USD 205 million to pay any adjustments needed as per the transfer and adjustment balance sheet;
c) USD 248 million to implement an Industrial Plan in the Argentine Airlines; and
d) USD 50 million against the payment of a promissory note payable by Interinvest.[134]

120.   Argentina contends that those funds were not used for their intended purpose, that Air Comet failed to make most of the capital contributions it had agreed to make,[135] and that Air Comet breached its undertakings under the SPA in detriment of the Argentine Airlines and the Argentine Republic, and in violation of the principle of good faith.

121.   Argentina also argues that in rejecting Argentina's objection to jurisdiction based on the misappropriation of funds received from SEPI and alleged lack of good faith, the Tribunal decided that such facts would be dealt with in the merits phase of the arbitration.[136]

---

[133] Decision on Provisional Measures, ¶ 172.

[134] Annulment Memorial, ¶¶ 112-114. Annulment Reply, ¶ 82. Argentina's Opening, slide 42.

[135] Annulment Memorial, ¶ 115. Argentina's Opening, slides 43-56, 63-71, 73-81.

[136] Argentina's Opening, slides 87-89.

However, the Tribunal failed to address Argentina's argument that the above-mentioned conduct was a breach of the principle of good faith under international law.[137] The Tribunal also failed to address the failure by Air Comet to use the USD 205 million to pay ARSA's and AUSA's debts or liabilities.[138]

122.   To conclude, Argentina contends that "*the undue use of funds contributed by SEPI and the non-compliance with the terms of the SPA breached the principle of good faith under international law. Accordingly, the investment invoked by Claimants could not benefit from the protection of the BIT and such conduct triggered the inadmissibility of the claim under international law. In granting protection to the alleged investment and admitting Claimants' claim, the majority of the Tribunal manifestly exceeded its powers within the meaning of Article 52(1)(b) of the ICSID Convention.*"[139]

### b.  The Claimants' Position

123.   The Claimants submit that the Tribunal did not manifestly exceed its powers in its findings and conclusions regarding how Air Comet used the SEPI funds.[140]

124.   The Claimants first note that Argentina was not a party to the SPA, and therefore has no standing to complain about an agreement to which it was extraneous. Any complaint as to the use of funds provided by the SPA should have been raised by SEPI.[141] As found by the Tribunal: "*As in the case of USD 300 million, the evidence indicates that SEPI was aware of how Air Comet was using the USD 248 million intended for the execution or implementation of the Industrial Plan. Apart from applying a penalty of USD 86,957 for failure to supply one airplane, SEPI does not appear to have invoked any contractual remedies against Air Comet for the possible failures to comply with the terms of the SPA.*

---

[137] Annulment Reply, ¶ 111.
[138] Annulment Memorial, ¶ 139. Argentina's Opening, slides 58-62.
[139] Annulment Reply, ¶ 120.
[140]  Annulment Counter-Memorial, ¶¶ 208-224. Annulment Rejoinder, ¶¶ 79-105.
[141] Claimants' Opening, slide109.

*Nor did SEPI or the Spanish government seek to revoke the agreement on the basis of possible non-compliance by Air Comet.*"[142]

125.   The Claimants contend that the Tribunal extensively discussed and rejected Argentina's arguments on the misappropriation of funds. The Tribunal first explained in its Decision on Jurisdiction that Air Comet's alleged breaches "*could not affect jurisdiction because they would have only occurred subsequent to Claimants' acquisition of the investment.*"[143] Regarding the USD 300 million, the Tribunal observed the there was no doubt that SEPI was aware of how these funds were being used: "*Although Respondent argues that the purchase of ARSA's debt and subrogation to ARSA's creditor's claims was not in compliance with the terms of the SPA, the references above indicate that SEPI was, indeed, aware of the purchase of the debt and subrogation by Air Comet and consented, as found by the Spanish audit court. In these circumstances, it appears that while the acquisition and subrogation may not have been in accordance with the SPA as originally contemplated, the parties subsequently agreed to a different handling of the USD 300 million contributed by SEPI. There is no indication that SEPI ever complained of this or that it sought to annul the SPA on this basis. In fact, SEPI's position before the Tribunal de Cuentas was that this was permitted by the SPA.*"[144]

126.   As to Argentina's complaint that the USD 248 million contributed by SEPI to carry out the Industrial Plan was not applied to that end, but mostly to operating costs,[145] the Claimants note that SEPI was aware of how the funds were being used, and that such funds were subject to auditing. The Tribunal also found that SEPI would only release each transfer after receiving from PriceWaterhouseCoopers ("**PwC**") a certification confirming that the previous transfer was spent in accordance with the SPA.[146]

---

[142] Award, ¶ 300.

[143] Annulment Counter-Memorial, ¶ 110, citing Award, ¶ 267. *See*, Decision on Jurisdiction, ¶¶ 324-28. Claimants' Opening, slide 111.

[144] Award, ¶ 289.

[145] Annulment Memorial, ¶. 126.

[146] Tr. Day 1, 198:20 -201:4.

### c.  The Committee's Analysis

127.    As said above, Argentina's argument is that, because of the alleged breach of the principle of good faith in the use of funds contributed by SEPI and of the non-compliance by Air Comet with the terms of the SPA, "*the investment invoked by Claimants could not benefit from the protection of the BIT and such conduct triggered the inadmissibility of the claim under international law*".[147] The argument, therefore, does not go to the jurisdiction of the Arbitral Tribunal. In fact, as correctly pointed out by the Claimants,[148] the alleged breaches of the SPA all occurred after the acquisition of the investment and could not form the basis for a jurisdictional argument.

128.    Argentina's argument is that the misuse of the SEPI funds by Air Comet amounted to a fraud which should have led the Tribunal to dismiss the claim on its merits as inadmissible, and that failing to do so was a manifest excess of powers.[149] Argentina also avers that the Tribunal failed to address its argument relating to the use of the USD 205 million aimed at covering the Airlines' liabilities, and that such omission is also a manifest excess of powers. The Committee will address each of these two arguments in turn.

129.    Concerning, first of all, the alleged breach of the principle of good faith, Argentina relies on the award in *Churchill Mining*[150] to submit that the existence of a fraud in the operation of an investment renders an international claim arising from that investment inadmissible. The Committee notes, in this regard, that from Argentina's own argument, the case in *Churchill Mining* was related to frauds and falsifications committed by the investor in the intent to obtain additional mining licenses. The Committee agrees, in this respect, that the fact for an investor to use the investment to commit a fraud to the detriment of the host State may be considered as depriving the investment from the protection granted to it by international law. In the Committee's view, however, not every breach of an obligation, whether or not contractual, is susceptible to be characterized as a fraud in international law. In order for a breach to constitute a fraud, it needs to be wilful, and to have been

---

[147] Annulment Reply, ¶ 120.

[148] Rejoinder, ¶¶ 80; 109.

[149] Annulment Memorial, ¶ 138.

[150] Annulment Memorial, ¶¶ 136-137.

orchestrated to obtain an undue advantage to the detriment of the host State. In the instant case, Argentina does not explain why the facts in dispute should be considered as such a breach of good faith in international law, why they affected the Airlines, and why they should lead to deprive the investors of the protection afforded to them by the BIT.

130.   The Tribunal has, in the Award, carefully analysed the grievances of Argentina with respect to the use of the SEPI funds.

131.   As to the use of the USD 300 million which, in accordance with the SPA, had to be used to pay off certain liabilities of the Airlines, Argentina complains that instead of paying off liabilities, Air Comet purchased the debts, subrogated itself in the rights of the creditors, to then transfer them to Interinvest which then turned them into capital contributions, thus increasing its stockholding and thereby lowering that of Argentina in ARSA.[151] The Tribunal found that Air Comet's use of the funds did not violate the SPA and was not in breach of any law.[152] That conclusion was not contradicted by its review of the Spanish criminal proceedings, which appear to be related to allegations of tax evasion to the prejudice of the Spanish treasury.[153] Concerning, in particular, the December 9, 2013 judgment of Criminal Court of Madrid, upon which Argentina relies,[154] The Tribunal found that such judgment had made "*no finding of fraud or harm, as it relates to the actual use of the funds Air Comet received from SEPI, to the airlines, its creditors, or otherwise*".[155]

132.   The Committee does not find any reason to question such findings. It is undisputed that, through the assignment of the relevant credits to Air Comet and their subsequent conversion into a capital contribution, the relevant liabilities of ARSA were indeed extinguished. There is no evidence that such conversion ran against the SPA or any other commitment or obligation of Air Comet, and even less that it amounts to a fraud to the

---

[151] Annulment Reply, ¶ 87.

[152] Award, ¶¶ 263-315.

[153] Annulment Counter-Memorial, ¶ 214.

[154] Annulment Reply, ¶ 92.

[155] Award, ¶ 320 n. 237.

prejudice of Argentina that could entail the inadmissibility of the claim for breach of the principle of good faith in international law.

133.   With respect to the allegation that the USD 248 million contributed by SEPI to carry out the industrial plan was not used to that end but to finance operating costs, Argentina provides no explanation as to why this would amount to a fraud to the prejudice of the Airlines.[156]   The Tribunal, in this respect, noted that SEPI was aware of the way the funds were used and had approved it.[157]

134.   As to the USD 50 million capital contribution, the Tribunal noted that "*neither Party indicate[*d] *that Air Comet was ever found to be in default of its obligations to make the USD 50 million investment, nor that SEPI took any steps under the SPA or otherwise in this regard*".[158] The Tribunal also noted that "*in its report N° 765, the Spanish Audit Court concluded that Air Comet had complied with its obligation to increase the capital of ARSA by USD 50 million (albeit somewhat late)*", and that "*The Tribunal de Cuentas determined that Air Comet paid in cash approximately 25% of the amount on February 19, 2003 and the balance by February 11, 2005*".[159] Argentina has not demonstrated, in addition, why the alleged failure to proceed to the capital contribution would amount, beyond being a breach of the SPA, to a fraud to the prejudice of the Airlines.

135.   The Committee now turns to Argentina's argument that the Tribunal failed to address its argument that the USD 205 million contributed by SEPI to cover the Airlines' debts were instead used to pay for operational expenses, and that such failure is a manifest excess of powers.

136.   As an initial matter, the Committee considers that while a failure to decide a claim may amount to a manifest excess of powers, the failure to address a factual or legal argument supporting a claim normally does not. As a matter of fact, a tribunal has the obligation to fulfil its mandate, which is to resolve the dispute brought before it by the parties by

---

[156] Annulment Reply, ¶ 102.
[157] Annulment Counter-Memorial, ¶ 216.
[158] Award, ¶ 304.
[159] Annulment Rejoinder, ¶ 77.

deciding on their respective claims. Failing to do so may therefore amount to a manifest excess of powers. To the contrary, the Tribunal has no obligation to address each and every single argument or sub-argument advanced by the parties in support of their claims.

137.   In the instant case, the alleged misuse of the USD 205 million is one of the arguments that Argentina has put forward before the Committee to sustain its claim that the Tribunal's decision with respect to the SEPI fund amounts to a manifest excess of powers. As such, even if the argument had not been addressed, there would be no manifest excess of powers.

138.   In any event, as rightly pointed out by the Claimants, the Tribunal did address the question and decided that these sums could be used to cover operational losses.[160] Argentina's argument was also rejected implicitly by the Tribunal's finding that SEPI was generally aware of the use of funds by Air Comet and did not object to it.[161] Finally, there is no explanation on the part of Argentina of the reason why the use of the USD 205 million to cover operational losses instead of debts would constitute a fraud to the detriment of the Airlines and a breach of the principle of good faith under international law.

139.   Based on the foregoing, the Committee holds that the Tribunal did not commit a manifest excess of powers in rejecting Argentina's arguments based on the alleged misuse of the SEPI funds.

### (5)   The July 2008 Agreement

#### a.   *Argentina's Position*

140.   Argentina submits that the only basis for the Tribunal's finding that Argentina breached the BIT was its alleged non-compliance with the July 2008 Agreement.[162] Such contract was concluded between Argentina and Interinvest in the context of the delicate financial

---

[160] Annulment Counter-Memorial, ¶ 220; Annulment Rejoinder, ¶ 77; Award, ¶ 377.

[161] Award, ¶ 300, fn 178.

[162] Annulment Memorial, ¶ 144.

situation of the Argentine Airlines,[163] and its purpose was to determine the price of the Airlines' shares, which were to be purchased by Argentina.[164]

141.   Article 6 of the July 2008 Agreement reads as follows:

"*ARTICLE 6: The prices for the purchase of the stock interests in AEROLÍNEAS and AUSTRAL shall be determined as follows:*

*(i) The purchase price for AUSTRAL's stock interest shall be determined based on the valuation provided by a valuation entity to be appointed therefor by IV and the valuation to be performed at the request of the STATE OF ARGENTINA*

*(ii) The purchase price for AEROLÍNEAS's stock interest shall be determined based on the valuation provided by a valuation entity to be appointed therefor by IV and the valuation to be performed at the request of the STATE OF ARGENTINA*

*The STATE OF ARGENTINA shall seek the abovementioned valuations from the Appraisal Board, which agency shall assess the value of the airlines as a whole. Should the valuations thus performed yield different results and/or if an agreement cannot be otherwise reached as to the price of the two stock interests, a third valuation shall be sought from an impartial local or foreign entity of international renown specialized in the purchase and sale and/or valuation of international airlines; the valuation thus obtained shall be final and definitive as between the Parties.*

*The valuation shall be performed using the discounted cash flow method. Such future cash flows shall be calculated using the following assumptions: (i) the cost of fuel at its current subsidized value of $1.85 (one Argentine peso and eighty-five cents) per liter plus VAT; said price is to be changed using reference prices and proportionately to price variations in the market; and (ii) the current fare for*

---

[163] *Ibid.*, ¶ 145.
[164] *Ibid.*, ¶ 146.

*domestic flights, modified proportionately to any changes projected for all other costs.*"[165]

142. The Tribunal noted that "*there had been no agreement on the transfer price for the shares in the Airlines*" and that Interinvest therefore "*request*[ed] *the selection of a third-party valuator, pursuant to the terms of the July 2008 Agreement.*"[166] Given the disagreements between Interinvest and the Argentine State, the third valuator was however not appointed. Thereafter, the Argentine Congress enacted a law declaring the shares of the Argentine Airlines of public interest and subject to expropriation.[167]

143. The Tribunal found that the Argentine Republic was liable for breaching the July 2008 Agreement by failing to comply with its obligation to purchase Interinvest's shares in the Argentine Airlines pursuant to the mechanism set forth under Article 6 of the July 2008 Agreement, and that such breach was a breach of the fair and equitable treatment standard established by the BIT[168] and an unjustified measure.[169] The Tribunal also concluded that the expropriation was unlawful, for Argentina failed to perform the procedure established in the July 2008 Agreement and the expropriation of the shares had therefore not been carried out in accordance with the Argentine law.[170]

144. Argentina first submits that the Tribunal had no jurisdiction to base its findings on the July 2008 Agreement, because (i) the Claimants are not party to that contract, and (ii) the breach of the July 2008 Agreement was a contractual breach that could not be elevated to the level of a treaty breach.[171]

145. Argentina further submits that "*the Tribunal manifestly exceeded its powers in completely failing to apply the guidelines it had identified as legal principles applicable to Claimants'*

---

[165] July 2008 Agreement, Article 6 (**RA-559**).
[166] Annulment Memorial, ¶ 148, citing the Award, ¶ 448.
[167] *Ibid.,* ¶ 148.
[168] Award, ¶ 857.
[169] *Ibid.,* ¶ 925.
[170] Annulment Memorial, ¶ 149.
[171] *Ibid.,* ¶ 174 and 264.

*compensation. The Tribunal arbitrarily decided to adopt the valuation submitted by one of the parties to the July 2008 Agreement—the Credit Suisse valuation submitted by Interinvest—*[172] *in direct contradiction to the guidelines the Tribunal itself had determined were applicable to the case, i.e. that the value of the shares of Interinvest in the Argentine Airlines was to be assessed in accordance with the valuation methodology set out in Article six of the July 2008 Agreement, by means of a valuation prepared by a third independent valuator specialised in the sector.*"[173]

### b.  The Claimants' Position

146.  The Claimants submit that the question of whether a breach of the July 2008 Agreement may *also* cause a violation of the FET standard is a question that pertains to the merits and not to jurisdiction.[174]

147.  The Claimants point out that the Tribunal's finding of a violation by Argentina of the FET standard was not only based on its breach of Article 6 of the July 2008 Agreement. It rather had a wider scope and included: "*Respondent's lack of transparency in agreeing to the July 2008 Agreement, passing Law 26,412 which resulted in the TTN applying a valuation methodology that was inconsistent with that agreed to in the July 2008 Agreement and its arbitrary decision to expropriate the investment rather than proceed to a third-party valuation as agreed.*"[175]

148.  The Claimants submit that other tribunals, such as the *Murphy II* tribunal, found that conduct giving rise to a breach of contract may also breach the FET standard.[176] The Claimants conclude that "*the Tribunal properly and clearly held that Argentina's conduct, including but not limited to its breach of Article 6 of the July 2008 Agreement, violated the FET standard. The Tribunal provided logical and sound reasons for its finding, and fully*

---

[172] Award, ¶ 1114.

[173] Annulment Reply, ¶ 143

[174] Annulment Counter-Memorial, ¶ 238

[175] *Ibid.,* ¶ 239; Award, ¶ 1010.

[176] Annulment Counter-Memorial, ¶ 240 (footnotes omitted).

*addressed Argentina's arguments in this respect. In addition, the Tribunal found Argentina liable under the Treaty on two additional grounds separate from the FET standard.*"[177]

### c.   The Committee's Analysis

149.   The Committee will first address Argentina's argument that the alleged breach of the July 2008 Agreement was a contract breach on which the Tribunal had no jurisdiction, to then deal with the argument that the Tribunal could not without exceeding its powers assess damages in disregard of the procedure established by that Agreement.

150.   Concerning, first of all, the argument that the breach of the July 2008 Agreement was a contract breach falling outside the scope of the Tribunal's jurisdiction, the Committee will as an initial matter note that the Tribunal rejected the arguments made by the Claimants, based on the BIT's MFN clause, to the effect that they would be entitled to rely on an umbrella clause.[178] That is undisputed. The Committee however finds the discussion on this point[179] to be irrelevant to the question whether the Tribunal could without exceeding its powers find that in breaching the July 2008 Agreement, Argentine also breached the BIT.

151.   The fact that the Claimants could not rely on an umbrella clause may have been relevant to the question whether a breach of a contractual obligation entered into between the parties could be elevated to the level of a treaty breach. In the case at hand, however, the findings of the Tribunal were based on breaches by Argentina of its treaty obligations, rather than on its contractual conduct. In finding that the refusal by Argentina to comply with Article 6 of the July 2008 Agreement was a breach of the FET standard, the Tribunal noted that Argentina had acted, in so doing, in its capacity as sovereign, and not merely as a contracting party. The Tribunal first noted that "*Argentina's purpose for entering into the July 2008 Agreement was to fulfil its obligation to guarantee the provision and continuity*

---

[177] *Ibid.,* ¶ 244.
[178] Award, ¶ 892.
[179] Annulment Memorial, ¶ 177; Annulment Rejoinder, ¶ 136.

*of air transportation services in Argentina*".[180] The Tribunal concluded that "*the July 2008 Agreement was not simply a commercial agreement*".[181]

152.     The July 2008 Agreement was part of the legal framework established by Argentina for the operation of the investment and the possible sale of the Airlines by Interinvest.[182] As such, a breach by Argentina of that contract could also be a breach of Argentina's treaty obligations, irrespective of the existence of an umbrella clause. And this is precisely the conclusion that the Tribunal reached by finding, with respect to the measures following the July 2008 Agreement, that "*Respondent's lack of transparency in agreeing to the July 2008 Agreement, passing Law 26,412 which resulted in the TTN applying a valuation methodology that was inconsistent with that agreed to in the July 2008 Agreement and its arbitrary decision to expropriate the investment rather than to proceed to a third-party valuation as agreed, have all been found to be a breach of the FET obligations*".[183]

153.     The Tribunal has therefore not elevated mere contract breaches to the international plane. It has rather found that the facts in dispute, irrespective of whether they were also contract breaches, were inconsistent with the state's international obligations. The Tribunal, to that effect, has considered that the July 2008 Agreement was part of the legal framework applicable to the investment,[184] and that the Claimants had a legitimate expectation that Argentina would act consistently with that legal framework.[185] In so doing, the Tribunal did not exceed its powers. As a matter of fact, a tribunal may without exceeding its powers hold that a breach by a state of its obligations under a contract is also a breach of its international obligations under a treaty. In so doing, a tribunal does not ignore the distinction between contract claims and treaty claims.

---

[180] Award, ¶ 854.

[181] *Ibid.*

[182] Award, ¶¶ 435, 778. *Acta Acuerdo* (Agreement) between the Argentine State and Interinvest dated July 21, 2008 ("***July 2008 Agreement***"), Article 3. (**C-190**).

[183] Award, ¶ 1010.

[184] Award, ¶¶ 782, 850.

[185] Award, ¶¶ 850-851, 854.

154.   The foregoing also disposes of Argentina's argument that the Tribunal could not base its findings on the July 2008 Agreement because the Claimants were not parties to that contract and had no right to invoke that contract.[186] Although the Claimants were not part to the July 2008 Agreement, the Tribunal found that they had a legitimate expectation that it would be complied with as part of the general legal framework applicable to the investment.[187] Having found that its obligations under the July 2008 Agreement were assumed to fulfil its public obligation to guarantee the provision and continuity of air transportation services in Argentina, and that the Claimants had a legitimate expectation that the July 2008 Agreement would be complied with, the Tribunal could conclude without exceeding its powers that Argentina's refusal to comply with the procedure established by Article 6 of said contract was also a breach of its international obligations.

155.   The Committee will now address Argentina's argument that the Tribunal manifestly exceeded its powers by adopting the Credit Suisse valuation as a basis to assess damages. The Tribunal, in this regard, held that "[T]*he Tribunal considers the Credit Suisse valuation to be the most reliable expression of the value of the Airlines as agreed by the Parties under the July 2008 Agreement and the best evidence of the fair market value of the Airlines in late 2008.*"[188]

156.   According to Argentina, in so doing, the Tribunal disregarded the July 2008 Agreement, upon which it has relied to find Argentina liable for breach of its FET obligations. Because Article 6 of the July 2008 Agreement provided that the price would be established, in case of a disagreement on the valuations submitted by the parties, on the basis on an independent valuation, the Tribunal should have appointed an independent expert to proceed to the valuation.[189] Argentina therefore submits that, in modifying the agreed valuation method, the Tribunal failed to apply the international law principle according to which the damages

---

[186] Annulment Memorial, ¶ 186 seq.

[187] Award, ¶¶ 850-851, 854. Annulment Counter-Memorial, ¶ 87.

[188] Annulment Memorial, ¶ 161, citing the Award, ¶ 1112.

[189] Annulment Memorial, ¶ 152.

should replace the parties in the situation in which they would have found themselves in absence of breach, and that by doing so it manifestly exceeded its powers.[190]

157.   The argument, however, erroneously assumes that the proper remedy should have been the specific performance of the price fixing mechanism provided by Article 6 of the July 2008 Agreement. However, the Tribunal has rejected the Claimants' argument that specific performance should be ordered, and the Claimants reinstated in their investment.[191] That part of the decision is not challenged by either party. As a consequence, the Tribunal had to assess reparation by equivalent, i.e. by fixing damages corresponding to the fair market value of the shares.

158.   The question then becomes a question of the assessment by the Tribunal of the evidence before it, which an annulment committee cannot revisit on the merits. The Tribunal, in this respect, relied on the Credit Suisse valuation not as part of the mechanism established by Article 6, but as reliable evidence of the fair market value of the shares at the time. The Tribunal, in so doing, also relied on three other contemporaneous valuations by PriceWaterHouseCoopers, Deloitte and Morgan Stanley, as well as on Compass Lexecon's adjusted valuation.[192] It held that the fact that Claimants' experts adjusted their model to provide a proxy for the value of AUSA in 2008 assuming no breaches of the Treaty provided a check on the reasonableness of the Credit Suisse valuation.[193] The Tribunal then concluded that the Credit Suisse provided the most reliable valuation and was therefore an acceptable evidence of the fair market value of the shares at the time of the taking.

159.   Although a more detailed analysis of the Credit Suisse valuation could perhaps have been provided in the Award, it is not up to the Committee to assess whether that decision was correct and whether the Credit Suisse overvalued the shares. What matters is only whether in the assessment of damages the Tribunal manifestly exceeded its powers by relying on the Credit Suisse report. It did not.

---

[190] Annulment Memorial, ¶ 159 seq.

[191] Award, ¶ 1098.

[192] Award, ¶¶ 1107, 1113.

[193] Award ¶ 1113.

160. Based on the foregoing, the Committee concludes that the Tribunal did not exceed its powers in its assessment of damages.

## B.   SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

### (1)   Legal Standard

#### a.  Argentina's Position

161. Argentina submits that this ground is concerned with principles of natural justice, and with the integrity and fairness of the arbitral process.[194] Argentina gives some examples of fundamental rules of procedure under Article 52(1)(d) of the ICSID Convention: "*due process, the right of defence, the right of both parties to be heard and to submit their claim or defence by presenting any arguments and evidence in support of their position, the right of each party to properly respond to the arguments and evidence presented by the other party, equality between the parties, deliberation among the members of the tribunal, independence and impartiality of the members of the tribunal, the treatment of evidence, the burden of proof, and the rules on legal standing, among others*."[195]

162. With regard to the seriousness of the departure that is required to entail annulment, Argentina, relying on the *Pey Casado* and *TECO*'s annulment committees' decisions, contends that "*the party applying for annulment must simply demonstrate the impact that the situation could have had on the award, that is to say, that observance of the rule departed from had the potential of causing the tribunal to render a substantially different award from the one it actually rendered*."[196]

#### b.  The Claimants' Position

163. The Claimants submit that this ground of annulment is concerned with the integrity and fairness of the arbitral process.[197] The Claimants contend that the threshold for a procedural violation to constitute a ground of annulment under Article 52(1)(d) of the ICSID

---

[194] Annulment Memorial, ¶ 46, citing ICSID's Updated Background Paper on Annulment, ¶ 98 (**AL RA 421**).

[195] Annulment Memorial, ¶ 48.

[196] *Ibid*., ¶¶ 49- 51.

[197] Counter-Memorial, ¶¶ 117-121.

Convention is very high, and rely on Professor Schreuer's view that: "*Even a serious violation of a rule of procedure would not constitute a ground for annulment if the particular rule was not fundamental. Conversely, the violation of even a fundamental rule could not lead to annulment if the violation was not serious. All of this makes clear that proof of a procedural impropriety in the proceedings before the tribunal will not be enough. In particular, a simple violation of the Arbitration rules is not, by itself, a ground for annulment.*"[198]

### c.   The Committee's Analysis

164.   The Committee holds that this ground of annulment applies to protect the integrity and fairness of the proceedings, in particular the fundamental principles of due process, such as the right to be heard, the principle of equal treatment of the parties, and the independence and impartiality of the arbitral tribunal. To the contrary, the ground of serious departure from a fundamental rule of procedure does not allow a party to seek a review of the substance of the award, which would convert an *ad hoc* committee into an appellate body. Only serious matters of procedure can be argued under Article 52(1)(d) of the ICSID Convention.

### (2)   Exercise of Jurisdiction

### a.   Argentina's Position

165.   Argentina submits that the Tribunal seriously departed from a fundamental rule of procedure by (i) exercising jurisdiction in this proceeding despite the fact that the Claimants did not discharge their burden of proof to show their capacity as investors under the Treaty or their investment in Argentina under the terms of the BIT; (ii) allowing counsel deprived of powers to appear before it; and (iii) allowing Burford, which is not an investor under the BIT, to be the principal beneficiary, together with King & Spalding, of the proceeds of the Award,[199] which in Argentina's view was an evident abuse of process.[200]

---

[198] Counter-Memorial, ¶ 117, citing *Schreuer*, (**C-1233**).
[199] Annulment Memorial, ¶ 194; Annulment Reply, ¶ 166. Argentina's Opening, slide 27.
[200] Annulment Reply, ¶ 169. Argentina's Opening, slide 19.

166.    Regarding the first of the above submissions, Argentina asserts (i) that one of the fundamental rules of procedure identified by *ad hoc* committees is "*the treatment of evidence and burden of proof*";[201] (ii) that the Claimants failed to discharge their burden of proof to show their capacity as investors under the Treaty or that their investment in Argentina was protected under the terms of the Treaty;[202] and (iii) that this was also noted by Arbitrator Hossain in his dissenting opinion.[203]

167.    Argentina also asserts that the Funding Agreement in this case was based on champerty, which consists in providing funding for an action in return for a share of the proceeds if the action is successful,[204] which may be characterised as an abuse of process,[205] affects the validity of a funding agreement, thereby rendering it unenforceable, and is contrary to international law and the object of the ICSID Convention.[206]

168.    Argentina, relying on *Phoenix v. Czech Republic,* submits that arbitral tribunals have the duty not to protect an abuse of the system of international investment protection under the ICSID Convention or bilateral investment treaties.[207]

169.    Argentina contends that Burford imposed King & Spalding in the arbitration, which also constitutes an abuse of process.[208]

170.    Argentina finally submits that the Funding Agreement releases the Funder from the payment of any sums or costs awarded against the Claimants,[209] which undermines the purity of justice or corrupts justice and must therefore be declared to be contrary to public policy.[210]

---

[201] Annulment Memorial, ¶ 195, citing ICSID's Updated Background Paper on Annulment, ¶ 99 (**AL RA 421**).

[202] Annulment Memorial, ¶¶ 194, 197-203; Argentina's Opening, slides 20-22.

[203] Annulment Memorial, ¶ 201; Dissenting Opinion of Kamal Hossain attached to the Award, ¶ 15.

[204] Annulment Memorial, ¶ 206.

[205] Annulment Reply, ¶ 170; Argentina's Opening, slides 34-35.

[206] Annulment Memorial, ¶ 207.

[207] Argentina's Opening, slide 30.

[208] Annulment Memorial, ¶ 214; Argentina's Opening, slides 35-36.

[209] Annulment Memorial, ¶ 217; see also, Funding Agreement, clause 2.4 (**RA 160**); Argentina's Opening, slide 34.

[210] Annulment Memorial, ¶ 218.

### b. The Claimants' Position

171.   The Claimants refute Argentina's submission that the Tribunal seriously departed from a fundamental rule of procedure when affirming jurisdiction over the underlying dispute.

172.   Regarding Argentina's argument that the Tribunal violated Argentina's due process rights when it rejected its objection concerning the absence of a protected investment, the Claimants submit that this argument does not involve any question of "due process" because Argentina's submissions were thoroughly addressed by the Tribunal in its Decision on Jurisdiction.[211]

173.   As to Argentina's submission that the Tribunal seriously departed from a fundamental rule of procedure by failing to refrain from benefiting Burford under the Funding Agreement, the Claimants contend that the Tribunal did not take and did not have to take any position on the validity of the Funding Agreement.[212]

### c. The Committee's Analysis

174.   The Committee will first address Argentina's argument that the Tribunal's jurisdictional findings were a serious departure from the rules applicable to the burden of proof. The Committee will then deal with Argentina's arguments regarding the lack of powers of King & Spalding, and with the Funding Agreement and the role of Burford.

175.   Concerning the argument relating to the burden of proof, the Committee considers, first of all, that an annulment committee has no powers to revisit the assessment of evidence made by the tribunal. Pursuant to Arbitration Rule 34(1), the tribunal is the judge of the admissibility as well as of the probative value of the evidence, and it is not up to an annulment committee to second-guess its findings in this regard. As rightly held by the *ad hoc* Committee in *CDC v. Seychelles*, an error in the tribunal's appreciation of the evidence does not in itself constitute a ground for annulment.[213]

---

[211] Annulment Counter-Memorial, ¶¶ 198-202.
[212] Annulment Counter-Memorial, ¶¶ 203-204.
[213] *CDC,* ¶¶ 59-61. See also *Schreuer*, ¶¶ 52, 330-331.

176.    Argentina sustains that the Claimants did not discharge their burden of proving their quality of investors and the existence of an investment under the BIT. As an initial matter, Argentina does not explain which fundamental rule of procedure would have been breached by the Tribunal in assessing the Claimants' arguments in this regard. There does not seem to have been any substantial difference between the Parties as to the facts that were relevant to the assessment of the Tribunal's jurisdiction. The factual matrix was essentially agreed. The matters in dispute were therefore of a legal nature, and essentially bore on the interpretation of Article 1 of the BIT (and whether indirect ownership of the shares deprived the Claimants to claim the existence of an investment), on the objective criteria for the existence of an investment, and on the arguments relating to the lack of powers of King & Spalding and the existence of funding on the part of Burford. On each of these matters, the Claimants put forward their arguments, with the support of legal evidence. The Tribunal found these arguments to be convincing. There was therefore no reversal of the burden of proof. Argentina considers that the Tribunal erred in its assessment of the legal questions involved by its jurisdictional objections. However, it is not up to an annulment committee to review the tribunal's assessment of the evidence.

177.    Based on the foregoing, the Committee finds that there was no serious departure from a fundamental rule of procedure in the Tribunal's jurisdictional findings.

### (3)    Lack of Capacity of the Claimants' Counsel

#### a.    *Argentina's Position*

178.    Argentina contends that "*in considering that King & Spalding's attorneys had capacity of representation for the arbitration proceeding, following the suspension of the Claimant companies' management and disposition powers and their replacement by the respective trustees in insolvency, the majority of the Tribunal acted in breach of basic standing and representation principles. This amounts to a serious departure from a fundamental rule of procedure within the meaning of Article 52(1)(d) of the ICSID Convention.*"[214]

---

[214] Annulment Reply, ¶ 177. *See also*, Annulment Memorial, ¶¶ 220-227 and Reply, ¶¶ 177-182.

53

### b.  The Claimants' Position

179.    The Claimants submit that the argument is no more than an attempt to review the Tribunal's findings on the matters in dispute, which is not within the powers of an annulment committee.[215] In addition, Argentina has not established whether the principles of representation relied upon by Argentina are a fundamental rule of procedure under Article 52(1)(d), or that the alleged departure was a serious one.[216]

### c.  The Committee's Analysis

180.    Argentina avers that the Tribunal's decision that King & Spalding had valid powers of attorney to represent the Claimants is a serious departure from a fundamental rule of procedure.[217] The Committee of course accepts that false representation may be a breach of a fundamental rule of procedure. Allowing a person that is deprived of powers to purportedly represent a party may be a procedural breach entailing the annulment of the award. To the contrary, a mere procedural irregularity in the release of a power of attorney should not, under Article 52(1)(d), result in the annulment of the award.

181.    In the case at hand, Argentina's complaints are formal in nature. The will of the insolvency administrators to be represented by King & Spalding in the arbitration has clearly been confirmed in the 2013 letters. The Committee has no reason to doubt that these letters are authentic and that they express the genuine intention of their authors. The insolvency administrators were aware of the arbitration and of the fact that King & Spalding was representing them, and they did not object to that situation or appoint another counsel; to the contrary, they even appeared to several hearings in the arbitration in the presence of the King & Spalding team. There is therefore no doubt, in the eyes of the Committee, that the insolvency administrators intended to be represented by King & Spalding in the arbitration.

182.    The alleged irregularities, in reality, lie in the fact that King & Spalding should, according to Argentina, have obtained fresh powers of attorney from the insolvency administrators after the dissolution of each of the claimant parties, and that the 2013 letters did purportedly

---

[215] Annulment Rejoinder, ¶ 69.

[216] *Ibid.*, ¶ 71.

[217] Annulment Memorial, ¶ 220 seq.

not comply with requirements of form established by Spanish law. In the Committee's view, in absence of any evidence that the insolvency administrators did not intend to be represented in the arbitration by King & Spalding, a failure to comply with purported requirements of form established by Spanish law does not establish a departure from a fundamental rule of procedure.

**(4)    Funding Agreement and role of Burford**

### a.   *Argentina's Position*

183.    Argentina first submits that the Funding Agreement amounts to a substitution of Burford as the real party in the arbitration, and that agreements based on principles of *champerty* and *maintenance* are an abuse of process that is contrary to public policy,[218] as well as to international law and the ICSID Convention.[219] According to Argentina, the Tribunal failed to verify that the Funding Agreement complied with good practices applicable to third-party funding, so as to avoid any situation of conflicts of interest and the improper exercise of an undue control on the arbitration.[220] As a consequence, the Tribunal's decision to take jurisdiction in spite of the illegal Funding Agreement was a serious departure from a fundamental rule of procedure.[221]

### b.   *The Claimants' Position*

184.    The Claimants object that the Tribunal did not have to take any position on the validity of the Funding Agreement, which is irrelevant to the resolution of the dispute between the Claimants and Argentina.[222] The Claimants also submit that Argentina failed to identify the fundamental rule of procedure at issue[223] and that there is no evidence that Burford exercised any control on the arbitration.[224]

---

[218] Annulment Memorial, ¶ 217.
[219] Annulment Memorial, ¶¶ 205-208.
[220] Annulment Memorial, ¶¶ 209-217.
[221] Annulment Memorial, ¶ 219.
[222] Annulment Rejoinder, ¶ 46.
[223] *Ibid.,* ¶ 48.
[224] *Ibid.,* ¶ 49.

### c. *The Committee's Analysis*

185. The thrust of Argentina's argument is that the Funding Agreement is illegal, first because it implied a transfer to Burford of the Claimants' interest in the arbitration,[225] and second because it allowed Burford to exercise control over the arbitration in disregard of recognized good practices aimed at avoiding conflicts of interest.[226]

186. As an initial matter, the Committee considers that the fact that the Funding Agreement may be contrary to public policy[227] or to international law and to the object and purposes of the ICSID Convention[228] would not necessarily be in itself sufficient to entail annulment under Article 52(1)(d) of the ICSID Convention. In order for the Committee to annul the Award on that ground, Argentina needs to identify a serious departure from a fundamental rule of procedure in the arbitration proceedings. The simple fact that the Funding Agreement may be illegal or contrary to public policy does not necessarily imply a serious departure from a fundamental rule of procedure.

187. The Committee also finds that Argentina has not demonstrated that the prohibition of *maintenance* and *champerty* applies in the context of a treaty-based ICSID arbitration. Nor has Argentina demonstrated that the best practices for third-party funding, such as those identified by Prof Catherine Kessedjian[229] or the Code of Conduct of litigation funders,[230] are a fundamental rule of procedure that should mandatorily be complied with in an ICSID arbitration. The Committee accepts that disregard on the part of the funded party and the funder of recognized good practices may in certain egregious cases be relevant to the assessment of whether a fundamental rule of procedure applying to the arbitration was breached. However, the applicant still has the onus of identifying the rule of procedure

---

[225] Annulment Memorial, ¶¶ 205 and 209.

[226] *Ibid.,* ¶¶ 211-217.

[227] *Ibid.,* ¶ 218.

[228] *Ibid.,* ¶ 207.

[229] *Ibid.,* ¶ 211.

[230] *Ibid.,* ¶¶ 212-215.

applying to the arbitration that has so been breached. Argentina did not identify any such breach in this case.

188.   As to the allegation that the Funding Agreement entailed a transfer of the rights in dispute in the arbitration,[231] so that Burford would have become the real claimant party,[232] the Committee considers that it is a fundamental rule of procedure that a party may not appear on behalf of another without disclosing the representation and being empowered to that effect. As a matter of fact, a party is entitled to know against whom it is litigating.

189.   In the instant case, however, the Committee already found that the Funding Agreement did not operate a transfer to Burford of the rights in dispute in the arbitration.[233] Article 3.1 of the Funding Agreement states that its purpose is to "*enable the Claimant to pursue its Claim*", thus confirming the Claimants' ownership of the claim. Article 3.2 further states that "*the Claimant may at any time without the consent of the Funder settle the claim for any amount or on any basis*". Also, Article 6 of the Funding Agreement confirms that the Claimants will receive the proceeds of the Award ("*the Claimant agrees to pay to the Funder the Recovery Amount immediately following receipt of all or any part of the Award*"), which confirms that the Claimants continued to own the claims in dispute at all times during the arbitration. In sum, there is nothing in the Funding Agreement suggesting that the rights in dispute would have been transferred to the Funder. The fact that the Claimants agreed to pay to Burford the Recovery Amount (as defined in Schedule 2 to the Funding Agreement), i.e. a portion of the proceeds of the Award, does not mean that Burford had acquired ownership of the rights in dispute, and even less that it had become the real party to the arbitration. In conclusion, the Funding Agreement has not deprived the Claimants of their standing to pursue their claims.

---

[231] *Ibid.,* ¶ 209.
[232] *Ibid.,* ¶ 205.
[233] *See* ¶ 92 *Supra*.

190.    Argentina contends, in this regard, that the Funding Agreement improperly imposed the presence as counsel of King & Spalding, which would amount to exercising control over the dispute.[234]

191.    Article 5.1 of the Funding Agreement provides, in this regard, that "*the Claimant, (having taken or had* (sic) *the opportunity to take legal advice for itself in relation to this agreement* [...] *and all other arrangements between itself), the Funder and the Nominated Lawyers, shall promptly appoint the Nominated Lawyers to prepare the Claim, submit the Claim to the Arbitration, prosecute the arbitration proceedings and enforce and recover any resulting Award favourable to the Claimant*". The Nominated Lawyers are King & Spalding.

192.    As an initial matter, it is to be noted that the presence of King & Spalding as the Claimants' counsel in the case predates the Funding Agreement. There can therefore be no doubt that King & Spalding was selected by the Claimants, and not by Burford. The Committee, in addition, fails to see why the inclusion in a funding agreement of provisions identifying the counsel in charge of representing the funded party, and providing that there shall be no non-agreed change in representation,[235] would amount to an abusive control of the funder on the case. As a matter of fact, it seems entirely reasonable that funding be released in consideration of an agreement between the funder and the funded party on the identity of counsel in charge of the case. Also, the fact that the funded party assumes the obligation to instruct the agreed counsel does not mean that such counsel would cease to represent that funded party, or that that the funder would in any way take control over the case. In any event, Argentina failed to identify the fundamental rule of procedure that these provisions of the Funding Agreement would offend.

193.    Argentina further contends that the Funding Agreement resulted into an undue interference[236] in the arbitration by Burford. Argentina relies,[237] in this regard, on the fact

---

[234] Annulment Memorial, ¶ 274.
[235] Funding Agreement, Art. 6.3.
[236] Annulment Memorial, ¶ 216.
[237] Annulment Memorial, ¶ 215.

that the Funding Agreement provides for the Claimants' obligation to accept a settlement agreement at certain conditions,[238] that the Funding Agreement establishes a duty of cooperation,[239] on the existence of limitations to the Claimants' right to initiate other legal proceedings,[240] and on the fact that Burford had a right of access to information relating to the case.[241]

194.   Argentina, again, does not identify the fundamental rule of procedure that these provisions of the Funding Agreement would breach. As said above, the Code of Conduct of the Litigation Funders Association is not a fundamental rule of procedure in an ICSID proceeding. Nor are the opinion of Prof. Catherine Kessedjian on funding good practices or the ruling of the Paris Bar referred to by Argentina.[242] In addition, Argentina does not show that any of the provisions of the Funding Agreement it criticizes could amount in any way to an improper interference by Burford in the arbitration. Art. 3.2 essentially provides for an agreement between the Funder and the Claimants that any settlement agreement for an amount at least equal to USD 250 million shall be accepted with no need of a further agreement on the part of the Claimants. This is no more than an agreement between the parties to the Funding Agreement on what a reasonable settlement amount would be. The Committee does not find in Argentina's case any demonstration that such an agreement deprives the Claimants of their control over the case. Likewise, the provisions relating to the Claimants' duty of cooperation[243] essentially aim at ensuring that the Claimants will provide King & Spalding with the necessary support and information for the claim to succeed. If anything, these provisions demonstrate that King & Spalding was at all times being instructed by the Claimants, not by Burford. The fact that the Claimants undertook not to initiate other legal proceedings that could prejudice the arbitration also seems to be entirely reasonable. Finally, the Committee fails to understand why the Funder's right to

---

[238] Funding Agreement, Art. 3.2 *in fine*.

[239] *Ibid.,* Art. 4.1.

[240] *Ibid.,* Art. 4.3.

[241] *Ibid.,* Art. 12.1.

[242] Annulment Memorial, ¶ 216.

[243] Funding Agreement, Art. 4.1 and 4.2.

receive information relating to the case would amount into an impermissible interference in the conduct of the Claimants' defence by King & Spalding.

195.    Finally, Argentina has referred to the possibility that the Funding Agreement would result in conflicts of interest between King & Spalding and the Funder.[244] Argentina, however did not specify to what conflicts of interests it referred to, and why they should be relevant to the decision of the Committee. There is indeed no demonstration whatsoever by Argentina of any conflict of interest arising from the Funding Agreement, involving either the Claimants, King & Spalding or any member of the Tribunal.

196.    In sum, Argentina has not identified any fundamental rule of procedure that would be inconsistent with the Funding Agreement. It has also not provided any demonstration of the reason why the Funding Agreement amounted to an improper or abusive control on the case by Burford. Based on the foregoing, the Committee concludes that the Tribunal did not depart from any fundamental rule of procedure with respect of the Funding Agreement and the role of Burford.

### (5)    Misappropriation of Funds Received from SEPI

#### a.    *Argentina's Position*

197.    Argentina submits that the Tribunal seriously departed from a fundamental rule of procedure by granting protection to the investment in spite of the improper use by Air Comet of funds received from SEPI.[245] Argentina, in this respect, makes two arguments. First, the Tribunal reversed the burden of proof regarding the capital increase of USD 50 million by imposing on Argentina the burden of proving the Claimants' investment.[246] Second, the Tribunal failed to deal with its argument relating to the misuse of USD 205 million received from SEPI for the payment of debts of the Airlines.[247]

---

[244] Annulment Memorial, ¶¶ 212-213; Argentina's Opening, slide 35.

[245] Annulment Memorial, ¶¶ 228-237; Annulment Reply, ¶¶ 183-191.

[246] Annulment Memorial, ¶¶ 229, 232; Argentina's Opening, slides, 104-106.

[247] Annulment Memorial, ¶ 236.

### b. The Claimants' Position

198. The Claimants point out that the Tribunal explained in its Decision on Jurisdiction and in the Award that Air Comet's alleged breaches could not affect jurisdiction because they would have occurred subsequent to the Claimants' acquisition of the investment.[248] The Claimants also aver that the Tribunal dealt in the Award with all the issues relating to the use of funds provided by SEPI, and did not reverse the burden of proof concerning the USD 50 million capital contribution.[249]

### c. The Committee's Analysis

199. In the Committee's views, the arguments raised by Argentina concerning the misappropriation of the SEPI funds do not establish a ground for annulment for breach of a fundamental rule of procedure. Argentina's argument rather goes to the assessment of the evidence. An annulment committee has no powers to revisit the assessment of evidence made by the tribunal. Pursuant to Arbitration Rule 34(1), the tribunal is the judge of the admissibility as well as of the probative value of the evidence, and it is not up to an annulment committee to second-guess its findings in this regard. As a consequence, as said above,[250] an error in the assessment of the evidence is no ground for annulment under Article 52.

200. Argentina first claims that the Tribunal reversed the burden of proof with respect to the USD 50 million capital contribution. In *Klöckner II*, the *ad hoc* Committee found that the burden of evidence is a procedural rather than a substantive issue, and that a reversal of the burden of proof may therefore amount to a departure from a fundamental rule of procedure.[251] In such a case, however, the departure must also be serious, meaning that it needs to have seriously affected the other party's right to present its case. At any rate, the

---

[248] Annulment Counter-Memorial, ¶ 210. See also, Award, ¶ 267; and Decision on Jurisdiction, ¶¶ 324-328.

[249] Annulment Rejoinder, ¶¶ 107-108.

[250] *See* ¶ 174 s*upra.*

[251] *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais*, ICSID Case No. ARB/81/2 ("***Klöckner II***"), Decision on Annulment, May 17, 1990, ¶ 6.80, unpublished and quoted in *Schreuer*, 52.327.

Committee does not need to opine on whether, as a general matter, a reversal of the burden of proof may entail annulment, for in this case it is clear that there was no such reversal.

201.    Argentina refers to paragraphs 303 and 305 of the Award to submit that there was a reversal of the burden of proof with respect to this matter.[252] At paragraph 303 of the Award (and footnote 202), however, the Tribunal makes clear reference to the arguments and evidence put forward by the Claimants to submit that contributions were made. Based on that evidence, the Tribunal found that "*Respondent has failed to demonstrate the alleged breach of the SPA and that Claimants made additional capital contributions to the Airlines after their initial investment*".[253] The Tribunal, as a consequence, reached its conclusion on the basis on arguments and evidence put forward by the Claimants. There was no reversal of the burden of proof.

202.    Argentina also makes the argument that the Tribunal failed to address its arguments relating to the misuse of USD 205 million provided by SEPI to Air Comet. The Committee has however already decided that a tribunal has no obligation to address each and every single argument advanced by the parties in support of their claims, and that a failure to address the alleged misuse of the USD 205 million would not amount to a manifest excess of powers.[254] For the same reasons, the same argument cannot serve as a basis for annulment for serious departure from a fundamental rule of procedure. The Committee has also found[255] that, in any event, the Tribunal did address the question and decided, explicitly and implicitly, that these sums could validly have been used to cover operational losses.[256]

203.    Based on the foregoing, the Committee decides that the Tribunal did not depart from a fundamental rule of procedure in its findings relating to the SEPI funds.

---

[252] Annulment Memorial, ¶ 232.

[253] Award, ¶ 305.

[254] *See* ¶¶ 135, 137 *supra*.

[255] *See* ¶¶ 138-139 *supra*.

[256] Award, ¶ 377.

**C.     FAILURE TO STATE THE REASONS ON WHICH THE AWARD IS BASED**

204.   Argentina alleges (i) that the Tribunal failed to provide reasons with respect to its findings as to the existence of an investment,[257] (ii) that the Tribunal's reasoning is contradictory with respect to the question of the validity of the powers of attorney,[258] as well as (iii) with respect to the SEPI funds,[259] and that (iv) it failed to express reasons regarding the international law principles on good faith.[260] Argentina also relies on Article 52(1)(e) concerning the alleged failure to provide reasons on the use of the USD 205 million received from SEPI.[261] Argentina then submits that the Tribunal failed to express reasons or expressed contradictory reasons with regard to the July 2008 Agreement,[262] as well as to its assessment of damages.[263]

**(1)     Legal Standard**

   **a.   Argentina's Position**

205.   Argentina avers that the requirement that tribunals state the reasons for their decisions is an essential aspect of the ICSID arbitration.[264] In this regard, Argentina cites the *Tidewater* annulment committee, according to which "… [t]*he legitimacy of an arbitral decision to invalidate a sovereign act would be severely undermined if the tribunal did not have to explain why the act contradicts the law*."[265]

206.   Argentina submits that annulment committees have considered as a ground for annulment under Article 52(1)(e), amongst others: a total absence of reasons, incoherent reasons or reasons that do not allow to understand the solution, frivolous, contradictory, insufficient

---

[257] Annulment Memorial, ¶¶ 241, 242.

[258] *Ibid.,* ¶ 255.

[259] *Ibid.,* ¶¶ 262, 264.

[260] *Ibid.,* ¶ 268.

[261] *Ibid.,* ¶ 271.

[262] *Ibid.,* ¶ 279.

[263] *Ibid.,* ¶¶ 295-296; 308.

[264] Annulment Memorial, ¶ 52.

[265] Annulment Memorial, ¶ 53, citing *Tidewater,* Decision on Annulment, ¶ 165 (**AL RA 419**).

or inadequate reasons, the failure to deal with a question that may affect the final decision of that tribunal and even the failure to address certain relevant evidence.

207.    Finally, Argentina contends that in the presence of a failure to state reasons, an annulment committee cannot imagine or make up what could have been the tribunal's reasons, and should therefore annul the award.[266]

### b.   The Claimants' Position

208.    The Claimants submit that, as held by many annulment committees and emphasized by commentators, the requirement to state reasons is intended to enable readers to understand and follow the reasoning of the tribunal.[267] Failure to state reasons therefore requires "*a finding that the tribunal failed to provide any reasons at all or, at a minimum, provided reasons so extremely flawed that a good-faith reader cannot follow the reasoning in the award through its conclusion.*"[268] Finally, tribunals have no duty to discuss each and every question raised by the parties and must be allowed a degree of discretion regarding how they express their reasoning.[269]

### c.   The Committee's Analysis

209.    The Committee considers, consistently with many committees having addressed arguments based on Article 52(1)(e),[270] that Article 52(1)(e) expresses the minimum requirement that a good faith reader of the award can understand the motives that led the Tribunal to adopt its decisions. In assessing whether that is the case, the award must be considered in its entirety. The mere fact that reasons are unclear or imperfectly expressed is therefore insufficient to annul an award. Likewise, contradictory reasons may only entail annulment

---

[266] Annulment Memorial, ¶¶ 60-61.

[267] Annulment Counter-Memorial, ¶¶ 122-123.

[268] Annulment Counter-Memorial, ¶ 125.

[269] Annulment Counter-Memorial, ¶¶ 129-130.

[270] *See, e.g., MINE,* ¶ 5.08-5.09, (**AL RA 418**); *Vivendi I,* ¶ 64, (**C-403**); *Wena,* Decision on Annulment, ¶¶ 79-81, (**C-621**); *CDC* ¶¶ 70-75, (**AL RA 420 *bis***); *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25 ("***Fraport***"), Decision on Annulment, December 23, 2010 ¶ 277, (**AL RA 145**); *Sociedad Anónima Eduardo Vieira v. Republic of Chile*, ICSID Case No. ARB/04/7, Decision on Annulment, , December 10, 2010 ¶ 355 (**AL RA 446**).

if the contradiction is such that it becomes impossible to understand the motives that led such tribunal to adopt its solution.

210. The Committee also agrees with the Claimants that a tribunal has no duty to follow the parties in the detail of their arguments, and that the sole fact of failing to address one or more of the same does not in itself entail annulment, unless the argument in question was so important that it would clearly have been determinative of the outcome. Likewise, a tribunal has no duty to address in its award all the evidence that is in the record, and failure to do so does not entail annulment unless the evidence that such tribunal failed to address was manifestly so important as to change the outcome of the arbitration. Apart from that situation, it is not the role of a Committee to step into the shoes of an arbitrator and engage into speculation as to the relevance that a piece of evidence that a tribunal did not address would have had on the award.

211. Finally, the control of the existence of reasons is exclusive of any review of the award on the merits, and a committee may not annul an award for failure to provide reasons on the basis that the reasoning is incorrect in fact or in law.

### (2) Jurisdictional finding concerning the existence of an investment

#### a. *Argentina's Position*

212. Argentina submits that the Tribunal failed to explain how the Claimants' shareholdings in the Spanish company Air Comet could be considered to be assets in Argentina, and how Air Comet's shareholdings in Interinvest could be considered to be assets acquired by the Claimants, in accordance with the definition of investment under the Argentina-Spain BIT and the ICSID Convention.[271]

#### b. *The Claimants' Position*

213. The Claimants submit that the Award did not fail to state the reasons on which the Tribunal supported its finding that the Claimants had standing to bring the Arbitration. The Tribunal

---

[271] Annulment Memorial, ¶ 249; Reply, ¶ 194.

explained its reasons on this issue clearly and coherently across more than 30 paragraphs, some of which are cited in paragraph 182 of the Claimants' Counter-Memorial.[272]

214.  The Claimants also contend that the Tribunal dedicated several pages in the Decision on Jurisdiction and in the Award explaining and describing the Claimants' various "investments" in Argentina, and they provide a summary of the Tribunal's reasoning and findings on this issue.[273]

### c.  *The Committee's Analysis*

215.  Contrary to Argentina's averment, the Tribunal's decision as to the existence of an investment and of an investor under the BIT is reasoned. The Tribunal explained why the Claimants qualified as investors under the BIT.[274] The Tribunal also explained, at paragraphs 208 to 232 of the Decision on Jurisdiction, why in its view Article I(2) of the BIT protected not only investments directly made in Argentina, but also indirect investments. The Tribunal also discussed in the Award whether the objective requirements of contribution and risk were met.[275] The reasoning followed by the Tribunal is exempt of contradictions. Argentina says that the Tribunal failed to apply the Vienna Convention in its interpretation of Article I(2) of the BIT.[276] But what matters in the context of Article 52(1)(e) is that there is an understandable explanation of how the Tribunal reached its conclusion. There is no failure to provide reasons unless such failure makes the decision impossible to understand, which is not the case here.

216.  Argentina also complains that the Tribunal relied on a decision made on the basis of another bilateral treaty.[277] However, such a circumstance does not constitute a failure to state reasons.

---

[272] Annulment Counter-Memorial, ¶ 178-184.

[273] Annulment Counter-Memorial, ¶ 185.

[274] Decision on Jurisdiction, ¶¶ 207, 214, 221-32.

[275] Award, ¶¶ 250-57, 267, 315, 373, 381.

[276] Annulment Memorial, ¶¶ 239; 246.

[277] Annulment Memorial, ¶ 244.

217.    Based on the foregoing, the Committee finds that the Tribunal did not fail to provide reasons in its jurisdictional findings.

### (3)    Lack of Capacity of the Claimants' Counsel

#### a.  *Argentina's Position*

218.    Argentina submits that the Tribunal contradicted itself in first accepting that Spanish law was applicable to King & Spalding's powers of attorney, to then ignore that same law that it had identified as applicable.[278]

#### b.  *The Claimants' Position*

219.     The Claimants' position on this issue is reflected under paragraphs 101-108 *supra*.

#### c.  *The Committee's Analysis*

220.    The Committee has already addressed Argentina's argument in the context of the discussion on manifest excess of powers.

221.    At paragraph 118 of this Decision, the Committee found that the Tribunal's reasoning on the validity of the powers of attorney was "*based on an analysis of the various legal provisions at stake, in view of the legal opinion of a Spanish law professor upon which the Claimants relied*", and that the Tribunal's findings rested "*on (i) the Tribunal's analysis of Article 61(2) of the Spanish Bankruptcy law, according to which the Retainer Agreement between the Claimants and King & Spalding was still in force in absence of termination, (ii) the Tribunal's analysis of Article 48(3) of that same law, according to which the powers of attorney had been "affected or limited" but not terminated as a consequence of the suspension, and  (iii) its finding that said powers had in any event been ratified by way of the undated letters signed by the insolvency administrators and that said ratification was not subject in Spanish law to a specific form*". The Committee also noted that "*[t]he Tribunal also found that the October 2015 public deeds were relevant to the question of the validity of the King & Spalding's powers of attorney and their authority to represent*

---

[278] Memorial, ¶¶ 254-261. Reply, ¶¶ 207-217.

*the Claimants in the arbitration.*"[279]  In the eyes of the Committee, these conclusions are reasoned and are not contradictory.

### (4)   Misappropriation of Funds Received from SEPI

#### a.  Argentina's Position

222.   Argentina first submits that the Tribunal contradicted itself by, on the one side, stating that the Claimants acknowledged that Air Comet did not pay the entirety of the USD 50 million capital contribution and, on the other side, finding that Argentina had failed to prove that Air Comet breached the SPA.[280] Argentina also avers,[281] with respect to the USD 300 million funds, that the Tribunal also contradicted itself by, on the one hand, acknowledging that the acquisition and subrogation of the debt had not been made in accordance with the SPA and, on the other, holding that "*there is no basis to conclude that the alleged non-compliance with the terms of the SPA has been made out nor that any deviation from the original terms of the SPA would provide a basis for finding that the transaction was illegal or would justify denying jurisdiction on the basis that the investment was not made in accordance with Argentina's legislation*".[282] Finally, Argentina complains that the Tribunal failed to address its argument relating to the USD 205 million funds.

#### b.  The Claimants' Position

223.   The Claimants essentially submit that SEPI never complained about the use of the funds under the SPA, and that there was no evidence that this matter was relevant to the jurisdiction or to the merits. The Tribunal's decision had clear record support, even if it was not stated so expressly.[283]

224.   Regarding Argentina's complaint that the Tribunal "*did not analyse or settle the issue concerning the use of the USD 205 million contributed to SEPI*",[284] the Claimants note that

---

[279] Decision on Provisional Measures, ¶ 172.
[280] Annulment Memorial, ¶ 263.
[281] *Ibid.*, ¶ 264.
[282] Award, ¶ 289.
[283] Tr. Day 1, 202:22-203:7.
[284] Claimants' Opening, slide 128, citing Annulment Reply, ¶ 96.

such funds were principally used for leasing and operational expenses,[285] and submit that the use of those funds were also subject to auditing by PriceWaterHouseCoopers under the terms of the SPA.

225.   The Claimants contend that Argentina had the remedy for this issue: it could have sought a supplementary decision under Article 49(2) of the ICSID Convention and Arbitration Rule 49, but it chose not to avail itself of that remedy, and it cannot now seek annulment under those same grounds here.[286]

### c.   *The Committee's Analysis*

226.   As an initial matter, the Committee notes that the Tribunal devoted no less than fifteen pages of its Award[287] to discuss in detail Argentina's averments concerning the use of the SEPI funds. In view of the Committee, in so doing, the Tribunal has provided a comprehensive and detailed answer to Argentina's arguments, which generally satisfies the requirement under Article 48(3) of the ICSID Convention that the Award be reasoned. The Tribunal had no duty to follow the Parties in the detail of their case and a failure to address each and every single argument put before it does not in itself amount to a failure to provide reasons. The Committee will now address the two specific complaints articulated by Argentina under Article 52(1)(e) of the Convention.

227.   Concerning first of all the argument relating to the use of the USD 50 million contribution, there is no contradiction in the Tribunal's reasoning. The Tribunal's conclusion that "*the Respondent has failed to demonstrate the alleged breach of the SPA*"[288] was based on its earlier finding that "*neither Party indicates that Air Comet was ever found to be in default of its obligation to make the USD 50 million investment, nor that SEPI took any steps under the SPA or otherwise in this regard*", and that "*the Spanish Audit Court concluded that Air Comet had complied with its obligation to increase the capital of ARSA by USD 50 million (albeit somewhat late). The Tribunal de Cuentas determined that Air Comet paid in cash*

---

[285] Claimants' Opening, slide 129, citing Rejoinder on Jurisdiction, ¶¶ 202, 212.
[286] Claimants' Opening, slide 131. Tr. Day 1, 203:8-203: 13.
[287] Award, pp. 69-84.
[288] Award, ¶ 305.

*approximatively 25% of the amount on February 9, 2003 and the balance by February 11, 2005*".[289] The Tribunal therefore explained that its finding that no breach occurred with regard to the USD 50 million payment was based on the fact that SEPI never complained about any breach, and that the Spanish Audit Court had found that the obligations provided by the SPA had been complied with.

228.    As concerns the USD 300 million funds, contrary to Argentina's averment,[290] the Tribunal did not acknowledge that the acquisition and subrogation had not taken place in accordance with the SPA. The exact words of the Tribunal are that "*while the acquisition and subrogation may not have been in accordance with the SPA as originally contemplated, the parties subsequently agreed to a different handling of the USD 300 million contributed by SEPI*".[291] Here again, the basis for the Tribunal's finding are clear: the Tribunal found that SEPI had acknowledged before the *Tribunal de Cuentas* that the way the funds had been used was permitted by the SPA.[292] As a consequence, there was no basis to find that the SPA had been breached. There was therefore no contradiction in the Tribunal's reasoning.

229.    Finally, for what concerns the USD 205 million funds, Argentina's argument is that this amount should have been used to extinguish debts and liabilities of ARSA and AUSA, and that they were instead used to pay off operating costs, fees and gasoline costs.[293] It is true that the argument is only cursively addressed in the Award. The Tribunal noted that "*SEPI later agreed to contribute an additional USD 205 million to cover the operational losses suffered by the Airlines between July and October 2001*",[294] but says nothing concerning the way these funds were effectively used.

230.    The Tribunal, however, appears to have implicitly concluded that SEPI had no complaint as to the way these funds had been used. The Tribunal, as a matter of fact, held that

---

[289] Award, ¶ 304.

[290] Annulment Memorial, ¶ 264.

[291] Award, ¶ 289.

[292] *Ibid.*, "*SEPI's position before the Tribunal de Cuentas was that this was permitted by the SPA*".

[293] Annulment Memorial, ¶ 271.

[294] Award, ¶ 377.

"*Claimants' investment was also the subject of further review by the Tribunal de Cuentas. In Report N°765 dated July 19, 2007, the court again addressed the transfer of the USD 300 million and the various other post-closing obligations contained in the SPA. In its conclusion, the court noted that SEPI had submitted a number of other documents, which did not demonstrate that the debts had been finally contributed to ARSA. This appears to have led the court to again address this subject in its next report (N°811), discussed below. The Court did note that SEPI submitted documentation demonstrating that other requirements under the SPA, such as Air Comet's capital contribution of USD 50 million to ARSA, had been performed*".[295]  The Committee understands the references to the "*the various other post-closing obligations contained in the SPA*" and to "*other requirements under the SPA*" to cover not only the USD 300 million and USD 50 million funds, but also the USD 205 million quantified based on Article 11 of the SPA. This means that the *Tribunal de Cuentas* had no objection as to the way these funds had been used. The Tribunal held that any breach of the SPA with respect to these payments could not affect jurisdiction, [296] and it also found that "*there is no basis to conclude that […] any deviation from the original terms of the SPA would provide a basis for finding that the transaction was illegal or would justify declining jurisdiction on the basis that the investment was not made in accordance with Argentina's legislation*".[297] These findings apply to the various funds paid by SEPI to Air Comet pursuant to Articles 9 and 11 of the SPA, including the USD 205 million. Because the Award allows understanding the Tribunal's findings on all aspects of the use of the SEPI funds, there is no failure to provide reasons, including with respect to the USD 205 million fund.

231. Finally, Argentina did not explain in the annulment proceedings why a departure from the SPA concerning these payments (i.e. the use of the USD 205 million to cover operational costs instead of debts and liabilities) would have been a breach of the principle of good faith in international law susceptible to entail the inadmissibility of the claims. As a consequence, any omission to deal with that argument would have been immaterial and

---

[295] Award, ¶ 285.
[296] Award, ¶ 267.
[297] Award, ¶ 289.

would not have been such as to entail the annulment of the Award for failure to provide reasons.

232.   Based on the foregoing, the Committee finds that the Tribunal did not fail to provide reasons concerning the use of the SEPI funds, and that any failure to provide reasons in respect of the USD 205 million argument would not be such as to entail the annulment of the Award.

### (5)   The July 2008 Agreement

#### a.   *Argentina's Position*

233.   Argentina submits that "*in establishing the international responsibility of Argentina for the breach of the BIT based on the non-compliance with the July 2008 Agreement and determining the damages flowing from such breach, the majority of the Tribunal failed to state reasons on crucial issues and incurred irreconcilable contradictions. This warrants annulment of the Award within the meaning of Article 52(1)(e) of the ICSID Convention.*"[298]

234.   Argentina first avers that the Award does not allow understanding how the breach of a contract could be a treaty breach.[299] Argentina further contends that the Tribunal's reasoning on the assessment of damages is completely illogical[300] and contradictory.[301] Finally, Argentina submits that the Tribunal failed to address the criticism raised in the arbitration to the Credit Suisse valuation.[302]

#### b.   *The Claimants' Position*

235.   The Claimants submit that the Tribunal did not fail to state reasons in finding that Argentina breached the BIT.[303] The Tribunal explained in detail the various elements of Argentina's

---

[298] Annulment Reply, ¶ 231. Annulment Memorial, ¶¶ 278-315. Annulment Reply, ¶¶ 231-272.
[299] Annulment Memorial, ¶ 288.
[300] *Ibid.,* ¶ 289.
[301] *Ibid.,* ¶¶ 295, 307.
[302] *Ibid.,* ¶¶ 308, 311.
[303] Counter-Memorial, ¶¶ 232-244.

conduct that gave rise to the breach of the July 2008 Agreement, why that breach also violated the FET standard, and the Tribunal further addressed Argentina's submission that contract breaches cannot be equated to the FET standard,[304] as well as its findings on quantum.[305]

### c.   The Committee's Analysis

236.   Concerning first of all Argentina's averment that the Award does not allow understanding how a breach of contract could be held to be a treaty breach, the Tribunal expressed clear and coherent reasons.

237.   The Tribunal has considered Argentina's argument that not every breach of contract by a State constitutes a violation of the duty of fair and equitable treatment. It accepted that proposition,[306] but nonetheless held that "*the July 2008 Agreement was not a simple commercial agreement*",[307] and therefore that "*Interinvest and the Claimants legitimately expected Respondent to comply with its commitment to purchase all the shares in the Airlines at the price determined by the agreed mechanism in Article 6 of the July 2008 Agreement*".[308] The Tribunal then found that Argentina's refusal to comply with the procedure established by Article 6 was a breach of these legitimate expectations and further found that its conduct "*in relation to the introductory message and bill seeking approval of the July 2008 Agreement, the adoption of Law N° 26,412, the objections as to the form of the Credit Suisse valuation, the injunction appointing a controller over the Airlines, the maintenance of Mr. Alak as General Manager of the Airlines and the decision to proceed by expropriation lacked transparency and was arbitrary*".[309] The Tribunal therefore concluded that Argentina "*breached the FET standard in the Treaty*".[310]

---

[304] *Ibid.,* ¶ 232. Award, ¶ 854.

[305] *Ibid.,* ¶¶ 92-93. Annulment Rejoinder, ¶¶ 138-144. Award, ¶¶ 1074-1092, 1098, 1102, 1105-07, 1109, 1111-14, 1116, 1127.

[306] Award, ¶ 854.

[307] *Ibid.*

[308] *Ibid.,* ¶ 855.

[309] *Ibid.,* ¶ 856.

[310] *Ibid.,* ¶ 857.

238.    It is not for the Committee to opine as to whether these findings are correct. These findings are however reasoned, clear, and understandable.

239.    Argentina also contends that the Tribunal failed to provide reasons for its decision to reject its umbrella clause argument. However, the Tribunal explained why it rejected the argument made by the Claimants, based on the BIT's MFN clause, to the effect that they would be entitled to rely on an umbrella clause.[311]

240.    For what regards the assessment of damages, Argentina's first argument is that the Tribunal's reasoning is contradictory because the Tribunal could not on the one hand accept that the function of damages is to replace the aggrieved party in the situation that would have prevailed in the absence of breach (i.e. an assessment of the price of the shares made by an independent valuator) and on the other hand fix damages on the basis of the valuation proposed by Interinvest in the price fixing procedure provided by Article 6 of the SPA.[312]

241.    The Committee finds no contradiction in the Tribunal's reasoning on point. The Tribunal concluded that "*the Credit Suisse valuation* [is] *the most reliable expression of the value of the Airlines as agreed by the Parties under the July 2008 Agreement and the best evidence of the fair market value of the Airlines in late 2008*".[313] That conclusion was based not only on an analysis of the Credit Suisse valuation, but also of third-party valuations made in the context of the May 2008 Agreement by Deloitte, Morgan Stanley and PriceWaterHouseCoopers.[314] The Tribunal also analysed the valuations proposed by Compass Lexecon for the Claimants,[315] and by KPMG for Argentina, which it found unreliable.[316] The Tribunal explained why in its view the Deloitte, Morgan Stanley, PriceWaterHouseCoopers and Credit Suisse third-party valuations were a reliable indicator

---

[311] Award, ¶¶ 884-892.

[312] Annulment Memorial, ¶ 295 seq.

[313] Award, ¶ 1112.

[314] *Ibid.,* ¶ 1102.

[315] *Ibid.,* ¶ 1105.

[316] *Ibid.,* ¶ 592.

of the value of the Airlines[317] and having compared them it found that the one proposed by Credit Suisse was the best evidence of the Airlines' fair market value in late 2008.

242.   Argentina's argument rests on a conceptual error: in adopting the Credit Suisse valuation, the Tribunal did in fact not purport to enforce the July 2008 Agreement. Argentina avers that Credit Suisse was not independent, and criticizes the Tribunal for holding that circumstance to be irrelevant.[318] Argentina further contends that this lack of independence did not allow the Tribunal to adopt its conclusions as being "*final and binding*", as provided by Article 6 of the July 2008 Agreement.[319] However, the Tribunal did not adopt the Credit Suisse valuation as the final and binding valuation provided by Article 6 of the July 2008 Agreement. Nor did it, as suggested by Argentina, adopt the Credit Suisse valuation as a substitute to the valuation provided for by Article 6 of the July 2008 Agreement.[320] It rather found, based on the other available valuations in the record, that the Credit Suisse valuation was the best available evidence of the fair market value of the Airlines at the time of the taking, which is different.

243.   The Tribunal found that the FET standard had been breached. It did not decide to order specific performance. As a consequence, in accordance with the full reparation standard in international law, the Claimants were entitled to damages equal to the fair market value of the Airlines at the time of the taking. The Tribunal found that fair market value was reflected by the Credit Suisse valuation. There is no contradiction in that reasoning. Nor is the Tribunal's reasoning unclear and even less incomprehensible.

244.   Whether, in assessing damages, the Tribunal over-compensated the Claimants is not a question that an *ad hoc* Committee has the power to assess under Article 52 of the ICSID Convention.

---

[317] *Ibid.,* ¶ 1106.

[318] Annulment Memorial, ¶ 312.

[319] *Ibid.*

[320] *Ibid.,* ¶ 314.

245. Argentina also points out that the Tribunal had acknowledged the difficult financial situation of the Airlines, which would be inconsistent with a valuation exceeding USD 300 million.[321] The Tribunal has indeed found that the Airlines were "*in a very difficult financial condition by the end of 2007 and early 2008*".[322] According to Argentina, this finding is contradictory with the assessment of a positive fair market value.

246. The Committee disagrees. As an initial matter, the Tribunal found that ARSA had no value and that only AUSA had value. Second, there is no conceptual inconsistency in finding that a company in a difficult situation may generate value in the future. Such a finding may well be based on the financial assumptions concerning the future business perspectives of the Airlines at the time of the taking, which an *ad hoc* committee may of course not assess or second guess.

247. The Committee will finally address Argentina's argument that the Tribunal failed to deal with the comments and criticisms contained in the KPMG report and in the TTN valuation report on the Credit Suisse valuation.[323] Argentina, in this respect, asserts that both reports made a number of specific criticisms to the Credit Suisse report, which the Tribunal should have considered and addressed.[324]

248. The Claimants respond that the Tribunal did discuss the KPMG and TTN reports in different parts of the Award.[325] These sections of the Award, however, do not discuss the criticism made by KPMG and TTN to the Credit Suisse report. These sections rather address the valuations proposed by KPMG and TTN, and explain why the Tribunal did not find them to be reliable.[326]

249. The Committee, however, does not believe that this situation can entail the annulment of the Award. As a matter of fact, as long as the award allows understanding the basis for the

---

[321] Annulment Memorial, ¶ 307.

[322] Award, ¶ 750.

[323] Annulment Memorial, ¶ 308 seq.

[324] Annulment Memorial, ¶ 310 for the KPMG report and ¶ 309 for the TTN report.

[325] For the KPMG report, Award, ¶¶ 510-511, 592-593, 823, 825, 1112-1113 (see transcript, Tr. Day 2 – 356:11 to 364:3); for the TTN report, Annulment Counter-Memorial, ¶ 278 (referring to ¶¶ 830-834 and 1112 of the Award.

[326] For KPMG report, Award, ¶¶ 592-593, dealing however with the different question whether airfare increases matched increases on the Airlines costs. For TTN, Award, ¶ 1112.

tribunal's findings (which it does), a tribunal has no duty to comment on the details of all the evidence produced by the parties. A failure by the Tribunal to comment on certain portions of an expert report produced by a party, which the Tribunal may have found to be irrelevant, is therefore not such as to entail the annulment of the Award. This is all the more so that Argentina does not allege to have relied, in its submissions before the Tribunal, on the parts of the KPMG and TTN reports upon which it now relies to sustain that the Tribunal failed to provide reasons.

250.    Based on the foregoing, the Committee finds that the Tribunal did not fail to provide reasons with respect to its assessment of the damages.

## V.    COSTS

### A.    ARGENTINA'S COST SUBMISSIONS

251.    In its submission on costs, Argentina argues that the Claimants should bear the total arbitration costs incurred by Argentina, including legal fees and expenses, totalling USD 884,319.88, broken down as follows:

| CONCEPT | ARS | USD |
|---|---|---|
| Translations | 93,467.95 | 2,296.51 |
| Airfare, accommodation, travel | 1,069,319.45 | 27,992.66 |
| Courier | 68,014.88 | 1,671.13 |
| Office supplies | 7,500.00 | 184.28 |
| Communication costs | 1,500.00 | 36.86 |
| ICSID costs | - | 725,000.00 |
| PTN personnel expenses | 2,981,134.97 | 127,138.46 |

| Total | 4,220,937.25 | 884,319.88 |
|-------|--------------|------------|

## B.   THE CLAIMANTS' COST SUBMISSIONS

252. In their submission on costs, the Claimants request that the Committee order Argentina to bear all the costs incurred by Claimants in this annulment proceeding, comprising Claimants' legal fees and expenses totalling USD 1,531,833.00, broken down as follows:

| CATEGORY | AMOUNT (IN USD) |
|----------|-----------------|
| Legal Fees & Expenses | |
| • King & Spalding | |
| Fees | $1,514,322.00 |
| Expenses | $17,512.00 |
| • TOTAL | 1,531,833.00 |

## C.   THE COMMITTEE'S DECISION ON COSTS

253. Article 61(2) of the ICSID Convention, applicable to this proceeding by virtue of Article 52(4) of the ICSID Convention, provides as follows:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

254.    The costs of the proceeding, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses, amount to (in USD): 359,060.45[327]

| Committee Members' fees and expenses | | |
|---|---|---|
| Mr. Alexis Mourre, | USD | 100,999.96 |
| Prof. Fernando Cantuarias Salaverrry, | USD | 67,903.54 |
| Mr. Ricardo Ramírez Hernández | USD | 53,796.93 |
| ICSID's administrative fees | USD | 84,000.00 |
| Direct expenses (estimated)[328] | USD | 52,360.02 |
| **Total** | **USD** | **359,060.45** |

255.    The above costs have been entirely paid out of the advances made by Argentina.[329]

256.    The Committee considers that, Argentina having failed in all the arguments that it has advanced in order to seek the annulment of the Award, it should bear the entirety of the costs of the proceedings. Argentina having advanced said costs in their entirety, the Claimants are not entitled to any payment in this respect.

257.    As to the Parties' legal costs and expenses, the Committee considers, for the same reasons, that the Claimants having prevailed in the annulment proceedings, they are entitled to be compensated for their costs. However, the Committee notes a significant disproportion between the representation costs of each party. While the Claimants have spent USD 1,514,322 in fees, Argentina has only spent 2,981,134.97 ARS (i.e slightly more than USD127,138.46). It is widely accepted that *ad hoc* committees enjoy a wide discretion in assessing the reasonableness of the parties' representation costs.[330] In view of the complexity of the case and the interests at stake, the Committee decides that the Claimants

---

[327] The ICSID Secretariat will provide the parties with a detailed Financial Statement of the case account once all invoices are received and the account is final.

[328] This amount includes estimated charges relating to the dispatch of this Decision (courier, printing and copying).

[329] The remaining balance will be reimbursed to Argentina.

[330] ICSID Convention Articles 52(4) & 61(2); Arbitration Rules 47(1)(j) & 53; Administrative and Financial Regulation 14(3)(e).  See ICSID's Updated Background Paper on Annulment"), ¶ 65 (**C-1217**) (**AL RA 421 bis**).

are entitled to be reimbursed of their representation costs in an amount of USD 1,000,000, in addition to their expenses, i.e. a total amount of USD 1,017,512.

## VI.   DECISION

258.   For the reasons stated *supra*, the Committee decides as follows:

(1)    Argentina's request for annulment is denied;

(2)    Argentina shall bear the entirety of the costs of the proceedings and shall pay to the Claimants an amount of USD 1,017,512 on account of their representation costs;

(3)    All other claims are dismissed.

_____
Prof. Fernando Cantuarias Salaverry
Committee Member

Date: 6 May 2019

_____
Mr. Ricardo Ramírez Hernández
Committee Member

Date: 9 may 2019

_____
Mr. Alexis Mourre
President of the *ad hoc* Committee

Date: 13 may 2019